ACCEPTED
03-15-00528-CV
7458584
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/20/2015 3:01:39 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00528-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/20/2015 3:01:39 PM
JEFFREY D. KYLE
Clerk

**TEXAS EDUCATION AGENCY AND MICHAEL WILLIAMS, COMMISSIONER OF EDUCATION, IN HIS OFFICIAL CAPACITY,**
*Appellants,*

**VS.**

**ACADEMY OF CAREERS AND TECHNOLOGIES, INC. D/B/A ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL,**
*Appellee.*

_____

On Appeal from the 200th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-15-002879

_____

**BRIEF OF APPELLANTS**
_____

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

ANGELA COLMENERO
Division Chief

ERIKA M. LAREMONT
Texas Bar No. 24013003
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 (PHONE)
(512) 320-0667 (FAX)

ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**
October 20, 2015

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellants herein provides this Court with the following list of parties and the names and addresses of all trial and appellate counsel:

| | |
|---|---|
| *Defendants-Appellants:* | Texas Education Agency ("TEA") and Michael L. Williams, in his Official Capacity as the Commissioner of Education |
| *Trial & Appellate Attorney for Defendants-Appellants:* | ERIKA M. LAREMONT<br>Texas Bar No. 24013003<br>Assistant Attorneys General<br>Office of the Attorney General<br>General Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, TX 78711-2548<br>PHONE: (512) 463-2120<br>FAX: (512) 320-0667 |
| *Plaintiff-Appellee:* | Academy of Careers and Technology, Inc., d/b/a Academy of Careers and Technology Charter School |
| *Trial and Appellate Attorneys For Plaintiff-Appellee:* | D. TODD SMITH<br>Texas Bar No. 00797451<br>Smith Law Group LLLP<br>1250 Capital of Texas Highway South T<br>Three Cielo Center, Suite 601<br>Austin, Texas 78746<br><br>STEPHEN M. FOSTER<br>Texas Bar No. 00792511<br>9013 Magna Carta Loop<br>Austin, Texas 78754<br>PHONE: (512) 784-4367 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................ ii

TABLE OF CONTENTS ................................................................................... iii

INDEX OF AUTHORITIES ................................................................................ v

STATEMENT OF THE CASE ............................................................................. 1

STATEMENT REGARDING ORAL ARGUMENT ................................................... 2

ISSUE PRESENTED ......................................................................................... 2

BRIEF OF APPELLANTS ................................................................................. 3

STATEMENT OF FACTS ................................................................................... 4

    I.    2012 SUNSET ADVISORY COMMISSION AND CHANGES TO TEXAS EDUCATION CODE. ................................................................ 4

    II.    THE TEXAS EDUCATION CODE PROVIDES FOR A LIMITED APPEAL PROCESS. ...................................................................................... 7

        A.    Appeal of academic and financial accountability ratings. ................................................................................... 7

        B.    Appeal of revocation decision. ...................................... 10

    III.    ACT FAILED TO MEET THE FINACIAL AND/OR ACADEMIC ACCOUNTATIBLITY RATING FOR THREE CONSECUTIVE YEARS. ................................................................ 11

    IV.    THE TEXAS EDUCATION CODE MANDATES REVOCATION OF ACT'S CHARTER SCHOOL ................................................. 14

SUMMARY OF ARGUMENTS ........................................................................... 16

ARGUMENT .................................................................................................. 17

    I.    STANDARDS OF REVIEW ................................................................ 17

        A.    Plea to the Jurisdiction ................................................ 17

        B.    Temporary Injunction .................................................. 18

        C.    Statutory Construction ................................................. 19

    II.    ACT HAS FAILED TO IDENTIFY THE VEHICLE IN WHICH IT MAY SEEK JUDICIAL REVIEW ................................................ 19

        A.    ACT Failed to Identify a Statutory Basis for Judicial Review of TEA's Accountability Ratings or Decision to Revoke ................................................................ 21

1. There is no statutory provision which allows this court to review TEA's rating decisions ...................21

2. There Is No Statutory Provision Which Allows This Court to Review TEA's Revocation Decision .......................................21

B. **ACT Failed to Demonstrate a Due Process Violation**. ...................................................................................23

1. ACT does not have a vested right in the charter contract ...........................................23

2. ACT failed to alleged a viable procedural-due-process claim ...........................................30

3. TEA applied the Texas Education Code neither arbitrarily nor capriciously in connection with ACT's accountability ratings or revocation.................................................32

C. **No Violation of Some Other Constitutional Right** ................34

1. ACT failed to demonstrate a property interest to substantiate its takings claim .....................................34

2. The Texas Education Code does not violate the Open Courts Provision .............................................37

III. **ACT'S ULTRA VIRES CLAIMS ARE MERITLESS, BARRED BY SOVEREIGN IMMUNITY, AND DO NOT SUPPORT THE DISTRICT COURT'S FINDING THAT ACT WOULD LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS** ........................................38

A. ACT failed to allege that the Commissioner acted without legal authority or failed to perform a ministerial act.................................................................38

B. ACT is seeking retroactive relief which is unavailable in an ultra vires action.................................................41

IV. **ACT FAILED TO DEMONSTRATE THE TRIAL COURT'S JURISDICTION AND, THEREFORE, THE TRIAL COURT ERRED BY DENYING TEA'S PLEA.** .......................................43

**PRAYER** ........................................................................................44

**CERTIFICATE OF COMPLIANCE** .................................................46

**CERTIFICATE OF SERVICE** ........................................................46

# INDEX OF AUTHORITIES

**Cases**

*Adler v. Duval County School Bd.*, 112 F.3d 1475 (11ᵗʰ Cir. 1997).........................41

*Bacon v. Hist. Comm'n*, 411 S.W.3d 161 (Tex. App.—Austin 2013,
  no pet.) ...............................................................................................................20

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ..................................................... 23, 24

*Byers v. Patterson*, 219 S.W.3d 514 (Tex.App.—Tyler 2007, no pet.) ...................32

*City of Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995)..................................41

*City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802 (Tex.
  1984).....................................................................................................................35

*City of Dallas v. Trammel*, 101 S.W.2d 1009 (Tex. 1937).....................................26

*City of El Paso v. Heinrich,* 284 S.W.3d 366 (Tex. 2009) .................... 38, 39, 41, 42

*City of El Paso v. Public Utility Comm'n of Tex.*, 883 S.W.2d 179
  (Tex. 1994) ..........................................................................................................33

*City of Elsa v. Gonzalez*, 325 S.W.3d 622 (Tex. 2010)...........................................18

*City of Elsa v. M.A.L.*, 226 S.W.3d 390 (Tex. 2007)..............................................41

*City of Houston v. Carlson*, 393 S.W.3d 350 (Tex. App.—Houston
  [14ᵗʰ Dist.] 2012, no pet.).....................................................................................30

*City of Houston v. Northwood Mun. Util. Dist. No. 1*, 73 S.W.3d 304
  (Tex.App.—Houston [1ˢᵗ Dist.] 2001, pet. denied)...............................................23

*City of Marshall v. City of Uncertain*, 206 S.W.3d 97 (Tex. 2006) ........................19

*City of Port Arthur v. Southwestern Bell Tel. Co.*, 13 S.W.3d 841
  (Tex.App.—Austin 2000, no pet.)..........................................................................37

*City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003).......................19

*Coastal Habit Alliance v. Pub. Util. Comm'n*, 294 S.W.32d 276 (Tex.
  App.—Austin 2009, no pet.) ................................................................................31

*Combs v. City of Webster*, 311 S.W.3d 85 (Tex.App.—Austin 2009,
  pet. filed)........................................................................................................ 23, 38

*Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458 (1981)......................................23

*Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality,* 307 S.W.3d 505 (Tex.App.—Austin 2010, no pet.) ........... 20, 38, 39, 41

*Creedmoor-Maha*, 307 S.W.3d 505 (Tex. App.—Austin 2010, no pet.) .................................................................................. 20, 37, 38

*Employees Ret. Sys. v. Jones*, 58 S.W.3d 148 (Tex. App.—Austin 2001, no pet.) ...................................................................................19

*Ex parte John M. Abell*, 613 S.W.2d 255 (Tex. 1981) ..................................... 24, 27

*Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401 (Tex. 1997)................................. 37, 38

*Gerst v. Nixon*, 411 S.W.2d 350 n. 8 (Tex. 1966) ......................................................33

*Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) ....................................................................................18

*Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709 (Tex. App.—Austin 2007, no pet.) ...............................................................17

*Hot Rod Hill Motor Park v. Triolo*, 276 S.W.3d 565 (Tex. App.— Waco 2008, no pet.)................................................................................18

*Houston Belt & Terminal Ry. Co. v. City of Houston*, 424 S.W.3d 663 (Tex.App.–Houston [14th Dist.] 2014, pet. filed) .....................................39

*In re Gamble*, 71 S.W.3d 313 (Tex. 2002) ............................................................18

*Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ............................................................18

*KEM Tex., Ltd. v. Texas Dep't of Transp.*, No. 03-08-00468-CV, 2009 Tex. App. LEXIS 4894 (Tex. App.—Austin 2009, no pet.)................................20

*Klumb v. Houston Mun. Emp. Pension Sys.*, 405 S.W.3d 204 (Tex. App.—Houston [1st Dist.] 2013, pet. filed)................................................. 25, 27

*Lazarides v. Farris*, 367 S.W.3d 788 (Tex.App.—Houston [14th Dist.] 2012, no pet.) .........................................................................................42

*Lee v. Tex. Workers' Compensation Comm'n*, 272 S.W.3d 806 (Tex.App.—Austin 2008)........................................................................ 24, 26

*McAllen Hosps., L.P. v. Suehs*, 426 S.W.3d 304 (Tex. App.— Amarillo 2014, no pet.) ............................................................................ 25, 27

*Mikeska v. City of Galveston*, 451 F.3d 376 (5th Cir. 2006) ....................................32

*Olim v. Wakinekona*, 461 U.S. 238 (1983) ...............................................24

*Paul v. Davis*, 424 U.S. 693 (1976) ........................................................23

*Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998) .........................23

*Pinnacle Charter Sch. v. Bd. of Regents*, 108 A.D.3d 1024, 969 N.Y.S.2d 318 (2013) ...................................................................28

*Pool v. River Bend Ranch*, LLC, 346 S.W.3d 853 (Tex. App.—Tyler 2011, pet. denied) ...............................................................18

*Project Reflect, Inc. v. Metro Nashville Bd. of Pub. Educ.*, 947 F. Supp. 2d 868 (M.D. Tenn. 2013) ............................................ 28, 29

*Project Sch. v. City of Indianapolis*, 2012 WL 3114573 (S.D. Ind. July 31, 2012).............................................................. 28, 30

*Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619 (Tex. 2011) ...........................................................19

*Reach Academy for Boys & Girls, Inc. v. Delaware Dept. of Educ.*, 46 F.Supp.3d 455 (D.Del. 2014) ........................................................28

*Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200 (11th Cir. 1997) .................................................................41

*Sch. Dist. of Kansas City v. Williamson*, 141 S.W.3d 418 (Mo. Ct. App. 2004)................................................................................28

*Scott v. Alphonso Crutch LSC Charter Sch., Inc.*, 392 S.W.3d 165 (Tex. App.—Austin 2010, pet. denied) (mem. op.) .......................... 23, 25, 27, 28

*Seguin v. Bexar Appraisal Dist.*, 373 S.W.3d 699 (Tex. App.—San Antonio 2012, pet. denied) ......................................................... 25, 27

*Sheffield Devel. Co. v. City of Glenn Heights*, 140 S.W.3d 660 (Tex. 2004)................................................................................35

*Simi Inv. Co. v. Harris County*, 236 F.3d 240 (5th Cir. 2000) ...............................32

*Society of Separationists, Inc. v. Herman*, 959 F.2d 1283 (5th Cir.), cert. denied, 506 U.S. 866 (1992)...............................................42

*Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556 (Tex.1985) ................................................................................23

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .................................41

*Suryanto v. Att'y Gen. of U.S.*, 398 Fed.Appx. 830 (3rd Cir. 2010) ........................23

*Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549 (Tex. App.—Austin 2013, pet. denied).............. 19, 40

*Tarrant County v. Ashmore*, 635 S.W.2d 417 (Tex. 1982) .....................................35

*Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170 (Tex. 2004) ........................................................ 20, 23, 38

*Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004)...............................................................................................................17

*Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636 (Tex. 1999)..................................20

*Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841 (Tex.App.—Austin 2002, no pet.)....................................................42

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)..........................................24

*Triantaphyllis v. Gamble*, 93 S.W.3d 398 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ...............................................................................18

*United States v. Or. State Med. Soc'y*, 343 U.S. 326 (1952)..................................41

*Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926 (Tex. 1995).............................31

*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992)....................................................18

*Walling v. Metcalfe*, 863 S.W.2d 56 (Tex. 1993)..................................................18

**Statutes**

19 TEX ADMIN. CODE §157.1183 (2015) ...............................................................10

19 TEX. ADMIN. CODE §109.1001 (a)(4)................................................................12

19 TEX. ADMIN. CODE §109.1001(a)(1) (2015) ......................................................7

19 TEX. ADMIN. CODE §109.1001(d)(1) (2015)......................................................8

19 TEX. ADMIN. CODE §109.1002(i)(2) .................................................................31

19 TEX. ADMIN. CODE §97.101(b) .........................................................................31

TEX. CIV. PRAC. & REM. CODE §51.014(a)(4).......................................................16

TEX. CIV. PRAC. & REM. CODE §51.014(a)(8) .......................................................16

TEX. CIV. PRAC. & REM. CODE §6.001..................................................................16

TEX. CONST. ART. I, §13 ................................................................36

TEX. CONST. ART. I, §17 ................................................................34

TEX. EDUC. CODE §12.101 .............................................................26

TEX. EDUC. CODE §12.106 .............................................................34

TEX. EDUC. CODE §12.107 .............................................................35

TEX. EDUC. CODE §12.115 (c-1) ...............................................7, 10

TEX. EDUC. CODE §12.115(a)...................................................15, 26

TEX. EDUC. CODE §12.115(c)........................................6, 10, 13, 26

TEX. EDUC. CODE §12.115(c)(3) ....................................................14

TEX. EDUC. CODE §12.116(a)..........................................................13

TEX. EDUC. CODE §12.116(c)..........................................................22

TEX. EDUC. CODE §12.116(c)(2) ...............................................14, 15

TEX. EDUC. CODE §12.1161 .......................................................35, 36

TEX. EDUC. CODE §12.128 ..............................................................34

TEX. EDUC. CODE §12.128(a)(2) .....................................................35

TEX. EDUC. CODE §12.128(c)..........................................................36

TEX. EDUC. CODE §39.053 ..............................................................43

TEX. EDUC. CODE §39.054(b) ..........................................................21

TEX. EDUC. CODE §39.082(g) .....................................................8, 31

TEX. EDUC. CODE §39.116(a)............................................................7

TEX. EDUC. CODE §39.116(e)............................................................7

TEX. EDUC. CODE §39.116(f)............................................................7

TEX. EDUC. CODE §39.151 ..............................................................31

TEX. EDUC. CODE §39.151(b) ............................................................9

TEX. EDUC. CODE §39.151(d) ..........................................................21

TEX. EDUC. CODE §39.151(e)........................................................9, 21

Tex. Educ. Code §39.152(a)..................................................................10

Tex. Educ. Code §39.152(c)(3) ........................................................ 10, 14

Tex. Gov't Code §311.021..................................................................19

Texas Civil Practive and Remedies Code §51.014(a)(4)...........................................1

Texas Civil Practive and Remedies Code §51.014(a)(8)...........................................1

**Rules**

Tex. R. App. P. 29.1(b)....................................................................16

Tex. R. App. P. 9.4(i)(3) ...................................................................45

**STATEMENT OF THE CASE**

*Nature of the Case:*    Appellee Academy of Careers and Technology, Inc., d/b/a Academy of Careers and Technology Charter School ("ACT"), is an open-enrollment charter school that sued TEA and the Commissioner of Education ("Commissioner") challenging the revocation of its charter. ACT alleges, *inter alia*, that TEA violated its substantive and procedural due process rights, and that the Commissioner acted *ultra vires* by revoking its charter.

*Trial Court:*    200th District Court, Travis County, Texas
The Honorable Gisela D. Triana

*Trial Court Disposition:*    The trial court denied Appellants' plea to the jurisdiction and granted Appellee's Request for Temporary Injunction. CR at 440-41 (order).

*Parties Below:*    Academy of Careers and eTechnologies, Inc., d/b/a Academy of Careers and Technologies Charter School, Plaintiff

Texas Education Agency ("TEA") and Michael L. Williams, in his Official Capacity as the Commissioner of Education, Defendants

*Jurisdiction:*    Following the trial court's denial of TEA's plea to the jurisdiction and grant of ACT's Request for Temporary Injunction, Appellants bring this appeal pursuant to Texas Civil Practive and Remedies Code §51.014(a)(4) and (8).

## STATEMENT REGARDING ORAL ARGUMENT

This case is factually similar to *Texas Education Agency and Michael Williams, Commissioner of Education, in his Official Capacity, v. American Youthworks, Inc., d/b/a American Youthworks Charter School, Honors Academy, Inc., d/b/a Honors Academy, and Two Azleway, Inc. d/b/a/ Azleway Charter School* Nos. 03-14-00283-CV and 03-14-00360-CV, which are currently on appeal before this Court. Oral Arguments were heard in these cases on September 24, 2015.

This case shares the same subject matter as *In Re Academy of Careers and Technology, Inc., d/b/a Academy of Careers and Technology Charter School*, Case No. 03-15-00570-CV, in which ACT filed a petition for writ of mandamus and sought emergency relief, which this Court granted and remains in effect.

Because the isues presented to the Court in this case are similar to the issues presented in the above-referenced cases, Appellants do not believe that oral argument will materially assist the Court in disposing of this matter. However, should Appellee request oral arguments which is then granted by this Court, Appellants request equal time for argument.

## ISSUE PRESENTED

1. Whether the district court erred when it denied the Commissioner's and the Texas Education Agency's plea to the jurisdiction and when it found that ACT demonstrated a probable right to the relief sought.

2

**No. 03-15-00528-CV**

_____

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT

_____

**TEXAS EDUCATION AGENCY AND MICHAEL WILLIAMS,
COMMISSIONER OF EDUCATION, IN HIS OFFICIAL CAPACITY,**
*Appellants,*

**VS.**

**ACADEMY OF CAREERS AND TECHNOLOGIES, INC. D/B/A
ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL,**
*Appellee.*

_____

On Appeal from the 200th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-15-002879

_____

**BRIEF OF APPELLANTS**

_____

TO THE HONORABLE COURT OF APPEALS:

For the reasons that follow, Appellants Texas Eduction Agency ("TEA") and

Commissioner Michael Williams ("Commissioner", jointly referenced as "TEA" or

"Appellants") respectfully show why this Court should reverse the trial court's

September 4, 2015 order, and dismiss this case for lack of jurisdiction or dissolve

the temporary injunctions and remand this case for trial.

**STATEMENT OF FACTS**

I.    **2012 SUNSET ADVISORY COMMISSION AND CHANGES TO TEXAS EDUCATION CODE.**

The Sunset Advisory Commission ("Sunset Commission") reviewed the Texas Education Agency in October 2012, preceding the commencement of the 83rd Texas Legislature.  The Sunset Commission noted that charter schools are public schools that "operate under decreased state regulation in exchange of increased accountability for results."  CR at 316. [1]   In its review of charter schools, the Sunset Commission identified the following issue:  "TEA lacks a full range of tools to effectively address poor academic performance and financial mismanagement at low-performing charter schools."  *Id*.  While many charter schools meet TEA educational expectations, charter schools experience higher rate of "academically unacceptable level than school districts."  CR at 317-18.   Further, the Sunset Commission noted that "[c]harter schools receive about 80 percent of their revenues in state aid, as compared to 41 percent for traditional school districts," and "[m]any charter schools also have poor financial performance, underscoring the importance of oversight of expenditure of state funds."  CR at 118.  Significantly, the Sunset Commission found, "Charter schools have far more accountability problems requiring assignment of interventions and sanctions, and ultimately, revocation of the charter.  Charter schools represent more than two-thirds, 71 percent, of schools

---

[1] For the convenience of the Court, the clerk's record will be referenced as, "CR at __" and the reporter's record will be referenced as, "RR at __."

assigned with sanctions, even though charter schools make up only 17 percent of the total number of districts and charters." CR at 318-19. The Sunset Commission further observed that "TEA lacked authority to revoke a charter for a school that is imminently insolvent and fails to plan for its student's education," leaving students susceptible to a charter school possibly closing mid-year due to lack of funds. CR at 320.

Although TEA had the authority to close a charter school and revoke the charter, the Sunset Commission criticized the process as unworkable, leaving students to be educated at underperforming charter schools. CR at 319. Of particular concern was the issue of "protracted litigation" concerning TEA's ability to timely revoke a charter and close an underperforming charter school. The report noted the two to three years it took to close a charter school prior to Sunset review, leaving students to be educated by an underperforming school. *Id.*

Based on these findings, the Sunset Commission recommended a change in statute that required the automatic revocation of a charter for failure to meet basic academic or financial accountability standards for three years in a row. CR at 326. It recommended that no appeal be permitted from the revocation determination. *Id.* According to the Sunset Commission, such a change in the law would:

> Allow the State to more quickly shut down the poorest performing charters, without years of litigation during which time the school remains open. The recommendation would also ensure students do not continue to attend a school lacking a quality education or with

serious financial problems that could affect the school and, ultimately, a student's academic progress.

*Id.*

The findings of the Sunset Commission demonstrate that there is a compelling state need to identify and close poor-performing charter schools in order to improve the choices available to parents and students. Thus, based on the Sunset Commission's recommendation, in 2013 Texas Legislature amended section 12.115 of the Texas Education Code to make mandatory the revocation of any open-enrollment charter school's charter if the school fails to meet financial and/or academic performance ratings in certain years. The Commissioner is now required to revoke a school's charter if one of three scenarios arises:

(1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39 [of the Education Code] for the three preceding years;

(2) the charter holder has been assigned financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

(3) the charter holder has been assigned any combination of the [unacceptable ratings under either subchapter].

TEX. EDUC. CODE §12.115(c).

Chapter 39, Subchapter C (academic performance) ratings allowed for 2009-2010 and 2010-2011 to be retroactively considered but specifically excluded ratings

for 2011-2012.[2]  *Id.* §12.115(c-1); *see also* TEX. EDUC. CODE §39.116(a), (e), and (f) (allowing Commissioner to suspend academic performance rating during transition period, but authorizing sanctions during the 2011-12 school year based on prior year performance ratings).  The Subchapter D (financial accountability) ratings to be considered are those assigned to the school for 2010-2011, 2011-2012, 2012-2013 and all years subsequent to the 2013 amendment.  TEX. EDUC. CODE §12.115 (c-1).

## II.     THE TEXAS EDUCATION CODE PROVIDES FOR A LIMITED APPEAL PROCESS.

### A.     Appeal of academic and financial accountability ratings.

Every public school or open-enrollment charter school is required to submit an audited annual financial report ("AFR") to TEA.  19 TEX. ADMIN. CODE §109.1001(a)(1) (2015).  This mandate is to ensure that "school districts and charter schools are spending [taxpayer] money appropriately and within the guidelines related to purchasing and required expenditures on programs and various other regulatory matters."  RR at 106: 22-p. 107: 7.  The AFR is required to be audited by an independent certified public accountant ("CPA").  RR at 108: 2-5; RR at 110: 2-4.  The school should prepare the financial statements and the auditor should then

---

[2] This provision was necessary because ratings were essentially "held over" during the 2011-12 school year, so a charter school that earned a failing rating in 2009-10 and 2010-11, could have been treated as having three strikes in 2011-12, but for the express exclusion of ratings for that year from 12.115(c).  *See* TEX. EDUC. CODE §39.116(e) (authorizing the imposition of sanctions during the 2011-12 school year for districts that had unacceptable performance during the prior school year).

review that information to ensure its accuracy and "free of material misstatements." RR at 108: 6-19; RR, Def. Ex. 1, p. 1. TEA uses the information contained in the AFR to calculate the school's financial accountability thus it is crucial that the information be true and correct. 19 TEX. ADMIN. CODE §109.1001(d)(1) (2015).

To further to goal of access to true and correct information, the Texas Education Code §39.082(g) states:

> Before assigning a final rating under the system, the commissioner shall assign each district or open-enrollment charter school a preliminary rating. A district or school may submit additional information to the commissioner relating to any indicator on which performance was considered unsatisfactory. The commissioner shall consider any additional information submitted by a district or school before assigning a final rating. If the commissioner determines that the additional information negates the concern raised by the indicator on which performance was considered unsatisfactory, the commissioner may not penalize the district or school on the basis of the indicator.

An AFR also includes opinions of the auditor regarding compliance. RR, Def. Ex. 1, p. 16-17. If the auditor makes comments that are negative or that the school disputes, the charter school may submit an AFR that is disapproved by the charter school board. RR at 110: 11-24. Furthermore, should a charter school submit the data prior to the deadline, it has up until the deadline to make any corrections necessary. RR at 38: 19-23; 114: 16-22. However, once the deadline passes, the information submitted by the school becomes final. The appeal process is not intended to correct mistakes made by the submitting school, but rather to correct errors made by TEA. RR at 113: 23 - p. 114: 3. Indeed, by the deadline to submit

8

the financial data, the information contained in the AFR has been reviewed by an independent CPA auditor and verified by the school. RR at 114: 8-10. TEA does not and cannot second-guess the information provided by school districts and charter schools. *Id*. at 114: 11-15.

After a school district or charter school receives its accountability or financial ratings, it has an opportunity to appeal the ratings to the Commissioner. TEX. EDUC. CODE § 39.151(a). Should a charter school seek to appeal a financial or academic rating and notify the Commissioner of such, the Commissioner must appoint a committee to make recommendations to the Commissioner on any challenge made to an agency decision. TEX. EDUC. CODE §39.151(b). After considering the committee's recommendation, the Commissioner makes a final decision. TEX. EDUC. CODE §39.151(d). The Commissioner's decision following any appeal is final, and the Legislature expressly prohibited any additional appeal from this final determination in "any other proceeding" if the charter "has had an opportunity to challenge the decision under [section 31.151]. TEX. EDUC. CODE §39.151(e).

An accountability rating becomes final if a school does not appeal or after TEA considers the appeal. Once a rating is final, it is not subject to further appeal. TEX. EDUC. CODE §39.151(e). TEA uses final accountability ratings to make accreditation decisions. CR at 318 ("Continued poor performance on academic and financial accountability ratings can lower a district's or charter's accreditation status...."). A school is required to be accredited to operate, so once TEA has final

9

accountability ratings, it can determine which schools may or may not open the next school year. RR at 114: 22- p. 115: 8.

## B.     Appeal of revocation decision.

If a charter school earns an unacceptable financial accountability rating or lower than satisfactory academic accountability rating or any combination of the two for three consecutive years, the Commissioner must begin proceedings to revoke the school's charter. TEX. EDUC. CODE §12.115(c), (c-1). This process begins when TEA notifies the charter school of its intent to revoke, specifying the reasons for the revocation decision and explaining that the "charter holder has the right to request an informal review regarding the Commissioner's intent to revoke the charter and appoint a conservator." CR at 61-64. The notice also states that if the charter school requests an informal hearing but the Commissioner's decision to revoke does not change, that the charter school may appeal the Commissioner's decision to close a school to the State Office of Administrative Hearings ("SOAH"). TEX. EDUC. CODE §39.152(a). The school must file a petition for review and meet certain requirements for the petition to be granted. 19 TEX ADMIN. CODE §157.1183 (2015). The decision of the administrative law judge is final and may not be appealed. TEX. EDUC. CODE §39.152(c)(3).

**III.    ACT    FAILED    TO    MEET    THE    FINACIAL    AND/OR    ACADEMIC    ACCOUNTATIBLITY RATING FOR THREE CONSECUTIVE YEARS.**

Academy of Careers and Technologies Charter School (hereinafter "ACT") was originally issued a state charter in 1998.  CR at 333-340.  In 2012, 2013, and 2014 TEA found that ACT failed to meet the state's financial accountability standards.  CR 342-349; *see also* CR 4-5.  A passing financial accountability score is 50.  CR at 346-348.  ACT scored a 47 in 2012 based on its financial data for the 2010-11 school year.  CR at 346.  It scored a 45 in 2013 related to financial information for the 2011-12 school year.  CR at 347.  In 2014, ACT received a 0 score related to financial information for the 2013-14 school year.  CR at 348.

The evidence demonstrated that: (1) ACT, not some third-party, submitted each of the financial reports at issue to TEA (RR at 37: 11-16); (2) ACT provided the information that was reviewed by the auditor ACT hired (RR at 37: 7-10); (3) ACT also was aware that the auditor it hired found deficiencies with ACT's internal controls (RR at 40: 5-19); (4) in 2013, prior to submitting the annual financial report to TEA, ACT was aware that the auditor it hired found "that ACT was failing to properly recognize fixed assets, loan proceeds and loan disbursements" (RR at 41: 7-13); (5)  the auditor noted that ACT "failed to remit federal payroll taxes to the Internal Revenue Service (IRS)" and that at the time of the 2014 audit, ACT owed $308,628 (including penalties and interest) for taxes owned for the fourth quarter of 2011, all of 2012 and the first two quarters of 2013 (RR, Def. Ex. 3, p. 11); (6) prior

11

to the submission to TEA, ACT reviewed and approved the each of the disputed annual financial and compliance reports (RR at 35: 5-17; RR at Def. Ex. 1, Certification page; 44: 24-p. 45: 6 ("Correct.")); and (7) ACT accepted responsibility for the information contained in the annual financial reports once submitted to TEA. RR at 36: 16- p. 37: 2.

According to Paula Applin, Chairman of the Governing Board of ACT, who also holds a degree in finance (RR at 19: 3-4; 20:3-7), ACT received a failing score on its financial accountability rating in 2010-11 due, in part, to ACT's failure to properly account for a property loan, an issue identified by the auditor prior to submission to TEA. RR at 41: 14-20. Indicator 14 asks: Was the charter school's administrative cost ratio less than the threshold ratio? ACT received a "0" score on this indicator in 2012 and 2013 because the administrative costs ACT reported exceeded the Finaincial Integrity Rating System of Texas ("FIRST")[3] rating threshold ratio for that indicator.

However, years later, in March 2015 ACT filed an appeal with TEA and for the first time argued that it accidently included debt services as part of their administrative costs rather than include it as "debt services" which is a separate

---

[3] "FIRST" is the financial accountability rating system administered by the TEA in accordance with Texas Education Code §39.082 and §39.085. The system provides additional transparency to public education finance and meaningful financial oversight and improvement for school districts (School FIRST) and open-enrollment charter schools (Charter FIRST). *See* 19 TEX. ADMIN. CODE §109.1001 (a)(4).

indicator[4] in its 2011 and 2012 AFR.  RR at 47: 12-21.  ACT believes that it should be permitted to make the correction which would allow them to receive the full five (5) points allotted to Indicator 14 which would give them a passing scores on the 2012 and 2013 financial accountability rating.  CR at 77.

In 2014, ACT once again failed the financial accountability rating for failing to disclose that it was in default on a debt, which resulted in an automatic failure.  The issue in 2014 was ACT failure to disclose payroll tax liability.  RR, Def. Ex. 3, p. 18; RR at 52: 20- 536.  ACT timely appealed only to present evidence of the tax liability.  RR, Def. Ex. 4.  Thus, its appeal was dismissed.  However, ACT again sought to appeal the issue regarding the tax liability with another, albeit untimely, appeal in March 2015.  CR at 112-117.

In 2014, ACT also received a failing academic performance rating.  CR at 349.  It failed to meet the "post-secondary readiness" index and received an accountability rating of "Improvement Required."  *Id*.  An "Improvement Required" rating is "an unacceptable performance rating under the accountability system used by the Texas Education Agency . . . ."  CR at 358, ¶5.

Based on ACT's failing accountability ratings, TEA issued a notice of revocation in December 2014 pursuant to Texas Education Code, Section 12.115(c).  ACT requested an informal review of the revocation by TEA.  RR at 63; 21-23; *see*

_____

[4] It should be noted that ACT included part of the January 2010 TEA Resource Guide as part of its March 2015 appeal.  That guide clearly stated that principal and interest on long-term debt should be included as "debt service."

*also* TEX. EDUC. CODE §12.116(a).  However, TEA reaffirmed the revocation.  CR at 355.

ACT also appealed its revocation to SOAH.  RR at 64: 3-5; CR at 361-376. The Administrative Law Judge ("ALJ") affirmed ACT's revocation. CR at 362.  The ALJ's determination is final and may not be appealed.  TEX. EDUC. CODE §12.116(c)(2).

## IV. THE TEXAS EDUCATION CODE MANDATES REVOCATION OF ACT'S CHARTER SCHOOL.

The Commissioner had no discretion but to revoke ACT's charter, since its failings in 2012, 2013 and 2014 represented three consecutive years of failure as defined by Texas Education Code §12.115(c)(3).  The Commissioner and TEA notified ACT of this fact on December 8, 2014.  CR at 342-349.

ACT sought an informal hearing regarding the revocation.  CR at 5 (3rd full paragraph).  A review was conducted, but the decision to revoke ACT's charter was upheld.  CR at 355-357.  ACT also availed itself of an appeal before SOAH.  CR at 5 (4th full paragraph).  Because there were no material factual issues in dispute, TEA filed a Motion for Summary Disposition, which provided the basis for a final decision and order of SOAH upholding the Commissioner's decision to revoke ACT's charter.  CR at 361-376.  This decision is not subject to appeal.  TEX. EDUC. CODE §39.152(c)(3).

Put simply, in December 2014, ACT failed to meet minimum financial and academic accountability standards for three consecutive years, the Commissioner of Education revoked its charter, an action he was required by law to take. *See* TEX. EDUC. CODE §12.115(a). ACT availed itself of an informal review by the TEA and then sought review before the SOAH. On May 21, 2015, the ALJ upheld the revocation of ACT's charter. By law, the ALJ's decision may not be appealed. *Id.* §12.116(c)(2).

More than two months after the revocation became final, and seven months after it received notice of the revocation, ACT sued in district court asserting that TEA and the Commissioner violated its rights to substantive and procedural due process, takings, and violation of the open courts provision, in addition to seeking declaratory relief and a temporary injunction prohibiting the Commissioner from engaging in various alleged *ultra vires* actions. CR at 3-20. Specifically, ACT sought judicial review of the appeals process only as it relates to the accountability ratings. CR at 3-20. ACT did not challenge the process by which TEA revokes charters; it only sought to have another chance to submit corrected financial data related to its failing rating in 2012 and/or 2013.

TEA and the Commissioner (hereinafter "TEA" or "Appellants") filed a Plea to the Jurisdiction and an Amended Plea to the Jurisdiction and Repsonse to ACT's Request for Temporary Injunction. CR at 293-407. A court hearing on ACT's

temporary injunction was heard on August 13, 2015 (RR at 3) and the court considered TEA's Plea by submission. RR at 134.

On August 21, 2015, the Friday before the start of the school year, the trial court notified the parties of its intent to enter a temporary injunction effectively prohibiting TEA from taking any action to wind up the failed charter school. CR at 421. The injunction was entered on September 4, 2015, two weeks after the start of the school year. CR at 440-441. The injunction ordered ACT to remain open; permits ACT to retain state-owned property for its own use; forces the State to fund a financially and academically unsuccessful school; and keeps children in a school that is not delivering a minimally accredited education. *Id.*

TEA filed an appeal of the temporary injunction and the denial of its Plea to the Jurisdiction pursuant to TEX. CIV. PRAC. & REM. CODE §§51.014(a)(4) and (8). The appeal automatically superseded the temporary injunction. TEX. R. APP. P. 29.1(b); TEX. CIV. PRAC. & REM. CODE §6.001.

## SUMMARY OF ARGUMENTS

ACT failed to establish jurisdiction for its collateral attack of final accountability ratings as the basis for revocation of its charter. ACT also failed to establish a constitutionally-protected property interest which is required for its due process and takings claims. Likewise, the evidence presented to the trial court clearly demonstrated that the Commissioner acted pursuant to the statute, which

mandated a certain course of action and was, therefore, protected by sovereign immunity. This defeats ACT's *ultra vires* claims.

Like many charter schools before it, ACT's suit simply seeks to attack final, non-appealable administrative accountability ratings. This Court has repeatedly held that such an attack is jurisdictionally barred, and the Uniform Declaratory Judgments Act cannot be used to make an end-run around the jurisdictional bar. As a result, ACT failed to show that the trial court had subject-matter jurisdiction to consider any of its claims, and the trial court erred by denying Appellants' Plea to the Juridiction.

## ARGUMENT

### I.   STANDARDS OF REVIEW.

#### A.   **Plea to the Jurisdiction**.

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709, 716 (Tex. App.—Austin 2007, no pet.). Whether a court has subject-matter jurisdiction and whether a plaintiff has affirmatively demonstrated subject-matter jurisdiction are questions of law that are reviewed *de novo*. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

In deciding a plea to the jurisdiction that challenges the pleadings, the reviewing court determines whether the pleader has alleged facts that affirmatively

17

demonstrate the court's jurisdiction to hear the cause. *Id.* The pleadings are liberally construed in the plaintiffs favor. *Id.* If a plea to the jurisdiction challenges the existence of jurisdictional facts, the court considers relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *Id.* at 227.

A trial court's order granting a temporary injunction is reviewed for abuse of discretion. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). Accordingly, questions of law, including whether a trial court has subject matter jurisdiction, are reviewed *de novo*. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010).

### B.    Temporary Injunction.

To obtain a temporary injunction, the applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Walling*, 863 S.W.2d at 57. Because an injunction is an equitable remedy, a court must balance the competing equities at stake. *See In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 690 (Tex. App.—Houston [1ˢᵗ Dist.] 2007, no pet.); *Pool v. River Bend Ranch*, LLC, 346 S.W.3d 853, 860 (Tex. App.—Tyler 2011, pet. denied); *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 478 (Tex. App.—Dallas 2010, no pet.). Consideration of the equities

involves weighing the public interest against the injury to the parties from the grant or denial of injunctive relief. *See Hot Rod Hill Motor Park v. Triolo*, 276 S.W.3d 565, 568 (Tex. App.—Waco 2008, no pet.); *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 401–02 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

### C.  Statutory Construction.

An agency's construction of a statute that it is charged with enforcing is entitled to serious consideration by reviewing courts so long as that construction is reasonable and does not contradict the statute's plain language of the statute. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619 (Tex. 2011); *Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 560-62 (Tex. App.—Austin 2013, pet. denied); *Employees Ret. Sys. v. Jones*, 58 S.W.3d 148, 151 (Tex. App.—Austin 2001, no pet.). Additionally, when construing a statute, courts must consider the statute in its entirety, assume the entire statute is effective, and avoid an absurd result. TEX. GOV'T CODE §311.021; *City of Marshall v. City of Uncertain*, 206 S.W.3d 97, 105 (Tex. 2006) (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003)).

## II.  ACT HAS FAILED TO IDENTIFY THE VEHICLE IN WHICH IT MAY SEEK JUDICIAL REVIEW.

ACT does not believe the Commissioner and TEA should have revoked its charter because two to three years after-the-fact, it uncovered purported clerical

19

errors to its 2012 and/or 2013 AFR that it attributes to either a third party and/or TEA. It contends that these errors resulted in two of the four failing accountability ratings it received from 2012-2014. TEA's accountability ratings are considered administrative decisions or action. *See Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality,* 307 S.W.3d 505, 524 (Tex.App.—Austin 2010, no pet.). In Texas there is no inherent right to judicial review of agency orders. *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *Bacon v. Hist. Comm'n*, 411 S.W.3d 161, 173-74 (Tex. App.—Austin 2013, no pet.) ("One implication of these principles is that there is no general right to challenge or seek review of a state agency order or decision in Texas state court; to the contrary, state agency decisions generally cannot be challenged in court unless the Legislature has enacted a statute expressly authorizing such review."); *Creedmoor-Maha*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.) (UDJA actions "that seek declaratory or injunctive relief against agency orders from which the legislature has not granted a right of judicial review" are barred by state sovereign immunity); *KEM Tex., Ltd. v. Texas Dep't of Transp*., No. 03-08-00468-CV, 2009 Tex. App. LEXIS 4894, at *8-18 (Tex. App.—Austin 2009, no pet.) (challenge to non-appealable agency order barred by sovereign immunity). A person may obtain judicial review of a final decision issued after a contested case or if the action adversely affects a vested property right or otherwise violates a constitutional right. *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 196-98 (Tex. 2004).

20

**A.** **ACT Failed to Identify a Statutory Basis for Judicial Review of TEA's Accountability Ratings or Decision to Revoke.**

*1.* *There is no statutory provision which allows this court to review TEA's rating decisions.*

Chapter 39 of the Texas Education Code, entitled "Public School System Accountability," governs the financial and academic performance system used to review both traditional public schools and charter schools. *See* TEX. EDUC. CODE §39.054(b). Section 39.151, however, limits the review of any accountability determination to review by the Commissioner and expressly exempts the decision from review by SOAH or a State District Court. *See id.*, at §§39.151(d) & (e). Thus, there is no statute affording ACT the right to judicial review of its accountability ratings.

*2.* *There Is No Statutory Provision Which Allows This Court to Review TEA's Revocation Decision.*

Section 12.115(c) of the Texas Education Code provides:

The commissioner shall revoke the charter of an open-enrollment charter school if:

(1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding years;

(2) the charter holder has been assigned an unacceptable financial accountability rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

(3) the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.

TEX. EDUC. CODE §12.115(c).

The Legislature directed that the Commissioner's decision to revoke a charter can be reviewed only by SOAH, and that an ALJ's review of that charter-revocation decision is final and unappealable. Section 12.116(c) provides:

A decision by the commissioner to revoke a charter is subject to review by the State Office of Administrative Hearings. Notwithstanding Chapter 2001, Government Code:

(1) the administrative law judge shall uphold a decision by the commissioner to revoke a charter unless the judge finds the decision is arbitrary and capricious or clearly erroneous; and

(2) a decision of the administrative law judge under this subsection is final and may not be appealed.

TEX. EDUC. CODE §12.116(c). Accordingly, the Commissioner's revocation decision is final unless it is appealed to SOAH, and the SOAH ALJ's decision either upholding or reversing the Commissioner's decision is unappealable. Thus, ACT had no right to judicial review of the revocation decision, the district court lacked jurisdiction over this claim, and the district court clearly erred in denying TEA's Plea to the Jurisdiction.

**B.      ACT Failed to Demonstrate a Due Process Violation.**

*1.      ACT does not have a vested right in the charter contract.*

ACT argues that the statutory procedures related to accountability ratings employed by TEA violated their substantive and procedural due process rights.  CR at 11-14.  ACT must be able to demonstrate that it possessed a ***vested property right*** as the basis of its due process claim.  *See Combs v. City of Webster*, 311 S.W.3d 85, 92 (Tex.App.—Austin 2009, pet. filed) (citing *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 560–62 (Tex.1985); *Texas Department of Protective and Regulatory Services v. Mega Child Care, Inc.*, 145 S.W.3d at 173;  *City of Houston v. Northwood Mun. Util. Dist. No. 1*, 73 S.W.3d 304, 311 (Tex.App.—Houston [1ˢᵗ Dist.] 2001, pet. denied)).  ACT cannot establish such an interest.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to" the continuation of the charter.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Such entitlements are, "'of course . . . not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  *Paul v. Davis*, 424 U.S. 693, 709 (1976) (quoting *Roth*, *supra*, at 577,); *see also Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998).

Further, a right is "vested" when it has some definitive, rather than potential, existence. *Scott v. Alphonso Crutch LSC Charter Sch., Inc.,* 392 S.W.3d 165, 170-71 (Tex. App.—Austin 2010, pet. denied) (mem. op.). As a general matter, "[w]hen the decision to grant or withhold a benefit is entrusted to the discretion of a government actor, one has no constitutional property interest in obtaining that relief." *Suryanto v. Att'y Gen. of U.S.*, 398 Fed.Appx. 830, 834 (3rd Cir. 2010) (citing *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). "If the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected . . . interest." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (finding no legitimate claim of entitlement where there were "no standards governing the administrator's exercise of his discretion" to transfer an inmate) (citation omitted); *Lee v. Tex. Workers' Compensation Comm'n*, 272 S.W.3d 806, 817 (Tex.App.—Austin 2008) (citing *Olim*, 461 U.S. at 249). In other words, there is no protected property interest where the decision to remove a benefit is left to the "unfettered discretion" of the government actor. *See Roth*, 408 U.S. at 566–67 (concluding a nontenured university professor had no property interest in his position because "State law . . . clearly leaves the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials."); *Lee*, 272 S.W.3d 817-18.

Thus, if the decision to grant the charter is left to the discretion of the commissioner, no property interest is created by granting the charter. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *see also Ex parte John M. Abell*, 613 S.W.2d 255, 262 (Tex. 1981) ("When the authority granting the right has the power and discretion to take that right away, it cannot be said to be a vested right"); *Seguin v. Bexar Appraisal Dist.*, 373 S.W.3d 699, 709 (Tex. App.—San Antonio 2012, pet. denied) (taxpayer did not have vested property right in disabled-veteran tax exemption that was "legislatively revocable"); *Klumb v. Houston Mun. Emp. Pension Sys.*, 405 S.W.3d 204, 226 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) ("[A] pensioner in a statutory pension plan does not have a vested right to his pension."); *McAllen Hosps., L.P., d/b/a McAllen Medical Center and d/b/a Edinburg Regional Medical Center and d/b/a Edinburg Children's Hospital and d/b/a McAllen Heart Hospital and Fort Duncan Medical Center, L.P., d/b/a Fort Duncan Regional Medical Center v. Thomas Suehs, Executive Commissioner of the Texas Health and Human Services Commission, Douglas Wilson, Inspector 2 General of the Health and Human Services Commission; Texas Health and Human Services Commission, et al.,* 426 S.W.3d 304, 313 (Tex. App.—Amarillo 2014, no pet.) (hospitals lack vested property right/interest in Medicaid reimbursement payments that were "contingent and potential rather than definitive and unconditional" prior to utilization review);

*Robert Scott, Commissioner of Education v. Alphonso Crutch LCS Charter Sch., Inc.*, 392 S.W.3d at 170-71 (concluding that, because allocation to which charter school was entitled for a given time period was subject to change depending on updated attendance figures during school year, the school's "interest in a definite amount" was not vested and "remain[ed] contingent rather than unconditional, and potential rather than definitive").

ACT's mistakenly believes that its interest in the continuation of its charter contact is sufficient to vest a property interest. CR at 4. However, the expectation of continuing its charter is not a vested interest, but rather a "mere expectancy created by the law and liable to be revoked or destroyed by the same authority." *City of Dallas v. Trammel*, 101 S.W.2d 1009, 1012 (Tex. 1937) (quoting John D. Dillon, Municipal Corporations § 431 (5th Ed. 1911)); *see Lee*, 272 S.W.3d at 818 ("It is well established that the legislature, 'which creates the property interest in the first place, may also take it away.'").

The Legislature created charters, and the ability to grant a charter is left entirely up to the discretion of the Commissioner. TEX. EDUC. CODE §12.101. Thus, even if a charter school meets all of the statutory requirements, the Commissioner may still deny the charter. Moreover, notwithstanding section 12.115(c), has required the Commissioner to revoke a school's charter when the school materially violates the terms of the charter, fails fiscal or academic accountability standards, fails to protect students enrolled in the school, or becomes imminently insolvent. *Id.*

§12.115(a)(1)-(6).[5] Moreover, nothing in the statute or in ACT's charter prohibits the Legislature from changing those standards, and the Legislature could abolish the charter-school system entirely if it chose to do so. *See Ex parte John M. Abell*, 613 S.W.2d at 262 ("When the authority granting the right has the power and discretion to take that right away, it cannot be said to be a vested right."); *Seguin*, 373 S.W.3d at 709 (taxpayer did not have vested property right in disabled-veteran tax exemption that was "legislatively revocable"); *Klumb*, 405 S.W.3d at 226 ("[A] pensioner in a statutory pension plan does not have a vested right to his pension."); *McAllen Hosps., L.P. v. Suehs*, 426 S.W.3d at 304 (hospitals lack vested property right/interest in Medicaid reimbursement payments that were "contingent and potential rather than definitive and unconditional" prior to utilization review); *Robert Scott, Commissioner of Education v. Alphonso Crutch LCS Charter Sch., Inc.*, 392 S.W.3d at 170-71 (concluding that, because allocation to which charter school was entitled for a given time period was subject to change depending on updated attendance figures during school year, the school's "interest in a definite amount" was not

---

[5] ACT's charter contract mirrors this statutory framework, expressly providing that: the "commissioner in his sole discretion make take any action authorized by Section 39.131, TEC or Chater 29, TEC relating to the charter contract." *See, e.g.* CR at 189; and the "Board in its sole discretion may modify, place on probation, revoke or deny timely renew of a charter for cause ("adverse action."). *Id.* "Adverse Actions" include (a) a material violation of the terms of the charter listed in paragraphs 2 and 3, including accountability provisions; (b) failure to satisfy generally accepted accounting standards of fiscal management; or (c) failure to comply with an applicable law or rule." *Id.* The charter holders agree to these terms, understand their obligations under the contract and the law, and should know that any rights to the charter are conditioned upon the law and satisfaction of the contractual terms.

vested and "remain[ed] contingent rather than unconditional, and potential rather than definitive").

At present, there is no Texas state case directly dealing with a charter school's right to its charter contract,[6] *but see Robert Scott, Commissioner of Education v. Alphonso Crutch LCS Charter Sch., Inc.*, 392 S.W.3d at 170-71, other jurisdictions have determined that a charter contract does not create a property interest. *See Reach Academy for Boys & Girls, Inc. v. Delaware Dept. of Educ.*, 46 F.Supp.3d 455, 457 (D.Del. 2014) ("[T]he renewal of Reach's charter, is not an interest protected by the Fourteenth Amendment's Due Process Clause."); *Project Reflect, Inc. v. Metro Nashville Bd. of Pub. Educ.*, 947 F. Supp. 2d 868, 878-79 (M.D. Tenn. 2013) (concluding that a charter school did not have a constitutionally protected interest in its charter under Tennessee law because the statutory provision governing charter revocation "uses the language of discretion, not entitlement, and only minimally conditions that exercise of discretion"); *Project Sch. v. City of Indianapolis*, 2012 WL 3114573, at *3 (S.D. Ind. July 31, 2012) (concluding that there was no protected property interest in a charter under Indiana law because "the charter school statute frames the decision to revoke a charter as a discretionary matter"); *Pinnacle Charter Sch. v. Bd. of Regents*, 108 A.D.3d 1024, 969 N.Y.S.2d 318, 320 (2013) ("[T]he

---

[6] Currently pending before this Court is *Texas Education Agency and Michael Williams, Commissioner of Education, in his Official Capacity, v. American Youthworks, Inc., d/b/a American Youthworks Charter School, Honors Academy, Inc., d/b/a Honors Academy, and Two Azleway, Inc. d/b/a/ Azleway Charter School* Nos. 03-14-00283-CV and 03-14-00360-CV, in which Appellees assert the same property interest in the charter.

28

New York Charter Schools Act . . . creates no constitutionally protected property interest in the renewal of a charter. . . ."); *State ex rel. Sch. Dist. of Kansas City v. Williamson*, 141 S.W.3d 418, 427 (Mo. Ct. App. 2004) ("[J]ust as a prospective charter school has no protected property interest at stake regarding an initial charter application, the school also has no protected property interest under the Charter Schools Act with regard to renewal of its charter.").

In *Project Reflect, Inc. Smithson Craighead Middle School v. Metropolitan Nashville Board of Public Education*, 947 F.Supp.2d 868, (M.D. Tennessee, 2013), the Tennessee district court considered whether a charter school sponsor (an entity similar to a charter holder in Texas) had a protected property interest in continuation of a charter school. In determining the charter lacked such an interest, the court noted that:

> [T]he statutory language and the charter agreement do not support Plaintiff's claim of a property interest protected by state law. "[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." The charter agreement incorporates [the Tennessee Public Charter Schools Act of 2002, recovation or renewal section], which provides that "A public charter school agreement may be revoked or denied renewal by the final chartering authority if the chartering authority determines that the school . . . (2) Received identification as a priority school, as defined by the state's accountability system." "The word 'may' customarily connotes discretion."

*Id*. at 878 (citations omitted). It went on to state:

> [T]he Tennessee charter school statute repeatedly declares its purpose and intention to provide the state department of education and local

29

school systems with "options," "alternative means," and "flexibility"—hardly the language of a statute creating a property interest. The law constrains this discretion only by requiring the chartering authority to state its reason(s) for revoking the charter. If, as in this case, the revocation occurs because of the school's priority status, no appeal is permitted—again emphasizing state discretion, not the charter holder's property rights.

*Id*. at 879 (citations omitted).

Similarly, in *Project School v. City of Indianapolis*, the district court held that Indiana's charter school statue and the facts in the case repudiated the plaintiff charter school's argument that it had a protected property interest in its continued ability to operate a school. No. 1:12-cv-01028-SEB-DKL, 2012 WL 3114573, *3 (S.D. Indiana, July 31, 2012). Because the charter was subject to revocation if certain conditions were met and because the sponsor was not required to grant a charter to an organizer to operate a charter school in the first place, the court held that the charter's "argument that somehow its existence is a 'property right' for purposes of the Fourteenth Amendment due process is a nonstarter." *Id*. at *4. For all of these same reasons, ACT has failed to identify a vested property interest that did not receive procedural or substantive due process consideration.

### 2. *ACT failed to alleged a viable procedural-due-process claim.*

Even if ACT demonstrated a property interest in its charter, it received all the process it was due regarding the accountability ratings and revocation. If an order deprives a person of vested property rights without due process, the order may be set aside even absent an express provision for judicial review. *See City of Houston*

*v. Carlson*, 393 S.W.3d 350, 361-62 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In this case, ACT received notice of its accountability ratings and the revocation decision along with an opportunity to be heard, which is all that due process requires.

"Procedural due process requires notice and 'an opportunity to be heard at a meaningful time and in a meaningful manner.'" *Coastal Habit Alliance v. Pub. Util. Comm'n*, 294 S.W.32d 276, 285 (Tex. App.—Austin 2009, no pet.) (quoting *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995)).

> What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances. This flexible standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*University of Texas Medical School at Houston, John C. Ribble, M.D., and M. David Low, M.D. v. Allan Than*, 901 S.W.2d at 930-31 (citations omitted).

ACT was given notice and an opportunity to appeal each of the three financial accountability ratings. CR at 350; *see also* TEX. EDUC. CODE §39.082(g); 19 TEX. ADMIN. CODE § 109.1002(i)(2) (financial accountability rating appeals). It was also provided notice and an opportunity to appeal its substandard academic accountability rating. CR at 358; *see also* TEX. EDUC. CODE §39.151; 19 TEX. ADMIN. CODE §97.101(b) (academic accountability rating appeals).

ACT was also given notice and an opportunity to appeal the decision to revoke its charter. CR at 342-349. It requested an informal review which was conducted by TEA. CR at 355-357. It filed a petition for review to SOAH which upheld TEA's decision to revoke. CR at 360-376.

3. *TEA applied the Texas Education Code neither arbitrarily nor capriciously in connection with ACT's accountability ratings or revocation.*

A violation of substantive due process occurs only when the government deprives individuals of constitutionally protected rights by an arbitrary use of its power. *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 249 (5th Cir. 2000), cert. denied, 534 U.S. 1022 (2001). A claimant prevails on a substantive due process claim by establishing it holds a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies and by establishing that the challenged governmental action is not rationally related to furthering a legitimate state interest. *Byers v. Patterson*, 219 S.W.3d 514, 525 (Tex.App.—Tyler 2007, no pet.) (citing *Simi Inv.*, 236 F.3d at 249-50 and *Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006)). The court must then review the government's actions against the deferential "rational basis" test that governs substantive due process claims. *Simi Inv.*, 236 F.3d at 249.

ACT claims that TEA has created a system of rating review and revocation that is devoid of a meaningful opportunity for review. CR at 7. It further claims that the accountability ratings TEA assigned in 2012-2104 were arbitrary because ACT

identified the errors it submitted and was not permitted to submit corrected data. *Id*. ACT argues, with no supporting evidence, that TEA did this specifically and arbitrarily to ACT. *Id*. ACT further claims that the current "mechanism for evaluating charter schools . . . allows TEA and Commissioner to change standards after the fact without any regard for a connection with a legitimate government purpose or rational relationship on a consistent basis." CR at 14. Again, ACT relied on the erroneous assumption that the renewal of its charter was automatic or vested which it is not. *Id.*

An agency's decision is arbitrary or results from an abuse of discretion (i.e is capricious) if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *City of El Paso v. Public Utility Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n. 8 (Tex. 1966)). Though ACT clearly opposed the results of the accountability ratings it received, it never argued that the ratings, based on the evidence actually received by TEA, were erroneous. It simply believes that it should be afforded an opportunity to correct incorrect data that it supplied years before, in an effort to avoid revocation now.

ACT presented the trial court with no evidence that TEA considered factors beyond those the legislature directed it to consider: ACT's financial and academic performance ratings. ACT presented no evidence that TEA considered a factor that

was irrelevant which led to the failing ratings. Finally, ACT failed to present any evidence that TEA considered the appropriate factors but reached a completely unreasonable result. In short, there is no evidence that TEA acted arbitrarily or capriciously when it reviewed the information ACT presented to it to reach the result that ACT did not meet its financial or academic benchmark for 2012-2014. There is no evidence that the Commissioner considered anything but the criteria found in the Texas Education Code when he issued the notice of intent to revoke.

Indeed, a charter school is given numerous opportunities to provide correct information at or near the time the AFR is due. What ACT seeks to do is appeal ratings that are 2-3 years old, disrupting the finality of those accountability ratings as well as the accreditation process. Allowing a charter school to submit untimely appeals of years-old accountability ratings (specifically at the point of revocation) frustrates one of the purposes of the 2013 statutory amendments which was to close down underperforming charter schools efficiently. CR at 319.

## C. No Violation of Some Other Constitutional Right.

### 1. *ACT failed to demonstrate a property interest to substantiate its takings claim.*

Notwithstanding the fact that ACT failed to demonstrate a property interest in the continuation of its charter, ACT also claimed a property interest in the property and funds that it has in its possession which are subject to seizure by TEA as a result of the charter revocation. CR at 15. Article I, section 17 of the Texas Constitution

34

provides that "[n]o person's property shall be taken, damaged or destroyed or applied to public use without adequate compensation being made . . . ." TEX. CONST., ART. I, §17. Absent a cognizable property interest, a claimant is not entitled to compensation under article I, section 17. *See Tarrant County v. Ashmore*, 635 S.W.2d 417, 422 (Tex. 1982). The takings provision of the Texas Constitution is comparable to the federal takings clause. *See Sheffield Devel. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004). Both provisions recognize that, while "all property is held subject to the valid exercise of the police power," a regulation may, under some circumstances, constitute a taking requiring compensation. *Id.* at 670 (quoting *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984)).

Texas Education Code §12.128 states that all property purchased or leased with funds received by the charter holder under TEX. EDUC. CODE §12.106 is considered to be public property for all purposes under state law and is held in trust for the students of the open-enrollment charter school. ACT's contract for its charter has been revoked, and, by law, a revoked charter school may not continue to operate under Subchapter D of Texas Education Code Chapter 12 (providing for the operation of an open-enrollment charter school) and may not continue to receive funds. *See* TEX. EDUC. CODE §12.1161

ACT's year ending August 31, 2011 AFR, ACT clearly listed as state property: all of its cash, land, buildings and improvements, vehicles and

35

approximately 92% of its furniture and equipment. RR, Def. exh. 1, p. 12; RR at 38: 24 – p. 39: 16. For the year ending August 31, 2012, ACT again listed as state property: all of its cash, land, buildings and improvements, vehicles and approximately 92% of its furniture and equipment. RR, Def. exh. 2, p. 12; RR at 46: 23 – p. 47: 11. Again, in the year ending on August 31, 2013, ACT listed all of its cash, land, buildings and improvements, vehicles and approximately 90% of its furniture and equipment as being state owned. RR, Def. exh. 3, p. 14. Moreover, ACT's 2014 AFR acknowledged that 100% of its land and improvements, building improvements, vehicles, furniture and equipment were state or federally owned. CR at 395.

The law is clear: public property may only be used in the operation of a public school. TEX. EDUC. CODE §12.128(a)(2). Additionally, section 12.107 of the Education Code clearly provides that funds received by a charter holder pursuant to section 12.106 are public funds held in trust by the charter holder for the benefits of students of the open-enrollment charter school. TEX. EDUC. CODE §12.107. Since ACT may not continue to operate a public school after revocation, pursuant to TEX. EDUC. CODE §12.1161, ACT must return this state property as directed by the Commissioner. TEX. EDUC. CODE §12.128(c). In this case, the only property subject to return to TEA would be the property identified by ACT as being owned by the state, and any state funds held in trust by the former charter holder that no longer operates an open-enrollment charter.

36

## 2. *The Texas Education Code does not violate the Open Courts Provision.*

ACT claims that the regulations regarding individual ratings violate the Open Courts provision of the Texas Constitution by not allowing charter schools the opportunity to seek redress from the courts. CR at 15. The Open Courts Provision provides that "all courts shall be open, and every person for any injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex. 1997) (quoting TEX. CONST. ART. I, §13). The Open Courts provision affords three distinct protections. First, courts must be open and operating. *Id.* Second, citizens must have access to the courts unimpeded by unreasonable financial barriers. *Id.* Finally, the law must afford meaningful legal remedies to Texas citizens, so the Texas legislature may not abrogate the right to assert a well-established common-law cause of action. *Id.* The Open Courts provision applies only to statutory restrictions of a cognizable common law cause of action. *Id.*

However, "there is no common-law cause of action for judicial review of an agency's administrative act." *Creedmoor–Maha*, 307 S.W.3d at 524 (quoting *City of Port Arthur v. Southwestern Bell Tel. Co.*, 13 S.W.3d 841, 845 (Tex.App.—Austin 2000, no pet.)). Further, ACT only cites a violation of the Open Courts Provision with regard to its non-existent property interest in its charter. CR at 15. Finally, and most importantly, ACT has demonstrated no right to judicial review of TEA's

accountability ratings appeals or revocation decision. Thus, ACT failed to plead a violation of the Open Courts Provision.

## III. ACT'S *ULTRA VIRES* CLAIMS ARE MERITLESS, BARRED BY SOVEREIGN IMMUNITY, AND DO NOT SUPPORT THE DISTRICT COURT'S FINDING THAT ACT WOULD LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS.

### A. ACT failed to allege that the Commissioner acted without legal authority or failed to perform a ministerial act.

To proceed in a suit against State entities and officials, the plaintiff must either plead and prove a waiver of sovereign immunity or allege that the State official acted without legal authority, or *ultra vires*, which is a suit where sovereign immunity is not implicated because a State official's illegal or unauthorized actions are not considered acts of the State. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 370-72 (Tex. 2009) (citing *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997); *Creedmoor–Maha*, 307 S.W.3d at 514; *Combs v. City of Webster*, 311 S.W.3d 85, 94 (Tex.App.—Austin 2009, pet. denied).

The law distinguishes between suits that implicate sovereign immunity and those that do not. "[A] suit challenging a specific administrative order implicates sovereign immunity because it seeks to control state action — it seeks to restrain the State or its officials in the exercise of discretionary statutory or constitutional authority*." Creedmoor–Maha*, 307 S.W.3d at 515 (citing *Texas Dept. of Protective and Regulatory Services v. Mega Child Care, Inc*., 145 S.W. 3d at 198). Conversely,

an *ultra vires* suit must allege that a state actor acted without legal authority. *Heinrich*, 284 S.W.3d at 372-73.

"A suit asserting that a government officer acted without legal authority or seeking to compel him to comply with statutory or constitutional provisions is an *ultra vires* suit and is not subject to pleas of governmental immunity. Such a suit, in effect, does not seek to alter government policy; it seeks to reassert the control of and enforce existing policy of the governmental entity." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 424 S.W.3d 663, 668 (Tex.App.–Houston [14th Dist.] 2014, pet. filed) (citing *Heinrich*, 284 S.W.3d at 371–72).

A suit that does not allege that a state actor acted without legal authority, "implicates sovereign immunity because it seeks to 'control state action,' to dictate the manner in which officers exercise their delegated authority.'" *See Heinrich*, 284 S.W.3d at 372; *Creedmoor–Maha*, 307 S.W.3d at 515–16. In other words, unless a suit alleges that a state official acted without legal authority or failed to perform a ministerial duty, then the assumption is that the state official acted with discretionary, legal authority and the suit seeks to control this lawful conduct. *See Creedmoor–Maha*, 307 S.W.3d at 515–16.

ACT requested that the trial court enter declarations specifically (i) reversing the administrative decision of the Commissioner to revoke its charter; and (ii) challenging TEA's use of what it considered was incorrect data to calculate ACT's

financial and academic accountability ratings without giving ACT the opportunity to submit correct information well after the deadline to do so.

The Commissioner did not act *ultra vires* in revoking ACT charter or by considering the data originally submitted by ACT to determine ACT's accountability ratings considering the plain language of the Texas Education Code and the facts of this case. The information provided by ACT was reviewed by ACT's auditor who specifically noted ACT's deficiencies. RR at 40: 5-19; RR, Def. Ex. 3, p. 11. However, instead of addressing those deficiencies, ACT simply reviewed the AFR and affirmed that the information was true and correct prior to submitting it to TEA. RR at 35: 5-17; RR at Def. Ex. 1, Certification page; 44: 24-p. 45: 6 ("Correct."); RR at 36: 16- p. 37: 2.

Based on this information, TEA determined that ACT was underperforming financially for three years in a row and also found that ACT needed substantial improvement of its academic accountability based on its 2013 information. CR at 358, ¶5.

Because ACT had four failing accountability ratings in the last three years, the Commissioner was mandated to revoke its charter, and the Commissioner, therefore, acted under such statutory authority in revoking ACT's charter. *See, e.g. Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 561-62 (Tex. App.—Austin 2013, pet. denied) (rejecting *ultra vires* claim where agency's construction of statute was reasonable); *see also supra,* Statement

of Facts, Part I, (Sunset Commission recommending statute be amended to "ensure students do not continue to attend a school lacking a quality education or with serious financial problems that could affect the school and, ultimately, a student's academic progress.").

B. **ACT is seeking retroactive relief which is unavailable in an** *ultra vires* **action.**

Sovereign immunity does not generally shield governmental agencies from suits for equitable relief for a violation of constitutional rights. *See Heinrich*, 284 S.W.3d at 373 n. 6; *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (determining that no private right for damages was permitted for violations of state constitutional rights and vacating jury award of damages). However, ACT seeks an injunction that addresses past decisions. CR at 18-20. If the relief sought by ACT effectively seeks to control the TEA's or the Commissioner's lawful, discretionary actions, then sovereign immunity is still implicated and the trial court erred in denying TEA's Plea to the Jurisdiction based on sovereign immunity. *Heinrich*, 284 S.W.3d at 370-72; *Creedmoor–Maha*, 307 S.W.3d at 515.

"Equitable relief is a prospective remedy, intended to prevent future injuries," *Adler v. Duval County School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997), and for that reason "[t]he sole function of an action for injunction is to forestall future violations." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952); *see*

*also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Because respondent alleges only past infractions . . . and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1202 (11th Cir. 1997) ("injunctive relief . . . addresses only ongoing or future violations"); *Heinrich*, 284 S.W.3d at 376 "[A] claimant who successfully proves an ultra vires claim is entitled to prospective injunctive relief, as measured from the date of injunction.").

Generally, the purpose of injunctive relief is to halt wrongful acts that are threatened or in the course of accomplishment, rather than to grant relief against past actionable wrongs or to prevent the commission of wrongs not imminently threatened. *See Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 853 (Tex.App.—Austin 2002, no pet.); *see also Webb v. Glenbrook Owners Ass'n*, 298 S.W.3d 374, 384 (Tex.App.—Dallas 2009, no pet.) (injunction not available to "prevent commission of wrongs not imminently threatened."). A party seeking injunctive relief preventing alleged *ultra vires* acts must plead and prove, among other things, existence of imminent harm, irreparable injury, and absence of adequate remedy at law. *See Lazarides v. Farris*, 367 S.W.3d 788, 803 (Tex.App.—Houston [14th Dist.] 2012, no pet.); *Texas Health Care Info. Council*, 94 S.W.3d at 853. "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury

42

in the future." *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir.), cert. denied, 506 U.S. 866 (1992).

ACT specifically sought a declaration regarding factors the Commissioner used in his accountability assessment which led to the revocation of ACT's charter. CR at 18. It sought to have the trial court declare certain factors in ACT's favor and then reapply those factors to its final accountability ratings for years prior to suit. *Id*. ACT did not request prospective (future-seeking) relief, but rather retrospective relief, seeking to remedy past harm it alleged that TEA committed against it by not allowing alleged corrected data to be considered for the 2011, 2012, and 2013 accountability ratings. These forms of requested relief are solely to remedy past alleged harm, which cannot be granted through an injunction.

## IV. ACT FAILED TO DEMONSTRATE THE TRIAL COURT'S JURISDICTION AND, THEREFORE, THE TRIAL COURT ERRED BY DENYING TEA'S PLEA.

The Commissioner revoked ACT's charter because of academic or financial substandard performance, or a combination of the two. Substandard academic performance ratings are issued only when a critical mass of a charter school's students are not meeting standards on assessment instruments or are dropping out or not completing high school. TEX. EDUC. CODE §39.053. Similarly, the Texas Education Code requires that charter schools be assigned the lowest financial accountability ratings when they show signs of financial stress or insolvency. *Id*. §39.082(f).

43

The Legislature clearly chose to automatically revoke the charters of schools that fail to meet accountability standards for three years in a row. The Commissioner complied with the statute, and ACT's revocation should have been effective on June 30, 2015. CR at 355. ACT sought the temporary injunction to delay the revocations citing meritless constitutional and *ultra vires* claims, none of which demonstrated that the trial court possessed jurisdiction to consider.

## PRAYER

For the foregoing reasons, Commissioner Williams and the Texas Education Agency respectfully request the Court reverse the trial court's denial of their Plea to the Jurisdiction and dismiss this case for lack of subject-matter jurisdiction. Alternatively, Commissioner Williams and the TEA request the Court hold the trial court's September 4, 2015 temporary injunction order is void, to dissolve it, and remand the case to the district court for further proceedings.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

ANGELA COLMENERO
Division Chief

 /s/   Erika M. Laremont
ERIKA M. LAREMONT
Attorney in Charge
Texas Bar No. 24013003
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX  78711-2548
PHONE: (512) 475-4196;
FAX:  (512) 320-0667
Erika.Laremont@texasattorneygeneral.gov

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4(i)(3), I certify that this brief contains 12,478 words, exclusive of the exempted portions in Tex. R. App. P. 9.4(i)(1).

/s/   *Erika M. Laremont*
ERIKA M. LAREMONT
Assistant Attorney General


## CERTIFICATE OF SERVICE

I certify that a copy of the above *Brief of Appellants* was served by certified

mail, return receipt requested, on October 20, 2015 upon the following individuals

at the listed address:

D. Todd Smith
State Bar No. 00797451
SMITH LAW GROUP LLLP
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, Texas 78746

Stephen M. Foster
9013 Magna Carta Loop
Austin, Texas 78754
(512) 784-4367


/s/   *Erika M. Laremont*
ERIKA M. LAREMONT
Assistant Attorney General

**No. 03-15-00528-CV**

_____

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT

_____

**TEXAS EDUCATION AGENCY AND MICHAEL WILLIAMS,
COMMISSIONER OF EDUCATION, IN HIS OFFICIAL CAPACITY,**
*Appellants,*

**VS.**

**ACADEMY OF CAREERS AND TECHNOLOGIES, INC. D/B/A
ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL,**
*Appellee.*

_____

On Appeal from the 200th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-15-002879

_____

**APPENDIX OF APPELLANT**

_____

# APPENDIX

Tab A        Amended Defendants' Plea to the Jurisdiction and Response to Plaintiff's Request for Temporary Injunction and Exhibits

Tab B        Plaintiff's Response to Defendants' Plea to the Jurisdiction

Tab C        Defendants' Reply to Plaintiff's Response to Defendants' Plea to the Jurisdiction and Response to Plaintiff's Request for Temporary Injunction

Tab D        Order Granting Temporary Injunction and Denying Defendant's Amended Plea to the Jurisdiction

Tab E-1      *Adler v. Duval County School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997)

Tab E-2      *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)

Tab E-3      *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)

Tab E-4      *Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006)

Tab E-5      *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)

Tab E-6      *Paul v. Davis*, 424 U.S. 693, 709 (1976) (quoting *Roth*, *supra*, at 577,)

Tab E-7      *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998)

Tab E-8      *Pinnacle Charter Sch. v. Bd. of Regents*, 108 A.D.3d 1024, 969 N.Y.S.2d 318, 320 (2013)

Tab E-9      *Project Reflect, Inc. v. Metro Nashville Bd. of Pub. Educ.*, 947 F. Supp. 2d 868, 878-79 (M.D. Tenn. 2013)

Tab E-10     *Project School v. City of Indianapolis*, 2012 WL 3114573, *3 (S.D. Indiana, July 31, 2012)

Tab E-11     *Reach Academy for Boys & Girls, Inc. v. Delaware Dept. of Educ.*, 46 F.Supp.3d 455, 457 (D.Del. 2014)

Tab E-12    *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1202 (11th Cir. 1997)

Tab E-13    *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 249 (5th Cir. 2000), cert. denied, 534 U.S. 1022 (2001).

Tab E-14    *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir.), cert. denied, 506 U.S. 866 (1992).

Tab E-15    *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998)

Tab E-16    *Suryanto v. Att'y Gen. of U.S.*, 398 Fed.Appx. 830, 834 (3rd Cir. 2010)

Tab E-17    *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)

Tab E-18    *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952)

Tab F       Tex. Educ. Code § 12.115

Tab G       Tex. Educ. Code, Subchapter C

Tab H       Tex. Educ. Code, Subchapter D

Tab I       Tex. Admin. Code § 97.1001 Amended 8-7-13 (2)

Tab J       19 TEX. ADMIN. CODE §109.1002, amended 10-18-11

Tab K       19 TEX. ADMIN. CODE §109.1002, amended 10-3-13

8/12/2015 3:38:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-002879
Jessica Arzola

CAUSE NO. D-1-GN-15-002879

| | | |
|---|---|---|
| ACDEMY OF CAREERS AND TECHNOLOGIES INC. d/b/a ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL, *Plaintiffs*, | § § § § § § | IN THE DISTRICT COURT |
| v. | § § | 98TH JUDICIAL DISTRICT |
| TEXAS EDUCATION AGENCY and MICHAEL WILLIAMS in his Official Capacity as the Commissioner of Education, *Defendants*. | § § § § § § | TRAVIS COUNTY, TEXAS |

**AMENDED DEFENDANTS' PLEA TO THE JURISDICTION AND RESPONSE TO PLANTIFF'S REQUEST FOR TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW Defendants, Texas Education Agency ("TEA") and Michael L. Williams, in his Official Capacity as the Commissioner of Education (individually "Williams" and, collectively with TEA, the "Defendants"), and file this Amended Plea to the Jurisdiction.

**I.
BACKGROUND**

A.     **2012 Sunset Advisory Commission and Changes to Texas Education Code.**

The Sunset Advisory Commission ("Commission") reviewed the Texas Education Agency in October 2012, preceding the commencement of the 83rd Texas Legislature. In its review, the Commission identified the following issue: "TEA lacks a full range of tools to effectively address poor academic performance and financial mismanagement at low-performing charter schools." Ex. 1. In identifying this issue, the Commission noted that "a higher rate of charter schools performed at an academically unacceptable level than school districts," and that "[m]any charter schools also have poor financial performance, underscoring the importance of oversight of

1

**Tab A**

expenditure of state funds." *Id*. at 70-71. Significantly, the Commission found:

> Charter schools have far more accountability problems requiring assignment of interventions and sanctions, and ultimately, revocation of the charter. Charter schools represent more than two-thirds, 71 percent, of schools assigned with sanctions, even though charter schools make up only 17 percent of the total number of districts and charters.

*Id*. at 71-72. Although TEA had the authority to close a charter school and revoke the charter, the Commission criticized the process as unworkable, leaving students to be educated at underperforming charter schools. *Id*. at 72.

Based on these findings, the Commission recommended a change in statute that required the automatic revocation of a charter for failure to meet basic academic or financial accountability standards for three years in a row. *Id*. at 79. It recommended that no appeal be permitted from the revocation determination. According to the Commission, such a change in the law would "allow the State to more quickly shut down the poorest performing charters, without years of litigation during which time the school remains open. The recommendation would also ensure students do not continue to attend a school lacking a quality education or with serious financial problems that could affect the school and, ultimately, a student's academic progress." *Id*. at 79.

Thus, based on the Commission's recommendation, the 83rd Texas Legislature amended section 12.115 of the Texas Education Code to make **mandatory** the revocation of any open-enrollment charter school's charter if the school fails to meet financial and/or academic performance ratings in certain years. The Commissioner of Education ("Commissioner") is now **required** to revoke a school's charter if one of three scenarios arises:

> (1)    the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39 [of the Education Code] for the three preceding years;

> (2)    the charter holder has been assigned financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

2

(3)     the charter holder has been assigned any combination of the [unacceptable ratings under either subchapter].

TEX. EDUC. CODE § 12.115(c).

Chapter 39, Subchapter C (academic performance) ratings to be considered are those assigned to the school for 2009-2010, 2010-2011, and 2012-2013 rating years. *Id.* § 112.115(c-1). However, "[f]or the purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be considered." *Id.*; *see also* TEX. EDUC. CODE § 39.116(a) and (f) (allowing commissioner of education to suspend academic performance rating during transition period). The Subchapter D ratings to be considered are those assigned to the school for the 2010-2011, 2011-2012, and 2012-2013 rating years. TEX. EDUC. CODE § 12.115(c-1).

The findings of the Sunset Advisory Commission demonstrate that there is a compelling state need to identify and close poor-performing charter schools in order to improve the choices available to parents and students.

**B.     The Appeal Process as Defined in the Texas Education Code.**

After a school district or charter school receives its accountability or financial ratings, it has an opportunity to appeal the ratings to the Commissioner of Education. TEX. EDUC. CODE § 39.151(a). Should a charter school seek to appeal a financial or academic rating and notifies the commissioner of such, the Commissioner must appoint a committee to make recommendations to the commissioner on any challenge made to an agency decision. TEX. EDUC. CODE §39.151(b). After considering the committee's recommendation, the Commissioner makes a final decision. TEX. EDUC. CODE §39.151(d). The commissioner's decision following any appeal is final, and the Legislature expressly prohibited any additional appeal from this final determination in "any other proceeding" if the charter "has had an opportunity to challenge the decision under [section 31.151]. TEX. EDUC. CODE §39.151(e).

3

A school district or charter school may also seek redress of the Commissioner's decision to close a school to the State Office of Administrative Hearings ("SOAH"). TEX. EDUC. CODE § 39.152(a). The school must file a petition for review and include certain requirements for the petition to be granted. 19 TAC §156.1183. The decision of the administrative law judge is final and may not be appealed. TEX. EDUC. CODE §39.152(c)(3). Strikingly absent is any mention of judicial review of TEA's ratings or decision to revoke a charter.

**C.      The Texas Education Code Mandates Revocation of Plaintiff's Charter School.**

Plaintiff Academy of Careers and Technology, Inc., d/b/a Academy of Careers and Technology Charter School ("ACT") was originally issued a state charter in 1998. Ex. 2. In 2012, 2013, and 2014 TEA found that ACT failed to meet the state's financial accountability standards. Ex. 3; Ex. 4; *see also* Pl. Orig. Petition, pp. 2-3. ACT did not file an appeal to these ratings until 2015. The committee recommended that the appeals be dismissed, and the Commissioner followed the committee's recommendations. Ex. 5. ACT also failed to meet academic accountability standards in 2014 and appealed the 2014 academic accountability rating to the outside appeal committee. Ex. 6. The committee recommended that the appeal be dismissed, and the Commissioner followed the committee's recommendation. Ex. 6. Under the Texas Education Code, these decisions are not appealable. TEX. EDUC. CODE §39.151(e).

Commissioner Williams had no discretion but to revoke ACT's charter, since its failings in 2012, 2013 and 2014 represented three consecutive years of failure as defined by Texas Education Code §§ 12.115(c)(3) & 12.115(c-1). The TEA notified ACT of this fact on December 8, 2014. Ex. 3.

ACT sought an informal hearing regarding the revocation. Pl. Orig. Petition, p. 3. A review was conducted, but the decision to revoke ACT's charter was sustained. Ex. 5. It is

4

undisputed that ACT filed a petition for review seeking review of the revocation decision before the State Office of Administrative Hearings ("SOAH"). Pl. Orig. Petition, p. 3. Because there were no material factual issues in dispute, TEA filed a Motion for Summary Disposition, which provided the basis for a final decision and order of SOAH upholding the Commissioner's decision to revoke ACT's charter. Ex. 7. This decision is not subject to appeal. TEX. EDUC. CODE §39.152(c)(3).

**D.      This Court Lacks Jurisdiction to Consider ACT's Claims.**

In its Original Petition for Declaratory Action and For Temporary Restraining Order and Temporary & Permanent Injunction, ACT's challenge fails to invoke the jurisdiction of this Court. The Legislature has broad latitude to shape and define the public school system in Texas. As a part of this discretion, the Legislature is free to have a stringent accountability system, and to even eliminate the charter system altogether. To this end, the Legislature has designated SOAH as the sole avenue for any administrative recourse a charter holder may seek in the event it disagrees with TEA's assessment of its performance in connection with an action to revoke the charter holder's charter. And, importantly, unlike many other administrative processes before SOAH, the Legislature has specifically exempted these SOAH proceedings from further review in the State District Courts, leaving SOAH as the ultimate arbiter of any charter holder's dispute with TEA on all issues relevant to the instant claims.

**II.**
**ARGUMENTS AND AUTHORITIES**

**A.      Plea to the Jurisdiction - The Legal Standard**

The Texas Supreme Court has long recognized that sovereign immunity, unless waived, protects the State of Texas ("State"), its agencies, and its officials from lawsuits for damages, absent legislative consent to sue the State. *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835,

5

844 (Tex. 2007); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam); *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). Sovereign immunity embraces two principles: immunity from suit and immunity from liability. *Fed. Sign*, 951 S.W.2d at 638 (citing *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.*, 453 S.W.2d 812, 813 (Tex.1970)). Immunity from suit prevents the State from being sued without legislative consent, even if the States' liability is not disputed. *Id.* (citing *Brownsville Navigation Dist.*, 453 S.W.2d at 813). "Immunity from liability protects the State from judgments even if the Legislature has expressly given consent to the suit." *Id.* (citing *Brownsville Navigation Dist.*, 453 S.W.2d at 813) (emphasis omitted).

A party may challenge the trial court's subject matter jurisdiction by filing a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). In deciding a plea to the jurisdiction, a court may not weigh the claims' merits, but must consider only the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002); *see also Miranda*, 133 S.W.3d at 227. If a defendant demonstrates that the trial court lacks jurisdiction, the burden shifts to the plaintiff to establish a fact question on the issue of jurisdiction. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). If the relevant evidence is undisputed and fails to present a fact question, the trial court should rule on the plea as a matter of law. *Id.*

Texas courts defer to the legislature to waive immunity from suit because this allows the legislature to protect its policymaking function. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 854 (Tex.2002). Any waiver of immunity must be expressed by clear and unambiguous language. TEX. GOV'T CODE § 311.034.

6

**B.** **The District Court Lacks Subject Matter Jurisdiction to Review Defendants' Final Decisions Regarding ACT's Financial and Academic Accountability Ratings and SOAH's Final Decision and Order Regarding Revocation.**

Through its Original Petition, ACT seeks judicial review of financial and academic ratings issued by the Commissioner in 2012, 2013, and 2014 as well as SOAH's final decision and order revoking the Plaintiff's contract for charter. Unless, the Texas Legislature has waived sovereign immunity, either by statute or legislative resolution, this Court does not have jurisdiction to consider Plaintiff's claims. Indeed, "[a] person may obtain judicial review of an administrative action only if a statute provides that right, or the action adversely affects a vested property right or otherwise violates a constitutional right." *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 173 (Tex. 2004). Such a right must be articulated by the legislature through "clear and unambiguous language." *Id*. at 197.

> **1.** *There is no statutory provision which allows this Court to review TEA's rating decisions.*

Chapter 39 of the Texas Education Code, entitled "Public School System Accountability," governs the financial and academic performance system used to review both traditional public schools and charter schools. *See* TEX. EDUC. CODE § 39.054(b). Section 39.151, however, limits the review of any accountability determination to the Commissioner and expressly exempts the decision from review by SOAH or a State District Court. *See id*., at §§ 39.151(d) & (e).

Here, ACT has failed to point to any provision in the Texas Education Code or any other statutory provision that provides for judicial review of TEA's financial and academic ratings that form the basis of the decision to revoke. *See Burkhalter v. Tx. State Bd. Of Med. Exam'r*, 918 S.W.3d 1, 3 (Tex. App.—Austin 1996)("The right to appeal from an administrative order to the courts is not a natural or inherent one but is one that may be granted or withheld at the discretion of the Legislature.").

7

ACT claims that it failed the 2012 and 2013 financial accountability ratings due to "third party" errors in its annual financial reports. *See* Pl. Orig. Petition, p. 2. The "third party" in question is the independent auditor that ACT hired to prepare its annual financial report (AFR). Ex. 8; *see also* TEC §44.008. In addition to preparing the report, ACT's Board of Trustees approved the reports in question, as well as the report that led to the 2014 failed accountability rating. TEC §44.008(d). While ACT characterizes the failures as "mutual" mistakes, the Agency relied on the financial information submitted by ACT, who was responsible for submitting correct data. *Id* at pp. 2-3.

ACT claims that the TEA rules impermissibly limited the appeal to errors made by TEA and argues that the statute requires TEA to allow ACT to correct its allegedly erroneous data. *Id* at pp. 3-4. However, the statute clearly allows the Commissioner to adopt rules for the review of the accountability ratings. *See* TEC §39.151(a) "… The Commissioner by rule shall provide a process for a … open enrollment charter school to challenge an agency decision made under this chapter relating to an academic or financial accountability rating that affect the … school."). The Commissioner reasonably interpreted the term "appeal" to mean an opportunity to challenge the Agency's rationale and methodology for issuing the rating, rather than an opportunity for ACT to re-submit data. An appeal is typically limited to the facts under which a decision was made, and frequently will not allow for additional evidence to be submitted. ACT, therefore, has no procedural or substantive due process right to re-submit its data.

Finally, while ACT complains that the appeal was limited, ACT cannot and does not allege that it provided "corrected" financial information in its appeals. ACT did file appeals for all the accountability ratings at issue. Exs. 4 and 6. However, ACT does not allege that it provided new financial information in its appeals that the Agency rejected. Moreover, while ACT claims that

8

the audited financial statements it submitted were incorrect, it has not provided new audited financial statements to substantiate this claim.

**2.      There is no statutory provision which allows this Court to review TEA's revocation decision.**

Section 12.115(c) of the Texas Education Code provides:

The commissioner shall revoke the charter of an open-enrollment charter school if:

(1)      the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding years;

(2)      the charter holder has been assigned an unacceptable financial accountability rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

(3)      the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.

TEX. EDUC. CODE §12.115(c).

The Legislature has mandated that the Commissioner's decision to revoke a charter can be reviewed only by SOAH, and that an ALJ's review of that charter-revocation decision is final and not subject to appeal. Section 12.116(c) provides:

A decision by the commissioner to revoke a charter is subject to review by the State Office of Administrative Hearings. Notwithstanding Chapter 2001, Government Code:

(1)      the administrative law judge shall uphold a decision by the commissioner to revoke a charter unless the judge finds the decision is arbitrary and capricious or clearly erroneous; and

(2)      a decision of the administrative law judge under this subsection is final and may not be appealed.

TEX. EDUC. CODE § 12.116(c). Accordingly, the Commissioner's revocation decision is final unless it is appealed to SOAH, and the SOAH ALJ's decision either upholding or reversing the Commissioner's decision is not subject to appeal. Because ACT has no right to judicial review of

9

the revocation decision, the district court lacks jurisdiction over this suit. *See Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *Bacon v. Hist. Comm'n*, 411 S.W.3d 161, 173-74 (Tex. App.—Austin 2013, no pet.) ("One implication of these principles is that there is no general right to challenge or seek review of a state agency order or decision in Texas state court; to the contrary, state agency decisions generally cannot be challenged in court unless the Legislature has enacted a statute expressly authorizing such review."); *Creedmoor-Maha Water Supply Corp*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.) (UDJA actions "that seek declaratory or injunctive relief against agency orders from which the legislature has not granted a right of judicial review" are barred by state sovereign immunity.); *KEM Tex., Ltd. v. Texas Dep't of Transp.*, No. 03-08-00468-CV, 2009 Tex. App. LEXIS 4894, at *8-18 (Tex. App.—Austin 2009, no pet.) (challenge to non-appealable agency order barred by sovereign immunity).

## C. ACT Has No Property Interest that Implicates a Due Process Violation.

ACT complains that it did not receive all the process it was due regarding the accountability ratings. *See* Pl. Orig. Petition, p. 4. "Due process is implicated when the state or its agents deprive a person of a protected liberty or property interest." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). At issue is whether ACT has a constitutionally-protected property interest in its charter or its accountability ratings. If a constitutionally-protected property interest is at stake, then the Court determines what process is sufficient to protect that interest. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. Such entitlements are, "'of course ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Paul v. Davis*, 424 U.S. 693, 709 (1976) (quoting *Roth*, supra, at 577,);

10

*see also Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998).

Here, ACT asserts its property interest in its charter through the implication that such an interest was created in 1998 when ACT was granted its charter by the TEA. *See* Pl. Orig. Pet. at 2. Indeed, the ability to grant a charter is left entirely up to the discretion of the Commissioner.[1] The Texas Education Code §12.101 provides, "[T]he commissioner *may* grant a charter on the application of an eligible entity for an open-enrollment charter school to operate in a facility of a commercial or nonprofit entity, an eligible entity or a school district, including a home-rule school district." (emphasis added). Thus, even if a charter school meets all of the statutory requirements, the Commissioner may still deny the charter.

However, the statute that granted ACT's charter does not create a constitutionally-protected property interest. "To determine whether a particular statute creates a constitutionally-protected property interest, we ask whether the statute or implementing regulations place 'substantive limitations on official discretion.'" *Lee v. Tex. Workers' Compensation Comm'n*, 272 S.W.3d 806, 817 (Tex.App.—Austin 2008) (citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). If "the legislature leaves final determination of which eligible individuals receive benefits to the unfettered discretion of administrators, no constitutionally-protected property interests exists." *Id*. at 817-18 (citing *Roth*, 408 U.S. at 567). Thus, if the decision to grant the charter is left to the discretion of the commissioner, no property interest is, therefore, created by granting the charter. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *see also Ex parte Abell*, 613 S.W.2d 255, 262 (Tex. 1981) ("When the authority granting the right has the power and discretion to take that right away, it cannot be said to be a

---

1 This power was formerly held by the State Board of Education. This authority was transferred to the Commissioner by Senate Bill 2 in 2013. Acts 2013, 83rd Leg., ch. 1140 (S.B. 2), §9, effective September 1, 2013.

vested right"); *Seguin v. Bexar Appraisal Dist.*, 373 S.W.3d 699, 709 (Tex. App.—San Antonio 2012, pet. denied) (taxpayer did not have vested property right in disabled-veteran tax exemption that was "legislatively revocable"); *Klumb v. Houston Mun. Emp. Pension Sys.*, 405 S.W.3d 204, 226 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) ("[A] pensioner in a statutory pension plan does not have a vested right to his pension."); *McAllen Hosps., L.P. v. Suehs*, 426 S.W.3d 304, 313 (Tex. App.—Amarillo 2014, no pet.) (hospitals lack vested property right/interest in Medicaid reimbursement payments that were "contingent and potential rather than definitive and unconditional" prior to utilization review); *Scott v. Alphonso Crutch LCS Charter Sch., Inc.*, 392 S.W.3d 165, 170-71 (Tex. App.—Austin 2010, pet. denied) (concluding that, because allocation to which charter school was entitled for a given time period was subject to change depending on updated attendance figures during school year, the school's "interest in a definite amount" was not vested and "remain[ed] contingent rather than unconditional, and potential rather than definitive").

Additionally, although there is no Texas case directly dealing with a charter school's right to its charter contract, there are two out-of-state federal district court cases that directly address the issue. *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex.1995) (*citing Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252-53 (1887) (following contemporary federal due process interpretations of procedural due process issues). In *Project Reflect, Inc. Smithson Craighead Middle School v. Metropolitan Nashville Board of Public Education*, the Tennessee district court considered whether a charter school sponsor (an entity similar to a charter holder in Texas) had a protected property interest in continuation of a charter school. 947 F.Supp.2d 868, (M.D. Tennessee, 2013). In determining the charter lacked such an interest, the court noted that:

> the statutory language and the charter agreement do not support Plaintiff's claim of a property interest protected by state law. "[A] party cannot possess a property

12

interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." The charter agreement incorporates Tenn. Code Ann. § 49–13–122(a), which provides that "A public charter school agreement may be revoked or denied renewal by the final chartering authority if the chartering authority determines that the school ... (2) Received identification as a priority school, as defined by the state's accountability system." "The word 'may' customarily connotes discretion."

*Id.* at 878 (citations omitted). It went on to state:

the Tennessee charter school statute repeatedly declares its purpose and intention to provide the state department of education and local school systems with "options," "alternative means," and "flexibility"—hardly the language of a statute creating a property interest. The law constrains this discretion only by requiring the chartering authority to state its reason(s) for revoking the charter. If, as in this case, the revocation occurs because of the school's priority status, no appeal is permitted—again emphasizing state discretion, not the charter holder's property rights.

*Id.* at 879 (citations omitted).

Similarly, in *Project School v. City of Indianapolis*, the district court held that Indiana's charter school statue and the facts in the case repudiated the plaintiff charter school's argument that it had a protected property interest in its continued ability to operate a school. No. 1:12-cv-01028-SEB-DKL, 2012 WL 3114573, *3 (S.D. Indiana, July 31, 2012). Because the charter was subject to revocation if certain conditions were met and because the sponsor was not required to grant a charter to an organizer to operate a charter school in the first place, the court held that the charter's "argument that somehow its existence is a 'property right' for purposes of the Fourteenth Amendment due process is a nonstarter." *Id.* at *4.

ACT has, therefore, failed to identify a property interest that did not receive procedural or substantive due process consideration.

**D.     ACT's Takings Claim Fails Because it Only Possesses State and Federal Property.**

ACT claims that it has a property interest in the property and funds that it has in its possession. *See* Pl. Orig. Pet. at 8. TEX. EDUC. CODE § 12.128 states that all property purchased or

13

leased with funds received by the charter holder under TEX. EDUC. CODE §12.106 are considered to be public property for all purposes under state law and is held in trust for the students of the open-enrollment charter school. ACT's contract for charter has been revoked, and TEX. EDUC. CODE §12.1161 states that a revoked charter school may not continue to operate under Subchapter D of Texas Education Code Chapter 12 (providing for the operation of an open-enrollment charter school) and may not continue to receive funds.

ACT's last Annual Financial Report acknowledges that all of the assets held by ACT are either state property or federal property. Ex. 8. This public property may only be used in the operation of a public school. TEX. EDUC. CODE §12.128(a)(2). Since ACT may not continue to operate a public school after revocation, pursuant to TEX. EDUC. CODE §12.1161, ACT must return this state property as directed by the Commissioner. TEX. EDUC. CODE §12.128(c).

**E.      The Commissioner's Discretion in not Overbroad.**

ACT argues that the entire statutory scheme is overbroad. While the statutory scheme grants the Commissioner discretion in the issuance of ratings and making a revocation decision, the statute provides safeguards. For accountability determinations, there is a right to challenge before a committee composed entirely of non-TEA employees. TEC §39.151(b). For revocation decisions, there is a right to challenge such decisions through a SOAH substantial evidence review. TEC §12.116(c).

**F.      ACT Failed to Properly Plead a Violation of the Open Courts Provision.**

The Open Courts provision of the Texas Constitution provides that "all courts shall be open, and every person for any injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 410 (Tex. 1997) (quoting TEX. CONST. ART. I, § 13). The Open Courts provision affords three distinct protections.

14

First, courts must be open and operating. *Id.* Second, citizens must have access to the courts unimpeded by unreasonable financial barriers. *Id.* Finally, the law must afford meaningful legal remedies to Texas citizens, so the Texas legislature may not abrogate the right to assert a well-established common law cause of action. *Id.* The Open Courts provision applies only to statutory restrictions of a cognizable common law cause of action. *Id.*

First, "there is no common-law cause of action for judicial review of an agency's administrative act." *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 524 (Tex.App.—Austin 2010, no pet.) (quoting *City of Port Arthur v. Southwestern Bell Tel. Co.*, 13 S.W.3d 841, 845 (Tex.App.—Austin 2000, no pet.)). Second, ACT only cites a violation of the Open Courts Provision with regard to its non-existent property interest in its charter. Pl. Orig. Petition, pp. 13. Finally, and most importantly, ACT has demonstrated no right to judicial review of Defendants' accountability ratings appeals or revocation decision. Thus, ACT failed to plead a violation of the Open Courts Provision.

**G.      Commissioner Williams Did Not Act Ultra Vires, and is, Therefore, Entitled To Sovereign Immunity.**

   *1.      ACT failed to allege that Commissioner Williams acted without legal authority or failed to perform a ministerial act.*

To proceed in a suit against State entities and officials, the plaintiff must either plead and prove a waiver of sovereign immunity or allege that the State official acted without legal authority, or ultra vires, which is a suit where sovereign immunity is not implicated because a State official's illegal or unauthorized actions are not considered acts of the State. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 370-72 (Tex. 2009) (citing *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997); *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 514 (Tex.App.—Austin 2010, no pet.); *Combs v. City of Webster*, 311 S.W.3d 85, 94 (Tex.App.—

15

Austin 2009, pet. denied).

The law distinguishes between suits that implicate sovereign immunity and those that do not. "[A] suit challenging a specific administrative order implicates sovereign immunity because it seeks to control state action — it seeks to restrain the State or its officials in the exercise of discretionary statutory or constitutional authority." *Creedmoor–Maha*, 307 S.W.3d at 515 (citing *Tex. Dep't of Protective & Regulatory Servs. v. Maga Child Care, Inc.*, 145 S.W. 3d 170, 198 (Tex. 2004)). Conversely, an ultra vires suit must allege that a state actor acted without legal authority. *Heinrich*, 284 S.W.3d at 372-73. "A suit asserting that a government officer acted without legal authority or seeking to compel him to comply with statutory or constitutional provisions is an *ultra vires* suit and is not subject to pleas of governmental immunity. Such a suit, in effect, does not seek to alter government policy; it seeks to reassert the control of and enforce existing policy of the governmental entity." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 424 S.W.3d 663, 668 (Tex.App.–Houston [14th Dist.] 2014, pet. filed) (citing *Heinrich*, 284 S.W.3d at 371–72). A suit that does not allege that a state actor acted without legal authority, "implicates sovereign immunity because it seeks to 'control state action,' to dictate the manner in which officers exercise their delegated authority.'" *See Heinrich*, 284 S.W.3d at 372; *Creedmoor–Maha*, 307 S.W.3d at 515–16. In other words, unless a suit alleges that a state official acted without legal authority or failed to perform a ministerial duty, then the assumption is that the state official acted with discretionary, legal authority and the suit seeks to control this lawful conduct. *See Creedmoor–Maha*, 307 S.W.3d at 515–16.

ACT's seeks this Court to enter declarations specifically challenging the administrative decision of Commissioner Williams to use prior-year data for calculation of the following year's accountability ratings. *See* Pl. Orig. Petition, p. 9. The Commissioner did not act *ultra vires* in

16

308

using prior-year data for the following year's accountability because to do otherwise would yield the absurd result of requiring consideration of a school-year rating for revocation purposes while simultaneously prohibiting it. *See, e.g., Jose Carreas, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We . . . interpret statutes to avoid an absurd result."). ACT's claim is particularly weak in light of the judicial deference given to an agency's reasonable interpretation of a statute it is charged with enforcing. *See, e.g. Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 561-62 (Tex. App.—Austin 2013, pet. denied) (rejecting *ultra vires* claim where agency's construction of statute was reasonable). Finally, ACT's interpretation would frustrate the legislative intent behind section 12.115(c-1) by delaying another year the issuance of performance ratings. *See Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 552 (Tex.1981) (courts should not insert words in a statute except to give effect to clear legislative intent); *see supra,* Statement of Facts, Part I, (Sunset Commission recommending statute be amended to "ensure students do not continue to attend a school lacking a quality education or with serious financial problems that could affect the school and, ultimately, a student's academic progress."); 1.CR.343.

2. ***ACT is seeking retroactive relief which is unavailable in an* ultra vires *action.***

Sovereign immunity does not generally shield governmental agencies from suits for equitable relief for a violation of constitutional rights. *See Heinrich*, 284 S.W.3d at 373 n. 6; *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (determining that no private right for damages was permitted for violations of state constitutional rights and vacating jury award of damages). However, ACT seeks an injunction that addresses past decisions. Pl. Orig. Petition, pp. 13-15. If the relief sought by ACT effectively seeks to control the TEA's or Commissioner Williams' lawful, discretionary actions,

17

then sovereign immunity is still implicated. *Heinrich*, 284 S.W.3d at 370-72; *Creedmoor–Maha*, 307 S.W.3d at 515.

"Equitable relief is a prospective remedy, intended to prevent future injuries," *Adler v. Duval County School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997), and for that reason "[t]he sole function of an action for injunction is to forestall future violations." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Because respondent alleges only past infractions . . . and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1202 (11th Cir. 1997) ("injunctive relief . . . addresses only ongoing or future violations"); *Heinrich*, 284 S.W.3d at 376 "[A] claimant who successfully proves an ultra vires claim is entitled to prospective injunctive relief, as measured from the date of injunction.").

Generally, the purpose of injunctive relief is to halt wrongful acts that are threatened or in the course of accomplishment, rather than to grant relief against past actionable wrongs or to prevent the commission of wrongs not imminently threatened. *See Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 853 (Tex.App.—Austin 2002, no pet.); *see also Webb v. Glenbrook Owners Ass'n*, 298 S.W.3d 374, 384 (Tex.App.—Dallas 2009, no pet.) (injunction not available to "prevent commission of wrongs not imminently threatened."). A party seeking injunctive relief preventing alleged *ultra vires* acts must plead and prove, among other things, existence of imminent harm, irreparable injury, and absence of adequate remedy at law. *See Lazarides v. Farris*, 367 S.W.3d 788, 803 (Tex.App.—Houston [14[th] Dist.] 2012, no pet.); *Texas Health Care Info. Council*, 94 S.W.3d at 853. "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated

18

injury in the future." *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir.), cert. denied, 506 U.S. 866 (1992).

ACT specifically seeks a declaration regarding factors Commissioner Williams used to in his accountability assessment which led to the revocation of ACT's charter. Pl. Orig Pet. p. 16. It seeks to have the Court declare certain factors in ACT's favor and then reapply those factors to its accountability ratings. *Id.* ACT's requests are not prospective (future-seeking) in nature, but rather, are retrospective, seeking to remedy past harm. These forms of requested relief are solely to remedy past alleged harm, which cannot be sought through an injunction.

## H.     This Court Lacks Jurisdiction to Hear Any of ACT's Claims

### 1.      *ACT has no appeal as of right to a state district court.*

For the reasons outlined above, ACT is limited in any challenge to the decisions raised in this case to, at most, a proceeding before SOAH. This is the extent of ACT's right to appeal. In fact, ACT did seek appeal of many of the granular complaints listed in its Original Petition. For those issues, ACT's appellate rights began and ended with the appeals committee, and there is no further right to appeal to this Court or elsewhere. ACT had a right to appeal the revocation decision to SOAH, an appeal that it pursued and lost, and it, was therefore, provided with all of the procedural due process to which it was entitled.

### 2.      *ACT has no constitutional interest beyond those defined by the contractual and statutory scheme for charter schools.*

ACT wishes to collaterally attack many decisions of TEA, up to and including the revocation decision in this Court. However, as outlined above, ACT has no constitutionally protected interest that would warrant review by a District Court. The Legislature has broad discretion to require charter schools to meet any set of performance criteria it wishes to set. It is entirely up to a charter school to either comply with those requirements or forfeit its charter. There

19

is no third option to ask a Court to forgive any charter school from the obligations imposed upon the charter school by the state. Indeed, the Texas statutory scheme that governs charter schools is subject to amendment and could be replaced or deleted entirely.

**3.** ***The appointment of a conservator is not ripe/no legal injury.***

ACT argues that the appointment of a conservator constitutes a taking of ACT's property without due process. Pl. Orig. Petition, p. 16. ACT also argues the TEC §12.128 is unconstitutional. Pl. Orig. Petition, p. 17. However, ACT's own financial report acknowledges that all the property in the possession of ACT is either state or federal property, therefore there is no takings issue for the court to adjudicate. Ex. 8.

**4.** ***Charter schools, as governmental entities, cannot sue the state for constitutional violations.***

That ACT is considered a governmental entity, which cannot acquire vested rights against the State, further precludes its arguments. Accordingly ACT cannot bypass the statutory bar on judicial review of revocation decisions by claiming a constitutional violation. *LTTS Charter School v. C2 Construction*, 342 S.W.3d 73, 76 (Tex. 2011).

**5.** ***The "high risk" designation of ACT by TEA is not a subject for relief in state court.***

ACT has requested that the court prohibit TEA from continuing to apply a "high risk" designation to ACT's federal grant reimbursement requests. *See* Pl. Orig. Petition, p. 15. This requests fails for two reasons: 1) the designation has already been made and, is therefore, not subject to prohibitory injunctive relief; and 2) ACT has not been *denied* federal funds, which would entail offering procedural due process; instead, ACT must simply meet additional requirements to receive federal grant fund reimbursements. Ex. 9. ACT, is not, therefore, entitled to any relief regarding the "high risk" designation.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiff take nothing by its suit that all costs be taxed and adjudged against Plaintiff, and that Defendants be granted such other and further relief to which they may be justly entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Division Chief - General Litigation

/s/ *Erika M. Laremont*
ERIKA M. LAREMONT
State Bar No. 24013003
Assistant Attorney General
General Litigation Division
Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
512-463-2120 (Telephone)
512-320-0667 (Facsimile)
erika.laremont@texasattorneygeneral.gov
**ATTORNEYS FOR DEFENDANTS**

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2015, the foregoing document was delivered by telephonic document transfer to the following:

Stephen M. Foster
9013 Magna Carta Loop
Austin, Texas 78754
(512) 784-4367
Attorneys for Plaintiff

/s/ *Erika M. Laremont*
ERIKA M. LAREMONT

22

314



# SUNSET ADVISORY COMMISSION

## STAFF REPORT

## *Texas Education Agency*

OCTOBER 2012

**ACT Ex. 1-Sunset**

315

# ISSUE 7

*TEA Lacks a Full Range of Tools to Effectively Address Poor Academic Performance and Financial Mismanagement at Low-Performing Charter Schools.*

## Background

Charter schools are public schools meant to improve student learning, allow for teacher innovation, and increase the number of quality education choices for families. Charters operate under decreased state regulation in exchange for increased accountability for results. While charter schools do not have a local tax base, they receive state funding for operations, just like traditional school districts, but not for facilities. In the 2011–2012 school year, charter schools educated about 155,000 students, or roughly 3 percent of Texas students, and expended state funds totaling approximately $938 million.

Statute provides for four types of charter schools: open-enrollment charters, campus charters, home-rule school district charters, and college, university, or junior college charters.[1] This issue focuses solely on open-enrollment charters, because they are regulated by TEA.[2]

Statute authorizes the State Board of Education (SBOE) to grant an open-enrollment charter to an applicant that meets financial, governance, and operational standards adopted by the Commissioner.[3] TEA just adopted these standards, effective for the next group — or generation — of charters, in 2013. Most open-enrollment charters are self-governed 501(c)(3) nonprofit organizations with an appointed board to oversee operations of the charter school. State law caps the number of charters at 215, but existing charter holders may expand the number of campuses they operate without getting a new charter and affecting this cap.[4] As of September 2012, 201 charters are in effect, representing 549 campuses.

- **State oversight.** After SBOE grants a charter, TEA regulates charter schools, including a charter renewal process, amendment and expansion process, and monitoring financial and academic performance through accountability ratings. TEA may apply interventions and sanctions to those charters that fail to meet academic or financial accountability standards, or that violate certain provisions of law or rule through two enforcement processes in separate chapters of the Education Code. Chapter 12 governs charter schools and requirements for charter contracts, and Chapter 39 governs TEA's academic and financial accountability requirements, including intervention and sanction authority, for both districts and charters.

- **Sanction authority.** The charter school statute, Chapter 12, authorizes TEA to revoke a charter, after a process for a full contested case hearing at the State Office of Administrative Hearings (SOAH), if the charter holder:

    - commits a material violation of the charter, including failure to satisfy accountability provisions prescribed by the charter;

    - fails to satisfy generally accepted accounting standards of fiscal management;

– fails to protect the health, safety, or welfare of the students enrolled at the school; or

– fails to comply with a law or rule.[5]

The accountability statute, Chapter 39, provides TEA with a range of interventions and sanctions for application to both districts and charters, including appointment of a monitor, conservator, or board of managers.[6] A charter holder can challenge certain decisions of the Commissioner, including closure, under the accountability statute through a formal record review process at the agency, which is subject to review by SOAH, under a substantial evidence standard of review.[7] If the Commissioner orders the charter closed under the accountability statute, the charter is automatically revoked.[8] Neither chapter's enforcement process provides for a judicial appeal of the Commissioner's final decision.

# Findings

### Statute frees charter schools from certain state restrictions in exchange for an expectation of higher, more innovative, performance.

The Legislature has an expectation that charter schools will satisfy performance standards, particularly academic performance, and that expanded autonomy through freedom from certain state restrictions that apply to traditional school districts will enable charter schools to achieve high performance in innovative ways. Because charter contracts are subject to certain limitations, such as compliance with academic and financial accountability standards, charter schools essentially operate on performance contracts. Appendix C provides more detail on which state restrictions apply to charter schools and which do not.

*Charter schools essentially operate on performance contracts.*

The Legislature's performance expectation is reflected in TEA's approach to school closure. The Legislature created charter schools to be vehicles for innovation and to offer families choices in educational settings. However, traditional districts serve as the school of last resort for students. If a charter school closes, students may be displaced, but are still afforded an education by attending their local school district. If a school district closes, students likely do not have another local education option, and could be required to travel some distance to another district, at additional cost. In the past 15 years, TEA has shut down 48 charters, but has closed only four traditional districts.[9]

### While many charter schools perform well, poor performance by some charter schools threatens provision of a quality education for their students.

Many charter schools clearly meet the Legislature's expectations for innovation and success. In fact, in 2011, 8.5 percent of charters received exemplary academic ratings, as compared to only 4.4 percent of school districts. However, as can be seen in the bar chart on the following page, *Academic Accountability Ratings for Charters and Districts*, a higher rate of charter schools performed at an academically unacceptable level than school

### Academic Accountability Ratings for Charters and Districts 2011



districts. Of the 1,029 districts and 199 charters rated, a higher percentage of charters — 17.6 percent versus 4.9 percent — were academically unacceptable in 2011.

Many individual charter school campuses have also demonstrated poor academic performance for years. Appendix D shows the number of years individual charter campuses, by generation, have been ranked academically unacceptable, including four charter campuses that have been ranked academically unacceptable for 10 or more years.[10]

Many charter schools also have poor financial performance, underscoring the importance of oversight for expenditure of state funds. Charter schools receive about 80 percent of their revenues in state aid, as compared to 41 percent for traditional school districts.[11] Beginning in 2012, TEA expanded the FIRST financial accountability ratings for charter schools from three to 19 indicators, consistent with the indicators used to rank districts, minus one indicator related to facilities. The bar chart, *Failing Financial Accountability Ratings*, illustrates that 13.1 percent of charter schools failed TEA's financial accountability system in 2012, significantly higher than the 2 percent of districts.

Continued poor performance on academic and financial accountability ratings can lower a district's or charter's accreditation status or lead to a series of interventions and sanctions, including TEA appointment of a monitor or conservator. Charter schools have far more accountability problems requiring assignment of interventions and sanctions and, ultimately, revocation of the charter. Charter schools represent more than two-thirds, 71 percent, of schools with assigned sanctions, even though charter

*Charters receive 80 percent of their funding from the State, compared to 41 percent for traditional schools.*

### Failing Financial Accountability Ratings 2012



schools make up only 17 percent of the total number of districts and charters. In the last three years, TEA has revoked or not renewed 10 charters, and accepted the surrender of five others in lieu of enforcement action.

**TEA cannot act quickly to revoke a charter for chronic poor performance, placing student education at risk.**

*Charters represent 71 percent of schools with sanctions, but only 17 percent of all schools.*

Because charter schools are expected to meet performance standards in exchange for greater autonomy, demonstrated records of continuous poor performance should not warrant the State spending significant time and resources to shut these charters down. Revocation of these charters should occur more quickly to protect students from an inadequate education. Despite the many instances of poor performance and interventions and sanctions among charter schools, TEA cannot act quickly, particularly in circumstances warranting revocation, to address charter schools that have failed to improve over time or through intermediate sanctions. The table, *Academically Unacceptable Charters and Districts for Consecutive Years*, shows that more charter schools have unacceptable academic performance over consecutive years than traditional school districts.

**Academically Unacceptable Charters and Districts for Consecutive Years 2010–2011 School Year**

| Years Academically Unacceptable | Charters | Districts |
|---|---|---|
| 3 Years | 5 | 1 |
| 2 Years | 5 | 2 |
| 1 Year | 25 | 47 |

While the agency has statutory authority to close a charter school and revoke the charter, TEA's actions are subject to protracted litigation, unlike with traditional school districts, because a charter is considered a legal contract or property right. Revocation of a charter under the charter school statute typically takes two to three years, on top of several years of poor performance, during which time a charter school remains open. While TEA's ability to revoke a charter under the accountability statute can move more quickly, it is not always workable, does not address health, safety, or welfare violations, and does not grant TEA the ability to suspend funding and operations. In one case, TEA has been working to revoke a charter for 12 years. A long revocation process leaves students to be educated at underperforming charter schools.

*In one case, TEA has been working to revoke a charter for 12 years.*

Beyond the practical challenges of winding down a school's operations, TEA typically faces opposition to revocation on several fronts. Students and their families often have an emotional attachment to their school or fear that closure reflects poorly on their decision to attend the school; teachers and school employees have professional or financial stakes in the operation of their school; and opposition from elected officials can create high political costs for the agency. TEA is unlikely to hear vocal support for school closure or revocation, as parents dissatisfied with the charter have likely already left the school to pursue other education options.

Protracted hearings and litigation can also result in closure of a charter school during the middle of the school year, which can displace teachers, students, and their families. Further, poor-performing charter schools threaten the

reputation of the many high-performing charter schools, and, because of the statutory cap on the number of charters the State may issue, limit opportunities for new charter schools that may perform well.

### TEA lacks authority to intervene when a charter fails to address its imminent financial insolvency.

TEA lacks authority to revoke a charter for a school that is imminently insolvent and fails to plan for its students' education. If a charter school opens in the fall and then runs out of funds, it could then be forced to shut down mid-year, with instruction and students' forward academic progress halted; teachers not paid or losing their jobs; teachers, students, and their families displaced to other schools; and student records not completed or transferred to new schools. However, TEA has no statutory authority to prevent such a situation.

In one recent example, TEA suspended an imminently insolvent charter's operations and prevented it from opening for school this fall. However, TEA based its actions on the charter's failure to submit its annual financial report — a material violation of its charter — and not on the charter's inability to show a positive cash flow to continue its operations. In 2012, TEA identified 20 charter schools with circumstances that could lead to insolvency. Of the charters TEA revoked in the last three years, six of the 10 were likely imminently insolvent, in addition to demonstrating other problems that led to revocation.

### As currently structured, charter renewal is not an effective oversight tool.

While TEA reviews a charter's performance after five years to determine whether it should be renewed for up to 10 years, the agency's process fails to accomplish the purpose of standard renewal processes. In practice, the process leaves charters pending in renewal for years until TEA can justify either revocation or renewal. In other regulatory agencies, renewal processes exist to ensure a regulated entity continues to meet standards for operation. Renewal processes provide an alternative to the sanctioning process when an entity no longer meets standards for continued operation.

While TEA has statutory authority to deny renewal of a charter, statute combines the basis for all adverse actions, including denying renewal and revocation, under the same provision.[12] The agency has interpreted this statutory grouping to mean that TEA must set the same performance standards and meet the same burden of proof for both actions: denying renewal and revoking the charter. Because TEA cannot always meet this high standard, especially for charters with intermittent poor performance, TEA generally no longer attempts to deny renewal of a charter. As a result, the agency has no process to shut down a poor performing charter short of revocation.

*Poor-performing charters threaten the reputation of the many high-performing charters.*

*TEA has no process to close a poor-performing charter short of revocation.*

Non-renewal and revocation should not have the same performance standard; the tools should be used for two separate purposes. Revocation should be used when a charter's performance is so poor, or a violation is so egregious, that the situation puts students' education at risk and a charter school should be shut down during its authorized term. Non-renewal should occur when a charter's performance record is not bad enough to stop operations mid-term, but ongoing deficiencies do not warrant renewal of a charter for another term. Similarly, while the State must prove its case for revocation of a charter, for renewal, the burden is typically on the regulated entity, the charter holder in this case, to prove why its charter should be renewed. Because statute does not distinguish the basis for revocation from denying renewal, this burden is reversed onto the State, instead of the charter holder, to prove why a charter's authority to operate should not be renewed.

*Some charters have been pending in renewal for nine years.*

While the process reauthorizes strong performers, it holds weak performers in a perpetual state of pending renewal until the agency can justify the higher standards for either renewal or revocation. For example, if a charter has a few years of poor academic or financial ratings, or has a monitor or conservator in place, TEA may delay renewal of a charter until performance either improves or deteriorates further. As a result, charters may linger in a state of pending renewal for years. The chart, *Outstanding Charter Renewals*, illustrates that some charters have been pending in renewal for up to nine years. Without more flexibility in setting performance standards for renewal, TEA also cannot offer an incentive or benefit to charters exceeding performance standards.

### Outstanding Charter Renewals

| Years Left Pending | Number of Charters |
|---|---|
| 1 | 16 |
| 2 | 5 |
| 3 | 1 |
| 4 | 3 |
| 5 | 0 |
| 6 | 3 |
| 7 | 5 |
| 8 | 0 |
| 9 | 4 |

While a charter can continue to operate while it is waiting for renewal, the uncertainty of the charter's status can still affect its operations. For example, charter schools report that it is difficult to access loans for new facilities while their charter is left pending in the renewal process.

*Without more flexibility, TEA cannot offer an incentive to charters to exceed performance standards.*

## Certain statutory provisions limit the agency's ability to scale sanctions to the nature of the violation.

The charter school statute provides too little discretion for certain sanctions, and too much for others, restricting TEA's flexibility to apply sanctions appropriate to the violation. Criteria for applying sanctions should be clear, objective, and scaled to the nature of the violation. Similar to renewal, as discussed in the previous finding, TEA's interpretation of its sanction authority in the charter statute also makes the use of modification and probation meaningless. TEA must meet the same burden of proof to modify

or probate a charter as for revocation. As such, TEA lacks the flexibility to use these lesser sanctions for less egregious violations.[13]

Requirements in the charter school statute similarly limit the agency's discretion in applying sanctions for health and safety violations. If TEA finds that a charter fails to protect the health and safety of its students, TEA may suspend its operations. Statute requires that TEA hold a hearing within three days of the suspension, after which TEA must either cease its suspension or seek revocation of the charter.[14] Other intermediate sanctions in the accountability statute would, in most cases, allow the agency to more appropriately address a charter school's deficiencies and still ensure the health and safety of students without seeking revocation of the charter.

Conversely, the charter school statute specifies that adverse action by the Commissioner be based on the best interest of the school's students, any previous violations, and the severity of those violations.[15] The subjective criterion of acting in the best interest of students does not provide either TEA or charter holders clear guidance on a threshold for applying sanctions and could exclude sanctions for some clear statutory violations. For example, if a school performs acceptably academically, but has clear financial management violations, a charter holder could argue that certain sanctions, including closure, are not in the best interests of students, despite the violations. The best interest of a school's students is a valuable principle that should be considered in guiding actions of both the charter and the agency. However, the inclusion of such a subjective criterion in determining appropriate sanctions is not a standard practice of other regulatory entities, as it can lead to inconsistent and unfair application of sanctions.

*TEA lacks the flexibility to use less severe sanctions for less egregious violations.*

### Differences between the agency's rules and its practice create unclear performance expectations for charter schools.

While TEA's rules provide for revocation or denial of renewal for failure to meet certain performance standards, in practice, TEA's policies are more lenient than its rules. The agency does not typically revoke or deny renewal of a charter for failure to meet performance standards in rule. For example, TEA's rules provide for revocation after two consecutive years of unsatisfactory, or unacceptable, academic performance, but TEA's matrix guiding accreditation sanctions, used for both districts and charters, does not provide for revocation until after four years of unacceptable academic performance.[16] The inconsistency between rule and practice results in uncertainty regarding the level of performance charters must maintain for renewal or to avoid sanctions or interventions. TEA may also have difficulty ensuring its decisions, and perception of its decisions, are fair, consistent, and transparent.

Agency practices that are inconsistent with, and more lenient than, agency rules reflect TEA's cautious approach to seeking revocation of a charter. While TEA regularly applies interventions and sanctions to poor performing charters, TEA waits and builds strong cases before pursuing revocation

instead of taking more immediate action to revoke based on serious violations or chronic poor performance. As a result of the agency not taking more immediate action to revoke a charter, a high number of charters remain pending in renewal and with interventions and sanctions over long periods of time.

## TEA lacks authority to address inadequate oversight by the governing board of a charter.

Short of revoking the charter, TEA does not have any tools to address inadequate oversight by a charter holder board, especially when it results in performance or operational problems. Charter schools' freedom from certain state restrictions requires strong oversight to ensure charter schools operate consistent with their charters and missions to achieve acceptable performance. Unlike traditional school boards of trustees, which TEA can require to hold new school board elections with use of a board of managers, TEA lacks a similar tool to address appointed charter holder governing boards that fail to remedy operational and accountability concerns for the school.

*Regular charter board oversight is critical to ensuring a school's accountability.*

In several examples, after a TEA-appointed conservator and board of managers addressed a charter school's concerns, TEA had to turn the school's oversight back over to the exact same people who failed to ensure the school met accountability standards in the first place. TEA also regularly encounters situations at charter schools in which the governing boards fail to meet regularly or cannot reach a quorum. Without regular board oversight, even routine activities like approval of the school's budget and annual financial report can negatively affect a charter school's accountability ratings. These situations increase the likelihood of continued operational and performance problems. Without appropriate enforcement tools to strengthen the leadership and oversight capacity of a charter school's governing board, TEA's only remedy is to seek revocation of the charter.

## Statutory provisions related to nepotism at charter schools are confusing, and allowance of this practice is an exception among publicly funded entities.

State law prohibits officers or members of a board of the State, or a district, precinct, school district or other political subdivision of the State, from appointing or employing a person directly or indirectly compensated with public funds if the person is closely related within certain degrees of blood kinship or marriage.[17] Statute exempts charter schools from standard restrictions on nepotism as long as the school remains academically acceptable for two of the last three years. When a charter fails to meet the academic standard set in law for nepotism, TEA requires a charter school to change its organizational structure to eliminate direct reporting or supervision of family members within the third degree of consanguinity and second degree of affinity. The chart on the following page, *Consanguinity and Affinity Relationships*, defines these relationships.

## Consanguinity and Affinity Relationships

**CONSANGUINITY**
(Related by blood)

**AFFINITY**
(Related by marriage)

*Note:* A spouse of an individual listed in the consanguinity portion of the chart is related to the individual to the same degree by affinity.

- **Allowance of nepotism is uncommon.** While nepotism does not always lead to problems in an organization, state law prohibits nepotism in governmental or publicly funded entities because of the inherent conflicts of interests the practice can present, detailed further in the textbox, *Potential Effects of Nepotism*. While charter schools are predominantly publicly funded, averaging 94 percent funded with state or federal funds in fiscal year 2011, statute provides charter schools with an exception to laws prohibiting nepotism. Thus, some charters still use family extensively in the school's operations and oversight. One charter school reported eight family members, including a sibling, a daughter, and several nieces and nephews of the same individual employed as staff at the school.

---

### Potential Effects of Nepotism

Nepotism can give the appearance of, or result in, the following.

- Conflicts of interest

- Misuse of office

- Preferential treatment or patronage

- Bad morale or resentment among other employees, including potential discrimination claims

- Employees who are not qualified or lack appropriate training or expertise for their positions

- Undermining of public trust — the public may perceive that actions of the organization are not always in the best interest of the community or students

---

● **Confusing standards.** Separate from nepotism provisions, board members are required to abstain from voting on contracts or other items if they are related to a person within the third degree of consanguinity or affinity. While this conflict of interest provision applies within the third degree of affinity, nepotism requirements apply within the second degree of affinity if a charter does not meet academic standards for the exception. Differing standards for conflict of interest and nepotism laws can be confusing to both charter schools and the public.

● **Risk to public funds.** Confusion over which standards or exceptions apply in which circumstances can lead to violations of law and create a culture where preferential treatment occurs more frequently. Public funds are most at risk from this confusion, which can lead to contracting or conflict of interest violations. In such cases, the State cannot ensure competitive bidding requirements are met or arms-length transactions ensure efficient use of public funds. Charter schools sometimes pay disproportionately large salaries or have substantial financial contracts with family members. One charter school with just over 450 students pays its superintendent and board president $214,000; his wife, the personnel director, $164,000; his brother, the assistant superintendent, $175,000, and a daughter, a principal, $60,000. As a comparison, superintendent salaries in similarly sized districts range from $73,000 to $99,000.[18]

● **Current nepotism provision is hard to enforce.** While intended to target low-performing charters, TEA cannot enforce provisions allowing exceptions to standard nepotism prohibitions. TEA does not have the resources to monitor this practice at every charter school, and even when TEA investigates complaints, it cannot be sure that forced reorganizations to prohibit direct reporting relationships change the actual practices or culture of a charter school. The agency finds that nepotism is present, often when prohibited, in most charter revocation cases. In fact, of the 10 charters revoked in the past three years, only two self-reported nepotism, but TEA found nepotism present in six others. Although TEA has started collecting self-reported data on nepotism, TEA is unaware of the true number of schools with nepotism present.

● **Governing board conflicts of interest.** While statute requires governing board members to abstain from votes in which a conflict of interest is presented, this provision is also not enforceable by TEA. Statute also prohibits family members from making up a quorum on the governing board. Despite these statutory provisions to prevent self-dealing and substantial contracts with family members, TEA finds occurrences of these practices regularly during investigations or through reports from assigned monitors or conservators. For example, one charter school superintendent, who is also the governing board president, contracts with herself for transportation services for more than $900,000 for only 778 students.

*Some charters have substantial contracts with family members or staff.*

Allowing family members and relatives to serve on a charter holder board together to direct the operation and oversight of publicly funded charter schools can present difficult situations in which the interests of family members and their own financial interests can be pitted against the best interests of the students. Governing board members have a strong influence over appointments to, and removal from, the board. The prevalence of several family members on a board can make it difficult for the governing board to maintain independence in its decision making for the charter. Strong oversight at the governance level, especially given the greater levels of autonomy, is essential to ensure charter schools achieve acceptable performance and act in the best interest of students.

# Recommendations

## *Change in Statute*

### 7.1 Require revocation of a charter for failure to meet basic academic or financial accountability standards for three years in a row.

This recommendation would require the Commissioner to revoke a charter without an agency hearing, if:

● for three consecutive years, the charter fails to satisfy academic accountability standards; or

● for three consecutive years, the charter fails to satisfy financial accountability standards.

If a charter meets either of the above-listed criteria, the Commissioner would order closure of all campuses under the charter and revoke the charter. A charter would not be able to appeal the Commissioner's revocation order through either an agency review or contested case hearing at SOAH. However, a charter could contest the current year's rating under existing processes for academic or financial rating appeals.[19]

TEA would be required to issue academic and financial accountability ratings by June 15 for those charters in jeopardy of triggering automatic revocation based on academic or financial performance. This date would allow time for a charter subject to automatic revocation to appeal its rating, and to provide as much notice as possible to the charter, students and their families, and teachers, that the school will not open the next school year, while also providing the agency a limited amount of time to collect and evaluate data needed to issue the ratings. TEA should evaluate its current financial and academic appeal processes and make any rule changes necessary to accommodate earlier ratings and appeals for charters in jeopardy of automatic revocation by June 1, 2014. As a result, TEA could automatically revoke a charter based on three consecutive years of poor academic or financial performance after the issuance of ratings in summer 2014.

Mandatory revocation of charters demonstrating continuing poor performance would allow the State to more quickly shut down the poorest performing charters, without years of litigation during which time the school remains open. The recommendation would also ensure students do not continue to attend a school lacking a quality education or with serious financial problems that could affect the school and, ultimately, a student's academic progress. Clear statutory authority to revoke a charter after chronic poor performance will speed up the charter revocation process by removing agency discretion and local politics from the decision, as well as clearly demonstrate the Legislature's expectation for high performance.

### 7.2   Authorize the Commissioner to suspend operations and pursue revocation of an imminently insolvent charter to ensure it does not open without sufficient funding to complete the term.

This recommendation would authorize the Commissioner to suspend the operations of all campuses under a charter on an effective date that would prevent the charter from opening for a new school year or term, and pursue revocation if the Commissioner determines the charter is imminently insolvent and does not have sufficient funding to complete the next school year. This recommendation would require the agency to define, in rule, conditions under which a charter would be considered imminently insolvent. TEA would be required to adopt these rules by March 1, 2014.

A charter would be entitled to challenge the suspension of its operations through a hearing at TEA, similar to the process the agency currently provides for health, safety, and welfare issues. TEA would be required to hold a hearing at the agency within 10 days of its suspension order. After the suspension hearing, if the Commissioner still determines the charter is imminently insolvent and cannot make it through the next school year, the Commissioner would order revocation of the charter. The Commissioner's order could be appealed to SOAH as a contested case hearing in the same manner as an appeal of any other order of the Commissioner under Chapter 12, except that the charter's operations would remain suspended pending the outcome of the appeal. Consistent with current processes, a charter could not appeal the Commissioner's final decision following the SOAH hearing.

This recommendation would allow the Commissioner to prevent a charter from opening for the next school year when the Commissioner believes the charter is at high risk of shutting down in the middle of the school year or term and displacing students, as well as placing state funds at risk. As is TEA's current practice, if TEA were to discover a charter's imminent insolvency in the middle of a school year, TEA would work with the charter to help it complete the school year or term, or help the charter deal with actual insolvency as it occurs.

### 7.3   Set eight-year terms for charters and restructure the renewal process to ensure failure to meet basic standards for accountability can lead to nonrenewal.

This recommendation would specify in statute that the initial and renewal term for a charter is eight years, at the end of which authority to operate a charter school would expire unless renewed by TEA. A longer, eight-year authorization term for initial and renewal terms would provide consistency in term lengths, and implementation of an automatic revocation process in Recommendation 7.1 should provide a mechanism for TEA to address the poorest performing charters that consistently fail accountability requirements. Charter holders would apply for renewal in advance of the eight-year expiration, under terms and timelines adopted by TEA in rule. TEA would be required to issue a decision on renewal of a charter before the expiration of the charter.

For charters with a proven record of high academic and financial performance, with no interventions or sanctions, TEA would provide the charter greater autonomy through a streamlined review and renewal process. TEA would be required to adopt clear standards for eligibility for this streamlined renewal in rule. For all other charters, TEA would examine the extent to which the charter has met academic, financial, and governance standards, as well as the extent to which the charter school has operated in compliance with its charter. TEA would be required to adopt in rule clear academic, financial, governance, or any other standards for renewal. TEA would have authority to ask for any additional information it deems necessary to determine whether a charter should be renewed. If TEA does not renew a charter, TEA would be authorized to impose conditions or requirements for improvement

during a one-year probationary period. If a charter fails to meet TEA conditions or standards within the one-year period, TEA must deny renewal of the charter.

If TEA does not renew a charter, the charter holder would be entitled to a contested case hearing at SOAH, under the framework outlined in the charter school statute. A charter school may stay open until the Commissioner makes a final decision to close and not renew the charter. If litigation results in final decision in the middle of a school year, existing statutory provisions allowing a charter that is not renewed to complete the school year would continue to apply. TEA would be required to adopt rules by September 1, 2014.

## 7.4 Provide for objective criteria and flexibility in applying sanctions to charter schools.

This recommendation would separate authority to deny renewal, revoke, probate, or modify a charter, and require the agency to establish separate performance standards or violations warranting each sanction. This recommendation would also change the bases for taking adverse action against a charter under the charter school statute to remove the subjective requirement to take action in the best interest of the school's students, and replace it with the following objective criteria:

- the charter's history of violations or performance on accountability systems;

- the severity of the charter's previous violations or poor performance on accountability systems;

- efforts by the charter to correct the violations or poor performance on accountability systems; and

- actions the Commissioner deems necessary to deter future violations or poor performance.

Statute would maintain the best interest of the school's students as a general principle, but it would no longer be a criterion for determining sanctions.

This recommendation would also grant TEA additional flexibility in applying sanctions for health and safety violations. After the agency holds a hearing, it would no longer be required to either cease its suspension or revoke the charter. Instead, TEA could apply any of the sanctions listed in the accountability statute, such as requiring professional services or appointment of a monitor or conservator.

## 7.5 Authorize TEA to reconstitute the governing board of a charter holder.

This recommendation would authorize the Commissioner to reconstitute the governing board of a charter holder if the Commissioner finds that the board is not providing adequate oversight of a charter school and other intermediate sanctions have not been effective in remedying the problems. The Commissioner would make all appointments to the new charter holder board, in accordance with terms and other provisions of the charter holder's bylaws. Before making appointments to the charter holder board, TEA would be required to gather local input from community members and parents. The Commissioner should consider appropriate expertise and credentials for appointment to the board, such as financial expertise, whether the person lives in the charter district, or if the person is an educator. This recommendation would allow TEA to re-appoint current members of the charter holder board.

If the charter holder board also oversees other enterprises of the nonprofit, this recommendation would authorize TEA to require the charter holder to create a new, single-purpose 501(c)(3) organization to oversee the charter school. TEA would appoint the members of that board and transfer the charter to that separate nonprofit. The charter holder would also have the option of surrendering the charter in

lieu of reconstitution. None of the authority that would be granted to TEA in this recommendation would supersede the Attorney General's authority over charitable organizations. Reconstituting a charter holder's board to be composed of qualified and interested board members would provide TEA with a tool to strengthen oversight of a charter, in lieu of seeking the charter's revocation. TEA would be required to adopt rules by September 1, 2014.

### 7.6 Apply standard prohibitions on nepotism to all charter schools.

This recommendation would remove the statutory exception to the prohibition on nepotism for charter schools with acceptable academic performance for two of the last three years. As a publicly funded entity, all restrictions, requirements, and prohibitions of Chapter 573 of the Government Code, such as prohibitions on the appointment, employment, or confirmation of employees within the third degree of consanguinity and second degree of affinity, would apply to all members of the charter holder board or employees of a charter school.

This recommendation would also change the provision related to conflicts of interest for members of the charter holder board to the second degree of affinity, from the third degree of affinity, to be consistent with the nepotism requirements and reduce confusion on the part of charter schools.

### 7.7 Prohibit family members from serving on a charter holder board together.

Under this approach, persons related to each other within the third degree of consanguinity and second degree of affinity would be prohibited from serving on a charter holder board at the same time. A charter holder would have two years from the effective date of this recommendation to replace any persons serving on a charter holder board to comply with this recommendation. This recommendation would ensure the charter holder board is free from situations in which the interests of family members on the board may conflict with the best interest of students.

### *Management Action*

### 7.8 TEA should revise its practices for applying interventions and sanctions to clarify expectations and ensure appropriate and timely action against poor performing charters.

This recommendation would direct the agency to revise its policies or practices for applying enforcement actions to be consistent with requirements or performance standards in rule for non-renewal, revocation, or other interventions and sanctions. TEA should ensure its rules for taking enforcement action set clear performance expectations and that the agency acts in accordance with those rules. TEA should use its full range of remedies in a timely manner to ensure charter schools meet accountability and performance expectations and provide a quality education for students. TEA would be required to adopt rules by September 1, 2014.

## Fiscal Implication

These recommendations should not result in additional costs to the State. While TEA would need to devote staff time to develop the changes to rules required by these recommendations, no new staff would be required.

. ...........................................

[1] Chapter 12, Texas Education Code.

[2] College and university charters are also regulated by TEA, and subject to most of the same rules as open-enrollment charters. However, college and university charters are granted under a different subchapter, and do not count against the statutory cap on open-enrollment charters.

[3] Section 12.101(b), Texas Education Code.

[4] Ibid.

[5] Section 12.115, Texas Education Code.

[6] Subchapter E, Chapter 39, Texas Education Code.

[7] Section 39.152, Texas Education Code; 19 T.A.C. Sections 97.1037 and 157.1151.

[8] Section 39.104(c), Texas Education Code.

[9] In the last 15 years, TEA revoked or denied renewal of 27 charters, and charter holders surrendered 21 charters in lieu of enforcement action.

[10] Following the 2010–2011 school year, TEA revoked one of these four charters and another charter was surrendered in lieu of revocation.

[11] Texas Education Agency, *Snapshot 2011 Summary Tables*, accessed August 31, 2012, http://ritter.tea.state.tx.us/perfreport/snapshot/2011/state.html.

[12] Section 12.115, Texas Education Code.

[13] Ibid.

[14] Section 12.1162, Texas Education Code.

[15] Section 12.115(b), Texas Education Code.

[16] 19 T.A.C. Section 100.1022(b)(1); Texas Education Agency, *Accreditation Status Matrix*, accessed October 2, 2012, http://www.tea.state.tx.us/index2.aspx?id=2147494532&menu_id=2147483702.

[17] Chapter 573, Texas Government Code.

[18] The Texas Tribune, *Interactive: How Much Does Your Superintendent Make?*, accessed September 17, 2012, http://www.texastribune.org/library/data/texas-superintendent-salaries-2011/.

[19] Section 39.151, Texas Education Code.

# Sunset Staff Review of the
# *Texas Education Agency*

———— *Report Prepared By* ————

Karen Latta, *Project Manager*

Erick Fajardo

Sarah Kirkle

Amy Trost

Skylar Wilk

Cee Hartley

Ginny McKay, *Project Supervisor*

Ken Levine
*Director*

Sunset Advisory Commission

Location
Robert E. Johnson Bldg., 6th Floor
1501 North Congress Avenue
Austin, TX 78701

Mail
PO Box 13066
Austin, TX 78711

Website
www.sunset.state.tx.us

Email
sunset@sunset.state.tx.us

Phone
(512) 463-1300

## CONTRACT FOR CHARTER

RECEIVED
OCT 16 1998
CHARTER SCHOOLS

This contract is executed the ___21st___ day of ___Sept___ 1998 between the Texas State Board of Education (the "Board) and ___The San Antonio Academy of Technologies___ ("Charterholder") for an open-enrollment charter to operate a Texas public school.

| General |
| --- |

1.  Definitions. As used in this contract:

    "Charter" means the open-enrollment charter, as provided by Subchapter D, Chapter 12, Texas Education Code (TEC), granted by this contract.

    "Charter school" means the open-enrollment charter school. Charterholder agrees to operate as provided in this contract. The charter school is a Texas public school.

    "Agency" means the Texas Education Agency.

2.  The Charter. This contract grants to Charterholder an open-enrollment charter under Subchapter D, Chapter 12, TEC. The terms of the charter include: (a) this contract; (b) applicable law; (c) Request for Application #701-98-016; (d) any condition, amendment, modification, revision or other change to the charter adopted or ratified by the Board; (e) all statements, assurances, commitments and representations made by Charterholder in its application for charter, attachments or related documents, to the extent consistent with (a) through (d); and (f) assurance by Charterholder, evidenced by execution of this contract, that no false information was submitted to the Agency or the Board by Charterholder, its agents or employees in support of its application for charter, .

3.  Authority Granted by Charter. The charter authorizes Charterholder to operate a charter school subject to the terms of the charter. Action inconsistent with the terms of the charter shall constitute a material violation of the charter.

4.  Alienation of Charter. The charter may not be assigned, encumbered, pledged or in any way alienated for the benefit of creditors or otherwise. Charterholder may not delegate, assign, subcontract or otherwise alienate any of its rights or responsibilities under the charter. Any attempt to do so shall be null and void and of no force or effect; provided, however, that Charterholder may contract at fair market value for services necessary to carry out policies adopted by Charterholder or the governing body of the charter school.

5.  Term of Charter. The charter shall be in effect from October ___10th___, 1998 through July 31, 2003, unless renewed or terminated.

183

---

**Ex. 2-Charter Contract**

6. <u>Renewal of Charter</u>. On timely application by Charterholder in a manner prescribed by the Board, the charter may be renewed for an additional period determined by the Board. The charter may be renewed only by written amendment approved by vote of the Board and properly executed by its chair.

7. <u>Revision by Agreement</u>. The terms of the charter may be revised with the consent of Charterholder by written amendment approved by vote of the Board. The commissioner of education ("the commissioner") may revise the charter on a provisional basis during an interim between Board meetings; however, such action shall expire unless ratified by the Board at its next regular meeting. Nothing in this paragraph limits the authority of the Board or the commissioner to act in accordance with other provisions of this contract.

## Students

8. <u>Open Enrollment</u>. Admission and enrollment of students shall be open to any person who resides within the geographic boundaries stated in the charter and who is eligible for admission based on lawful criteria identified in the charter. Total enrollment shall not exceed 310 students. The charter school's admission policy shall prohibit discrimination on the basis of sex, national origin, ethnicity, religion, disability, academic or athletic ability, or the district the student would otherwise attend. Students who reside outside the geographic boundaries stated in the charter shall not be admitted to the charter school until all eligible applicants who reside within the boundaries have been enrolled.

9. <u>Public Education Grant Students</u>. Charterholder shall adopt an express policy providing for the admission of, and shall admit under such policy, students eligible for a public education grant, including those students who reside outside the geographic area identified in the charter application, under Subchapter G, Chapter 29, TEC.

10. <u>Non-discrimination</u>. The educational program of the charter school shall be nonsectarian, and shall not discriminate against any student or employee on the basis of race, creed, sex, national origin, religion, disability or need for special education services.

11. <u>Children with Disabilities</u>. The charter school is a "local educational agency" as defined by federal law. Charterholder must comply with the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1401, et seq., and implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.§794, and implementing regulations; Title II of the Americans with Disabilities Act, 42 U.S.C. §12131-12165, and implementing regulations; Chapter 29, TEC, and implementing rules; and the many court cases applying these laws. For example:

184

(a) Child Find. Charterholder must adopt and implement policies and practices that affirmatively seek out, identify, locate, and evaluate children with disabilities enrolled in the charter school or contacting the charter school regarding enrollment, and must develop and implement a practical method to determine which children with disabilities are currently receiving needed special education and related services. For each eligible child, Charterholder must develop and offer an individualized education plan appropriate to the needs of that student.

(b) Free Appropriate Public Education. Charterholder must provide a free appropriate public education to all children with disabilities otherwise eligible to enroll in the charter school. If the program, staff or facilities of the charter school are not capable of meeting the needs of a particular child, Charterholder must implement changes necessary to accommodate the child at the charter school. If reasonable accommodations would be insufficient to enable the child to benefit from the charter school's program, Charterholder must, at its own expense, place the child at an appropriate school.

(c) Services to Expelled Students. Charterholder must continue to provide a free appropriate public education to a child with disabilities even after expelling or suspending the child for valid disciplinary reasons. This obligation to serve the child continues until the end of the school year.

(d) Monitoring. The charter school's implementation of the laws governing education of children with disabilities will be monitored for compliance by the United States Department of Education, Office of Special Education Programs; the United States Department of Education, Office of Civil Rights; the Texas Education Agency; and others. This monitoring activity includes responding to complaints, random on-site inspections and other investigations by the enforcing agencies, and will result in corrective actions imposed on Charterholder by these agencies for all discrepancies found.

(e) Due Process Hearings. The charter school's implementation of the laws governing education of children with disabilities will, in addition, be subject to court supervision via litigation against Charterholder brought by individuals affected by the actions of the charter school. The cost of this litigation can be substantial.

Notice: These are only a few of the charter school's legal responsibilities in this area, included here for illustrative purposes only.

12. Student Performance and Accountability. Charterholder shall satisfy Subchapters B, C, D, and G of Chapter 39 of the TEC, and related agency rules, as well as the student performance accountability criteria stated in its application for charter. Charterholder shall annually provide in a manner and form defined by the commissioner a written evaluation of the charter school's compliance with the statements, assurances,

185

commitments and representations made by Charterholder in its application for a charter, attachments, and related documents.

13. Criminal History. Charterholder shall take prompt and appropriate measures if Charterholder or the charter school, or any of their employees or agents, obtains information that an employee or volunteer of the charter school or an employee, officer, or board member of a management company contracting with the charter school has a reported criminal history that bears directly on the duties and responsibilities of the employee, volunteer, or management company at the school. Charterholder further represents that the Board and the agency shall be notified immediately of such information and the measures taken.

14. Reporting Child Abuse or Neglect. Charterholder shall adopt and disseminate to all charter school staff and volunteers a policy governing child abuse reports required by Chapter 261, Texas Family Code. The policy shall require that employees, volunteers or agents of Charterholder or the charter school report child abuse or neglect directly to an appropriate entity listed in Chapter 261, Texas Family Code.

15. Notice to District. Charterholder shall notify the school district in which the student resides within three business days of any action expelling or withdrawing a student from the charter school.

16. School Year. Charterholder shall adopt a school year with fixed beginning and ending dates.

## Financial Managment

17. Fiscal Year. Charterholder shall adopt a fiscal year beginning September 1 and ending August 31.

18. Financial Accounting. Unless otherwise notified by the agency, Charterholder shall comply fully with generally accepted accounting principles ("GAAP") and the Financial Accountability System Resource Guide, Bulletin 679 or its successor ("Bulletin 679") published by the agency in the management and operation of the charter school.

19. Federal Requirements. Failure to comply with Internal Revenue Service withholding regulations shall constitute a material violation of the charter.

20. Workers' Compensation. Charterholder shall extend workers' compensation benefits to charter school employees by (1) becoming a self-insurer; (2) providing insurance under a workers' compensation insurance policy; or (3) entering into an agreement with other entities providing for self-insurance.

21. Annual Audit. Charterholder shall at its own expense have the financial and programmatic operations of the charter school audited annually by a certified public accountant holding a permit from the Texas State Board of

336

Public Accountancy. Charterholder shall file a copy of the annual audit report, approved by Charterholder, with the agency not later than the 120th day after the end of the fiscal year for which the audit was made. The audit must comply with Generally Accepted Auditing Standards and must include an audit of the accuracy of the fiscal information provided by the charter school through PEIMS. Financial statements in the audit must comply with Government Auditing Standards and the Office of Management and Budget Circular 133.

22.  Attendance Accounting. To the extent required by the commissioner, Charterholder shall comply with the "Student Attendance Accounting Handbook" published by the Agency; provided, however, that Charterholder shall report attendance data to the agency at six-week intervals or as directed by the agency.

23.  Foundation School Program. . Distribution of funds to the charter school under Section 12.106, TEC, is contingent upon charterholder's compliance with the terms of the charter. Charterholder is ineligible to receive Foundation School Program funds prior to execution of this contract by the board. Within 30 days of receiving notice of overallocation and request for refund under Section 42.258, TEC, Charterholder shall transmit to the agency an amount equal to the requested refund. If Charterholder fails to make the requested refund, the agency may recover the overallocation by any means permitted by law, including but not limited to the process set forth in Section 42.258, TEC.

24.  Tuition and Fees. Charterholder shall not charge tuition and shall not charge a fee except that it may charge a fee listed in Subsection 11.158(a), TEC.

25.  Assets of Charter. Charterholder shall not apply, hold, credit, transfer or otherwise make use of funds, assets or resources of the charter school for any purpose other than operation of the charter school described in the charter.

26.  Indebtedness of Charter. Charterholder shall not incur a debt, secure an obligation, extend credit, or otherwise make use of the credit or assets of the charter school for any purpose other than operation of the charter school described in the charter.

27.  Interested Transactions. All financial transactions between the charter school and (a) Charterholder; (b) an officer, director, or employee of Charterholder or of the charter school; or (c) a person or entity having partial or complete control over Charterholder or the charter school shall be separately and clearly reflected in the accounting, auditing, budgeting, reporting, and record keeping systems of the charter school. Charterholder shall not transfer any asset of the charter or incur any debt except in return for goods or services provided for the benefit of the charter school at fair market value.

187

28. <u>Non-Charter Activities</u>. Charterholder shall keep separate and distinct accounting, auditing, budgeting, reporting, and record keeping systems for the management and operation of the charter school. Any business activities of Charterholder not directly related to the management and operation of the charter school shall be kept in separate and distinct accounting, auditing, budgeting, reporting, and record keeping systems from those reflecting activities under the charter. Any commingling of charter and non-charter business in these systems shall be a material violation of the charter.

<div style="text-align:center;background:#ccc;">**Governance and Operations**</div>

29. <u>Non-Profit Status</u>. Charterholder shall take and refrain from all acts necessary to be and remain in good standing as an organization exempt from taxation under Section 501(c)(3), Internal Revenue Code. If Charterholder is incorporated, it shall in addition comply with all applicable laws governing its corporate status. Failure to comply with this paragraph is a material violation of the charter, and the Board may act on the violation even if the Internal Revenue Service, Secretary of State, or other body with jurisdiction has failed to act.

30. <u>Records Retention and Management</u>. Charterholder shall implement a records management system that conforms to the system required of school districts under the Local Government Records Act, Section 201.001 et seq., Local Government Code, and rules adopted thereunder; provided, however, that records subject to audit shall be retained and available for audit for a period of not less than five (5) years from the latter of the date of termination or renewal of the charter.

31. <u>PEIMS Reporting</u>. Charterholder shall report timely and accurate information to the Public Education Information Management System (PEIMS), as required by the commissioner.

32. <u>Conflict of Interest</u>. Charterholder shall comply with any applicable prohibition, restriction or requirement relating to conflicts of interest. If an officer or board member of Charterholder or of the charter school has a substantial interest, within the meaning of Chapter 171, Local Government Code, in a transaction, such interest shall be disclosed in public session at a duly called meeting of the governing body prior to any action on the transaction.

33. <u>Disclosure of Campaign Contributions</u>. Charterholder shall adopt policies that will ensure compliance with the disclosure requirements of State Board of Education Operating Rule 4.3 or its successor.

34. <u>Indemnification</u>. Charterholder shall hold the Board and agency harmless from and shall indemnify the Board and agency against any and all claims, demands, and causes of action of whatever kind or nature asserted by any third party and occurring or in any way incident to, arising

out of, or in connection with wrongful acts of Charterholder, its agents, employees, and subcontractors.

35.  Failure to Operate.  Charterholder shall operate the charter school for the full school term as described in the charter application in each year of the charter contract.  Charterholder may not suspend operation for longer than 21 days without a revision to its charter, adopted by the Board, stating that the charter school is dormant and setting forth the date on which operations shall resume and any applicable conditions. Suspension of operations in violation of this paragraph shall constitute abandonment of this contract and of the charter.

36.  Charter School Facility.  Charterholder shall have and maintain throughout the term of the charter a lease agreement, title or other legal instrument granting to Charterholder the right to occupy and use one or more facilities suitable for use as the charter school facilities described by the charter.  During any period of dormancy granted by the Board, this requirement may be waived by the Board.  Facilities occupied and used as charter school facilities shall comply with all applicable laws, including, but not limited to, the Texas Architectural Barriers Act, Article 9102, Vernon's Texas Civil Statutes.

## Enforcement

37.  Agency Investigations.  The commissioner may in his sound discretion direct the agency to conduct investigations of the charter school to determine compliance with the terms of the charter or as authorized in Sections 39.074 and 39.075, Subchapter D, Chapter 39, TEC or other law.  Charterholder, its employees and agents shall fully cooperate with such investigations.  Failure to timely comply with reasonable requests for access to sites, personnel, documents or things is a material violation of the charter.

38.  Commissioner Authority.  The commissioner in his sole discretion may take any action authorized by Section 39.131, TEC or Chapter 29, TEC relating to the charter school.  Such action is not "adverse action" as used in this contract.  Charterholder, its employees and agents shall fully cooperate with such actions.  Failure to timely comply with any action authorized by Section 39.131, TEC or Chapter 29, TEC is a material violation of the charter.

39.  Adverse Action.  The Board in its sole discretion may modify, place on probation, revoke or deny timely renewal of the charter for cause ("adverse action").  Each of the following shall be cause for adverse action on the charter:  (a) any material violation of the terms of the charter listed in paragraphs 2, 3, and 20; (b) failure to satisfy generally accepted accounting standards of fiscal management; or (c) failure to comply with an applicable law or rule.

189

**This Agreement**

40. Entire Agreement. This contract, including all referenced attachments and terms incorporated by reference, contains the entire agreement of the parties. All prior representations, understandings and discussions are merged into, superseded by and canceled by this contract.

41. Severability. If any provision of this contract is determined by a court or other tribunal to be unenforceable or invalid for any reason, the remainder of the contract shall remain in full force and effect, so as to give effect to the intent of the parties to the extent valid and enforceable.

42. Conditions of Contract. Execution of this contract by the Board is conditioned on full and timely compliance by Charterholder with: (a) the terms, required assurances and conditions of Request for Application #701-97-028; (b) applicable law; and (c) all commitments and representations made in Charterholder's application and any supporting documents (to the extent such commitments and representations are consistent with the terms of this contract).

43. No Waiver of Breach. No assent, express or implied, to any breach of any of the covenants or agreements herein shall waive any succeeding or other breach.

44. Venue. Any suit arising under this contract shall be brought in Travis County, Texas.

45. Governing Law. In any suit arising under this contract, Texas law shall apply.

46. Authority. By executing this contract, Charterholder represents that it is an "eligible entity" within the meaning of Section 12.101 (a), TEC. Charterholder shall immediately notify the Board of any legal change in its status which would disqualify it from holding the charter, of any violation of the terms and conditions of this contract, or of any change in the chief operating officer of the charter school or Charterholder. Charterholder further represents that the person signing this contract has been properly delegated authority to do so.

Entered into this _____ day of _____, 1998.

Texas State Board of Education

By Dr. Jack Christie
Chairman

Charterholder

By _____

190



**Texas Education Agency**

Michael Williams
Commissioner

STATE OF TEXAS         §
                              §
COUNTY OF TRAVIS     §

## CERTIFIED RECORDS OF THE TEXAS EDUCATION AGENCY

I, Mo Brantley, a custodian of official records of the Texas Education Agency, after causing a search to be made of such records, do hereby certify that the following documents are true and correct copies of the documents from the Agency's files:

- Commissioner's December 8, 2014, Notice of Intent to Revoke Open-Enrollment

   Charter sent to the Academy of Careers and Technologies. (8 pages)

**IN TESTIMONY THEREOF,** I have signed my name officially and caused to be impressed hereon the Seal of the Texas Education Agency at my office in the city of Austin, Travis County, Texas, this 17 day of March, 2015.



MO BRANTLEY
CUSTODIAN OF RECORDS,
TEXAS EDUCATION AGENCY,
OFFICE OF COMPLAINTS, INVESTIGATIONS &
ENFORCEMENT

341

**Ex. 3-Notice of Intent to Revoke**


Michael Williams
Commissioner

015-816

---

**NOTICE OF INTENT TO REVOKE**
**OPEN-ENROLLMENT CHARTER**

---

December 8, 2014

**Via Certified Mail**

Tonja Nelson, Superintendent
Academy of Careers and Technologies Charter School
PO Box 681866
San Antonio, Texas 78268

Paula Applin, Board President
Academy of Careers and Technologies Inc.
PO Box 681866
San Antonio, Texas 78268

RE:  Open-Enrollment Charter Held by Academy of Careers and Technologies Inc.

Dear Dr. Nelson and Ms. Applin:

This is to notify you that I, as Commissioner of Education, am revoking the open-enrollment contract for charter held by Academy of Careers and Technologies Inc. (hereinafter referred to as the "charter holder") for the Academy of Careers and Technologies Charter School pursuant to Texas Education Code (TEC) §12.115(c).

---

**I. Revocation under TEC §12.115(c)**

---

On or about September 1, 1998, a charter contract creating the open-enrollment charter school that is the subject of this action was entered into by Academy of Careers and Technologies Inc.[1] and the State Board of Education (SBOE). During the 83rd legislative session, TEC §12.115 was amended to include a statutory provision for the revocation of charters that fail to meet academic or financial accountability performance ratings for the three preceding school years, or any combination thereof. Charters failing to meet the specified criteria are subject to mandatory revocation of their charter. The specific school years that must be considered in reaching any revocation decision are also listed. TEC §12.115(c).

---

[1] Subsequent to the execution of the charter contract, the charter holder's name has changed to the name referenced in this document.

The commissioner shall revoke the charter of an open-enrollment charter school if: 1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding school years; 2) the charter holder has been assigned a financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or 3) the charter holder has been assigned any combination of the rating described by Subdivision (1) or (2) for the three preceding school years.

For revocation actions initiated following the issuance of the 2013-14 academic and financial accountability ratings, the three preceding academic accountability ratings that shall be considered are the 2010-2011, 2012-2013, and 2013-14 academic accountability ratings.[2] The three preceding financial accountability ratings that shall be considered are the 2011-2012, 2012-2013, and 2013-14 financial accountability ratings. TEC §12.115(c-1).

Specifically, Academy of Careers and Technologies Charter School was assigned the following ratings:

- 2011-2012 financial accountability rating of "Substandard Achievement" (Exhibit A);

- 2012-2013 financial accountability rating of "Substandard Achievement" (Exhibit B);

- 2013-2014 financial accountability rating of "Substandard Achievement" (Exhibit C); and

- 2013-2014 academic accountability rating of "Improvement Required" (Exhibit D).

All rights to appeal the ratings identified above have been waived or exhausted, and these ratings are now final and not appealable. TEC §39.151(d). Accordingly, pursuant to TEC 12.115(c), the charter held by Academy of Careers and Technologies Inc. is subject to mandatory revocation.

## II. Appointment of a Conservator

Further, I am assigning a conservator, pursuant to TEC §39.102(a)(7) and 19 Texas Administrative Code (TAC) §§ 97.1057, 97.1059 and 97.1073, due to the on-going and long-standing deficiencies and because such intervention is necessary to prevent substantial or imminent harm to the welfare of the charter school's students or to the public interest. I am appointing Richard Clifford to the Academy of Careers and Technologies Charter School to serve as a Texas Education Agency (TEA) conservator.

As a TEA conservator, Richard Clifford's role will include, but is not limited to, the following:

- Overseeing the financial management and governance of the charter school to ensure the charter school complies with state and federal law;
- Attending board meetings, including executive session, and directing the board as necessary to address the findings in the Final Report required by TAC §100.1052(a); and
- Overseeing all close-out activities of the charter school.

Please note that the appointment of Richard Clifford does not relieve the charter school and its governing board of the responsibility to, at all times, operate the charter school in

---

[2] No academic accountability ratings were issued for the 2011-12 school year due to the transition from the TAKS test to the STAAR test, and performance from that academic year is not considered for purposes of revocation under TEC §12.115(c)(1). TEC §12.115(c-1).

compliance with all applicable statutes and rules. The agency reserves the right to implement all available interventions and sanctions under TEC, Chapters 39, and Title 19, TAC, Chapters 97, to address the current, or any future, deficiencies identified for Academy of Careers and Technologies Charter School.

Agency staff will be present at the next meeting of the charter school's governing board to introduce Richard Clifford to the members of the board. The cost of the conservator's services will be paid by the charter school in accordance with TEC §39.110. The conservator's fee shall be $85 per hour plus necessary travel expenses not to exceed the state per diem rate. Failure to make timely payments to the conservator may result in appropriate amounts being deducted from the charter school's Foundation School Program (FSP) funds.

---

## III. Opportunity for Informal Review and Hearing

---

This is your Notice of my intent, as Commissioner of Education, to revoke the open-enrollment charter contract held by Academy of Careers and Technologies Inc. and to appoint a conservator. As set forth in 19 TAC §157.1123, the charter holder has the right to request an informal review regarding the Commissioner's intent to revoke the charter and to appoint a conservator. However, this informal review shall be provided only if the charter holder submits a written request for informal review **not later than January 12, 2015.** 19 TAC §157.1123(b). Written information may be submitted by the required deadline for requesting an informal review. 19 TAC §157.1123(c). If no informal review is requested by the deadline, a final decision may be issued without informal review. 19 TAC §157.1123(d).

**Failure to submit a request by January 12, 2015 shall result in waiver of any right to a hearing on the proposed revocation of the open-enrollment charter.**

If you submit a timely request and I do not change my decision regarding the revocation during the informal review, this issue will be sent to the State Office of Administrative Hearings for a hearing pursuant to TEC §12.116. Any hearing provided shall be limited to the specific findings and/or recommendations detailed in this correspondence. Under TEC §12.116(c), the administrative law judge must uphold my decision unless the judge finds the decision arbitrary and capricious or clearly erroneous. The decision of the administrative law is final and may not be appealed.

Any written response or other correspondence pertaining to this Notice must be sent to:

Eric Marin, Legal Counsel
Texas Education Agency
1701 North Congress Avenue
Suite 2-150
Austin, Texas 78701-1494

Sincerely,

Michael Williams
Commissioner of Education

MW/cc

Enclosures

cc: Dr. Ronald L. Beard, Executive Director, Region 20, Education Service Center
    Lizzette Gonzalez Reynolds, Chief Deputy Commissioner, TEA
    Michael Berry, Deputy Commissioner, Policy and Programs, TEA
    Alice McAfee, Associate Commissioner, Complaints, Investigations, and Enforcement, TEA
    Lisa Dawn-Fisher, Associate Commissioner, School Finance, TEA
    Sally Partridge, Associate Commissioner, Accreditation and School Improvement, TEA
    Nora Hancock, Associate Commissioner, Grants and Federal Fiscal Compliance, TEA
    Von Byer, General Counsel, TEA
    Heather Mauze, Director, Charter Schools, TEA
    Chris Cowan, Director, Enforcement Coordination, TEA
    Ron Rowell, Director, Governance, TEA
    Eric Marin, Legal Counsel
    Richard Clifford, Conservator



**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**

| Rating Year: | 2011-2012 ▼ | CDN: | 015816 ▼ | Select An Option ▼ | Help |

Home   Exit

## 2011-2012 Ratings Based on School Year 2010-2011 Data - Charter School Status Detail

Charter School Status Detail     Indicator Detail Summary     Determination of Ratings

### Size-Dependent Indicators

**Name:** **ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816)**

**Publication Level 0:** 6/19/2012 4:03:28 PM

**Status:** **FAILED**

**Publication Level 1:** 8/7/2012 9:16:36 AM

**Rating:** Substandard Achievement

**Publication Level 2:** 9/20/2012 8:29:51 AM

**Charter School Score:** 47

**Passing Score:** 50

**Last Updated:** 6/19/2012 4:03:28 PM

## Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15



**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**

**Rating Year:** 2012-2013 ▼ **CDN:** 015816 ▼ | Select An Option ▼ | Help

Home | Exit

## 2012-2013 Ratings Based on School Year 2011-2012 Data - Charter School Status Detail

Charter School Status Detail          Indicator Detail Summary          Determination of Ratings

### Size-Dependent Indicators

| | |
|---|---|
| **Name:  ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816)** | **Publication Level 0:**  6/20/2013 10:42:58 AM |
| **Status:  FAILED** | **Publication Level 1:**  9/12/2013 6:37:32 PM |
| **Rating:**  Substandard Achievement | **Publication Level 2:**  9/12/2013 6:37:32 PM |
| **Charter School Score:**  45 | |
| **Passing Score:**  50 | **Last Updated:**  9/12/2013 6:37:32 PM |

## Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15


**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**
**Rating Year:** | 2013-2014 ▼ | **CDN:** | 015816 ▼ | Select An Option ▼ | Help

Home | Exit

## 2013-2014 Ratings Based on School Year 2012-2013 Data - Charter School Status Detail

Charter School Status Detail        Indicator Detail Summary        Determination of Ratings

### Size-Dependent Indicators

**Name:** ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816)

**Publication Level 0:** 6/17/2014 8:14:23 AM

**Status:** FAILED

**Publication Level 1:** 9/5/2014 3:56:38 PM

**Rating:** Substandard Achievement

**Publication Level 2:** 9/5/2014 3:58:47 PM

**Charter School Score:** 0

**Passing Score:** 50

**Last Updated:** 9/5/2014 3:58:47 PM

## Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15

# TEXAS EDUCATION AGENCY
## 2014 Accountability Summary
## ACADEMY OF CAREERS AND TECHNOLOGIE (015816)

## Accountability Rating
## Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - Student Achievement | - Postsecondary Readiness |
| - Closing Performance Gaps | |

## Performance Index Report

| Index 1 | Index 2 | Index 3 | Index 4 |
|---|---|---|---|
| 67 | N/A | 32 | 48 |
| Student Achievement (Target Score=55) | Student Progress | Closing Performance Gaps (Target Score = 31) | Postsecondary Readiness (Target Score = 57) |

## Distinction Designation

| Postsecondary Readiness |
|---|
| NOT ELIGIBLE |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 64 | 96 | 67 |
| 2 - Student Progress | N/A | N/A | N/A |
| 3 - Closing Performance Gaps | 259 | 800 | 32 |
| 4 - Postsecondary Readiness | | | |
| STAAR Score | 7.6 | | |
| Graduation Rate Score | 16.9 | | |
| Graduation Plan Score | 18.8 | | |
| Postsecondary Indicator Score | 5.0 | | 48 |

## System Safeguards

### Number and Percent of Indicators Met

| | |
|---|---|
| Performance Rates | 4 out of 6 = 67% |
| Participation Rates | 0 out of 4 = 0% |
| Graduation Rates | 0 out of 2 = 0% |
| Met Federal Limits on Alternative Assessments | 0 out of 1 = 0% |
| **Total** | **4 out of 13 = 31%** |

For further information about this report, please see the Performance Reporting Division web site at http://ritter.tea.state.tx.us/perfreport/account/2014/index.html

TEA's Motion for Summary Disposition
TEA v. Academy of Careers and Technologies Inc.
SOAH Docket No. 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

STATE OF TEXAS      §
                             §

COUNTY OF TRAVIS      §

## AFFIDAVIT OF DR. LISA DAWN-FISHER

1. My name is Dr. Lisa Dawn-Fisher. I am over the age of 18, of sound mind, and able to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

2. I am employed by the Texas Education Agency as the Chief School Finance Officer.

3. I have examined the exhibits attached to the letter dated December 8, 2014, sent by the Texas Commissioner of Education to Academy of Careers and Technologies Inc.

4. Exhibits A, B, and C show that Academy of Careers and Technologies Charter School (charter school) was assigned ratings of "Substandard Achievement" for the 2011-2012, 2012-2013, and 2013-2014 school years.

5. Ratings of "Substandard Achievement" in the 2011-2012, 2012-2013, and 2013-2014 school years constitute lower than satisfactory performance ratings under the accountability system used by the Texas Education Agency to implement Subchapter D, Chapter 39, of the Texas Education Code.

6. The charter school was provided with notice and an opportunity to appeal its 2011-2012, 2012-2013, and 2013-2014 financial performance ratings. It appealed each of the three ratings, and each appeal was denied. No further appeal is available, and these ratings are now final.

Dr. Lisa Dawn-Fisher

SWORN TO AND SUBSCRIBED before me, on this the 16th day of March, 2015, by Dr. Lisa Dawn-Fisher.

[SEAL] DIANE SALDANA
Notary Public, State of Texas
My Commission Expires
MARCH 15, 2018

Notary Public's Signature

**Ex. 4-Affidavit of LDF**



**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**

| Rating Year: | 2011-2012 ▼ | CDN: | 015816 ▼ | Select An Option ▼ | Help |

| | Home | Exit |

## 2011-2012 Ratings Based on School Year 2010-2011 Data – Charter School Status Detail

Charter School Status Detail      Indicator Detail Summary      Determination of Ratings

Size-Dependent Indicators

| | |
|---|---|
| **Name:** ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816) | **Publication Level 0:** 6/19/2012 4:03:28 PM |
| **Status:** FAILED | **Publication Level 1:** 8/7/2012 9:16:36 AM |
| **Rating:** Substandard Achievement | **Publication Level 2:** 9/20/2012 8:29:51 AM |
| **Charter School Score:** 47 | |
| **Passing Score:** 50 | **Last Updated:** 6/19/2012 4:03:28 PM |

## Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15

351



**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**

| Rating Year: | 2012-2013 ▼ | CDN: | 015816 ▼ | Select An Option ▼ | Help |

Home | Exit

## 2012-2013 Ratings Based on School Year 2011-2012 Data - Charter School Status Detail

Charter School Status Detail     Indicator Detail Summary     Determination of Ratings

Size-Dependent Indicators

| | |
|---|---|
| **Name:** ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816) | **Publication Level 0:** 6/20/2013 10:42:58 AM |
| **Status:** FAILED | **Publication Level 1:** 9/12/2013 6:37:32 PM |
| **Rating:** Substandard Achievement | **Publication Level 2:** 9/12/2013 6:37:32 PM |
| **Charter School Score:** 45 | |
| **Passing Score:** 50 | **Last Updated:** 9/12/2013 6:37:32 PM |

## Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15

352



**Charter School - School FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**

**Rating Year:** | 2013-2014 ▼ | **CDN:** | 015816 ▼ | Select An Option | ▼ | Help

Home | Exit

## 2013-2014 Ratings Based on School Year 2012-2013 Data - Charter School Status Detail

Charter School Status Detail        Indicator Detail Summary        Determination of Ratings

Size-Dependent Indicators

| | |
|---|---|
| **Name:** ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816) | **Publication Level 0:** 6/17/2014 8:14:23 AM |
| **Status:** FAILED | **Publication Level 1:** 9/5/2014 3:56:38 PM |
| **Rating:** Substandard Achievement | **Publication Level 2:** 9/5/2014 3:58:47 PM |
| **Charter School Score:** 0 | |
| **Passing Score:** 50 | **Last Updated:** 9/5/2014 3:58:47 PM |

# Options

Print

Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.state.tx.us
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.1.0.15

353



1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

Michael Williams
Commissioner

STATE OF TEXAS       §

COUNTY OF TRAVIS       §
§
§

### CERTIFIED RECORDS OF THE TEXAS EDUCATION AGENCY

I, Mo Brantley, a custodian of official records of the Texas Education Agency, after causing a search to be made of such records, do hereby certify that the following documents are true and correct copies of the documents from the Agency's files:

- Commissioner's February 19, 2015, letter sent to Academy of Careers and

  Technologies regarding the informal review decision. (3 pages)

**IN TESTIMONY THEREOF,** I have signed my name officially and caused to be impressed hereon the Seal of the Texas Education Agency at my office in the city of Austin, Travis County, Texas, this 17 day of March, 2015.



MO BRANTLEY
CUSTODIAN OF RECORDS,
TEXAS EDUCATION AGENCY,
OFFICE OF COMPLAINTS, INVESTIGATIONS &
ENFORCEMENT


015-816

February 19, 2015

**Via Certified Mail**

Tonja Nelson, Superintendent
Academy of Careers and Technologies Charter School
PO Box 681866
San Antonio, Texas 78268

Paula Applin, Board President
Academy of Careers and Technologies Inc.
PO Box 681866
San Antonio, Texas 78268

> RE: **Open-Enrollment Charter Held by Academy of Careers and Technologies, Inc.**

Dear Dr. Nelson and Ms. Applin:

I, as Commissioner of Education, have received your response to the Texas Education Agency's (TEA) December 8, 2014, notice of intent to revoke the open enrollment charter held by Academy of Careers and Technologies, Inc. I have conducted an informal review of your response and determined that the TEA will proceed with the revocation of the contract for the charter effective August 21, 2015, with school operations to cease no later than June 30, 2015. Pursuant to 19 Texas Administrative Code (TAC) §157.1183, a petition for review of this decision must be received no later than **March 6, 2015.**

If a petition for review complying with the requirements contained in 19 TAC §157.1183 (attached) is received by the deadline, it will be forwarded to the State Office of Administrative Hearings (SOAH) for a hearing pursuant to §12.116(c) of the Texas Education Code (TEC). A petition for review pursuant to 19 TAC §157.1183 requires the following:

> (1) The petition for review shall include a copy of the challenged decision and any attachments or exhibits to the decision.

> (2) The petition for review shall concisely state, in numbered paragraphs:

<span style="color:blue">355</span>

(A) if alleging the decision was arbitrary or capricious, each finding, inference, conclusion, or decision affected and the specific facts supporting a conclusion that each was so affected;

(B) if alleging the decision was clearly erroneous, each finding, inference, conclusion, or decision affected and the specific facts supporting a conclusion that each was so affected; and

(C) for each violation, error, or defect alleged under subparagraphs (A) and (B) of this paragraph, the substantial rights of the school district or charter school that were prejudiced by such violation, error, or defect.

(3) A petition for review shall further contain:

(A) a concise statement of the relief sought by the petitioner; and

(B) the name, mailing address, telephone number, and facsimile number of the petitioner's representative.

(4) A request for relief in a review under this division may not be made orally or as part of the record at a prehearing conference or hearing.

If the petition for review does not meet the requirements of 19 TAC §157.1183, the petition for review will be dismissed without further review and without referral to SOAH.

The charter holder also requested an informal review of the December 8, 2014, conservator appointment and, after review, I have determined that the appointment should remain in effect. No further review of the appointment is available under the TEC or applicable rules.

Any written response or other correspondence pertaining to this notice must be sent to:

Eric Marin, Legal Counsel
Texas Education Agency
1701 North Congress Avenue
Suite 2-150
Austin, Texas 78701-1494

Sincerely,

Michael Williams
Commissioner of Education

MW/cc

Enclosures

cc: Dr. Ronald L. Beard, Executive Director, Region 20, Education Service Center
Lizzette Gonzalez Reynolds, Chief Deputy Commissioner, TEA
Michael Berry, Deputy Commissioner, Policy and Programs, TEA
Alice McAfee, Associate Commissioner, Complaints, Investigations, and Enforcement, TEA
Lisa Dawn-Fisher, Associate Commissioner, School Finance, TEA
Sally Partridge, Associate Commissioner, Accreditation and School Improvement, TEA
Nora Hancock, Associate Commissioner, Grants and Federal Fiscal Compliance, TEA
Von Byer, General Counsel, TEA
Christopher Jones, Senior Legal Counsel, TEA
Eric Marin, Legal Counsel, TEA
Heather Mauze, Director, Charter Schools, TEA
Chris Cowan, Director, Enforcement Coordination, TEA
Ron Rowell, Director, Governance, TEA
Richard Clifford, Conservator

TEA's Motion for Summary Disposition
TEA v. Academy of Careers and Technologies Inc.
SOAH Docket No. 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

STATE OF TEXAS §
§
§
COUNTY OF TRAVIS §

## AFFIDAVIT OF SHANNON HOUSSON

1.  My name is Shannon Housson. I am over the age of 18, of sound mind, and able to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

2.  I am employed by the Texas Education Agency as the director of the Division of Performance Reporting.

3.  I have examined the exhibits attached to the letter dated December 8, 2014, sent by the Texas Commissioner of Education to Academy of Careers and Technologies Inc.

4.  Exhibit D shows that Academy of Careers and Technologies Charter School (charter school) was assigned a rating of "Improvement Required" in the 2013-2014 school year.

5.  A rating of "Improvement Required" in the 2013-2014 school year is an unacceptable performance rating under the accountability system used by the Texas Education Agency to implement Subchapter C, Chapter 39, of the Texas Education Code.

6.  The charter school was provided with notice and an opportunity to appeal its 2013-2014 academic performance rating. The charter school filed an appeal, and the appeal was denied. No further appeal is available, and this rating is now final.

_Shannon Housson_
Shannon Housson

SWORN TO AND SUBSCRIBED before me, on this the 14th day of March, 2015, by Shannon Housson.

[SEAL]
DIANE SALDANA
Notary Public, State of Texas
My Commission Expires
MARCH 15, 2018

_Diane Saldana_
Notary Public's Signature

21

358

**Ex. 6- SH Affidavit**

# TEXAS EDUCATION AGENCY
## 2014 Accountability Summary
### ACADEMY OF CAREERS AND TECHNOLOGIE (015816)

## Accountability Rating
### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - Student Achievement | - Postsecondary Readiness |
| - Closing Performance Gaps | |

## Performance Index Report

| Index 1 | Index 2 | Index 3 | Index 4 |
|---|---|---|---|
| 67 | N/A | 32 | 48 |
| Student Achievement (Target Score=55) | Student Progress | Closing Performance Gaps (Target Score = 31) | Postsecondary Readiness (Target Score = 57) |

## Distinction Designation

| Postsecondary Readiness |
|---|
| NOT ELIGIBLE |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 64 | 96 | 67 |
| 2 - Student Progress | N/A | N/A | N/A |
| 3 - Closing Performance Gaps | 259 | 800 | 32 |
| 4 - Postsecondary Readiness | | | |
| STAAR Score | 7.6 | | |
| Graduation Rate Score | 16.9 | | |
| Graduation Plan Score | 18.8 | | |
| Postsecondary Indicator Score | 5.0 | | 48 |

## System Safeguards

### Number and Percent of Indicators Met

| | |
|---|---|
| Performance Rates | 4 out of 6 = 67% |
| Participation Rates | 0 out of 4 = 0% |
| Graduation Rates | 0 out of 2 = 0% |
| Met Federal Limits on Alternative Assessments | 0 out of 1 = 0% |
| Total | 4 out of 13 = 31% |

For further information about this report, please see the Performance Reporting Division web site at http://ritter.tea.state.tx.us/perfreport/account/2014/index.html

**Exhibit D**

359



STATE OF TEXAS         §    CERTIFICATION OF OFFICIAL
                         §    RECORD OF THE STATE OFFICE

COUNTY OF TRAVIS      §    OF ADMINISTRATIVE HEARINGS

I, Susan Gage, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated. The State Office of Administrative Hearings (SOAH) has delegated to me the authority to serve as custodian of records and documents referred to below.

Pursuant to this authority, I have attached hereto true and correct copy of the following:

*Docket No. 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; In the Matter of Texas Education Agency vs Academy of Careers and Technologies, Inc. d/b/a Academy of Careers and Technologies Charter School*

       \*      Copy of *Decision and Order*

Records are kept in the regular course of business by SOAH. It was in the regular course of business for an employee or representative of SOAH, with knowledge of the act or event, to make the record or to transmit information thereof to be included in such record; and the record was made at or the near the time or reasonably soon thereafter. The records attached hereto are exact duplicates of the documents on file with SOAH.

IN WITNESS WHEREOF, I have executed this certificate under the official seal of the State Office of Administrative Hearings this 4th day of August, 2015, in the city of Austin, Travis County, Texas.



*Susan Gage*/rc
Susan Gage, Custodian of Records

Upload Date: 20150521084804    Account Number: 16    Upload Description: 15-2748D&O

# State Office of Administrative Hearings



Cathleen Parsley
Chief Administrative Law Judge

May 21, 2015

Christopher Jones                                        **VIA INTERAGENCY**
Texas Education Agency
Charter School Division
1701 Congress Avenue, 2nd Floor
Austin, Texas 78701

     RE:   SOAH Docket No. 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; Texas Education Agency v. Academy of
            Careers and Technologies, Inc. d/b/a Academy of Careers and Technologies
            Charter School

Dear Mr. Jones:

    Enclosed please find the Decision and Order on Summary Disposition in the above-
referenced case.

                    Sincerely,

                    Sharon Cloninger
                    Administrative Law Judge

SC/lh
Enclosure (Certified Evidentiary Record and Case File CD)
xc:     Eric Marin, Assistant Counsel, Texas Education Agency, 1701 N. Congress Ave., 2nd Floor, Austin, TX 78701 -
     **VIA INTERAGENCY**
     Stephen M. Foster, Attorney, 9013 Magna Carta Loop, Austin, TX 78754 - **VIA REGULAR MAIL.**

300 W. 15th Street, Suite 502, Austin, Texas 78701/ P.O. Box 13025, Austin, Texas 78711-3025
512.475.4993 (Main) 512.475.3445 (Docketing) 512.322.2061 (Fax)
www.soah.state.tx.us

361

| | | |
|---|---|---|
| TEXAS EDUCATION AGENCY, | § | BEFORE THE STATE OFFICE |
| Petitioner | § | |
| | § | |
| v. | § | OF |
| | § | |
| ACADEMY OF CAREERS AND | § | |
| TECHNOLOGIES INC. D/B/A | § | |
| ACADEMY OF CAREERS AND | § | |
| TECHNOLOGIES CHARTER | § | |
| SCHOOL, | § | |
| Respondent | § | ADMINISTRATIVE HEARINGS |

## DECISION AND ORDER ON SUMMARY DISPOSITION

Academy of Careers and Technologies Inc. d/b/a Academy of Careers and Technologies Charter School (Respondent) challenges the decision by the Commissioner of the Texas Education Agency (TEA) to revoke its charter. The Administrative Law Judge (ALJ) finds the Commissioner's decision was not arbitrary and capricious, or clearly erroneous. The Commissioner's decision to revoke Respondent's charter is upheld.

## I. JURISDICTION, PROCEDURAL HISTORY, AND NOTICE

The parties do not dispute that the State Office of Administrative Hearings (SOAH) has jurisdiction over this case. Jurisdiction is addressed in the Findings of Fact and Conclusions of Law sections of this Decision without further discussion here.

On December 8, 2014, the Commissioner provided Respondent with written notice of his decision to revoke its charter pursuant to Texas Education Code § 12.115(c) and of Respondent's opportunity to submit a written request by January 12, 2015, for an informal review of the decision.[1] Respondent apparently requested an informal review.[2] On February 19, 2015, the Commissioner notified Respondent that he had conducted an informal review and determined

---

[1] TEA Exhibit 1.

[2] Respondent's request for an informal review is not in evidence.

that TEA would proceed with the revocation.[3] The February 19, 2015 notification also informed Respondent of its right to submit a petition for review by March 6, 2015, to be forwarded to SOAH for a hearing. Respondent apparently timely submitted a petition for review[4] and the case was referred to SOAH on March 10, 2015.

On March 12, 2015, TEA staff (Staff) sent Respondent notice that a hearing would be held before a SOAH ALJ to review the Commissioner's decision. The hearing notice contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.[5] The notice complied with SOAH's hearing notice rule.[6]

On March 18, 2015, TEA staff filed a Motion for Summary Disposition (Motion)[7] and sent a copy of the Motion to Respondent's counsel of record via facsimile. Respondent did not respond to the Motion within 14 days of receipt.[8] On April 14, 2015, the ALJ issued Order No. 1 granting the Motion, finding there are no genuine issues of material fact and that TEA is entitled to a decision in its favor as a matter of law.[9] Because the Motion was granted, the hearing on the merits scheduled to be held on April 20, 2015, was canceled.

On April 17, 2015, Respondent filed a Motion for Rehearing. The ALJ granted the Motion for Rehearing on April 21, 2015, setting aside Order No. 1 and giving Respondent until May 6, 2015, to respond to the Motion. Respondent responded (Respondent's Response) on May 6, 2015. After reconsidering the Motion and Respondent's Response, the ALJ granted the Motion on May 11, 2015.

---

[3] TEA Exhibit 2.

[4] Respondent's petition for review is not in evidence.

[5] The hearing notice is not in evidence but was filed with SOAH on March 12, 2015.

[6] 1 Tex. Admin. Code § 155.401(a).

[7] *See* 1 Tex. Admin. Code § 155.103(c)(3).

[8] *See* 1 Tex. Admin. Code § 155.505(c).

[9] *See* 1 Tex. Admin. Code § 155.505.

## II. APPLICABLE LAW

### A.    Standard of Review

Section 12.116 of the Texas Education Code states in relevant part:

(c)    A decision by the commissioner to revoke a charter is subject to review by the State Office of Administrative Hearings.   Notwithstanding Chapter 2001, Government Code:[10]

> (1)    the administrative law judge shall uphold a decision by the commissioner to revoke a charter unless the judge finds the decision is arbitrary and capricious or clearly erroneous . . . .[11]

An agency's decision can be arbitrary and capricious if the agency:

- failed to consider legally relevant factors,[12]

- considered a legally irrelevant factor,[13]

- failed to follow its own rules or regulations,[14]

- denied a respondent due process and thereby prejudiced its substantial rights,[15] or

- considered only legally relevant factors but still reached a completely unreasonable result.[16]

---

[10] Government Code ch. 2001 does not apply to a procedure that is related to a revocation under Texas Education Code § 12.115.  Tex. Educ. Code § 12.116(b); 19 Tex. Admin. Code § 157.1182(a).

[11] *See also* 19 Tex. Admin. Code § 157.1184.

[12] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *see also Texas Dep't. of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245-46 (Tex. App.—Austin 2008, no pet.); *Public Util. Comm'n v. South Plains Elec. Co-op., Inc.*, 635 S.W.2d 954, 957 (Tex. App.—Austin 1982, writ ref'd n.r.e.).

[13] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *see also Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245-46 (Tex. App.—Austin 2008, no pet.); *Public Util. Comm'n v. South Plains Elec. Co-op., Inc.*, 635 S.W.2d 954, 957 (Tex. App.—Austin 1982, writ ref'd n.r.e.).

[14] *Office of Public Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555, 564 (Tex. App.—Austin 2006, pet. denied); *see also Power Res. Group, Inc. v. Public Util. Comm'n*, 73 S.W.3d 354, 358 (Tex. App.—Austin 2002, pet. denied).

[15] *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984).

[16] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)).

## B.    Standards for Revocation

Section 12.115 of the Texas Education Code was amended, effective September 1, 2013, to add the following subsections:

(c)    The commissioner shall revoke the charter of an open-enrollment charter school if:

    (1)    the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding school years;

    (2)    the charter holder has been assigned a financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

    (3)    the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.[17]

(c-1)    For purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be considered. For purposes of revocation under Subsection (c)(1), the initial three school years for which performance ratings under Subchapter C, Chapter 39, shall be considered are the 2009-2010, 2010-2011, and 2012-2013 school years. For purposes of revocation under Subsection (c)(2), the initial three school years for which financial accountability performance ratings under Subchapter D, Chapter 39, shall be considered are the 2010-2011, 2011-2012, and 2012-2013 school years. This subsection expires September 1, 2016.

## C.    Scope of Review

The scope of the ALJ's review does not include consideration of whether the academic or financial accountability performance ratings determinations underlying a revocation decision by the Commissioner are arbitrary and capricious, or erroneous. Instead, the ALJ is tasked with

---

[17]    The rules regarding TEA's accountability and performance monitoring are at 19 Texas Administrative Code ch. 97. The rules regarding TEA's financial accountability rating system are at 19 Texas Administrative Code §§ 109.101-.105.

considering whether the Commissioner's actual decision to revoke was arbitrary and capricious, or erroneous.

When a charter school disagrees with a performance rating, the rating is subject to review by the Commissioner. Pursuant to Texas Education Code § 39.151(a), the Commissioner by rule shall provide a process for an open-enrollment charter school to challenge an agency decision relating to an academic performance or financial accountability performance rating that affects the school. Texas Education Code § 39.151(b) requires that rules be promulgated to provide for the Commissioner to appoint a committee, which may not include a TEA employee, to make recommendations to him regarding a school's challenge. The Commissioner may limit a challenge to a written submission of any issue identified by the school challenging the academic performance or financial accountability performance rating.[18] The Commissioner shall make a final decision regarding the academic performance or financial accountability performance rating after considering the committee's recommendation.[19]

The Commissioner's decision following an informal review of a challenge to a performance rating may not be appealed under any law.[20] In addition, a school may not challenge a TEA decision relating to an academic performance or financial accountability performance rating in another proceeding if the school has had an opportunity to challenge the decision under Texas Education Code § 39.151.[21] Respondent had an opportunity, pursuant to Texas Education Code § 39.151, to challenge the performance ratings underlying the revocation decision. All rights to appeal the performance ratings have been waived or exhausted and these ratings are now final and not appealable.[22]

---

[18] Tex. Educ. Code § 39.151(c).

[19] Tex. Educ. Code § 39.151(d).

[20] Tex. Educ. Code § 39.151(d); *see also* 19 Tex. Admin. Code §§ 157.1121(5), .1123.

[21] Tex. Educ. Code § 39.151(e).

[22] TEA Exhibits 3 and 4; 19 Tex. Admin. Code §§ 157.1121(5), .1123.

**D.     Burden of Proof, Decision Due Date, and Finality of ALJ's Decision**

Staff bears the initial burden of proving the charter must be revoked. Once Staff establishes its *prima facie* case the burden shifts to the charter school to prove that the revocation decision is arbitrary and capricious, or clearly erroneous.[23]

In all cases in which the case is docketed at SOAH prior to March 15, the ALJ must issue a decision by May 31 of that same year.[24] The ALJ's decision in this matter is final and may not be appealed.[25]

## III. REVOCATION IS BASED ONLY ON LEGALLY RELEVANT FACTS

For the three school years preceding the Commissioner's December 2014 decision to revoke Respondent's charter, the Commissioner assigned Respondent the following performance ratings:

- a 2011-2012 financial accountability performance rating of "Substandard Achievement";[26]

- a 2012-2013 financial accountability performance rating of "Substandard Achievement";[27]

- a 2013-2014 financial accountability performance rating of "Substandard Achievement";[28] and

- a 2013-2014 academic performance rating of "Improvement Required."[29]

---

[23] *City of El Paso v Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

[24] 19 Tex. Admin. Code § 157.1186(f).

[25] 19 Tex. Admin. Code §§ 157.1184(b), .1188.

[26] TEA Exhibit 1, Attachment A; TEA Exhibit 3.

[27] TEA Exhibit 1, Attachment B; TEA Exhibit 3.

[28] TEA Exhibit 1, Attachment C; TEA Exhibit 3.

[29] TEA Exhibit 1, Attachment D; TEA Exhibit 4.

The Commissioner provided Respondent with notice and an opportunity to appeal each of these ratings.[30] Respondent's appeals of its 2011-2012, 2012-2013, and 2013-2014 financial accountability performance ratings were denied.[31] Respondent's appeal its 2013-2014 academic performance rating was denied.[32] Based on these performance ratings for the three preceding school years, the Commissioner decided to revoke Respondent's charter, as set out in his December 8, 2014 notification to Respondent.[33]

Under Texas Education Code § 12.115(c), Respondent's performance ratings for the three preceding school years were legally relevant factors that the Commissioner was required to consider when he decided to revoke Respondent's charter. The statute does not require or allow the Commissioner to consider any other factor. There is no evidence that the Commissioner considered anything other than Respondent's performance ratings in deciding to revoke Respondent's charter. Because the statute provides that the Commissioner "shall revoke the charter" if the holder's performance ratings are below specified levels (and Respondent's ratings were below those levels), the statute gives the Commissioner no authority to exercise his discretion and not revoke the charter.

The ALJ concludes that, in revoking Respondent's charter, the Commissioner followed the legally applicable substantive law, considered all legally relevant factors, and did not consider legally irrelevant factors.

## IV. SOAH HAS NO JURISDICTION TO REVIEW THE UNDERLYING RATINGS

### A.    Respondent's Evidence and Argument

Respondent states that technical errors and erroneously entered data resulted in its unacceptable and lower than satisfactory ratings. Respondent requests that the technical errors

---

[30] TEA Exhibit 1.

[31] TEA Exhibit 3.

[32] TEA Exhibit 4.

[33] TEA Exhibit 1.

and the erroneously entered data be corrected to show Respondent has met "Standard Achievement" criteria for the ratings at issue, with the result that its charter cannot be revoked.[34]

Respondent argues that it should be permitted to have the financial accountability ratings corrected as allowed by law, so as not to reflect third-party technical errors or the like. Respondent contends that third-party auditor errors for both the 2010-2011 and 2011-2012 school years have resulted in "Substandard Achievement" ratings. Respondent states that if given the opportunity for correction per 19 Texas Administrative Code § 109.1003(c) or Texas Education Code § 157.1187, the ratings would be changed to "Satisfactory" for both years.[35]

In addition, Respondent represents that the 2013-2014 financial accountability rating is in error. Respondent complains that pursuant to the requirement of Texas Education Code § 39.151(a) and the "unlawful appeal limitations" of 19 Texas Administrative Code § 109.1002(i)(2), TEA must revise Respondent's rating because it is based on an arbitrary and capricious interpretation of what constitutes a default on a debt.

Respondent contends that the 2013-2014 academic performance rating of "Improvement Required" is clearly erroneous due to a technical error.

## B.     ALJ's Analysis and Conclusion

Revocation is mandatory pursuant to Texas Education Code § 12.115 when performance ratings are properly finalized as unacceptable or below satisfactory for three consecutive school years.   An open-enrollment charter school may not appeal a performance rating in another proceeding, including in a hearing before SOAH, if it has had an opportunity to do so under Texas Education Code § 39.151.[36]   Respondent did, in fact, have an opportunity to appeal its performance ratings under Texas Education Code § 39.151.[37]   Respondent's appeals of its

---

[34]   Respondent's Response at 1; see Respondent Exhibits 1 through 5.

[35]   Respondent's Response at 2.  The 2010-2011 performance rating is not for one of the three preceding school years upon which the Commissioner's revocation decision was based.

[36]   Tex. Educ. Code § 39.151(e).

[37]   TEA Exhibits 3 and 4.

unacceptable and lower than satisfactory performance ratings were denied.[38] Upon receiving the Commissioner's December 8, 2014 Notice of Intent to Revoke Open-Enrollment Charter, Respondent requested an informal review. The Commissioner did not change his determination as a result of the informal review.[39] The Commissioner's final decision setting the performance ratings may not be appealed under any law.[40]

Thus, the scope of the ALJ's review does not include consideration of whether the financial and academic performance ratings underlying the Commissioner's revocation decision were arbitrary and capricious, or clearly erroneous. Instead, the ALJ is limited to determining whether the Commissioner's revocation decision is arbitrary and capricious, or clearly erroneous.[41] Therefore, the ALJ cannot consider Respondent's assertions regarding the correctness of its academic performance or financial accountability performance ratings.

## V. RESPONDENT WAS PROVIDED DUE PROCESS

One of the ways in which the Commissioner's revocation decision could be found to be arbitrary and capricious is if Respondent was not provided due process. However, the ALJ finds Respondent was provided due process.

Subsections (a) and (b) of Section 12.116 of the Texas Education Code state:

(a)     The commissioner shall adopt an informal procedure to be used for revoking the charter of an open-enrollment charter school ... as authorized by Section 12.115.

(b)     Chapter 2001, Government Code, does not apply to a procedure that is related to a revocation ... under this subchapter.

---

[38] TEA Exhibits 2, 3, and 4.

[39] TEA Exhibit 2.

[40] Tex. Educ. Code § 39.151(d).

[41] Tex. Educ. Code § 12.116(c)(1).

Given these statutes, the Commissioner was not required to follow a formal procedure to revoke Respondent's charter. Instead, he was required to follow an unspecified informal procedure.

Despite the statutory requirement to use an informal process, the Commissioner provided Respondent with the basic elements of due process—notice and an opportunity to be heard at a meaningful time and in a meaningful manner[42]—before the Commissioner revoked Respondent's charter. On December 8, 2014, the Commissioner provided Respondent with written notice of his decision to revoke its charter, setting out the factual and legal bases for that decision.[43] In that same letter, the Commissioner notified Respondent of the opportunity for an informal review of that decision by submitting a written request, by January 12, 2015, that contained specific responses to each of the findings that led the Commissioner to decide to revoke its charter.[44] Respondent apparently requested an informal review of the Commissioner's decision. On February 19, 2015, the Commissioner notified Respondent of his decision to proceed with the revocation.[45]

The ALJ concludes that the Commissioner followed the applicable procedural law, provided the Respondent with due process, and did not prejudice Respondent's substantial rights before deciding to revoke its charter.

## VI. REVOCATION IS NOT A COMPLETELY UNREASONABLE RESULT

Even if an agency considered only legally relevant factors, its decision would be an abuse of discretion if it reached a completely unreasonable result.[46] A decision might be completely unreasonable if it is inconsistent with a prior decision or order of the agency related to the same

---

[42] *University of Texas Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 930 (Tex. 1995) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976)); *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657-58 (Tex. 1965).

[43] TEA Exhibit 1.

[44] TEA Exhibit 1.

[45] TEA Exhibit 2.

[46] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)).

law, the same parties, or other parties with the same legal issues and substantially the same facts.[47] It is a delicate task to decide that an agency acted arbitrarily despite the fact that it purported to have weighed all the relevant factors and only the relevant factors. Because the balance is so delicate, striking the decision should be avoided unless the agency has clearly acted unreasonably, and thereby abused its discretion.[48]

There is no evidence that the Commissioner's decision to revoke Respondent's charter is inconsistent with the way he has treated Respondent or others in the past when revoking charters under Section 12.115(c) of the Texas Education Code. The ALJ concludes that the Commissioner's decision to revoke Respondent's charter was not a completely unreasonable result.

## VII. THE DECISION WAS NOT CLEARLY ERRONEOUS

The Texas Supreme Court has defined the "clearly erroneous" standard as follows: "A finding is considered clearly erroneous when the reviewing body 'is left with the definite and firm conviction that a mistake has been committed.'"[49] The evidence does not leave the ALJ with a definite and firm conviction that the Commissioner committed a mistake in revoking the charter. Therefore, the Commissioner's decision was not clearly erroneous.

## VIII. FINDINGS OF FACT

1.      On September 1, 1998, a charter contract creating the open-enrollment charter school that is the subject of this action was entered into by the Academy of Careers and Technologies Inc. d/b/a Academy of Careers and Technologies Charter School (Respondent) and the State Board of Education.

---

[47] *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 901 (Tex. App.—Austin 1993, writ denied); *Austin Chevrolet, Inc. v. Motor Vehicle Bd. & Motor Vehicle Div. of Texas Dep't of Transp.*, 212 S.W.3d 425, 438 (Tex. App.—Austin 2006, pet. denied); *AEP Texas N. Co. v. Public Util. Comm'n*, 297 S.W.3d 435, 450 (Tex. App.—Austin 2009, pet. denied); *see also* Ronald L. Beal, 1 *Texas Administrative Practice and Procedure* § 9.3.7, at 9-76 to 9-77 (2012).

[48] *Gerst v Nixon*, 411 S.W.2d 350, 360 n. 8 (Tex. 1966).

[49] *Hunter Indus. Facilities, Inc. v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 96 (Tex. App.—Austin 1995, writ denied) (citing *United States v U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)).

2. Respondent received a combination of unacceptable academic performance and lower than satisfactory financial accountability performance ratings from the Texas Education Agency (TEA) for three consecutive school years. Specifically, Respondent received:

   (a) a 2011-2012 financial accountability performance rating of "Substandard Achievement";

   (b) a 2012-2013 financial accountability performance rating of "Substandard Achievement;"

   (c) a 2013-2014 financial accountability performance rating of "Substandard Achievement"; and

   (d) a 2013-2014 academic performance rating of "Improvement Required."

3. Respondent's appeals of its 2011-2012, 2012-2013, and 2013-2014 financial accountability performance ratings were denied.

4. Respondent's appeal of its 2013-2014 academic performance rating was denied.

5. On December 8, 2014, TEA's Commissioner provided Respondent with notice of his decision to revoke Respondent's charter because of the unacceptable and lower than satisfactory performance ratings. The Commissioner's notice advised Respondent of its opportunity to request an informal review of the Commissioner's intent to revoke the charter.

6. Respondent requested an informal review by the January 12, 2015 deadline.

7. On February 19, 2015, the Commissioner notified Respondent that his revocation decision had not changed as a result of the informal review and advised Respondent of its right to submit a petition for review of the decision by March 6, 2015.

8. Respondent submitted a petition for review and, on March 10, 2015, TEA referred the case to the State Office of Administrative Hearings (SOAH) for review of the revocation decision.

9. On March 12, 2015, TEA staff (Staff) sent Respondent notice that a hearing would be held before a SOAH Administrative Law Judge (ALJ) to review the Commissioner's decision. The hearing notice contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

10. On March 18, 2015, Staff filed a Motion for Summary Disposition (Motion).

11. Respondent did not file a timely response to the Motion.

12. The Motion was granted in Order No. 1 on April 14, 2015, and the hearing scheduled to be held on April 20, 2015, was canceled.

13. On April 17, 2015, Respondent filed a Motion for Rehearing. The Motion for Rehearing was granted on April 21, 2015, setting aside Order No. 1 and giving Respondent until May 6, 2015, to respond to the Motion.

14. Respondent filed a response (Respondent's Response) on May 6, 2015.

15. After considering the Motion and Respondent's Response, the Administrative Law Judge granted the Motion on May 11, 2015.

## IX. CONCLUSIONS OF LAW

1. TEA has jurisdiction over this proceeding. Tex. Educ. Code ch. 12.

2. SOAH has jurisdiction to review the Commissioner's revocation decision and to issue a final decision and order. Tex. Educ. Code § 12.116(c).

3. Chapter 2001 of the Government Code does not apply to this proceeding. Tex. Educ. Code § 12.116(b).

4. The hearing notice complied with SOAH's hearing notice rule. 1 Tex. Admin. Code § 155.401(a).

5. Pursuant to 1 Texas Administrative Code § 155.505(a), the ALJ may issue a final decision on all or part of a contested case without an evidentiary hearing if the evidence shows there is no genuine issue as to any material fact and that a party is entitled to a decision in its favor as a matter of law.

6. There are no genuine issues of material fact, and TEA is entitled to a decision in its favor as a matter of law. 1 Tex. Admin. Code § 155.505.

7. The Commissioner must revoke the charter of a school that fails to meet academic or financial accountability performance ratings, or any combination thereof, for the three preceding school years. Tex. Educ. Code § 12.115(c).

8. A financial accountability performance rating of "Substandard Achievement" is lower than satisfactory. Tex. Educ. Code, Chapter 39, Subchapter D; Tex. Educ. Code § 12.115(c)(2); 19 Tex. Admin. Code § 109.1002.

9. An academic performance rating of "Improvement Required" is unacceptable. Tex. Educ. Code, Chapter 39, Subchapter C; Tex. Educ. Code § 12.115(c)(1); 19 Tex. Admin. Code ch. 97.

10.  All rights to appeal the unacceptable and lower than satisfactory ratings have been waived or exhausted by Respondent and these ratings are now final and not appealable. Tex. Educ. Code § 39.151(d); 19 Tex. Admin. Code §§ 157.1121(5), .1123.

11.  Respondent may not challenge TEA's determinations relating to academic or financial accountability performance ratings in another proceeding, including in a hearing before SOAH, because Respondent had an opportunity to appeal the determinations. Tex. Educ. Code § 39.151(e).

12.  Respondent's receipt of a combination of unacceptable and lower than satisfactory performance ratings for three consecutive school years mandates the revocation of Respondent's charter. Tex. Educ. Code § 12.115(c)(3), (c-1).

13.  An ALJ must uphold the Commissioner's revocation decision unless it is arbitrary and capricious, or clearly erroneous. Tex. Educ. Code § 12.116(c)(1); 19 Tex. Admin. Code § 157.1184.

14.  An agency's decision can be arbitrary and capricious if the agency failed to consider all legally relevant factors or considered a legally irrelevant factor. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *see also Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245-46 (Tex. App.—Austin 2008, no pet.); *Public Util. Comm'n v. South Plains Elec. Co-op, Inc.*, 635 S.W.2d 954, 957 (Tex. App.—Austin 1982, writ ref'd n.r.e.).

15.  The Commissioner did not fail to consider all legally relevant factors and did not consider a legally irrelevant factor when reaching his revocation decision. Tex. Educ. Code § 12.115(c)(3), (c-1).

16.  An agency's decision can be arbitrary and capricious if the agency failed to follow its own rules or regulations. *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555, 564 (Tex. App.—Austin 2006, pet. denied); *Power Res. Group, Inc. v. Public Util. Comm'n*, 73 S.W.3d 354, 358 (Tex. App.—Austin 2002, pet. denied).

17.  In arriving at his decision to revoke Respondent's charter, the Commissioner did not fail to follow TEA's own rules or regulations. Tex. Educ. Code §§ 12.115(c)(3), (c-1), 39.151; 19 Tex. Admin. Code §§ 157.1121(5), 157.1123.

18.  An agency's decision can be arbitrary and capricious if it denies due process to a respondent and thereby prejudices a respondent's substantial rights. *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 466, 454 (Tex. 1984).

19.  Respondent has been afforded due process throughout the revocation decision course of action. Tex. Educ. Code § 12.115(a), (b); 19 Tex. Admin. Code §§ 157.1121(5), .1123.

20. An agency's decision can be arbitrary and capricious if the agency considers only legally relevant factors but still reaches a completely unreasonable result. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex.1966)).

21. The Commissioner did not reach a completely unreasonable result in arriving at the revocation decision.

22. A finding is considered clearly erroneous when the reviewing body is left with the definite and firm conviction that a mistake has been committed. *Hunter Indus. Facilities v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 96, 104 (Tex. App.—Austin 1995, writ denied) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)).

23. The ALJ is not left with the definite and firm conviction that the Commissioner has committed a mistake in reaching his decision to revoke Respondent's charter.

24. The Commissioner's decision to revoke Respondent's charter was not arbitrary and capricious, or clearly erroneous, and it must be upheld by the ALJ. Tex. Educ. Code § 12.116(c)(1); 19 Tex. Admin. Code § 157.1184.

## ORDER

Respondent was assigned the specific performance ratings requiring mandatory revocation, and the revocation is not arbitrary and capricious, or clearly erroneous. Tex. Educ. Code §§ 12.115(c), 12.116(c)(1). Therefore, the Commissioner's decision to revoke Respondent's charter is upheld.

**SIGNED May 21, 2015.**

*Sharon Cloninger*

SHARON CLONINGER
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS



**1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov**

Michael Williams
Commissioner

STATE OF TEXAS     §
          §
COUNTY OF TRAVIS   §

## CERTIFIED RECORDS OF THE TEXAS EDUCATION AGENCY

I, Montgomery Meitler, a custodian of official records of the Texas Education Agency, after causing a search to be made of such records, do hereby certify that the following documents are true and correct copies of the documents from the Agency's files:

- Academy of Careers and Technologies, Inc. Annual Financial Report for the year ended August 31, 2014 (26 pages)

**IN TESTIMONY THEREOF,** I have signed my name officially and caused to be impressed hereon the Seal of the Texas Education Agency at my office in the city of Austin, Travis County, Texas, this 4th day of August, 2015.



MONTGOMER MEITLER
CUSTODIAN OF RECORDS,
TEXAS EDUCATION AGENCY,
OFFICE OF LEGAL SERVICES

*ACADEMY OF CAREERS & TECHNOLOGIES, INC.*

*ANNUAL FINANCIAL REPORT*

*FOR THE YEAR ENDED*

*AUGUST 31, 2014*

# TABLE OF CONTENTS

**CERTIFICATE OF BOARD**........................................................................................................ 1

**INDEPENDENT AUDITOR'S REPORT** ................................................................................. 2

**GENERAL-PURPOSE FINANCIAL STATEMENTS**........................................................... 4

    STATEMENT OF FINANCIAL POSITION............................................................................. 5
    STATEMENT OF ACTIVITIES................................................................................................ 6
    STATEMENT OF CASH FLOWS ........................................................................................... 7
    NOTES TO FINANCIAL STATEMENTS................................................................................ 8

**SUPPLEMENTARY INFORMATION**................................................................................... 14

    SCHEDULE OF EXPENSES.................................................................................................. 15
    SCHEDULE OF CAPITAL ASSETS .................................................................................... 16
    BUDGETARY COMPARISON SCHEDULE........................................................................ 17
    NOTES TO THE BUDGETARY COMPARISON SCHEDULE ........................................... 18

**COMPLIANCE AND INTERNAL CONTROL**.................................................................... 19

    REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON
        COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL
        STATEMENTS PERFORMED IN ACCORDANCE WITH *GOVERNMENT AUDITING*
        *STANDARDS* ....................................................................................................................... 20
    SCHEDULE OF FINDINGS AND QUESTIONED COSTS ................................................. 22

# ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
## FEDERAL EMPLOYER IDENTIFICATION NUMBER: 74-3016035
## BEXAR COUNTY DISTRICT NUMBER 015-816

### CERTIFICATE OF BOARD

We, the undersigned, certify that the attached Financial and Compliance Report of Academy of Careers and Technologies, Inc. was reviewed and (check one) _____✓_____ approved _____ disapproved for the year ended August 31, 2014, at a meeting of the governing body of the charter holder on the _26_ day of January, 2015.

_____
Signature of Board Secretary

_____
Signature of Board President

1

SHAREHOLDERS:
Nancy L. Vaughan, CPA
Deborah F. Fraser, CPA
Phil S. Vaughan, CPA

Armstrong, Vaughan & Associates, P.C.
Certified Public Accountants

## INDEPENDENT AUDITOR'S REPORT

To the Board of Directors
Academy of Careers and Technologies, Inc.
San Antonio, Texas

**Report on the Financial Statements**

We have audited the accompanying financial statements of Academy of Careers and Technologies, Inc., which comprise the statement of financial position as of August 31, 2014, and the related statements of activities and cash flows for the year then ended, and the related notes to the financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

381

## Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Academy of Careers and Technologies, Inc. as of August 31, 2014, and the changes in its net assets and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

## Emphasis of Matter

The accompanying financial statements have been prepared assuming that the entity will continue as a going concern. As discussed in Note 11 to the financial statements, the entity received a notice from the Texas Education Agency indicating their intent to revoke the entity's charter, raising substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 11. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

## Other Matter

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

## Other Reporting Requirements Required by *Government Auditing Standards*

In accordance with *Government Auditing Standards*, we have also issued our report dated December 31, 2014 on our consideration of Academy of Careers and Technologies, Inc.'s internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering Academy of Careers and Technologies, Inc.'s internal control over financial reporting and compliance.

*Armstrong, Vaughan & Associates, P.C.*

Armstrong, Vaughan & Associates, P.C.

December 31, 2014

3

**GENERAL-PURPOSE
FINANCIAL STATEMENTS**

4

# ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
## STATEMENT OF FINANCIAL POSITION
### AUGUST 31, 2014

**ASSETS**

*Current Assets:*

| | | |
|---|---|---|
| Cash and Cash Equivalents | $ | 192,056 |
| Due from Texas Education Agency | | 70,766 |
| Total Current Assets | | 262,822 |
| | | |
| Property and Equipment, net | | 1,766,080 |
| | | |
| **TOTAL ASSETS** | $ | 2,028,902 |

**LIABILITIES AND NET ASSETS**

*Current Liabilities:*

| | | |
|---|---|---|
| Accounts Payable | $ | 26,457 |
| Payroll Deductions and Witholdings | | 236,612 |
| Accrued Wages | | 56,453 |
| Due to Texas Education Agency | | 259,719 |
| Current Maturities of Notes Payable | | 69,442 |
| Total Current Liabilities | | 648,683 |

*Long-Term Liabilities:*

| | | |
|---|---|---|
| Notes Payable Net of Current Portion | | 889,456 |
| Total Liabilities | | 1,538,139 |

*Net Assets:*

| | | |
|---|---|---|
| Unrestricted | | 401,856 |
| Temporarily Restricted | | 88,907 |
| Total Net Assets | | 490,763 |
| | | |
| **TOTAL LIABILITIES AND NET ASSETS** | $ | 2,028,902 |

The accompanying notes are an integral part of this financial statement.

# ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
## STATEMENT OF ACTIVITIES
### FOR THE YEAR ENDED AUGUST 31, 2014

| | Unrestricted | Temporarily Restricted | Totals |
|---|---|---|---|
| **REVENUE** | | | |
| 5740 Other Local Sources | $ 26,971 | $ - | $ 26,971 |
| 5750 Local Enterprising Revenues | 10,294 | - | 10,294 |
| 5760 Local Intermediate Sources | 459 | - | 459 |
| 5810 State Foundation School Program | - | 1,743,118 | 1,743,118 |
| 5820 Other State Revenues | - | 14,230 | 14,230 |
| 5920 Federal Revenue Passed through TEA | - | 302,734 | 302,734 |
| 5930 Federal Revenues from Other Sources | - | 62,742 | 62,742 |
| | 37,724 | 2,122,824 | 2,160,548 |
| Net Assets Released from Restrictions | 2,033,917 | (2,033,917) | - |
| **TOTAL REVENUE** | 2,071,641 | 88,907 | 2,160,548 |
| | | | |
| **EXPENSES** | | | |
| 11 Instruction | 603,250 | - | 603,250 |
| 12 Instructional Resources | 36,619 | - | 36,619 |
| 13 Curriculum Development and Instructional Staff Development | 111,977 | - | 111,977 |
| 23 School Leadership | 145,938 | - | 145,938 |
| 31 Guidance, Counseling and Evaluation Services | 81,515 | - | 81,515 |
| 34 Student Transportation | 6,746 | - | 6,746 |
| 35 Food Services | 181,629 | - | 181,629 |
| 36 Extracurricular Activities | 19,549 | - | 19,549 |
| 41 General Administration | 212,708 | - | 212,708 |
| 51 Facilities Maintenance | 355,302 | - | 355,302 |
| 52 Security and Monitoring | 96,728 | - | 96,728 |
| 53 Data Processing | 107,509 | - | 107,509 |
| 71 Debt Service | 74,447 | - | 74,447 |
| 81 Fund Raising | 2,380 | - | 2,380 |
| **TOTAL EXPENSES** | 2,036,297 | - | 2,036,297 |
| | | | |
| **CHANGE IN NET ASSETS** | 35,344 | 88,907 | 124,251 |
| | | | |
| **NET ASSETS - BEGINNING OF YEAR** | 420,486 | 383,575 | 804,061 |
| **Prior Period Adjustment** | (53,974) | (383,575) | (437,549) |
| | | | |
| **NET ASSETS - END OF YEAR** | $ 401,856 | $ 88,907 | $ 490,763 |

The accompanying notes are an integral part of this financial statement.

6

**CASH FLOWS PROVIDED (USED)**
**BY OPERATING ACTIVITIES**

| | | |
|---|---|---:|
| Payments Received from State and Federal Agencies | $ | 1,985,527 |
| Payments Received from Local Sources | | 37,723 |
| Cash Paid to Suppliers for Goods and Services | | (638,660) |
| Cash Paid to Employees for Services | | (1,286,307) |
| Cash Paid for Interest | | (74,447) |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES** | | 23,836 |

**CASH FLOWS PROVIDED (USED)**
**BY INVESTING ACTIVITIES**

| | | |
|---|---|---:|
| Maturity of Certificate of Deposit | | 7,000 |
| **NET CASH PROVIDED BY INVESTING ACTIVITIES** | | 7,000 |

**CASH FLOWS PROVIDED (USED)**
**BY FINANCING ACTIVITIES**

| | | |
|---|---|---:|
| Principal Payments on Notes Payable | | (63,144) |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | | (63,144) |
| **NET INCREASE (DECREASE) IN CASH** | | (32,308) |
| **CASH AT BEGINNING YEAR** | | 224,364 |
| **CASH AT END OF YEAR** | $ | 192,056 |

**RECONCILIATION OF CHANGE IN NET ASSETS TO NET**
**CASH PROVIDED (USED) BY OPERATING ACTIVITIES**

| | | |
|---|---|---:|
| Increase (Decrease) in Net Assets | $ | 124,251 |
| Adjustments: | | |
| Depreciation | | 124,467 |
| (Increase) Decrease in Current Assets: | | |
| Due from Texas Education Agency | | (14,379) |
| Other Receivables | | 50 |
| Increase (Decrease) in Liabilities: | | |
| Accounts Payable | | 1,995 |
| Other Current Liabilities | | (19,325) |
| Payroll Deductions and Witholdings | | (83,184) |
| Accrued Wages | | 12,929 |
| Due to Texas Education Agency | | (122,968) |
| **NET CASH PROVIDED (USED) BY** | | |
| **OPERATING ACTIVITIES** | $ | 23,836 |

The accompanying notes are an integral part of this financial statement.

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The general-purpose financial statements of Academy of Careers and Technologies, Inc. (the Corporation) were prepared in conformity with accounting principles generally accepted in the United States. The *Financial Accounting Standards Board* is the accepted standard setting body for establishing not-for-profit accounting and financial reporting principles.

*Reporting Entity*

The corporation is a not-for-profit organization incorporated in the State of Texas in 1997 and exempt from federal income taxes pursuant to Section 501(c)(3) of the Internal Revenue Code. The corporation is governed by a Board of Directors selected pursuant to the bylaws of the Corporation and has the authority to make decisions, appoint the chief executive officer of the Corporation, and significantly influence operations. The Board of Directors has the primary accountability for the fiscal affairs of the Corporation.

In October 1998, the State Board of Education of the State of Texas granted the Corporation an open-enrollment charter pursuant to Chapter 12 of the Texas Education Code. Pursuant to the program described in the charter application approved by the State Board of Education and the terms of the applicable Contract of Charter, Academy of Careers and Technologies, Inc. was opened. Academy of Careers and Technologies, Inc. was organized to provide educational services to students in grades 9 through 12, focusing on career and technical training.

Since the Corporation received funding from local, state, and federal government sources, it must comply with the requirements of the entities providing those funds.

*Basis of Accounting and Presentation*

The accompanying general-purpose financial statements have been prepared using the accrual basis of accounting in accordance with generally accepted accounting principles. Accordingly, revenues are recognized when earned and expenses are recognized when they are incurred.

Net assets and revenues, expenses, gains, and losses are classified based on the existence and nature or absence of donor-imposed restrictions. Accordingly, net assets of the organization and changes therein are classified and reported as follows:

> *Unrestricted Net Assets* – net assets that are not subject to donor-imposed stipulations.

> *Temporarily Restricted Net Assets* – net assets subject to donor-imposed stipulations that may or will be met either by actions of the Corporation and/or passage of time.

> *Permanently Restricted Net Assets* – net assets required to be maintained in perpetuity with only the income to be used for the charter school's activities due to donor-imposed restrictions.

8

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONT.)

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

*Contributions*

The Corporation accounts for contributions as unrestricted, temporarily restricted, or permanently restricted support depending on the existence or nature of any donor restrictions.

Support that is restricted by the donor is reported as an increase in temporarily restricted or permanently restricted net assets in the reporting period in which the support is recognized. When a restriction expires, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the statement of activities as net assets released from restrictions.

*Cash and Cash Equivalents*

For financial statement purposes, the Corporation considers all highly liquid investment instruments with an original maturity of three months or less to be cash.

*Capital Assets*

Capital assets, which include leasehold improvements, playgrounds, furniture and equipment, vehicles, and other personal property, are reported in the general-purpose and specific-purpose financial statements. Capital assets are defined by the Corporation as assets with an individual cost of more than $1,000. Such assets are recorded at historical cost and are depreciated over their estimated useful lives using the straight-line method of depreciation. Expenditures for additions, major renewals and betterments are capitalized, and maintenance and repairs are charged to expense as incurred. Donations of assets are recorded as direct additions to net assets at fair value at the date of donation, which is then treated as cost.

*Income Taxes*

The Corporation is a not-for-profit organization exempt from federal income taxes pursuant to Section 501(c)3 of the Internal Revenue Code, except to the extent it has unrelated business income. As such, no provision for income taxes has been made in the financial statements. The Corporation generally is no longer subject to income tax examination by Federal authorities for years prior to August 31, 2011.

*Subsequent Events*

Subsequent events were considered through December 31, 2014, which is the date the financial statements were available to be issued.

NOTE 2 -- DUE FROM/TO THE TEXAS EDUCATION AGENCY

The Corporation receives the majority of its funding from the Texas Education Agency (TEA). At year end, the Corporation has receivables from TEA and overpayments from TEA formula grants. In addition, the Foundation School Program funding is distributed beginning September 1 of each year, while the school year starts in late August. The corporation accrued a portion of the next year's funding related to the days in August. Amounts due from the Texas Education Agency at August 31, 2014 consisted of the following:

| | |
|---|---|
| Foundation School Program Accrual | $ 63,693 |
| Textbook Allotment Reimbursements | 6,367 |
| Pass-through Federal Revenues | 706 |
| Foundation School Program Overpayments | (259,719) |
| Net Due from (to) the State | $ (188,953) |

NOTE 3 -- CAPITAL ASSETS

Capital assets at August 31, 2014 were as follows:

| | |
|---|---|
| Land and Land Improvements | $ 191,549 |
| Buildings and Improvements | 1,862,711 |
| Equipment, Furniture & Fixtures | 62,688 |
| Vehicles | 107,145 |
| Total Property and Equipment | 2,224,093 |
| Less: Accumulated Depreciation | (458,013) |
| Property and Equipment - Net | $ 1,766,080 |

Capital assets acquired with public funds received by the Corporation for the operation of Academy of Careers and Technologies, Inc. constitute public property pursuant to Charter 12 of the Texas Education Code. These assets are specifically identified on the Schedule of Capital Assets in the Supplementary Information. Depreciation expense for the year ending August 31, 2014 was $124,467.

NOTE 4 -- NOTES PAYABLE

The Corporation agreed to a note payable in January 2012 to purchase land and related improvements for its campus. The note bears interest at 7.41%, requires monthly payments of $10,329 and matures December 14, 2025. The note is secured by a first lien on the Corporation's real property.

The Corporation agreed to a note payable in November 2011 to purchase vehicles. The note bears interest at 5.326%, requires monthly payments of $1,094 and matures November 2016. The note is secured by title to two of the Corporation's vehicles.

| | Balance 9/1/13 | Additions | Retirements | Balance 8/31/14 | Due in One Year |
|---|---|---|---|---|---|
| Real Property Note | $ 983,038 | $ - | $ (51,844) | $ 931,194 | $ 56,850 |
| Vehicle Note | 39,004 | - | (11,300) | 27,704 | 12,592 |
| | $ 1,022,042 | $ - | $ (63,144) | $ 958,898 | $ 69,442 |

10

NOTE 4 -- NOTES PAYABLE (CONT.)

Requirements to service these notes payable are as follows:

| Fiscal year ending August 31, | Principal | Interest | Total |
|---|---|---|---|
| 2015 | $ 68,790 | $ 68,283 | $ 137,073 |
| 2016 | 73,800 | 63,273 | 137,073 |
| 2017 | 69,073 | 58,073 | 127,146 |
| 2018 | 70,954 | 52,992 | 123,946 |
| 2019 | 76,394 | 47,552 | 123,946 |
| 2020-2024 | 479,338 | 140,392 | 619,730 |
| 2025-2026 | 120,549 | 4,955 | 125,504 |
| | $ 958,898 | $ 435,520 | $ 1,394,418 |

NOTE 5 -- PENSION PLAN OBLIGATIONS

All employees of the Corporation employed for one-half or more of the standard work load, and who are not exempted from membership under Texas Government Code, Title I, Subtitle C Section 822.002, are required to participate in the Teacher Retirement System of Texas (the "System"), a multiple-employer public employee retirement system ("PERS"). It is a cost-sharing PERS with one exception - all risks and costs are not shared by the Corporation, but are the liability of the State of Texas. By statute, the State contributes to the retirement system an amount equal to the current authorized rate times the aggregate annual compensation of all members of the retirement system during the fiscal year. The payments made by the State on behalf of the Corporation are not reflected in the accompanying financial statements.

The System provides service retirement and disability retirement benefits, and death benefits to plan members and beneficiaries. The System operates under the authority of provisions contained primarily under the provisions of Texas Constitution, Article XVI, 67 and Texas Government Code, Title 8, Public Retirement Systems, Subtitle C, Teacher Retirement System of Texas, which is subject to amendment by the Texas Legislature. The System also administers proportional retirement benefits and service credit transfer under Texas Government Code, Title 8 Chapter 803 and Chapter 805, respectively.

Normal retirement age for an unreduced standard annuity is 65 with five or more years of service, or any combination of age and service totaling 80, with at least five years of membership service credit. Members are entitled to early age service retirement when total of age and service is less than 80 and the following conditions are met: At least age 55 with five or more years of service credit or below age 50 with 30 or more years of service credit. The System's annual financial report and other required disclosure information are available by writing the Teacher Retirement System of Texas, 1000 Red River, Austin, Texas 78701-2698 or by calling (800) 877-0123.

Funding Policy – Under provision in State law, plan members are required to contribute 6.4% of their annual covered salary and the State contributes an amount equal to 6.8% of the Corporation's covered payroll, except for employees paid from federal and private grants and for that portion of salary exceeding the state minimum salary established under Section 21, Texas Education Code, as determined by a statutory formula involving the price differential index and other factors. The Corporation's employees' required contributions to the System for the year ending August 31, 2014 were $63,494. The Corporation contributed amounts for new members of $1,145 for the year ending August 31, 2014.

11

NOTE 6 -- RETIREE HEALTH PLAN

The Corporation contributes to the Texas Public School Retired Employees Group Insurance Program (TRS-Care), a cost sharing multiple-employer defined benefit post employment health care plan administered by the System. TRS-Care provides health care coverage for certain persons (and their dependents) who retired under the System. The statutory authority for the program is Texas Insurance Code, Chapter 1575. Section 1575.052 grants the TRS Board of Trustees the authority to establish and amend basic and optional group insurance coverage for participants. The System issues a publicly available financial report that includes financial statements and required supplementary information for TRS-Care. That report may be obtained by visiting the TRS Web site at www.trs.state.tx.us under the TRS Publications heading, by calling the TRS Communications Department at 1-800-2263-8778, or by writing to the Communications Department of the Teacher Retirement System of Texas at 1000 Red River Street, Austin, Texas 78701.

Contribution requirements are not actuarially determined but are legally established each biennium by the Texas Legislature, Texas Insurance Code, Sections 1575.202, 203 and 204 establish state, active employee and public school contributions, respectively. Funding for free basic coverage is provided by the program based upon public school payroll. Per Texas Insurance Code, Chapter 1575, the public school contribution may not be less than 0.25% or greater than 0.75% of the salary of each active employee of the public school. Funding for optional coverage is provided by those participants selecting the optional coverage. For the year ending August 31, 2014, employees contributed $6,448 and the Corporation contributed $5,456.

NOTE 7 -- HEALTH CARE COVERAGE

During the year ended August 31, 2014, employees of Corporation were covered by TRS Active Care health insurance (the Plan). The Corporation contributed $59 per week per employee to the Plan. Employees, at their option, authorized payroll withholdings to pay contributions or premiums for dependents.

NOTE 8 -- TEMPORARILY RESTRICTED NET ASSETS

Temporarily restricted net assets at August 31, 2014 represents unspent foundation school program revenues that are restricted for the operation of the open-enrollment charter school.

NOTE 9 -- COMMITMENTS AND CONTINGENCIES

The charter school receives funds through state and federal programs that are governed by various statutes and regulations. State program funding is based primarily on student attendance data submitted to the Texas Education Agency and is subject to audit and adjustment. Expenses charged to federal programs are subject to audit and adjustment by the grantor agency. The programs administered by the charter school have complex compliance requirements, and should state or federal auditors discover areas of noncompliance, charter school funds may be subject to refund if so determined by the Texas Education Agency or the grantor agency.

NOTE 10 -- LITIGATION

The Corporation is subject to various claims and litigation that have arisen in the course of its operations. Management and legal counsel are of the opinion that the Corporation's liability in these cases, if decided adversely to the Corporation, will not have a material effect on the Corporation's financial position.

## NOTE 11 -- UNCERTAIN CHARTER STATUS

In December 2014, the Corporation was notified by the Texas Education Agency (TEA) that TEA intends to revoke the charter of the Corporation at the end of the 2014/2015 school year (June 2015) for accountability and financial ratings. The Corporation is appealing the decision based on inaccurate methods of determining these ratings.

If the appeal is unsuccessful, the Charter will lose its state accreditation status and the current state and federal funding, representing the majority of the Corporation's revenues. In addition, loss of the state accreditation would cause the Corporation's real property note to go into default. The State also has the authority to recover any assets of the Charter that were purchased with state funds.

## NOTE 12 -- PRIOR PERIOD ADJUSTMENT

In the prior year, accruals for payables, and payroll related liabilities were understated. In addition, an adjustment to the foundation school program allotment was not recorded. A prior period adjustment has been recorded to correct these issues as follows:

| | |
|---|---:|
| Beginning Net Assets, Previously Reported | $ 804,061 |
| Understated Liability for Foundation School Program Overpayments | (382,687) |
| Understated Accounts Payable | (8,544) |
| Understated Accrued Wages | (28,244) |
| Understated Payroll Deductions and Witholdings | (18,074) |
| Beginning Net Assets, Restated | $ 366,512 |

**SUPPLEMENTARY INFORMATION**

ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
SCHEDULE OF EXPENSES
FOR THE YEAR ENDED AUGUST 31, 2014

**EXPENSES**

| | | |
|---|---|---|
| 6100 Payroll | $ | 1,216,052 |
| 6200 Professional and Contracted Services | | 388,004 |
| 6300 Supplies and Materials | | 201,877 |
| 6400 Other Operating Costs | | 155,917 |
| 6500 Debt Related Costs | | 74,447 |
| Total Expenses | $ | 2,036,297 |

## ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
## SCHEDULE OF CAPITAL ASSETS
### AUGUST 31, 2014

| | Local | State | Federal |
|---|---|---|---|
| 1510 Land and Improvements | $ - | $ 191,549 | $ - |
| 1520 Building Improvements | - | 1,862,711 | - |
| 1531 Vehicles | - | 62,688 | - |
| 1539 Furniture and Equipment | - | 96,295 | 10,850 |
| Total Capital Assets | $ - | $ 2,213,243 | $ 10,850 |

16

## ACADEMY OF CAREERS AND TECHNOLOGIES, INC.
## BUDGETARY COMPARISON SCHEDULE
## FOR THE YEAR ENDED AUGUST 31, 2014

| | Budgeted Amounts Original | Budgeted Amounts Final | Actual Amounts (Budgetary) | Variance from Final Budget |
|---|---|---|---|---|
| **REVENUE** | | | | |
| 5740 Other Local Sources | $ 30,450 | $ 30,450 | $ 26,971 | $ (3,479) |
| 5750 Local Enterprising Revenues | 1,500 | 1,500 | 10,294 | 8,794 |
| 5760 Local Intermediate Sources | - | - | 459 | 459 |
| 5810 State Foundation School Program | 1,972,533 | 1,685,000 | 1,743,118 | 58,118 |
| 5820 Other State Revenues | - | 115,000 | 14,230 | (100,770) |
| 5920 Federal Revenue Passed through TEA | 139,667 | 360,000 | 302,734 | (57,266) |
| 5930 Federal Revenues from Other Sources | - | - | 62,742 | 62,742 |
| **TOTAL REVENUE** | 2,144,150 | 2,191,950 | 2,160,548 | (31,402) |
| | | | | |
| **EXPENSES** | | | | |
| 11 Instruction | 730,065 | 930,678 | 603,250 | 327,428 |
| 12 Instructional Resources | - | - | 36,619 | (36,619) |
| 13 Curriculum Development and Instructional Staff Development | 85,500 | 85,500 | 111,977 | (26,477) |
| 21 Instructional Leadership | 52,200 | - | - | - |
| 23 School Leadership | 87,453 | 139,653 | 145,938 | (6,285) |
| 31 Guidance, Counseling and Evaluation Services | 88,500 | 88,500 | 81,515 | 6,985 |
| 33 Health Services | - | 250 | - | 250 |
| 34 Student Transportation | 10,000 | 10,000 | 6,746 | 3,254 |
| 35 Food Services | 81,930 | 125,000 | 181,629 | (56,629) |
| 36 Extracurricular Activities | 15,000 | 15,000 | 19,549 | (4,549) |
| 41 General Administration | 192,179 | 185,000 | 212,708 | (27,708) |
| 51 Facilities Maintenance | 216,000 | 168,446 | 230,835 | (62,389) |
| 52 Security and Monitoring | 5,200 | 85,000 | 96,728 | (11,728) |
| 53 Data Processing | 133,547 | 133,547 | 107,509 | 26,038 |
| 71 Debt Service | - | - | 74,447 | (74,447) |
| 81 Fund Raising | - | 5,000 | 2,380 | 2,620 |
| **TOTAL EXPENSES** | 1,697,574 | 1,971,574 | 1,911,830 | 59,744 |
| | | | | |
| **CHANGE IN BUDGETARY NET ASSETS** | $ 446,576 | $ 220,376 | $ 248,718 | $ 28,342 |

17

BUDGETARY PERSPECTIVE DIFFERENCES

The Corporation does not budget for depreciation expense.  Amounts needed to reconcile to the basic financial statements are as follows:

|  |  |
|---|---|
| Reconciliation to Change in Net Assets | |
| Change in Budgetary Net Assets | 248,718 |
| Perspective Differences: | |
| Unbudgeted Depreciation | (124,467) |
| Change in Net Assets (All Funds, GAAP Basis) | $ 124,251 |

VARIANCES BETWEEN FINAL BUDGET AND ACTUAL EXPENSES

The following functions exceeded their final budgeted amount by more than 10% and $10,000:

12 Instructional Resources
A position was added after the original budget.

13 Curriculum Development and Instructional Staff Development
Additional training and resources were needed.

35 Food Service
Unexpected funding.  Original budget did not include Summer Feeding Program.

41 General Administration
Professional services needed to be increased from original budget.  Coding should have included $20,000 for additional management tasks performed to ensure compliance.

51 Facilities Maintenance
Budget had some items miscoded in function 11 that should have been recorded in function 51.

52 Security and Monitoring
Additional professional services and equipment needed to ensure the security of the campus.

71 Debt Service
Coding error in the budget.

**COMPLIANCE AND
INTERNAL CONTROL**

SHAREHOLDERS:
Nancy L. Vaughan, CPA
Deborah F. Fraser, CPA
Phil S. Vaughan, CPA



Armstrong, Vaughan & Associates, P.C.
Certified Public Accountants

## REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS*

### INDEPENDENT AUDITOR'S REPORT

To the Board of Directors
Academy of Careers and Technologies, Inc.
San Antonio, Texas

We have audited in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States, the financial statements of Academy of Careers and Technologies, Inc., which comprise the statement of financial position as of August 31, 2014, and the related statements of activities and cash flows for the year then ended, and the related notes to the financial statements and have issued our report thereon dated December 31, 2014.

**Internal Control over Financial Reporting**

In planning and performing our audit of the financial statements, we considered Academy of Careers and Technologies, Inc.'s internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of Academy of Careers and Technologies, Inc.'s internal control. Accordingly, we do not express an opinion on the effectiveness of Academy of Careers and Technologies, Inc.'s internal control.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis. A *significant deficiency* is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control over financial reporting was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over financial reporting that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that were not identified. Given these limitations, during our audit we did not identify any deficiencies in internal control over financial reporting that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified. We did identify certain deficiencies in internal control, described in the accompanying schedule of findings and questioned costs, that we consider to be significant deficiencies: 2014-1, 2014-2 and 2014-3.

399

**Compliance and Other Matters**

As part of obtaining reasonable assurance about whether Academy of Careers and Technologies, Inc.'s financial statements are free from material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit and, accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards.*

We noted certain matters that we have reported to the management of Academy of Careers and Technologies, Inc. in a separate letter dated December 31, 2014.

**Purpose of This Report**

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the entity's internal control or on compliance. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the entity's internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

Armstrong, Vaughan & Associates, P.C.

December 31, 2014

400

FINDING 2014-1 -- Foundation School Program Revenue Recognition

TYPE OF FINDING -- Significant Deficiency in Internal Controls over Financial Reporting

*Criteria:*
The Corporation should have procedures in place to ensure revenue received from the Texas Education Agency is recognized in the period for which it is allotted. This would include reviewing allotment adjustments subsequent to year end but before the report is issued to capture any significant adjustments.

*Condition:*
On September 10, 2013, a large downward adjustment was made to the foundation school program allotment for the 2012-2013 school year. This adjustment was not accounted for in the August 31, 2013 financial statements.

*Cause:*
Management did not have controls in place to monitor allotment adjustments after year end and effectively communicate those adjustments to the individuals responsible for preparing the financial statements.

*Effect:*
Allotment adjustments to the Foundation School Program are not recorded in the correct period.

*Recommendation:*
The Corporation should adopt some procedures to review allotment changes after year end, communicate them to appropriate individuals, and ensure they are accounted for in the appropriate period.

*Management's Corrective Action Plan:*
Beginning in February 2015, the Finance Coordinator will review payment ledgers periodically and ensure any significant adjustments to allotments are captured timely and in the correct reporting period.

FINDING 2014-2 -- Review of Bank Reconciliations

TYPE OF FINDING -- Significant Deficiency in Internal Controls over Financial Reporting

*Criteria:*
The Corporation should review bank reconciliations thoroughly to identify errors and other adjustments that may lead to inaccurately reporting cash and other balances on the financial statements.

*Condition:*
A review of the August 2014 bank reconciliation noted several electronic payments that had not cleared the bank as well as a couple of duplicate deposits. A significant adjustment as a result of audit procedures was needed to correct cash, payroll liabilities and revenues.

*Cause:*
Management has accurately and timely reconciled the bank statements. However, a thorough review of outstanding items was not performed.

*Effect:*
Erroneous items on the bank reconciliation were not detected and corrected, leading to several misstated items on the financial statements.

*Recommendation:*
The Corporation should assign an appropriate individual to review bank reconciliations monthly and reasearch uncleared items, especially journal entries, deposits and checks over 30 days old.

*Management's Corrective Action Plan:*
Beginning in February 2015, the Finance Coordinator will review uncleared items on the bank reconciliation monthly for any errors or other items that require additional action.

FINDING 2014-3 -- Ineffective Budgetary Controls

TYPE OF FINDING -- Significant Deficiency in Internal Controls over Financial Reporting

*Criteria:*
The Corporation's Board of Directors should annually adopt a budget that serves as a guide for management to conduct operations. The budget should be recorded in the accounting software to enable management and the Board to review budget to actual comparisons periodically during the year. In addition, the budget should be sufficiently detailed to ensure management acts within the guidelines set out by the Board.

*Condition:*
The budget was not sufficiently detailed to serve as a control over management's actions. In addition, the budget was not recorded in the accounting software and actual results varied significantly from the budget.

*Cause:*
The Board of Directors and management did not place a significant importance on the budget and did not use it as an internal control mechanism.

*Effect:*
The budget was an ineffective internal control, because management and the Board of Directors were unable to review budget to actual data during the year.

*Recommendation:*
The Corporation should record the budget in the accounting software and monitor compliance with that budget regularly. The budget should be detailed enough to give management direction that is in line with the Board's intentions. The budget can and should be an important part of the Corporation's internal controls.

*Management's Corrective Action Plan:*
In February 2015, the Finance Coordinator will ensure the budget is entered into Quickbooks and budget to actual reports will be provided for Board review periodically (at least quarterly).



**Texas Education Agency**

Michael Williams
Commissioner

STATE OF TEXAS        §
                             §

COUNTY OF TRAVIS     §

### CERTIFIED RECORDS OF THE TEXAS EDUCATION AGENCY

I, Montgomery Meitler, a custodian of official records of the Texas Education Agency, after causing a search to be made of such records, do hereby certify that the following documents are true and correct copies of the documents from the Agency's files:

- March 4, 2015, Official Notice to Academy of Careers and Technologies regarding High Risk Designation. (3 pages)

**IN TESTIMONY THEREOF,** I have signed my name officially and caused to be impressed hereon the Seal of the Texas Education Agency at my office in the city of Austin, Travis County, Texas, this 4th day of August, 2015.



MONGOMERY MEITLER
CUSTODIAN OF RECORDS,
TEXAS EDUCATION AGENCY,
OFFICE OF LEGAL SERVICES

**9- ACT High Risk Designation**



Texas Education Agency

Michael Williams
Commissioner

Certified Mail
Return Receipt Requested

**Immediate Attention Required**

March 4, 2015

Tonja Nelson,
Superintendent
Academy of Careers and Technologies Charter School
P.O. Box 681866
San Antonio, Texas 78268

Re:     Designation as a high-risk grantee

Dear Ms. Nelson:

This letter serves as official notice that Academy of Careers and Technologies Charter School has been designated as a high-risk grantee by the Texas Education Agency. This designation is being made, pursuant to Title 34 of the Code of Federal Regulations (CFR), §80.12, because your charter school has received a notice of revocation from TEA, and because TEA's decision to revoke your school's charter has been upheld following an informal review.

TEA is authorized to designate a grantee as high risk, and to impose special conditions upon that grantee, by 34 CFR, §80.12.

Your charter school agreed to comply with the federal fiscal grant requirements given in each grant application your charter school submitted to TEA in order to receive federal funds. Please consult the General and Fiscal Guidelines and the General Provisions and Assurances that apply to TEA grants and are published online at tea.texas.gov/Finance_and_Grants/Administering_a_Grant.aspx.

TEA is required to monitor the activities of federal grant subrecipients to ensure that federal awards are used for authorized purposes in compliance with laws, regulations, and the provisions of contracts or grant agreements, and to ensure that performance goals are achieved. This requirement is given in Office of Management and Budget (OMB) Circular A-133, Subpart D, §___.400(d)(3) and in 34 CFR §80.40(a). TEA is also required to uphold its administrative responsibilities by ensuring that subrecipients are in compliance with applicable statutes and regulations. This requirement is given in 34 CFR §76.770.

**Special Conditions**

Effective immediately, TEA is imposing the following special conditions upon each of your charter school's federal grants administered through TEA. Your charter school

1.  Will not be able to draw down its funds automatically using TEA's expenditure reporting system (ER).
2.  Must provide supporting documentation to TEA to support each reimbursement request.
3.  Must ensure that each reimbursement request is for funds that have already been obligated and recorded in the general ledger.

4. Must submit all unreimbursed expenditures to TEA at least once each month for each federal grant, or notify TEA if you do not have expenditures for a given month.
5. Must attend a training session with TEA, in Austin, about how to comply with the special conditions. We will notify you of the date of the training session. You may use federal grant funds to cover travel costs as long as the costs are allowable, reasonable, necessary, and allocable under the federal grant used. You must also have adequate documentation when requesting reimbursement for the travel costs.

You are also encouraged to obtain technical assistance from your regional education service center to help you comply with these special conditions.

## Supporting Documentation

We will send you an email that will provide detailed information about the kind of supporting documentation you must submit for each reimbursement request. In general, your charter school must submit current and up-to-date copies of general ledgers and, if applicable, payroll journals. TEA will only accept general ledgers and payroll journals that comply with the following requirements:

1. The mandatory account code structure and accounting requirements given in Module 11, Special Supplement to Financial Accounting and Reporting, Nonprofit Charter School Chart of Accounts, of TEA's *Financial Accountability System Resource Guide* (FASRG).
2. Generally accepted accounting principles (GAAP).
3. Fund accounting in accordance with 34 CFR §80.20.

TEA *will not* accept any substitutes for a general ledger, such as check registers, profit and loss statements, trial balances, or other limited accounting reports generated from accounting software applications and spreadsheets created with Microsoft Excel. Information about acceptable general ledgers is available online at tea.texas.gov/Finance_and_Grants/Grants/Federal_Fiscal_Monitoring/ Minimum_Required_Elements_for_General_Ledgers_and_Payroll_Journals/.

Once the submitted ledgers have been reviewed, TEA will select certain TRANSACTIONS FOR MORE DETAILED REVIEW. FOR THESE TRANSACTIONS, TEA WILL REQUEST THAT YOU SUBMIT ADDITIONAL SUPPORTING DOCUMENTATION SUCH AS, BUT NOT LIMITED TO, COPIES OF CONTRACTS, EXPENSE REIMBURSEMENT vouchers, payment authorization forms, invoices, receipts, travel vouchers, job descriptions, and time and effort records. (Please be sure to submit only copies to TEA and to retain the original documents.)

So that TEA can communicate directly with the person responsible for gathering the required documentation, please send the name of the appropriate contact person to the Division of Federal Fiscal Monitoring at FFM_Monitoringreview@tea.texas.gov.

## Reimbursement

After reviewing the selected transactions, TEA will reimburse your charter school for only those costs determined to be adequately documented and allowable under the applicable grant program.

## Duration of Special Conditions

The special conditions will remain in place until, and only if, TEA determines otherwise. You will be notified by letter if and when TEA no longer designates your charter school as a high-risk grantee.

As stated above, the special conditions will apply to all of your charter school's federal grants. While the high-risk grantee designation is in place, the special conditions will also apply to any *new* federal grant programs for which TEA may issue a Notice of Grant Award. TEA also reserves the right not to award a discretionary grant to a high-risk grantee.

Your charter school may request reconsideration of the special conditions by writing to Lizzette C. González Reynolds, Chief Deputy Commissioner. The written request must state the reasons why your charter school believes that the special conditions are not warranted.

## Consequences of Failing to Comply

Failure to comply with the imposed special conditions in a timely and adequate manner can result in TEA taking enforcement actions against your charter school. TEA is authorized by Title 34 of the Code of Federal Regulations (CFR), §80.43 to take one or more of the following enforcement actions related to federal grants as appropriate:

- Temporarily withhold cash payments pending correction of the deficiency or more severe enforcement action.
- Disallow all or part of the cost of an activity or action not in compliance.
- Wholly or partly suspend or terminate the current award.
- Withhold further awards for the program.
- Take other remedies that may be legally available.

## Other TEA Monitoring

Please note that in addition to the monitoring imposed as part of your charter school's designation as a high-risk grantee, TEA reserves the right to review your charter school at any time through its other grant monitoring processes.

## TEA Contact Information

Throughout the duration of the special conditions, you may communicate with staff in the Division of Federal Fiscal Monitoring at FFM_Monitoringreview@tea.texas.gov

Should you have any questions related to these matters, please contact Jose de la Garza in the Division of Federal Fiscal Monitoring at (512) 463-9918.

Sincerely,

Nora Ibáñez Hancock, EdD
Associate Commissioner
Office for Grants and Federal Fiscal Compliance

cc: Lizzette C. Gonzalez Reynolds, Chief Deputy
Michael Berry, Deputy Commissioner, Office for Policy and Programs
Shirley Beaulieu, Chief Financial Officer
Von Byer, General Counsel, Legal Services Division
Chris Jones, Senior Counsel, Legal Services Division
Eric Marin, Attorney, Legal Services Division
Cory Green, Chief Grants Administrator
Mark Hernandez, Director, Division of Federal Fiscal Monitoring
Yolanda Cantu, Senior Director, Division of Grants Administration
Heather Mauzé, Director, Division of Charter Schools
Paula Applin, President, Academy of Careers and Technologies Inc.
Richard Clifford, Conservator

CDN: 015816

8/21/2015 2:37:26 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-15-002879**
**Terri Juarez**

Cause No. D-1-GN-15-002879

| | | |
|---|---|---|
| ACADEMY OF CAREERS AND | § | IN THE DISTRICT COURT |
| TECNOLOGIES INC. D/B/A ACADEMY | § | |
| OF CAREERS AND TECHNOLOGIES | § | |
| CHARTER SCHOOL, | § | |
| Plaintiff, | § | |
| | § | 200ᵗʰ JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| TEXAS EDUCATION AGENCY and | § | |
| MICHAEL WILLIAMS | § | |
| in his Official Capacity as the | § | |
| Commissioner of Education Defendants, | § | |
| | § | |
| | § | TRAVIS COUNTY, TEXAS |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' PLEA TO THE JURISDICTION

COMES NOW ACADEMY OF CAREERS AND TECHNOLOGIES, INC. (hereinafter referred to as "Plaintiff' and/or "ACT") and files this it's Plaintiff's Response to Defendants' Plea to the Jurisdiction shows the court as follows:

### Procedural Due Process

ACT has a property interest in its charter and has since 1998. As a result, it cannot be deprived of that property right without due process. The non-profit owns personal and real property over which the TEA cannot take without just compensation and due process, but that is what they are actually attempting to do. As a result, before negative action can be taken which affects the charter contract, procedural and substantive due process must be provided. ACT has a property interest in not only its charter, but in the property and funds it currently has in its possession which is used for school operations and function. Additionally, the TEA is attempting to take personal and real property owned by the non-profit which were purchased, in part, with funds other than TEA payments without paying for such property or providing an opportunity to explain why such property is not subject to seizure. Under the guise of §12.128, the TEA is simply stating that if

1 | P a g e

## Tab B

ACT use any state funds to paid for the property, it can seize the property outright. Such is a taking and violation of ACT constitutional rights.

ACT has received a notice the TEA has assigned a conservator to come in and seize funds and property. His name is Dr. Clifford. Because the TEA intends to close ACT, the intent of the conservator is to shut down the school and seize funds and property held by ACT. This process would conclude before any determination can be made in this case and is a threatened but regulatory certain conclusion given the mandatory nature of Tex. Educ. Code Ann. §12.115. As a result, such seizure constitutes a taking. The takings are intentional and forceful seizures of ACT assets as well as the arbitrary cancellation of its contract.

The Texas Education Code §12.128 states any property which is utilized by using funds provided to a charter-school automatically becomes the property of the state. The non-profit which runs ACT also has other ventures, including federally funded summer programs. Under §12.128, the TEA and Commissioner, through an assigned conservator, could attempt to seize the property owned by the non-profit and purchased with other funds. That deprives the non-profit of its property interest without just compensation or due process of law. The assignment of a conservator as noted in correspondence from the TEA dated on or about June 1, 2015 make it clear the TEA intends to take funds and property, (i.e. ACT vehicles and real property) even that which does not belong to the state or ACT. As a result, §12.128 is unconstitutional.

It is well-settled that a district court has jurisdiction to review an administrative agency order in two circumstances only: (1) the plaintiff's pleaded claim comes within a valid statute that assigns jurisdiction to the court; or (b) the plaintiff's pleaded claim is that the agency order deprived the plaintiff of property without due course of law, a claim lying within the court's original or constitutional jurisdiction. See *Stone v. Texas Liquor Control Bd.,* 417 S.W.2d 385, 385-86 (Tex.1967); *Southwest Airlines Co. v. Texas High-Speed Rail Authority,* 867 S.W.2d 154, 157

(Tex. App.-Austin 1993, writ denied). So even if a statute does not provide a mechanism for judicial review, such review must exist if the agency's system deprives a person of a property interest without due process of law. The Texas Constitution is self-enacting, and thus provide the right to bring an action against the government for violations of the provisions without the need for legislative consent or a waiver of sovereign immunity. *Nueces County v. Ferguson*, 97 S.W.3d 205, 217 (Tex. App.—Corpus Christi 2002, no pet.)(citing *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex.1980)).

ACT asserts the TEA system in place does just that and should be ripe for district court review. First, the Commissioner is ignoring certain statutes and applying others. This selective choice of which laws to follow results in an unconstitutional application of the system. Second, certain sections of the regulatory system are designed to deprive a contract charter holder of their rights and avoid any meaningful review whatsoever. Third, at least one statute is unconstitutional on its face and its threatened application by means of being in the system violated ACT's constitutional rights.

*Lewis v. Metropolitan Savings and Loan Association-a* Texas Supreme Court case holding that an administrative decision fails for arbitrariness if it does not comply with state procedural due process demonstrates both the federal and state requirements for due process. 550 S.W.2d 11, 16 (Tex.1977). In *Lewis,* the Commissioner contended that the administrative decision could not be considered arbitrary if it was supported by substantial evidence, so any procedural irregularities were irrelevant as long as substantial evidence existed to support his decision. *Id.* at 13.13 the Supreme Court recognized that there can be evidence in the administrative record that qualifies as substantial, yet the parties may have also been denied due process and the rudiments of fair play in the conduct of the proceeding. *Id.* at 13-14. Accordingly, the Court concluded and held that "arbitrary action of an administrative agency cannot stand [regardless of whether there is substantial evidence supporting the agency's decision]. There is arbitrariness where the treatment accorded parties in the administrative process denies them due process of law." *Id.* at 16.

ACT also asserts that the statutory and regulatory system in place surrounding issuing strikes against a charter-school and closing them, when applied as a whole, deprives ACT of any judicial review to protect its property interest. Tex. Educ. Code §12.116 provides that the Commissioner shall adopt an informal procedure for revoking a charter but that the Administrative Procedures Act in Chapter 2001 of the Texas Government Code does not apply to the procedure. The State Office of Administrative Hearings (SOAH) may review a decision of the Commissioner to revoke a charter, but that is notwithstanding the procedural safeguards set up in Chapter 2001. Tex. Educ. Code §12.116 (c). A SOAH judge can only disagree with a charter revocation if the acts of the Commissioner are arbitrary and capricious, however, any decision by SOAH is final and cannot be appealed. Tex. Educ. Code §12.116. In other words, a decision to revoke a charter and take a property interest in a charter contract avoids judicial review. In fact, the Commissioner has taken that exact stance in prior litigation asserting the courts have no power to review a revocation or any aspect of it. *In re Texas Educ. Agency,* 441 S.W.3d 747 (2014). Additionally, any appeal on an accountability rating cannot be appealed under Tex. Educ. Code §7.057 "or other law" which means it cannot be appealed at all. Tex. Educ. Code §39.151 (d). The ability to challenge a TEA rule under Chapter 2001 is also specifically prohibited since the TEA takes the position §2001.038 does not apply to accountability ratings. Such a statute is unconstitutional on its face and certainly has been applied in an unconstitutional manner to ACT.

The TEA and Commissioner have made very clear they do not want to allow any appeal of the factual determinations or application standards. There is no way to appeal an accountability rating each year to anyone other than the Commissioner and he will only allow an appeal of a data and calculation error made by TEA and its designees nothing more.

**The Commissioner's rule regarding appeals is extremely limited and narrow, far beyond what is authorized by the statute (Texas Education Code 39.151). See Chapter 7 of 2014 Accountability**

**Manual, p. 69 adopted by 19 TAC §97.1001. It states "the state accountability appeals process is limited to rare cases where a data or calculation error is attributable to the testing contractor or the Texas Education Agency (TEA)."**

However narrow in scope, Plaintiff does not refute the fact because this is all Plaintiff seeks, sought and needs to succeed in removing itself from having its charter revoked due to third-party auditor error. Plaintiff's timeliness of establishing error should not be the bar to its remedy especially prior to revocation. TEA has given its designees allowances for data and calculation errors, however not the entity which carries out the governmental purpose of public education that it oversees.

Further, TEA's process denies any meaningful way to appeal individual year determinations and precludes any judicial review of a closure. Texas District Court is the only viable judicial review for the Plaintiff since TEA has protectively taken itself out of Chapter 2001 of the Texas Government Code (Administrative Procedures Act) and provided charter holders with the meaningless course to SOAH which has its hands tied in these matters.

This point is made evident in ALJ Sharon Cloninger's Decision and Order on Summary Judgment; May 21, 2015.

"An open-enrollment charter school may not appeal a performance rating in another proceeding, including in a hearing before SOAH, if it has had an opportunity to do so under Texas Education Code Chapter 39.151. Respondent did, in fact, have an opportunity to appeal its performance ratings under Texas Education Code Chapter 39.151. Respondent's appeal of its unacceptable and lower than satisfactory performance ratings were denied. Upon receiving the Commissioner's December 8, 2014 Notice of Intent to Revoke Open-Enrollment Charter, Respondent requested an informal review. The Commissioner's final decision did not change his

determination as a result of the informal review. The Commissioner's final decision setting the performance ratings may not be appealed under any law.

Thus, the scope of the ALJ's review does not include consideration of whether the financial and academic performance ratings underlying the Commissioner's revocation decision were arbitrary and capricious, or clearly erroneous. Instead, the ALJ is limited to determining whether the Commissioner's revocation decision is arbitrary and capricious, or clearly erroneous. Therefore, the ALJ cannot consider Respondent's assertions regarding the correctness of its academic performance or financial accountability performance ratings."

Plaintiff is left with no real trier-of-fact in its case because the Commissioner is truly "judge, jury and executioner" and the ALJ merely a pro forma extension of a fraudulent appeals system heavily-weighted for the agency which neither takes into consideration the education and welfare of the students of Texas, in particular, those who are 'at-risk" nor the high-performing charter institutions.

## Substantive Due Process

A violation of substantive due process occurs when the government deprives individuals of constitutionally protected rights by an arbitrary use of its power. *Byers* v. *Patterson*, 219 S.W.3d 514, 525 (Tex. App.-Tyler 2007, no pet.). A claimant prevails on a substantive due process claim by establishing it holds a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies and by establishing that the challenged governmental action is not rationally related to furthering a legitimate state interest. *Id.*

ACT holds a contract which is renewed unless it fails to meet standards for financial and academic accountability. The mechanism in place at the moment amounts to nothing more than the TEA and Commissioner retroactively changing regulations in order to force strikes with no meaningful

6 | P a g e

way to oppose them. Such amounts to a violation of substantive due process.

Under the guise of §12.128, the TEA is simply stating that if ACT paid a mortgage to the bank, it can seize ACT's property outright. TEA claims that funds used for anything by ACT given to it by TEA belongs to TEA. ACT asserts TEA actually paid for services to provide public education and services to students and not creating an interest in real or personal property. If this were the case, ACT would receive "facilities funding" from TEA which ACT does not and TEA would also have the ability to contract with lending institutions to acquire real property and be on a deed which it cannot. Therefore, TEA merely has a contract for services claim in which it has sought to terminate with its charter revocation without due process and should have no real or personal property interest of any kind using a back-handed methodology to avoid a taking in this matter. Additionally, because ACT's 501(c)3 is still financially and legally obligated to the lender, TEA's directives to return its property to the lender because it is State property would create a chilling effect for lenders and those entities seeking to enter into a contract to serve the interest of public education. This chilling effect would be present even when payments continue to be made and the ability to maintain the contract initially entered into can be disrupted at any time by a non-vested, disinterested party to the contract.

The charter holders whether or not seen as the same entity as the charter school after real or personal property has been acquired must maintain its due process rights in their property to reasonably administer contractual certainty of terms between the lender and borrower. Again, ACT asserts TEA's perceived ability to disrupt contractual agreements even through statute is overbroad and should end when services for public education terminates.

As a result, the court has jurisdiction to hear this type of case and the plea should be denied.

## Prayer

Plaintiff prays this court deny the Defendants' Plea to the Jurisdiction, retain jurisdiction in this case and allow the Plaintiff to prosecute its claims. In the alternative, Plaintiff prays it have the ability to amend its pleadings since the Defendants' arguments do not affirmatively negate all jurisdiction. Plaintiff prays for such further relief as it may show itself justly entitled.

Respectfully submitted,

Stephen M. Foster
Attorney for the Plaintiff
9013 Magna Carta Loop
Austin, TX 78754
512-784-4367

By:

Stephen M. Foster
Texas Bar No:00792511
stephenmfosterlaw@gmail.com

8/20/2015 4:45:37 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-002879
Tamara Franklin

CAUSE NO. D-1-GN-15-002879

| | | |
|---|---|---|
| ACDEMY OF CAREERS AND | § | IN THE DISTRICT COURT |
| TECHNOLOGIES INC. d/b/a ACADEMY | § | |
| OF CAREERS AND | § | |
| TECHNOLOGIES CHARTER SCHOOL, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 98TH JUDICIAL DISTRICT |
| | § | |
| TEXAS EDUCATION AGENCY and | § | |
| MICHAEL WILLIAMS in his Official | § | |
| Capacity as the Commissioner of | § | |
| Education, | § | TRAVIS COUNTY, TEXAS |
| *Defendants.* | § | |

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' PLEA TO THE JURISDICTION AND RESPONSE TO PLANTIFF'S REQUEST FOR TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW Defendants, Texas Education Agency ("TEA") and Michael L. Williams, in his Official Capacity as the Commissioner of Education (individually "Williams" and, collectively with TEA, the "Defendants"), and file this Reply to Plaintiff's Response to its Amended Plea to the Jurisdiction.

**I.**

ACT's due process claims assume a property interest in the charter that was created when TEA granted it its charter. ACT is wrong in this assumption and presented this Court with no evidence or authority supporting their contention that a charter creates a constitutionally-protected property interest. A property interest entitled to procedural due process under the Due Process Clause is created and defined not by the Constitution, but rather by "existing rules or understandings that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of*

1

**Tab C**

*Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*

As a general matter, "[w]hen the decision to grant or withhold a benefit is entrusted to the discretion of a government actor, one has no constitutional property interest in obtaining that relief." *Suryanto v. Att'y Gen. of U.S.*, 398 Fed.Appx. 830, 834 (3rd Cir. 2010) (citing *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). "If the decision maker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected ... interest." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (finding no legitimate claim of entitlement where there were "no standards governing the administrator's exercise of his discretion" to transfer an inmate) (citation omitted). In other words, there is no protected property interest where the decision to remove a benefit is left to the "unfettered discretion" of the government actor. *See Roth*, 408 U.S. at 566–67 (concluding a nontenured university professor had no property interest in his position because "State law ... clearly leaves the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials.").

Likewise, the undisputed evidence demonstrates that the ability to grant a charter is left entirely up to the discretion of the Commissioner. The Texas Education Code §12.101 provides, "[T]he commissioner *may* grant a charter on the application of an eligible entity for an open-enrollment charter school to operate in a facility of a commercial or nonprofit entity, an eligible entity or a school district, including a home-rule school district." (emphasis added). Thus, even if a charter school meets all of the statutory requirements, the Commissioner may still deny the

2

charter. Thus, when "the legislature leaves final determination of which eligible individuals receive benefits to the unfettered discretion of administrators, no constitutionally-protected property interests exists." *Lee v. Tex. Workers' Compensation Comm'n*, 272 S.W.3d 806, 817-18 (Tex.App.—Austin 2008) (citing *Roth*, 408 U.S. at 567).

Other than to reiterate that ACT has a property interest in its charter, ACT has failed to demonstrate how a property interest is created by the charter or respond to TEA's arguments and authorities on this point. If the decision to grant the charter is left to the discretion of the commissioner, no property interest is, therefore, created by granting the charter. In *In re New Maurice J. Moyer Acad., Inc.*, C.A. No. 10398–CB, —— A.3d ——, slip op. at 39–42 (Del.Ch.Ct. Jan. 9, 2015), the court, reviewing a charter-school revocation in which a non-profit corporation sought to argue due process violations, found that the charter-holder had no constitutionally-protected property interest in school charter because decision to revoke was discretionary and without substantive limitations. *See also Reach Academy for Boys and Girls, Inc. v. Delaware Department of Education*, 46 F.Supp.3d 455, 2014 WL 2445804 (D.Del.2014), *modifying* 8 F.Supp.3d 574 (D.Del.2014). Because TEA established that the Commissioner has discretion to grant a charter, the interest was never guaranteed or vested and therefore, may not be the basis of a substantive or procedural due process challenge.

## II.

The evidence presented during the August 13, 2015 hearing, clearly demonstrated that the real property in question was solely owned by TEA. The annual financial documentation submitted by ACT to TEA established exactly who ACT believed the owner of the land, buildings and equipment to be – the State, or TEA. Because the property is wholly-owned by the state, ACT failed to establish the *prima facie* elements of a takings claim.

## III.

Finally, Defendants attached hereto Exhibit A, which is an affidavit of Dr. Lisa Dawn-Fisher. ACT presented the court with its Exhibit 5 during the hearing on its Temporary Injunction on August 13, 2015. After the hearing, and after Defendants had an opportunity to review this exhibit in detail, it has come to Defendants attention that this is not a document issued by TEA and does not qualify as an admission by party-opponent or a business record. This exhibit, which was not provided to TEA prior to the hearing, appeared to be admissible, but it is not and should not be considered as evidence that the Court considers when ruling on ACT's Temporary Injunction or Defendants' Plea to the Jurisdiction.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants pray that this Court deny Plaintiff's Request for Temporary Injunction and grant Defendants' Plea to the Jurisdiction, that Plaintiff takes nothing by its suit that all costs be taxed and adjudged against Plaintiff, and that Defendants be granted such other and further relief to which they may be justly entitled.

4

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Division Chief - General Litigation

/s/ *Erika M. Laremont*
ERIKA M. LAREMONT
State Bar No. 24013003
Assistant Attorney General
General Litigation Division
Post Office Box 12548, Capitol Station
Austin, Texas  78711-2548
512-463-2120 (Telephone)
512-320-0667 (Facsimile)
erika.laremont@texasattorneygeneral.gov
**ATTORNEYS FOR DEFENDANTS**

5

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2015, the foregoing document was delivered by electronic mail to the following:

Stephen M. Foster
9013 Magna Carta Loop
Austin, Texas 78754
(512) 784-4367
stephenfosterlaw@gmail.com

Attorneys for Plaintiff

/s/ *Erika M. Laremont*
ERIKA M. LAREMONT

413

# EXHIBIT A

| | | |
|---|---|---|
| ACDEMY OF CAREERS AND | § | IN THE DISTRICT COURT |
| TECHNOLOGIES INC. d/b/a ACADEMY OF CAREERS AND | § | |
| | § | |
| TECHNOLOGIES CHARTER SCHOOL, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 200TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| TEXAS EDUCATION AGENCY and | § | |
| MICHAEL WILLIAMS in his Official Capacity as the Commissioner of | § | |
| Education, | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |
| | § | |

## AFFIDAVIT OF DR. LISA DAWN-FISHER

1.  My name is Dr. Lisa Dawn-Fisher. I am over the age of 18, of sound mind, and able to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

2.  I am employed by the Texas Education Agency as the Chief School Finance Officer.

3.  I have examined the document attached to this affidavit and labeled as Exhibit 1. This document is entitled "2014-15 Ratings based on Fiscal Year 2014 Data – Charter School Status Detail."

4.  This document is in a form that makes it appear to be a rating issued by TEA. However, this document was not prepared by the Texas Education Agency. The Agency did not issue any financial accountability ratings for charter schools who have received a final order of revocation, including the Academy of Careers and Technology.

5.  The document presented varies from the TEA-issued reports in several ways. The document presented has a column labeled "Updated" that was blank. The TEA-issued ratings contain the date and time updated each indicator was last updated. Further, the score entered for "Indicator 5" was "3." For indicator 5, TEA will only assign scores of 0, 2, 4, 6, 8, or 10. TEA would not have assigned the score of "3" for indicator "5" as reflected in the document presented at the hearing held on August 13, 2015.

Dr. Lisa Dawn-Fisher

SWORN TO AND SUBSCRIBED before me, on this the 20th day of August, 2015, by Dr. Lisa Dawn-Fisher.

[SEAL]

Notary Public's Signature

DIANE SALDANA
Notary Public, State of Texas
My Commission Expires
MARCH 15, 2018

416

# Exhibit 1



**Charter FIRST**
Financial Integrity Rating System of Texas

**User: Public**
**User Role: Public**
**Rating Year:** ▢ **CDN:** ▢

**2014-2015 Ratings Based on Fiscal Year 2014 Data - Charter School Status Detail**

Charter School Status Detail     Indicator Detail Summary     Determination of Ratings

Size-Dependent Indicators

**ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL(015816)**

| Status | Indicator Num | Indicator Description | Updated | Score |
|---|---|---|---|---|
| P | †1| 1 | Was the complete annual financial and compliance report (AFR) and charter school financial data submitted to TEA on or before the November 27 or January 28 deadline depending on the charter school's fiscal year end date of June 30 or August 31, respectively? | | YES |
| P | †1| 2 | Was there an unmodified opinion in the AFR on the financial statements as a whole? The American Institute of Certified Public Accountants (AICPA) defines unmodified opinion, and the external independent auditor determines if there was an unmodified opinion. | | YES |
| P | †1| 3 | Was the charter school in compliance with the payment terms of all debt agreements at fiscal year end? If the charter school was in default in a prior fiscal year, an exemption applies in following years if the charter school is current on its forbearance or payment plan with the lender and the payments are made on schedule for the fiscal year being rated. Also exempted are technical defaults that are not related to monetary defaults. A technical default is a failure to uphold the terms of a debt covenant, contract, or master promissory note even though payments to the lender, trust, or sinking fund are current. | | YES |
| P | †1| 4 | Was the total net asset balance in the statement of financial position for the charter school greater than zero? (If the charter school's five-year percent change in students was a 10 percent increase or more, then the charter school passes this indicator). (New charter schools that have a negative net asset balance will pass this indicator if they have a 10 percent growth in students year over year until it completes its fifth year of operations. After the fifth year of operations, the calculation changes to the 10 percent increase in 5 years.) | | YES |
| | | | Was the charter school's administrative cost ratio equal to or | | |

| | 5 | below the threshold ratio as specified by TEA? | | 3 |
|---|---|---|---|---|
| | 6 | Did the comparison of Public Education Information Management System (PEIMS) data to like information in the charter school's AFR result in an aggregate variance of less than 3 percent of all expenses? | | 10 |
| | 7 | Was the AFR free of any instance(s) of material weaknesses in internal controls over financial reporting and compliances for local, state, or federal funds? The AICPA defines material weakness and the external independent auditor determines if there are any instances of material weakness. | | 10 |
| | | | | 23 Weighted Sum |
| | | | | 1 Multiplier Sum |
| | | | | 23 Score |

†1: must pass 1-4

## Options



Audit Home Page: School Financial Audits | Send comments or suggestions to schoolaudits@tea.texas.gov
The Texas Education Agency
1701 North Congress Avenue · Austin, Texas, 78701 · (512) 463-9095
Copyright © Texas Education Agency (TEA) 2007-2012

This website is best viewed in Internet Explorer 6.0 and above.
CSSF 1.4.0.15

PEIMS EDIT+ REPORTS DATA REVIEW
Worksheet for Calculating Administrative Cost Ratio

2014-2015 Midyear Collection, Resubmission
For Fiscal Year 2014
Unallocated

Filename:  M2015015816
District:  015816 - ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL

| Functions | | Payroll Costs (61xx) | Professional and Contracted Services (62xx) | Supplies and Materials (63xx) | Other Operating Expenses (64xx) | |
|---|---|---|---|---|---|---|
| Code | Description | | | | | |
| 21 | Instructional Leadership | 0 | 0 | 0 | 0 | Administrative Costs (A) |
| 41 | General Administration | 134,556 | 54,000 | 0 | 365 | |

Administrative Costs (A)

$188,921

| 11 | Instruction | 448,335 | 14,851 | 39,979 | 2,055 | |
| 12 | Instructional Resources and Media Services | 35,266 | 0 | 0 | 0 | |
| 13 | Curriculum Development and Instr Staff Development | 109,989 | 0 | 0 | 60 | |
| 31 | Guidance, Counseling, and Evaluation Services | 80,832 | 0 | 0 | 27 | Instructional Costs (B) |

Instructional Costs (B)

$731,394

| Administrative Cost Standards | |
|---|---|
| Enrollment (ADA) | Standard |
| 10,000 and above | 0.1105 |
| 5,000 to 9,999 | 0.1250 |
| 1,000 to 4,999 | 0.1401 |
| 500 to 999 | 0.1561 |
| Less than 500 | 0.2654 |
| * Sparsity Adjustment Value | 0.3614 |

0.2583
Administrative Cost Ratio (A/B)

| Summary | | | |
|---|---|---|---|
| (C) District ADA | 178 | (F) District Administrative Cost (A) | $188,921 |
| (D) District Band | Less than 500 | (G) Administrative Cost Standard (E x B) | $194,112 |
| (E) District Standard | 0.2654 | (H) Under/(Over)  (G - A) | $5,191 |
| | | (I) Under/(Over) Percent (H / G) | 2.7% |
| MEETS the administrative cost standard | | | |

*   Sparsity Adjustment value denotes a wide area district (by miles) that receives additional funding for being documented as sparse.
    Sparsity Adjustment value assignments are documented by the TEA Research and Evaluation Department.

Note:  Fiscal Year refers to the fiscal period ended June 30th or August 31st

NO. D-1-GN-15-002879

Filed in The District Court
of Travis County, Texas

SEP - 3 2015

At_____8:40____M.
Velva L. Price, District Clerk

| | | |
|---|---|---|
| ACADEMY OF CAREERS AND TECHNOLOGIES, INC. d/b/a ACADEMY OF CAREERS AND TECHNOLOGIES CHARTER SCHOOL | § § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | OF TRAVIS COUNTY, TEXAS |
| TEXAS EDUCATION AGENCY and MICHAEL WILLIAMS in His Official Capacity as the Commissioner of Education | § § § § § | |
| Defendants. | § | 200TH JUDICIAL DISTRICT |

## ORDER GRANTING TEMPORARY INJUNCTION

CAME ON FOR CONSIDERATION Plaintiff's Motion for Temporary Injunction. After considering the motion, the responses on file, the authorities cited, all admissible evidence, and the arguments of counsel, the Court FINDS as follows:

1.    Defendants Texas Education Agency and Michael Williams, in His Official Capacity as the Commissioner of Education ("Defendants") intend to revoke the charter of Plaintiff Academy of Careers and Technologies, Inc. d/b/a Academy of Careers and Technologies Charter School, take over its bank accounts and real property, and close the school down.

2.    Plaintiff will suffer irreparable harm if Defendants are not enjoined from revoking Plaintiff's charter.

3.    Defendants will suffer no harm from a delay in their efforts to revoke Plaintiff's charter.



**Tab D**    440

4.      This case presents important constitutional issues, including but not limited to the procedural due process required in manner of the charter revocation pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), and whether Defendants are constitutionally taking Plaintiff's private property in violation of the Fourteenth Amendment. These issues should be considered carefully and thoughtfully after a full trial on the merits.

5.      Absent a temporary injunction, Plaintiff has no adequate remedy at law.

Accordingly, the Court GRANTS Plaintiff's Motion for Temporary Injunction.

The Court ORDERS, ADJUDGES, AND DECREES that Defendants Texas Education Agency and Michael Williams, in His Official Capacity as the Commissioner of Education, and Defendants' agents, servants, attorneys, employees, representatives, and any person or party in concert or participation with them, are PROHIBITED and ENJOINED from taking any further action to revoke Plaintiff's charter, take over Plaintiff's bank accounts and real property, or shut Plaintiff's school down until such time as this Court may conduct a full trial on the merits.

It is FURTHER ORDERED that final trial to determine whether this temporary injunction should be made permanent is set for **February 1, 2016 at 9:00 o'clock a.m**.

Applicant shall post a bond in the amount of $2,500.00.

Based upon the Court's findings that constitutional rights are involved, for which there would be no sovereign immunity from suit over a suit to determine those constitutional rights, the Court denies the Defendants' plea to the jurisdiction.

SIGNED on this 2nd day of September, 2015 at 3:30 o'clock p.m.

The Honorable Gisela D. Triana
Judge Presiding

2

112 F.3d 1475
United States Court of Appeals,
Eleventh Circuit.

Karen ADLER, individually, and as Next Friend of
the Minor, Leslie Adler, and all others similarly
situated, Laura Jaffa, individually and all others
similarly situated, Robin Zion, individually and all
others similarly situated, Robin Rand, individually
and as Next Friend of the minor, Doug Rand, and
all others, similarly situated,
Plaintiffs–Appellants,
v.
DUVAL COUNTY SCHOOL BOARD, Larry Zenke,
in his official capacity as Superintendent of the
Duval County Public School District, Don Buckley,
in his official capacity as member of the Duval
County School Board, Stan Jordan, in his official
capacity as member of the Duval County School
Board, Nancy Corwin, in her official capacity as
member of the Duval County School Board, et al.,
Defendants–Appellees,
Student Coalition for Free Speech, American
Jewish Congress, Amici,
Sharon Green, as parent and next friend of
Jennifer Green, minor child, and Joshua Green,
minor child, Linda Muhlbauer, as parent and next
friend of Mandy Muhlbauer, minor child, and
Mark Muhlbauer, minor child, Linda Gaston,
parent and next friend of Matthew Gaston, minor
child, Rhonda Sellers, parent and next friend of
Steven Sellers, minor child, et al.,
Intervenors–Defendants.

No. 94–2638. | May 6, 1997.

Graduating high school students and parents brought § 1983 action alleging that school district policy permitting school prayer at graduation ceremony violated First Amendment prohibition against the establishment of religion by state. The United States District Court for the Middle District of Florida, No. 93-833–CIV-J–10, Wm. Terrell Hodges, J., 851 F.Supp. 446, granted summary judgment to school district. Students and parents appealed. The Court of Appeals, Tjoflat, Circuit Judge, held that: (1) students' claims for declaratory and injunctive relief seeking to prevent school board from allowing student prayers at future graduation ceremonies were moot, and (2) students waived damages claims on appeal.

Affirmed in part, vacated and remanded in part.

Vining, Senior District Judge, sitting by designation, filed opinion concurring in part and dissenting in part.

West Headnotes (3)

[1] **Civil Rights**
Education
**Declaratory Judgment**
Education

High school students' claims for declaratory and injunctive relief seeking to prevent school board from allowing student prayers at future graduation ceremonies were moot, where students had already graduated from high school and where parents who had other children who would graduate from high school in future were not described as plaintiffs, no theories had ever been advanced to support individual action by either parent, and no allegations were made in complaint regarding existence of other children. U.S.C.A. Const. Art. 3, § 2, cl. 1.

23 Cases that cite this headnote

[2] **Civil Rights**
Education
**Declaratory Judgment**
Education

High school students' claims for declaratory and injunctive relief seeking to prevent school board from allowing student prayers at future graduation ceremonies did not fall within exception to mootness doctrine for injury that is capable of repetition, yet evading review, where complaining students had graduated from high school, so there was no reasonable expectation that they would be subjected to same injury again. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend 1.

71 Cases that cite this headnote

**Tab E-1**

**[3]**     **Federal Courts**
☞Specification of errors;  points and arguments

High school students bringing § 1983 action seeking damages arising out of alleged violation of establishment clause caused by student prayer at graduation ceremonies waived damages claims on appeal where their briefs offered no connection between damages and student prayer, offered no indication as to any of circumstances surrounding graduation prayer, failed to even allege that student prayer was delivered during graduation ceremony at high school, and omitted to enumerate specific relief sought. 42 U.S.C.A. § 1983; F.R.A.P.Rule 28(a)(3, 4, 6, 7), 28 U.S.C.A.

12 Cases that cite this headnote

**Attorneys and Law Firms**

D. Gray Thomas, William J. Sheppard, Sheppard & White, P.A., Jacksonville, FL, for Plaintiffs–Appellants.

Jessica Smith, Washington, DC, for amicus National Pearl.

Marc D. Stern, New York City, for amicus American Jewish Congress & National Jewish Community Relations Advisory Counsel.

Stephen M. Durden, Jacksonville, FL, for Defendants–Appellees.

Frederick H. Nelson, Mathew D. Staver, Orlando, FL, for Intervenors–Defendants–Appellees Sharon Green, et al.

Mitchell A. Stone, Jacksonville, FL, Jay A. Sekulow, Washington, DC, for American Jewish Congress (amicus in District Court).

Steven T. McFarland, Center for Law & Religious Freedom, Annandale, VA, for amicus Christian Legal Society.

Appeal from the United States District Court for the Middle District of Florida.

Before TJOFLAT and COX, Circuit Judges, and VINING[*], Senior District Judge.

**Opinion**

TJOFLAT, Circuit Judge:

Appellants are four former high school students[1] in the Duval County, Florida, school system who brought this action under 42 U.S.C. § 1983 (1994), alleging that a Duval County school policy permitting student-initiated prayer at high school graduation ceremonies (the "policy") violated their rights under the First and Fourteenth Amendments.[2] They named as defendants the Duval County School Board, the Board's members in their official capacity, the Duval County School District, and Dalton Epting, the principal of Mandarin Senior High School ("Mandarin"), in his official capacity. These defendants are all appellees in the present appeal. The remaining appellees are a group of parents who intervened as defendants to assert their children's free exercise rights to have prayers at graduation.

**I.**

Appellants Adler, Laura Jaffa, and Robin Zion filed a two-count complaint on June 2, 1993. Count one alleged that the policy constitutes an establishment of religion. Count two alleged that the policy infringes on the appellants' free exercise of religion. They asked for equitable relief in the form of a judgment declaring the policy unconstitutional and enjoining the School Board from permitting prayers at high school graduation ceremonies. They also sought money damages.

On June 7, 1993, appellants Adler, Jaffa, and Zion graduated from Mandarin, one of the schools in the Duval County system. On June 10, 1993, they amended their complaint to include, *inter alia,* a request that the court certify their action as a class action. They amended their complaint a second time on November 1, 1993, to add appellant Rand, a **\*1477** student at another school in the Duval County system, as a plaintiff.[3]

The plaintiffs, defendants, and defendant-intervenors filed cross-motions for summary judgment on March 3, 1994. On May 4, 1994, the district court denied the appellants' motion and granted the appellees' motions. In its dispositive memorandum opinion and order, the court found the policy constitutional and entered final judgment for the appellees. *Adler,* 851 F.Supp. at 456. Appellants

filed their notice of appeal on May 9, 1994.

Appellant Rand subsequently graduated in June 1994. Because all four appellants have graduated, we find that to the extent they seek declaratory and injunctive relief, their case is moot. The only justiciable controversy in this case is the appellants' claim for money damages. We affirm the district court's grant of summary judgment for the appellees on this claim, but we do so without reviewing the merits of the district court's constitutional analysis.

## II.

[1] We begin by noting that appellants' claims for declaratory and injunctive relief are moot. All appellants have graduated, and none are threatened with harm from possible prayers in future Duval County graduation ceremonies. In short, the appellants have no legally cognizable need for relief declaring the policy unconstitutional and preventing the School Board from allowing prayers at future graduations.

Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of certain "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of mootness is derived from this limitation because an action that is moot cannot be characterized as an active case or controversy. *See Church of Scientology Flag Serv. Org. v. City of Clearwater,* 777 F.2d 598, 604 (11th Cir.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Any decision on the merits of a moot case would be an impermissible advisory opinion. *See Church of Scientology Flag Serv. Org.,* 777 F.2d at 604 (citing *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969) (per curiam)).

To apply the doctrine of mootness to this case, we must distinguish the appellants' claims for equitable relief from their claim for money damages. Although neither the appellants nor the district court treated the appellants' claim for damages as distinct from their claims for equitable relief, these claims are distinct by nature. Equitable relief is a prospective remedy, intended to prevent future injuries. In contrast, a claim for money damages looks back in time and is intended to redress a past injury.

Frequently, a plaintiff will seek both forms of relief in the same cause of action when challenging a defendant's course of conduct that began before the initiation of the lawsuit and is likely to continue in the future. The plaintiff requests money damages to redress injuries caused by the defendant's past conduct and seeks equitable relief to prevent the defendant's future conduct from causing future injury.

When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury. This is precisely what happened in this case.

[2] Appellants argue that, despite their graduation from high school, their claims for declaratory and injunctive relief are not moot because the original injury is "capable of repetition, yet evading review." *See Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). This exception to the mootness doctrine is narrow.

[I]n the absence of a class action, the "capable of repetition, yet evading review" doctrine [is] limited to the situation where **\*1478** two elements combine[ ]: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.

*Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). This case does not satisfy the second element. Because the complaining students have graduated from high school, there is no reasonable expectation that they will be subjected to the same injury again. *See DeFunis v. Odegaard,* 416 U.S. 312, 319–20, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (finding challenge to law school admission policy moot because petitioner "will never again be required to run the gauntlet of the Law School's admission process").

Appellants contend, however, that two of the named plaintiffs, Karen Adler and Robin Rand, are parents of other children who will graduate sometime in the future from high schools in Duval County and may be subjected to the same injury. In the complaint, however, the caption notwithstanding, neither parent is described as a plaintiff and no theories have ever been advanced to support an individual action by either parent, nor were any allegations made in the complaint regarding the existence of other children. The former students are the only plaintiffs before us,[4] and as to them, any claim for equitable relief is clearly moot. *See Sapp v. Renfroe,* 511 F.2d 172, 176 (5th Cir.1975) (holding constitutional

challenge to graduation requirement brought by student who then graduated moot);[5] *Laurenzo v. Mississippi High Sch. Activities Ass'n,* 662 F.2d 1117, 1120 (5th Cir. Unit A Dec.1981) (holding constitutional challenge to student-transfer rule brought by student who then graduated moot despite argument that student's parent had other children who might suffer same injury).[6]

Because any claim for equitable relief has been rendered moot by the appellants' graduations, we must vacate the district court's grant of summary judgment to the appellees on the appellants' claims for declaratory and injunctive relief and remand the case to the district court with instructions to dismiss those claims. *See, e.g., Lewis v. Continental Bank Corp.,* 494 U.S. 472, 482, 110 S.Ct. 1249, 1256, 108 L.Ed.2d 400 (1990). Having disposed of the appellants' claims for equitable relief, we are left with their claim for money damages, which we now address.

### III.

[3] Because the appellants' claim for money damages does not depend on any threat of future harm, this claim remains a live controversy. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 371, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982) ("Given respondents' continued active pursuit of monetary relief, this case remains 'definite and concrete, touching the legal relations of parties having adverse legal interests.' ") (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)).

We accordingly turn our focus to the basis for the appellants' claim for damages. The complaint alleges that a "senior class chaplain" delivered a prayer at the June 7, 1993, Mandarin graduation ceremony at which appellants **\*1479** Adler, Jaffa, and Zion graduated.[7] The only past injury for which the appellants could seek redress is being subjected to this prayer at their graduation ceremony.[8] To prove that the appellees caused this injury, the appellants alleged in their complaint that the prayer was "a direct consequence" of the school's policy. In their answer, the appellees admitted that a student said the prayer, but denied that the prayer was a consequence of the policy.

The district court based its decision to grant the appellees' motion for summary judgment on its conclusion that the policy was not unconstitutional. Because we find that the district court's order must be affirmed regardless of the constitutionality of the policy, we abstain from ruling on this controversial constitutional question. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

The only issue the appellants raise on appeal is whether the district court erred in holding the policy constitutional. While the constitutionality of the policy may have been central to the now moot issue of whether equitable relief is warranted to prevent the policy from being implemented at future graduations, it does not dispose of the issue of whether the appellants should be awarded money damages for being subjected to the prayer at their graduation. In other words, any claim for damages does not depend on the constitutionality of the policy in the abstract or as applied in other Duval County schools. Even if the policy is unconstitutional, the defendants might not be liable if, for example, they did not implement the policy at the ceremony in question or if the prayer would have been delivered without the policy. On the other hand, if the district court was correct in finding the policy constitutional, defendant Epting, Mandarin's principal, might nonetheless be liable if he implemented the policy in an unconstitutional manner.[9]

The constitutionality of the policy, therefore, has little independent relevance to the appellants' damages claim. Whether they **\*1480** are entitled to damages depends entirely on the circumstances under which the prayer was delivered at their graduation ceremony. In order to prevail, the appellants must have some theory connecting the individual defendants to the prayer.

For these reasons, even if we were to find fault with the district court's constitutional analysis of the policy, this conclusion by itself would not answer the question of whether the court erred in granting the appellees summary judgment on the damages claim. The appellants offer no other grounds in their briefs for finding trial court error.

After considering the appellants' briefs and oral argument, we are convinced that they either fail to understand the basis for their damages claim or do not seriously seek damages.[10] They have offered us no connection between the prayer and their damages claim; their briefs offer no indication as to any of the circumstances surrounding the Mandarin graduation prayer. They failed to argue that the prayer was a "direct consequence" of the policy, or any other theory connecting the defendants' actions to the Mandarin prayer. Their briefs do not even include the allegation made in their complaint that a prayer was delivered at Mandarin.

If they had desired to preserve their damages claim on appeal, they should have included all this information in their initial brief pursuant to the rules of appellate procedure. *See* Fed. R.App. P. 28(a)(3), (4), (6), (requiring appellant to include in initial brief "[a] statement of the issues presented for review"; a statement "indicat[ing] briefly the nature of the case" followed by "a statement of the facts relevant to the issues presented for review"; an argument "contain[ing] the contentions of the appellant on the issues presented"). Most telling of all, is their request for relief. Fed. R.App. P. 28(a)(7) requires appellants to include in their initial brief a "short conclusion stating the precise relief sought." In their brief, the appellants only ask us to reverse the district court and remand the case "with directions for entry of summary judgment and declaratory relief." They do not ask us to direct the district court on remand to award money damages or to hold any kind of further proceedings on their damages claim. *See Frank v. United States,* 78 F.3d 815, 832–34 (2d Cir.1996) (holding issue waived because cross-appellant failed to request appropriate relief, even though cross-appellant had stated the issue and attempted to incorporate argument before district court), *petition for cert. filed,* 64 U.S.L.W. 2600 (U.S. June 13, 1996)(No. 95-2006) .

In fact, the only references to their claim for damages were two cursory statements, one in their initial brief and one at oral argument. Their brief indicated that they initiated the lawsuit "seeking declaratory and injunctive relief, as well as damages," but never again mentioned their damages claim or its underlying legal theory. After contending at oral argument that their case fit within the "capable of repetition, yet evading review" exception to the mootness doctrine discussed above, appellants suggested in passing that their case was not moot because the complaint contained a prayer for money damages.[11]

We cannot agree with Judge Vining's conclusion that this cursory treatment is sufficient to preserve their damages claim on appeal. Without the benefit of developed argument from both sides regarding the propriety of the district court's grant of summary judgment on the damages claim, we cannot effectively review that decision. For us to rule on this issue would deny the appellees the opportunity to argue that they were not legally responsible for the prayer delivered at the appellants' graduation. As we noted in *Federal Savings & Loan Ins. Corp. v. Haralson,* 813 F.2d 370 (11th Cir.1987):

> **\*1481** The waiver rule requires that the appellant state and address argument to the issues the appellant desires to have reviewed by this Court in the appellant's initial brief because "[i]n preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed."

*Id.* at 373–74 n. 3 (quoting *Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983)).

For all these reasons, we hold that they have waived their damages claim on appeal.[12] *See, e.g., Braun v. Soldier of Fortune Magazine,* 968 F.2d 1110, 1121 n. 13 (11th Cir.1992) (refusing to review issue not raised and argued in appellant's initial brief), *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). We therefore affirm the district court's order to the extent it denied the appellants' motion for summary judgment and granted the appellees' motions for summary judgment on the appellants' damages claim.

## IV.

For the foregoing reasons, we VACATE the district court's order granting the appellees summary judgment on the appellants' claims for declaratory and injunctive relief and REMAND the case with instructions that the district court dismiss those claims. We AFFIRM the district court's denial of the appellants' motion for summary judgment and its grant of summary judgment for the appellees on the appellants' damages claim.

It is SO ORDERED.

VINING, Senior District Judge, concurring in part and dissenting in part:

While I concur in the majority's conclusion that the appellants' requests for injunctive and declaratory relief are moot, I cannot agree with its finding that the appellants have waived their claim for money damages. Accordingly, I respectfully dissent from Part III of the majority opinion.

As the majority observes, the appellants specifically alleged in their complaint that a member of the senior class delivered a prayer at the June 7, 1993, Mandarin Senior High School graduation exercises at which appellants Adler, Jaffa, and Zion graduated. Consistent with this allegation and their request for money damages, the appellants also alleged that the prayer was a direct consequence of the Duval County School District policy at issue in this case.[1]

**\*1482** On May 4, 1994, the district court granted the appellees' motion for summary judgment, concluding that the Duval County School District policy was not unconstitutional. The district court neither discussed nor analyzed the appellants' claim for money damages in its memorandum opinion and order.[2] Instead, after dismissing all of the appellants' constitutional challenges to the instant policy, the district court entered final judgment for the appellees. It never, explicitly or implicitly, addressed, in any substantive fashion, the appellants' damages claim.[3]

Despite the uncontroverted fact that the district court never addressed or analyzed the appellants' claim for money damages in its memorandum opinion and order, the majority concludes that the appellants' failure to "fully brief" their money damages claim on appeal constitutes a waiver of that claim.[4] Because I find that the appellants properly and adequately briefed and argued on appeal the only issue actually addressed and decided by the district court, i.e., the constitutionality of the instant policy, I disagree with the majority's decision.[5]

As the district court implicitly recognized, it was absolutely unnecessary for it to engage in any analysis of the appellants' claim for money damages after it determined that the instant policy was not unconstitutional. The district court properly expressed no opinion regarding the propriety of the appellants' money damages claim subsequent to holding that the policy at issue survived constitutional scrutiny because, under the facts of this case, the appellants were not entitled to money damages, or injunctive or declaratory relief for that matter, absent a finding that the subject policy was unconstitutional.[6] **\*1483** Consistent with the district court's ruling, the appellants, therefore, properly focused upon the alleged errors committed by the district court in its constitutional analysis. Under these circumstances, I am not aware of any legal theories, principles of equity, or appellate rules, including those cited by the majority, that support the majority's waiver position.

Since I conclude that the appellants sufficiently raised their claim for money damages in their complaint, properly alleged that such damages were the direct consequence of an unconstitutional policy, and properly and adequately challenged in their appellate briefs and during oral argument the only issue actually addressed and decided by the district court, I cannot agree that the appellants have waived their claim for money damages on appeal. Consequently, I would reach the merits of the constitutional arguments raised in this case and would, if necessary, remand the matter to the district court for a hearing on all relevant factual and legal issues relating to the appellants' claim for money damages.[7]

**All Citations**

112 F.3d 1475, 37 Fed.R.Serv.3d 824, 118 Ed. Law Rep. 39, 10 Fla. L. Weekly Fed. C 890

Footnotes

\*      Honorable Robert L. Vining, Jr., Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

1      Two appellants, Leslie Adler and Doug Rand, were minors when the complaint was filed and brought their claims through their mothers, Karen Adler and Robin Rand. The complaint makes it clear that Karen Adler and Robin Rand are parties in name only and it is the students whose interests are at stake. We therefore refer to the four students as the "appellants" and to Leslie Adler and Doug Rand as "Adler" and "Rand," respectively.

2      The factual and procedural background of this case is set out more fully in the published memorandum opinion and order of the district court. See Adler v. Duval County Sch. Bd., 851 F.Supp. 446 (M.D.Fla.1994).

3      This second amended complaint is the complaint before us; we refer to it as "the complaint."

4      The appellants originally sought to represent a class of similarly situated students who would graduate in the future, but they failed timely to move the district court for class certification pursuant to local court rules. The district court denied the appellants leave to file a motion for class certification out of time. The appellants do not challenge this ruling.

5      In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

6      Although decisions from Unit A of the former Fifth Circuit handed down after September 30, 1981, are not binding precedent, we find the reasoning in Laurenzo persuasive. See Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th

Cir.1982) (adopting as binding precedent all decisions of Unit B of former Fifth Circuit handed down after September 30, 1981, but recognizing persuasive authority of non-binding Unit A decisions).

The parties agree that a student delivered the following message:

First and foremost, we give thanks to our parents for providing the love and support that we have too many times taken for granted. We thank our teachers for challenging our minds and inspiring us to greater achievement. And finally to our special friends who are present today, we thank you for sharing our joy.

We, as a class, are entering a new chapter in our lives. As we enter this new time, there will be many decisions to be made, decisions that will shape our future.

We ask for divine guidance, strength, and a burning desire to move ahead and succeed. In God's name we pray. Amen.

We assume without deciding that this message constitutes a religious prayer for First Amendment purposes. *See DeSpain v. DeKalb County Community Sch. Dist. 428,* 255 F.Supp. 655, 655–56 (N.D.Ill.1966) (finding verse "We thank you for the flowers so sweet; /We thank you for the food we eat; / We thank you for the birds that sing; /We thank you for everything" did not constitute prayer for First Amendment purposes), *rev'd,* 384 F.2d 836 (7th Cir.1967) (finding same verse did constitute prayer), *cert. denied,* 390 U.S. 906, 88 S.Ct. 815, 19 L.Ed.2d 873 (1968); *see also Engel v. Vitale,* 370 U.S. 421, 424, 82 S.Ct. 1261, 1264, 8 L.Ed.2d 601 (1962) (describing prayer as "solemn avowal of divine faith and supplication for the blessings of the Almighty").

Appellant Rand did not graduate at this ceremony. Because he graduated after the district court entered final judgment, he has no claim for money damages in this case. Summary judgment in favor of the appellees on Rand's claim was thus proper and is affirmed. In the rest of this part of the opinion, we use the term "appellants" to refer only to appellants Adler, Jaffa, and Zion.

For example, the district court based its conclusion that the policy did not violate the Constitution under the test enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in part on its finding that the policy did not have the primary effect of advancing religion because it did "not mandate, require, or direct that religious expression or prayer occur at any graduation ceremony." *Adler,* 851 F.Supp. at 453. Similarly, it held that the policy was not unconstitutional under *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), because the policy did "not solicit or mandate invocations or benedictions." *Adler,* 851 F.Supp. at 456.

Assuming that both these conclusions are correct, Epting still might be liable for a constitutional tort under either of these tests if he "mandate [d], require[d], or direct[ed] that" the prayer be delivered at the Mandarin gradation.

In support of the latter conclusion, we note that appellants agreed with the district court's assertion at a pretrial hearing that their "prayer for injunctive relief ... is 99 percent of this litigation."

They first argued that their case was not moot in their reply brief. In that brief, however, the only argument they made was that their case was "capable of repetition, yet evading review." They made no mention of their claim for damages.

Judge Vining suggests that the proper disposition of this case is to reach the merits of the district court's ruling and, if we were to find it erroneous, remand the case for further proceedings on the damages claim. Such a disposition is logically appealing, but does not take into account the significance of the appellants' failure on appeal to (1) articulate any theory connecting the actions of the appellees to a cognizable injury suffered by the appellants, (2) discuss any facts relevant to the Mandarin graduation ceremony, other than the existence of the policy, or (3) request that we remand the case with directions that the district court either award money damages or, at the very least, conduct further proceedings to determine whether damages are warranted. These glaring omissions clearly demonstrate that the appellants have not advanced their damages claim on appeal.

Perhaps the appellants did state a valid damages claim in their complaint, and the evidence available to them may very well support that claim. Had the appellants perceived that any claim for injunctive relief based solely on the policy was moot, we have little doubt that they would have fully briefed their damages claim on appeal. In the absence of plain error, however, it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate. *See* Fed. R.App. P. 28(a); *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11,* 46 F.3d 629, 635 (7th Cir.1995) (noting that an appellate "court has no duty to research and construct legal arguments available to a party"); *Golden Pacific Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.) ("[Appellate courts] do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties."), *cert. denied,* 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988).

We recognize that we have discretion to overlook technical noncompliance with Rule 28(a) and can even decide issues *sua sponte.* These courses of action are only appropriate in rare circumstances to avoid manifest injustice. *See Frank,* 78 F.3d at 833. We find, however, that this case does not present sufficiently compelling reasons for us to exercise that discretion.

The appellants' complaint is replete with additional specific and particularized allegations that outline other instances in which senior class representatives delivered religious messages at other Duval County high school commencement ceremonies. Moreover, the appellants specifically allege that these prayers were delivered as a result of the subject school district policy.

In fact, the district court referenced the appellants' claim for money damages only once in its twenty-two page memorandum opinion and order. In its introduction, the court, after observing that the appellants sought injunctive relief, noted that they "also sought declaratory relief and damages." R4–123–2. This was the district court's sole reference to the appellants' money damages claim. The district court thereafter extensively analyzed the constitutional issues presented in this case without ever addressing, even in the most perfunctory fashion, the appellants' money damages claim.

I am not implying that the district court erred by failing to analyze the appellants' claim for money damages. Once the district court ruled that the subject policy was not unconstitutional, it was unnecessary for the court to consider the appellants' claim for monetary damages. Indeed, any discussion by the district court of money damages at that point would have been dicta.

Although the appellants may have agreed with the district court's assertion at the pretrial hearing that their prayer for injunctive relief was ninety-nine percent of the relief sought in this matter, such a concurrence provides no persuasive support for the proposition that the appellants waived their claim for money damages on appeal or that they did not seriously seek monetary damages. To the extent that the majority states otherwise, I do not concur.

Although the appellants did not discuss in great detail during oral argument the evidence supporting their money damages claim, they did, as the majority notes, reference and acknowledge the existence of such a claim.

While the constitutionality of the instant policy is not *dispositive* of the appellants' money damages claim, the appellants' claim for money damages, like their requests for injunctive and declaratory relief, clearly does *depend* upon the constitutionality of the subject policy. I disagree with the majority's assertion to the contrary. The appellants' only claim for money damages relates to the prayer delivered at the Mandarin graduation. As I have previously explained, the appellants specifically alleged in their complaint that this prayer was given as a direct result of the policy at issue in this case.

The appellants did not allege in their complaint, or assert at any time in the course of this litigation, that any individual defendant acted unconstitutionally, except when acting pursuant to the purportedly unconstitutional Duval County School District policy. For example, the appellants did not allege in their complaint that the Mandarin principal, Dalton Epting, acted independently, rather than pursuant to the policy at issue, when he permitted the senior class representative to deliver the prayer at the Mandarin graduation ceremony. The majority's suggestion that Epting might be liable if he independently mandated, required, or directed that a prayer be given appears only in the majority opinion. The appellants have never advanced this theory of liability, and there are no factual allegations in their complaint to support such a theory. Thus, consistent with the appellants' allegations in their complaint, the claim for money damages does depend directly upon the constitutionality of the subject policy.

I am cognizant of the fact that the constitutionality of the instant policy is not dispositive of the issue of money damages. Even if this court were to find that the subject policy is unconstitutional, the appellants would not automatically be entitled to money damages. Rather, the appellants would still be required to prove, as they alleged in their complaint, that the prayer delivered at the Mandarin graduation was given as a result of the subject policy.

If this court were to conclude that the instant policy is unconstitutional, the appellees, contrary to the majority's assertion otherwise, would have an ample opportunity to "argue that they were not legally responsible for the prayer delivered at the appellants' graduation." If this court concluded that the subject policy did not survive constitutional scrutiny, the court would then remand the damages issue to the district court. On remand, both the appellants and appellees would have the opportunity to argue the merits of the appellants' damages claim. After reviewing all of the relevant evidence and hearing arguments from the appellants and appellees, the district court would thereafter determine whether the appellants were entitled to the money damages that they have requested.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Not Followed as Dicta** Brito v. Diamond, S.D.N.Y., June 26, 1992

**92 S.Ct. 2701**
**Supreme Court of the United States**

The BOARD OF REGENTS OF STATE COLLEGES
et al., Petitioners,
v.
David F. ROTH, etc.

No. 71—162. | Argued Jan. 18, 1972. | Decided June 29, 1972.

Action by assistant professor at state university, who had no tenure rights to continued employment and who was informed that he would not be rehired after first academic year, alleging that decision not to rehire him infringed his Fourteenth Amendment rights. The United States District Court for the Western District of Wisconsin, 310 F.Supp. 972, granted summary judgment for assistant professor on procedural issue, ordering university officials to provide him with reasons and a hearing, and appeal was taken. The Court of Appeals, 446 F.2d 806, affirmed the partial summary judgment, and certiorari was granted. The Supreme Court, Mr. Justice Stewart, held that where state did not make any charge against assistant professor that might seriously damage his standing and associations in his community and there was no suggestion that state imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities, he was not deprived of 'liberty' protected by the Fourteenth Amendment when he simply was not rehired in the job but remained as free as before to seek another. The Court further held that where terms of appointment of assistant professor secured absolutely no interest in reemployment for the next year and there was no state statute or university rule or policy that secured his interest in reemployment or that created any legitimate claim to it, he did not have a property interest protected by Fourteenth Amendment that was sufficient to require university authorities to give him a hearing when they declined to renew his contract of employment.

Judgment of Court of Appeals reversed and case remanded.

Mr. Justice Douglas filed a dissenting opinion.

Mr. Justice Marshall filed a dissenting opinion.

For concurring opinion of Mr. Chief Justice Burger, see 92 S.Ct. 2717.

For dissenting opinion of Mr. Justice Brennan in which Mr. Justice Douglas joined, see 92 S.Ct. 2717.

Mr. Justice Powell took no part in decision of case.

West Headnotes (10)

**[1]** **Constitutional Law**
Rights, Interests, Benefits, or Privileges Involved in General
**Constitutional Law**
Notice and Hearing

Requirements of procedural due process apply only to deprivation of interests encompassed by Fourteenth Amendment's protection of liberty and property, and when protected interests are implicated the right to some kind of prior hearing is paramount. U.S.C.A.Const. Amend. 14.

2984 Cases that cite this headnote

**[2]** **Constitutional Law**
Rights, Interests, Benefits, or Privileges Involved in General

To determine whether due process requirements apply in the first place, court must look not to the "weight" but to the nature of the interest at stake and must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property. U.S.C.A.Const. Amend. 14.

1607 Cases that cite this headnote

**[3]** **Constitutional Law**
Liberties and liberty interests

**Tab E-2**

**Constitutional Law**
🔑Property Rights and Interests

Property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels or money, and due process protection is required for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process. U.S.C.A.Const. Amend. 14.

665 Cases that cite this headnote

[4] **Constitutional Law**
🔑Reputation; defamation

Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. U.S.C.A.Const. Amend. 14.

623 Cases that cite this headnote

[5] **Constitutional Law**
🔑Employees

Whatever may be a teacher's right of free speech, interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest.

33 Cases that cite this headnote

[6] **Constitutional Law**
🔑Reputational interests, protection and deprivation of

Where state in declining to rehire assistant professor at state university, who had no tenure rights to continued employment, did not make any charge against him that might seriously damage his standing and associations in his community and there was no suggestion that

state imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities, he was not deprived of "liberty" protected by the Fourteenth Amendment when he simply was not rehired but remained as free as before to seek another. U.S.C.A.Const. Amend. 14; W.S.A. 37.31(1).

1378 Cases that cite this headnote

[7] **Constitutional Law**
🔑Benefits, rights and interests in

Fourteenth Amendment's procedural protection of property is a safeguard of security of interests that a person has already acquired in specific benefits. U.S.C.A.Const. Amend. 14.

411 Cases that cite this headnote

[8] **Constitutional Law**
🔑Benefits, rights and interests in
**Constitutional Law**
🔑Notice and Hearing

To have a property interest in a benefit, a person must have more than an abstract need or desire for it or a unilateral expectation of it, and he must have a legitimate claim of entitlement to it, it is a purpose of ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined, and it is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. U.S.C.A.Const. Amend. 14.

3340 Cases that cite this headnote

[9] **Constitutional Law**
🔑Source of right or interest
**Constitutional Law**
🔑Benefits, rights and interests in

Property interests are not created by the Constitution; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. U.S.C.A.Const. Amend. 14.

3687 Cases that cite this headnote

[10]     **Constitutional Law**
         Tenure

Where terms of appointment of assistant professor at state university, who had no tenure rights to continued employment and who was informed that he would not be rehired after first academic year, secured absolutely no interest in reemployment for the next year and there was no state statute or university rule or policy that secured his interest in reemployment or that created any legitimate claim to it, he did not have a property interest protected by Fourteenth Amendment that was sufficient to require university authorities to give him a hearing when they declined to renew his contract of employment. U.S.C.A.Const. Amend. 14; W.S.A. 37.31(1).

2837 Cases that cite this headnote

**\*\*2702** Syllabus[*]

**\*564** Respondent, hired for a fixed term of one academic year to teach at a state **\*\*2703** university, was informed without explanation that he would not be rehired for the ensuing year. A statute provided that all state university teachers would be employed initially on probation and that only after four years' continuous service would teachers achieve permanent employment 'during efficiency and good behavior,' with procedural protection against separation. University rules gave a nontenured teacher 'dismissed' before the end of the year some opportunity for review of the 'dismissal,' but provided that no reason need be given for nonretention of a nontenured teacher, and no standards were specified for reemployment. Respondent brought this action claiming deprivation of his Fourteenth Amendment rights, alleging infringement of (1) his free speech right because the true reason for his nonretention was his criticism of the university administration, and (2) his procedural due process right because of the university's failure to advise him of the reason for its decision. The District Court granted summary judgment for the respondent on the procedural issue. The Court of Appeals affirmed. Held: The Fourteenth Amendment does not require opportunity for a hearing prior to the nonrenewal of a nontenured state teacher's contract, unless he can show that the nonrenewal deprived him of an interest in 'liberty' or that he had a 'property' interest in continued employment, despite the lack of tenure or a formal contract. Here the nonretention of respondent, absent any charges against him or stigma or disability foreclosing other employment, is not tantamount to a deprivation of 'liberty,' and the terms of respondent's employment accorded him no 'property' interest protected by procedural due process. The courts below therefore erred in granting summary judgment for the respondent on the procedural due process issue. Pp. 2705—2710.

446 F.2d 806, reversed and remanded.

**Attorneys and Law Firms**

**\*565** Charles A. Bleck, Asst. Atty. Gen., Madison, Wis., for petitioners.

Steven H. Steinglass, Milwaukee, Wis., for respondent.

**Opinion**

**\*566** Mr. Justice STEWART delivered the opinion of the Court.

In 1968 the respondent, David Roth, was hired for his first teaching job as assistant professor of political science at Wisconsin State University-Oshkosh. He was hired for a fixed term of one academic year. The notice of his faculty appointment specified that his employment would begin on September 1, 1968, and would end on June 30, 1969.[1] The respondent completed that term. But he was informed that he would not be rehired for the next academic year.

The respondent had no tenure rights to continued employment. Under Wisconsin statutory law a state university teacher can acquire tenure as a 'permanent' employee only after four years of year-to-year employment. Having acquired tenure, a teacher is entitled

to continued employment 'during efficiency and good behavior.' A relatively new teacher without tenure, however, is under Wisconsin law entitled to nothing **2704** beyond his one-year appointment.[2] There are no statutory **\*567** or administrative standards defining eligibility for re-employment. State law thus clearly leaves the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials.

The procedural protection afforded a Wisconsin State University teacher before he is separated from the University corresponds to his job security. As a matter of statutory law, a tenured teacher cannot be 'discharged except for cause upon written charges' and pursuant to certain procedures.[3] A nontenured teacher, similarly, is protected to some extent during his one-year term. Rules promulgated by the Board of Regents provide that a nontenured teacher 'dismissed' before the end of the year may have some opportunity for review of the 'dismissal.' But the Rules provide no real protection for a nontenured teacher who simply is not re-employed for the next year. He must be informed by February 1 'concerning retention or non-retention for the ensuing year.' But 'no reason for non-retention need be given. No review or appeal is provided in such case.'[4]

**\*568** In conformance with these Rules, the President of Wisconsin State University-Oshkosh informed the respondent before February 1, 1969, that he would not be rehired for the 1969—1970 academic year. He gave the respondent no reason for the decision and no opportunity to challenge it at any sort of hearing.

The respondent then brought this action in Federal District Court alleging that the decision not to rehire him for the next year infringed his Fourteenth Amendment rights. He attacked the decision both in substance and procedure. First, he alleged that the true reason for the decision was to punish him for certain statements critical of the University administration, and that it therefore violated his right to freedom of speech.[5] **2705 \*569** Second, he alleged that the failure of University officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process of law.

The District Court granted summary judgment for the respondent on the procedural issue, ordering the University officials to provide him with reasons and a hearing. 310 F.Supp. 972. The Court of Appeals, with one judge dissenting, affirmed this partial summary judgment. 446 F.2d 806. We granted certiorari. 404 U.S. 909, 92 S.Ct. 227, 30 L.Ed.2d 181. The only question presented to us at this stage in the case is whether the respondent had a constitutional right to a statement of reasons and a hearing

on the University's decision not to rehire him for another year.[6] We hold that he did not.

# I

[1] The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right **\*570** to some kind of prior hearing is paramount.[7] But the range of interests protected by procedural due process is not infinite.

[2] The District Court decided that procedural due process guarantees apply in this case by assessing and balancing the weights of the particular interests involved. It concluded that the respondent's interest in re-employment at Wisconsin State University-Oshkosh outweighed the University's interest in denying him re-employment summarily. 310 F.Supp., at 977—979. Undeniably, the respondent's re-employment prospects were of major concern to him—concern that we surely cannot say was insignificant. And a weighing process has long been a part of any determination of the form of hearing required in particular situations by procedural due process.[8] But, to determine whether **\*571** due **2706** process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake. See Morrissey v. Brewer, 408 U.S. 471, at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.

[3] 'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience. . . . (T)hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (Frankfurter, J., dissenting). For that reason, the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights.[9] The Court has also made clear that the property interests protected by **\*572** procedural due process extend well beyond actual ownership of real estate, chattels, or money.[10] By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.[11]

Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning.

## II

'While this court has not attempted to define with exactness the liberty . . . guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely **\*\*2707** freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 499—500, 74 S.Ct. 693, 694, 98 L.Ed. 884; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

**\*573** There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case.

[4] The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515; Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216; Joint Anti- Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; United States v. Lovett, 328 U.S. 303, 316—317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252; Peters v. Hobby, 349 U.S. 331, 352, 75 S.Ct. 790, 801, 99 L.Ed. 1129 (Douglas, J., concurring). See Cafeteria & Restaurant Workers v. MeElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230. In such a case, due process would accord an opportunity to refute

the charge before University officials.[12] In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would **\*574** be a different case. For '(t)o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . ..' Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 185, 71 S.Ct. at 655 (Jackson, J., concurring). See Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . . that contravene(s) . . . Due Process,' Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, and, specifically, in a manner that denies the right to a full prior hearing. Willner v. Committee on Character, 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224. See Cafeteria Workers v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. at 1750. In the present case, however, this principle does not come into play.[13] **\*\*2708** [5] To be sure, the respondent has alleged that the nonrenewal of his contract was based on his exercise of his right to freedom of speech. But this allegation is not now before us. The District Court stayed proceedings on this issue, and the respondent has yet to prove that **\*575** the decision not to rehire him was, in fact, based on his free speech activities.[14]

[6] Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another. Cafeteria Workers v. McElroy, supra, 367 U.S. at 895—896, 81 S.Ct. at 1748—1749, 6 L.Ed.2d 1230.

## **\*576** III

[7] The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287.[15] **2709** See Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435. Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and college professors and **577** staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, have interests in continued employment that are safeguarded by due process. Only last year, the Court held that this principle 'proscribing summary dismissal from public employment without hearing or inquiry required by due process' also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment. Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418.

[8] Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vendicate those claims.

[9] Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in Goldberg v. Kelly, supra, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

**578** Just as the welfare recipients' 'property' interest in welfare payments was created and defined by statutory terms, so the respondent's 'property' interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment.

Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever. **2710** [10] Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it.[16] In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

## IV

Our analysis of the respondent's constitutional rights in this case in no way indicates a view that an opportunity for a hearing or a statement of reasons for nonretention would, or would not, be appropriate or wise in public **579** colleges and universities.[17] For it is a written Constitution that we apply. Our role is confined to interpretation of that Constitution.

We must conclude that the summary judgment for the respondent should not have been granted, since the respondent has not shown that he was deprived of liberty or property protected by the Fourteenth Amendment. The judgment of the Court of Appeals, accordingly, is reversed and the case is remanded for further proceedings consistent with this opinion. It is so ordered. Reversed and remanded.

Mr. Justice POWELL took no part in the decision of this case.

Mr. Justice DOUGLAS, dissenting.

Respondent Roth, like Sindermann in the companion case, had no tenure under Wisconsin law and, unlike Sindermann, he had had only one year of teaching at

Wisconsin State University-Oshkosh—where during 1968—1969 he had been Assistant Professor of Political Science and International Studies. Though Roth was rated by the faculty as an excellent teacher, he had publicly criticized the administration for suspending an entire group of 94 black students without determining individual guilt. He also criticized the university's regime as being authoritarian and autocratic. He used his classroom to discuss what was being done about the **\*580** black episode; and one day, instead of meeting his class, he went to the meeting of the Board of Regents.

In this case, as in Sindermann, an action was started in Federal District Court under 42 U.S.C. s 1983[1] claiming in part that the decision of the school authorities not to rehire was in retaliation for his expression of opinion. The District Court, in partially granting Roth's motion for summary judgment, held that the Fourteenth Amendment required the university to give a hearing **\*\*2711** to teachers whose contracts were not to be renewed and to give reasons for its action. 310 F.Supp. 972, 983. The Court of Appeals affirmed. 446 F.2d 806.

Professor Will Herberg, of Drew University, in writing of 'academic freedom' recently said:
'(I)t is sometimes conceived as a basic constitutional right guaranteed and protected under the First Amendment.

'But, of course, this is not the case. Whereas a man's right to speak out on this or that may be guaranteed and protected, he can have no imaginable human or constitutional right to remain a member of a university faculty. Clearly, the right to academic freedom is an acquired one, yet an acquired right of such value to society that in the minds of many it has verged upon the constitutional.'

Washington Sunday Star, Jan. 23, 1972, B-3, col. 1.

**\*581** There may not be a constitutional right to continued employment if private schools and colleges are involved. But Prof. Herberg's view is not correct when public schools move against faculty members. For the First Amendment, applicable to the States by reason of the Fourteenth Amendment, protects the individual against state action when it comes to freedom of speech and of press and the related freedoms guaranteed by the First Amendment; and the Fourteenth protects 'liberty' and 'property' as stated by the Court in Sindermann.

No more direct assault on academic freedom can be imagined than for the school authorities to be allowed to discharge a teacher because of his or her philosophical, political, or ideological beliefs. The same may well be true of private schools, if through the device of financing or other umbilical cords they become instrumentalities of the State. Mr. Justice Frankfurther stated the constitutional theory in Sweezy v. New Hampshire, 354 U.S. 234, 261—262, 77 S.Ct. 1203, 1217, 1 L.Ed.2d 1311 (concurring in result):

> 'Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic perplexities. For society's good—if understanding be an essential need of society—inquires into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered **\*582** as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling.'

We repeated that warning in Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629:

> 'Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.'

When a violation of First Amendment rights is alleged, the reasons for dismissal or for nonrenewal of an employment contract must be examined to see if the

reasons given are only a cloak for activity or attitudes protected by the Constitution. A statutory analogy is present under the National Labor Relations Act, 29 U.S.C. s 151 et seq. While discharges of employees for 'cause' are **\*\*2712** permissible (Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233), discharges because of an employee's union activities are banned by s 8(a)(3), 29 U.S.C. s 158(c)(3). So the search is to ascertain whether the stated ground was the real one or only a pretext. See J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 300 (2 Cir.).

In the case of teachers whose contracts are not renewed, tenure is not the critical issue. In the Sweezy case, the teacher, whose First Amendment rights we honored, had no tenure but was only a guest lecturer. In the Keyishian case, one of the petitioners (Keyishian himself) had only a 'one-year-term contract' that was not renewed. 385 U.S., at 592, 87 S.Ct., at 678. In Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231, one of the petitioners was **\*583** a teacher whose 'contract for the ensuing school year was not renewed' (id., at 483, 81 S.Ct., at 249) and two others who refused to comply were advised that it made 'impossible their re-employment as teachers for the following school year.' Id., at 484, 81 S.Ct., at 250. The oath required in Keyishian and the affidavit listing memberships required in Shelton were both, in our view, in violation of First Amendment rights. Those cases mean that conditioning renewal of a teacher's contract upon surrender of First Amendment rights is beyond the power of a State.

There is sometimes a conflict between a claim for First Amendment protection and the need for orderly administration of the school ststem, as we noted in Pickering v. Board of Education, 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811. That is one reason why summary judgments in this class of cases are seldom appropriate. Another reason is that careful factfinding is often necessary to know whether the given reason for nonrenewal of a teacher's contract is the real reason or a feigned one.

It is said that since teaching in a public school is a privilege, the State can grant it or withhold it on conditions. We have, however, rejected that thesis in numerous cases, e.g., Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534. See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). In Hannegan v. Esquire, Inc., 327 U.S. 146, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586, we said that Congress may not by withdrawal of mailing privileges place limitations on freedom of speech which it could not do constitutionally if done directly. We said in American Communications

Ass'n v. Douds, 339 U.S. 382, 402, 70 S.Ct. 674, 685, 94 L.Ed. 925, that freedom of speech was abridged when the only restraint on its exercise was withdrawal of the privilege to invoke the facilities of the National Labor Relations Board. In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, we held that an applicant could not be denied the opportunity **\*584** for public employment because he had exercised his First Amendment rights. And in Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460, we held that a denial of a tax exemption unless one gave up his First Amendment rights was an abridgment of Fourteenth Amendment rights.

As we held in Speiser v. Randall, supra, when a State proposes to deny a privilege to one who it alleges has engaged in unprotected speech, Due Process requires that the State bear the burden of proving that the speech was not protected. '(T)he 'protection of the individual against arbitrary action' . . . (is) the very essence of due process,' Slochower v. Board of Higher Education, 350 U.S. 551, 559, 76 S.Ct. 637, 641, 100 L.Ed. 692, but where the State is allowed to act secretly behind closed doors and without any notice to those who are affected by its actions, there is no check against the possibility of such 'arbitrary action.'

**\*\*2713** Moreover, where 'important interests' of the citizen are implicated (Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90) they are not to be denied or taken away without due process. Ibid. Bell v. Burson involved a driver's license. But also included are disqualification for unemployment compensation (Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965), discharge from public employment (Slochower v. Board of Education, supra), denial of tax exemption (Speiser v. Randall, supra), and withdrawal of welfare benefits (Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287). And see Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515. We should now add that nonrenewal of a teacher's contract, whether or not he has tenure, is an entitlement of the same importance and dignity.

Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230, is not opposed. It held that a cook employed in a cafeteria in a military installation was not entitled to a hearing prior **\*585** to the withdrawal of her access to the facility. Her employer was prepared to employ her at another of its restaurants, the withdrawal was not likely to injure her reputation, and her employment opportunities elsewhere were not impaired. The Court held that the very limited individual interest in this one job did not outweigh the Government's authority over an important federal military establishment.

Nonrenewal of a teacher's contract is tantamount in effect to a dismissal and the consequences may be enormous. Nonrenewal can be a blemish that turns into a permanent scar and effectively limits any chance the teacher has of being rehired as a teacher, at least in his State.

If this nonrenewal implicated the First Amendment, then Roth was deprived of constitutional rights because his employment was conditioned on a surrender of First Amendment rights; and, apart from the First Amendment, he was denied due process when he received no notice and hearing of the adverse action contemplated against him. Without a statement of the reasons for the discharge and an opportunity to rebut those reasons—both of which were refused by petitioners—there is no means short of a lawsuit to safeguard the right not to be discharged for the exercise of First Amendment guarantees.

The District Court held, 310 F.Supp., at 979—980:

> 'Substantive constitutional protection for a university professor against non-retention in violation of his First Amendment rights or arbitrary non-retention is useless without procedural safeguards. I hold that minimal procedural due process includes a statement of the reasons why the university intends not to retain the professor, notice of a hearing at which he may respond to the stated reasons, and a hearing if the professor appears at the appointed **\*586** time and place. At such a hearing the professor must have a reasonable opportunity to submit evidence relevant to the stated reasons. The burden of going forward and the burden of proof rests with the professor. Only if he makes a reasonable showing that the stated reasons are wholly inappropriate as a basis for decision or that they are wholly without basis in fact would the university administration become obliged to show that the stated reasons are not inappropriate or that they have a basis in fact.'

It was that procedure that the Court of Appeals approved. 446 F.2d, at 809—810. The Court of Appeals also concluded that though the s 1983 action was pending in court, the court should stay its hand until the academic procedures **\*\*2714** had been completed.[1a] As stated by the

Court of Appeals in Sindermann v. Perry, 430 F.2d 939 (CA5):

> 'School-constituted review bodies are the most appropriate forums for initially determining issues of this type, both for the convenience of the parties and in order to bring academic expertise to bear in resolving the nice issues of administrative discipline, teacher competence and school policy, which so frequently must be balanced in reaching a proper determination.' Id., at 944—945.

That is a permissible course for district courts to take, though it does not relieve them of the final determination **\*587** whether nonrenewal of the teacher's contract was in retaliation for the exercise of First Amendment rights or a denial of due process.

Accordingly I would affirm the judgment of the Court of Appeals.

Mr. Justice MARSHALL, dissenting.

Respondent was hired as an assistant professor of political science at Wisconsin State University-Oshkosh for the 1968—1969 academic year. During the course of that year he was told that he would not be rehired for the next academic term, but he was never told why. In this case, he asserts that the Due Process Clause of the Fourteenth Amendment to the United States Constitution entitled him to a statement of reasons and a hearing on the University's decision not to rehire him for another year.[1] This claim was sustained by the District Court, which granted respondent summary judgment, 310 F.Supp. 972, and by the Court of Appeals which affirmed the judgment of the District Court. 446 F.2d 806. This Court today reverses the judgment of the Court of Appeals and rejects respondent's claim. I dissent.

While I agree with Part I of the Court's opinion, setting forth the proper framework for consideration of the issue presented, and also with those portions of Parts II and III of the Court's opinion that assert that a public employee is entitled to procedural due process whenever a State stigmatizes him by denying employment, or injures his future employment prospects severely, or whenever the State deprives him of a property **\*588** interest. I would go further than the Court does in defining the terms 'liberty' and 'property.'

The prior decisions of this Court, discussed at length in the opinion of the Court, establish a principle that is as obvious as it is compelling—i.e., federal and state governments and governmental agencies are restrained by the Constitution from acting arbitrarily with respect

employment opportunities that they either offer or control. Hence, it is now firmly established that whether or not a private employer is free to act capriciously or unreasonably with respect to employment practices, at least absent statutory[2] or contractual[3] controls, a government employer is different. The government may only act fairly and reasonably.

**\*\*2715** This Court has long maintained that 'the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure.' Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915) (Hughes, J.). See also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). It has also established that the fact that an employee has no contract guaranteeing work for a specific future period does not mean that as the result of action by the government he may be 'discharged at any time, for any reason or for no reason.' Truax v. Raich, supra, 239 U.S., at 38, 36 S.Ct., at 9.

In my view, every citizen who applies for a government job is entitled to it unless the government can establish some reason for denying the employment. This is the 'property' right that I believe is protected by the Fourteenth Amendment and that cannot be denied 'without due process of law.' And it is also liberty— **\*589** liberty to work—which is the 'very essence of the personal freedom and opportunity' secured by the Fourteenth Amendment.

This Court has often had occasion to note that the denial of public employment is a serious blow to any citizen. See, e.g., Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 185, 71 S.Ct. 624, 655, 95 L.Ed. 817 (1951) (Jackson, J., concurring); United States v. Lovett, 328 U.S. 303, 316—317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). Thus, when an application for public employment is denied or the contract of a government employee is not renewed, the government must say why, for it is only when the reasons underlying government action are known that citizens feel secure and protected against arbitrary government action.

Employment is one of the greatest, if not the greatest, benefits that governments offer in modern-day life. When something as valuable as the opportunity to work is at stake, the government may not reward some citizens and not others without demonstrating that its actions are fair and equitable. And it is procedural due process that is our fundamental guarantee of fairness, our protection against arbitrary, capricious, and unreasonable government action.

Mr. Justice Douglas has written that:
'It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.' Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S., at 179, 71 S.Ct., at 652 (concurring opinion).

And Mr. Justice Frankfurter has said that '(t)he history of American freedom is, in no small measure, the **\*590** history of procedure.' Malinski v. New York, 324 U.S. 401, 414, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (separate opinion). With respect to occupations controlled by the government, one lower court has said that '(t)he public has the right to expect its officers . . . to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse.' Hornsby v. Allen, 326 F.2d 605, 610 (CA5 1964).

We have often noted that procedural due process means many different things in the numerous contexts in which it applies. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Prior decisions have held that an applicant for admission to practice as an attorney before the United States Board of Tax Appeals may not be rejected without a statement of reasons **\*\*2716** and a chance for a hearing on disputed issues of fact;[4] that a tenured teacher could not be summarily dismissed without notice of the reasons and a hearing;[5] that an applicant for admission to a state bar could not be denied the opportunity to practice law without notice of the reasons for the rejection of his application and a hearing;[6] and even that a substitute teacher who had been employed only two months could not be dismissed merely because she refused to take a loyalty oath without an inquiry into the specific facts of her case and a hearing on those in dispute.[7] I would follow these cases and hold that respondent was denied due process when his contract was not renewed and he was not informed of the reasons and given an opportunity to respond.

**\*591** It may be argued that to provide procedural due process to all public employees or prospective employees would place an intolerable burden on the machinery of government. Cf. Goldberg v. Kelly, supra. The short answer to that argument is that it is not burdensome to give reasons when reasons exist. Whenever an application for employment is denied, an employee is discharged, or a

decision not to rehire an employee is made, there should be some reason for the decision. It can scarcely be argued that government would be crippled by a requirement that the reason be communicated to the person most directly affected by the government's action.

Where there are numerous applicants for jobs, it is likely that few will choose to demand reasons for not being hired. But, if the demand for reasons is exceptionally great, summary procedures can be devised that would provide fair and adequate information to all persons. As long as the government has a good reason for its actions it need not fear disclosure. It is only where the government acts improperly that procedural due process is truly burdensome. And that is precisely when it is most necessary.

It might also be argued that to require a hearing and a statement of reasons is to require a useless act, because a government bent on denying employment to one or more persons will do so regardless of the procedural hurdles that are placed in its path. Perhaps this is so, but a requirement of procedural regularity at least renders arbitrary action more difficult. Moreover, proper procedures will surely eliminate some of the arbitrariness that results, not from malice, but from innocent error. 'Experience teaches . . . that the affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits **\*592** from occurring.' Silver v. New York Stock Exchange, 373 U.S. 341, 366,

83 S.Ct. 1246, 1262, 10 L.Ed.2d 389 (1963). When the government knows it may have to justify its decisions with sound reasons, its conduct is likely to be more cautious, careful, and correct.

Professor Gellhorn put the argument well:
'In my judgment, there is no basic division of interest between the citizenry on the one hand and officialdom on the other. Both should be interested equally in the quest for procedural safeguards. I echo the late Justice Jackson in saying: 'Let it not be overlooked that due process of law is not for the sole benefit of an accused. It is the best insurance for the Government itself against those blunders which leave lasting stains on a system of justice'—blunders which are **\*\*2717** likely to occur when reasons need not be given and when the reasonableness and indeed legality of judgments need not be subjected to any appraisal other than one's own. . . .' Summary of Colloquy on Administrative Law, 6 J. Soc. Pub. Teachers of Law, 70, 73 (1961).

Accordingly, I dissent.

**All Citations**

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

Footnotes

\*       The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1       The respondent had no contract of employment. Rather, his formal notice of appointment was the equivalent of an employment contract.
The notice of his appointment provided that: 'David F. Roth is hereby appointed to the faculty of the Wisconsin State University Position number 0262. (Location:) Oshkosh as (Rank:) Assistant Professor of (Department:) Political Science this (Date:) first day of (Month:) September (Year:) 1968.' The notice went on to specify that the respondent's 'appointment basis' was for the 'academic year.' And it provided that '(r)egulations governing tenure are in accord with Chapter 37.31, Wisconsin Statutes. The employment of any staff member for an academic year shall not be for a term beyond June 30th of the fiscal year in which the appointment is made.' See n. 2, infra.

2       Wis.Stat. s 37.31(1) (1967), in force at the time, provided in pertinent part that:
'All teachers in any state university shall initially be employed on probation. The employment shall be permanent, during efficiency and good behavior after 4 years of continuous service in the state university system as a teacher.'

3       Wis.Stat. s 37.31(1) further provided that:
'No teacher who has become permanently employed as herein provided shall be discharged except for cause upon written charges. Within 30 days of receiving the written charges, such teacher may appeal the discharge by a written notice to the president of the board of regents of state colleges. The board shall cause the charges to be investigated, hear the case and provide such teacher with a written statement as to their decision.'

4   The Rules, promulgated by the Board of Regents in 1967, provide:
'RULE I—February first is established throughout the State University system as the deadline for written notification of non-tenured faculty concerning retention or non-retention for the ensuing year. The President of each University shall give such notice each year on or before this date.'
'RULE II—During the time a faculty member is on probation, no reason for non-retention need be given. No review or appeal is provided in such case.
'RULE III—'Dismissal' as opposed to 'Non-Retention' means termination of responsibilities during an academic year. When a non-tenure faculty member is dismissed he has no right under Wisconsin Statutes to a review of his case or to appeal. The President may, however, in his discretion, grant a request for a review within the institution, either by a faculty committee or by the President, or both. Any such review would be informal in nature and would be advisory only.
'RULE IV—When a non-tenure faculty member is dismissed he may request a review by or hearing before the Board of Regents. Each such request will be considered separately and the Board will, in its discretion, grant or deny same in each individual case.'

5   While the respondent alleged that he was not rehired because of his exercise of free speech, the petitioners insisted that the non-retention decision was based on other, constitutionally valid grounds. The District Court came to no conclusion whatever regarding the true reason for the University President's decision. 'In the present case,' it stated, 'it appears that a determination as to the actual bases of (the) decision must await amplification of the facts at trial. . . . Summary judgment is inappropriate.' 310 F.Supp. 972, 982.

6   The courts that have had to decide whether a nontenured public employee has a right to a statement of reasons or a hearing upon nonrenewal of his contract have come to varying conclusions. Some have held that neither procedural safeguard is required. E.g., Orr v. Trinter, 444 F.2d 128 (CA6); Jones v. Hopper, 410 F.2d 1323 (CA10); Freeman v. Gould Special School District, 405 F.2d 1153 (CA8). At least one court has held that there is a right to a statement of reasons but not a hearing. Drown v. Portsmouth School District, 435 F.2d 1182 (CA1). And another has held that both requirements depend on whether the employee has an 'expectancy' of continued employment. Ferguson v. Thomas, 430 F.2d 852, 856 (CA5).

7   Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113. 'While '(m)any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate (a protected) interest . . ., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective.' Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90. For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see, e.g., Central Union Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 215, 65 L.Ed. 403; Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 597, 51 S.Ct. 608, 611, 75 L.Ed. 1289; Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088.

8   'The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' Boddie v. Connecticut, supra, 401 U.S., at 378, 91 S.Ct., at 786. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287; Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307. The constitutional requirement of opportunity for some form of hearing before deprivation of a protected interest, of course, does not depend upon such a narrow balancing process. See n. 7, supra.

9   In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a 'privilege,' not a 'right,' and that procedural due process guarantees therefore were inapplicable. Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, aff'd by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. The basis of this holding has been thoroughly undermined in the ensuing years. For, as Mr. Justice Blackmun wrote for the Court only last year, 'this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534. See, e.g., Morrissey v. Brewer, supra, 408 U.S., at 482, 92 S.Ct., at 2600; Bell v. Burson, supra, 402 U.S., at 539, 91 S.Ct., at 1589; Goldberg v. Kelly, supra, 397 U.S., at 262, 90 S.Ct., at 1017; Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811; Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965.

10  See, e.g., Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418; Bell v. Burson, supra; Goldberg v. Kelly, supra.

11   'Although the Court has not assumed to define 'liberty' (in the Fifth Amendment's Due Process Clause) with any great precision, that term is not confined to mere freedom from bodily restraint.' Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884. See, e.g., Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

12   The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons.

13   The District Court made an assumption 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.' 310 F.Supp., at 979. And the Court of Appeals based its affirmance of the summary judgment largely on the premise that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor' amounts to a limitation on future employment opportunities sufficient invoke procedural due process guarantees. 446 F.2d, at 809. But even assuming, arguendo, that such a 'substantial adverse effect' under these circumstances would constitute a state-imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.' Cf. Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

14   See n. 5, supra. The Court of Appeals, nonetheless, argued that opportunity for a hearing and a statement of reasons were required here 'as a prophylactic against non-retention decisions improperly motivated by exercise of protected rights.' 446 F.2d, at 810 (emphasis supplied). While the Court of Appeals recognized the lack of a finding that the respondent's nonretention was based on exercise of the right of free speech, it felt that the respondent's interest in liberty was sufficiently implicated here because the decision not to rehire him was made 'with a background of controversy and unwelcome expressions of opinion.' Ibid.
When a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards. Thus, we have required fair notice and opportunity for an adversary hearing before an injunction is issued against the holding of rallies and public meetings. Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325. Similarly, we have indicated the necessity of procedural safeguards before a State makes a large-scale seizure of a person's allegedly obscene books, magazines, and so forth. A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809; Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649; Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584. See generally Monaghan, First Amendment 'Due Process', 83 Harv.L.Rev. 518.
In the respondent's case, however, the State has not directly impinged upon interests in free speech or free press in any way comparable to a seizure of books or an injunction against meetings. Whatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest.

15   Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494, is a related case. There, the petitioner was a lawyer who had been refused admission to practice before the Board of Tax Appeals. The Board had 'published rules for admission of persons entitled to practice before it, by which attorneys at law admitted to courts of the United States and the states, and the District of Columbia, as well as certified public accountants duly qualified under the law of any state or the District are made eligible. . . . The rules further provide that the Board may in its discretion deny admission to any applicant, or suspend or disbar any person after admission.' Id., at 119, 46 S.Ct., at 216. The Board denied admission to the petitioner under its discretionary power, without a prior hearing and a statement of the reasons for the denial. Although this Court disposed of the case on other grounds, it stated, in an opinion by Mr. Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. It said that the Board's discretionary power 'must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process.' Id., at 123, 46 S.Ct., at 217.

16   To be sure, the respondent does suggest that most teachers hired on a year-to-year basis by Wisconsin State University-Oshkosh are, in fact, rehired. But the District Court has not found that there is anything approaching a 'common law' of re-employment, see Perry v. Sindermann, 408 U.S. 593, at 602, 92 S.Ct. 2694, at 2705, 33 L.Ed.2d 570, so strong as to require University officials to give the respondent a statement of reasons and a hearing on their decision not to rehire him.

17    See, e.g., Report of Committee A on Academic Freedom and Tenure, Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments, 56 AAUP Bulletin No. 1, p. 21 (Spring 1970).

1    Section 1983 reads as follows:
     'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'

1a    Such a procedure would not be contrary to the well-settled rule that s 1983 actions do not require exhaustion of other remedies. See, e.g., Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 419 (1971); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). One of the allegations in the complaint was that respondent was denied any effective sate remedy, and the District Court's staying its hand thus furthered rather than thwarted the purposes of s 1983.

1    Respondent has also alleged that the true reason for the decision not to rehire him was to punish him for certain statements critical of the University. As the Court points out, this issue is not before us the present time.

2    See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); 42 U.S.C. s 2000e.

3    Cf. Note, Procedural 'Due Process' in Union Disciplinary Proceedings, 57 Yale L.J. 1302 (1948).

4    Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926).

5    Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

6    Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

7    Connell v. Higginbotham, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971).

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Tellier v. Fields, 2nd Cir.(N.Y.), November 1, 2000

101 S.Ct. 2460
Supreme Court of the United States

CONNECTICUT BOARD OF PARDONS et al.,
Petitioners,
v.
David DUMSCHAT et al.

No. 79-1997. | Argued Feb. 24, 1981. | Decided June 17, 1981.

Life inmate brought suit against Connecticut Board of Pardons seeking declaratory judgment that Board's failure to provide him with written statement of reasons for denying commutation violated his rights under due process clause of the Fourteenth Amendment. The United States District Court for the District of Connecticut, 432 F.Supp. 1310 and 462 F.Supp. 509, entered declaratory judgment requiring statement of reasons by Board in case of denial of application for pardon by prisoners serving life terms, and appeal was taken. The Court of Appeals for the Second Circuit, 593 F.2d 165, affirmed, and petition for writ of certiorari was filed. The United States Supreme Court, 442 U.S. 926, 99 S.Ct. 2854, 61 L.Ed.2d 294, vacated and remanded for further proceedings. On remand, the Court of Appeals for the Second Circuit, 618 F.2d 216, reaffirmed its original decision, and petition for writ of certiorari was filed. The Supreme Court, Chief Justice Burger, held that power vested in Connecticut Board of Pardons to commute sentences conferred no rights on life inmates beyond right to seek commutation.

Reversed.

Justice Brennan concurred and filed opinion.

Justice White concurred and filed opinion.

Justice Stevens dissented and filed opinion in which Justice Marshall joined.

West Headnotes (5)

[1] **Constitutional Law**
⚷ Rights, Interests, Benefits, or Privileges
⚷ Involved in General

State-created right can, in some circumstances, beget yet other rights to procedures essential to realization of the parent right; however, underlying right must have come into existence before it can trigger due process protection. U.S.C.A.Const. Amend. 14.

58 Cases that cite this headnote

[2] **Pardon and Parole**
⚷ Proceedings to Obtain Clemency

Unlike probation, pardon and commutation decisions have not traditionally been business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.

75 Cases that cite this headnote

[3] **Constitutional Law**
⚷ Pardon and Clemency
**Pardon and Parole**
⚷ Commutation of Sentence

Life inmate had no constitutional or inherent right to commutation of his sentence and consistent practice of Connecticut Board of Pardons of granting commutations to most life inmates was not sufficient to create protectible liberty interest. C.G.S.A. § 18-26; U.S.C.A.Const. Amend. 14.

337 Cases that cite this headnote

[4] **Constitutional Law**
⚷ Constitutional Rights in General

Constitutional entitlement cannot be created, as if by estoppel, merely because wholly and expressly discretionary state privilege has been

**Tab E-3**

granted generously in the past.

44 Cases that cite this headnote

[5]     **Constitutional Law**
🔑Life in General
**Pardon and Parole**
🔑Commutation of Sentence

Connecticut commutation statute, having no definitions, no criteria, and no mandated "shalls," created no duty or constitutional right in life inmates beyond right to seek commutation. C.G.S.A. § 18-26.

99 Cases that cite this headnote

**\*\*2461 \*458 *Syllabus*\***

After several applications by respondent Dumschat, a life inmate in a Connecticut state prison, for commutation of his life sentence had been rejected by the Connecticut Board of Pardons without explanation, he sued the Board in Federal District Court under 42 U.S.C. § 1983, seeking a declaratory judgment that the Board's failure to provide him with a written statement of reasons for denying commutation violated his rights under the Due Process Clause of the Fourteenth Amendment. Relying chiefly on the fact that the Board had granted approximately three-fourths of all applications for commutation of life sentences, the District Court, after allowing other inmates (also respondents) to intervene and certifying the suit as a class action, held that all prisoners serving life sentences in Connecticut state prisons have a constitutionally protected "entitlement" to a statement of reasons why commutation is not granted. The Court of Appeals affirmed, and then, after its judgment had been vacated by this Court and the case had been remanded for reconsideration in light of *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668, held that the overwhelming likelihood that Connecticut life inmates will be pardoned and released before they complete their minimum terms gave them a constitutionally protected liberty interest in pardon proceedings, and that under *Greenholtz* a statement of reasons for denying commutation was constitutionally

necessary under the Due Process Clause.

*Held*: The power vested in the Connecticut Board of Pardons to commute sentences conferred no rights on respondents beyond the right to seek commutation. Pp. 2463-2465.

(a) Far from supporting an "entitlement," *Greenholtz*, which rejected the claim that a constitutional entitlement to release from a valid prison sentence exists independently of a right explicitly conferred by the State, compels the conclusion that an inmate has "no constitutional or inherent right" to commutation of his life sentence. In terms of the Due Process Clause, a Connecticut felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no **\*459** more substantial than an inmate's expectation, for example, that he will not be transferred to another prison; it is simply a unilateral hope. A constitutional entitlement cannot "be created-as if by estoppel-merely because a wholly and *expressly* discretionary state privilege has been granted generally in the past." *Leis v. Flynt*, 439 U.S. 438, 444, n.5, 99 S.Ct. 698, 701, 702, 58 L.Ed.2d 717. No matter how frequently a particular form of clemency has been granted, the statistical probabilities generate no constitutional protections. Pp. 2463-2464.

(b) In contrast to the unique Nebraska parole statute which was applied in *Greenholtz* and which created a right to parole **\*\*2462** unless certain findings were made, the mere existence of a power to commute under the Connecticut commutation statute-which imposes no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied by the Board of Pardons-and the granting of commutation to many inmates, create no right or "entitlement." P. 2465.

2 Cir., 618 F.2d 216, reversed.

**Attorneys and Law Firms**

Stephen J. O'Neill, Hartford, Conn., for petitioners.

Stephen Wizner, New Haven, Conn., for respondents.

**Opinion**

Chief Justice BURGER delivered the opinion of the Court.

The question presented is whether the fact that the Connecticut Board of Pardons has granted approximately three-fourths of the applications for commutation of life

sentences creates a constitutional "liberty interest" or "entitlement" in life-term inmates so as to require that Board to explain its reasons for denial of an application for commutation.

### *460 I

In 1964, respondent Dumschat was sentenced to life imprisonment for murder. Under state law, he was not eligible for parole until December 1983.[1] The Connecticut Board of Pardons is empowered to commute the sentences of life inmates by reducing the minimum prison term,[2] and such a commutation accelerates eligibility for parole.[3] The authority of the Board of Pardons derives from Conn.Gen.Stat. § 18-26 (1981), which provides in pertinent part:

"(a) Jurisdiction over the granting of, and the authority to grant, commutations of punishment or releases, conditioned or absolute, in the case of any person convicted of any offense against the state and commutations from the penalty of death shall be vested in the board of pardons.

"(b) Said board shall have authority to grant pardons, conditioned or absolute, for any offense against the state at any time after the imposition and before or after the service of any sentence."

*461 On several occasions prior to the filing of this suit in February 1976, Dumschat applied for a commutation of his sentence. The Board rejected each application without explanation. Dumschat then sued the Board under 42 U.S.C. § 1983, seeking a declaratory judgment that the Board's failure to provide him with a written statement of reasons for denying commutation violated his rights guaranteed by the Due Process Clause of the Fourteenth Amendment.

After hearing testimony from officials of the Board of Pardons and the Board of Parole, the District Court concluded (a) that Dumschat had a constitutionally protected liberty entitlement in the pardon process, and (b) that his due process rights had been violated when the Board of Pardons failed to give "a written statement of reasons and facts relied on" in denying commutation. **2463 432 F.Supp. 1310, 1315 (1977). The court relied chiefly on a showing that "at least 75 percent of all lifers received some favorable action from the pardon board prior to completing their minimum sentences" and that virtually all of the pardoned inmates were promptly paroled.[4] Id., at 1314. In response to postjudgment

motions, the District Court allowed other life inmates to intervene, certified the suit as a class action, and heard additional evidence.[5] *462 The court held that all prisoners serving life sentences in Connecticut state prisons have a constitutionally protected expectancy of commutation and therefore that they have a right to a statement of reasons when commutation is not granted. The Court of Appeals affirmed. 593 F.2d 165 (CA2 1979). A petition for a writ of certiorari was filed, and we vacated and remanded for reconsideration in light of *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). 442 U.S. 926, 99 S.Ct. 2854, 61 L.Ed.2d 294 (1979).

On remand, the Court of Appeals reaffirmed its original decision, 618 F.2d 216 (CA2 1980), stating:

"In marked contrast [to the Nebraska statute considered in *Greenholtz*], Connecticut's pardons statute contains neither a presumption in favor of pardon nor a list of factors to be considered by the Board of Pardons. Instead, the statute grants the board unfettered discretion in the exercise of its power. The statute offers only the 'mere hope' of pardon; it does not create a legitimate expectation of freedom and therefore does not implicate due process." *Id.*, at 219 (citation omitted).

The Court of Appeals also noted that the District Court's holding that the mere possibility of a pardon creates a constitutionally cognizable liberty interest or entitlement was "no longer tenable" in light of *Greenholtz*. 618 F.2d, at 221; see 442 U.S., at 8-11, 99 S.Ct. at 2104-2105. However, the Court of Appeals then proceeded to conclude that "[t]he overwhelming likelihood that Connecticut life inmates will be pardoned and released before they complete their minimum terms gives them a constitutionally protected liberty interest in pardon proceedings." *463 618 F.2d, at 220. The Court of Appeals also understood our opinion in *Greenholtz* to hold that under the Due Process Clause, a brief statement of reasons is "not only constitutionally sufficient but also constitutionally *necessary*."[6] 618 F.2d, at 222. On that reading of *Greenholtz*, the case was remanded to the District Court for a determination of "how many years life inmates must serve before the probability of pardon becomes so significant as to give rise to a protected liberty interest."[7]

### **2464 II

## A

[1] A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right. See *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Plainly, however, the underlying right must have come into existence before it can trigger due process protection. See, *e. g., Leis v. Flynt*, 439 U.S. 438, 442-443, 99 S.Ct. 698, 701-702, 58 L.Ed.2d 717 (1979).

[2] In *Greenholtz*, far from spelling out any judicially divined "entitlement," we did no more than apply the unique Nebraska statute. We rejected the claim that a constitutional entitlement to release from a valid prison sentence exists independently *464 of a right explicitly conferred by the State. Our language in *Greenholtz* leaves no room for doubt:

"There is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: '[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.' " 442 U.S., at 7, 99 S.Ct., at 2103, (emphasis supplied; citation omitted).

*Greenholtz* pointedly distinguished parole revocation and probation revocation cases,[8] noting that there is a "critical" difference between denial of a prisoner's request for initial release on parole and revocation of a parolee's conditional liberty. *Id.*, at 9-11, 99 S.Ct. at 2104-2106, quoting, *inter alia*, Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1296 (1975). Unlike probation, pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.[9] Cf. *Meachum v. Fano, supra*, at 225, 96 S.Ct., at 2538.

[3] A decision whether to commute a long-term sentence generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision. A commutation decision therefore shares some of the characteristics of a decision whether to grant parole. See *Greenholtz*, 442 U.S., at 9-10, 99 S.Ct., at 2104-2105. Far from supporting an "entitlement," *Greenholtz* therefore compels the conclusion that an inmate has "no constitutional or inherent right" to commutation of his sentence.

*465 Respondents nevertheless contend that the Board's consistent practice of granting commutations to most life inmates is sufficient to create a protectible liberty interest. They argue:

"[T]he State Board has created an unwritten common law of sentence commutation and parole acceleration for Connecticut life inmates.... In effect, there is an unspoken understanding between the State Board and inmates. The terms are simple: If the inmate cooperates with the State, the State will exercise its parole power on the inmate's behalf. Both the State and the inmate recognize those terms. Each expects the other to abide by them." Brief for Respondents 17-18.

[4] This case does not involve parole, and respondents' argument wholly misconceives the nature of a decision by a state to commute the sentence of a convicted felon. The petition in each case is nothing more **2465 than an appeal for clemency. See *Schick v. Reed*, 419 U.S. 256, 260-266, 95 S.Ct. 379, 382, 385, 42 L.Ed.2d 430 (1974). In terms of the Due Process Clause, a Connecticut felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison;[10] it is simply a unilateral hope. *Greenholtz, supra*, at 11, 99 S.Ct., at 2106, see *Leis v. Flynt*, 439 U.S., at 443-444, 99 S.Ct., at 701-702. A constitutional entitlement cannot "be created-as if by estoppel-merely because a wholly and*expressly* discretionary state privilege has been granted generously in the past." Id., at 444, n. 5, 99 S.Ct., at 701-702, n. 5. No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections; a contrary conclusion would trivialize the Constitution. The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency.

### *466 B

The Court of Appeals correctly recognized that Connecticut has conferred "unfettered discretion" on its Board of Pardons, but-paradoxically-then proceeded to fetter the Board with a halter of constitutional "entitlement." The statute imposes no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied by the Board. Respondents challenge the Board's procedure

precisely because of "the absence of any apparent standards." Brief for Respondents 28. We agree that there are no explicit standards by way of statute, regulation, or otherwise.

[5] This contrasts dramatically with the Nebraska statutory procedures in *Greenholtz*, which expressly mandated that the Nebraska Board of Parole "shall" order the inmate's release "unless" it decided that one of four specified reasons for denial was applicable. 442 U.S., at 11, 99 S.Ct., at 2106. The Connecticut commutation statute, having no definitions, no criteria, and no mandated "shalls," creates no analogous duty or constitutional entitlement.

It is clear that the requirement for articulating reasons for denial of parole in *Greenholtz* derived from unique mandates of the Nebraska statutes. Thus, although we noted that under the terms of the Nebraska statute, the inmates' expectancy of parole release "is entitled to some measure of constitutional protection," we emphasized that "this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." *Id.*, at 12, 99 S.Ct., at 2106.

Moreover, from the standpoint of a reasons requirement, there is a vast difference between a denial of parole-particularly on the facts of *Greenholtz*-and a state's refusal to commute a lawful sentence. When Nebraska statutes directed that inmates who are eligible for parole "shall" be released "unless" **\*467** a certain finding has been made, the statutes created a right. By contrast, the mere existence of a power to commute a lawfully imposed sentence, and the granting of commutations to many petitioners, create no right or "entitlement." A state cannot be required to explain its reasons for a decision when it is not required to act on prescribed grounds.

We hold that the power vested in the Connecticut Board of Pardons to commute sentences conferred no rights on respondents beyond the right to seek commutation.

*Reversed.*

Justice BRENNAN, concurring.

I join the Court's opinion. Although respondents have demonstrated a statistical likelihood of obtaining the relief they request, that is not enough to create a protectible liberty interest. Rather, respondents must also show-by reference to statute, **\*\*2466** regulation, administrative practice, contractual arrangement or other mutual understanding-that particularized standards or criteria guide the State's decisionmakers. See *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 701, 58 L.Ed.2d 717 (1979); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The *structure* of the State's decisionmaking process is thus as significant as the likely *result* of that process. Respondents have not shown that the Board is required to base its decisions on objective and defined criteria. As in *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976), the decisionmaker can deny the requested relief for any constitutionally permissible reason or for no reason at all. Accordingly, I agree that respondents have no protectible liberty interest in a pardon.

Justice WHITE, concurring.

I join the Court's opinion and write separately only to observe that neither *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), nor *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), suggested that state law is the only source of a prisoner's liberty worthy of **\*468** federal constitutional protection. The opinion in *Wolff v. McDonnell* pointed out that although a prisoner's "rights may be diminished by the needs and exigencies of the institutional environment, [he] is not wholly stripped of constitutional protections when he is imprisoned for crime.... [He] may not be deprived of life, liberty or property without due process of law." 418 U.S., at 555-556, 94 S.Ct., at 2974. The issue in the case was the deprivation of the right to good-time credits, a right which was not guaranteed by the Federal Constitution but was a creation of state law. *Wolff* held that even such a liberty interest rooted in state law was entitled to constitutional protection.

*Meachum v. Fano* also pointed out that "the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect." 427 U.S., at 225, 96 S.Ct., at 2538. The Court went on to hold that a state prisoner has no federal constitutional right protecting him against administrative transfers to another state prison. Neither did state law purport to create a liberty interest entitled to protection under the Fourteenth Amendment. Of course, Justice STEVENS was in dissent in that case; but even there he recognized that the Court's opinion first addressed whether the right asserted was one of the liberty interests retained by convicted felons. We decided

that it was not; he thought that it was. But neither *Wolff* nor *Meachum* is fairly characterized as suggesting that all liberty interests entitled to constitutional protection must be found in state law.

Justice STEVENS, with whom Justice MARSHALL joins, dissenting.

"Liberty from bodily restraint always have been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18, 99 S.Ct. 2100, 2109, 60 L.Ed.2d 668 (opinion of POWELL, J.). **\*469** The liberty that is worthy of constitutional protection is not merely "a statutory creation of the State," *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935. Surely the Court stumbles when it states that liberty "must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency," *ante*, at 2464, or when it implies that liberty has "its roots in state law," *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451.

To some of us, it is "self-evident" that individual liberty has far deeper roots.[1] **\*\*2467** Moreover, the deprivation of liberty that follows conviction of a criminal offense is not total; the individual possesses a residuum of constitutionally protected liberty even while he is in the legal custody of the State.[2] The question this case presents is not whether these respondents are mere slaves, wholly divested of any constitutionally protected interest in liberty; rather, the question is whether the decision by the Connecticut Board of Pardons refusing to commute their life sentences constitutes a deprivation of liberty entitling respondents to the protection of the Due Process Clause.

**\*470** The facile answer to that question is that the distinction between a refusal to grant freedom on the one hand and the imposition of a sentence or the revocation of a parole on the other forms the basis for a determination whether due process is implicated. Only the imposition of sentence or revocation of parole is obviously a deprivation of liberty. But in practice, as Justice POWELL has explained, that distinction is far less satisfactory than it first appears.[3] In my judgment, it provides an insufficient answer to the question presented by this case because the distinction does not correctly evaluate the character of the deprivation of liberty that occurs when a person is convicted of a crime.

If the conviction were effective to terminate the defendant's liberty, he would thereafter retain no constitutional right to procedural safeguards against arbitrary action. The process of sentencing, parole release, parole revocation, and ultimate discharge could all be totally arbitrary. But no State asserts such total control over the convicted offender, and this Court has unequivocally held that the Constitution affords protection at different stages of the postconviction **\*471** process.[4] The basic reason **\*\*2468** the constitutional protection applies at these stages is that liberty itself survives to some extent and its deprivation is a continuous process rather than an isolated event.

This case involves the State of Connecticut's process for determining when a relatively small group of serious offenders will be released from custody. Routinely that process includes three determinations: the judge imposes a life sentence; the Board of Pardons in due course commutes that sentence; and finally the Board of Parole discharges the prisoner from custody. Each of these three decisions is a regular and critical component of the decisionmaking process employed by the State of Connecticut to determine the magnitude of its deprivation of the prisoner's liberty.[5] In my opinion the Due Process Clause applies to each step and denies the State the power to act arbitrarily.[6]

**\*472** Whether the refusal to provide the inmates with a statement of reasons is a procedural shortcoming of constitutional magnitude is, admittedly, fairly debatable. Judges often decide difficult and important cases without explaining their reasons, and I would not suggest that they thereby commit constitutional error. But the ordinary litigant has other substantial procedural safeguards against arbitrary decisionmaking in the courtroom. The prison inmate has few such protections. Indeed, as in this case, often he is not even afforded the protection of written standards to govern the exercise of the powers of the Board of Pardons. His protection is somewhat analogous to that of the litigant in the earliest days of our common-law history. The judges then were guided by few written laws, but developed a meaningful set of rules by the process of case-by-case adjudication. Their explanations of why they decided cases as they did provided guideposts for future decisions and an assurance to litigants that like cases were being decided in a similar way. Many of us believe that those statements of reasons provided a better guarantee of justice than could possibly have been described in a code written in sufficient detail to be fit for Napoleon.

As Justice MARSHALL has pointed out, "the obligation to justify a decision publicly would provide the assurance, critical to the appearance of fairness, that the Board's

decision is not capricious," see *Greenholtz*, 442 U.S., at 40, 99 S.Ct., at 2121 (dissenting opinion). I therefore believe the Court of Appeals correctly concluded that in this context a brief statement of reasons is an essential element of the process that is due these respondents.

Accordingly, I respectfully dissent.

**All Citations**

452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158

### Footnotes

| | |
|---|---|
| * | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499. |
| 1 | A Connecticut inmate serving a life sentence, imposed before 1971, that does not have a specified minimum term must serve a minimum of 25 years in prison, less a maximum of 5 years' good-time credits, unless the Board of Pardons commutes the sentence. See Conn.Gen.Stat. § 54-125 (1981).<br>Effective in 1971, the sentencing judge must specify a minimum term, which may be as low as 10 years or as high as 25 years. Conn.Gen.Stat. § 53a-35(c)(1) (1981). |
| 2 | The Board of Pardons also has the power to grant immediate release in the form of an absolute pardon, but according to the District Court, that power has not been employed in recent history. 432 F.Supp. 1310, 1313 (D.C. Conn. 1977).<br>The District Court noted that by virtue of this statute, Connecticut "stands outside the traditional scheme of clemency through application to the state's chief executive." The Governor of Connecticut has only the power to grant temporary reprieves. *Id.*, at 1312. |
| 3 | Parole determinations are made by the Board of Parole, a separate body. This case does not involve parole procedure; it involves only denials of commutations. |
| 4 | Of the inmates whose minimum sentences have been commuted by the Board of Pardons, the Board of Parole has paroled approximately 90% during the first year of eligibility, and all have been paroled within a few years. App. 33, 39. The Chairman of the Board of Parole testified that "no more than 10 or 15 per cent" of Connecticut's life inmates serve their 20-year minimum terms. *Id.*, at 31. |
| 5 | On the day that the District Court entered its declaratory judgment, the Board commuted Dumschat's sentence to time served and granted him immediate release. The Board then moved to dismiss the suit as moot. The District Court denied the Board's motion and permitted three other inmates to intervene. Those inmates were serving life terms for murder and had been denied commutation without statements of reasons. Two of them are still serving their sentences. According to respondents, there are approximately 35 persons in the certified class, which consists of all "inmates of the State of Connecticut who are currently serving sentences of life imprisonment [without court-imposed minimum terms] and who have been, or who will be, denied pardons during their current terms of incarceration" by the Board of Pardons. App. to Pet. for Cert. 21a; Brief for Petitioners ii; Tr. of Oral Arg. 36; see n. 1, *supra*. |
| 6 | In the cited passage of *Greenholtz*, we said: "The Nebraska [statutory] procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." 442 U.S., at 16, 99 S.Ct., at 2108. |
| 7 | The Court of Appeals remarked that "[o]nly after this period has elapsed are lifers entitled to due process safeguards in the pardon process." 618 F.2d, at 221. Because it believed that *every* life inmate who is denied a pardon is constitutionally entitled to a statement of reasons, the District Court did not make such a determination prior to the decision of the Court of Appeals that is now before us. *Id.*, at 220-221; see App. to Pet. for Cert. 25a. |
| 8 | *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). |
| 9 | Respondents have not raised any equal protection claim. |

10      See *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

1       "It is self-evident that all individuals possess a liberty interest in being free from physical restraint." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 23, 99 S.Ct. 2100, 2112, 60 L.Ed.2d 668 (MARSHALL, J., dissenting).

        "If man were a creature of the State, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

        "I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations." *Meachum v. Fano*, 427 U.S. 215, 230, 96 S.Ct. 2532, 2541, 49 L.Ed.2d 451 (STEVENS, J., dissenting).

2       See *Meachum v. Fano, supra*, at 231-233, 96 S.Ct., at 2541-2542.

3       "The Court today, however, concludes that parole release and parole revocation 'are quite different,' because 'there is a ... difference between losing what one has and not getting what one wants,' *ante*, at 9, 10 [99 S.Ct., at 2105]. I am unpersuaded that this difference, if indeed it exists at all, is as significant as the Court implies. Release on parole marks the first time when the severe restrictions imposed on a prisoner's liberty by the prison regimen may be lifted, and his behavior in prison often is molded by his hope and expectation of securing parole at the earliest time permitted by law. Thus, the parole-release determination may be as important to the prisoner as some later, and generally unanticipated, parole-revocation decision. Moreover, whatever difference there may be in the subjective reactions of prisoners and parolees to release and revocation determinations is not dispositive. From the day that he is sentenced in a State with a parole system, a prisoner justifiably expects release on parole when he meets the standards of eligibility applicable within that system. This is true even if denial of release will be a less severe disappointment than revocation of parole once granted." *Greenholtz v. Nebraska Penal Inmates, supra*, at 19-20, 99 S.Ct., at 2109-2110 (opinion of POWELL, J.).

4       Thus the Court has held that the Due Process Clause protects the prisoner at the sentencing stage. *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336, in probation revocation proceedings, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656, and in parole revocation proceedings, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484. Moreover, the Constitution has been applied to other issues affecting prisoners. See, *e. g., Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (right to assistance in the filing of legal papers); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (First Amendment rights); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (right to practice religious faith); *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (right to file petition for writ of habeas corpus); *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct., 1733, 12 L.Ed.2d 1030 (right to purchase religious materials); *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (right to petition federal court for writ of habeas corpus). Cf. *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (sentence may violate Eighth Amendment).

5       As the Court recognizes, *ante*, at 2462, at least 75% of all life inmates receive some favorable action from the Board of Pardons. The Board of Parole paroles approximately 90% of these inmates during the first year after the Board of Pardons commutes their minimum sentences, and all are paroled within a few years. *Ante*, at 2462, n.4.

6       The fact that the petitioner agency is given the title "Board of Pardons" does not, of course, make its work the equivalent of the exercise by a chief executive of the occasional totally discretionary power to grant pardons in isolated cases. As the record in this case makes clear, the petitioner commutes sentences with roughly the same frequency that parole boards make parole release determinations.

---

---

KeyCite Yellow Flag - Negative Treatment
**Called into Doubt by** Lindquist v. City of Pasadena, Tex.,
S.D.Tex., September 10, 2009

**451 F.3d 376**
**United States Court of Appeals,**
**Fifth Circuit.**

Wayne MIKESKA; Janice Mikeska; Mose Smith;
Carol Smith, Plaintiffs–Appellants,
v.
CITY OF GALVESTON; et al., Defendants,
City of Galveston, Defendant–Appellee.

No. 04–41147. | June 6, 2006.

**Synopsis**
**Background:** Beachfront homeowners filed § 1983
action alleging that city's refusal to permit them to repair
and maintain their homes or to access municipal utility
and sewer services following tropical storm violated their
constitutional rights. The United States District Court for
the Southern District of Texas, Samuel B. Kent, J., 328
F.Supp.2d 671, granted city's motion for summary
judgment and dismissed the complaint. Homeowners
appealed.

**Holdings:** The Court of Appeals, Edith Brown Clement,
Circuit Judge, held that:

[1] city failed to demonstrate rational relationship between
its refusal to reconnect public utilities to houses and its
legitimate interest in protecting open access to public
beach, and

[2] city posited no reason for its differential treatment of
homes.

Vacated and remanded.

Patrick E. Higginbotham, Circuit Judge, filed opinion
concurring in part and dissenting in part.

Opinion, 419 F.3d 431, superseded.

West Headnotes (9)

[1] **Water Law**
  Use of shores or banks

Texas Open Beaches Act (OBA) was passed in
order to protect the public's right for "free and
unrestricted" access to state-owned beaches.
V.T.C.A., Natural Resources Code § 61.011(a).

1 Cases that cite this headnote

[2] **Water Law**
  Use of shores or banks

Pursuant to the Texas Open Beaches Act
(OBA), to prevent destruction of the public
beach from a landward shift of the mean low
tide line, the legal boundaries of the public
easement change with their physical
counterparts. V.T.C.A., Natural Resources Code
§ 61.011 et seq.

2 Cases that cite this headnote

[3] **Zoning and Planning**
  De novo review

Whether a particular zoning action has the
requisite rational relationship to a legitimate
government interest to satisfy substantive due
process or equal protection requirements is a
question of law, the district court's
determination of which is reviewed *de novo.*
U.S.C.A. Const.Amend. 14.

11 Cases that cite this headnote

[4] **Constitutional Law**
  Reasonableness, rationality, and relationship
to object

To succeed on a substantive due process claim, a
plaintiff must cross two hurdles: first, he must

**Tab E-4**

allege a deprivation of a constitutionally protected right, and second, he must show that the governmental action was not rationally related to a legitimate governmental interest. U.S.C.A. Const.Amend. 14.

19 Cases that cite this headnote

**[5]**     **Constitutional Law**
🔑Particular issues and applications
**Constitutional Law**
🔑Carriers and Public Utilities
**Water Law**
🔑Use of shores or banks

City's refusal to restore utility service to homes, after tropical storm had moved vegetation line landward of those homes, leaving them positioned on public beach as defined by Texas law, had to be rationally related to governmental interest of protection of open access to public beach under Texas Open Beaches Act, in order to comport with substantive due process. U.S.C.A. Const.Amend. 14; V.T.C.A., Natural Resources Code § 61.011 et seq.

7 Cases that cite this headnote

**[6]**     **Constitutional Law**
🔑Selective enforcement

To bring an equal protection claim for the denial of zoning permits, plaintiff must show that the difference in treatment with others similarly situated was irrational. U.S.C.A. Const.Amend. 14.

17 Cases that cite this headnote

**[7]**     **Constitutional Law**
🔑Public Services
**Federal Civil Procedure**
🔑Civil rights cases in general

City, which refused to allow beachfront homeowners to reconnect their public utility services following tropical storm but allegedly allowed reconnection of other similarly situated homeowners' utility services, posited no reason, let alone one supported by evidence, for its differential treatment of plaintiffs' homes, as required to sustain its motion for summary judgment on homeowners' equal protection claim; city's only proffered evidence consisted of a district court decision dismissing the similar complaint of other plaintiffs against city and city's motion in response to homeowners' injunction request, neither of which constituted a cognizable evidentiary source. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

**[8]**     **Federal Courts**
🔑Briefs

The Court of Appeals generally does not address newly minted arguments at oral argument.

Cases that cite this headnote

**[9]**     **Zoning and Planning**
🔑Scope of Review

Although the federal appellate courts are to resist becoming "super zoning boards," zoning decisions are to be reviewed by federal courts by the same constitutional standards that the Court of Appeals employs to review statutes enacted by the state legislatures.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*377** J. David Breemer (argued), Meriem L. Hubbard, Pac. Legal Found., Sacramento, CA, Robert M. Moore, Robert M Moore & Associates, Galveston, TX, for

Plaintiffs–Appellants.

George William Vie, III (argued), Mills Shirley, Galveston, TX, for Defendant–Appellee.

**\*378** Kenneth Charles Cross, Brian E. Berwick, Asst. Atty. Gens., Austin, TX, for Amicus Curiae.

Appeal from the United States District Court for the Southern District of Texas.

Before HIGGINBOTHAM, BARKSDALE and CLEMENT, Circuit Judges.

**Opinion**

EDITH BROWN CLEMENT, Circuit Judge:

The petition for panel rehearing is DENIED. The prior opinion, *Mikeska v. City of Galveston,* 419 F.3d 431 (5th Cir.2005), is WITHDRAWN, and the following opinion is substituted:

This appeal arises from the dismissal, on summary judgment, of the appellants' suit against the City of Galveston for its refusal to grant permits for reconnection of the appellants' homes to utility services after Tropical Storm Frances. We vacate the lower court's ruling and remand for further proceedings.

## I.

[1] [2] The Texas Open Beaches Act ("OBA") was passed in order to protect the public's right for "free and unrestricted" access to state-owned beaches. TEX. NAT. RES.CODE ANN. § 61.011(a). The OBA safeguards the public's common law easement for access to the "public beach"—defined by the OBA as consisting of the area between the line of vegetation and the mean low tide line. § 61.001(8). Due to shifts of the vegetation line and the erosion of the shoreline, the natural demarcation lines are not static. To prevent destruction of the public beach from a landward shift of the mean low tide line, the legal boundaries of the public easement change with their physical counterparts. *Feinman v. State,* 717 S.W.2d 106, 110–11 (Tex.App.Ct.1986).

The OBA makes it "an offense against the public policy of this state for any person to create, erect, or construct any obstruction, barrier, or restraint that will interfere ... [with the right of the public] to enter or to leave any public beach." § 61.013(a). Texas empowers the Texas

General Land Office ("GLO") to both "strictly and vigorously enforce the prohibition against encroachments on and interferences with the public beach easement," and to "promulgate rules" to enforce the OBA's public beach protections. § 61.011(c), (d). The OBA also requires local municipalities to design plans to protect access to public beaches that are within their respective jurisdictions. § 61.015(a).

Wayne and Janice Mikeska and Mose and Carol Smith (collectively "appellants") own separate beachfront rental properties in the Bermuda Beach subdivision of Galveston, Texas. Until 1998, when Tropical Storm Frances hit the coast of Texas causing erosion of the vegetation line, these homes were landward of the public beach. After Frances, the appellants' homes were entirely seaward of the vegetation line—*i.e.,* the homes were completely situated on the public beach as defined by Texas law. Along with 105 other houses that were also fully positioned on the public beach, the appellants' properties were placed on the GLO's 100% List.[1] The 100% List was submitted to the Texas Attorney General to decide whether the listed homes should be removed.

**\*379** The City of Galveston ("City") then condemned the appellants' homes, disabling a number of important utilities including electricity, sewer, and water services. Although the Attorney General concluded that the appellants' homes did not require removal, his office notified the appellants by letter that it was deferring any questions as to the reconnection of utilities services to the City. The appellants submitted a number of requests for the reconnection of their electricity, water, and sewer lines. As to the sewer lines, the appellants requested connection to the City's newly constructed line built through the Bermuda Beach subdivision. The appellants' requests, along with those from five others whose homes also are located in Bermuda Beach,[2] were rejected.

The appellants subsequently filed suit in federal court seeking both a preliminary injunction to force the City to allow the restoration of utility services and compensatory damages. The district court granted the preliminary injunction request, and the appellants pursued their suit for money damages, averring that the City violated their substantive due process and equal protection rights under the color of state law in violation of 42 U.S.C. § 1983.[3]

On the City's motion for summary judgment, the district court dismissed the complaint. According to the district court, the City's actions were rationally related to the protection of open access to the public beach (substantive due process) and to the City's obligation to follow state law to "protect the public beaches from interference"

(equal protection). The appellants filed this timely appeal.

## II.

[3] The appellants challenge two related rulings of the district court. They argue that neither the City's persistent denial of the appellants' requests for utility connections nor its differential treatment of appellants' homes vis-a-vis similarly situated houses was rationally related to any legitimate governmental interest. "Whether a particular zoning action has the requisite rational relationship to a legitimate government interest is a question of law," *FM Props. Operating Co. v. City of Austin,* 93 F.3d 167, 172 n. 6 (5th Cir.1996), the district court's determination of which is reviewed *de novo. Simi Inv. Co. v. Harris County,* 236 F.3d 240, 249 (5th Cir.2000). Each claim is discussed in turn.

## A.

[4] To succeed on a substantive due process claim, a plaintiff must cross two hurdles. First, he must allege a deprivation of a constitutionally protected right. *Simi,* 236 F.3d at 249. The district court held that the appellants have a constitutionally protected right in their homes and in access to public utility services, a decision that the City does not seek to disturb on appeal. Thus, the precise issue here, and the second and last prong of the substantive due process test, is whether the governmental action was "rationally related to a legitimate governmental interest." *Id.* (quoting *FM Props.,* 93 F.3d at 174) (internal quotations omitted).

[5] The City and appellants dispute the scope of the City's duties under state law. The City contends that it has a legitimate **\*380** governmental interest in following its obligations under state law. Its actions were related to this interest, the City argues, in that the OBA is designed to protect access to the public beach, the GLO has promulgated rules for the enforcement of the OBA, and the City and the GLO generally cooperate on matters related to the protection of the public beach. TEX. NAT. RES.CODE ANN. § 61.013; 31 TEX. ADMIN. CODE § 15.3; *see also* Application for City of Galveston Beachfront Construction/Dune Protection Permit. The appellants challenge this assertion, contending that nothing in the OBA explicitly requires the denial of service permits in situations such as this.

State law does provide the City with an important role in the protection of the public beach. However, the City's obligations, under the relevant provisions of the Texas Administrative Code and the OBA, did not mandate that the City refuse to reconnect utilities to existing homes. Rather, the City's obligations under state law were limited to prohibiting "construction." The Texas Administrative Code prohibits local governments from

> issu[ing] any beachfront construction certificate authorizing construction landward of the public beach that functionally supports or depends on, or is otherwise related to, proposed or existing structures that encroach on the public beach, regardless of whether the encroaching structure is on land that was previously landward of the public beach.

31 TEX. ADMIN. CODE § 15.5(c)(2). The City emphasizes that this code section applies to any construction, even related to preexisting structures, to support its argument that it simply did not have the authority to reconnect the appellants's utilities. However, no "construction," defined as "[c]ausing or carrying out any building, bulkheading, filling, clearing, excavation, or substantial improvement to land or the size of any structure," was necessary to reconnect utilities to a preexisting home. 31 TEX. ADMIN. CODE § 15.2(18). Indeed, the City's zoning code states that no beachfront construction certificate is needed for "routine repairs, maintenance and upkeep of existing structures." City of Galveston Zoning Ordinance § 29–90(a)(3). The City reconnected utility and sewer service to thirty homes that were similarly identified as encroachments on the public beach without running afoul of any explicit state law provisions. Therefore, the City had *at least some* authority under state law for deciding the disposition of permit requests.

Perhaps the City also had *some* authority to deny utility permits pursuant to its state law obligations to protect public beaches. However, in exercising that discretionary authority, the City must still conform to its constitutional obligations. *Cf. Mickens–Thomas v. Vaughn,* 321 F.3d 374, 386 (3d Cir.2003) (noting, in a different context, that "[t]he possession of a discretionary component" fails to remove governmental action from "constitutional scrutiny"). Thus, the City actions must be rationally related to some other independent and legitimate interest.

The rational basis test requires not only a legitimate state

interest, but also that the government action is rationally related to furthering that interest. There is indeed a legitimate state interest at stake—the protection of public access to the public beach—but, at this stage, the government fails to provide any rational reason why refusing to reconnect utilities to houses found on a public beach furthers the end of protecting public access to public beaches.

After further development of the record, facts may come to light that indeed serve to indicate that there was a rational basis for the government's action. For example, **\*381** we might learn that reconnecting the utilities involved hanging obtrusive wires or placing unsightly water meters that would discourage public use of the beach. However, there is no indication of such facts in the record at this summary judgment stage, and we decline to invent them. Thus, we find that the government's argument fails because there is nothing in the record before us to suggest that the connection of either the appellants' sewer system or their electricity and water lines to the City's service grid would hinder the public's access to the beach or otherwise serve as an impermissible encroachment under the OBA.

As the City argues, the "local government does not have to be right" in implementing the requirements of state law, nor may a plaintiff bootstrap violations of state law into the Constitution. The appellants' allegations implicate neither of these concerns, however. The City must conform its discretionary actions to its constitutional obligations; because the City has not demonstrated the requisite rational relationship to sustain a motion for summary judgment at this stage of litigation, we vacate the district court's determination as to the substantive due process claim.

### B.

[6] The appellants' equal protection claim is based on their contention that there are a number of other similarly situated homes that were allowed reconnection of their utility services. In contrast to a due process action, which looks solely to the government's exercise of its power vis-a-vis the appellants, an equal protection claim asks whether a justification exists for the *differential* exercise of that power. To bring such an equal protection claim for the denial of zoning permits,[4] the appellant must show that the difference in treatment with others similarly situated was irrational. *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) ("Our cases have recognized successful equal protection

claims ... where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

[7] [8] The City failed to offer any reason for the differential treatment of the appellants' homes in its brief. Although the City proffered two reasons at oral argument for its denial of the appellants' permit application, as a general matter we do not address newly minted arguments at oral argument. *See, e.g., Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 270 (5th Cir.1998). Furthermore, the fact that these reasons were raised for the first time at oral argument bolsters our view that they are merely *ex post facto* justifications for the City's irrational treatment.

The lack of identifiable reasons for the City's actions highlights the more general problem of the insufficiency of evidentiary support. The City's only proffered evidence consists of (a) Judge Kent's decision dismissing the similar complaint of other plaintiffs against the City, *Korndorffer v. City of Galveston,* No. G–02–144 (S.D.Tex. July 9, 2002) (unpublished), and (b) the City's motion in response to the appellants' **\*382** injunction request. Neither of these constitutes a cognizable evidentiary source. Indeed, at oral argument the City conceded that it had failed to support its arguments with record evidence. This lack of evidentiary support is particularly acute with regard to the refusal to reconnect electricity and water services—the City posits no reason, let alone one supported by evidence, for how reconnection of those particular services interfered with access to the public beach.

### C.

[9] Although we are to resist becoming "super zoning boards," *S. Gwinnett Venture v. Pruitt,* 482 F.2d 389, 390 (5th Cir.1973), "[w]e have plainly and consistently held that zoning decisions are to be reviewed by federal courts by the same constitutional standards that we employ to review statutes enacted by the state legislatures." *Shelton v. City of Coll. Station,* 780 F.2d 475, 479 (5th Cir.1986). Without supporting evidence for the City's rationales, we hold that summary judgment at this stage was improper.

### III.

The decision of the district court is VACATED and REMANDED for further proceedings.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in part and dissenting in part:

I concur in all respects, except that I would affirm the district court's grant of summary judgment dismissing the substantive due process claim. To my eyes, the challenged state purpose is rational as a matter of law. I agree that the case must go forward on the challenge to the means of achieving the purpose of mandatory open beaches, the equal protection claim.

**All Citations**

451 F.3d 376

Footnotes

1    The 100% List consisted of 107 homes on the Texas coast that, after Frances, were 100% seaward of the natural vegetation line and therefore considered encroachments on the public beach.

2    The other five homeowners filed a separate suit, which was ultimately dismissed by Judge Kent, who was also the presiding judge for this action. *See Korndorffer v. City of Galveston,* No. G–02–144 (S.D.Tex. July 9, 2002) (unpublished).

3    The appellants also brought a takings claim, which the district court dismissed. That decision is not appealed.

4    Contrary to the City's contention, the appellants' equal protection cause of action does not sound in two other types of "class of one" claims: "selective enforcement," *Allred's Produce v. United States Dep't of Agric.,* 178 F.3d 743, 748 (5th Cir.1999), and "personal vindictiveness." *See Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995); *Bryan v. City of Madison,* 213 F.3d 267, 277 (5th Cir.2000) (citing *Esmail,* 53 F.3d 176). We thus reject the City's contention that we must apply the higher evidentiary burden that would normally be required by either claim.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Abrogation Recognized by** Elwell v. Byers, 10th Cir.(Kan.), November 14, 2012

103 S.Ct. 1741
Supreme Court of the United States

Antone OLIM, et al., Petitioners
v.
Delbert Kaahanui WAKINEKONA.

No. 81-1581. | Argued Jan. 19, 1983. | Decided April 26, 1983.

Hawaii prisoner, who had been transferred to prison in California, brought action on claim of denial of due process rights arising out of reclassification proceedings. The United States District Court for the District of Hawaii, 459 F.Supp. 473, Dick Yin Wong, J., dismissed the complaint, and prisoner appealed. The Court of Appeals for the Ninth Circuit, 664 F.2d 708, reversed and remanded. Certiorari was granted. The Supreme Court, Justice Blackmun, held that: (1) the interstate prison transfer did not deprive the inmate of any liberty interest protected by the due process clause in and of itself, even though the transfer covered a substantial distance, and (2) Hawaii's prison regulations did not create a constitutionally protected liberty interest.

Reversed.

Justice Marshall filed a dissenting opinion in which Justice Brennan joined and in which Justice Stevens joined in part.

West Headnotes (10)

[1]     **Prisons**
        Inter-System Issues

        Just as inmate has no justifiable expectation that he will be incarcerated in any particular prison within any state, he has no justifiable expectation that he will be incarcerated in any particular state. U.S.C.A. Const.Amend. 14.

        644 Cases that cite this headnote

[2]     **Prisons**
        Interstate and State-Federal Transfer

        Given statutes and interstate agreements which recognize that, from time to time, it is necessary to transfer inmate to prison in other states, it is neither unreasonable nor unusual for inmate to serve practically his entire sentence in a state other than the one in which he was convicted and sentenced, or to be transferred to out-of-state prison after serving portion of his sentence in his home state. 18 U.S.C.A. §§ 4002, 5003(a); U.S.C.A. Const.Amend. 14.

        92 Cases that cite this headnote

[3]     **Prisons**
        Inter-System Issues

        Confinement in another state, unlike confinement in a mental institution, is within the normal limits or range of custody which a conviction has authorized state to impose. U.S.C.A. Const.Amend. 14.

        140 Cases that cite this headnote

[4]     **Prisons**
        Interstate and State-Federal Transfer

        Even when interstate prison transfer involves long distances and an ocean crossing, confinement remains within constitutional limits. U.S.C.A. Const.Amend. 14.

        46 Cases that cite this headnote

[5]     **Constitutional Law**
        Transfer

**Tab E-5**

Interstate prison transfer, including one from Hawaii to California, does not deprive inmate of any liberty interest protected by due process clause in and of itself. U.S.C.A. Const.Amend. 14.

1243 Cases that cite this headnote

[6] **Constitutional Law**
👉Imprisonment and Incidents Thereof

Hawaii's prison regulations place no substantive limitations on official discretion and thus create no liberty interest entitled to protection under due process clause. U.S.C.A. Const.Amend. 14.

1371 Cases that cite this headnote

[7] **Prisons**
👉Particular Issues and Applications

Where Hawaii prison regulations prescribed no substantive standards to guide committee whose task it was to advise administrator in deciding whether to transfer inmate, no significance attached to fact that prison regulations required a particular kind of hearing before administrator could exercise his unfettered discretion. U.S.C.A. Const.Amend. 14.

112 Cases that cite this headnote

[8] **Constitutional Law**
👉Rights, Interests, Benefits, or Privileges Involved in General

Process is not an end in itself, its constitutional purpose is to protect substantive interest to which individual has legitimate claim of entitlement. U.S.C.A. Const.Amend. 14.

346 Cases that cite this headnote

[9] **Constitutional Law**
👉Transfer

If prison officials may transfer prisoner for whatever reason or for no reason at all, there is no substantive interest for process to protect. U.S.C.A. Const.Amend. 14.

289 Cases that cite this headnote

[10] **Prisons**
👉Transfer

Although state may choose to require procedures governing transfers of prisoners for reasons other than protection against deprivation of substantive rights, in making that choice state does not create independent substantive right. U.S.C.A. Const.Amend. 14.

318 Cases that cite this headnote

**\*\*1742** *Syllabus*[\*]

**\*238** Petitioner members of a prison "Program Committee," after investigating a breakdown in discipline and the failure of certain programs within the maximum control unit of the Hawaii State Prison outside Honolulu, singled out respondent and another inmate as troublemakers. After a hearing-respondent having been notified thereof and having retained counsel to represent him-the same Committee recommended that respondent's classification as a maximum security risk be continued and that he be transferred to a prison on the mainland. Petitioner administrator of the Hawaii prison accepted the Committee's recommendation, and respondent was transferred to a California state prison. Respondent then filed suit against petitioners in Federal District Court, alleging that he had been denied procedural due process because the Committee that recommended his transfer consisted of the same persons who had initiated the hearing, contrary to a Hawaii prison regulation, and

because the Committee was biased against him. The District Court dismissed the complaint, holding that the Hawaii regulations governing prison transfers did not create a substantive liberty interest protected by the Due Process Clause of the Fourteenth Amendment. The Court of Appeals reversed.

*Held:*

1. An interstate prison transfer does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself. Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State so as to implicate the Due Process Clause directly when an intrastate prison transfer is made, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451; *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466, he has no justifiable expectation that he will be incarcerated in any particular State. Statutes and interstate agreements recognize that, from time to time, it is necessary to transfer inmates to prisons in other States. Confinement in another State is within the normal limits or range of custody which the conviction has authorized the transferring State to impose. Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits. Pp. 1745-1747.

2. Nor do Hawaii's prison regulations create a constitutionally protected liberty interest. Although a State creates a protected liberty interest **\*239** by placing substantive limitations on official discretion, Hawaii's prison regulations place no substantive limitations on the prison administrator's discretion to transfer an inmate. For that matter, the regulations prescribe no substantive standards to guide the Program Committee whose task is to advise the administrator. Thus no significance attaches to the fact that the prison regulations require a particular kind of hearing before the administrator can exercise his unfettered discretion. Pp. 1747-1748.

664 F.2d 708 (CA9 1981), reversed.

### Attorneys and Law Firms

*Michael A. Lilly,* First Deputy Attorney General of Hawaii, argued the cause for petitioners. With him on the brief was *James H. Dannenberg,* Deputy Attorney General.

*Robert Gilbert Johnston* argued the cause for respondent. With him on the brief was *Clayton C. Ikei.\**

\* Briefs of *amici curiae* urging reversal were filed for the

State of Alaska et al. by *Paul L. Douglas,* Attorney General of Nebraska, *J. Kirk Brown,* Assistant Attorney General, *Judith W. Rogers,* Corporation Counsel of the District of Columbia, and the Attorneys General for their respective jurisdictions as follows: *Wilson L. Condon* of Alaska, *Aviata F. Fa'alevao* of American Samoa, *Robert K. Corbin* of Arizona, *Jim Smith* of Florida, *David H. Leroy* of Idaho, *William J. Guste, Jr.,* of Louisiana, *William A. Allain* of Mississippi, *Michael T. Greely* of Montana, *Richard H. Bryan* of Nevada, *Irwin I. Kimmelman* of New Jersey, *Jeff Bingaman* of New Mexico, *Rufus L. Edmisten* of North Carolina, *Robert Wefald* of North Dakota, *William J. Brown* of Ohio, *Dennis J. Roberts II* of Rhode Island, *Mark V. Meierhenry* of South Dakota, *William M. Leech, Jr.,* of Tennessee, *John J. Easton* of Vermont, *Gerald L. Baliles* of Virginia, *Kenneth O. Eikenberry* of Washington, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Steven F. Freudenthal* of Wyoming; and for the Commonwealth of Massachusetts et al. by *Francis X. Bellotti,* Attorney General of Massachusetts, *Stephen R. Delinsky, Barbara A.H. Smith,* and *Leo J. Cushing,* Assistant Attorneys General, *Anthony Ching,* Solicitor General of Arizona, and the Attorneys General for their respective jurisdictions as follows: *Wilson L. Condon* of Alaska, *Aviata F. Fa'alevao* of American Samoa, *Robert K. Corbin* of Arizona, *Jim Smith* of Florida, *David H. Leroy* of Idaho, *William A. Allain* of Mississippi, *Michael T. Greely* of Montana, *Irwin I. Kimmelman* of New Jersey, *Jeff Bingaman* of New Mexico, *Rufus L. Edmisten* of North Carolina, *Robert O. Wefald* of North Dakota, *William J. Brown* of Ohio, *Dennis J. Roberts II* of Rhode Island, *Mark V. Meierhenry* of South Dakota, *William M. Leech, Jr.,* of Tennessee, *John J. Easton* of Vermont, *Chauncey H. Browning* of West Virginia, and *Bronson C. La Follette* of Wisconsin.

### Opinion

**\*240** Justice BLACKMUN delivered the opinion of the Court.

The issue in this case is whether the transfer of a prisoner from a state prison **\*\*1743** in Hawaii to one in California implicates a liberty interest within the meaning of the Due Process Clause of the Fourteenth Amendment.

I

A

Respondent Delbert Kaahanui Wakinekona is serving a sentence of life imprisonment without the possibility of parole as a result of his murder conviction in a Hawaii state court. He also is serving sentences for various other crimes, including rape, robbery, and escape. At the Hawaii State Prison outside Honolulu, respondent was classified as a maximum security risk and placed in the maximum control unit.

Petitioner Antone Olim is the administrator of the Hawaii State Prison. The other petitioners constituted a prison "Program Committee." On August 2, 1976, the Committee held hearings to determine the reasons for a breakdown in discipline and the failure of certain programs within the prison's maximum control unit. Inmates of the unit appeared at these hearings. The Committee singled out respondent and another inmate as troublemakers. On August 5, respondent received notice that the Committee, at a hearing to be held on August 10, would review his correctional program to determine whether his classification within the system should be changed and whether he should be transferred to another Hawaii facility or to a mainland institution.

**\*241** The August 10 hearing was conducted by the same persons who had presided over the hearings on August 2. Respondent retained counsel to represent him. The Committee recommended that respondent's classification as a maximum security risk be continued and that he be transferred to a prison on the mainland. He received the following explanation from the Committee:

> "The Program Committee, having reviewed your entire file, your testimony and arguments by your counsel, concluded that your control classification remains at Maximum. You are still considered a security risk in view of your escapes and subsequent convictions for serious felonies. The Committee noted the progress you made in vocational training and your expressed desire to continue in this endeavor. However your relationship with staff, who reported that you threaten and intimidate them, raises grave concerns regarding your potential for further disruptive and violent behavior. Since there is no other Maximum security prison in Hawaii which can offer you the correctional programs you require and you cannot remain at [the maximum control unit] because of impending construction of a new facility, the Program Committee recommends your transfer to an institution on the mainland." App. 7-8.

Petitioner Olim, as administrator, accepted the Committee's recommendation, and a few days later respondent was transferred to Folsom State Prison in California.

**B**

Rule IV of the Supplementary Rules and Regulations of the Corrections Division, Department of Social Services and Housing, State of Hawaii, approved in June 1976, recites that the inmate classification process is not concerned with punishment. Rather, it is intended to promote the best interests **\*242** of the inmate, the State, and the prison community.[1] Paragraph 3 of Rule **\*\*1744** IV requires a hearing prior to a prison transfer involving "a grievous loss to the inmate," which the Rule defines "generally" as "a serious loss to a reasonable man." App. 21.[2] The administrator, under ¶ 2 of the Rule, is required to establish "an impartial Program Committee" to conduct such a hearing, the Committee to be "composed of at least three members who were not actively involved in the process by which the inmate ... was brought before the Committee." App. 20. Under ¶ 3, the Committee must give the inmate written notice of the hearing, permit him, with certain stated exceptions, to confront and cross-examine witnesses, afford him an opportunity to be heard, and apprise him of the Committee's findings. App. 21-24.[3]

The Committee is directed to make a recommendation to the administrator, who then decides what action to take:

> "[The administrator] may, as the final decisionmaker:
>
> "(a) Affirm or reverse, in whole or in part, the recommendation; or
>
> "(b) hold in abeyance any action he believes jeopardizes the safety, security, or welfare of the staff, inmate **\*243** ..., other inmates ..., institution, or community and refer the matter back to the Program Committee for further study and recommendation." Rule IV, ¶ 3d(3), App. 24.

The regulations contain no standards governing the administrator's exercise of his discretion. See *Lono v. Ariyoshi,* 63 Haw. 138, 144-145, 621 P.2d 976, 980-981 (1981).

**C**

Respondent filed suit under 42 U.S.C. § 1983 against petitioners as the state officials who caused his transfer. He alleged that he had been denied procedural due process because the Committee that recommended his

transfer consisted of the same persons who had initiated the hearing, this being in specific violation of Rule IV, ¶ 2, and because the Committee was biased against him. The United States District Court for the District of Hawaii dismissed the complaint, holding that the Hawaii regulations governing prison transfers do not create a substantive liberty interest protected by the Due Process Clause. 459 F.Supp. 473 (1978).[4]

The United States Court of Appeals for the Ninth Circuit, by a divided vote, reversed. 664 F.2d 708 (1981). It held that Hawaii had created a constitutionally protected liberty interest by promulgating Rule IV. In so doing, the court declined to follow cases from other Courts of Appeals holding that certain procedures mandated by prison transfer regulations do not create a liberty interest. See, *e.g., Cofone v. Manson,* 594 F.2d 934 (CA2 1979); *Lombardo v. Meachum,* 548 F.2d 13 (CA1 1977). The court reasoned that Rule IV gives Hawaii prisoners a justifiable expectation that they will not be transferred to the mainland absent a hearing, before an impartial committee, concerning the facts alleged in the **\*244** pre-hearing notice.[5] Because **\*\*1745** the Court of Appeals' decision created a conflict among the circuits, and because the case presents the further question whether the Due Process Clause in and of itself protects against interstate prison transfers, we granted certiorari. 456 U.S. 1005, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982).

## II

In *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), this Court held that an *intrastate* prison transfer does not directly implicate the Due Process Clause of the Fourteenth Amendment. In *Meachum,* inmates at a Massachusetts medium security prison had been transferred to a maximum security prison in that Commonwealth. In *Montanye,* a companion case, an inmate had been transferred from one maximum security New York prison to another as punishment for a breach of prison rules. This Court rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum,* 427 U.S., at 224, 96 S.Ct., at 2538 (emphasis in original). It went on to state:

"The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty **\*245** interest to empower the State to confine him in *any* of its prisons.

"Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.,* at 224-225, 96 S.Ct., at 2538 (emphasis in original).

The Court observed that, although prisoners retain a residuum of liberty, see *Wolff v. McDonnell,* 418 U.S. 539, 555-556, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974), a holding that "*any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U.S., at 225, 96 S.Ct., at 2538 (emphasis in original).

Applying the *Meachum* and *Montanye* principles in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), this Court held that the transfer of an inmate from a prison to a mental hospital did implicate a liberty interest. Placement in the mental hospital was "not within the range of conditions of confinement to which a prison sentence subjects an individual," because it brought about "consequences ... qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.,* at 493, 100 S.Ct., at 1264. Respondent argues that the same is true of confinement of a Hawaii prisoner on the mainland, and that *Vitek* therefore controls.

[1] We do not agree. Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State.[6] Often, confinement **\*246** in the inmate's home State will not be possible. **\*\*1746** A person convicted of a federal crime in a State without a federal correctional facility usually will serve his sentence in another State. Overcrowding and the need to separate particular prisoners may necessitate interstate transfers. For any number of reasons, a State may lack prison facilities capable of providing appropriate correctional programs for all offenders.

[2] Statutes and interstate agreements recognize that, from time to time, it is necessary to transfer inmates to prisons in other States. On the federal level, 18 U.S.C. § 5003(a) authorizes the Attorney General to contract with a State

for the transfer of a state prisoner to a federal prison, whether in that State or another. See *Howe v. Smith,* 452 U.S. 473, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981).[7] Title 18 U.S.C. § 4002 (1976 ed. and Supp. V) permits the Attorney General to contract with any State for the placement of a federal prisoner in state custody for up to three years. Neither statute requires that the prisoner remain in the State in which he was convicted and sentenced.

On the state level, many States have statutes providing for the transfer of a state prisoner to a federal prison, *e.g.,* Haw.Rev.Stat. § 353-18 (1976), or another State's prison, *e.g.,* Alaska Stat.Ann. § 33.30.100 (1982). Corrections compacts between States, implemented by statutes, authorize incarceration of a prisoner of one State in another State's prison. See, *e.g.,* Cal.Penal Code Ann. § 11189 (West 1982) (codifying Interstate Corrections Compact); § 11190 (codifying Western Interstate Corrections Compact); **\*247** Conn.Gen.Stat. § 18-102 (1981) (codifying New England Interstate Corrections Compact); § 18-106 (codifying Interstate Corrections Compact); Haw.Rev.Stat. § 355-1 (1976) (codifying Western Interstate Corrections Compact); Idaho Code § 20-701 (1979) (codifying Interstate Corrections Compact); Ky.Rev.Stat. § 196.610 (1982) (same). And prison regulations such as Hawaii's Rule IV anticipate that inmates sometimes will be transferred to prisons in other States.

[3] [4] [5] In short, it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State. Confinement in another State, unlike confinement in a mental institution, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum,* 427 U.S., at 225, 96 S.Ct., at 2538.[8] Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits. The difference between such a transfer and an intrastate or interstate transfer of **\*248** shorter **\*\*1747** distance is a matter of degree, not of kind,[9] and *Meachum* instructs that "the determining factor is the nature of the interest involved rather than its weight." 427 U.S., at 224, 96 S.Ct., at 2538. The reasoning of *Meachum* and *Montanye* compels the conclusion that an interstate prison transfer, including one from Hawaii to California, does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself.

## III

The Court of Appeals held that Hawaii's prison regulations create a constitutionally protected liberty interest. In *Meachum,* however, the State had "conferred no right on the **\*249** prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct," 427 U.S., at 226, 96 S.Ct., at 2539, and "ha[d] not represented that transfers [would] occur only on the occurrence of certain events," *id.,* at 228, 96 S.Ct., at 2540. Because the State had retained "discretion to transfer [the prisoner] for whatever reason or for no reason at all," *ibid.,* the Court found that the State had not created a constitutionally protected liberty interest. Similarly, because the state law at issue in *Montanye* "impose[d] no conditions on the discretionary power to transfer," 427 U.S., at 243, 96 S.Ct., at 2547, there was no basis for invoking the protections of the Due Process Clause.

These cases demonstrate that a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (BRENNAN, J., concurring). If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," *ibid.,* the State has not created a constitutionally protected liberty interest. See *id.,* at 466-467, 101 S.Ct., at 2465 (opinion of the Court); see also *Vitek v. Jones,* 445 U.S., at 488-491, 100 S.Ct., at 1261-62 (summarizing cases).

[6] [7] [8] [9] [10] Hawaii's prison regulations place no substantive limitations on official discretion and thus create no liberty interest entitled to protection under the Due Process Clause. As Rule IV itself makes clear, and as the Supreme Court of Hawaii has held in *Lono v. Ariyoshi,* 63 Haw. 138, 144-145, 621 P.2d 976, 980-981 (1981), the prison administrator's discretion to transfer an inmate is completely unfettered. No standards **\*\*1748** govern or restrict the administrator's determination. Because the administrator is the only decisionmaker under Rule IV, we need not decide whether the introductory paragraph **\*250** of Rule IV, see n. 1, *supra,* places any substantive limitations on the purely advisory Program Committee.[10]

The Court of Appeals thus erred in attributing significance to the fact that the prison regulations require a particular kind of hearing before the administrator can exercise his unfettered discretion.[11] As the United States

Court of Appeals for the Seventh Circuit recently stated in *Shango v. Jurich,* 681 F.2d 1091, 1100-1101 (1982), "[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality."[12] Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. See generally Simon, Liberty and Property in the Supreme Court: A Defense of *Roth* and *Perry,* 71 Calif.L.Rev. 146, 186 (1983). If officials may transfer a prisoner "for whatever reason or for no reason at all," *Meachum,* 427 U.S., at 228, 96 S.Ct., at 2540, there is no such interest for process to protect. The State may choose to require procedures for reasons other than protection against deprivation of substantive **\*251** rights, of course,[13] but in making that choice the State does not create an independent substantive right. See *Hewitt v. Helms,* --- U.S. ----, ----, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (slip op. 10).

### IV

In sum, we hold that the transfer of respondent from Hawaii to California did not implicate the Due Process Clause directly, and that Hawaii's prison regulations do not create a protected liberty interest.[14] Accordingly, the judgment of the Court of Appeals is

*Reversed.*

Justice MARSHALL, with whom Justice BRENNAN joins, and with whom Justice STEVENS joins as to Part I, dissenting.

In my view, the transfer of respondent Delbert Kaahanui Wakinekona from a prison in Hawaii to a prison in California implicated an interest in liberty protected by the Due Process Clause of the Fourteenth Amendment. I respectfully dissent.

### I

An inmate's liberty interest is not limited to whatever a State chooses to bestow upon him. An inmate retains a significant residuum of constitutionally protected liberty following his incarceration independent of any state law.

As we stated in **\*\*1749** *Wolff v. McDonnell,* 418 U.S. 539, 555-556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons **\*252** of this country.... [P]risoners may not be deprived of life, liberty, or property without due process of law."

In determining whether a change in the conditions of imprisonment implicates a prisoner's retained liberty interest, the relevant question is whether the change constitutes a sufficiently "grievous loss" to trigger the protection of due process. *Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980). See *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The answer depends in part on a comparison of "the treatment of the prisoner with the customary, habitual treatment of the population of the prison as a whole." *Hewitt v. Helms, supra,* 459 U.S., at ----, 103 S.Ct., at 879 (STEVENS, J., dissenting). This principle was established in our decision in *Vitek,* which held that the transfer of an inmate from a prison to a mental hospital implicated a liberty interest because it brought about "consequences ... qualitatively different from the punishment characteristically suffered by a person convicted of crime." 445 U.S., at 493, 100 S.Ct., at 1264. Because a significant qualitative change in the conditions of confinement is not "within the range of conditions of confinement to which a prison sentence subjects an individual," *ibid.,* such a change implicates a prisoner's protected liberty interest.

There can be little doubt that the transfer of Wakinekona from a Hawaii prison to a prison in California represents a substantial qualitative change in the conditions of his confinement. In addition to being incarcerated, which is the ordinary consequence of a criminal conviction and sentence, Wakinekona has in effect been banished from his home, a punishment historically considered to be "among the severest."[1] For an indeterminate period of time, possibly the **\*253** rest of his life, nearly 4,000 miles of ocean will separate him from his family and friends. As a practical matter, Wakinekona may be entirely cut off from his only contacts with the outside world, just as if he had been imprisoned in an institution which prohibited visits by outsiders. Surely the isolation imposed on him by the transfer is far more drastic than that which normally accompanies imprisonment.

I cannot agree with the Court that *Meachum v. Fano,* 427

U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), compel the conclusion that Wakinekona's transfer implicates no liberty interest. *Ante,* at 1748. Both cases involved transfers of prisoners between institutions located within the same State in which they were convicted, and the Court expressly phrased its holdings in terms of *intra*state transfers.[2] **\*\*1750** Both decisions rested on the premise that no liberty interest is implicated by an initial decision to place a prisoner in one institution in the State rather than another. See *Meachum, supra,* 427 U.S., at 224, 96 S.Ct., at 2538; *Montanye, supra,* 427 U.S., at 243, 96 S.Ct., at 2547. On the basis of that premise, the Court concluded that the subsequent transfer of a prisoner to a different facility within the State likewise implicates no liberty interest. In this case, however, we cannot assume that a State's initial placement of an individual in a prison far removed from his family and residence would raise no due process questions. None of our **\*254** prior decisions has indicated that such a decision would be immune from scrutiny under the Due Process Clause.

Actual experience simply does not bear out the Court's assumptions that interstate transfers are routine and that it is "not unusual" for a prisoner "to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced." *Ante,* at 1746. In Hawaii less than three percent of the state prisoners were transferred to prisons in other jurisdictions in 1979, and on a nationwide basis less than one percent of the prisoners held in state institutions were transferred to other jurisdictions.[3] Moreover, the vast majority of state prisoners are held in facilities located less than 250 miles from their homes.[4] Measured against these norms, Wakinekona's transfer to a California prison represents a punishment "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Vitek v. Jones,* 445 U.S., at 493, 100 S.Ct., at 1264.

I therefore cannot agree that a State may transfer its prisoners at will, to any place, for any reason, without ever implicating any interest in liberty protected by the Due Process Clause.

## II

Nor can I agree with the majority's conclusion that Hawaii's prison regulations do not create a liberty interest. This Court's prior decisions establish that a liberty interest **\*255** may be "created"[5] by state laws,

prison rules, regulations, or practices. State laws that impose substantive criteria which limit or guide the discretion of officials have been held to create a protected liberty interest. See, e.g., *Hewitt v. Helms, supra; Wolff v. McDonnell, supra; Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Wright v. Enomoto,* 462 F.Supp. 397 (ND Cal.1976), summarily aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). By contrast, a liberty interest is not created by a law which "imposes no conditions on [prison officials'] discretionary power," *Montanye, supra,* 427 U.S., at 243, 96 S.Ct., at 2547, authorizes prison officials to act "for whatever reason or for no reason at all," *Meachum, supra,* 427 U.S., at 228, 96 S.Ct., at 2540, or accords officials "unfettered discretion," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 466, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981).

**\*\*1751** The Court misapplies these principles in concluding that Hawaii's prison regulations leave prison officials with unfettered discretion to transfer inmates. *Ante,* at 1747-1748. Rule IV establishes a scheme under which inmates are classified upon initial placement in an institution, and must subsequently be reclassified before they can be transferred to another institution. Under the Rule the standard for classifying inmates is their "optimum placement within the Corrections Division" in light of the "best interests of the individual, the State, and the community."[6] In classifying inmates, the Program **\*256** Committee may not consider punitive aims. It may consider only factors relevant to determining where the individual will be "best situated," such as "his history, his changing needs, the resources and facilities available to the Corrections Divisions, the other inmates/wards, the exigencies of the community, and any other relevant factors." Section 3 of Rule IV establishes a detailed set of procedures applicable when, as in this case, the reclassification of a prisoner may lead to a transfer involving a "grievous loss," a phrase contained in the Rule itself.[7] The procedural rules are cast in mandatory language, and cover such matters as notice, access to information, hearing, confrontation and cross-examination, and the basis on which the Committee is to make its recommendation to the faculty administrator.

The limitations imposed by Rule IV are at least as substantial as those found sufficient to create a liberty interest in *Hewitt v. Helms, supra,* decided earlier this Term. In *Hewitt* an inmate contended that his confinement in administrative custody implicated an interest in liberty protected by the Due Process Clause. State law provided that a prison official could place inmates in administrative

custody "upon his assessment of the situation and the need for control," or "where it has been determined that there is a threat of a serious disturbance or a serious threat to the individual or others," and mandated certain procedures such as notice and a **\*257** hearing.[8] This Court construed the phrases " 'the need for control,' or 'the threat of a serious disturbance,' " as "substantive predicates" which restricted official discretion. *Id.,* at ----, 103 S.Ct., at 871. These restrictions, in combination with the mandatory procedural safeguards, "deman[ded] a conclusion that the State has created a protected liberty interest." 459 U.S., at ----, 103 S.Ct., at 871.

Rule IV is not distinguishable in any meaningful respect from the provisions at issue in *Helms.* The procedural requirements contained in Rule IV are, if anything, far more elaborate than those involved in *Helms,* and are likewise couched in "language of an unmistakably mandatory character." *Id.,* at ----, 103 S.Ct., at 871. Moreover, Rule IV, to no less an extent than the state law at issue in *Helms,* imposes substantive criteria restricting official discretion. In *Helms* this Court held that a statutory phrase such as "the need **\*\*1752** for control" constituted a limitation on the discretion of prison officials to place inmates in administrative custody. In my view Rule IV, which states that transfers are intended to ensure an inmate's "optimum placement" in accordance with considerations which include "his changing needs [and] the resources and facilities available to the Corrections Division," also restrict official discretion in ordering transfers.[9]

The Court suggests that, even if the Program Committee does not have unlimited discretion in making recommendations for classifications and transfers, this cannot give rise to a state-created liberty interest because the prison administrator retains "completely unfettered ... discretion to transfer **\*258** an inmate," *ante,* at 1747. I disagree. Rule IV(3)(d)(3) provides for review by the prison administrator of recommendations forwarded to him by the Program Committee.[10] Even if this provision must be construed as authorizing the administrator to transfer a prisoner for wholly arbitrary reasons,[11] that mere possibility does not defeat the protectible expectation otherwise created by Hawaii's reclassification and transfer scheme that transfers will take place only if required to ensure an inmate's optimum placement. In *Helms* a prison regulation also left open the possibility that the Superintendent could decide, for any reason or no reason at all, whether an inmate should be confined in administrative custody.[12] This Court nevertheless held that the state scheme as a whole created an interest in liberty protected by the Due Process Clause. 459 U.S., at ----, 103 S.Ct., at 871. *Helms* thus necessarily rejects the view that state laws which impose substantive **\*259** limitations and elaborate procedural requirements on official conduct create no liberty interest solely because there remains the possibility that an official will act in an arbitrary manner at the end of the process.[13]

For the foregoing reasons, I dissent.

### All Citations

461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Paragraph 1 of Rule IV states:
    "An inmate's ... classification determines where he is best situated within the Corrections Division. Rather than being concerned with isolated aspects of the individual or punishment (as is the adjustment process), classification is a dynamic process which considers the individual, his history, his changing needs, the resources and facilities available to the Corrections Division, the other inmates ..., the exigencies of the community, and any other relevant factors. It never inflicts punishment; on the contrary, even the imposition of a stricter classification is intended to be in the best interests of the individual, the State, and the community. In short, classification is a continuing evaluation of each individual to ensure that he is given the optimum placement within the Corrections Division." App. 20.

2    Petitioners concede, "for purposes of the argument," that respondent suffered a "grievous loss" within the meaning of Rule IV when he was transferred from Hawaii to the mainland. Tr. of Oral Arg. 9, 25.

3    Rule V provides that an inmate may retain legal counsel if his hearing concerns a "potential Interstate transfer." App. 25.

4     Respondent also had alleged that the transfer violated the Hawaii Constitution and state regulations and statutes. In light of its dismissal of respondent's federal claims, the District Court declined to exercise pendent jurisdiction over these state-law claims. 459 F.Supp., at 476.

5     Several months before the Court of Appeals handed down its decision, the Supreme Court of Hawaii had held that because Hawaii's prison regulations do not limit the administrator's discretion to transfer prisoners to the mainland, they do not create any liberty interest. *Lono v. Ariyoshi,* 63 Haw. 138, 621 P.2d 976 (1981). In a petition for rehearing in the present case, petitioners directed the Ninth Circuit's attention to the *Lono* decision. See 664 F.2d, at 714. The Court of Appeals, however, concluded that the Hawaii court's interpretation of the regulations was not different from its own; the Hawaii court merely had reached a different result on the "federal question." The Court of Appeals thus adhered to its resolution of the case. *Id.,* at 714-715.

6     Indeed, in *Vitek* itself the Court did not read *Meachum* and *Montanye* as stating a rule applicable only to intrastate transfers. The Court stated: "In *Meachum v. Fano* ... and *Montanye v. Haymes* ... we held that the transfer of a prisoner *from one prison to another* does not infringe a protected liberty interest." 445 U.S., at 489, 100 S.Ct., at 1261 (emphasis added). The Court's other cases describing *Meachum* and *Montanye* also have eschewed the narrow reading respondent now proposes. See *Hewitt v. Helms,* --- U.S. ----, ----, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Moody v. Daggett,* 429 U.S. 78, 88, n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976).

7     This statute has been invoked to transfer prisoners from Hawaii state facilities to federal prisons on the mainland. See *Anthony v. Wilkinson,* 637 F.2d 1130 (CA7 1980), vacated and remanded *sub nom. Hawaii v. Mederios,* 453 U.S. 902, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1981).

8     After the decisions in *Meachum* and *Montanye,* courts almost uniformly have held that an inmate has no entitlement to remain in a prison in his home State. See *Beshaw v. Fenton,* 635 F.2d 239, 246-247 (CA3 1980), cert. denied, 453 U.S. 912, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981); *Cofone v. Manson,* 594 F.2d 934, 937, n. 4 (CA2 1979); *Sisbarro v. Warden,* 592 F.2d 1, 3 (CA1), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979); *Fletcher v. Warden,* 467 F.Supp. 777, 779-780 (Kan.1979); *Curry-Bey v. Jackson,* 422 F.Supp. 926, 931-933 (DC 1976); *McDonnell v. United States Attorney General,* 420 F.Supp. 217, 220 (ED Ill.1976); *Goodnow v. Perrin,* 120 N.H. 669, 671, 421 A.2d 1008, 1010 (1980); *Girouard v. Hogan,* 135 Vt. 448, 449-450, 378 A.2d 105, 106-107 (1977); *In re Young,* 95 Wash.2d 216, 227-228, 622 P.2d 373, 379 (1980); cf. *Fajeriak v. McGinnis,* 493 F.2d 468 (CA9 1974) (pre-*Meachum* transfers from Alaska to other States); *Hillen v. Director of Department of Social Services,* 455 F.2d 510 (CA9), cert. denied, 409 U.S. 989, 93 S.Ct. 331, 34 L.Ed.2d 256 (1972) (pre-*Meachum* transfer from Hawaii to California). But see *In re Young,* 95 Wash., at 233, 622 P.2d, at 382 (concurring opinion); *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621 (ND 1977); cf. *Tai v. Thompson,* 387 F.Supp. 912 (Haw.1975) (pre-*Meachum* transfer).

9     Respondent's argument to the contrary is unpersuasive. The Court in *Montanye* took note that among the hardships that may result from a prison transfer are separation of the inmate from home and family, separation from inmate friends, placement in a new and possibly hostile environment, difficulty in making contact with counsel, and interruption of educational and rehabilitative programs. 427 U.S., at 241, n. 4, 96 S.Ct., at 2546, n. 4. These are the same hardships respondent faces as a result of his transfer from Hawaii to California.

    Respondent attempts to analogize his transfer to banishment in the English sense of "beyond the seas," arguing that banishment surely is not within the range of confinement justified by his sentence. But respondent in no sense has been banished; his conviction, not the transfer, deprived him of his right freely to inhabit the State. The fact that his confinement takes place outside Hawaii is merely a fortuitous consequence of the fact that he must be confined, not an additional element of his punishment. See *Girouard v. Hogan,* 135 Vt., at 449-450, 378 A.2d, at 105. Moreover, respondent has not been exiled; he remains within the United States.

    In essence, respondent's banishment argument simply restates his claim that a transfer from Hawaii to the mainland is different in kind from other transfers. As has been shown in the text, however, respondent's transfer was authorized by his conviction. A conviction, whether in Hawaii, Alaska, or one of the contiguous 48 States, empowers the State to confine the inmate in any penal institution in any State unless there is state law to the contrary or the reason for confining the inmate in a particular institution is itself constitutionally impermissible. See *Montanye,* 427 U.S., at 242, 96 S.Ct., at 2547; *id.,* at 244, 96 S.Ct., at 2548 (dissenting opinion); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Fajeriak v. McGinnis,* 493 F.2d, at 470.

10     In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), unlike this case, state law limited the decisionmakers' discretion. To the extent the dissent doubts that the administrator's discretion under Rule IV is truly unfettered, *post,* at 1752, and n. 11, it doubts the ability or authority of the Hawaii Supreme Court to construe state law.

11     In *Meachum* itself, the Court of Appeals had interpreted the applicable regulations as entitling inmates to a pre-transfer hearing, see *Fano v. Meachum,* 520 F.2d 374, 379-380 (CA1 1975), but this Court held that state law created no liberty

interest.

12      Other courts agree that an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause. See, *e.g., United States v. Jiles,* 658 F.2d 194, 200 (CA3 1981), cert. denied, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 465 (1982); *Bills v. Henderson,* 631 F.2d 1287, 1298-1299 (CA6 1980); *Pugliese v. Nelson,* 617 F.2d 916, 924-925 (CA2 1980); *Cofone v. Manson,* 594 F.2d 934, 938 (CA2 1979); *Lombardo v. Meachum,* 548 F.2d 13, 14-16 (CA1 1977); *Adams v. Wainwright,* 512 F.Supp. 948, 953 (ND Fla.1981); *Lono v. Ariyoshi,* 63 Haw., at 144-145, 621 P.2d, at 980-981.

13      Petitioners assert that the hearings required by Rule IV not only enable the officials to gather information and thereby to exercise their discretion intelligently, but also have a therapeutic purpose: inmate participation in the decisionmaking process, it is hoped, reduces tension in the prison. See Tr. of Oral Arg. 52-53.

14      In light of this conclusion, respondent's claim of bias in the composition of the prison Program Committee becomes irrelevant.

1       J. Madison, 4 Elliott's Debates, 455. Whether it is called banishment, exile, deportation, relegation or transportation, compelling a person "to quit a city, place, or country, for a specified period of time, or for life," has long been considered a unique and severe deprivation, and was specifically outlawed by "[t]he twelfth section of the English Habeas Corpus Act, 31 Car. II, one of the three great muniments of English liberty." *United States v. Ju Toy,* 198 U.S. 253, 270, 25 S.Ct. 644, 649, 49 L.Ed.2d 1040 (1905) (Brewer, J., dissenting).

2       Thus in *Meachum* the Court stated that the State, by convicting the defendant, was "empowere[d] to confine him to any of its prisons," 427 U.S., at 224, 96 S.Ct., at 2538 (latter emphasis added), that a "transfer from one institution to another within the state prison system" implicated no due process interest, *id.,* at 225, 96 S.Ct., at 2538, and that "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Ibid.* See also *Montanye, supra,* 427 U.S., at 242, 96 S.Ct., at 2547 ("We held in *Meachum v. Fano,* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State.")

3       U.S. Department of Justice, T. Flanagan, et al., Sourcebook of Criminal Justice Statistics-1981, Table 6.27, pp. 478-479. These figures reflect "all inmates who were transferred from one State's jurisdiction to another to continue sentences already in force," and "[d]oes not include the release if [the] State does not relinquish jurisdiction." *Id.,* at 580.

4       U.S. Department of Justice, Profile of State Prison Inmates: Sociodemographic Findings from the 1974 Survey of Inmates of State Correctional Facilities, p. 1 (1979). Over 70% of state inmates are held in institutions located less than 250 miles from their homes.

5       But see *Hewitt v. Helms,* --- U.S. ----, at ----, 103 S.Ct. 864, at 880, 74 L.Ed.2d 675 (1983) (STEVENS, J., dissenting) (Prison regulations "provide evidentiary support for the conclusion that the transfer affects a constitutionally-protected interest in liberty," but they "do not *create* that interest." (Emphasis in original)).

6       Section 1 of Regulation IV provides:
        "An inmate's/ward's classification determines where he is best situated within the Corrections Division. Rather than being concerned with the isolated aspects of the individual or punishment (as is the adjustment process), classification is a dynamic process which considers the individual, his history, his changing needs, the resources and facilities available to the Corrections Division, the other inmates/wards, the exigencies of the community, and any other relevant factors. It never inflicts punishment; on the contrary, even the imposition of a stricter classification is intended to be in the best interests of the individual, the State, and the community. In short, classification is a continuing evaluation of each individual to ensure that he is given the optimum placement within the Corrections Division." App. 20.

7       While the term "grievous loss" is not explicitly defined, the prison regulations treat a transfer to the mainland as a grievous loss entitling an inmate to the procedural rights established in IV(3). This is readily inferred from Rule IV(3), which states that intrastate transfers do not involve a grievous loss, and Rule V, which permits inmates to retain counsel only in specified circumstances, one of which is a reclassification that may result in an interstate transfer. App. 25.

8       See 459 U.S., at ---- n. 6, 103 S.Ct., at 871 n. 6.

9    See also *Wright v. Enomoto,* 462 F.Supp. 397 (ND Cal.1976), summarily aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). In that case, the District Court held that the language of a prison *policy statement,* stating that "inmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons," *id.,* at 403, was sufficient to create a protected expectation that an inmate would not be segregated for arbitrary reasons. See also *Bills v. Henderson,* 631 F.2d 1287, 1293 (CA6 1980), cert. denied, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981); *Winsett v. McGinnes,* 617 F.2d 996, 1007 (CA3 1980) (en banc).

10    Rule IV(3)(d)(3) provides:
    "(3) The facility administrator will, within a reasonable period of time, review the Program Committee's recommendation. He may, as the final decisionmaker:
    (a) Affirm or reverse, in whole or in part, the recommendation; or
    (b) hold in abeyance any action he believes jeopardizes the safety, security, or welfare of the staff, inmate/ward, other inmates/wards, institution, or community and refer the matter back to the Program Committee for futher study and recommendation."

11    I doubt that Rule IV would be construed to permit the administrator to order a transfer for punitive reasons, since Rule IV expressly disallows punitive transfers.

12    That provision provided: "All decisions of the Program Review Committee shall be reviewed by the Superintendent for his sustaining the decision or amending or reversing the decision in favor of the inmate." Pennsylvania Bureau of Correction Administrative Directive BC-ADM 801, Rule VI(C). Brief for Respondent, 12a, in *Hewitt v. Helms,* O.T. 1982, No. 81-638. Because an inmate could be confined in administrative custody only if the Program Review Committee determined that such confinement is and continues to be "appropriate," Brief for Respondent, *supra,* at 18a, the Superintendent in *Helms* was the "decisionmaker," *ante,* at 11, who determined whether inmates would be held in administrative custody.

13    This view was also implicitly rejected in *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The Court held that the Nebraska statute governing the decision whether or not to grant parole created a "protectible entitlement," *id.,* at 12, 99 S.Ct., at 2106, even though the statute, which listed a number of factors to be considered in the parole decision, also authorized the Parole Board to deny parole on the basis of "[a]ny other factors the board determines to be relevant." *Id.,* at 18, 99 S.Ct., at 2109.
    To the extent that *Lono v. Ariyoshi,* 63 Haw. 138, 144-145, 621 P.2d 976, 980-981 (1981), on which the majority relies, *ante,* at 1747, suggests that no liberty interest is created as State law has not entirely eliminated the possibility of arbitrary action, it is inconsistent with both *Helms* and *Greenholtz.*

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Not Followed on State Law Grounds** In re J.B., Pa., December 29, 2014

96 S.Ct. 1155
Supreme Court of the United States

Edgar PAUL, etc., et al., Petitioners,
v.
Edward Charles DAVIS, III.

No. 74-891. | Argued Nov. 4, 1975. | Decided March 23, 1976. | Rehearing Denied May 19, 1976.

See 425 U.S. 985, 96 S.Ct. 2194.

Plaintiff whose name and photograph appeared on a flyer which was captioned "Active Shoplifters" and which was distributed among merchants by police chiefs brought class action. The United States District Court for the Western District of Kentucky dismissed the complaint and plaintiff appealed. The Court of Appeals, 505 F.2d 1180, reversed and remanded, and certiorari was granted. The Supreme Court, Mr. Justice Rehnquist, held that reputation alone does not implicate any "liberty" or "property" interests sufficient to invoke the procedural protection of the due process clause, and something more than simple defamation by the state official must be involved to establish a claim under section 1983; that police chiefs' action in distributing flyer did not deprive plaintiff of any "liberty" or "property" rights secured against state deprivations by the due process clauses; and that the flyer did not deprive plaintiff of right to privacy.

Judgment of Court of Appeals reversed.

Mr. Justice Brennan filed a dissenting opinion in which Mr. Justice Marshall joined and in which Mr. Justice White joined in part.

West Headnotes (8)

**[1]** **Constitutional Law**
Protections Provided and Deprivations Prohibited in General

Not every legally cognizable injury which may have been inflicted by a state official acting under "color of law" establishes a violation of the Fourteenth Amendment. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

193 Cases that cite this headnote

**[2]** **Constitutional Law**
Immunity in general

The Fourteenth Amendment's due process clause does not ex proprio vigore extend to a person a right to be free of injury wherever the state may be characterized as the tort-feasor. U.S.C.A.Const. Amend. 14.

335 Cases that cite this headnote

**[3]** **Constitutional Law**
Rights, Interests, Benefits, or Privileges Involved in General

The procedural guarantees of the Fourteenth Amendment apply whenever the state seeks to remove or significantly alter interests comprehended within meaning of either "liberty" or "property." U.S.C.A.Const. Amend. 14.

353 Cases that cite this headnote

**[4]** **Constitutional Law**
Reputation; defamation

Any harm or injury to interest in reputation, even where inflicted by an officer of the state, does not result in a deprivation of any "liberty" or "property" and does not invoke the procedural protection of the due process clause. U.S.C.A.Const. Amend. 14.

2194 Cases that cite this headnote

**Tab E-6**

[5] **Civil Rights**
📌Defamation

To establish a claim under § 1983 and the Fourteenth Amendment more must be involved than simple defamation by a state official. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

402 Cases that cite this headnote

[6] **Constitutional Law**
📌Investigative activity in general

Plaintiff whose name and photograph appeared on flyer which was captioned "Active Shoplifters" and which was distributed by police chiefs to merchants did not have any legal guarantee of present enjoyment of reputation which was altered as the result of police chiefs' actions and thus suffered no deprivation of any "liberty" or "property" interests within due process guarantee. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

1546 Cases that cite this headnote

[7] **Constitutional Law**
📌Right to Privacy

While no "right of privacy" is found in any specific guarantee of the Constitution, "zones of privacy" may be created by more specific constitutional guarantees and thereby impose limits upon government power. U.S.C.A.Const. Amends. 1, 4, 5, 9, 14.

118 Cases that cite this headnote

[8] **Constitutional Law**
📌Particular Issues and Applications

Actions of police chiefs in distributing to merchants a flyer which was captioned "Active Shoplifters" and which contained plaintiff's name and photograph did not violate any constitutionally protected right to privacy inasmuch as claim was based not upon any challenge to the state's ability to restrict his freedom of action in a sphere intended to be "private," but instead on a claim that state may not publicize a record of an official act such as an arrest. U.S.C.A.Const. Amends. 1, 4, 5, 9, 14.

526 Cases that cite this headnote

**\*\*1157 \*693** *Syllabus**

A photograph of respondent bearing his name was included in a "flyer" of "active shoplifters," after he had been arrested on a shoplifting charge in Louisville, Ky. After that charge had been dismissed respondent brought this action under 42 U.S.C. s 1983 against petitioner police chiefs, who had distributed the flyer to area merchants, alleging that petitioners' action under color of law deprived him of his constitutional rights. The District Court granted petitioners' motion to dismiss. The Court of Appeals reversed, relying on Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515. Held:

1. Petitioners' action in distributing the flyer did not deprive respondent of any "liberty" or "property" rights secured against state deprivation by the Due Process Clause of the Fourteenth Amendment. Pp. 1159-1165.

(a) The Due Process Clause does not Ex proprio vigore extend to a person a right to be free of injury wherever the State may be characterized as the tortfeasor. Pp. 1159-1161.

(b) Reputation alone, apart from some more tangible interests such as employment, does not implicate any "liberty" or "property" interests sufficient to invoke the procedural protection of the Due Process Clause; hence to establish a claim under s 1983 and the Fourteenth Amendment more must be involved than simply defamation by a state official. Wisconsin v. Constantineau, supra, distinguished. Pp. 1160-1166.

(c) Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation that has been altered by petitioners' actions, and the interest in reputation alone is thus quite different from the "liberty"

or "property" recognized in such decisions as Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90, and Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, where the guarantee of due process required certain procedural safeguards before the State could alter the status of the complainants. Pp. 1165-1166.

2. Respondent's contention that petitioners' defamatory flyer deprived him of his constitutional right to privacy is without *694 merit, being based not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private" but on a claim that the State may not publicize a record of an official act like an arrest. P. 1166.

6 Cir., 505 F.2d 1180, reversed.

**Attorneys and Law Firms**

Carson P. Porter, Louisville, Ky., for petitioners.

Daniel T. Taylor, III, Louisville, Ky., for respondent.

**Opinion**

Mr. Justice REHNQUIST delivered the opinion of the Court.

We granted certiorari, 421 U.S. 909, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1975), in this case to consider whether respondent's charge that petitioners' defamation of him, standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. s 1983 and the Fourteenth Amendment. For the reasons hereinafter stated, we conclude that it does not.

Petitioner Paul is the Chief of Police of the Louisville, Ky., Division of Police, while petitioner McDaniel occupies the same position in the Jefferson County, Ky., Division of Police. In late 1972 they agreed to combine their efforts for the purpose of alerting local area merchants to possible shoplifters who might be operating during *695 the Christmas season. In early December petitioners distributed to approximately 800 merchants in the Louisville metropolitan area a "flyer," which began as follows:
"TO: BUSINESS MEN IN THE METROPOLITAN AREA

"The Chiefs of The Jefferson County and City of Louisville Police Departments, **1158 in an effort to keep their officers advised on shoplifting activity, have approved the attached alphabetically arranged flyer of

subjects known to be active in this criminal field.

"This flyer is being distributed to you, the business man, so that you may inform your security personnel to watch for these subjects. These persons have been arrested during 1971 and 1972 or have been active in various criminal fields in high density shopping areas.

"Only the photograph and name of the subject is shown on this flyer, if additional information is desired, please forward a request in writing . . . ."

The flyer consisted of five pages of "mug shot" photos, arranged alphabetically. Each page was headed:

**"NOVEMBER 1972**

CITY OF LOUISVILLE

JEFFERSON COUNTY

POLICE DEPARTMENTS

ACTIVE SHOPLIFTERS"

In approximately the center of page 2 there appeared photos and the name of the respondent, Edward Charles Davis III.

Respondent appeared on the flyer because on June 14, 1971, he had been arrested in Louisville on a charge of shoplifting. He had been arraigned on this charge in September 1971, and, upon his plea of not guilty, the *696 charge had been "filed away with leave (to reinstate)," a disposition which left the charge outstanding. Thus, at the time petitioners caused the flyer to be prepared and circulated respondent had been charged with shoplifting but his guilt or innocence of that offense had never been resolved. Shortly after circulation of the flyer the charge against respondent was finally dismissed by a judge of the Louisville Police Court.

At the time the flyer was circulated respondent was employed as a photographer by the Louisville Courier-Journal and Times. The flyer, and respondent's inclusion therein, soon came to the attention of respondent's supervisor, the executive director of photography for the two newspapers. This individual called respondent in to hear his version of the events leading to his appearing in the flyer. Following this discussion, the supervisor informed respondent that although he would not be fired, he "had best not find

himself in a similar situation" in the future.

Respondent thereupon brought this s 1983 action in the District Court for the Western District of Kentucky, seeking redress for the alleged violation of rights guaranteed to him by the Constitution of the United States. Claiming jurisdiction under 28 U.S.C. s 1343(3), respondent sought damages as well as declaratory and injunctive relief. Petitioners moved to dismiss this complaint. The District Court granted this motion, ruling that "(t)he facts alleged in this case do not establish that plaintiff has been deprived of any right secured to him by the Constitution of the United States."

Respondent appealed to the Court of Appeals for the Sixth Circuit which recognized that, under our decisions, for respondent to establish a claim cognizable under s 1983 he had to show that petitioners had deprived **\*697** him of a right secured by the Constitution[1] of the United States, and that any such deprivation was achieved under color of law.[2] *Adickes v. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 2, 150 (1970). The Court of Appeals concluded that respondent had set forth a s 1983 claim "in that he has alleged facts that constitute a denial of due process of law." 505 F.2d 1180, 1182 (1974). In its view our decision in **\*\*1159** Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), mandated reversal of the District Court.

## I

Respondent's due process claim is grounded upon his assertion that the flyer, and in particular the phrase "Active Shoplifters" appearing at the head of the page upon which his name and photograph appear, impermissibly deprived him of some "liberty" protected by the Fourteenth Amendment. His complaint asserted that the "active shoplifter" designation would inhibit him from entering business establishments for fear of being suspected of shoplifting and possibly apprehended, and would seriously impair his future employment opportunities. Accepting that such consequences may flow from the flyer in question, respondent's complaint would appear to state a classical claim for defamation actionable in the courts of virtually every State. Imputing criminal behavior to an individual is generally considered defamatory Per se, and actionable without proof of special damages.

Respondent brought his action, however, not in the state courts of Kentucky, but in a United States District **\*698** Court for that State. He asserted not a claim for

defamation under the laws of Kentucky, but a claim that he had been deprived of rights secured to him by the Fourteenth Amendment of the United States Constitution. Concededly if the same allegations had been made about respondent by a private individual, he would have nothing more than a claim for defamation under state law. But, he contends, since petitioners are respectively an official of city and of county government, his action is thereby transmuted into one for deprivation by the State of rights secured under the Fourteenth Amendment.

In Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), in the course of considering an important and not wholly dissimilar question of the relationship between the National and the State Governments, the Court said that "(i)t is worth contemplating what the result would be if the strained interpretation of s 1443(1) urged by the individual petitioners were to prevail." Id., at 832, 86 S.Ct., at 1814, 16 L.Ed.2d, at 959. We, too, pause to consider the result should respondent's interpretation of s 1983 and of the Fourteenth Amendment be accepted.

If respondent's view is to prevail, a person arrested by law enforcement officers who announce that they believe such person to be responsible for a particular crime in order to calm the fears of an aroused populace, presumably obtains a claim against such officers under s 1983. And since it is surely far more clear from the language of the Fourteenth Amendment that "life" is protected against state deprivation than it is that reputation is protected against state injury, it would be difficult to see why the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle, would not have claims equally cognizable under 1983.

[1] It is hard to perceive any logical stopping place to such **\*699** a line of reasoning. Respondent's construction would seem almost necessarily to result in every legally cognizable injury which may have been inflicted by a state official acting under "color of law" establishing a violation of the Fourteenth Amendment. We think it would come as a great surprise to those who drafted and shepherded the adoption of that Amendment to learn that it worked such a result, and a study of our decisions convinces us they do not support the construction urged by respondent.

## II

The result reached by the Court of Appeals, which

respondent seeks to sustain here, must be bottomed on one of two premises. The first is that the Due Process Clause of the Fourteenth Amendment and s 1983 make actionable many wrongs inflicted by government employees which had heretofore been thought to give rise only to state-law tort claims. The second premise **1160** is that the infliction by state officials of a "stigma" to one's reputation is somehow different in kind from the infliction by the same official of harm or injury to other interests protected by state law, so that an injury to reputation is actionable under s 1983 and the Fourteenth Amendment even if other such harms are not. We examine each of these premises in turn.

### A

The first premise would be contrary to pronouncements in our cases on more than one occasion with respect to the scope of s 1983 and of the Fourteenth Amendment. In the leading case of Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Court considered the proper application of the criminal counterpart of s 1983, likewise intended by Congress to enforce the guarantees of the Fourteenth *700 Amendment. In his opinion for the Court plurality in that case, Mr. Justice Douglas observed:

"Violation of local law does not necessarily mean that federal rights have been invaded. The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States," 325 U.S., at 108-109, 65 S.Ct., at 1039, 89 L.Ed., at 1506.

After recognizing that Congress' power to make criminal the conduct of state officials under the aegis of the Fourteenth Amendment was not unlimited because that Amendment "did not alter the basic relations between the States and the national government," the plurality opinion observed that Congress should not be understood to have attempted

"to make all torts of state officials federal crimes. It brought within (the criminal provision) only specified acts 'under color' of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States." Id., at 109, 65 S.Ct., at 1039, 89 L.Ed., at 1507.

[2] This understanding of the limited effect of the Fourteenth Amendment was not lost in the Court's decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5

L.Ed.2d 492 (1961). There the Court was careful to point out that the complaint stated a cause of action under the Fourteenth Amendment because it alleged an unreasonable search and seizure violative of the guarantee "contained in the Fourth Amendment (and) made applicable to the States by Reason of the Due Process Clause of the Fourteenth Amendment." Id., at 171, 81 S.Ct., at 476, 5 L.Ed.2d, at 496. Respondent, however, has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded. *701 Rather, he apparently believes that the Fourteenth Amendment's Due Process Clause should *ex proprio vigore* extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, Griffin v. Breckenridge, 403 U.S. 88, 101-102, 91 S.Ct. 1790, 1797-98, 29 L.Ed.2d 338, 347-48 (1971); A fortiori, the procedural guarantees of the Due Process Clause cannot be the source for such law.

### B

The second premise upon which the result reached by the Court of Appeals could be rested that the infliction by state officials of a "stigma" to one's reputation is somehow different in kind from infliction by a state official of harm to other interests protected by state law is equally untenable. The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently **1161** drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. As we have said, the Court of Appeals, in reaching a contrary conclusion, relied primarily upon Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). We think the correct import of that *702 decision, however, must be derived from an examination of the precedents upon which it relied, as well as consideration of the other decisions by this Court,

before and after Constantineau, which bear upon the relationship between governmental defamation and the guarantees of the Constitution. While not uniform in their treatment of the subject, we think that the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth[3] or Fourteenth Amendment.

In United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Court held that an Act of Congress which specifically forbade payment of any salary or compensation to three named Government agency employees was an unconstitutional bill of attainder. The three employees had been proscribed because a House of Representatives subcommittee found them guilty of "subversive activity," and therefore unfit for Government service. The Court, while recognizing that the underlying charges upon which Congress' action was premised "stigmatized (the employees') reputation and seriously impaired their chance to earn a living," Id., at 314, 66 S.Ct., at 1078, 90 L.Ed., at 1259, also made it clear that "(w)hat is involved here is a Congressional proscription of (these employees), prohibiting their ever holding a government job." Ibid.

Subsequently, in *703 Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), the Court examined the validity of the Attorney General's designation of certain organizations as "Communist" on a list which he furnished to the Civil Service Commission. There was no majority opinion in the case; Mr. Justice Burton, who announced the judgment of the Court, wrote an opinion which did not reach the petitioners' constitutional claim. Mr. Justice Frankfurter, who agreed with Mr. Justice Burton that the petitioners had stated a claim upon which relief could be granted, noted that "publicly designating an organization as within the proscribed categories of the Loyalty Order does not directly deprive anyone of liberty or property." Id., at 164, 71 S.Ct., at 644, 95 L.Ed., at 849. Mr. Justice Douglas, who likewise concluded that petitioners had stated a claim, observed in his separate opinion:
"This is not an instance of name calling by public officials. This is a determination of status a proceeding to ascertain whether the organization is or is not 'subversive.' This determination has consequences that are serious to the condemned organizations. Those consequences flow in part, of course, from public opinion. But they also flow from actions of regulatory agencies that are moving in the wake of the Attorney General's determination to penalize or police these organizations." Id., at 175, 71 S.Ct., at 650, 95 L.Ed., at 855.

Mr. Justice Jackson, who likewise agreed that petitioners had stated a claim, commented:
**1162 "I agree that mere designation as subversive deprives the organizations themselves of no legal right or immunity. By it they are not dissolved, subjected to any legal prosecution, punished, penalized, or prohibited from carrying on any of their activities. Their claim of injury is that they cannot attract audiences, enlist members, or obtain contributions *704 as readily as before. These, however, are sanctions applied by public disapproval, not by law." Id., at 183-184, 71 S.Ct., at 655, 95 L.Ed., at 860.

He went on to say:
"(T)he real target of all this procedure is the government employee who is a member of, or sympathetic to, one or more accused organizations. He not only may be discharged, but disqualified from employment, upon no other ground than such membership or sympathetic affiliation. . . . To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity." Id., at 184-185, 71 S.Ct., at 655, 95 L.Ed., at 860.

Mr. Justice Reed, writing for himself, The Chief Justice, and Mr. Justice Minton, would have held that petitioners failed to state a claim for relief. In his dissenting opinion, after having stated petitioners' claim that their listing resulted in a deprivation of liberty or property contrary to the procedure required by the Fifth Amendment, he said:
"The contention can be answered summarily by saying that there is no deprivation of any property or liberty of any listed organization by the Attorney General's designation. It may be assumed that the listing is hurtful to their prestige, reputation and earning power. It may be such an injury as would entitle organizations to damages in a tort action against persons not protected by privilege. . . . This designation, however, does not prohibit any business of the organizations, subject them to any punishment or deprive them of liberty of speech or other freedom." Id., at 202, 71 S.Ct., at 664, 95 L.Ed., at 869.

Thus at least six of the eight Justices who participated *705 in that case viewed any "stigma" imposed by official action of the Attorney General of the United States, divorced from its effect on the legal status of an organization or a person, such as loss of tax exemption or loss of government employment, as an insufficient basis for invoking the Due Process Clause of the Fifth Amendment.

In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court again recognized the potential "badge of infamy" which might arise from being branded disloyal by the government. Id., at 191, 73 S.Ct., at 218, 97 L.Ed., at 222. But it did not hold this sufficient by itself to invoke the procedural due process guarantees of the Fourteenth Amendment; indeed, the Court expressly refused to pass upon the procedural due process claims of petitioners in that case. Id., at 192, 73 S.Ct. at 219, 97 L.Ed. at 222. The Court noted that petitioners would, as a result of their failure to execute the state loyalty oath, lose their teaching positions at a state university. It held such state action to be arbitrary because of its failure to distinguish between innocent and knowing membership in the associations named in the list prepared by the Attorney General of the United States. Id., at 191, 73 S.Ct., at 218, 97 L.Ed., at 222. See also Peters v. Hobby, 349 U.S. 331, 347, 75 S.Ct. 790, 99 L.Ed. 1129 (1955).

A decade after Joint Anti-Fascist Refugee Comm. v. McGrath, supra, the Court returned to consider further the requirements of procedural due process in this area in the case of Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Holding that the discharge of an employee of a Government contractor in the circumstances there presented comported with the due process required by the Fifth Amendment, the Court observed:

**\*\*1163** "Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity. See **\*706** *Wien v. Updegraff,* 344 U.S. 183, 190-191, 73 S.Ct. 215, 218-219, 97 L.Ed. 216; Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 140-141, 71 S.Ct. 624, 632, 95 L.Ed. 817 . . . ." Id., at 898, 81 S.Ct., at 1750, 6 L.Ed.2d, at 1238. (Emphasis supplied.)

Two things appear from the line of cases beginning with Lovett. The Court has recognized the serious damage that could be inflicted by branding a government employee as "disloyal," and thereby stigmatizing his good name. But the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment.[4]

**\*707** It is noteworthy that in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), this Court had before it two actions for defamation brought against federal officers. But in neither opinion is there any intimation that any of the parties to

those cases, or any of the Members of this Court, had the remotest idea that the Due Process Clause of the Fifth Amendment might itself form the basis for a claim for defamation against federal officials.

It was against this backdrop that the Court in 1971 decided Constantineau. There the Court held that a Wisconsin statute authorizing the practice of "posting" was unconstitutional because it failed to provide procedural safeguards of notice and an opportunity to be heard, prior to an individual's being "posted." Under the statute "posting" consisted of forbidding in writing the sale or delivery of alcoholic beverages to certain persons who were determined to have become hazards to themselves, to their family, or to the community by reason of their "excessive drinking." The statute also made it a misdemeanor to sell or give liquor to any person so posted. See 400 U.S., at 434 n. 2, 91 S.Ct., at 508, 27 L.Ed.2d, at 517.

There is undoubtedly language in Constantineau, which is sufficiently ambiguous to justify the reliance upon it by the Court of Appeals:
**\*\*1164** "Yet certainly where the State attaches 'a badge of infamy' to the citizen due process comes into play. **\*708** *Wieman v. Updegraff,* 344 U.S. 183, 191, 73 S.Ct. 215, 218-219, 97 L.Ed. 216. '(T)he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (Frankfurter, J., concurring).

"Where a person's good name, reputation, honor, or integrity is at stake Because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. 433, 437, 91 S.Ct. 507, at 510, 27 L.Ed.2d 515, at 519 (emphasis supplied).

The last paragraph of the quotation could be taken to mean that if a government official defames a person, without more, the procedural requirements of the Due Process Clause of the Fourteenth Amendment are brought into play. If read that way, it would represent a significant broadening of the holdings of Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), and Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), relied upon by the Constantineau Court in its analysis in the immediately preceding paragraph. We should not read this language as significantly broadening those holdings without in any way adverting to the fact if there is any other possible interpretation of Constantineau's language. We believe

there is.

We think that the italicized language in the last sentence quoted, "because of what the government is doing to him," referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law the right to purchase or obtain liquor in common with the rest of the citizenry. "Posting," therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting **\*709** from the defamation, justified the invocation of procedural safeguards. The "stigma" resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived Constantineau of any "liberty" protected by the procedural guarantees of the Fourteenth Amendment.

This conclusion is reinforced by our discussion of the subject a little over a year later in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). There we noted that "the range of interests protected by procedural due process is not infinite," Id., at 570, 92 S.Ct., at 2705, 33 L.Ed.2d at 556, and that with respect to property interests they are,
"of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id., at 577, 92 S.Ct., at 2709, 33 L.Ed.2d, at 561.

While Roth recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable under the Fourteenth Amendment:
"The State, In declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. . . .

"Similarly, there is no suggestion that the State, In declining to re-employ the respondent, imposed on **\*710** him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." **\*\*1165** Id., at 573, 92 S.Ct., at 2707, 33 L.Ed.2d, at 558 (emphasis supplied).

Thus it was not thought sufficient to establish a claim under s 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment. Certainly there is no suggestion in Roth to indicate that a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee.

This conclusion is quite consistent with our most recent holding in this area, Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), that suspension from school based upon charges of misconduct could trigger the procedural guarantees of the Fourteenth Amendment. While the Court noted that charges of misconduct could seriously damage the student's reputation, Id., at 574-575, 95 S.Ct., at 736-737, 42 L.Ed.2d, at 734-735, it also took care to point out that Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right.

### III

[3] It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law,[5] and we **\*711** have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. In Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), for example, the State by issuing drivers' licenses recognized in its citizens a right to operate a vehicle on the highways of the State. The Court held that the State could not withdraw this right without giving petitioner due process. In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the State afforded parolees the right to remain at liberty as long as the conditions of their parole were not violated. Before the State could alter the status of a parolee because of alleged violations of these conditions, we held that the Fourteenth Amendment's guarantee of due process of law required certain procedural safeguards.

[4] [5] [6] In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing

the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the "liberty" or "property" recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a **\*712** result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, **\*\*1166** providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

Respondent in this case cannot assert denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment. That being the case, petitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any "liberty" or "property" interests protected by the Due Process Clause.

### IV

Respondent's complaint also alleged a violation of a "right to privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments." The Court of Appeals did not pass upon this claim since it found the allegations of a due process violation sufficient to require reversal of the District Court's order. As we have agreed with the District Court on the due process issue, we find it necessary to pass upon respondent's other theory in order to determine whether there is any support for the litigation he seeks to pursue. [7] While there is no "right of privacy" found in any specific guarantee of the Constitution, the Court has recognized that "zones of privacy" may be created by **\*713** more specific constitutional guarantees and thereby impose limits upon government power. See *Roe v. Wade, 410 U.S. 113, 152-153, 93 S.Ct. 705, 726,* 35 L.Ed.2d 14 176-178 (1973). Respondent's case, however, comes

within none of these areas. He does not seek to suppress evidence seized in the course of an unreasonable search. See Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 581 (1967); Terry v. Ohio, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 1872-1873, 20 L.Ed.2d 889, 898 (1968). And our other "right of privacy" cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. In Roe the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty" as described in Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

[8] Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

None of respondent's theories of recovery were based upon rights secured to him by the Fourteenth Amendment. **\*714** Petitioners therefore were not liable to him under s 1983. The judgment of the Court of Appeals holding otherwise is

Reversed.

Mr. Justice STEVENS took no part in the consideration or decision of this case.

**\*\*1167** Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL concurs and Mr. Justice WHITE concurs in part, dissenting.

I dissent. The Court today holds that police officials, acting in their official capacities as law enforcers, may on

their own initiative and without trial constitutionally condemn innocent individuals as criminals and thereby brand them with one of the most stigmatizing and debilitating labels in our society. If there are no constitutional restraints on such oppressive behavior, the safeguards constitutionally accorded an accused in a criminal trial are rendered a sham, and no individual can feel secure that he will not be arbitrarily singled out for similar Ex parte punishment by those primarily charged with fair enforcement of the law. The Court accomplishes this result by excluding a person's interest in his good name and reputation from all constitutional protection, regardless of the character of or necessity for the government's actions. The result, which is demonstrably inconsistent with our prior case law and unduly restrictive in its construction of our precious Bill of Rights, is one in which I cannot concur.

To clarify what is at issue in this case, it is first necessary to dispel some misconceptions apparent in the Court's opinion. 42 U.S.C. s 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within **\*715** the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other prop proceeding for redress."

Thus, as the Court indicates, Ante, at 1158, respondent's complaint, to be cognizable under s 1983, must allege both a deprivation of a constitutional right[1] and the effectuation of that deprivation under color of law. See, E. g., Adickes v. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142, 150 (1970). But the implication, see Ante, at 1158-1160, that the existence Vel non of a state remedy for example, a cause of action for defamation is relevant to the determination whether there is a cause of action under s 1983, is wholly unfounded. "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492, 503 (1961). See also, E. g., McNeese v. Board of Education, 373 U.S. 668, 671-672, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622, 624-625 (1963).

Indeed, even if the Court were creating a novel doctrine that state law is in any way relevant, it would be incumbent upon the Court to inquire whether respondent has an adequate remedy under Kentucky law or whether petitioners would be immunized by state doctrines of official or sovereign immunity. The Court, however, undertakes no such inquiry.

Equally irrelevant is the Court's statement that "(c)oncededly if the same allegations had been made about respondent by a private individual, he would have nothing more than a claim for defamation under state law." Ante, at 1159. The action complained of here is "state **\*716** action" allegedly in violation of the Fourteenth Amendment, and that Amendment, which is Only designed to prohibit "state" action, clearly renders unconstitutional actions taken by state officials that would merely be criminal or tortious if engaged in by those acting in their private capacities. Of course, if a private citizen enters the home of another, manacles and threatens the owner, and searches the house in the course of a robbery, he would be criminally and civilly liable under state law, but no constitutional **\*\*1168** rights of the owner would be implicated. However, if state police officials engage in the same acts in the course of a narcotics investigation, the owner may maintain a damages action against the police under s 1983 for deprivation of constitutional rights "under color of" state law. Cf. Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 390-392, 91 S.Ct. 1999, 2001-2002, 29 L.Ed.2d 619, 623-624 (1971). See also, E. g., Monroe v. Pape, supra. In short, it is difficult to believe that the Court seriously suggests, see Ante, at 1158-1159, that there is some anomaly in the distinction, for constitutional purposes, between tortious conduct committed by a private citizen and the same conduct committed by state officials under color of state law.

It may be that I misunderstand the thrust of Part I of the Court's opinion. Perhaps the Court is not questioning the involvement of a constitutional "liberty" or "property" interest in this case, but rather whether the deprivation of those interests was accomplished "under color of" state law. The Court's expressed concern that but for today's decision, negligent tortious behavior by state officials might constitute a s 1983 violation, see Ante, at 1159, suggests this reading.[2] But that concern is **\*717** groundless. An official's actions are not "under color of" law merely because he is an official; an off-duty policeman's discipline of his own children, for example, would not constitute conduct "under color of" law. The essential element of this type of s 1983 action[3] is Abuse of his Official position. "Congress, in enacting (s 1983), meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an

official's Abuse of his position." Monroe v. Pape, supra, 365 U.S., at 172, 81 S.Ct., at 476, 5 L.Ed.2d, at 497 (emphasis supplied). Section 1983 focuses on "(m)isuse of power, possessed by virtue of state law and Made possible only because the wrongdoer is clothed with the authority of state law." United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, 1383 (1941) (emphasis supplied). Moreover, whether or not mere negligent official conduct in the course of duty can ever constitute such abuse of power, the police officials here concede that their conduct was intentional and was undertaken in their official capacities. Therefore, beyond peradventure, it is action taken under color of law, see Ante, at 1158, and n. 2, and it is disingenuous for the Court to argue, see Ante, at 1160-1161, that respondent is seeking to convert s 1983 into a generalized font of tort law. The only issue properly presented by this case is whether petitioners' intentional conduct infringed any of respondent's "liberty" or "property" interests without due process of law, and that is the question to be addressed. I am **\*718** persuaded that respondent has alleged a case of such infringement, and therefore of a violation of s 1983.

The stark fact is that the police here have officially imposed on respondent the stigmatizing label "criminal" without the salutary and constitutionally mandated safeguards of a criminal trial. The Court concedes that this action will have deleterious consequences for respondent. For 15 years, the police had prepared and circulated similar lists, not with respect to shoplifting alone, but also for other offenses. App., 19, 27-28. Included in the five-page list in **\*\*1169** which respondent's name and "mug shot" appeared were numerous individuals who, like respondent, were never convicted of any criminal activity and whose only "offense" was having once been arrested.[4] **\*719** Indeed, respondent was arrested over 17 months before the flyer was distributed,[5] not by state law enforcement authorities, but by a store's private security police, and nothing in the record appears to suggest the existence at that time of even constitutionally sufficient probable cause for that single arrest on a shoplifting charge.[6] Nevertheless, petitioners had 1,000 flyers printed (800 were distributed widely throughout the Louisville business community) proclaiming that the individuals identified **\*720** by name and picture were "subjects *known* to be *active* in this criminal field (shoplifting)," and trumpeting the "fact" that each page depicted *"Active Shoplifters"* (emphasis supplied).[7]

Although accepting the truth of the allegation, as we must on the motion to dismiss, see, E. g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 174-175, 86 S.Ct. 347, 348-349, 15 L.Ed.2d 247, 249-250 (1965); cf. **\*\*1170** Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957),

that dissemination of this flyer would "seriously impair (respondent's) future employment opportunities" and "inhibit him from entering business establishments for fear of being suspected of shoplifting and possibly apprehended," Ante, at 1159, the Court characterizes the allegation as "mere defamation" involving no infringement of constitutionally protected interests. E. g., ante, at 1163. This is because, the Court holds neither a "liberty" nor a "property" interest was invaded by the injury done respondent's reputation and therefore no violation of s 1983 or the Fourteenth Amendment was alleged. I wholly disagree.

It is important, to paraphrase the Court, that "(w)e, too, (should) pause to consider the result should (the Court's) interpretation of s 1983 and of the Fourteenth Amendment be accepted." Ante, at 1159. There is no attempt by the Court to analyze the question as one of reconciliation of constitutionally protected personal rights and the exigencies of law enforcement. No effort is made to distinguish the "defamation" that occurs when a grand jury indicts an accused from the "defamation" that occurs when executive officials arbitrarily and without **\*721** trial declare a person an "active criminal."[8] Rather, the Court by mere fiat and with no analysis wholly excludes personal interest in reputation from the ambit of "life, liberty, or property" under the Fifth and Fourteenth Amendments, thus rendering due process concerns *never* applicable to the official stigmatization, however arbitrary, of an individual. The logical and disturbing corollary of this holding is that no due process infirmities would inhere in a statute constituting a commission to conduct ex parte trials of individuals, so long as the only official judgment pronounced was limited to the public condemnation and branding of a person as a Communist, a traitor, an "active murderer," a homosexual, or any other mark that "merely" carries social opprobrium. The potential of today's decision is frightening for a free people.[9] That decision surely finds no support in our relevant constitutional jurisprudence.

**\*722** "In Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, E. g., Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S.Ct. 693, 694, 98 L.Ed. 884; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551." Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972). "Without doubt it denotes not merely freedom from bodily restraint but also the right of the individual . . . generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923).[10] Certainly the enjoyment of **\*723** one's **\*\*1171** good name and reputation has been recognized repeatedly in our

cases as being among the most cherished of rights enjoyed by a free people, and therefore as falling within the concept of personal "liberty."

"(A)s Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name " 'reflects no more than our basic concept of the essential dignity and worth of every human being a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.' Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion)." Gertz v. Robert Welch, Inc., 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974).[11]

**\*724** We have consistently held that

" '(W)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515; Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; United States v. Lovett, 328 U.S. 303, 316-317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252; Peters v. Hobby, 349 U.S. 331, 352, 75 S.Ct. 790, 801, 99 L.Ed. 1129 (Douglas, J., concurring). See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230." Board of Regents v. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558.

**\*\*1172** See also, E. g., Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377, 1390 (1959); Cafeteria Workers v. McElroy, 367 U.S. 886, 899-902, 81 S.Ct. 1743, 1750-1752, 6 L.Ed.2d 1230, 1238-1240 (1961) (Brennan, J., dissenting); Goss v. Lopez, 419 U.S. 565, 574-575, 95 S.Ct. 729, 736-737, 42 L.Ed.2d 725 (1975). In the criminal justice system, this interest is given concrete protection through the presumption of innocence and the prohibition of state-imposed punishment unless the State can demonstrate beyond a reasonable doubt, at a public trial with the attendant constitutional safeguards, that a particular individual has engaged in proscribed criminal conduct. "(B)ecause of the certainty that (one found guilty of criminal behavior) would be stigmatized by the conviction . . . a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." In re

Winship, 397 U.S. 358, 363-364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970). "It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing **\*725** a proper factfinder of his guilt with utmost certainty." Id., at 364, 90 S.Ct., at 1073, 25 L.Ed.2d, at 375.[12]

Today's decision marks a clear retreat from Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), a case closely akin to the factual pattern of the instant case, and yet essentially ignored by the Court. Jenkins, which was also an action brought under s 1983, both recognized that the public branding of an individual implicates interests cognizable as either "liberty" or "property," and held that such public condemnation cannot be accomplished without procedural safeguards designed to eliminate arbitrary or capricious executive action. Jenkins involved the constitutionality of the Louisiana Labor-Management Commission of Inquiry, an executive agency whose "very purpose . . . is to find persons guilty of violating criminal laws without trial or procedural safeguards, and to publicize those findings." 395 U.S., at 424, 89 S.Ct., at 1850, 23 L.Ed.2d, at 418.

"(T)he personal and economic consequences alleged to flow from such actions are sufficient to meet the requirement that appellant prove a legally redressable injury. Those consequences would certainly be actionable if caused by a private party and thus should be sufficient to accord appellant standing. See **\*726** Greene v. McElroy, 360 U.S. 474, 493, n. 22, 79 S.Ct. 1400, 1411, 3 L.E2d 1377 (1959); Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 140-141, 71 S.Ct. (624), at 632 (95 L.Ed. 817) (opinion of Burton, J.); Id., at 151-160, 71 S.Ct. (624), at 637-642 (95 L.Ed. 817) (Frankfurter, J., concurring). It is no answer that the Commission has not itself tried to impose any direct sanctions on appellant; it is enough that the Commission's alleged actions will have a substantial impact on him. . . . Appellant's allegations go beyond the normal publicity attending criminal prosecution; he alleges a concerted attempt publicly to brand him a criminal without a trial." Id., at 424-425, 89 S.Ct., at 1850, 23 L.Ed.2d, at 418.

**\*\*1173** Significantly, we noted that one defect in the Commission was that it "exercises a function very much akin to making an official adjudication of criminal culpability," and that it was "concerned only with exposing violations of criminal laws by specific individuals." Id., at 427, 89 S.Ct., at 1852, 23 L.Ed.2d, at 420. "(I)t is empowered to be used and allegedly is used to find named individuals guilty of violating the criminal

laws of Louisiana and the United States and to brand them as criminals in public." Id., at 428, 89 S.Ct., at 1852, 23 L.Ed.2d, at 420. See also Ibid., quoting Hannah v. Larche, 363 U.S. 420, 488, 80 S.Ct. 1502, 1543, 4 L.Ed.2d 1307, 1353 (1960) (Frankfurter, J., concurring in result). Although three Justices in dissent would have dismissed the complaint for lack of standing, since there were no allegations that the appellant would be investigated, called as a witness, or named in the Commission's findings, 395 U.S., at 436, 80 S.Ct., at 1512, 4 L.Ed.2d, at 1318 (Harlan, J., dissenting), they nevertheless observed, Id., at 438, 80 S.Ct., at 1857, 4 L.Ed.2d, at 1318:

> "(There is) a constitutionally significant distinction between two kinds of governmental bodies. The first is an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing. To the extent that such a determination whether called a 'finding' or an 'adjudication' **\*727** finally and directly affects the substantial personal interests, I do not doubt that the Due Process Clause may require that it be accompanied by many of the traditional adjudicatory procedural safeguards. Cf. *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951)."

See also Id., at 442, 89 S.Ct., at 1859, 23 L.Ed.2d, at 428. Thus, although the Court was divided on the particular procedural safeguards that would be necessary in particular circumstances, the common point of agreement, and the one that the Court today inexplicably rejects, was that the official characterization of an individual as a criminal affects a constitutional "liberty" interest.

The Court, however, relegates its discussion of Jenkins to a dissembling footnote. First, the Court ignores the fact that the Court in Jenkins clearly recognized a constitutional "liberty" or "property" interest in reputation sufficient to invoke the strictures of the Fourteenth Amendment.[13] It baffles me how, in the face of that holding, the Court can come to today's conclusion by reliance on the fact that the conduct in question does not "come within the language" of the Dissent in Jenkins, ante, at 1163 n. 4. Second, and more important, the Court's footnote manifests the same confusion that pervades the remainder of its opinion; it simply fails to

recognize the crucial difference between the question whether there is a personal interest in one's good name and reputation that is constitutionally cognizable as a "liberty" or "property" interest within the Fourteenth and Fifth Amendment Due Process Clauses, and the totally separate question whether particular government **\*728** action with respect to that interest satisfies the mandates of due process. See, *e. g., supra,* at 1170 and n. 8. Although the dissenters in *Jenkins* thought that the Commission's procedures complied with due process, they clearly believed that there was a personal interest that had to be weighed in reaching that conclusion.[14] The **\*\*1174** dissenters in *Jenkins,* like the Court in *Hannah v. Larche, supra,* held the view that in the context of a *purely investigatory, factfinding* agency, full trial safeguards are not required to comply with due process. But that question would never have been reached unless there were some constitutionally cognizable personal interest making the inquiry necessary the interest in reputation that is affected **\*729** by public "exposure." The Court, by contrast, now implicitly repudiates a substantial body of case law and finds no such constitutionally cognizable interest in a person's reputation, thus foreclosing *any* inquiry into the procedural protections accorded that interest in a given situation.

In short, it is difficult to fathom what renders respondent's interest in his reputation somehow different from the personal interest affected by " 'an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing.' " Ante, at 1163 n. 4, quoting 395 U.S., at 438, 89 S.Ct., at 1857, 23 L.Ed.2d, at 426. Surely the difference cannot be found in the fact that police officials rather than a statutory "agency" engaged in the stigmatizing conduct, for both situations involve the requisite action "under color of" law. Ante, at 1158 n. 2. Nor can the difference be found in the argument that petitioners' actions were "serving any other public interest," for that consideration Only affects the outcome of the due process balance in a particular case, not whether there is a personal "liberty" interest to be weighed against the government interests supposedly justifying the State's official actions. It is remarkable that the Court, which is so determined to parse the language of other cases, see generally Ante, Part II, can be thus oblivious to the fact that Every Member of the Court so recently felt that the intentional, public exposure of alleged wrongdoing like the branding of an individual as an "active shoplifter" implicates a constitutionally protected "liberty" or "property" interest and requires analysis as to whether procedures adequate to satisfy due process were accorded the accused by the State.

Moreover, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), which was relied on by

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

the Court of Appeals in this case, did not rely at all on the fact asserted by the **\*730** Court today as controlling namely, upon the fact that "posting" denied Ms. Constantineau the right to purchase alcohol for a year, *ante*, at 1164. Rath, Constantineau stated: "The Only issue present here is whether the label or characterization given a person by 'posting,' though a mark of serious illness to some, is to others such a stigma or badge of disgrace that procedural due process requires notice and an opportunity to be heard." 400 U.S., at 436, 91 S.Ct., at 509, 27 L.Ed.2d, at 518 (emphasis supplied). In addition to the statements quoted by the Court, Ante, at 1163-1164, the Court in Constantineau continued: " 'Posting' under the Wisconsin Act may to some be merely the **\*\*1175** mark of illness, to others it is a stigma, an official branding of a person. The label is a degrading one. Under the Wisconsin Act, a resident of Hartford is given no process at all. This appellee was not afforded a chance to defend herself. She may have been the victim of an official's caprice. Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." 400 U.S., at 437, 91 S.Ct., at 510, 27 L.Ed.2d, at 519. " '(T)he right to be heard before being condemned to suffer grievous loss of any kind, Even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' " Ibid., quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring) (emphasis supplied). There again, the fact that government stigmatization of an individual implicates constitutionally protected interests was made plain.[15]

**\*731 \*\*1176** Thus Jenkins and Constantineau, and the decisions upon which they relied, are cogent authority that a person's interest in his good name and reputation falls **\*732** within the broad term "liberty" and clearly require that the government afford procedural protections before infringing that name and reputation by branding a person as a criminal. The Court is reduced to discrediting the clear thrust of Constantineau and Jenkins by excluding the interest in reputation from all constitutional protection "if there is any other possible interpretation" by which to deny their force as precedent according constitutional protection for the interest in reputation.[16] Ante, at 1164. The Court's approach oblivious both to Mr. Chief Justice Marshall's admonition that "we must never forget, that it is A constitution we are expounding," McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579, 601 (1819), and to the teaching of cases such as Roth and Meyer, which were attentive to the necessary breadth of constitutional "liberty" and "property" interests, see nn. 10, 15, supra— is to water down our prior precedents by reinterpreting **\*733** them as confined to injury to

reputation that affects an individual's employment prospects or, as "a right or status previously recognized by state law (that the State) distinctly altered or extinguished." Ante, at 1165. See also, E. g., ante, at 1160, 1162-1163, 1164-1165. The obvious answer is that such references in those cases (when there even were such references) concerned the particular fact situations presented, and in nowise implied any limitation upon the application of the principles announced. E. g., ante, at 1164-1165, quoting Board of Regents v. Roth, 408 U.S., at 573, 92 S.Ct., at 2707, 33 L.Ed.2d, at 558. See n. 15, Supra. Discussions of impact upon future employment opportunities were nothing more than recognition of the logical and natural consequences flowing from the stigma condemned. E. g., ante, at 1162-1163, quoting Cafeteria Workers v. McElroy, 367 U.S., at 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230, 1238.[17]

**\*734** Moreover, the analysis has a hollow ring in light of the Court's acceptance of the truth of the allegation that the "active shoplifter" label would "seriously impair **\*\*1177** (respondent's) future employment opportunities." Ante, at 1159. This is clear recognition that an official "badge of infamy" affects tangible interests of the defamed individual and not merely an abstract interest in how people view him; for the "badge of infamy" has serious consequences in its impact on no less than the opportunities open to him to enjoy life, liberty, and the pursuit of happiness. It is inexplicable how the Court can say that a person's status is "altered" when the State suspends him from school, revokes his driver's license, fires him from a job, or denies him the right to purchase a drink of alcohol, but is in no way "altered" when it officially pins upon him the brand of a criminal, particularly since the Court recognizes how deleterious will be the consequences that inevitably flow from its official act. See, E. g., ante, at 1164, 1165-1166. Our precedents clearly mandate that a person's interest in his good name and reputation is cognizable as a "liberty" interest within the meaning of the Due Process Clause, and the Court has simply failed to distinguish those precedents in any rational manner in holding that no invasion of a "liberty" interest was effected in the official stigmatizing of respondent as a criminal without any "process" whatsoever.

I have always thought that one of this Court's most important roles is to provide a formidable bulwark against governmental violation of the constitutional safeguards **\*735** securing in our free society the legitimate expectations of every person to innate human dignity and sense of worth. It is a regrettable abdication of that role and a saddening denigration of our majestic Bill of Rights when the Court tolerates arbitrary and capricious official conduct branding an individual as a criminal without compliance with constitutional procedures designed to

ensure the fair and impartial ascertainment of criminal culpability. Today's decision must surely be a short-lived aberration.[18]

**All Citations**

424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, 1 IER Cases 1827

Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499, 505.

1      The "and laws" provision of 42 U.S.C. s 1983 is not implicated in this case.

2      It is not disputed that petitioners' actions were a part of their official conduct and that this element of a s 1983 cause of action is satisfied here.

3      If respondent is correct in his contention that defamation by a state official is actionable under the Fourteenth Amendment, it would of course follow that defamation by a federal official should likewise be actionable under the cognate Due Process Clause of the Fifth Amendment. Surely the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth upon their federal counterparts. We thus consider this Court's decisions interpreting either Clause as relevant to our examination of respondent's claim.

4      We cannot agree with the suggestion of our Brother BRENNAN, dissenting, Post, at 1173, that the actions of these two petitioner law enforcement officers come within the language used by Mr. Justice Harlan in his dissenting opinion in Jenkins v. McKeithen, 395 U.S. 411, 433, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). They are not by any conceivable stretch of the imagination, either separately or together, "an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing." Id., at 438, 89 S.Ct., at 1857, 23 L.Ed.2d, at 426. Indeed, the actions taken by these petitioners in this case fall far short of the more formalized proceedings of the Commission on Civil Rights established by Congress in 1957, the procedures of which were upheld against constitutional challenge by this Court in Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). There the Court described the functions of the Commission in this language:
"It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any Legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's Legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action." Id., at 441, 80 S.Ct., at 1514, 4 L.Ed.2d, at 1321 (emphasis supplied).
Addressing itself to the question of whether the Commission's "proceedings might irreparably harm those being investigated by subjecting them to public opprobrium and scorn, the distinct likelihood of losing their jobs, and the possibility of criminal prosecutions," the Court said that "even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function." Id., at 443, 80 S.Ct., at 1515, 4 L.Ed.2d, at 1322.

5      There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which has been "incorporated" into the Fourteenth Amendment. Section 1983 makes a deprivation of such rights actionable independently of state law. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
Our discussion in Part III is limited to consideration of the procedural guarantees of the Due Process Clause and is not intended to describe those substantive limitations upon state action which may be encompassed within the concept of "liberty" expressed in the Fourteenth Amendment. Cf. Part IV, Infra.

1      Deprivations of rights secured by "laws" as well as by the Constitution are actionable under s 1983. Only an alleged constitutional violation is involved in this case. Ante, at 1158 n. 1.

2      Indeed, it would be difficult to interpret that discussion as anything but a discussion of the "under color of" law requirement of s 1983, which is not involved in this case and which has no relationship to the question whether a "liberty" or "property" interest is involved here. There is simply no way in which the Court, despite today's treatment of the terms "liberty" and "property," could declare that the loss of a person's life is not an interest cognizable within the

"life" portion of the Due Process Clause. See Ante, at 1159.

3    Of course, in addition to providing a remedy when an official abuses his position, s 1983 is designed to provide a remedy when a state statute itself abridges constitutional rights, when a remedy under state law is inadequate to protect constitutional rights, and when a state remedy, though adequate in theory, is unavailable in practice. See, E. g., Monroe v. Pape, 365 U.S. 167, 173-174, 81 S.Ct. 473, 476-477, 5 L.Ed.2d 492, 497-498 (1961).

4    Petitioners testified:
"Q. And you didn't limit this to persons who had been convicted of the offense of shoplifting, is that correct?
"A. That's correct.
"Q. Now, my question is what is the basis for your conclusion that a person a person who has been arrested for the offense of shoplifting is an active shoplifter?
"A. The very fact that he's been arrested for the charge of shoplifting and evidence presented to that effect.
"Q. And this is not based on any finding of the court?
"A. No, sir." App. 26.
"Q. All right. So that if my understanding is correct, this included all persons who were arrested in '71 and '72?
"A. That's true.
"Q. And selected persons from who were arrested in previous years?
"A. . . . . I assume from the number of persons here that many of these have been arrested many years back down the line consecutively . . . .
"Q. So there's no distinction made between persons whose arrest terminated in convictions and persons whose arrest did not terminate in convictions?
"A. No, sir." Id. 29.

5    Respondent was arrested on June 14, 1971. He pleaded not guilty and the charge was "filed away with leave (to reinstate)" on September 22, 1971. The distribution of the flyer was on December 5, 1972. The shoplifting charge was dismissed on December 11, 1972, and respondent filed his complaint the following day. He sought compensatory and punitive damages, and an injunction prohibiting similar dissemination of such flyers in the future and ordering petitioners to obtain the return of the flyers and to instruct those who received them that respondent and the others pictured in the flyers were not "active shoplifters," and had not been convicted of shoplifting or any similar offense. Respondent's only other arrest took place five years previously for a speeding offense.

6    The Court, by totally excluding a person's interest in his reputation from any cognizance under the Due Process Clause, would be forced to reach the same conclusion that there is no cause of action under s 1983 even to obtain injunctive relief if petitioners had randomly selected names from the Louisville telephone directory for inclusion in the "active shoplifters" flyer. Of course, even if a person has been arrested on a constitutionally sufficient basis, that does not justify the State's treating him as a criminal.
"The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated." Schware v. Board of Bar Examiners, 353 U.S. 232, 241, 77 S.Ct. 752, 757, 1 L.Ed.2d 796, 803 (1957). The constitutional presumption of innocence, the requirement that conviction for a crime must be based on proof beyond a reasonable doubt, and the other safeguards of a criminal trial are obviously designed at least in part to give concrete meaning to this fact.

7    At one point in the flyer, there was also an indication that "(t)hese persons have been arrested during 1971 and 1972 Or have been active in various criminal fields in high density shopping areas." The stated purpose of the flyer was "so that you, the businessman . . . may inform your security personnel to Watch for these subjects." Ante, at 1158 (emphasis supplied).

8    Indeed, the Court's opinion confuses the two separate questions of whether reputation is a "liberty" or "property" interest and whether, in a particular context, state action with respect to that interest is a violation of due process. E. g., ante, at 1159, 1160-1161, and n. 3 (assuming that if reputation is a cognizable liberty or property interest, every defamation by a public official would be an offense against the Due Process Clause of the Fifth or Fourteenth Amendment).

9    Today's holding places a vast and arbitrary power in the hands of federal and state officials. It is not difficult to conceive of a police department, dissatisfied with what it perceives to be the dilatory nature or lack of efficacy of the judicial system in dealing with criminal defendants, publishing periodic lists of "active rapists," "active larcenists," or other "known criminals." The hardships resulting from this official stigmatization loss of employment and educational opportunities, creation of impediments to professional licensing, and the imposition of general obstacles to the right of

all free men to the pursuit of happiness will often be as severe as actual incarceration, and the Court today invites and condones such lawless action by those who wish to inflict punishment without compliance with the procedural safeguards constitutionally required of the criminal justice system.

One of the more questionable assertions made by the Court suggests that "liberty" or "property" interests are protected only if they are recognized under state law or protected by one of the specific guarantees of the Bill of Rights. Ante, at 1165 and n. 5. To be sure, the Court has held that "(p) roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source Such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972) (emphasis supplied). See also, E. g., Goss v. Lopez, 419 U.S. 565, 572-573, 95 S.Ct. 729, 734, 42 L.Ed.2d 725, 733 (1975). However, it should also be clear that if the Federal Government, for example, creates an entitlement to some benefit, the States cannot infringe a person's enjoyment of that "property" interest without compliance with the dictates of due process. Moreover, we have never restricted "liberty" interests in the manner the Court today attempts to do. The Due Process Clause of the Fifth Amendment, like the Due Process Clause of the Fourteenth Amendment, protects "liberty" interests. But the content of "liberty" in those Clauses has never been thought to depend on recognition of an interest by the State or Federal Government, and has never been restricted to interests explicitly recognized by other provisions of the Bill of Rights:

" 'While this Court has not attempted to define with exactness the liberty . . . guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042." Board of Regents v. Roth, supra, 408 U.S. at 572, 92 S.Ct. at 2706, 33 L.Ed.2d at 558. See also, E. g., Arnett v. Kennedy, 416 U.S. 134, 157, 94 S.Ct. 1633, 1645, 40 L.Ed.2d 15, 35 (1974) (opinion of Rehnquist, J.). It should thus be clear that much of the content of "liberty" has no tie whatsoever to particular provisions of the Bill of Rights, and the Court today gives no explanation for its narrowing of that content.

It is strange that the Court should hold that the interest in one's good name and reputation is not embraced within the concept of "liberty" or "property" under the Fourteenth Amendment, and yet hold that that same interest, when recognized under state law, is sufficient to overcome the specific protections of the First Amendment. See, E. g., Gertz v. Robert Welch, Inc.; Time, Inc. v. Firestone, ante, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

The Court's insensitivity to these constitutional dictates is particularly evident when it declares that because respondent had never been brought to trial, "his guilt or innocence of that offense (shoplifting) had never been resolved." Ante, at 1158. It is hard to conceive of a more devastating flouting of the presumption of innocence, 25 L.Ed.2d, at 375, "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " In re Winship, 397 U.S., at 363, 90 S.Ct., at 1072, quoting Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481, 491 (1895). Moreover, even if a person was once convicted of a crime, that does not mean that he is "actively engaged" in that activity now.

Of course, such oversights are typical of today's opinion. Compare, E. g., the discussions of Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), Ante, at 1165 and n. 15, Infra; the discussions of Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), Ante, at 1163-1164, and Infra, at 1174-1175.

For example, in addition to the statements already quoted in text, the dissenters observed:

The Commission thus bears close resemblance to certain federal administrative agencies . . .. These agencies have one salient feature in common, which distinguishes them from those designed simply to 'expose.' None of them is the Final arbiter of anyone's guilt or innocence. Each, rather, plays only a Preliminary role designed, in the usual course of events, to Initiate a subsequent formal proceeding in which the accused will enjoy the full panoply of procedural safeguards. For this reason, and because such agencies could not otherwise practicably pursue their investigative functions, they have not been required to follow 'adjudicatory' procedures. 395 U.S., at 439, 442, 89 S.Ct., at 858, 23 L.Ed.2d at 427.

"Although in this respect the Commission is not different from the federal agencies discussed above, I am not ready to say that the collateral consequences of government-sanctioned opprobrium may not under some circumstances entitle a person to some right, consistent with the Commission's efficient performance of its investigatory duties, to have his public say in rebuttal. However, the Commission's procedures are far from being niggardly in this respect. . . .

" . . . It may be that some of my Brethren understand the complaint to allege that in fact the Commission acts primarily as an agency of 'exposure,' rather than one which serves the ends required by the state statutes. If so although I do not believe that the complaint can be reasonably thus construed the area of disagreement between us may be small or

nonexistent." Id., at 442, 89 S.Ct., at 858.

Even more recently, in Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), we recognized that students may not be suspended from school without being accorded due process safeguards. We explicitly referred to "the liberty interest in reputation" implicated by such suspensions, Id., at 576, 95 S.Ct., at 737, 42 L.Ed.2d, at 735, based upon the fact that suspension for certain actions would stigmatize the student, Id., at 574-575, 95 S.Ct., at 736, 42 L.Ed.2d, at 735:

"The Due Process Clause also forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied. Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); Board of Regents v. Roth, supra, 408 U.S. at 573, 92 S.Ct. (2701) at 2707 (33 L.Ed.2d 548). School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution."

The Court states that today's holding is "quite consistent" with Goss because "Ohio law conferred a right upon all children to attend school, and . . . the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right." Ante, at 1165. However, that was only one-half of the holding in Goss. The Ohio law established a Property interest of which the Court held a student could not be deprived without being accorded due process. 419 U.S., at 573-574, 95 S.Ct., at 735, 42 L.Ed.2d, at 733-734. However, the Court also specifically recognized that there was an independent Liberty interest implicated in the case, not dependent upon the statutory right to attend school, but based, as noted above, on the fact that suspension for certain conduct could affect a student's "good name, reputation, honor, or integrity." Id., at 574-575, 95 S.Ct., at 736, 42 L.Ed.2d, at 735.

Similarly, the idea that the language in Board of Regents v. Roth, supra, is "quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable," Ante, at 1164, borders on the absurd. The Court in Roth, like the Court in Goss, explicitly quoted the language from Constantineau that the Court today denigrates, Ante, at 1163-1164, and it was clear that Roth was focusing on stigmatization as such. We said there that when due process safeguards are required in such situations, the "purpose of such notice and hearing is to provide the person an opportunity To clear his name," 408 U.S., at 573 n. 12, 92 S.Ct., at 2707, 33 L.Ed.2d, at 558 (emphasis supplied), and only found no requirement for due process safeguards because "(i)n the present case . . . there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake." Id., at 573, 92 S.Ct., at 2707, 33 L.Ed.2d, at 558. See also Arnett v. Kennedy, 416 U.S., at 157, 94 S.Ct., at 1646, 40 L.Ed.2d 15 (opinion of Rehnquist, J.) ("(L)iberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee . . . . (T)he purpose of the hearing in such a case is to provide the person 'an opportunity to clear his name' . . ."). The fact that a stigma is imposed by the government in terminating the employment of a government employee may make the existence of state action unquestionable, but it surely does not detract from the fact that the operative "liberty" concept relates to the official stigmatization of the individual, whether imposed by the government in its status as an employer or otherwise.

Similar insensitivity is exhibited by the Court when it declares that respondent "has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded." Ante, at 1160. The gravamen of respondent's complaint is that he has been stigmatized as a criminal without Any of the constitutional protections designed to prevent an erroneous determination of criminal culpability.

The import of these cases and the obvious impact of official stigmatization as a criminal were not lost on the Court of Appeals in this case:

"This label ("active shoplifter") carries with it the badge of disgrace of a criminal conviction. Moreover, it is a direct statement by law enforcement officials that the persons included in the flyer are presently pursuing an active course of criminal conduct. All of this was done without the slightest regard for due process. There was no notice nor opportunity to be heard prior to the distribution of the flyer, and appellant and others have never been accorded the opportunity to refute the charges in a criminal proceeding. It goes without saying that the Police Chiefs cannot determine the guilt or innocence of an accused in an administrative proceeding. Such a determination can be made only in a court of law.

"The harm is all the more apparent because the branding has been done by law enforcement officials with the full power, prestige and authority of their positions. There can be little doubt that a person's standing and associations in the community have been damaged seriously when law enforcement officials brand him an active shoplifter, accuse him of a continuing course of criminal conduct, group him with criminals and distribute his name and photograph to the merchants and businessmen of the community. Such acts are a direct and devastating attack on the good name, reputation, honor and integrity of the person involved. The fact of an arrest without more may impair or cloud a person's reputation. Michelson v. United States, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Such acts on

the part of law enforcement officials may result in direct economic loss and restricted opportunities for schooling, employment and professional licenses. Menard v. Mitchell, 139 U.S.App.D.C. 113, 430 F.2d 486, 490 (1970)." 505 F.2d 1180, 1183 (1974).

18    In light of my conviction that the State may not condemn an individual as a criminal without following the mandates of the trial process, I need not address the question whether there is an independent right of privacy which would yield the same result. Indeed, privacy notions appear to be inextricably interwoven with the considerations which require that a State not single an individual out for punishment outside the judicial process. Essentially, the core concept would be that a State cannot broadcast even such factual events as the occurrence of an arrest that does not culminate in a conviction when there are no legitimate law enforcement justifications for doing so, since the State is chargeable with the knowledge that many employers will treat an arrest the same as a conviction and deny the individual employment or other opportunities on the basis of a fact that has no probative value with respect to actual criminal culpability. See, E. g., Michelson v. United States, 335 U.S. 469, 482, 69 S.Ct. 213, 221, 93 L.Ed. 168, 177 (1948); Schware v. Board of Bar Examiners, 353 U.S., at 241, 77 S.Ct., at 757, 1 L.Ed.2d, at 802. A host of state and federal courts, relying on both privacy notions and the presumption of innocence, have begun to develop a line of cases holding that there are substantive limits on the power of the government to disseminate unresolved arrest records outside the law enforcement system, see, E. g., Utz v. Cullinane, 172 U.S.App.D.C. 67, 520 F.2d 467 (1975); Tarlton v. Saxbe, 165 U.S.App.D.C. 293, 507 F.2d 1116 (1974); United States v. Dooley, 364 F.Supp. 75 (E.D.Pa.1973); Menard v. Mitchell, 328 F.Supp. 718, 725-726 (D.C.1971), rev'd on other grounds, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974); United States v. Kalish, 271 F.Supp. 968 (P.R.1967); Davidson v. Dill, 180 Colo. 123, 503 P.2d 157 (1972); Eddy v. Moore, 5 Wash.App. 334, 487 P.2d 211 (1971). I fear that after today's decision, these nascent doctrines will never have the opportunity for full growth and analysis. Since the Court of Appeals did not address respondent's privacy claims, and since there has not been substantial briefing or oral argument on that point, the Court's pronouncements are certainly unnecessary. Of course, States that are more sensitive than is this Court to the privacy and other interests of individuals erroneously caught up in the criminal justice system are certainly free to adopt or adhere to higher standards under state law. See, E. g., Michigan v. Mosley, 423 U.S. 96, 111, 120-121, 96 S.Ct. 321, 330, 334-335, 46 L.Ed.2d 313, 326, 331-332 (1975) (Brennan, J., dissenting).
Mr. Justice WHITE does not concur in this footnote.

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Engquist v. Oregon Dept. of Agriculture, 9th Cir.(Or.), February 8, 2007

118 S.Ct. 1925
Supreme Court of the United States

Thomas R. PHILLIPS, et al., Petitioners,

v.

WASHINGTON LEGAL FOUNDATION et al.

No. 96–1578. | Argued Jan. 13, 1998. | Decided June 15, 1998.

Public interest group, Texas attorney, and Texas citizen brought action against justices of Texas Supreme Court, Texas Equal Access to Justice Foundation, and Foundation's chairman, challenging constitutionality of Texas' Interest on Lawyers Trust Account (IOLTA) program. The United States District Court for the Western District of Texas, James R. Nowlin, J., 873 F.Supp. 1, granted summary judgment to defendants. Plaintiffs appealed. The Court of Appeals for the Fifth Circuit, 94 F.3d 996, reversed. Certiorari was granted. The Supreme Court, Chief Justice Rehnquist, held that under Texas law, interest income generated by funds held in IOLTA accounts is private property of owner of principal for purposes of Takings Clause.

Affirmed.

Justice Souter dissented and filed a separate opinion in which Justices Stevens, Ginsburg, and Breyer joined.

Justice Breyer dissented and filed a separate opinion in which Justices Stevens, Souter, and Ginsburg joined.

West Headnotes (7)

[1] **Federal Courts**
  Property

Inasmuch as Federal Constitution protects rather than creates property interests, existence of property interest is determined by reference to existing rules or understandings that stem from independent source such as state law. U.S.C.A. Const.Amend. 5.

77 Cases that cite this headnote

[2] **Eminent Domain**
  Property and Rights Subject of Compensation

At least as to confiscatory regulations, as opposed to those regulating use of property, state may not sidestep Takings Clause by disavowing traditional property interests long recognized under state law. U.S.C.A. Const.Amend. 5.

47 Cases that cite this headnote

[3] **Property**
  Right of alienation

Fundamental maxim of property law is that owner of property interest may dispose of all or part of that interest as he sees fit.

11 Cases that cite this headnote

[4] **Interest**
  Nature and grounds in general

Government has great latitude in regulating circumstances under which interest may be earned.

1 Cases that cite this headnote

[5] **Interest**
  Funds in litigation or in custody of the law

Under Texas law, regardless of whether owner of principal has constitutionally cognizable interest in anticipated generation of interest by his funds, any interest that does accrue attaches

**Tab E-7**

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

as a property right incident to ownership of underlying principal.

46 Cases that cite this headnote

[6]    **Property**
🔑Ownership and incidents thereof

Property is more than economic value; it also consists of group of rights which so-called owner exercises in his dominion of the physical thing, such as right to possess, use and dispose of it.

13 Cases that cite this headnote

[7]    **Eminent Domain**
🔑Property and Rights Subject of Compensation

Under Texas law, interest income generated by funds held in Interest on Lawyers Trust Account (IOLTA) accounts is private property of owner of principal for purposes of Takings Clause. U.S.C.A. Const.Amend. 5; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 11, §§ 3, 4, 5(A); Equal Access to Justice Program Rules 4, 6, 7, 9(a).

133 Cases that cite this headnote

**\*\*1926 \*156** *Syllabus*\*

Under Texas' Interest on Lawyers Trust Account (IOLTA) program, an attorney who receives client funds must place them in a separate, interest-bearing, federally authorized "NOW" account upon determining that the funds "could not reasonably be expected to earn interest for the client or [that] the interest which might be earned ... is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest." IOLTA interest income is paid to the Texas Equal Access to Justice Foundation (TEAJF), which finances legal services for low-income persons. The Internal Revenue

Service does not attribute such interest to the individual clients for federal income tax purposes if they have no control over the decision whether to place the funds in the IOLTA account and do not designate who will receive the interest. Respondents—a public-interest organization having Texas members opposed to the IOLTA program, a Texas attorney who regularly deposits client funds in an IOLTA account, and a Texas businessman whose attorney retainer has been so deposited—filed this suit against TEAJF and the other petitioners, alleging, *inter alia,* that the Texas IOLTA program violated their rights under the Fifth Amendment, which provides that "private property" shall not "be taken for public use, without just compensation." The District Court granted petitioners summary judgment, reasoning that respondents had no property interest in the IOLTA interest proceeds. The Fifth Circuit reversed, concluding that such interest belongs to the owner of the principal.

*Held:*

1. Interest earned on client funds held in IOLTA accounts is the "private property" of the client for Takings Clause purposes. The existence of a property interest is determined by reference to existing rules or understandings stemming from an independent source such as state law. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548. All agree that under Texas law the principal held in IOLTA accounts is the client's "private property." Moreover, the general rule that "interest follows principal" applies in Texas. See *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358. Petitioners' contention **\*\*1927** that **\*157** *Webb's* does not control because examples such as income-only trusts and marital community property rules demonstrate that Texas does not, in fact, adhere to the general rule is rejected. These examples miss the point of *Webb's.* Their exception by Texas from the "interest follows principal" rule has a firm basis in traditional property law principles, whereas petitioners point to no such principles allowing the owner of funds temporarily deposited in an attorney trust account to be deprived of the interest the funds generate. Petitioners' further contention that "interest follows principal" in Texas only if it is allowed by law does not assist their cause. They do not argue that Texas law prohibits the payment of interest on IOLTA funds, but, rather, that interest actually "earned" by such funds is not the private property of the principal's owner. Regardless of whether that owner has a constitutionally cognizable interest in the *anticipated* generation of interest by his funds, any interest that *does* accrue attaches as a property right incident to the ownership of the underlying

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

principal. Petitioners' final argument that the money transferred to the TEAJF is not "private property" because IOLTA funds cannot reasonably be expected to generate interest income on their own is plainly incorrect under Texas' requirement that client funds be deposited in an IOLTA account "if the interest which might be earned" is insufficient to offset account costs and service charges that would be incurred in obtaining it. It is not that the funds to be placed in IOLTA accounts cannot generate *interest,* but that they cannot generate *net interest.* This Court has indicated that a physical item does not lack "property" status simply because it does not have a positive economic or market value. See, *e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 437, n. 15, 102 S.Ct. 3164, 3175–3176, 3177, n. 15, 73 L.Ed.2d 868. While IOLTA interest income may have no economically realizable value to its owner, its possession, control, and disposition are nonetheless valuable rights. See *Hodel v. Irving,* 481 U.S. 704, 715, 107 S.Ct. 2076, 2083–2084, 95 L.Ed.2d 668. The United States' argument that "private property" is not implicated here because IOLTA interest income is "government-created value" is factually erroneous: The State does nothing to create value; the value is created by respondents' funds. The Federal Government, through its banking and taxation regulations, imposes costs on this value if private citizens attempt to exercise control over it. Waiver of these costs if the property is remitted to the State hardly constitutes "government-created value." In any event, this Court rejected a similar argument in *Webb's, supra,* at 162, 101 S.Ct., at 451. Pp. 1930–1933.

2. This Court leaves for consideration on remand the question whether IOLTA funds have been "taken" by the State, as well as the amount of "just compensation," if any, due respondents. P. 1934.

94 F.3d 996, affirmed.

**\*158** REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post,* p. 1934. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, AND GINSBURG, JJ., joined, *post,* p. 1937.

**Attorneys and Law Firms**

Darrell E. Jordan, Dallas, TX, for petitioners.

Edwin S. Kneedler, Washington, DC, for United States as amicus curiae by special leave of the Court.

Richard A. Samp, Arlington, VA, for respondents.

**Opinion**

**\*159** Chief Justice REHNQUIST delivered the opinion of the Court.

Texas, like 48 other States and the District of Columbia,[1] has adopted an Interest on **\*\*1928** Lawyers Trust Account **\*160** (IOLTA) program. Under these programs, certain client funds held by an attorney in connection with his practice of law are deposited in bank accounts. The interest income generated by the funds is paid to foundations that finance legal services for low-income individuals. The question presented by this case is whether interest earned on client funds held in IOLTA accounts is "private property" of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment. We hold that it is the property of the client.

**I**

In the course of their legal practice, attorneys are frequently required to hold client funds for various lengths of time. Before 1980, an attorney generally held such funds in noninterest-bearing, federally insured checking accounts in which all client trust funds of an individual attorney were pooled. These accounts provided administrative convenience and ready access to funds. They were noninterest bearing because federal law prohibited federally insured banks and savings and loans from paying interest on checking accounts. See 12 U.S.C. §§ 371a, 1464(b)(1)(B), 1828(g). When a lawyer held a large sum in trust for his client, such funds were generally placed in an interest-bearing savings account because the interest generated **\*161** outweighed the inconvenience caused by the lack of check-writing capabilities.

In 1980, Congress authorized the creation of Negotiable Order of Withdrawal (NOW) accounts, which for the first time permitted federally insured banks to pay interest on demand deposits. § 303, 94 Stat. 146, as amended, 12 U.S.C. § 1832. NOW accounts are permitted only for deposits that "consist solely of funds in which the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, political, or other similar purposes and which is not operated for profit." § 1832(a)(2). For-profit corporations and partnerships are thus prohibited from earning interest on demand deposits. See *ibid.* However, interpreting § 1832(a), the Federal

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

Reserve Board has concluded that corporate funds may be held in NOW accounts if the funds are held in trust pursuant to a program under which charitable organizations have "the exclusive right to the interest." Letter from Federal Reserve Board General Counsel Michael Bradfield to Donald Middlebrooks (Oct. 15, 1981), reprinted in Middlebrooks, The Interest on Trust Accounts Program: Mechanics of its Operation, 56 Fla. B.J. 115, 117 (Feb. 1982) (hereinafter Federal **\*\*1929** Reserve's IOLTA Letter).[2]

Beginning with Florida in 1981, a number of States moved quickly to capitalize on this change in the banking regulations by establishing IOLTA programs. Texas followed suit in 1984. Its Supreme Court issued an order, now codified as Article XI of the State Bar Rules, providing that an attorney who receives client funds that are "nominal in amount or are reasonably anticipated to be held for a short period of time" must place such funds in a separate, interest-bearing NOW account (an IOLTA account). Tex. State Bar Rule, Art. XI, **\*162** § 5(A); Rules 4, 7 of the Texas Rules Governing the Operation of the Texas Equal Access to Justice Program. Client funds are considered "nominal in amount" or "held for a short period of time" if the attorney holding the funds determines that

> "such funds, considered without regard to funds of other clients which may be held by the attorney, law firm or professional corporation, could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client." Texas IOLTA Rule 6.

Interest earned by the funds deposited in an IOLTA account is to be paid to the Texas Equal Access to Justice Foundation (TEAJF), a nonprofit corporation established by the Supreme Court of Texas. Tex. State Bar Rule, Art. XI, §§ 3, 4; Texas IOLTA Rule 9(a). TEAJF distributes the funds to nonprofit organizations that "have as a primary purpose the delivery of legal services to low income persons." Texas IOLTA Rule 10. The Internal Revenue Service does not attribute the interest generated by an IOLTA account to the individual clients for federal income tax purposes so long as the client has no control over the decision whether to place the funds in the IOLTA account and does not designate who will receive the interest generated by the account. See Rev.Rul. 81–209, 1981–2 Cum.Bull. 16; Rev.Rul. 87–2, 1987–1 Cum.Bull. 18.

Respondents are the Washington Legal Foundation (WLF), Michael Mazzone, and William Summers. WLF is a public-interest law and policy center with members in the State of Texas who are opposed to the Texas IOLTA program. App. 26. Mazzone is an attorney admitted to practice in **\*163** Texas who maintains an IOLTA account into which he regularly deposits client funds. *Id.,* at 82. Summers is a Texas citizen and businessman whose work requires him to make regular use of the services of an attorney. In January 1994, Summers learned that a retainer he had deposited with his attorney was being held in an IOLTA account. *Id.,* at 85. In February 1994, respondents filed this suit against petitioners—TEAJF, W. Frank Newton, in his official capacity as chairman of TEAJF, and the nine Justices of the Supreme Court of Texas. Respondents alleged, *inter alia,* that the Texas IOLTA program violated their rights under the Fifth Amendment, by taking their property without just compensation.

The District Court granted summary judgment to petitioners, reasoning that respondents had no property interest in the interest proceeds generated by the funds held in IOLTA accounts. *Washington Legal Foundation v. Texas Equal Access to Justice Foundation,* 873 F.Supp. 1 (W.D.Tex.1995). The Court of Appeals for the Fifth Circuit reversed, concluding that "any interest that accrues belongs to the owner of the principal." *Washington Legal Foundation v. Texas Equal Access to Justice Foundation,* 94 F.3d 996, 1004 (1996). Because of a split over whether the interest income generated by funds held in IOLTA accounts is private property for purposes of the Fifth Amendment's Takings Clause,[3] we granted certiorari. **\*\*1930** 521 U.S. 1117, 117 S.Ct. 2535, 138 L.Ed.2d 1011 (1997).

## II

[1] The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q.R. Co.* **\*164** *v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585–586, 41 L.Ed. 979 (1897), provides that "private property" shall not "be taken for public use, without just compensation." Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

All agree that under Texas law the principal held in

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

IOLTA trust accounts is the "private property" of the client. Texas IOLTA Rule 4 (discussing circumstances under which "client funds" must be deposited in an IOLTA account); Texas Bar Rule 1.14(a) (lawyers "shall hold funds ... belonging in whole or in part to clients ... separate from the lawyer's own property"); see also Brief for United States as *Amicus Curiae* 10 ("There can be no doubt that the client funds underlying the IOLTA program are the property of respondents"). When deposited in an IOLTA account, these funds remain in the control of a private attorney and are freely available to the client upon demand. As to the principal, then, the IOLTA rules at most "regulate the use of [the] property." *Yee v. Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992). Respondents do not contend that the State's regulation of the manner in which attorneys hold and manage client funds amounts to a taking of private property. The question in this case is whether the interest on an IOLTA account is "private property" of the client for whom the principal is being held.[4]

**\*165** The rule that "interest follows principal" has been established under English common law since at least the mid-1700's. *Beckford v. Tobin,* 1 Ves.Sen. 308, 310, 27 Eng.Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body"). Not surprisingly, this rule has become firmly embedded in the common law of the various States.[5] The Court of Appeals in **\*\*1931** this case, two of the three **\*166** judges of which are Texans, held that Texas also follows this rule, citing *Sellers v. Harris County,* 483 S.W.2d 242, 243 (Tex.1972) ("The interest earned by deposit of money owned by the parties to the lawsuit is an increment that accrues to that money and to its owners"). Indeed, in *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980), we cited the *Sellers* opinion as demonstrative of the general rule that "any interest ... follows the principal."

[2] In *Webb's,* we addressed a Florida statute providing that interest accruing on an interpleader fund deposited in the registry of the court " 'shall be deemed income of the office of the clerk of the circuit court.' " *Id.,* at 156, n. 1, 101 S.Ct., at 448, n. 1 (quoting Fla. Stat. § 28.33 (1977)) (emphasis deleted). The appellant in that case filed an interpleader action in Florida state court and tendered the sum at issue, nearly $2 million, into court. In addition to deducting $9,228.74 from the interpleader fund as a fee "for services rendered," the clerk of court also retained the more than $100,000 in interest income generated **\*167** by the deposited funds. We held that the statute authorizing the clerk to confiscate the earned interest violated the Takings Clause. As we explained, "a State, by *ipse dixit,* may not transform private property into

public property without compensation" simply by legislatively abrogating the traditional rule that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." 449 U.S., at 164, 101 S.Ct., at 452. In other words, at least as to confiscatory regulations (as opposed to those regulating the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law. See *id.,* at 163–164, 101 S.Ct., at 451–453; see also *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029, 112 S.Ct. 2886 2900–2901, 120 L.Ed.2d 798 (1992).

Petitioners nevertheless contend that *Webb's* does not control because Texas does not, in fact, adhere to the "interest follows principal" rule, "at least if elevated to the level of an absolute legal rule." Brief for Petitioners 22. They point to several examples, such as income-only trusts and marital community property rules, where under Texas law interest does not follow principal. According to petitioners, the IOLTA program is simply another exception to the general rule.

[3] We find these examples insufficient to dispel the presumption of deference given the views of a federal court as to the law of a State within its jurisdiction. *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 204, 76 S.Ct. 273, 276–277, 100 L.Ed. 199 (1956). Petitioners' examples miss the point of our decision in *Webb's.* Texas' exception of income-only trusts and certain marital property from the general rule that "interest **\*\*1932** follows principal" has a firm basis in traditional property law principles. Permitting the owner of a sum of money to distribute to a designated beneficiary the interest income generated by his principal is entirely consistent with the fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit. *United* **\*168** *States v. General Motors Corp.,* 323 U.S. 373, 377–378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945) (property "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to ... dispose of it"). Similarly, the Texas rules governing the distribution of marital assets have a historical pedigree tracing back to the marital property laws adopted by the Texas Congress only four years after Texas became an independent republic. W. McClanahan, Community Property Law in the United States § 3:23, pp. 123–124 (1982). But petitioners point to no "background principles" of property law, *Lucas, supra,* at 1030, 112 S.Ct., at 2901, that would lead one to the conclusion that the owner of a fund temporarily deposited in an attorney trust account may be deprived of the interest the fund generates.

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

[4]  [5] Petitioners further contend that "interest follows principal" is an incomplete explication of the Texas rule. Reply Brief for Petitioners 11. Petitioners explain that interest follows principal in Texas only if the interest is "allowed by law or fixed by the parties." *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985). We fail to see how this assists petitioners' cause. We agree that the government has great latitude in regulating the circumstances under which interest may be earned. As we explained in *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), "anticipated gains ha[ve] traditionally been viewed as less compelling than other property-related interests." But petitioners do not argue that the payment of interest on client funds deposited in an attorney trust account is not "allowed by law" in Texas. Rather, they argue that interest actually "earned" by funds held in IOLTA accounts, Texas IOLTA Rule 9, is not the private property of the owner of the principal. However, regardless of whether the owner of the principal has a constitutionally cognizable interest in the *anticipated* generation of interest by his funds, any interest that *does* accrue attaches as a property right incident to the ownership of the underlying principal.

**\*169** Finally, petitioners argue that the interest income transferred to the TEAJF is not "private property" because the client funds held in IOLTA accounts "cannot reasonably be expected to generate interest income on their own." Brief for Petitioners 18. As an initial matter, petitioners' assertion that client funds held in IOLTA accounts cannot be expected to generate interest income is plainly incorrect under the express terms of the Texas IOLTA rules. Texas IOLTA Rule 6 requires that client funds held by an attorney be deposited in an IOLTA account "if the interest which might be earned" is insufficient to offset the "cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client." In other words, it is not that the client funds to be placed in IOLTA accounts cannot generate *interest,* but that they cannot generate *net interest.*

Whether client funds held in IOLTA accounts could generate net interest is a matter of some dispute. As written, the Texas IOLTA program requires the calculation as to net interest to be made "without regard to funds of other clients which may be held by the attorney." Texas IOLTA Rule 6. This provision would deny to an attorney the traditional practice of pooling funds of several clients in one account, a practice which might produce net interest when opening an account for each

client would not. But in the District Court, petitioners agreed that this portion of the rule was not to be enforced, and that an attorney could make the necessary calculation on the basis of pooled accounts. Petitioners made a similar concession during oral argument here. Tr. of Oral Arg. 13–16. We accept this concession but find that it does not avail petitioners.

**\*\*1933** [6] We have never held that a physical item is not "property" simply because it lacks a positive economic or market value. For example, in *Loretto v. Teleprompter Manhattan CATV* **\*170** *Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), we held that a property right was taken even when infringement of that right arguably *increased* the market value of the property at issue. *Id.,* at 437, n. 15, 102 S.Ct., at 3177, n. 15. Our conclusion in this regard was premised on our longstanding recognition that property is more than economic value, see *id.,* at 435, 102 S.Ct., at 3175–3176; it also consists of "the group of rights which the so-called owner exercises in his dominion of the physical thing," such "as the right to possess, use and dispose of it," *General Motors, supra,* at 378, 65 S.Ct., at 359. While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property. See *Hodel v. Irving,* 481 U.S. 704, 715, 107 S.Ct. 2076, 2083, 95 L.Ed.2d 668 (1987) (noting that "the right to pass on" property "is itself a valuable right"). The government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected.

The United States, as *amicus curiae,* additionally argues that "private property" is not implicated by the IOLTA program because the interest income generated by funds held in IOLTA accounts is "government-created value." Brief for United States as *Amicus Curiae* 20. We disagree. As an initial matter, this argument is factually erroneous. The interest income transferred to the TEAJF is not the product of increased efficiency, economies of scale, or pooling of funds by the government. Indeed, as noted above, the State has conceded at oral argument that if an attorney could in any way (such as pooling of client funds) earn interest for a client, he is ethically obligated to do so rather than place the funds in an IOLTA account. Interest income is economically realizable by IOLTA primarily because: (1) the Federal Government imposes tax reporting costs only on those who attempt to exercise control over the interest their funds generate, see Rev.Rul. 81–209, 1981–2 Cum.Bull. 16; **\*171** Rev.Rul. 87–2, 1987–1 Cum.Bull. 18; and (2) the Federal Government prohibits for-profit corporations from holding funds in

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

NOW accounts if the interest is paid to the corporation, but permits corporate funds to be held in NOW accounts if the interest is paid to the TEAJF, see Federal Reserve's IOLTA Letter. In other words, the State does nothing to create value; the value is created by respondents' funds. The Federal Government, through the structuring of its banking and taxation regulations, imposes costs on this value if private citizens attempt to exercise control over it. Waiver of these costs if the property is remitted to the State hardly constitutes "government-created value."

In any event, we rejected a similar "government-created value" argument in *Webb's.* There, the State of Florida argued that since the clerk's authority to invest deposited funds was a statutorily created right, any interest income generated by the funds was not private property. 449 U.S., at 163, 101 S.Ct., at 451–452. We rejected this argument, explaining that "the State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest." *Id.,* at 162, 101 S.Ct., at 451.

This would be a different case if the interest income generated by IOLTA accounts was transferred to the State as payment "for services rendered" by the State. *Id.,* at 157, 101 S.Ct., at 448–449. Our holding does not prohibit a State from imposing reasonable fees it incurs in generating and allocating interest income. See *id.,* at 162, 101 S.Ct., at 451; cf. *United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 393–394, 107 L.Ed.2d 290 (1989) (upholding the imposition of a "reasonable 'user fee' " on those utilizing the Iran-United States Claims Tribunal). But here the State does not, indeed cannot, argue that its confiscation of respondents' interest income amounts to a fee for services performed. Unlike in *Webb's,* where the State safeguarded and invested the deposited funds, funds held in IOLTA accounts are managed entirely by banks and private attorneys.

**\*\*1934 \*172 III**

[7] In sum, we hold that the interest income generated by funds held in IOLTA accounts is the "private property" of the owner of the principal. We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amount of "just compensation," if any, due respondents. We leave these issues to be addressed on remand. The judgment of the Court of Appeals is

*Affirmed.*

Justice SOUTER, with whom Justice STEVENS, Justice GINSBURG, and Justice Breyer join, dissenting.

The Court holds that "interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal." *Ante,* this page. I do not join in today's ruling because the Court's limited enquiry has led it to announce an essentially abstract proposition; even assuming that the proposition correctly states the law, it may ultimately turn out to have no significance in resolving the real issue raised in this case, which is whether the Interest on Lawyers Trust Account (IOLTA) scheme violates the Takings Clause of the Fifth Amendment. Since the sounder course would be to vacate the similarly limited judgment of the Court of Appeals for the Fifth Circuit and remand for the broader enquiry outlined below, I respectfully dissent.

The Court recognizes three distinct issues implicated by a takings claim: whether the interest asserted by the plaintiff is property, whether the government has taken that property, and whether the plaintiff has been denied just compensation for the taking. *Ibid.* The Court is careful to address only the first of these questions, *ibid.,* which is the only one on which the Fifth Circuit ruled. See *Washington Legal Foundation v. Texas Equal Access to Justice Foundation,* 94 F.3d 996, 1004 (1996).

**\*173** The affirmative answer given by the Court and the Fifth Circuit to the question whether IOLTA interest attributable to a client's funds is the client's property states, in essence, a proposition of state law, which is one source of property interests entitled to federal constitutional protection, see *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992). In this instance the relevant state law is said to embrace the general principle that property in interest income follows ownership of the principal on which the interest is earned, *ante,* at 1930, and n. 4, and the Court treats any income generated by a client's funds like income that the client could derive directly through a method of money management or investment that costs more than it produced, *ante,* at 1932–1933.

In addressing only the issue of the property interest, leaving the questions of taking and compensation for a later day in the litigation of respondents' action, the Court and the Court of Appeals have, however, postponed

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

consideration of the most salient fact relied upon by petitioners in contesting respondents' Fifth Amendment claim: that the respondent client would effectively be barred from receiving any net interest on his funds subject to the state IOLTA rule by the combination of an unchallenged federal banking statute and regulation, 12 U.S.C. § 1832(a); 12 CFR § 204.130 (1997); a separate, unchallenged Texas rule of attorney discipline, Texas Bar Rules, Art. 10, § 9, Rule 1.14(b); and unchallenged Internal Revenue Service interpretations of the Tax Code, Rev.Rul. 81–209, 1981–2 Cum.Bull. 16; Rev.Rul. 87–2, 1987–1 Cum.Bull. 18. The argument for the view contrary to the one taken by the Court would emphasize that salient fact right now. The view that the client has no cognizable property right in the IOLTA interest is said to rest not only on a different understanding of the scope of the general principle **\*174** and its place in state law,[1] but **\*\*1935** also upon the very regulatory framework that would prevent a client from obtaining any net interest on funds now subject to IOLTA, even if IOLTA did not exist.[2] It is not, of course, that the federal and state regulatory combination includes some rule that is facially inconsistent with the general principle that interest follows principal; the components of the regulatory structure do not even directly address the question of who owns interest. Indeed, the most obvious relevance of the regulatory provisions and their effects is to the issues of whether IOLTA results in a taking of the client's property and whether any such taking requires compensation. And yet by this route the regulatory structure becomes relevant to the property issue as well, simply because the way we may ultimately resolve the taking and compensation issues bears on the way we ought to resolve the property issue. If it should turn out that within the meaning of the Fifth Amendment, the IOLTA scheme had not taken the property recognized today, or if it should turn out that the "just compensation" for any taking was zero, then there would be no practical consequence for purposes of the Fifth Amendment in recognizing a client's property right in the interest in the first place; any such recognition would be an inconsequential **\*175** abstraction. Cf. *Hooker v. Burr,* 194 U.S. 415, 419, 24 S.Ct. 706, 708, 48 L.Ed. 1046 (1904) (If a contractual obligation is impaired, but the obligor is "not injured to the extent of a penny thereby, his abstract rights are unimportant"). The significance of the regulatory structure, and the issues of taking and compensation, should therefore be considered today.

Approaching the property issue in conjunction with the two others would, in fact, be entirely faithful to the Fifth Amendment, for as we have repeatedly said its Takings Clause does nothing to bar the government from taking property, but only from taking it without just compensation, see, *e.g., First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–2386, 96 L.Ed.2d 250 (1987); *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194, 105 S.Ct. 3108, 3120–3121, 87 L.Ed.2d 126 (1985). It thus makes good sense to consider what is property only in connection with what is a compensable taking, an approach to Fifth Amendment analysis that not only would avoid spending time on what might turn out to be an entirely theoretical matter, but would also reduce the risk of placing such undue emphasis on the existence of a generalized property right as to distort the taking and compensation analyses that necessarily follow before the Fifth Amendment's significance can be known.[3]

**\*176** That is not to say, of course, that we should resolve either the taking or compensation issues here, for the Fifth Circuit did not address them. Rather, we should determine here whether either of the remaining issues might reasonably be resolved against respondents; if so, we should not abstract the property issue for resolution in their **\*\*1936** favor now, but should return the case to the Court of Appeals to consider all three issues before resolving the first. Suffice it to say that both the taking and compensation questions are serious ones for respondents.

First, as to a taking, we start with *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and its guidance about certain sorts of facts that are of particular importance in what is supposed to be an "ad hoc, factual" enquiry, *id.,* at 124, 98 S.Ct., at 2659, into whether the government has "go[ne] too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Attention should be paid to the nature of the government's action, its economic impact, and the degree of any interference with reasonable, investment-backed expectations. *Penn Central, supra,* at 124, 98 S.Ct., at 2659. Here it is enough to note the possible significance of the facts that there is no physical occupation or seizure of tangible property, cf. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3170–3171, 73 L.Ed.2d 868 (1982) (noting that physical intrusion is "unusually serious" in the takings context); that there is no apparent economic impact (since the client would have no net interest to go in his pocket, IOLTA or no IOLTA); and that the facts present neither anything resembling an investment nor (for the reason just given) any apparent basis for reasonably expecting to obtain net interest. While a court would certainly consider any proposal that respondents might make for a departure from the *Penn Central* approach to vindicating the Fifth

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

Amendment in these circumstances, application of *Penn Central* would not bode well for claimants like respondents.

Second, as to the just compensation requirement, the client's inability to earn net interest outside IOLTA, due to **\*177** the unchallenged federal and state regulations, raises serious questions about entitlement to any compensation (which, if required, would convert any "taking" into a wash transaction from the client's standpoint). "Just compensation" generally means "the full monetary equivalent of the property taken." *United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). In determining the amount of just compensation for a taking, a court seeks to place a claimant " 'in as good a position pecuniarily as if his property had not been taken.' " *United States v. 564.54 Acres Land,* 441 U.S. 506, 510, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)), calculating any loss objectively and independently of the claimant's subjective valuation, see, *e.g., Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437–1438, 93 L.Ed. 1765 (1949).

Thus, in deciding what award would be needed to place the client respondent in as good a position as he would have enjoyed without a taking, a court presumably would look to the claimant's putative property interest as it was or would have been enjoyed in the absence of IOLTA, cf. *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 460–461, 54 L.Ed. 725 (1910), and consequently would measure any required compensation by the claimant's loss, not by the government's (or the public's) gain, *ibid.* This rule would not obviously produce much benefit to respondents. While it has been suggested in their favor that a cognizable taking may occur even when value has been enhanced, on the supposed authority of *Loretto, supra,* at 437, n. 15, 102 S.Ct., at 3177, n. 15, that case dealt only with physical occupation, it rested on no finding that value had actually been enhanced, and it held nothing about the legal consequences of an actual finding that enhancement had occurred. The Court today makes a further suggestion of a way in which respondents might deflect the objection that they have lost nothing, when it observes that the notion of property is not limited by the concept of value, *ante,* at 1933. But the Court makes the point by equating the government's seizure **\*178** of funds from the pocket of a failing business owner with IOLTA's disposition of funds the client never had or could have received. Neither the equation, nor its relevance to the Fifth Amendment's guarantee of just compensation, is immune to question.

But, however these issues of taking and compensation may someday be adjudicated, **\*\*1937** two things are clear now: the issues are serious and they might be resolved against respondents. If that should happen, today's holding would stand as an abstract proposition without significance for the application of the Fifth Amendment.

If abstraction were guaranteed to be harmless, of course, an abstract ruling now and again would not matter much, beyond the time spent reaching it. But our law has been wary of abstract legal propositions not only because the common-law tradition is a practical one, but because abstractions pose their own peculiar risks. As THE CHIEF JUSTICE noted in a different but related context, there is a danger in "cutting loose the notion of 'just compensation' from the notion of 'private property.' " *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 486, 93 S.Ct. 791, 800, 35 L.Ed.2d 1 (1973) (REHNQUIST, J., dissenting); see also *id.,* at 482–483, 93 S.Ct., at 798–799 ("While the inquiry as to what property interest is taken by the condemnor and the inquiry as to how that property interest shall be valued are not identical ones, they cannot be divorced without seriously undermining a number of rules dealing with the law of eminent domain").

One may wonder here not only whether the theoretical property analysis may skew the resolution of the taking and compensation issues that will follow, but also how far today's holding may unsettle accepted governmental practice elsewhere. By recognizing an abstract property right to interest "actually 'earned' " by a party's principal, *ante,* at 1932, does the Court not raise the possibility of takings challenges whenever the government holds and makes use of the principal of private parties, as it frequently does? When, for **\*179** example, the National Government, or a State, has engaged in excessive tax withholding, it does not refund the interest earned between the time of withholding and the issuance of a refund. For any number of reasons unrelated to the recognition or nonrecognition of a generalized property right in interest, but tied to the questions of takings and compensation, it seems unlikely that such withholding practices would violate the Fifth Amendment. Nevertheless, the Court's abstract ruling may encourage claims of just this sort.

To avoid the dangers of abstraction, I would therefore vacate the judgment of the Court of Appeals and remand for plenary Fifth Amendment consideration. If, however, the property interest question is to be considered in the abstract, I would recast it and answer it as Justice BREYER has done in his own dissenting opinion, which I join.

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

Justice BREYER, with whom Justice STEVENS, Justice SOUTER, and Justice GINSBURG join, dissenting.

The question presented is whether "interest earned on client trust funds," which would "not earn interest" in the absence of a special "IOLTA program," amounts to a "property interest of the client or lawyer" for purposes of the Fifth Amendment's Takings Clause. Brief for Petitioners i; Brief for Respondents i; see U.S. Const., Amdt. 5 ("nor shall private property be taken for public use, without just compensation").

The question presented is premised on four assumptions: First, that lawyers sometimes hold small amounts of clients' funds for short periods of time; second, that because of federal tax and banking rules and regulations, such funds normally could not earn interest during that time; third, that state Interest on Lawyers Trust Account (IOLTA) rules require lawyers to place such funds in a special account where, mixed with other funds, they will earn interest; and fourth, that IOLTA rules require that interest earned on these funds **\*180** is distributed to groups that represent low-income individuals rather than to the lawyers or their clients who own the funds.

Insofar as factual circumstances such as these raise a Fifth Amendment question, I agree with Justice SOUTER that the question is whether Texas, by requiring the placing of the funds in special IOLTA accounts and depriving the funds' owners of the subsequently earned interest has temporarily "taken" what is undoubtedly "private property," namely, the client's funds, *i.e.,* the principal, without "just compensation." To answer this (appropriately framed) question, the parties **\*\*1938** and the lower courts would have to consider whether the use of the principal in the fashion dictated by the IOLTA rules amounts to a deprivation of a property right, and, if so, whether the government's "taking" required compensating the owner of the funds, where it did not deprive the funds' owners of interest they might have otherwise received. But the Court of Appeals did not address this latter question. See *ante,* at 1937 (SOUTER, J., dissenting).

Although I believe it wrong to separate Takings Clause analysis of the property rights at stake from analysis of the alleged deprivation, I have considered the question presented on its own terms. And, on the majority's assumptions, I believe that its answer is not the right one. The majority's answer rests upon the use of a legal truism, namely, "interest follows principal," and its application of a particular case, namely, *Webb's Fabulous*

*Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). See *ante,* at 1931–1932, 1933–1934. In my view, neither truism nor case can answer the hypothetical question the Court addresses.

The truism does not help because the question presented assumes circumstances that differ dramatically from those in which interest is ordinarily at issue. Ordinarily, principal is capable of generating interest for whoever holds it. Here, by the very terms of the question, we must assume **\*181** that (because of pre-existing federal law) the client's principal could not generate interest without IOLTA intervention. That is to say, the client could not have had an expectation of receiving interest without that intervention. Nor can one say that IOLTA rules excluded, or prevented, the client's use of his principal to generate interest that would otherwise be his. Under these circumstances, what is the property right of the client that IOLTA could have "confiscat[ed]"? *Ante,* at 1932.

The most that Texas law here could have taken from the client is not a right to use his principal to create a benefit (for he had no such right), but the client's right to keep the client's principal sterile, a right to prevent the principal from being put to productive use by others. Cf. *National Bd. of YMCA v. United States,* 395 U.S. 85, 92–93, 89 S.Ct. 1511, 1515–1516, 23 L.Ed.2d 117 (1969) (noting that government deprivation of property requiring compensation normally takes from an owner *use* that the owner may otherwise make of the property). And whatever this Court's cases may have said about the constitutional status of such a right, they have *not* said that the Constitution forces a State to confer, upon the owner of property that cannot produce anything of value for him, ownership of the fruits of that property should that property be rendered fertile through the government's lawful intervention. Cf., *e.g., United States ex rel. TVA v. Powelson,* 319 U.S. 266, 276, 63 S.Ct. 1047, 1053, 87 L.Ed. 1390 (1943) (no need to pay for value that the "power of eminent domain" itself creates); *City of New York v. Sage,* 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143 (1915) (city need not pay for value added by unifying parcels where unification impracticable absent eminent domain); *United States v. Twin City Power Co.,* 350 U.S. 222, 228, 76 S.Ct. 259, 263, 100 L.Ed. 240 (1956) (to require payment for value created by government "would be to create private claims in the public domain"). Thus the question is whether "interest," *earned only as a result of IOLTA rules* and earned upon otherwise *barren* client principal, "follows principal." The slogan "interest follows principal" no more answers *that* question than **\*182** does King Diarmed's legendary slogan, "[T]o every cow her calf." A. Birrell, Seven Lectures on The Law and History of Copyright in Books 42 (1889) (internal

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

quotation marks omitted). Cf. *Berkey v. Third Avenue Railway Co.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926) (Cardozo, J.) ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it").

Nor can *Webb's Fabulous Pharmacies* answer the question presented. But for state intervention the principal in that case could have, and would have, earned interest. See 449 U.S., at 156–157, and nn. 1, 2, 101 S.Ct., at 448, and nn. 1, 2 (state law required party to deposit funds with court, authorized court to hold the funds in an interest-bearing account, and allowed the court to claim the interest as well as a fee). Here, federal law **1939 ensured that, in the absence of IOLTA intervention, the client's principal would earn nothing. *Webb's Fabulous Pharmacies* holds that a state law which places *that* ordinary kind of principal in an interest-bearing account (which interest the State unjustifiably keeps) takes "private property ... for public use without just compensation." That holding says little about *this* kind of principal, principal that otherwise is barren. Nor do cases that find a private interest in property with virtually no economic value tell us to *whom* the fruits of that property belong when that property bears fruit through the intervention of another. *Ante,* at 1933 (citing *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Hodel v. Irving,* 481 U.S. 704, 715, 107 S.Ct. 2076, 2082–2083, 95 L.Ed.2d 668 (1987)).

If necessary, I should find an answer to the question presented in other analogies that this Court's precedents provide. Land valuation cases, for example, make clear that the value of what is taken is bounded by that which is "lost," not that which the "taker gained." *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 460–461, 54 L.Ed. 725 (1910) (opinion of Holmes, J.); see also *United States* v. *Miller,* 317 U.S. 369, 375, 63 S.Ct. 276, 280–281, 87 L.Ed. 336 (1943) ("[S]pecial value to the condemnor ... must be excluded as an element of market value"); *United States* ***183*** *v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 75–76, 33 S.Ct. 667, 676–677, 57 L.Ed. 1063 (1913). This principle suggests that the government must pay the current value of condemned land, not the added value that a highway it builds on the property itself creates. It also suggests that condemnation of, say, riparian rights in order to build a dam must be followed by compensation for these rights, not for the value of the electricity that the dam would later produce. Cf. *id.,* at 76, 33 S.Ct., at 677; *Twin City Power Co., supra,* at 226–228, 76 S.Ct., at 261–263; *United States* v. *Appalachian Elec. Power Co.,* 311 U.S. 377, 423–424, 427, 61 S.Ct. 291, 306–307, 308–309, 85 L.Ed. 243 (1940). Indeed, no one would say that such electricity was, for Takings Clause purposes, the owner's "private property," where, as here, in the absence of the lawful government "taking," there would have been no such property.

These legal analogies more directly address the key assumption raised by the question presented, namely, that "absent the IOLTA program," no "interest" could have been earned. I consequently believe that the interest earned is *not* the client's "private property."
I respectfully dissent.

## All Citations

524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563, 98 Daily Journal D.A.R. 6227, 98 CJ C.A.R. 3102, 11 Fla. L. Weekly Fed. S 634

## Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  Ala. Rule Prof. Conduct 1.15(g) (1996); Alaska Rule Prof. Conduct 1.15(d) (1997); Ariz. Sup.Ct. Rule 44(c)(2) (1997); Ark. Rule Prof. Conduct 1.15(d)(2) (1997); Cal. Bus. & Prof.Code Ann. § 6211(a) (West 1990 and Supp.1998); Colo. Rule Prof. Conduct 1.15(e)(2) (1997); Conn. Rule Prof. Conduct 1.15(d) (1998); Del. Rule Prof. Conduct 1.15(h) (1998); D.C. Rule Prof. Conduct 1.15(e) (1997); Fla. Bar Rule 5–1.1 (1994 and Supp.1998); Ga.Code Prof. Responsibility Rule 3–109, DR 9–102 (1998); Haw. Sup.Ct. Rule 11 (1997); Idaho Rule Prof. Conduct 1.15(d) (1997); Ill. Rule Prof. Conduct 1.15(d) (1997); Iowa Code Prof. Responsibility DR 9–102 (1997); Kan. Rule Prof. Conduct 1.15(d)(3) (1997); Ky. Sup.Ct. Rule 3.830 (1998); La. Rule Prof. Conduct 1.15(d) (1997); Me. Code Prof. Responsibility 3.6(e)(4) (1997); Md. Bus. Occ. & Prof.Code Ann. § 10–303 (1995); Mass. Sup.Ct. Rule 3:07, DR 9–102 (1997); Mich. Rule Prof. Conduct 1.15(d) (1997); Minn. Rule Prof. Conduct 1.15(d) (1993); Miss. Rule Prof. Conduct 1.15(d) (1997); Mo. Rule Prof. Conduct 1.15(d) (1997); Mont. Rule Prof. Conduct 1.18(b) (1996); Neb. Sup.Ct. Trust Acct. Rules 1–8

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

(1997); Nev. Sup.Ct. Rule 217 (1998); *Petition of New Hampshire Bar Assn.,* 122 N.H. 971, 453 A.2d 1258 (1982); N.J. Rules Gen. Application 1:28A–2 (1998); N.M. Rule Prof. Conduct 16–115(D) (1998); N.Y. Jud. Law § 497 (McKinney Supp.1997 and 1998); N.C. Rule Prof. Conduct 1.15–3 (1997); N.D. Rule Prof. Conduct 1.15(d)(1) (1997); Ohio Rev.Code Ann. § 4705.09(A)(1) (1997); Okla. Rule Prof. Conduct 1.15(d) (1997); Ore.Code Prof. Responsibility DR 9–101(D)(2) (1997); Pa. Rule Prof. Conduct 1.15(d) (1997) and Pa. Rule Disciplinary Enforcement 601(d) (1997); R.I. Rule Prof. Conduct 1.15(d) (1997); S.C.App.Ct. Rule 412 (1988); S.D. Rule Prof. Conduct 1.15(d)(4) (1995); Tenn.Code Prof. Responsibility DR 9–102(C)(2) (1997); *In re Interest on Lawyers' Trust Accounts,* 672 P.2d 406 (Utah 1983); Va. Sup.Ct. Rules, Pt. 6, § 4, & para. 20 (1997); Vt.Code Prof. Responsibility DR 9–103 (1996); Wash. Rule Prof. Conduct 1.14(c)(1) (1997); W. Va. Rule Prof. Conduct 1.15(d) (1997); Wis. Sup.Ct. Rules 13.04, 20:1.15 (1997); Wyo. Rule Prof. Conduct 1.15(II) (1997). Indiana is the only State that has not implemented an IOLTA program. See *In re Indiana State Bar Association Petition,* 550 N.E.2d 311 (Ind.1990).

2   We express no opinion as to the reasonableness of this interpretation of § 1832(a). See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–2783, 81 L.Ed.2d 694 (1984).

3   *Cone v. State Bar of Fla.,* 819 F.2d 1002 (C.A.11), cert. denied, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *In re Interest on Lawyers' Trust Accounts,* 672 P.2d 406 (Utah 1983); *Petition of New Hampshire Bar Assn.,* 122 N.H., at 975–976, 453 A.2d, at 1260–1261; *In re Minnesota State Bar Assn.,* 332 N.W.2d 151, 158 (Minn.1982); *In re Interest on Trust Accounts,* 402 So.2d 389, 395–396 (Fla.1981).

4   We granted certiorari in this case to answer the question whether "interest earned on client trust funds held by lawyers in IOLTA accounts [is] a property interest of the client or lawyer, cognizable under the ... Fifth Amendmen[t] to the U.S. Constitution...." Pet. for Cert. i. Justice SOUTER contends that we should vacate the judgment of the Court of Appeals because it was improper for that court to have answered this question apart from the takings and just compensation questions. Petitioners, however, did not argue in their petition for certiorari that it was error for the Fifth Circuit to address the property question alone. Because, under this Court's Rule 14(1)(a), our practice is to consider "[o]nly the questions set forth in the petition, or fairly included therein," it would be improper for us *sua sponte* to raise and address the question answered by Justice SOUTER.

5   *E.g., Freeman v. Young,* 507 So.2d 109, 110 (Ala.Civ.App.1987) ("The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property" (internal quotation marks omitted)); *Pomona City School Dist. v. Payne,* 9 Cal.App.2d 510, 512, 50 P.2d 822, 823 (1935) ("[O]bviously the interest accretions belong to such owner"); *Vidal Realtors of Westport, Inc. v. Harry Bennett & Assocs., Inc.,* 1 Conn.App. 291, 297–298, 471 A.2d 658, 662 (1984) ("As long as the attached fund is used for profit, the profit ... is impounded for the benefit of the attaching creditor and is subject to the same ultimate disposition as the principal of which it is the incident" (internal quotation marks omitted)); *Burnett v. Brito,* 478 So.2d 845, 849 (Fla.App.1985) ("[A]ny interest earned on interpleaded and deposited funds follows the principal and shall be allocated to whomever is found entitled to the principal"); *Morton Grove Park Dist. v. American Nat. Bank & Trust Co.,* 78 Ill.2d 353, 362–363, 35 Ill.Dec. 767, 771, 399 N.E.2d 1295, 1299 (1980) ("The earnings on the funds deposited are a mere incident of ownership of the fund itself "); *B & M Coal Corp. v. United Mine Workers,* 501 N.E.2d 401, 405 (Ind.1986) ("[I]nterest earnings must follow the principal and be distributed to the ultimate owners of the fund"); *Unified School Dist. No. 490, Butler County v. Board of County Commissioners of Butler County,* 237 Kan. 6, 9, 697 P.2d 64, 69 (1985) ( "[I]nterest follows principal"); *Pontiac School Dist. v. City of Pontiac,* 294 Mich. 708, 715–716, 294 N.W. 141, 144 (1940) ("The generally understood and applied principles that interest is merely an incident of the principal and must be accounted for"); *State Highway Comm'n v. Spainhower,* 504 S.W.2d 121, 126 (Mo.1973) ("Interest earned by a deposit of special funds is an increment accruing thereto" (internal quotation marks omitted)); *Siroky v. Richland County,* 271 Mont. 67, 74, 894 P.2d 309, 313 (1995) ("[I]nterest earned belongs to the owner of the funds that generated the interest"); *Bordy v. Smith,* 150 Neb. 272, 276, 34 N.W.2d 331, 334 (1948) ("Once settled clearly and definitely whose money the principal sum was, the interest necessarily belongs to that person as an increment to the principal fund"); *State ex rel. Board of County Commissioners v. Montoya,* 91 N.M. 421, 423, 575 P.2d 605, 607 (1978) ( "[T]he general rule is that interest is an accretion or increment to the principal fund earning it"); *Stuarco, Inc. v. Slafbro Realty Corp.,* 30 A.D.2d 80, 82, 289 N.Y.S.2d 883, 885 (1968) (plaintiff "is entitled to the interest actually accrued ... despite the absence of any agreement to pay interest on the deposit, and this precisely and only because interest was in fact earned thereon"); *McMillan v. Robeson County,* 262 N.C. 413, 417, 137 S.E.2d 105, 108 (1964) ("The earnings on the fund are a mere incident of ownership of the fund itself"); *Des Moines Mut. Hail & Cyclone Ins. Assn. v. Steen,* 43 N.D. 298, 301, 175 N.W. 195 (1919) ( "[A]ccruing interest follows the principal"); *Board of Educ., Woodward Public Schools v. Hensley,* 665 P.2d 327, 331 (Okla.App.1983) ("The interest earned ... becomes a part of the principal of the fund which generates it"); *University of S.C. v. Elliott,* 248 S.C. 218, 220, 149 S.E.2d 433, 434 (1966) ("[I]nterest earned ... is simply an increment of the principal fund, making the interest the property of the party who owned the principal fund"); *Board of County Commissioners of the County of Laramie v. Laramie County School Dist. No. One,* 884 P.2d 946, 953 (Wyo.1994) ("In general, interest is merely an incident of the principal fund, making it the property of the party owning the principal

**Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)**

118 S.Ct. 1925, 141 L.Ed.2d 174, 66 USLW 4468, 98 Cal. Daily Op. Serv. 4563...

fund").

1     The highest court of Texas has not understood the general principle that a property right in interest always follows property in principle in a way that supports respondents in this IOLTA challenge. See *Sellers* v. *Harris County,* 483 S.W.2d 242, 243 (Tex.1972) (owner of principal is entitled to interest, less administrative and accounting costs). *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), is not on point precisely because it dealt with interest actually in the hands of the fiduciary, net of any administrative expense.

2     These unchallenged state and federal rules clearly fall within the general category of relevant law defining property subject to constitutional protection, see *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) ( "Property interests" are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law").

3     For example, with respect to the determination whether government regulation "goes too far" in diminishing the value of a claimant's property, we have repeatedly instructed that a "parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 644, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993); see also *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 130–131, 98 S.Ct. 2646, 2662–2663, 57 L.Ed.2d 631 (1978). With its narrow focus on a party's right to any interest generated by its principal, the Court's opinion might be read (albeit erroneously, in my view) to mean that the accrued interest is the only property right relevant to the question whether IOLTA effects a taking.

**End of Document**         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

108 A.D.3d 1024, 969 N.Y.S.2d 318, 294 Ed. Law Rep. 973, 2013 N.Y. Slip Op. 05105

**\*\*1** Pinnacle Charter School et al., Respondents-Appellants
v
Board of Regents of the University of the State of New York et al., Appellants-Respondents.

**Supreme Court, Appellate Division, Fourth Department, New York**
**July 5, 2013**

CITE TITLE AS: Pinnacle Charter Sch. v Board of Regents of the Univ. of the State of N.Y.

**HEADNOTES**

Injunctions
Preliminary Injunction

Failure to Demonstrate Likelihood of Success on Merits

Schools
Charter Schools

Failure of Board of Regents to Renew Charter School's Charter—No Constitutionally Protected Property Right

Schools
Charter Schools

Limitation on Administrative Review of Board of Regents' Decision Not to Renew Charter School's Charter

Administrative Law
Rule Making

Board of Regents Not Required to Promulgate Rule When Denying Renewal of Charter School's Charter

Schools
Charter Schools

Failure to Renew Charter School's Charter No Violation of Right to Sound Basic Education

Schools
Charter Schools

Failure to Renew Charter School's Charter by Board of Regents No Basis for Negligent Misrepresentation Claim

Eric T. Schneiderman, Attorney General, Albany (Robert M. Goldfarb of counsel), for defendants-appellants-respondents.
Rupp, Baase, Pfalzgraf, Cunningham & Coppola LLC, Buffalo (Lisa A. Coppola of counsel), for plaintiffs-respondents-appellants.

Appeal and cross appeal from an order of the Supreme Court, Erie County (Paula L. Feroleto, J.), entered July 5, 2012. The order, among other things, granted plaintiffs' motion for a preliminary injunction and granted in part defendants' cross motion by dismissing the fourth cause of action.

It is hereby ordered that the order so appealed from is unanimously modified on the law by denying plaintiffs' motion for a preliminary injunction, vacating the preliminary injunc **\*1025** tion, and granting defendants' cross motion in its entirety and dismissing the complaint, and as modified the order is affirmed without costs.

Memorandum: In April 2012 defendant Board of Regents of the University of the State of New York (Board of Regents) denied the application of plaintiff Pinnacle Charter School (Pinnacle) to renew its charter to operate a charter school in the City of Buffalo. Pinnacle and the individual plaintiffs, parents of infant children enrolled at Pinnacle, commenced this action seeking, inter alia, judgment declaring that the action of the Board of Regents was unconstitutional, and preliminary and permanent injunctions enjoining defendants from enforcing the denial of the renewal application and permitting Pinnacle to continue operating as an authorized charter school. Plaintiffs allege, inter alia, that the decision of the Board of Regents was made in violation of their rights to due process, the requirements of the State Administrative **\*\*2** Procedure Act and the rights of the individual plaintiffs' children to a sound basic education

**Tab 8**

under the Education Article of the State Constitution (NY Const, art XI, § 1). Plaintiffs further allege that Education Law § 2852 (6) is unconstitutional to the extent that it limits judicial and administrative review of the Board of Regents' action. Finally, plaintiffs allege that employees of defendant New York State Education Department (Department) negligently misrepresented that Pinnacle's charter would likely be renewed and the school would remain open at the same time that the Department was preparing its recommendation to deny Pinnacle's application to renew its charter and close the school.

Supreme Court erred in granting plaintiffs' motion seeking a preliminary injunction enjoining enforcement of the Board of Regents' determination denying Pinnacle's application to renew its charter and permitting Pinnacle to operate as an authorized charter school, inasmuch as plaintiffs failed to demonstrate a likelihood of success on the merits with respect to any of their claims (*see Doe v Axelrod*, 73 NY2d 748, 750-751 [1988]). To the contrary, the evidence establishes conclusively that plaintiffs have no cause of action. Thus, although the court properly granted defendants' cross motion to dismiss the complaint for failure to state a cause of action to the extent that it sought dismissal of the fourth cause of action, for negligent misrepresentation, we conclude that the court should have granted defendants' cross motion in its entirety and dismissed the complaint (*see generally Kaufman v International Bus. Machs. Corp.*, 97 AD2d 925, 926-927 [1983], *affd* 61 NY2d 930 [1984]). We therefore modify the order accordingly. **\*1026**

The first and second causes of action allege, respectively, that the determination of the Board of Regents violated Pinnacle's due process rights under the State Constitution (NY Const, art I, § 6) and the Federal Constitution (US Const, 14th Amend, § 1). We agree with defendants that the New York Charter Schools Act (Education Law art 56) creates no constitutionally protected property interest in the renewal of a charter and thus that the first and second causes of action fail to state a cause of action (*see Matter of New Covenant Charter School Educ. Faculty Assn. v Board of Trustees of the State Univ. of N.Y.*, 30 Misc 3d 1205[A], 2010 NY Slip Op 52287[U], \*2 [Sup Ct, Albany County 2010]; *see generally Board of Regents of State Colleges v Roth*, 408 US 564, 577 [1972]). Moreover, we note that Pinnacle's charter expressly provided that "[n]othing herein shall require the [Board of] Regents to approve a Renewal Application." Contrary to Pinnacle's further allegation, the limitation on administrative review set forth in Education Law § 2852 (6) does not effect an unconstitutional denial of due process inasmuch as Pinnacle has no constitutional right to an administrative appeal (*see Matter of Wong v*

*Coughlin*, 138 AD2d 899, 901 [1988]). Absent any indication that the Board of Regents acted illegally, unconstitutionally or in excess of its jurisdiction, moreover, the limitation on judicial review does not implicate Pinnacle's due process rights (*see Matter of New York City Dept. of Envtl. Protection v New York City Civ. Serv. Commn.*, 78 NY2d 318, 323-324 [1991]).

Contrary to the court's conclusion with respect to the third cause of action, alleging violation of the State Administrative Procedure Act, we agree with defendants that the Board of Regents was acting pursuant to its discretionary authority when it denied Pinnacle's renewal application, and it was not required to promulgate any rules pursuant to article 2 of the State Administrative Procedure Act with respect to its exercise of such authority (*see generally Matter of Alca Indus. v Delaney*, 92 NY2d 775, 777-778 [1999]). Plaintiffs' contention that the Department's guidelines for charter renewal applications must be promulgated as rules pursuant to State Administrative Procedure Act § 202 was improperly raised for the first time in their reply papers (*see Keitel v Kurtz*, 54 AD3d 387, 391 [2008]; *Sanz v Discount Auto*, 10 AD3d 395, 395 [2004]). In any event, that contention lacks merit inasmuch as the guidelines are excluded from the Act's rulemaking requirement (*see* § 102 [2] [b] [iv]). The charter renewal process, moreover, is not an "adjudicatory proceeding" within the meaning of State Administrative Procedure Act § 102 (3), and thus the requirements of section 301 (3) are inapplicable. **\*\*3 \*1027**

With respect to the fifth cause of action, even assuming, arguendo, that the individual plaintiffs have standing to allege a violation of the Education Article on behalf of their children enrolled at Pinnacle based upon the alleged failure of the Buffalo School District to offer a sound basic education, we also agree with defendants that plaintiffs fail to state a cause of action for such violation (*see generally Paynter v State of New York*, 100 NY2d 434, 439 [2003]). In any event, the renewal of Pinnacle's charter would not remedy the alleged violation of the Education Law article.

Finally, with respect to plaintiffs' cross appeal, we conclude that the court properly granted that part of defendants' cross motion seeking dismissal of the fourth cause of action, for negligent misrepresentation, inasmuch as plaintiffs did not have a special or privity-like relationship with the Department such that it was required to impart correct information to plaintiffs (*see Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 180 [2011]; *Sample v Yokel*, 94 AD3d 1413, 1414-1415 [2012]). Present—Scudder, P.J., Peradotto, Lindley, Valentino and

Martoche, JJ.

Copr. (c) 2015, Secretary of State, State of New York

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Project Reflect, Inc. v. Metropolitan Nashville Bd. of Public Educ., 947 F.Supp.2d 868...

299 Ed. Law Rep. 530

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Reach Academy for Boys and Girls, Inc. v. Delaware Department of Education, D.Del., May 30, 2014

**947 F.Supp.2d 868**
United States District Court,
M.D. Tennessee,
Nashville Division.

PROJECT REFLECT, INC. SMITHSON
CRAIGHEAD MIDDLE SCHOOL, et al., Plaintiffs,
v.
METROPOLITAN NASHVILLE BOARD OF
PUBLIC EDUCATION, et al., Defendants.

No. 3:13–cv–00341. | May 22, 2013.

**Synopsis**
**Background:** Charter school's sponsor and parents of attending children brought action under § 1983 alleging violations of the equal protection and due process clauses of the Fourteenth Amendment based on school district's decision to revoke school's charter. School district moved to dismiss.

**Holdings:** The District Court, Kevin H. Sharp, J., held that:

[1] sponsor failed to state a claim for violation of procedural due process;

[2] school sponsor did not have protected property interest in continuation of school;

[3] parents did not have a protected property interest in sending their children to charter school;

[4] sponsor and parents received adequate process;

[5] There was no relevant comparator for sponsor's class-of-one discrimination claim.

Motion granted.

West Headnotes (26)

**[1]** **Constitutional Law**
Duration and timing of deprivation; pre- or post-deprivation remedies

The Fourteenth Amendment's due process clause includes a guarantee of procedural fairness, assuring that a deprivation of life, liberty, or property must be preceded by notice and opportunity for a hearing appropriate to the nature of the case. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[2]** **Municipal Corporations**
Rights of action

Political subdivisions cannot sue the state of which they are a part under the United States Constitution.

Cases that cite this headnote

**[3]** **Education**
Judicial review

Sponsor of charter school that filed application in support of charter school possessed standing to sue school district under the Due Process Clause of the Fourteenth Amendment; sponsor was not a political subdivision of the state that would be precluded from suing the state under the constitution. U.S.C.A. Const.Amend. 14; West's T.C.A. § 49–13–104(10).

1 Cases that cite this headnote

**[4]** **Constitutional Law**
Procedural due process in general

A § 1983 plaintiff may prevail on a procedural due process claim by either: (1) demonstrating that he is deprived of property as a result of

**Tab E-9**

established state procedure that itself violates Fourteenth Amendment due process rights; or (2) by proving that the defendants deprived him of property pursuant to a random and unauthorized act and that available state remedies would not adequately compensate for the loss. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[5]  **Constitutional Law**
Relationship to Other Sources of Law

Because § 1983 was not meant to supply an exclusive federal remedy for every alleged wrong committed by state officials, a plaintiff proceeding under the due process random, unauthorized act theory under § 1983 must prove as an element of the claim that state procedural remedies are inadequate. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[6]  **Civil Rights**
Education

Sponsor of charter school was required to plead inadequacy of state procedural remedies in its challenge under § 1983 alleging that school district's decision to revoke its charter violated the Due Process Clause of the Fourteenth Amendment, where it did not allege that Tennessee Charter Schools Act or other state law was procedurally unfair in depriving them of due process, but argued instead that school district authorities had no statutory authority to revoke the school's charter. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; West's T.C.A. § 49–13–101 et seq.

Cases that cite this headnote

[7]  **Constitutional Law**

Duration and timing of deprivation; pre- or post-deprivation remedies

The controlling inquiry into a procedural due process claim under § 1983 for violation of the Fourteenth Amendment based on allegations of a random unauthorized act for which state law remedies are inadequate is solely whether the state is in a position to provide for predeprivation process. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[8]  **Constitutional Law**
Establishment and closing of schools
**Education**
Termination of charter

Charter school sponsor's allegations that school district officials acted without statutory authority in revoking the school's charter were insufficient to state a claim for a violation of procedural due process guaranteed by the Fourteenth Amendment, where sponsor failed to make required pleading that state procedural remedies were inadequate, since the state could not have provided a sufficient predeprivation process to address district officials' alleged ultra vires actions in revoking the charter. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[9]  **Constitutional Law**
Benefits, rights and interests in

When evaluating a claim for the violation of due process rights under the Fourteenth Amendment, the court undertakes a two-step analysis: first, a plaintiff must establish as a threshold matter that it had a protected property interest in a benefit; second, the court must determine what process is due. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[10] Constitutional Law**
👉Source of right or interest

Property interests protected by the Due Process Clause of the Fourteenth Amendment are not created by the Constitution; rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[11] Constitutional Law**
👉Source of right or interest

A property interest protected by the Due Process Clause of the Fourteenth Amendment can be created by a state statute, a formal contract, or a contract implied from the circumstances. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[12] Constitutional Law**
👉Property Rights and Interests
**Constitutional Law**
👉Benefits, rights and interests in

Property interests protected by the Due Process Clause of the Fourteenth Amendment must be more than abstract desires or attractions to a benefit; the Due Process Clause only protects those interests to which one has a legitimate claim of entitlement. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[13] Constitutional Law**

👉Source of right or interest

The existence of a property interest protected by the Due Process Clause of the Fourteenth Amendment is a matter of state law; whether that interest rises to the level of a legitimate claim of entitlement protected by the due process clause is determined by federal law. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[14] Federal Civil Procedure**
👉Matters considered in general

Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.

Cases that cite this headnote

**[15] Federal Civil Procedure**
👉Matters considered in general
**Federal Civil Procedure**
👉Motion

A court may consider public records without converting a motion to dismiss for failure to state a claim into a motion for summary judgment. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.

Cases that cite this headnote

**[16] Constitutional Law**
👉Benefits, rights and interests in

A party cannot possess a property interest protected by the Due Process Clause of the Fourteenth Amendment in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary.

U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[17]     **Constitutional Law**
          Establishment and closing of schools
          **Education**
          Termination of charter

Charter school sponsor did not have a protected property interest in the continuation of the charter school protected by the Due Process Clause of the Fourteenth Amendment; Tennessee Charter Schools Act committed revocation of a school's charter to the discretion of the chartering authority, and the purpose of the act was to a provide the school system with options, not protect the interests of charter school sponsors. U.S.C.A. Const.Amend. 14; West's T.C.A. §§ 49–13–102(a)(2), (b–e), 49–13–122(a).

2 Cases that cite this headnote

[18]     **Constitutional Law**
          Right to Education
          **Constitutional Law**
          Elementary and Secondary Education
          **Constitutional Law**
          Education

Public education is not a right granted to individuals by the Constitution; however, if a state elects to furnish free compulsory public education to any of its citizens it must do so in a manner, respecting all of its residents, which comports with basic Fourteenth Amendment equal protection and due process strictures. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[19]     **Education**
          Right to education in general

In Tennessee, school-age children have a constitutional and statutory right to a public education. West's T.C.A. Const. Art. 11, § 12; West's T.C.A. §§ 49–6–3001(c)(1), 49–6–3003.

Cases that cite this headnote

[20]     **Constitutional Law**
          Establishment and closing of schools
          **Education**
          Termination of charter

Parents of students attending charter school that had its charter revoked did not have a protected property interest under the Due Process Clause of the Fourteenth Amendment in sending their children to that school, where other schools were available and parents had sufficient notice to participate in the school choice application process. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[21]     **Constitutional Law**
          Duration and timing of deprivation; pre- or post-deprivation remedies

The right to procedural due process under the Fourteenth Amendment requires that when a state seeks to terminate a protected interest it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[22]     **Constitutional Law**
          Establishment and closing of schools
          **Education**
          Termination of charter

Charter school sponsor and parents of charter

school students received adequate process required by the Due Process Clause of the Fourteenth Amendment in the decision of the school district to close their charter school, where sponsor and parents received notice of the revocation, and the sponsor's representative was allowed to address the school board. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[23] **Constitutional Law**
🔑Similarly situated persons; like circumstances
**Constitutional Law**
🔑Strict scrutiny and compelling interest in general

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[24] **Constitutional Law**
🔑"Class of one" claims
**Constitutional Law**
🔑"Class of one" claims

Because Equal Protection Clause of the Fourteenth Amendment is concerned with arbitrary government classification, a plaintiff can state a class-of-one discrimination claim by alleging that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[25] **Constitutional Law**

🔑Equal protection

Plaintiffs must overcome a heavy burden to prevail based on the class-of-one theory under the Equal Protection Clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[26] **Constitutional Law**
🔑Establishment and closing of schools
**Education**
🔑Termination of charter

There was no relevant comparator to charter school in its sponsor's action alleging class-of-one discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment for chartering authority's decision to revoke its charter; the school was the only charter school performing in the bottom 5%, and was not similar to public schools since the chartering authority had no authority to close them. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*871** W. Carl Spining, Ortale, Kelley, Herbert & Crawford, Nashville, TN, for Plaintiffs.

Keli J. Oliver, Derrick C. Smith, James E. Robinson, Metropolitan Legal Department, W. Carl Spining, Ortale, Kelley, Herbert & Crawford, Nashville, TN, for Defendants.

*MEMORANDUM*

KEVIN H. SHARP, District Judge.

Plaintiff Project Reflect, Inc. Smithson Craighead Middle

School, a nonprofit charter school, and two parents of children enrolled in the school bring this putative class action lawsuit against the Metropolitan Nashville Board of Public Education (the "Board") and individual defendants Metro Nashville Public Schools ("MNPS") Director of Schools Jesse Register and MNPS Office of Innovation Executive Director Alan Coverstone. In it, they allege that the Defendants violated their rights under the Due Process and Equal Protection Clauses of the 14th Amendment to the United States Constitution when the Board, relying on the recommendation of Register and Coverstone, voted on November 13, 2012, to revoke Smithson Craighead's charter, effectively shutting down the school at the end of the current academic year. Among other forms of relief requested, Plaintiffs ask the Court to issue a Preliminary Injunction preventing Defendants from closing Smithson Craighead and from interfering with its operations. (Docket Nos. 2 & 8).

In response, Defendants have filed Motions to Dismiss (Docket Nos. 12 & 14) for failure to state a claim upon which relief can be granted, *see* Fed.R.Civ.P. 12(b)(6), and, with respect to the individual Defendants, on the grounds that they are entitled to qualified immunity from suit. They have also asked the Court to stay discovery pending resolution of the qualified immunity issue (Docket No. 21) and have responded to the Motion for Preliminary Injunction (Docket No. 24). Plaintiffs have responded to the Motions to Dismiss (Docket No. 23), and Defendants have replied (Docket No. 29).

For the reasons explained herein, the Court will grant Defendants' Motions to **\*872** Dismiss and deny as moot all other pending motions.

### FACTS[1]

Project Reflect, Inc., has started several educational initiatives with MNPS since 1994 designed to address the academic and developmental needs of low-income students. Project Reflect, Inc. Smithson Craighead Middle School has operated a public charter elementary school in Nashville since 2003, after the Board approved their 2002 application and renewed it in 2008. In 2008, Project Reflect, Inc., presented to MNPS and the Board an application to open and run a charter middle school targeting minority, underprivileged, and Title I students.

The Board granted this charter, and Smithson Craighead Middle School (SCMS) opened in an MNPS "abandoned school" in August 2009. The leaky, flooding, and deteriorating facility necessitated that SCMS move to Madison before its third year of operation, and due to student displacement associated with this move,

standardized test scores were low. Despite the parties being signatories to a "collaboration compact" in which they pledged to support one another, Coverstone did not visit or provide support or notification of areas of concern for SCMS when he determined the school needed assistance.

On November 13, 2012, the Board voted 8–1 to revoke SCMS' charter because it was underperforming academically. However, test scores were improving incrementally, the school was safe, and it had been taking steps since February 2012 to turn around the academic performance of the school. At the November 13 board meeting in which Coverstone and Register presented their recommendation to revoke the charter, Dr. Carolyn Baldwin Tucker addressed the Board during the public comment period and urged them not to revoke SCMS' charter. Parents and representatives of SCMS were not allowed to speak other than during the public comment period. SCMS was not notified of the decision to recommend closure of the school until November 9, 2012.

The school has deteriorated since the Board's November 13 action. Parents have withdrawn students and sent them to other schools; teachers have transferred; students could not concentrate on their standardized tests; when MNPS officials have visited the campus, they have created stress for students and faculty by their very presence as "closers of the school." As of April 1, 2013, enrollment dropped 20%, forcing the school to adopt undesirable schedule, curriculum, and operational changes. Its programming has suffered, and it has experienced economic harm.

### LEGAL STANDARD

The Federal Rules of Civil Procedure require a plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the Court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir.2002). The Court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). However, "[i]n addition to the **\*873** allegations in the complaint, [the Court] may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ashland,*

*Inc. v. Oppenheimer & Co., Inc.,* 648 F.3d 461, 467 (6th Cir.2011) (citation omitted). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Generally, a complaint does not need to contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly,* 550 U.S. at 555, 556 n. 3, 127 S.Ct. 1955. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). The factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949–50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. "In the context of Section 1983 municipal liability, courts have interpreted *Iqbal*'s standards strictly." *Hutchison v. Metro. Gov't,* 685 F.Supp.2d 747, 751 (M.D.Tenn.2010); *Maness v. Boston Scientific,* 751 F.Supp.2d 962, 966 (E.D.Tenn.2010) (explaining that *Twombly* applies to state-law claims in federal cases).

*ANALYSIS*

Plaintiffs' Complaint under 42 U.S.C. § 1983 alleges that Defendants deprived Plaintiff Project Reflect, Inc. Smithson Craighead Middle School of a legally protected interest in running a charter school, without due process of law in violation of the Fourteenth Amendment; that Defendants deprived the individual and class Plaintiffs of a legally protected interest, created by Tennessee law, in educating their children at SCMS, without due process of law in violation of the Fourteenth Amendment; and that Defendants denied Plaintiffs' rights to equal protection of the laws in violation of the Fourteenth Amendment by singling out SCMS for charter revocation and closure without a rational basis, acting arbitrarily and capriciously, and with discriminatory intent.

Defendants have moved to dismiss this action in its entirety. The Court analyzes each claim in turn.

**I. Count I: Due Process Violations**

[1] "The Fourteenth Amendment's due process clause includes a guarantee of procedural fairness, assuring that a deprivation of life, liberty, or property must 'be preceded by notice and opportunity for a hearing appropriate to the nature of the case.' " *Blazy v. Jefferson Cnty. Regional Planning Com'n,* 438 Fed.Appx. 408, 411 (6th Cir.2011) (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

**A. Plaintiff Project Reflect, Inc. Smithson Craighead's Standing to Sue**

Defendants argue that the relationship between SCMS and MNPS is analogous to the relationship between a municipality and the state that created it. As a political subdivision of the state of Tennessee, they argue, the organizational Plaintiff lacks standing to sue the state under the Fourteenth Amendment. Plaintiffs respond that Project Reflect, Inc., is a nonprofit corporation and private citizen of the **\*874** state of Tennessee that acquired a property interest by virtue of its contractual relationship with MNPS.

As an initial matter, it must be determined exactly which organization is the Plaintiff in this case. The Complaint identifies as a party "PROJECT REFLECT, INC. SMITHSON CRAIGHEAD MIDDLE SCHOOL (hereinafter referred to as 'SC–MS') ... a publicly funded Charter School organized and existing under the Tennessee Charter Schools Act, Tenn.Code Ann. § 49–13–101, *et seq.*" (Docket No. 1 ¶ 6). It then states that "PROJECT REFLECT, INC. is a Nonprofit Corporation organized and existing under the laws of the State of Tennessee, and PROJECT REFLECT, INC. is the 'Sponsor' of the Charter School SC–MS pursuant to the Tennessee Charter Schools Act." *Id.* In subsequent briefing, Plaintiffs seem to distinguish between cases in which "the Charter School itself was the plaintiff" and the instant case, in which Project Reflect, Inc., seeks to defend its protected property interest. (Docket No. 23 at 6).

[2] It is a distinction that may make a difference. "It is well established that political subdivisions cannot sue the state of which they are part under the United States Constitution." *Greater Heights Acad. v. Zelman,* 522 F.3d 678, 680 (6th Cir.2008) (citing *City of Trenton v. New Jersey,* 262 U.S. 182, 186–87, 43 S.Ct. 534, 67 L.Ed. 937 (1923)). In *Greater Heights,* the Sixth Circuit, considering Ohio's "community schools," which are functionally similar to Tennessee charter schools, held that "community schools are political subdivisions of the state" and thus "barred from invoking the protections of

the Fourteenth Amendment." 522 F.3d at 680–81. Defendants also cite a thoroughly reasoned district court opinion from Pennsylvania, a state with a charter school law that is similar, but not identical, to Tennessee's law in relevant respects, dismissing a charter school's § 1983 claims against a school district because the school was "sufficiently analogous to a municipal corporation" to preclude it from filing suit against its creator. *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.,* 908 F.Supp.2d 597, 614 (M.D.Pa.2012).

However, these cases are of limited value in determining whether a public charter school created by Tennessee law is a political subdivision of the state. The Court's analysis in *Greater Heights* was based on Ohio's "statutory and case law, as well as the substantive control that Ohio exerts on its community schools," *id.* at 680, and Ohio statutory law is quite different from Tennessee law on this question. Among other salient differences, an Ohio statute defines "political subdivision" to include a "community school established under Chapter 3314." *Id.* (quoting Ohio Rev.Code § 2744.01(F)) (emphasis removed). Tennessee law does not. Pennsylvania law, meanwhile, specifies that a charter school may "sue and be sued, but only to the same extent and upon the same condition that political subdivisions and local agencies can be sued." 24 Pa. Stat. Ann. § 17–1714–A (West). Tennessee law, in contrast, provides that "The governing body of a public charter school may sue and be sued," without qualification, and prohibits the governing body of a charter school from levying taxes or issuing bonds "except in accordance with state law." Tenn.Code Ann. § 49–13–124(a). This suggests a formal distinction in the law between political subdivisions and charter schools, in which "control of instruction" is "vested in the governing body of the school under the *general supervision* of the chartering authority" and in compliance with a signed charter agreement and state law. *Id.* § 111(a)(1) (emphasis added); *see also id.* § 49–13–102 (noting the legislative intent **\*875** to allow the establishment of public charter schools that "operate within a school district structure but are allowed maximum flexibility to achieve their goals").

On the other hand, Tennessee exerts a great deal of substantive control over its charter schools. Public charter schools are "part of the state program of public education." *Id.* § 105. They are subject to formation, reporting, licensure, and insurance requirements, periodic audits, educational performance standards and requirements, liability limits, open meetings laws, and public records laws, all either identical or analogous to the laws that govern political subdivisions and municipalities. *See, e.g., id.* §§ 49–13–106, 111, 116, 119, 120, 125, 127, 138, 140. This suggests that public charter schools in

Tennessee may be properly regarded as political subdivisions that lack standing to sue the state.

[3] However, the Court need not resolve this issue at present. Instead, it accepts Plaintiffs' argument that Project Reflect, Inc., the "sponsor" of SCMS, is the intended organizational Plaintiff in this case. Tennessee law defines a charter school's "sponsor" as "any individual, group, or other organization filing an application in support of the establishment of a public charter school" and subject to certain restrictions including, *inter alia,* nonsectarian and nonprofit status. *Id.* § 49–13–104(10). The sponsor—as distinguished from the "governing body of the public charter school"—plays a key role in applying for a charter, appealing its disapproval, and, if approved, signing the written agreement, "which shall be binding upon the governing body of the public charter school." *Id.* §§ 49–13–107, 108, & 110. Defendants do not contend that Project Reflect, Inc., a nonprofit corporation that has run educational programming for approximately nine years before opening a charter school, lacks standing to sue. (*See* Docket Nos. 1 at 8 & 29 at 2). Thus, in an effort to construe the Complaint "so as to do justice," Fed.R.Civ.P. 8(e), and mindful of the time-sensitive nature of the issues presented, the number of individuals potentially affected, and considerations of judicial economy, the Court will discuss the Complaint and Motion to Dismiss under the assumption that Project Reflect, Inc., is the organizational Plaintiff.[2]

**B. Adequacy of State Remedies**

Defendants argue that Plaintiffs have failed to plead the inadequacy of state law remedies, which Defendants contend is an essential element of any due process claim. Alternatively, they argue that inadequacy of state remedies must be pled for claims alleging a due process violating arising from a random, unauthorized act, and that Plaintiffs have presented such a claim. Plaintiffs do not address this argument in their response.

[4] In the Sixth Circuit, "a § 1983 plaintiff may prevail on a procedural due process claim by either (1) demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property pursuant to a 'random and unauthorized act' *and* that available state remedies would not adequately compensate for the loss." *Macene v. MJW, Inc.,* 951 F.2d 700, 706 (6th Cir.1991) (citation omitted); *see also Mertik v. Blalock,* 983 F.2d 1353, 1364 (6th Cir.1993) ("Where the state action **\*876** complained of consists of, *e.g.,* unpredictable and tortious or otherwise random and

unauthorized acts of state employees, the Constitution does not require the state to do the impossible and predict when the loss will occur.").

[5] "Not all due process challenges can be so conveniently categorized" as either attacking an established state procedure or a random, unauthorized act, however. *Id.* at 1365. Nor has the relevant case law always been clear. *See Mitchell v. Fankhauser,* 375 F.3d 477, 481–84 (6th Cir.2004) (chronicling the inconsistent development of circuit precedent, and holding that the inadequacy of state remedies must only be pled when a plaintiff challenges a deprivation arising from a random, unauthorized act). Still, because § 1983 "was not meant to supply an exclusive federal remedy for every alleged wrong committed by state officials," *Vicory v. Walton,* 721 F.2d 1062, 1065 (6th Cir.1983), a plaintiff proceeding under the random, unauthorized act theory "must prove as an element of the claim that state procedural remedies are inadequate." *Magnum Towing & Recovery v. City of Toledo,* 287 Fed.Appx. 442, 447 (6th Cir.2008) (in the context of a motion for summary judgment).

[6] On its face, the Complaint seems to challenge an official process—the revocation of a school charter—that is largely controlled by state law, namely the Tennessee Charter Schools Act, Tenn.Code Ann. § 49–13–101 *et seq.* Based upon "the nature of the deprivation complained of and the circumstances under which the deprivation occurred," then, it would appear that the gravamen of the Complaint is that "a state process dictated by statute ... itself deprived [Plaintiffs] of due process," and thus there would be no requirement that Plaintiffs allege the inadequacy of state remedies. *See Mertik,* 983 F.2d at 1365–67 (explaining analysis that should be used to categorize complaints, particularly when they challenge statutory schemes that give officials "broad power and little guidance") (citing *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)).

But the Complaint and subsequent briefing (or the lack thereof) resist this analysis, inexplicably. First, Plaintiffs allege in the Complaint that they "have no adequate remedy in state law." (Docket No. 1 ¶ 52). Second, Plaintiffs' assertions in response to the Motion to Dismiss render the Court's attempted interpretation untenable. Plaintiffs argue that Defendant Coverstone and the Office of Innovation "have no authority" under state law. (Docket No. 23 at 10). They characterize state law as providing "absolutely no procedural or substantive guidance for revocation other than the [sic] LEA [local education authority] 'may' revoke a Charter." *Id.* That the Board acted on Defendants Coverstone and Register's

recommendation to revoke the charter, they say,

> is an ultra vires act beyond the scope of the Act, which resulted in the deprivation of the Plaintiffs' protected property interest. The [Board] and the individual Defendants acted without statutory authority in recommending the revocation of the SCMS Charter as the "Office of Innovation" has no Statutory basis.
>
> Most importantly, because the "Director" of the "Office of Innovation" has no statutory authority, the [Board's] reliance on his statements is particularly misguided and unfair.... Since the Office of Innovation is a fictional entity and the Director thereof has no more power than a common citizen, ... the action by the [Board] cannot be validated.

*Id.* at 10–11. Finally, Plaintiffs remain silent in response to Defendants' argument that they failed to plead the inadequacy of state remedies, specifically why they could **\*877** not obtain redress through a writ of certiorari action brought pursuant to Tenn.Code Ann. § 27–8–101 *et seq.*

[7] [8] Plaintiffs are "master[s] of the complaint," *Holmes Group, Inc. v. Vornado Air Circ. Sys., Inc.,* 535 U.S. 826, 831, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002) (citation omitted), and they have eliminated any ambiguity about the due process theory under which they proceed. The school board Defendant acted randomly and without authority when it voted to approve a recommendation made by the head of a fictional entity, a man harboring a "desire to close SCMS for his own personal reasons." (Docket No. 23 at 7). This is akin to the state official who "was not acting pursuant to any established state procedure, but, instead, was apparently pursuing a random, unauthorized personal vendetta ...." *Zinermon,* 494 U.S. at 130, 110 S.Ct. 975 (discussing *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). "The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Hudson,* 468 U.S. at 534, 104 S.Ct. 3194.

Because Plaintiffs allege that Defendants acted *ultra vires* and do not respond to Defendants' argument that they failed to allege inadequate postdeprivation state remedies, the Court is compelled to conclude that Defendants' unauthorized reliance on a malicious individual, who himself acted outside the bounds of state law, could not have been anticipated. Accordingly, the state could not have provided adequate predeprivation process. Plaintiffs are thus required to plead that state procedural remedies are inadequate. *See Magnum Towing,* 287 Fed.Appx. at 447.

Plaintiffs' conclusory allegation that they lack an

adequate postdeprivation remedy in state law is factually insufficient to raise a reasonable expectation that such is the case, *see Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, and they fail to attack the state's judicial process for the correction of board and agency errors, *see Copeland v. Machulis,* 57 F.3d 476, 479–80 (6th Cir.1995).[3] For this reason, the procedural due process claim should be dismissed as to all Defendants. Nonetheless, the Court will analyze the remainder of Defendants' motion.

**C. Merits of the Due Process Claim**

**i. Property Interest of Project Reflect, Inc.**

Defendants argue that Project Reflect., Inc., has no property interest, protected by due process, to operate a charter school, much less an underperforming one, and that neither Tennessee law nor the charter agreement between MNPS and Project Reflect, Inc., provides that any particular process is due before the state may revoke a failing school's charter. Plaintiffs respond that Project Reflect, Inc., acquired a property interest by virtue of its contractual relationship with MNPS, manifested in the form of the charter agreement, which was signed according to state law.

[9] When evaluating a claim for the violation of due process rights, "[t]his court undertakes a two-step analysis." *Blazy,* 438 Fed.Appx. at 411 (quoting *Mitchell,* 375 F.3d at 480). First, a Plaintiff must establish as a threshold matter that it had a protected property interest in a benefit. *Id.* at 411–12. Second, the Court must determine what process is due. *Id.* at 412.

**\*878** [10] [11] [12] [13] Property interests are not created by the Constitution. *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules ...." *Id.* "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Blazy,* 438 Fed.Appx. at 412 (citation omitted). "Property interests protected by the due process clause must be more than abstract desires or attractions to a benefit. The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Waeschle v. Dragovic,* 576 F.3d 539, 544–45 (6th Cir.2009) (citation omitted). The existence of a property interest is a matter of state law; "whether that interest rises to the level of a legitimate claim of entitlement protected by the due process clause is determined by federal law." *Brotherton*

*v. Cleveland,* 923 F.2d 477, 481–82 (6th Cir.1991).

[14] [15] [16] [17] In the case at hand, the statutory language and the charter agreement[4] do not support Plaintiff's claim of a property interest protected by state law. "[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *EJS Properties, LLC v. City of Toledo,* 698 F.3d 845 (6th Cir.2012) (citation omitted). The charter agreement incorporates Tenn.Code Ann. § 49–13–122(a), which provides that "A public charter school agreement may be revoked or denied renewal by the final chartering authority if the chartering authority determines that the school ... (2) Received identification as a priority school, as defined by the state's accountability system." "The word 'may' customarily connotes discretion." *Jama v. Immigration and Customs Enforcement,* 543 U.S. 335, 346, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005). Interpreting similar statutory language while rejecting a charter school's procedural due process challenge, one federal district court wrote that the law "frames the decision to revoke a charter as a discretionary matter" and "affords the sponsor[5] of a charter school significant—indeed, almost total—discretion." *Project School v. City of Indianapolis,* No. 1:12–cv–01028–SEB–DKL, 2012 WL 3114573, at \*3 (S.D.Ind. July 31, 2012) (noting that the "use of the word 'may' is significant; this word is precatory and customarily connotes discretion") (internal quotation marks and citation omitted). Tennessee's law similarly uses the language of discretion, **\*879** not entitlement, and only minimally conditions that exercise of discretion.

Underscoring this broad grant of discretion, the Tennessee charter school statute repeatedly declares its purpose and intention to provide the state department of education and local school systems with "options," "alternative means," and "flexibility"—hardly the language of a statute creating a property interest. Tenn.Code Ann. § 49–13–102(a)(2), (b), (c), (d), & (e). The law constrains this discretion only by requiring the chartering authority to state its reason(s) for revoking the charter. *Id.* § 49–13–122(b). If, as in this case, the revocation occurs because of the school's priority status, no appeal is permitted—again emphasizing state discretion, not the charter holder's property rights. *Id.* § 49–13–122(c).

Even if it could be said that state law and the charter agreement create a property interest, for the aforementioned reasons, the Court finds that this interest does not rise to the level of a legitimate claim of entitlement protected by the Due Process Clause. *See Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 756–57, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005).

### ii. Property Interest of Parent and Putative Class Plaintiffs

Defendants assert that the parent Plaintiffs do not have a protected property interest in sending their children to the individual charter school of their choosing, *i.e.* SCMS. Furthermore, they argue, the parent Plaintiffs cannot show that the education their students will receive at new schools to which they are assigned next year is significantly different from, or inferior to, the education received at SCMS. Plaintiffs respond that the Tennessee Charter Schools Act gives them a legally protected interest in enrolling their children in the charter school of their choice, and that the parent Plaintiffs have established an entitlement, protected by the Due Process Clause, not to be transferred to an inferior school.

[18] [19] "Public education is not a 'right' granted to individuals by the Constitution." *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). "However, if a state elects to furnish free compulsory public education to *any* of its citizens ... it must do so in a manner, respecting *all* of its residents, which comports with basic Fourteenth Amendment equal protection and due process strictures." *Wayne v. Shadowen,* 15 Fed.Appx. 271, 283 (6th Cir.2001) (emphasis in original). In Tennessee, school-age children have a constitutional and statutory right to a public education. *Heyne v. Metropolitan Nashville Bd. of Public Educ.,* 380 S.W.3d 715, 731–32 (Tenn.2012). However, in the context of student discipline, the Sixth Circuit has suggested that a public school student "may not have procedural due process rights to notice and an opportunity to be heard when the sanction is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school." *Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1359 (6th Cir.1996) (citations omitted); *accord Wayne,* 15 Fed.Appx. at 290; *see also Mullen v. Thompson,* 31 Fed.Appx. 77, 80 (3rd Cir.2002) (holding that students "have no constitutionally cognizable property or liberty interest in attending the individual school of their choice").

[20] Plaintiffs argue that the Tennessee legislature created a substantive right to attend a charter school when it passed the Tennessee Charter Schools Act, and **\*880** that this right represents a property interest protected by due

process. (Docket No. 23 at 5). However, the Court disagrees and finds no support in statutory or case law for this proposition, nor do Plaintiffs cite any such authority. As explained *supra,* the Tennessee Charter Schools Act represents a broad grant of discretion to LEAs to revoke a school's charter. While SCMS can at least point to a signed charter agreement to support its claim to proprietary status, the Parent Plaintiffs present even less to justify their claim to "any significant property interests ... including statutory entitlements." *Arnett v. Myers,* 281 F.3d 552, 565 (6th Cir.2002) (citation omitted).

As to the parent Plaintiffs' assertion that, if SCMS is closed, they will have no choice but to transfer their children to an inferior MNPS zoned school, enroll them in private school, or homeschool them (Docket No. 1 ¶¶ 14–15), that allegation is belied by other allegations in the complaint (*see id.* ¶ 43), statements made at the November 13, 2012, meeting in question, and public records.[6] Defendants specifically discussed the need to give parents sufficient notice of the school's closing so that they could participate in the choice school and charter school application process, which was taking place in November 2012. (Docket No. 14–4). Plaintiffs' allegation that they will have no choice but to send their children to an inferior zoned school, home school, or private school falls short of the plausibility threshold and is contradicted by the pleadings.[7]

### iii. What Process Is Due

[21] [22] "The right to procedural due process requires that when a State seeks to terminate a protected interest it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective." *Crump v. Lafler,* 657 F.3d 393, 397 (6th Cir.2011) (internal citations omitted). Because the Court finds that no Plaintiff has a property interest protected by due process in the continued existence of SCMS, no process is due. However, the Complaint and the materials cited therein make it clear that Plaintiffs had notice of the revocation recommendation (Docket No. 14–3), and that their representative, Dr. Carolyn Baldwin Tucker, addressed the Board at the November 13, 2012, meeting (Docket No. 14–4). Even assuming *arguendo* that a Plaintiff could establish a protected property interest, the Court finds that they received appropriate procedural protections under the circumstances. *See Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (discussing three-factor analysis to determine what process is due); (Docket No. 14–1 at 17 (signed agreement stating that the

chartering authority may revoke agreement "according to the procedures set forth in TCA § 49–13–121 and TCA § 49–13–122")).

Accordingly, Plaintiffs' due process claims will be dismissed.

## II. Equal Protection Claim

[23] [24] " 'The Equal Protection Clause prohibits discrimination by government **\*881** which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.' " *Loesel v. City of Frankenmuth,* 692 F.3d 452, 461 (6th Cir.2012) (citation omitted) *cert. denied,* ––– U.S. ––––, 133 S.Ct. 878, 904, 184 L.Ed.2d 660 (2013). Because "the Equal Protection Clause is concerned with arbitrary government classification," a plaintiff can state a class-of-one discrimination claim by alleging that she has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Oregon Dep't of Agr.,* 553 U.S. 591, 601–02, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (citation omitted).

Defendants allege that Plaintiffs have failed to identify a similarly situated comparator for their class-of-one equal protection claim. Plaintiffs respond that their equal protection claim "is unique in that SCMS is the only charter school in the bottom 5%." (Docket No. 23 at 7). However, they assert in their response that MNPS treats charter schools differently than traditional public schools in priority status because traditional schools "are apparently exempt from closure or revocation." *Id.*

[25] [26] Plaintiffs "must overcome a 'heavy burden' to prevail based on the class-of-one theory." *Loesel,* 692 F.3d at 462 (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio,* 430 F.3d 783, 791 (6th Cir.2005)). Plaintiffs

> must show that they were treated differently than those similarly situated in all material respects. In addition, they must show that the adverse treatment they experienced was so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational. This showing is made either by negating every

conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will.

*Id.* (internal citation omitted).

In the instant case, Plaintiffs have not alleged the existence of another charter school that is similarly situated in all material respects, or other charter school parents who are likewise situated. Indeed, they concede that SCMS "is the only charter school in the bottom 5%." (Docket No. 23 at 7). Despite Plaintiffs' subsequent suggestion that SCMS be compared to traditional public schools in priority status, traditional public schools are not relevant comparators because Plaintiffs have not alleged that they have "relevant similarity," *see Bench Billboard Co. v. City of Cincinnati,* 675 F.3d 974, 987 (6th Cir.2012) (citation omitted), namely, that Defendants are authorized to close them for being identified as a priority school by the state. Nor do they assert that the legislative distinction between charter schools and traditional public schools lacks a "rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). While Plaintiffs do allege that Defendants' " 'Class of One' discrimination had no rational basis" and was implemented "arbitrarily and capriciously with a singular discriminatory intent," they fail to plead the existence of a similarly situated comparator. *See Vill. of Willowbrook v. Olech,* 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

As such, the Complaint does not contain sufficient factual matter to state a plausible claim for relief under the Equal Protection Clause. *See Iqbal,* 556 U.S. at 678–79, 129 S.Ct. 1937. Accordingly, Count II will be dismissed as to all Defendants.

## \*882 III. Other Pending Motions

Because the Court will grant Defendants' Motions to Dismiss, all other pending motions will be denied as moot.

### *CONCLUSION*

For the foregoing reasons, Defendants' Motions to Dismiss (Docket Nos. 12 & 14) will be GRANTED. All other pending motions will be DENIED AS MOOT. This action will be dismissed.

An appropriate Order will be entered.

### *ORDER*

For the reasons stated in the accompanying Memorandum, Defendants' Motions to Dismiss (Docket Nos. 12 & 14) are hereby GRANTED. All other pending motions are hereby DENIED AS MOOT. This action is dismissed.

The hearing scheduled for May 22, 2013, at 4:00 p.m. is cancelled.

It is SO ORDERED.

**All Citations**

947 F.Supp.2d 868, 299 Ed. Law Rep. 530

Footnotes

1    Unless otherwise indicated, this brief recitation of the factual background is drawn from the Complaint and documents referred to therein. *See infra* n. 4.

2    Of course, the discussion that follows would apply with equal force to a claim by the charter school itself.

3    A common-law writ of certiorari would seem to be an adequate state remedy for the unconstitutional deprivation alleged here. *See Heyne v. Metropolitan Nashville Bd. of Pub. Ed.,* 380 S.W.3d 715, 729–30 (Tenn.2012).

4    "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir.1997) ("[A] defendant may introduce certain pertinent documents if the plaintiff fails to do so. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied.") (internal citations omitted). Additionally, "a court may consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion." *Jones v. City of Cincinnati,* 521 F.3d 555, 562 (6th Cir.2008) (citing *Passa v. City of Columbus,* 123 Fed.Appx. 694, 697 (6th Cir.2005) ("[I]n order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute.")); *accord Ashland, Inc.,* 648 F.3d at 467 ("In addition to the allegations in the complaint, [the Court] may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

5    The term "sponsor" in the Indiana statute is roughly equivalent to the term "chartering authority" in Tennessee law.

6    *See supra* n. 4.

7    It is also doubtful that Plaintiffs can show that the zoned schools are "inferior" to SCMS. They concede that SCMS is a "priority school" (academic progress within the bottom 5% of schools in the state) under the state's academic accountability regime and that they "cannot refute the standardized test scores" (Docket No. 23 at 6). In light of these statistics, the Complaint's vague allegations about safety, overcrowding, learning, and nurture at unspecified MNPS zoned schools (Docket No. 1 at 5–6) cannot establish a claim of significant educational inferiority.

2012 WL 3114573
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

The PROJECT SCHOOL, Plaintiff,
v.
CITY OF INDIANAPOLIS and Gregory A. Ballard,
in his official capacity as Mayor of
Indianapolis/Marion County, Indiana,
Defendants.

No. 1:12–cv–01028–SEB–DKL. | July 31, 2012.

**Attorneys and Law Firms**

Andrew J. Mallon, Jayme E. Donnelson, Sean Thomas Devenney, Drewry Simmons Vornehm, LLP, Carmel, IN, for Plaintiff.

Alexander Phillip Will, Amanda J. Griffith, Office Of Corporation Counsel, Clifford R. Whitehead, City Of Indianapolis, Corporation Counsel, Indianapolis, IN, for Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

SARAH EVANS BARKER, District Judge.

**\*1** This cause is presently before the Court on the Emergency Motion to Expedite and Consolidate Hearing on Merits of Injunctive Relief [Docket No. 12], filed July 29, 2012 by Plaintiff, The Project School ("TPS"). On July 23, 2012, TPS filed its Verified Complaint [Docket No. 1–1] in the Marion Superior Court, asserting two causes of action: (1) a 42 U.S.C. § 1983 claim alleging violation of procedural due process protected by the Fourteenth Amendment to the Constitution, and (2) promissory estoppel. TPS contemporaneously moved for a temporary restraining order and a limited permanent injunction to prevent Defendants from revoking TPS's charter until June 30, 2013. Following receipt of a second motion for injunctive relief, the state court granted TPS's motion on July 24, 2012 and temporarily enjoined Defendants from any activities that would effectively prevent the School from opening on August 6, 2012 as

scheduled.[1] *See* Docket No. 1–7. Defendants removed the lawsuit to federal court on the basis of federal question jurisdiction[2] on July 26, 2012. Hoping to maintain the status quo under the state court order, TPS filed its Motion for Preliminary Injunction [Docket No. 10] the following day. In the instant motion, TPS seeks permanent injunctive relief as described above and, pursuant to Federal Rule of Civil Procedure 65(a), seeks an expedited, consolidated hearing on the merits of preliminary and permanent injunctive relief. The motion is fully briefed, and the Court, being duly advised in the matter, DENIES both of Plaintiff's motions.

Bearing in mind that time is of the essence, we begin with a very brief recitation of the facts. TPS is an Indianapolis charter school, which the Indiana Code defines as "a public elementary or secondary school ... that: (1) is nonsectarian and nonreligious; and (2) operates under a charter." Ind.Code § 20–24–1–4. On August 5, 2008, in his official capacity as Mayor of the City of Indianapolis, Gregory Ballard agreed to serve as TPS's "sponsor" within the meaning of Indiana Code § 20–24–1–9(3).[3] Pl.'s P.I. Br. at 2. The parties concomitantly executed a Charter Agreement,[4] which has governed the continuous operation of TPS since the 2008–09 school year. *See id.* Ex. A. One of the Mayor's Office's established sponsorship practices not only for TPS, but for every other charter school it supervised is to conduct a Fourth Year Charter Review (FYCR) and associated site visit. Pl.'s P.I. Br. at 2. Defendants furnished a preliminary draft of the FYCR to TPS's board of directors by letter dated July 17, 2012. *See id* .Ex. G. This document served two additional purposes: first, to notify TPS of Mayor Ballard's intent to revoke the school's charter; and second, to inform TPS of its right to appeal the notice on or before August 7, 2012, when a final revocation decision would issue. *Id.*

Both parties concede that the FYCR draft report was not the first indication that Defendants were concerned about the quality of TPS's operations and performance. Between May and July of 2012, TPS officials attempted to discuss "media reports critical of the [s]chool's performance" as well as "ways to address data and issues raised during the [FYCR] process" with the Mayor's Office. Pl.'s P.I. Br. at 3. Each time, they were instructed to wait until all the data required to complete the FYCR had been collected and analyzed. *See, e.g., id.* Ex. E. The Mayor's Office indicated on July 12, 2012 that it "anticipate[d] receiving the[se] final pieces of data ... in August" and provided a document to "give [TPS] a sense of what [its] FYCR [would] look like." Importantly, Defendants did not explicitly guarantee TPS a fifth year

**Tab E-10**

of operation, let alone a review of the school's fifth year plan. *See id.*[5] Notwithstanding these communications, on July 17, 2012, Defendants appointed interim trustees to facilitate enrollment of TPS students in other schools. TPS further alleges that around the same time, agents of the Mayor's Office verbally represented to parents and one media outlet that its decision to revoke TPS's charter was "final." Pl.'s P.I. Br. at 6, Exs. I, J. On July 20, 2012, TPS filed two responses to the Mayor's notice of intent to revoke. Compl. ¶ 27. TPS now entreats this court to find that, "[u]nless Defendants are immediately enjoined ... from the proposed school closing activities ..., it [will be] impossible to maintain TPS's student enrollment, upon which it is both manifestly and financially dependent for the 2012–2013 academic year and permanently."*Id.* ¶ 56.

**\*2** To determine whether injunctive relief is appropriate, a district court engages in a two-pronged analysis consisting of a threshold phase and a balancing phase. The party seeking injunctive relief must satisfy three requirements to survive the threshold phase; it must show (1) that the claim has some likelihood of success on the merits; (2) that, absent a preliminary injunction, it will suffer irreparable harm pending final resolution of its claim; and (3) that no adequate legal remedy will suffice. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008); *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir.2001). Permanent injunctive relief requires the same threshold showing, save one important distinction: the plaintiff must demonstrate *actual* success on the merits. *Plummer v. Am. Inst. of Certified Pub. Accountants,* 97 F.3d 220, 229 (7th Cir.1996) (noting that the relevant inquiry is "whether [the plaintiff] has *in fact* succeeded on the merits"); *see also Amoco v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.")."If the court determines that the moving party has failed to demonstrate *any one of [the] threshold requirements,* it must deny the injunction" and refrain from the balancing phase of its analysis. *Girl Scouts of U.S.A., Inc.,* 549 F.3d at 1086 (citing *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir.1992)) (emphasis added). This is precisely the situation before the Court: TPS has not established that either of its claims has some likelihood of succeeding on the merits, not to mention actual success. Accordingly, we shall abbreviate our discussion by limiting it to the first requirement of the threshold phase and omitting the balancing phase.

Our first inquiry in the present matter is the viability of

TPS's § 1983 constitutional claim. Success on the merits of this claim requires a showing that, while acting under color of state law, the defendant caused the plaintiff to suffer a constitutional injury. 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights; rather, it "provides the means by which rights conferred elsewhere may be enforced."*Bublitz v. Cottey,* 327 F.3d 485, 488 (7th Cir.2003). Accordingly, the Court must first identify the specific constitutional or statutory rights purportedly infringed. *Id.* These specific rights dictate "the appropriate analytical lens through which facts are to be viewed."*Payne ex rel. Hicks v. Churchich,* 161 F.3d 1030, 1039 (7th Cir.1998). Here, TPS contends that, while acting under color of state law, Defendants infringed upon its Fourteenth Amendment right to due process. The Fourteenth Amendment provides, in relevant part, that no state "shall deprive any person of life, liberty, or property, without due process of law."U.S. Const. Amend. XIV. Due process mandates an opportunity to be heard "at a meaningful time and in a meaningful manner," but only where a plaintiff has properly alleged an infringement of a protected property interest. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**\*3** As TPS has repeatedly informed the Court, the school is committed to its goal of commencing the 2012–13 school year on August 6, 2012. We cast no aspersions on TPS's expressed devotion to public education; indeed, we applaud the school's enthusiastic and principled advocacy over the past few years. Regrettably, however, whereas TPS's energy abounds, its understanding of the applicable law falls critically short. The school first alleges that its "ability to operate as a charter school for the 2012–2013 school year" is a protected property interest. Pl.'s Emerg. Mot. at 6. Further, TPS contends that its very existence and operation under the Charter Agreement are "not mere unilateral expectations or otherwise subject to the discretionary whims of the Mayor."Pl.'s P.I. Br. at 12. We disagree. A plain reading of Indiana's charter school statute, as applied to the relevant facts, plainly repudiates this argument.

We find TPS's apparent belief that its existence is not subject to Defendants' discretion patently unreasonable. Indiana law, which governs the Charter Agreement, affords the sponsor of a charter school significantindeed, almost totaldiscretion. Notably, the charter school statute frames the decision to revoke a charter as a discretionary matter, as follows:

> Notwithstanding the provisions of the charter, a sponsor that grants a charter *may* revoke the charter at any time before the expiration of

the term of the charter *if the sponsor determines* that at least one (1) of the following occurs: (1) The organizer[6] fails to comply with the conditions established in the charter; (2) The charter school established by the organizer fails to meet the educational goals set forth in the charter; (3) The organizer fails to comply with all applicable laws; (4) The organizer fails to meet generally accepted government accounting principles; [or] (5) One (1) or more grounds for revocation exist as specified in the charter.

Ind.Code § 20–24–9–4 (emphases added). The use of the word "may" is significant; this word "is precatory and 'customarily connotes discretion.' " *Exelon Generation Co. v. Local 15, Int'l B'hood of Elec. Workers,* 676 F.3d 566, 571 (7th Cir.2012) (internal citations omitted). Other provisions of the statute support our conclusion that decisionmaking regarding TPS's very existence falls squarely within the ambit of Defendants' sponsorship duties. For instance, a sponsor *may* grant a charter to an organizer to operate a charter school,"Ind.Code § 20–24–3–1, and *may* reject a charter school proposal, *see id.* § 20–24–3–11.

With the foregoing provisions in mind, it is clear that Defendants' decision to revoke TPS's charter was both permissible under Indiana statute and entirely within Defendants' prerogatives. Between July 1, 2008 and June 30, 2010, the State Board of Accounts (SBOA) audited TPS and found "significant deficiencies and material weaknesses in [TPS's] management" of federal grant monies. Defs.' Resp. Ex. 3 at 1. SBOA found, *inter alia,* that TPS: had overdrawn its general fund by nearly $225,000 as of June 30, 2010; regularly used restricted funds to pay salaries; failed to submit timely financial data to the Mayor's Office when requested to do so; failed to maintain a balanced budget between 2009 and 2012; and regularly used its revolving line of credit to pay expenses. *Id.* at 1–2;*see also* Defs.' Resp. Ex. 5 (indicating TPS's massive debt load and projected negative cash flow). In the aggregate, these facts support a finding that, pursuant to Indiana Code § 20–24–9–4(5), "one (1) or more grounds for revocation exist as specified in the charter."Specifically, they constitute compelling evidence that TPS was "becom[ing] insolvent," which is one of the Charter Agreement's permissible bases for revocation of the charter. Charter Agrmt. § 16.4(j).

**\*4** The facts also support revocation of TPS's charter under Indiana Code § 20–24–9–4(2), which permits the sponsor to cease school operations if the school fails to meet the charter's educational goals. The uncontroverted evidence before the Court paints a bleak picture of the school in this respect. In its charter application, TPS stated that its primary goals were to have each student reading, writing, and computing "at or above grade level" within his or her first three consecutive years of study. Charter App. at 4. Reports from the Mayor's Director of Charter Schools document clear failures with respect to this goal, citing "failing ISTEP+ test scores for all of [TPS's] year[s] operating as a charter school."Defs.' Resp. Ex. 1 at 2. In fact, disaggregated state test results placed TPS in the bottom five percent of Marion County schools and the bottom two percent of Indiana schools. *Id.* at 3. The Director of Charter Schools also made a specific finding with respect to TPS's educational goals:

> [I]n 2011–2012, only 36.0% of students who had been enrolled for three consecutive years or more demonstrated proficiency in both English and mathematics. This falls short of the school's academic goal, as stated in the Charter Agreement, that by the third year of enrollment, every student would be able to read, write and compute as measured by state standardized tests.

*Id.* at 4.

Faced with such dismal results respecting TPS's academic and financial health, Mayor Ballard's decision was factually reasonable and legally permissible. His revocation of TPS's charter was justified not only by concrete facts, but also by statutory law which clearly afforded him discretion in the matter. Consequently, TPS's argument that somehow its existence is a "property right" for purposes of Fourteenth Amendment due process is a nonstarter.

TPS also asserts that "[l]egitimate and reasonable reliance on a promise from the state can be the source of property rights protected under the Due Process Clause."Pl.'s Reply at 5 (citing *Vail v. Bd. of Educ. of Paris Union Sch. Dist. No. 95,* 706 F.2d 1435, 1440 (7th Cir.1983)). Although indisputably true, this legal principle is applicable only with a showing as to one thing TPS has failed to demonstrate: an actual promise. In *Vail,* the Seventh Circuit alluded to its prior holding in *McElearney v. University of Illinois,* 612 F.2d 285, 290 (7th Cir.1979),

which held that informal assurances do not give rise to a constitutionally protected property right. Additional Seventh Circuit case law supports this proposition; for instance, in *Upadhya v. Langenberg,* 834 F.2d 661, 665 (7th Cir.1987), the court held that vague statements (and a party's understanding of what has been said to him) "do not transmute probabilities into entitlements."The Seventh Circuit has also noted "overwhelming" authority establishing that even repeated assurances of being "on the right track" or being "certain [to] be retained if ... performance is satisfactory" do not create an enforceable property right. *Colburn v. Trs. of Ind. Univ.,* 973 F.2d 581, 592 (7th Cir.1992). Having reviewed the inter-party communications in the record, we can point to no statements that rise above the level of "vague assurances," guesses, or anticipated results. A promise requires something much more, strengthening our view that none of Defendants' statements to Plaintiff suffice to provide a basis for any property right. Having found no evidence of any actionable "promise" made by Defendants, we need not address Plaintiff's promissory estoppel claim, which cannot survive in the absence of a promise.

**\*5** Because TPS has failed to demonstrate the existence of a protected property right under the Fourteenth Amendment or the critical element of promissory estoppel, further analysis is unnecessary. It is patently clear that TPS has failed to establish any likelihood of succeeding on the merits of either claim it has advanced against Defendants. By extension, TPS has similarly faltered in its efforts to demonstrate actual success, as required for permanent injunctive relief. TPS's failures at this stage of the analysis foreclose any need for the Court to convene a hearing as TPS has requested that we do, given that oral argument cannot revitalize the school's case or overcome its deficiencies. Therefore, we DENY Plaintiff's request for an expedited, consolidated hearing on the matter. Additionally, in accordance with guiding case law, we DENY Plaintiff's Motions for preliminary and permanent injunctive relief.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3114573

Footnotes

1    This order, which also enjoined Defendants from "promoting the removal of students from TPS enrollment or teachers from TPS staff," was to expire at 4:00 p.m. on August 3, 2012, barring extension by the Marion Superior Court. Docket No. 1–1 at 2.

2    28 U.S.C. § 1331.

3    For purposes of the charter school statute, a "sponsor" is "one of the following ... (3)[t]he executive ... of a consolidated city."Ind.Code § 20–24–1–9(3). The term "executive" includes the mayor of a city. *Id.* § 36–1–2–5.

4    The Charter Agreement is "governed by, subject to, and construed under the laws of the State of Indiana."Pl.'s P.I. Br. Ex. A § 18.2.

5    TPS was informed only that an anticipated meeting "would be the opportune time for [the parties] to discuss the [fif]th year plan."Pl.'s P.I. Br. Ex. E.

6    "Organizer" refers to the not-for-profit group that enters into a contract to operate as a charter school; thus, for purposes of this lawsuit, the "organizer" is TPS. *See*Ind.Code § 20–24–1–7.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** S.M. v. Delaware Department of Education, D.Del., January 12, 2015

**46 F.Supp.3d 455
United States District Court,
D. Delaware.**

**Reach Academy for Boys and Girls, Inc., O.G., by
her parent and next friend, T.W., by her parent
and next friend, T.W., by her parent and next
friend, S.O., by her parent and next friend,
Plaintiffs,
v.
Delaware Department of Education and Mark
Murphy in his capacity as Secretary of the
Delaware Department of Education, Defendants.**

**C.A. No. 13–1974–LPS | Signed May 30, 2014**

**Synopsis**

**Background:** All-girls public charter school, and students through their parents or guardians, sued Delaware Department of Education (DOE) and its Secretary, claiming that non-renewal of school's charter violated Equal Protection Clause, Due Process Clause, Title IX, and two provisions of Delaware's Charter School Act (CSA). Plaintiffs moved for preliminary injunction, and defendants moved to dismiss for failure to state claim.

**Holdings:** The District Court, Stark, J., held that:

[1] charter school lacked standing;

[2] procedural due process claim was not actionable;

[3] DOE did not violate CSA's technical assistance provision;

[4] DOE did not violate CSA's notice provision;

[5] equal protection claim was sufficiently alleged;

[6] Title IX claim was sufficiently alleged; and

[7] preliminary injunction was warranted.

Plaintiffs' motion granted; defendants' motion granted in part and denied in part.

West Headnotes (35)

**[1]**   **Federal Courts**
          Pleadings and motions

When a motion to dismiss for failure to state a claim relies on the absence of Article III standing, the motion is analyzed pursuant to the rule governing motions to dismiss for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1), 12(b)(6).

Cases that cite this headnote

**[2]**   **Federal Courts**
          Pleadings and motions
          **Federal Courts**
          Evidence; Affidavits

Motions to dismiss for lack of subject matter jurisdiction may present either facial or factual challenges to district court's jurisdiction. Fed. R. Civ. P. 12(b)(1).

Cases that cite this headnote

**[3]**   **Federal Courts**
          Pleadings and motions
          **Federal Courts**
          Presumptions and burden of proof

A facial challenge to district court's subject matter jurisdiction, which contests only the sufficiency of the pleadings, is subjected to an analysis identical to that of a motion to dismiss for failure to state a claim; thus, the court considers only the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**Tab E-11**

Cases that cite this headnote

Cases that cite this headnote

**[4]** **Federal Civil Procedure**
🔑In general; injury or interest
**Federal Civil Procedure**
🔑Causation; redressability

To establish Article III standing, plaintiff must satisfy three requirements: (1) an injury in fact, which is an invasion of a legally-protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) a causal connection between the injury and the conduct complained of, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S. Const. art 3, § 2, cl. 1.

Cases that cite this headnote

**[5]** **Constitutional Law**
🔑Local government
**Constitutional Law**
🔑Governmental entities

A political subdivision created by a state for the better ordering of government has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator; nonetheless, an exception to this principle is recognized in actions against the state arising under the Supremacy Clause. U.S. Const. art. 6, cl. 2.

Cases that cite this headnote

**[6]** **Education**
🔑Construction and operation of charter

Under Delaware law, the legal status of a charter school is equivalent to that of a public school district. 14 Del. Code §§ 503, 503, 504.

**[7]** **Education**
🔑Construction and operation of charter

Under Delaware law, just as school districts are "political subdivisions," so effectively, are charter schools, and charter schools lack capacity to bring suit against the state. 14 Del. Code § 504(d).

Cases that cite this headnote

**[8]** **Civil Rights**
🔑Education
**Education**
🔑Judicial review

All-girls charter school lacked standing to pursue claims against Delaware Department of Education (DOE) and its Secretary for allegedly violating constitution, Title IX, and Delaware's Charter School Act (CSA) by non-renewal of school's charter, since charter school was political subdivision lacking capacity to bring suit in opposition to state of Delaware that created school. U.S. Const. art. 3, § 2, cl. 1; Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681; 14 Del. C. §§ 506, 514A.

Cases that cite this headnote

**[9]** **Constitutional Law**
🔑Procedural due process in general

When a plaintiff filed a § 1983 claim based on a state actor's failure to provide procedural due process, district courts undertake a two-stage inquiry to determine: (1) whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) whether the procedures available provided the plaintiff with due process of law. U.S. Const. Amend. 14; 42

U.S.C.A. § 1983.

Cases that cite this headnote

[10] **Constitutional Law**
🔑Source of right or interest
**Constitutional Law**
🔑Benefits, rights and interests in

In analyzing a due process claim, property rights are not created by the constitution; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules, or understandings that secure benefits and that support claims of entitlement to those benefits. U.S. Const. Amend. 14.

Cases that cite this headnote

[11] **Constitutional Law**
🔑Accreditation and licensure
**Education**
🔑Termination of charter
**Education**
🔑Judicial review

Students in all-girls charter school and their parents lacked cognizable property interest in renewal of school's charter, as required to support procedural due process claim by students and parents against Delaware Department of Education (DOE); under Delaware law, charter was renewable only at discretion of DOE. U.S. Const. Amend. 14; 14 Del. Code § 514A(b).

Cases that cite this headnote

[12] **Constitutional Law**
🔑Accreditation and licensure
**Education**
🔑Termination of charter

Even if students in all-girls charter school and their parents had protected property interest in renewal of school's charter, they were provided with constitutionally adequate procedural due process, where charter school accountability committee (CSAC) met with school to discuss renewal application, DOE then held public hearing affording school opportunity to submit supplemental materials, and CSAC afforded school yet another hearing before making final determination of non-renewal. U.S. Const. Amend. 14; 14 Del. Code § 514A(g).

1 Cases that cite this headnote

[13] **Civil Rights**
🔑Due process of law and equal protection

Section 1983 may not be invoked every time local officials allegedly act contrary to state or local procedural law purportedly in violation of due process. U.S. Const. Amend. 15; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[14] **Education**
🔑Application and approval

Delaware Department of Education's (DOE) failure to provide technical assistance to all-girls charter school after its creation did not violate Delaware's Charter School Act (CSA) provision, requiring DOE to assist school with initial charter application, but not requiring DOE to provide technical assistance on continuous ongoing basis. 14 Del. Code § 506(a)(3).

Cases that cite this headnote

[15] **Education**
🔑Termination of charter

Delaware Department of Education's (DOE)

failure to provide all-girls charter school notice that its charter was in jeopardy of non-renewal did not violate Delaware's Charter School Act (CSA) provision requiring such notice, since provision did not exist at time that school's charter was in jeopardy of non-renewal. 14 Del. Code § 514A.

Cases that cite this headnote

[16] **Injunction**
🔑Extraordinary or unusual nature of remedy
**Injunction**
🔑Grounds in general; multiple factors

A preliminary injunction is an extraordinary remedy, and district courts consider four factors when faced with a request to grant one: (1) whether the movant has shown a reasonable probability of success on the merits, (2) whether the movant will be irreparably injured by denial of relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting the preliminary relief will be in the public interest.

Cases that cite this headnote

[17] **Civil Rights**
🔑Substantive or procedural rights

Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States constitution and federal statutes that it describes. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[18] **Civil Rights**
🔑Nature and elements of civil actions

To prevail on a § 1983 claim, plaintiff must demonstrate: (1) a violation of a right secured by the constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[19] **Constitutional Law**
🔑Similarly situated persons; like circumstances

The Fourteenth Amendment's Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. Amend. 14.

Cases that cite this headnote

[20] **Constitutional Law**
🔑Intentional or purposeful action requirement
**Constitutional Law**
🔑Similarly situated persons; like circumstances

In order to bring a successful § 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination; in other words, they must demonstrate that they received different treatment from that received by other individuals similarly situated. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[21] **Constitutional Law**
🔑Sex or Gender

In the context of a sex discrimination claim, to bring a successful § 1983 claim for the denial of equal protection, plaintiffs must show that their disparate treatment from others similarly situated was based upon gender. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Clause by not renewing charter for all-girls school while continuing to renew charter for all-boys school. U.S. Const. Amend. 14; 14 Del. Code § 506(a)(3).

2 Cases that cite this headnote

**[22]    Constitutional Law**
🔑Sex or Gender

Gender classifications under law are not inherently proscribed by the Equal Protection Clause; indeed, gender classifications may be used in a variety of legitimate ways, such as to compensate women for particular economic disabilities they have suffered, to promote equal employment opportunity, or to advance full development of the talent and capacities of citizens. U.S. Const. Amend. 14.

Cases that cite this headnote

**[23]    Constitutional Law**
🔑Sex or gender

Because gender classifications have been used to create or perpetuate the legal, social, and economic inferiority of women, courts review classifications based on gender to determine whether the proffered justification is exceedingly persuasive; thus, the burden on defendants is demanding, as they must show that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. U.S. Const. Amend. 14.

Cases that cite this headnote

**[24]    Civil Rights**
🔑Education

Students of all-girls charter school and their parents, seeking preliminary injunction requiring Delaware Department of Education (DOE) to renew school's charter for additional school year, had likelihood of success on merits of claim that DOE violated Equal Protection

**[25]    Civil Rights**
🔑Sex Discrimination

To prevail on a Title IX claim, plaintiffs need not show that a defendant purposefully discriminated on the basis of gender. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

Cases that cite this headnote

**[26]    Civil Rights**
🔑Education

Students of all-girls charter school and their parents, seeking preliminary injunction requiring Delaware Department of Education (DOE) to renew school's charter for additional school year, had likelihood of success on merits of Title IX claim, where DOE refused to renew charter for all-girls school while continuing to renew charter for all-boys school. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); 34 C.F.R. § 106.34(c); 14 Del. Code § 506(a)(3).

2 Cases that cite this headnote

**[27]    Injunction**
🔑Irreparable injury
**Injunction**
🔑Adequacy of remedy at law

To obtain a preliminary injunction, a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial; the preliminary injunction

must be the only way of protecting the plaintiff from harm.

Cases that cite this headnote

[28]     **Injunction**
         🔑Irreparable injury

The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm required to grant a preliminary injunction.

Cases that cite this headnote

[29]     **Civil Rights**
         🔑Education

Students of all-girls charter school and their parents, seeking preliminary injunction requiring Delaware Department of Education (DOE) to renew school's charter for additional school year on grounds that non-renewal allegedly violated Equal Protection Clause and Title IX, would likely suffer irreparable harm in absence of preliminary injunctive relief, where non-renewal would negatively impact parents' willingness to consider school as option for their children, causing precipitous drop in enrollment and lack of financial viability even though students and parents could succeed at trial. U.S. Const. Amend. 14; Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); 14 Del. Code § 506(a)(3).

Cases that cite this headnote

[30]     **Injunction**
         🔑Balancing or weighing hardship or injury

Before issuing a preliminary injunction, district courts must weigh the potential harm to the moving party, in the absence of the requested relief, against the potential harm, if any, to the nonmoving party and others not subject to the action if the relief is granted.

Cases that cite this headnote

[31]     **Injunction**
         🔑Extraordinary or unusual nature of remedy
         **Injunction**
         🔑Balancing or weighing factors; sliding scale

A preliminary injunction is an extraordinary remedy never awarded as of right; in each case, district courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.

Cases that cite this headnote

[32]     **Injunction**
         🔑Public interest considerations

District court must determine whether a grant of preliminary relief would be in the public interest; in other words, in exercising their sound discretion, the court must pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

Cases that cite this headnote

[33]     **Civil Rights**
         🔑Preliminary Injunction

In determining whether to grant a preliminary injunction, in the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights.

Cases that cite this headnote

[34]    **Civil Rights**
⚷ Education

Balance of hardships favored preliminary injunction requiring Delaware Department of Education (DOE) to renew charter for all-girls charter school for additional school year on grounds that non-renewal allegedly violated Equal Protection Clause and Title IX, since non-renewal would likely cause school to cease to exist before trial on merits of claims, so educational opportunities for students would be gone forever, which outweighed harms to DOE by allowing failing school to continue receiving benefits. U.S. Const. Amend. 14; Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); 14 Del. Code § 506(a)(3).

Cases that cite this headnote

[35]    **Civil Rights**
⚷ Education

Public interest favored preliminary injunction requiring Delaware Department of Education (DOE) to renew charter for all-girls charter school for additional school year on grounds that non-renewal allegedly violated Equal Protection Clause and Title IX, since public interest was served by demanding that DOE comply with federal and state laws. U.S. Const. Amend. 14; Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); 14 Del. Code § 506(a)(3).

1 Cases that cite this headnote

**Attorneys and Law Firms**

*459 Duane D. Werb, WERB & SULLIVAN, Wilmington, DE, Charles J. Brown, III, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, DE, Attorneys for Plaintiffs.

Catherine T. Hickey, Joseph Clement Handlon, Kenisha LaShelle Ringgold, DEPARTMENT OF JUSTICE, Wilmington, DE, Attorneys for Defendants.

*OPINION*

STARK, U.S. District Judge:

*INTRODUCTION*

This case arises from unique factual circumstances and presents the Court with difficult issues of first impression implicating the public availability of same-gender education in the State of Delaware. On November 12, 2013, the State of Delaware, through its Department of Education and Secretary of Education ("DOE" or "Defendants"), made the decision not to renew the charter of Reach Academy for Girls ("Reach"), thereby effectuating the closing of the only all-girls public school in the State of Delaware. Reach filed suit in federal court, alleging violations of Equal Protection, Title IX of the Education Act (20 U.S.C. § 1681), Due Process, and two provisions of Delaware's Charter School Act (14 Del. C. §§ 506 & 514A). (D.I. 1) ("Complaint") The Complaint is also filed on behalf of individual students at Reach **460 through their parents and guardians[1] ("Individual Plaintiffs" and, with Reach, "Plaintiffs"). In their suit, Plaintiffs seek an order that Defendants renew Reach's charter for a five-year term.

Plaintiffs filed a Motion for a Preliminary Injunction (D.I. 7) and Defendants filed a Motion to Dismiss. (D.I. 10) After a hearing on January 2, 2014, on January 3 the Court granted in part and denied in part Defendants' Motion to Dismiss and granted Plaintiffs' Motion for a Preliminary Injunction. (D.I. 18) Although the Court issued an 11–page Memorandum Order at that time, it stated it would provide further explanation in a later opinion. Today's Opinion sets forth in detail the reasoning of the Court.[2]

*BACKGROUND*

**Factual Background**

In 1996, the Supreme Court issued its decision in *United States v. Virginia ("VMI"),* 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), relating to state-sanctioned schools that deny applicants admission on the basis of gender. The Supreme Court held that "Virginia's categorical exclusion of women from the educational opportunities [the Virginia Military Institute] provides denies equal protection to women;" "[n]either federal nor state government acts compatibly with equal protection when a law or official policy denies to women, simply because they are women, full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *Id.* at 515–16, 116 S.Ct. 2264. In 2006, the United States Department of Education ("U.S. Department of Education") issued regulations relating to the requirements for the opening and operation of same-sex schools receiving federal funding pursuant to the No Child Left Behind Act of 2001, 20 U.S.C. § 6301 *et seq. See generally* 34 C.F.R. § 106.34.

In 2008, the Delaware General Assembly amended its charter school laws in accordance with the U.S. Department of Education regulations to allow applicants an opportunity to apply for and create same-gender charter schools. *See* 76 Del. Laws ch. 202, §§ 1–6 (2008) (codified at 14 Del. C. § 506(a)(3)).[3] However, this opportunity was made available for only a limited period. Section 506 limits the acceptance of applications for a same-sex charter school by providing that "[t]he same-gender charter school provisions shall sunset, for any new charter applications, on June 30, 2013, unless the General Assembly has otherwise acted to extend such date prior to its expiration." 14 Del. C. § 506(a)(3)e.

At the time Section 506 was adopted, Delaware had one all-boys school, Prestige Academy, and no all-girls charter school. The new law reflects this state of affairs, providing:

> [T]he Department of Education, with approval of the State Board of Education, shall be considered the approving authorizer of Prestige Academy, a same-gender school, and shall provide oversight to such school. The Department of Education, with the approval of the State Board, may waive any provisions **\*461** in this Chapter that would limit the school from opening for the 2008–2009 school year. Any subsequent same-gender charter school shall make its

application to the Department of Education and the State Board of Education.

14 Del. C. § 506(a)(3)c. Subsection 506(a)(3)d calls for the creation of a "substantially equal" "same-gender charter school of the opposite gender ... matching in grade level and marketed towards similar demographics [as Prestige Academy]."

In 2009, Reach was approved as the all-girls counterpart to Prestige, and in 2010 Reach began conducting classes for several grade levels. (D.I. 1 ¶¶ 8, 10, 20 n.1) From the very start, Reach had difficulties. Less than two months after opening its doors to its first students, Reach came under the scrutiny of the DOE for financial mismanagement and was placed under formal review. (D.I. 1 ¶¶ 10–12) With the school threatened with closure, Reach's Board of Directors was in turmoil, and in May 2011 all of the directors resigned. (D.I. 1 ¶ 13–15) Under the direction of a new board, in June 2011 Reach filed suit in the Delaware Court of Chancery seeking to enjoin the DOE from closing Reach. (D.I. 1 ¶ 16) Before the Chancery Court was required to make any ruling on the merits, the DOE and Reach came to an agreement whereby the DOE recommended that Reach remain open but also be placed on probation. (D.I. 1 ¶ 18)

Under new leadership, enrollment for the 2012–2013 school year was robust, as Reach expanded from offering four grade levels (kindergarten, first, fifth, and sixth) in the 2010–2011 school year to now offering eight grade levels (kindergarten through third and fifth through eighth). (D.I. 1 ¶ 20 n. 1) Because state funding for a charter school is based on its enrollment in September of any given year, the number of students enrolled at a charter school is key to its continued viability. (D.I. 1 ¶ 10) Reach's increased enrollment meant an improved financial status, and in May 2013 the DOE removed Reach from probation. (D.I. 1 ¶ 19) In June 2013, the DOE approved a modification of Reach's charter and authorized it to enter into a long-term lease to occupy a recently-vacated school complex. (D.I. 1 ¶ 22)

Reach's application for a renewal of its charter was due in September 2013. In July 2013, Reach students' results on the Delaware Comprehensive Assessment Scores ("DCAS"), the statewide test used to monitor student performance, were poor. The scores placed Reach students' performance in Delaware's lowest-performing category of "Falls Far Below Standard" in both math and reading, resulting in an overall school rating of "F." (*See* D.I. 9 ex. A)[4]

Coinciding with Reach's impending renewal deadline was a July 2013 amendment to the Delaware Code, which changed the renewal process for charter schools; the DOE's charter application procedure was also revised. *See* 79 Del. Laws ch. 51, §§ 1–2 (July 1, 2013); *see also* D.I. 11 ex. A at 7–8; D.I. 7 ex. 4 ¶ 3. Amended 14 Del. C. § 514A(c) now mandates that the DOE issue a renewal report by April 30th to provide guidance to charter schools in danger of non-renewal. Reach did not benefit from this amendment, however, since Reach's renewal application year was 2013 and the amendment **\*462** was adopted after April 30, 2013. Similarly, the timing of the DOE's revision to its charter application process had the effect of truncating the time available for Reach to prepare its renewal application from seven months to three months. (D.I. 7 ex. 4 ¶ 3)

Reach submitted its charter renewal application by the deadline of September 30, 2013. (D.I. 1 ¶ 26) On October 7, Reach met with the Charter School Accountability Committee ("CSAC") to discuss its renewal application. On October 15, the CSAC—citing the poor performance of Reach's students—issued a preliminary report recommending that Reach's charter not be renewed. (D.I. 1 ¶ 27; *see also* D.I. 14 App. at A85) On October 23, a public hearing lasting several hours was held in Dover, Delaware at which Reach students and their parents testified about the school's significance in the community. (D.I. 1 ¶ 28; *see also* D.I. 3 ex. D) After receiving supplemental materials responding to concerns raised at the October 15 meeting, the CSAC met once more on November 4 to discuss Reach's renewal application. (D.I. 1 ¶ 29; *see also* D.I. 14 App. at A115–20) On November 6, a second public hearing was conducted, during which Reach made a final effort to persuade the DOE to grant its application, including by presenting testimony from representatives of the NAACP and submitting data related to the recent test scores of Reach students. (D.I. 1 ¶ 30; D.I. 3 exs. E, G) These efforts failed and the next day the CSAC issued its final report recommending denial of Reach's renewal application. (D.I. 1 ¶ 32; D.I. 14 App. at A121) On November 12, Reach's application for renewal was officially denied when Secretary Murphy informed the State Board of Education that he was not recommending renewal of Reach's charter.[5] (D.I. 1 ¶ 34)

**Procedural Background**

On November 25, 2013, Reach and several of its students filed this suit against the Delaware Department of Education and Secretary Mark Murphy. Plaintiffs assert five causes of action: (1) deprivation of their constitutional right to equal protection under the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a discrimination action under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681; (3) a violation of their right to due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (4) violations of Delaware law relating to 14 Del. C. § 506; and (5) violations of Delaware law relating to 14 Del. C. § 514A. (D.I. 1) On December 11, 2013, Plaintiffs filed an emergency Motion for a Preliminary Injunction[6] seeking a temporary stay of the DOE's decision in advance of a critical application deadline of January 8, 2014, the date by which parents are required to file "choice" requests for student placement for the 2014–15 school year. (D.I. 7)

After ordering and receiving letters concerning Plaintiffs' motion (D.I. 8, 9), on December 13 the Court held a teleconference to discuss how the case would proceed. At the conclusion of the teleconference, the Court directed the parties to **\*463** complete, by December 30, all briefing on the preliminary injunction motion as well as a motion to dismiss Defendants intended to file. The Court expressed the view it was in all parties' interest to expedite proceedings given the impending January 8 choice deadline. (*See* Dec. 13 Hr'g Tr. at 27–32)

On January 2, 2014, the Court heard oral argument on both motions. (*See* D.I. 12–13) The next day, January 3, the Court issued its memorandum order granting in part and denying in part Defendants' Motion to Dismiss, and granting Plaintiffs' Motion for a Preliminary Injunction. (D.I. 18) Specifically, the Court dismissed Plaintiffs' Due Process and state law claims, and dismissed Reach as a party due to lack of standing. (*Id.*) The Court found that the Individual Plaintiffs had sufficiently plead claims upon which relief may be granted with respect to Equal Protection and Title IX. (*Id.*) Finally, the Court granted the Individual Plaintiffs' preliminary injunction motion on the surviving claims and, as relief, extended Reach's charter by one school year, subject to any reasonable conditions the DOE might impose. *(Id.* at 10–11)

### *MOTION TO DISMISS*

**I. Legal Standards**

When presented with a motion to dismiss for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(6), courts conduct a two-part analysis. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). First, courts separate the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210–11. This step requires courts to draw all reasonable

inferences in favor of the non-moving party. *See Maio v. Aetna, Inc.,* 221 F.3d 472, 500 (3d Cir.2000). However, courts are not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.,* 113 F.3d 405, 417 (3d Cir.1997), or allegations that are "self-evidently false," *Nami v. Fauver,* 82 F.3d 63, 69 (3d Cir.1996).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler,* 578 F.3d at 211 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. This is a context-specific determination, requiring the court "to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.,* 522 F.3d 315, 321 (3d Cir.2008) (internal quotation marks omitted). Courts may consider exhibits attached to the complaint, matters of public record, and "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

[1] [2] [3] When a Rule 12(b)(6) motion relies on the absence of Article III standing, it is analyzed pursuant to Federal Rule of Civil Procedure Rule 12(b)(1). *See* **\*464** *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007) ("A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (noting that standing is "threshold jurisdictional question"). Motions brought under Rule 12(b)(1) may present either facial or factual challenges to a court's subject matter jurisdiction. *See Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). A facial challenge, which contests only the sufficiency of the pleadings, is subjected to an analysis identical to that of a Rule 12(b)(6) motion; thus, a court considers "only ... the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elec. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). Here,

Defendants' motion is properly construed as a facial challenge because Defendants "accept[ ] as true" the "facts set forth in the Complaint" but nevertheless contend that the allegations are insufficient to "state[ ] a plausible claim for relief." (D.I. 11 ¶ 1)

## II. Standing

[4] The Court agrees with Defendants that Reach lacks standing to press any of the claims in the complaint. (D.I. 11 ¶¶ 11–12) To establish standing, a plaintiff must satisfy three requirements: (1) an injury in fact, which is an invasion of a legally-protected interest that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical;' " (2) a causal connection between the injury and the conduct complained of; and (3) it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### A. Reach as Charter Holder and Reach as Charter School

Defendants argue that Reach lacks standing because charter schools have a legal status equivalent to that of a school district, and a school district lacks standing to sue the State that created it.[7] (D.I. 11 ¶ 12) Reach counters that it brings suit in its capacity as a charter holder rather than as a charter school and, thus, should not be viewed as like a school district. Nevertheless, Reach further argues it would have standing as a charter school because it is bringing claims under the Supremacy Clause. (D.I. 15 at 5–7)

As a threshold matter, the Court must examine the distinction between a charter holder and a charter school. If Reach Academy for Boys and Girls, Inc. as the holder of a charter, is a legally distinct entity from the charter school Reach Academy for Girls, then the standing inquiry may be affected. Plaintiffs contend that "[w]hereas Reach might have an issue suing Defendants in its capacity as a Charter School, that fact should not preclude it from filing suit in its capacity as a private Delaware corporation that is a Charter Holder." (D.I. 16 at 4) In attempting to distinguish between the corporate entity and the school, Plaintiffs observe that, absent judicial relief, "the school itself will cease to exist. In the event of non-renewal, Reach, on the other hand, will not cease to exist but will still be a private non-profit corporation with assets and liabilities that have to be administered pursuant to its corporate charter and its

by-laws." (D.I. 15 at 8)

**\*465** At least one court has held that this distinction makes a difference. In *Project Reflect, Inc. v. Metro. Nashville Bd. of Pub. Educ.,* 947 F.Supp.2d 868, 875 (M.D.Tenn.2013), the court found that the Plaintiff before it was the charter school sponsor, not the charter school, obviating the need for a standing analysis. *Id.* The court based its conclusion on the clear distinction in Tennessee law between a sponsor and a charter school: "[t]he sponsor—as distinguished from the 'governing body of the public charter school'—plays a key role in applying for a charter, appealing its disapproval, and, if approved, signing the written agreement, 'which shall be binding upon the governing body of the public charter school.' " *Id.* Defendants assert that, in Delaware, no such distinction exists: "Reach Academy for Girls and Reach Academy for Boys and Girls, Inc. are not separate legal entities. The former is a 'd/b/a' of the latter.... Reach Academy for Girls could only sue the state in its corporate name." (D.I. 17 at 4) In this way, according to Defendants, Delaware's charter school regime is different from that involved in Tennessee's *Project Reflect* case. (D.I. 17 at 4)

Defendants are correct. Generally speaking, Delaware law makes no substantive distinction between a charter holder and a charter school. *See generally* 14 DE Admin. Code 275.2.1. Beyond the initial application process, a charter holder does not exist or act separately from the charter school; among other things, the two share a common board of directors. *See* 14 DE Admin. Code 275.2.1 (defining board of directors of charter school as board of directors of applicant at time of charter approval). Delaware law makes explicit that a charter school's board of directors is deemed a public body with the same standing and authority, except for the power to tax, as a board of education of a traditional public school district. *See* 14 Del. C. §§ 503, 1041(1). The situation is different in Tennessee, where a sponsor is a distinct entity separate from the governing body of the charter school, possessing the power to bind the governing body to contracts. *See Project Reflect,* 947 F.Supp.2d at 875. Unlike the situation in *Project Reflect,* Reach's operations are limited to the operation of the charter school, as Delaware law does not permit a charter holder to operate any business except a charter school. 14 DE Admin. Code 275.4.1.3.2.

Thus, the Court finds no legally cognizable distinction between Reach's capacity as a charter holder and Reach's capacity as a charter school as affects the standing analysis.

**B. Reach's Standing is Equivalent to that of a School District**

[5]A political subdivision "created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *see also Coleman v. Miller,* 307 U.S. 433, 441, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."). Nonetheless, courts recognize an exception in actions against the state arising under the Supremacy Clause of the U.S. Constitution. *See Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist,* 908 F.Supp.2d 597, 612 (M.D.Pa.2012) ("[C]ourts that have allowed a municipality or municipal corporation to assert claims against its creator have generally permitted claims **\*466** only for violations of the Supremacy Clause.").

[6] [7]Delaware law unambiguously provides that the legal status of a charter school is equivalent to that of a public school district. *See* 14 Del. C. §§ 503, 504. Unlike *Pocono Mountain* and *Project Reflect*—where the state law was silent with respect to the charter school's capacity to bring suit—in Delaware the statute expressly provides that "[a] charter school may sue or be sued to the same extent and on the same conditions as a public school district." 14 Del. C. § 504(d); *see also Pocono Mountain,* 908 F.Supp.2d at 607 (Pennsylvania charter schools may be sued to same extent as political subdivisions); *Project Reflect,* 947 F.Supp.2d at 874 (Tennessee charter schools may sue and be sued without qualification). Hence, just as school districts are political subdivisions, *see* 14 Del. C. § 1002(3), (5); *see generally Davis v. Thomas,* 2009 WL 3112318 (D.Del. Sept. 25, 2009); *Beck v. Claymont Sch. Dist.,* 407 A.2d 226, 229 (Del.Super.Ct.1979), so, effectively, are charter schools, and charter schools lack capacity to bring suit against the state.

**C. Reach Lacks Standing**

[8]As it is a charter school, Reach lacks standing to sue Defendants. Nonetheless, Reach analogizes itself to school districts that were found by the Supreme Court to have standing to sue the State of Washington concerning desegregation laws in *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). In *Seattle School District,* 458 U.S. at 464, 102 S.Ct. 3187, three school districts sued the state to bring an equal protection challenge to a ballot initiative approved by popular vote. However, as the Middle

District of Pennsylvania explained in *Pocono Mountain,* 908 F.Supp.2d at 613, *Seattle School District* did not expressly address the issue of standing and, thus, "does not establish a binding rule that a school district can sue the state." *Id.*; *see also Common Cause of Pa. v. Pennsylvania,* 558 F.3d 249, 266 (3d Cir.2009) ("The Supreme Court has 'repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect.' "). *Seattle School District,* then, does not help Reach.

Reach also cites to *Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.1979), an example of a case in which suits by municipalities against states have been permitted for violations of the Supremacy Clause. Here, the Complaint does not mention the Supremacy Clause, and Reach provides no persuasive basis for viewing its claims as alleging a violation of the Supremacy Clause.

Therefore, the Court concludes that Reach lacks standing and the claims it asserts must be dismissed.

### III. Procedural Claims[8]

Plaintiffs[9] allege that "[p]rocedural due process requires some minimal notice and an opportunity to be heard." (D.I. 1 ¶ 59) Specifically, in Count III Plaintiffs allege a violation of the Due Process Clause; in Count IV they allege a violation of 14 Del. C. § 506(d), due to a lack of sufficient **\*467** technical assistance from Defendants (D.I. 1 ¶¶ 76–82); and in Count V Plaintiffs allege that Defendants violated 14 Del. C. § 514A by not providing adequate notice under state law (D.I. 1 ¶¶ 83–89). The Court concludes that Plaintiffs lack a cognizable property interest in the renewal of Reach's charter and, further, that Plaintiffs received adequate notice and procedure.

### A. Fourteenth Amendment Procedural Due Process

[9] [10]When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, courts undertake a two-stage inquiry: determining (1) whether "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property;' " and (2) whether the procedures available provided the plaintiff with "due process of law." *Robb v. City of Philadelphia,* 733 F.2d 286, 292 (3d Cir.1984). Property rights are not created by the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure benefits and that support claims of entitlement to those

benefits." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

[11]The interest Plaintiffs assert, the renewal of Reach's charter, is not an interest protected by the Fourteenth Amendment's Due Process Clause. Delaware law provides that a charter "*may* be renewed for successive 5–year terms," vesting the DOE with the discretion to renew or not renew charters. 14 Del. C. § 514A(b) (emphasis added). Just as no protected property interest was found in other cases involving charter schools, neither, here, do Plaintiffs have such an interest. *See Jackson v. Pocono Mountain School District,* 2010 WL 4867615, at \*4 (M.D.Pa. Nov. 23, 2010), *aff'd Pocono Mountain Charter School v. Pocono Mountain School District,* 442 Fed.Appx. 681, 684 (3d Cir.2011); *Project Reflect,* 947 F.Supp.2d at 878–79; *Pinnacle Charter School v. Board of Regents,* 108 A.D.3d 1024, 969 N.Y.S.2d 318, 320 (2013) ("[T]he New York Charter Schools Act ... creates no constitutionally protected property interest in the renewal of a charter...."); *State ex rel. Sch. Dist. of Kansas City v. Williamson,* 141 S.W.3d 418, 427 (Mo.Ct.App.2004) ("[J]ust as a prospective charter school has no protected property interest at stake regarding an initial charter application, the school also has no protected property interest under the Charter Schools Act with regard to renewal of its charter.").

[12]Even if Plaintiffs had a protected property interest, they were provided with constitutionally adequate processes. Plaintiffs allege that "Reach was exposed to a terribly flawed process" (D.I. 7–1 at 18), consisting of "sham public hearings that do no more than pay lip service to the concept of due process" (D.I. 15 at 2), which subjected Reach to a "kangaroo process in a quasi-star chamber environment" (*id.* at 6), culminating in Defendants' "knee-jerk response" (D.I. 1 ¶ 88) to use Reach as its "sacrificial lamb" (D.I. 1 at 25). The materials which the Court is permitted to consider at this stage establish that Plaintiffs' allegations cannot be proven.

[13]Renewal decisions for a five-year extension of a charter must result from a process involving (a) grounding in evidence of the school's performance over the term of the charter, (b) data used that is made available to the school and the public, and (c) a public report summarizing the evidentiary basis for each decision. (D.I. 14 at 6) (*citing* 14 Del. C. § 514A(g)) Here, after **\*468** Reach submitted its renewal application on September 30, the CSAC met with Reach to discuss the application, before the CSAC issued its preliminary report on October 15. (D.I. 1 ¶¶ 26–27) The DOE then held a public hearing and gave Reach an opportunity to submit supplemental materials in support of the application, after which the

CSAC met before making its final determination of non-renewal on November 4. (D.I. 1 ¶ 29; *see also* D.I. 14 App. at A102–114 (containing supplemental materials)) Plaintiffs were then afforded another hearing, before the CSAC issued its report recommending non-renewal and Secretary Murphy later made his final decision of non-renewal on November 12. (D.I. 1 ¶¶ 30–34) Plaintiffs had access all along to the data Defendants were using to assess the application. While there is some evidence that Defendants may not have fully comported with state law,[10] "Section 1983 ... may not be invoked every time local officials allegedly act contrary to state or local procedural law." *Mullen v. Thompson,* 31 Fed.Appx. 77, 79 (3d Cir.2002). Plaintiffs' Due Process claims must be dismissed.

**B. State Law Claim under 14 Del.C. § 506**

[14]In Count IV, Plaintiffs allege that "at no point during Reach's initial application process through its initial five year term did DOE provide any technical assistance to Reach regarding its academic program." (D.I. 7–1 at 3) Plaintiffs contend this is a violation of 14 Del. C. § 506(a)(3)d, which requires the DOE to "work with the education community on a plan for recruitment *and technical assistance* for applicants of a same-gender charter school of the opposite gender [from Prestige]" (emphasis added). Specifically, Plaintiffs claim that "[i]f not explicit, at least implicit, in the mandate ... to render technical assistance to Reach is that this obligation does not end the minute that DOE approved the Reach charter but ... continues so as to ensure that the State of Delaware ... provide[s] equal education opportunities to both genders." (D.I. 1 ¶ 77)

Section 506(a)(3)d mandates technical assistance to assist in the initial creation of a charter school similar to Prestige, meaning that the DOE was statutorily obligated to assist Reach with its initial application. The statute does not require the DOE also to ensure Reach's success by providing it with technical assistance on an ongoing, continuous basis. Hence, Count IV must be dismissed.

**C. State Law Claim under 14 Del. C. § 514A**

[15]Invoking 14 Del. C. § 514A, Plaintiffs contend, "Reach was never advised that its charter was in jeopardy of non-renewal as *current state law mandates.*" (D.I. 7–1 at 19) (emphasis added) Section 514A(c) provides that "[n]o later than April 30, the approving authority shall issue a charter school renewal report and charter renewal application guidance to any charter school whose charter will expire the following year." However, as Defendants

observe, this section was not added to Delaware law until June 2013—well after the April 30 deadline in the statute. The renewal report deadline did not exist prior to the June 2013 amendment. (D.I. 11 ¶ 33 (citing 79 Del. Laws ch. 51, §§ 1, 2 (effective July 2013))) Plaintiffs cannot **\*469** prove that Defendants' failure to comply with a timing requirement that did not exist at the relevant time was a violation of Plaintiffs' rights. Thus, Count V must also be dismissed.

**IV. Discrimination Claims**

Plaintiffs allege that the decision to close Reach, combined with the sunset provision of Section 506, creates a situation that indefinitely deprives Delaware girls, but not Delaware boys, of the opportunity to attend a state-provided same-sex school. (D.I. 1 ¶¶ 47–51) As the Court held previously, the Individual Plaintiffs have standing to pursue their Equal Protection and Title IX claims ("Discrimination Claims"). (D.I. 18 ¶ 3) The Individual Plaintiffs allege an invasion of a legally-protected interest to be free from discrimination based on gender, a concrete and particularized injury of not being afforded the benefits of single-gender education, which—due to Defendants' decisions—is not merely speculative. (D.I. 1 ¶ 2) Defendants do not appear to contest the Individual Plaintiffs' standing to pursue the Discrimination Claims. (*See* Jan. 2 Hr'g Tr. at 68–69) Rather, Defendants argue that, as a matter of law, the Equal Protection Clause and Title IX are not violated when a state has only one same-sex charter school. (D.I. 11 ¶¶ 14–18)

The parties are in agreement that, at least for some students, there may be inherent benefits in single-gender education. (Tr. at 69 ("Certainly, the Court can take judicial notice of the fact that single-gender education is more beneficial than coed education and therefore they have alleged an injury in fact.")) Defendants contend, however, that "so long as the state makes available to one gender 'education equal'—in whatever form—to [the single-gender public school offering] available for the other gender," then neither the Equal Protection Clause nor Title IX are violated. (D.I. 11 ¶ 14) Defendants cite to the U.S. Department of Education's regulations under 34 C.F.R. § 106.34(c)(1) in support of their position, as these federal regulations provide that "a recipient ... must provide students of the excluded sex a substantially equal single-sex school or *coeducational school*." (D.I. 11 ¶ 16) (emphasis added)

The Court disagrees with Defendants. The closure of Delaware's only publicly-funded all-girls school without any opportunity for another publicly-funded all-girls

school even to be considered, while the State funds the all-boys Prestige Academy, states a claim that survives a motion to dismiss. Therefore, the Discrimination Claims as brought by the Individual Plaintiffs will not be dismissed.

## PRELIMINARY INJUNCTION

### I. Legal Standards

[16]A preliminary injunction is an "extraordinary remedy," and courts consider four factors when faced with a request to grant one. *NutraSweet Co. v. Vit–Mar Enters., Inc.,* 176 F.3d 151, 153 (3d Cir.1999). They are:

(1) whether the movant has shown a reasonable probability of success on the merits;[11]

(2) whether the movant will be irreparably injured by denial of relief;

(3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and

(4) whether granting the preliminary relief will be in the public interest.

**\*470** *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997).

### II. Mandatory Injunction

Defendants assert that Plaintiffs are seeking a mandatory injunction, an even more extreme form of relief, which imposes a "particularly heavy" burden on Plaintiffs to make a showing under each prong of the applicable legal standard. (D.I. 14 at 13) (citing *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980)) Defendants characterize Plaintiffs' requested relief as an injunction that would alter the status quo. In Defendants' view, the status quo is that Reach Academy's charter will terminate at the end of the school year, so Reach Academy will be shutting its doors. (*See* D.I. 14 at 13; *see also* Tr. 61 ("[T]he renewal decision has already been made. They're [Plaintiffs] seeking to undo that.")) To Defendants, then, the relief Plaintiffs are seeking by their motion—the extension of Reach's charter, allowing Reach to operate in the 2014–15 school year—would alter the status quo, resulting in a mandatory injunction.

Plaintiffs counter that the injunction they seek would, instead, preserve the status quo. To Plaintiffs, the "status quo is that the individual Reach students, and Delaware

female students in general, are attending, or have an option to attend, a single gender public school just like the option that is available for the male students through Prestige Academy." (D.I. 16 at 1) From this perspective, "[i]t is only through an extension of the Reach Charter for one year that the status quo can be preserved." (D.I. 16 at 1) In Plaintiffs' view, then, the ordinary preliminary injunction standard applies.

Neither side is completely correct. The status quo is that the Individual Plaintiffs are attending Reach Academy, and may do so for the remainder of the current school year, but are not permitted to choose to attend Reach Academy for the 2014–15 school year, since Reach Academy will not be permitted to operate in 2014–15. Thus, the preliminary relief Plaintiffs seek would alter the status quo. However, that alteration is not truly analogous to the injunctions involved in the cases on which Defendants rely for their heightened standard. In *Hart Intercivic, Inc. v. Diebold, Inc.,* 2009 WL 3245466, at \*1 (D.Del. Sept. 30, 2009), this Court determined that the mandatory preliminary injunction standard applied where the plaintiffs' requested relief was a mandatory divestiture of a corporation's stock and holdings after a merger had already been effectuated. In *Punnett v. Carter,* 621 F.2d at 580, the plaintiffs sought an injunction requiring the government to issue public warnings to U.S. Army Servicemen of the potential mutagenic effects of exposure to nuclear testing.

These cases are simply not comparable to the circumstances presented here. Reach is presently open and has all the resources to enable it to be operating in the 2014–15 school year. It is not as if Plaintiffs are asking the Court to order Defendants to create a new school out of nothing. Thus, the Court finds the mandatory injunction standard inapplicable.

### III. Likelihood of Success on the Merits

In Counts I and II, Plaintiffs challenge "the decision of DOE to deny Reach's charter renewal application," asserting claims pursuant to 42 U.S.C. § 1983 and Title IX based on allegations that Defendants' decision "depriv[es] the female students of Delaware the same educational opportunity for a single gender public education that is afforded the male students in Delaware." (D.I. 1 ¶ 2) Plaintiffs contend that, due to the sunset provision of **\*471** Section 506(a)(3)e, "the closure of Delaware's only all-girls charter school" will have the effect of "depriving the female students in Delaware now and forever from having access to the same single gender educational opportunities that are afforded to the male students in Delaware." (D.I. 7–1 at 8) Defendants respond

that Plaintiffs' Discrimination Claims are "based upon the faulty premise that it is a *per se* violation of the Equal Protection Clause and Title IX for a state to have a single-gender public school for one gender and not the other." (D.I. 14 at 15)

Defendants correctly note the absence of any "compelling authority demonstrating that [Plaintiffs] will succeed on the merits." (D.I. 14 at 26) However, this asks too much—Plaintiffs are not required to cite "compelling" authority nor show they certainly "will" prevail. Instead, at this stage of the proceedings, Plaintiffs have met their burden to show that indefinitely depriving Delaware's girls of access to same-gender education, while at the same time providing that option to Delaware's boys for at least several more years, is likely to be found to be a violation of Plaintiffs' rights under the Equal Protection Clause and Title IX.

**A. Likelihood of Success on Count I**

[17] [18]Section 1983 prohibits the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 749 n. 9, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (internal quotation marks omitted). To prevail on a Section 1983 claim, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged deprivation was committed by a person acting under color of state law. *See Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir.2000).

[19] [20] [21]Plaintiffs claim they were deprived of equal protection of the laws under the Fourteenth Amendment. (D.I. 1 ¶¶ 47–51) The Fourteenth Amendment's Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.,* 422 F.3d 141, 151 (3d Cir.2005). "In other words, they must demonstrate that they received different treatment from that received by other individuals similarly situated." *Id.* In the context of a sex discrimination claim, plaintiffs must show that this disparate treatment was based upon gender.

[22] [23]Gender classifications under law are not inherently

"proscribed classification[s]." *United States v. Virginia,* 518 U.S. at 533, 116 S.Ct. 2264. Indeed, they may be used in a variety of legitimate ways, such as "to compensate women 'for particular economic disabilities [they have] suffered,' to 'promot[e] equal employment opportunity,' [or] to advance full development of the talent and capacities of our Nation's people." *Id.* (internal citations omitted). But because gender classifications have historically been used "to create or perpetuate the legal, social, and economic inferiority of women," courts review classifications based on gender to determine "whether the proffered justification is 'exceedingly persuasive.'" **\*472** *Id.* at 533–34, 116 S.Ct. 2264. The burden on Defendants, then, is demanding, as they must show that the "[challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* at 533, 116 S.Ct. 2264.

Defendants contend that equal protection is not typically violated when a state offers optional, single-gender public schools, so long as the state makes available to both genders "education equal" options. *See Vorchheimer v. School Dist. of Philadelphia,* 532 F.2d 880, 886 (3d Cir.1976). However, as Plaintiffs observe, "[d]ue to the sunset provision of 14 Del. C. § 506, Reach is the only option that is available to Defendants to comply with Federal law and provide female students with an educational option that is comparable to that of the male students at Prestige Academy." (D.I. 16 at 16 (citing 14 Del. C. § 506(a)(3)e, which prohibits new same-gender charter schools after June 30, 2013)) To Plaintiffs, there is an inherent benefit—for at least some boys, and at least some girls—to same-gender education, and Delaware may not provide these benefits to one gender but not the other.

[24]Plaintiffs are likely to succeed in showing that there are unique benefits to same-gender schooling opportunities for at least some students. Defendants state in their Reply that they "do not dispute that single-gender education has potential benefits and is, in obvious respects, different from coed education." (D.I. 17 ¶ 21) This is consistent with the apparent policy decision of Delaware's lawmakers, who by enactment of the amended Section 506 mandated the creation of two same-gender charter schools. Given the conceded benefits of same-sex education for some students, and not just boys, Defendants have failed to show that providing such benefits to boys while depriving girls of the same benefits serves important governmental objectives.

Defendants argue that "there are no allegations in the

Complaint that Defendants took any action based on the gender of Reach students," and therefore the Individual Plaintiffs have failed to show the purposeful discrimination required for an Equal Protection violation. (D.I. 17 ¶ 24) Defendants continue: "[T]hat their decision not to renew Reach's charter results in the elimination of the only single-gender charter school for girls does not make their decision gender-based governmental action. At least, Plaintiffs provide the Court with no support for it to reach such a conclusion." (*Id.*) But this analysis ignores the additional fact that the State of Delaware—including Defendants—is not even permitted to consider offering the same benefits to girls that it currently provides to boys. On the facts here—where Delaware is providing its boys the opportunity for a single-gender public school education and, for no articulated reason, is forever depriving its girls of the same opportunity—Plaintiffs are likely to show an Equal Protection violation.[12]

**B. Title IX**

[25]In Count II, Plaintiffs contend that the "interplay between the sun-setting **\*473** provision of 14 Del. C. § 506 and the regulations under Title IX, which encouraged single gender charter schools, and envisioned equal opportunity for both sexes through the opportunity for multiple single gender charter schools creates a unique situation in Delaware whereby DOE has a heightened burden to ensure that Reach remains open in order to promote gender equality." (D.I. 1 ¶ 7) Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To prevail, plaintiffs need not show that a defendant purposefully discriminated on the basis of gender. *See Favia v. Indiana Univ. of Pennsylvania,* 812 F.Supp. 578, 584 (W.D.Pa.1993), *aff'd,* 7 F.3d 332 (3d Cir.1993); *Mehus v. Emporia State Univ.,* 295 F.Supp.2d 1258, 1272 (D.Kan.2004).

[26]For all the reasons already stated in connection with Plaintiffs' Equal Protection claim, Plaintiffs are also likely to succeed on the merits of their Title IX claim.

In arguing for a contrary conclusion, Defendants rely heavily on the federal regulations issued under Title IX, which appear to contemplate the existence of single-gender charter schools, even in the absence of single-gender charter schools of the opposite gender. *See* 34 C.F.R. 106.34(c). The regulations provide:

(c) Schools.

(1) General Standard. Except as provided in paragraph (c)(2) of this section, a recipient that operates a public nonvocational elementary or secondary school that excludes from admission any students, on the basis of sex, must provide students of the excluded sex a substantially equal single-sex school or coeducation school.

(2) Exception. A nonvocational public charter school that is a single-school educational agency[13] under State law may be operated as a single-sex charter school without regard to the requirements in paragraph (c)(1) of this section.

Thus Defendants conclude that, "Plaintiffs' [discrimination claims] fail [ ] because there is no claim or proof that Reach students do not have educational opportunities substantially equivalent to a single-gender, all-male school." (D.I. 14 at 3)

Plaintiffs read Section 106.34(c)(1)—requiring that districts "must provide students of the excluded sex a substantially equal single-sex school or coeducational school"—as meaning that Delaware must provide both options to students of both sexes. To Plaintiffs, in this context "or" means "and," so "[i]n the context of this regulation, the word 'or' is referring to the options that the state has to make available to the excluded sex." (D.I. 16 at 5; *see also id.* at 6 ("This regulation is clearly referring to the options that must be available to the students and does not mean that the state gets to limit the students' options to whatever the state decides."))[14]

The Court finds neither side's reasoning persuasive. Plaintiffs' reading is a stretch. **\*474** But even Defendants' interpretation does not look as if it would prevent a finding of liability. On Defendants' reading of the regulation, a **school district** and/or a **charter school** may not have to provide single-sex schools to both boys and girls, but this does not mean that the **State** of Delaware, its DOE, and its Secretary of Education may discriminate on a **statewide** level. *See generally* 34 C.F.R. § 106.34(a) ("Except as provided for in this section or otherwise in this part, a recipient shall not provide or otherwise carry out any of its education programs or activities separately on the basis of sex, or require or refuse participation therein by any of its students on the basis of sex."); "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 71 Fed.Reg. 62,530, 62,541 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34(c)(2)) ("With regard to public charter schools, it would be impracticable to require either chartering authorities, which are merely approving applications for—but are not operating—single-sex charter schools, or the groups of

community leaders, developers, or parents who seek to establish a single-sex charter school that will be a single-school LEA under State law, to establish and operate an additional substantially equal school to meet the needs of the other sex.").

Consequently, the Court finds that Plaintiffs are likely to show that Defendants' conduct violated Title IX.

### IV. Irreparable Injury

[27] [28]To obtain a preliminary injunction, a plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.1989). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (internal quotation marks omitted).

[29]Plaintiffs argue that, without temporary relief, "Reach faces the impossible task of attempting to retain and recruit students while facing school closure during the critical period that students have for exercising their school choice options." (D.I. 7–1 at 21) Plaintiffs illustrate the potential harm to Reach by describing the financial problems confronted by other charter schools in Delaware that have been threatened with closure. (*Id.* at 21–24) As already noted, funding for charter schools is dependent on enrollment numbers. (D.I. 1 ¶ 10) Plaintiffs thus argue that without a preliminary injunction before the January 8, 2014 deadline for "choice applications" to attend a specific school in the 2014–15 school year, the "DOE's threatened non-renewal of [Reach's] charter obviously [will have] a very negative impact on a parent's willingness to consider Reach as an option for their children," causing a precipitous drop in enrollment and lack of financial viability—even if Plaintiffs prevail at trial. (D.I. 7–1 at 23–24)

Defendants acknowledge that "Reach may be irreparably harmed," but insist "equally if not more important is the irreparable harm to children who continue to attend Reach or plan to attend Reach next year." (D.I. 14 at 26) Defendants urge the Court to deny the preliminary injunction because "[o]n balance, the greater irreparable harm will befall Reach students because the students will be able to attend one of the worst academically performing schools in the State for another year." (*Id.* at 23)

The Court does not agree with Defendants' assertion that

granting the requested **\*475** relief "would *subject* ... students to another year of an admittedly unacceptable education." § *Id.* at 25) (emphasis added) Nothing, including the Court's order, has compelled any parent to send his or her daughter to Reach. Each Reach student is at Reach by *choice*. Nor did Defendants present evidence to support a finding that parents are choosing to send their daughters to a school they believe will fail them.

Therefore, the Court finds that the Individual Plaintiffs will be irreparably harmed in the absence of an order that Reach's charter be renewed for an additional academic year.[15]

### V. Balance of Hardships and the Public Interest

[30] [31] [32]Before issuing a preliminary injunction, courts also must weigh the potential harm to the moving party, in the absence of the requested relief, against the potential harm, if any, to the nonmoving party (and others not subject to the action) if the relief is granted. *See Council of Alternative Political Parties,* 121 F.3d at 879. "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (internal quotation marks omitted). Finally, the Court must also determine whether a grant of preliminary relief would be in the public interest. As the Supreme Court has instructed, "[i]n exercising their sound discretion, [courts must] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Plaintiffs argue that the irreparable harm to them in the absence of a preliminary injunction (described above) would outweigh any harm that might be suffered by Defendants as a result of a Court order to renew Reach's charter for one additional year while this case proceeds to trial and a final judgment. Plaintiffs further assert that the "public interest is served by demanding Defendants comply with Federal and State law." (D.I. 7–1 at 24)

[33] [34]The Court agrees with Plaintiffs. "In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alternative Political Parties,* 121 F.3d at 883–84. That principle plainly applies here. And the irreparable harm to Plaintiffs that would occur here if the Court denied a preliminary injunction—essentially, that Reach would likely cease to exist before this case could be completed, so the educational opportunities it provides

would be gone forever, even if Plaintiffs ultimately prevailed at trial—outweighs the harms to Defendants resulting from the granting of the preliminary injunction.

[35]Yet it is important to point out that there are harms to Defendants from the Court's ruling, and those harms factor into the public interest analysis as well. That is, there are "legitimate, countervailing concerns" on Defendants' side of the ledger.

Charter schools are mandated to meet measurable standards of student performance, *see* 14 Del. C. § 501, and Defendants are "statutorily required to determine **\*476** whether [a charter] school is providing an adequate education to its students" (D.I. 14 at 23). Defendants insist that this is precisely what they have done here, necessitating "the tough decision not to renew the only all-girl public school in Delaware." (D.I. 9 at 5; *see also* D.I. 11 at 16 ("The Defendants indeed were forced to make the difficult and necessary decision not to permit the continued existence of a charter school that was performing at the academic-bottom of Delaware's public schools.")) The Court agrees with Defendants that "it is in the public interest that DOE not consent to allow a failing charter school to continue receiving the benefits afforded to charter schools when that school has repeatedly failed to meet its academic requirements and is moving in the wrong direction." (D.I. 14 at 24)

The Court further agrees with Defendants that "the public interest cautions against judicial interposition in the operation of a state public school system." (D.I. 14 at 3) It seems likely that the success of Delaware's charter school system depends, in part, on the State's ability to close a failing school—and on the understanding of all interested constituencies that the State can and will, when necessary, revoke or not renew some charters. It is not in the public interest for courts to make it more difficult for the State to properly exercise this authority and implement hard decisions supported by educational expertise. *See Richard Milburn Public Charter Alternative High School v. Cafritz,* 798 A.2d 531, 547 (D.C.2002) ("[An] obvious burden in the context of the charter revocation proceedings from additional procedural safeguards would be the delay involved by more elaborate proceedings, as well as the cost of continuing to provide public funding to charter schools that have flouted their statutory obligations while the revocation proceeding is pending.").

Though Defendants' concerns carry serious weight, the

Court has determined that, on balance, the public interest favors preliminary relief for the Individual Plaintiffs.

*CONCLUSION*

The difficulty of this case stems from the absence of any single-sex public charter school option for girls, now and—under current law—forever, all while Delaware provides that very option to boys. If the DOE's denial decision stands, all boys in the State of Delaware will have an option of attending a single-gender public charter school, while at the same time no girl in the State of Delaware will have such an option. At a time when the choice deadline was just weeks away, yet this case was still in its earliest stages, the parties presented the Court with only two courses of action: Defendants' planned imminent closure of Reach or Plaintiffs' request for a one-year extension of operations while this case could be litigated to a conclusion. Given the Court's findings, Plaintiffs' proposal was clearly the better of the two.

This conclusion is bolstered by the facts that, in the months leading up to Defendants' closure decision, Reach had moved into its new, larger facilities, on which it has signed a long-term lease; Reach had achieved full enrollment and had grown to its final grade configuration of K–8; and Reach had been removed from DOE probation in May 2013. (D.I. 1 ¶ 19) Now may be a particularly auspicious moment for Reach to turn its academic performance around. At minimum, another year of operations will provide additional data that should enable all interested parties to make an accurate assessment of Reach's program and competency.

Hence, for the reasons provided here, as well as those stated in the earlier Memorandum Order, the Court has decided to grant Plaintiffs' motion for a preliminary **\*477** injunction and grant in part and deny in part Defendants' motion to dismiss.

**All Citations**

46 F.Supp.3d 455, 314 Ed. Law Rep. 693

Footnotes

1       The students are O.G., T.W., another T.W., and S.O., each student by her parent and next friend. (D.I. 1)

2    The parties filed a stipulation of dismissal on May 2, 2014. (D.I. 31) The Court subsequently sought the parties' views as to whether the Court should adhere to its plan and issue this opinion, and no party objected.

3    The Court uses the terms "same-sex" and "same-gender" interchangeably throughout this Opinion, and does the same with the terms "single-sex" and "single-gender."

4    It may be that Reach's influx of students contributed to the low scores. For grades five through eight—the grades represented in Reach's DCAS scores—82% of Reach's students enrolled with scores below proficient in math, and 68% enrolled with scores below proficient in reading. (D.I. 7–1 ex. 4 ¶¶ 12–13; *see also* D.I. 14 App. at A91 (noting that there were only 23 students who had attended Reach for three years))

5    Although the State Board is required to assent to the Secretary's decision to approve a charter or revoke a charter, the Secretary's decisions denying non-renewal of a charter are final. *See* 14 Del. C. §§ 511(c), 514A(f); *see also* 14 DE Admin. Code 275.10.3 ("Charters shall be renewed only if the school receives a satisfactory performance review.").

6    Plaintiffs initially requested relief in the form of a temporary restraining order or a preliminary injunction. (D.I. 7) The Court, after conferring with the parties, decided to proceed only on the preliminary injunction. (*See* Dec. 13, 2013 Hr'g Tr. at 27)

7    The Court need not address Defendants' additional argument that Reach lacks third party standing (D.I. 11 ¶ 12), as Reach does not assert it has standing on this basis.

8    Plaintiffs appeared to concede at oral argument that the Individual Plaintiffs are parties only to Counts I and II, that is the Equal Protection and Title DC claims. (*See* Jan. 2 Hr'g Tr. (hereinafter "Tr.") at 55) As the Complaint is unclear on this point, the Court will address all five claims.

9    All references to "Plaintiffs" in the remainder of this opinion are solely to the Individual Plaintiffs.

10   At oral argument, Defendants admitted that Secretary Murphy may not have had access to all materials in the record when he made his decision (although Defendants maintain he had access to the underlying data). (*See* Tr. at 38–40) The regulations require all decisions to be "base[d] on the record." 14 DE Admin. Code 275.3.8.

11   The Third Circuit uses "reasonable probability of success" interchangeably with "likelihood of success." *See, e.g., Allegheny Energy, Inc. v. DOE, Inc.,* 171 F.3d 153, 158 (3d Cir.1999).

12   A finding that Plaintiffs are likely to succeed on the merits is not, as Defendants suggest, a "legal conclusion that a single-gender education is so inherently unique that Defendants are constitutionally required to provide parity." (D.I. 17 ¶ 19) It may be that the State could lawfully fund two all-boys schools and only one all-girls school; it may also be that the State could lawfully fund one all-boys school and no all-girls schools, so long as the State was also willing to entertain new applications for single-sex charter schools. These are not the facts before the Court, so the Court draws no conclusions as to them.

13   Public school districts and, in Delaware, charter schools, *see* 14 Del. C. § 503, are defined as "Local Educational Agencies." *See* 20 U.S.C. § 1401(19) (defining Local Educational Agency as "public authority" created for "administrative control" of elementary and secondary schools).

14   Plaintiffs' idea seems to be that since each student only attends one school (at a time), she need be provided at any one time only with a single-sex "or" coeducational school, but she also must be provided the opportunity to choose between the two options.

15   Importantly, the Court's order expressly allows Defendants, at all times—including during the 2014–15 school year—to exercise its ordinary powers of oversight, including by seeking to revoke Reach's charter and by imposing reasonable conditions on Reach's continued operations.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Reich v. Occupational Safety and Health Review Com'n, 102 F.3d 1200 (1997)

17 O.S.H. Cas. (BNA) 1858, 1995-1997 O.S.H.D. (CCH) P 31,216...

102 F.3d 1200
United States Court of Appeals, Eleventh Circuit.

Robert B. REICH, Secretary of Labor, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH
REVIEW COMMISSION; Jacksonville Shipyards,
Inc., Respondents.

No. 95–2807. | Jan. 7, 1997.

Secretary of Labor appealed decision of Occupational Safety and Health Review Commission OSHRC No. 92–888, Stuart E. Weisberg, J., dismissing Occupational Safety and Health Act (OSHA) citation proceeding against employer as moot. The Court of Appeals, Edmondson, Circuit Judge, held that employer's cessation of business did not render proceeding moot since, inter alia, existence of case or controversy did not depend on employer's postviolation acts.

Vacated and remanded.

West Headnotes (5)

[1]     **Federal Courts**
        👉Voluntary cessation of challenged conduct

        In general, case does not become moot by party's cessation of allegedly illegal conduct.

        Cases that cite this headnote

[2]     **Injunction**
        👉Mootness and ripeness;  ineffectual remedy

        Claim for injunctive relief may become moot if: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated effects of alleged violation.

        13 Cases that cite this headnote

[3]     **Federal Courts**
        👉Matters of Procedure in General

        In general, claims for money do not become moot as result of defendants' acts following the occurrence giving rise to the claims.

        1 Cases that cite this headnote

[4]     **Federal Courts**
        👉Injunctions

        Mootness analysis for injunctive relief claims would not be applied to money penalty claim; unlike injunctive relief which addresses only ongoing or future violations, civil penalties address past violations, and liability attaches when violation occurs.

        4 Cases that cite this headnote

[5]     **Labor and Employment**
        👉Procedure

        Employer's cessation of business did not render Occupational Safety and Health Act (OSHA) citation proceeding against it moot; existence of case or controversy did not depend on employer's postviolation acts or date that tribunal set for hearing, and to allow cessation of business to render proceeding moot might greatly diminish effectiveness of money penalties as deterrence. Occupational Safety and Health Act of 1970, §§ 2–33, 29 U.S.C.A. §§ 651–678.

        2 Cases that cite this headnote

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Tab E-12**

**Reich v. Occupational Safety and Health Review Com'n, 102 F.3d 1200 (1997)**

17 O.S.H. Cas. (BNA) 1858, 1995-1997 O.S.H.D. (CCH) P 31,216...

**Attorneys and Law Firms**

**\*1200** Charles F. James, Barbara Werthman, Bruce Justh, U.S. Dept. of Labor, Washington, DC, for petitioner.

Robert E. Mann, Dianne M. D'Onofrio, Chicago, IL, for Jacksonville Shipyards.

Petition for Review of an Order of the Occupational Safety and Health Review Commission.

Before EDMONDSON, Circuit Judge, FAY, Senior Circuit Judge, and ALDRICH*, Senior District Judge.

**Opinion**

**\*1201** EDMONDSON, Circuit Judge:

This appeal raises the question whether a proceeding for civil penalties under the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 651–678, becomes moot when an employer permanently ceases doing business. Because we conclude that this case is not moot, we vacate the order of dismissal and remand for further proceedings.

**I. *Background***

Jacksonville Shipyards, Inc. ("JSI") was formerly engaged in the ship repair business in Florida. In August 1991, two JSI employees were killed in a work-related fall at JSI's Mayport Naval Station facility. The Secretary of Labor (the Secretary) issued citations totaling $692,000, including citations for alleged willful violations leading directly to the deaths. JSI contested the citations and the proposed penalties. The Occupational Safety and Health Commission (the Commission) assigned the case to an Administrative Law Judge (ALJ) for hearing and disposition.

By November 1992, JSI had released almost all of its workforce, retaining only a small number of administrative employees to wind-up; and it had sold almost all of its assets. At this time, JSI filed a motion with the ALJ seeking to have the case dismissed as moot. The ALJ granted the motion.

The Secretary petitioned the Commission to review the decision. The Commission, in a two to one decision, concluded that an OSHA citations proceeding is moot where the employer has terminated its employees and where there is no likelihood of resuming the employment relationship. The dissenting commissioner maintained that

an employer's voluntary cessation of illegal conduct does not render a proceeding moot, because the citation is based on the employer's status at the time the violation occurred. The case was remanded to the ALJ to determine whether JSI was still an "employer" under OSHA.

On remand, the ALJ dismissed the case as moot based on an unrebutted affidavit of JSI's president that all employees had been terminated. The Secretary petitioned the Commission to review the ALJ's decision, and the Commission denied review. The ALJ's second dismissal of the case became a final order of the Commission, and the Secretary appealed.

**II. *Discussion***

[1] [2] A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950–51, 23 L.Ed.2d 491 (1969). The Commission made a legal determination that the OSHA proceeding was "moot" in the ordinary sense—that is, no live case or controversy—of that word.[1] In general, a case does not become moot by a party's cessation of allegedly illegal conduct. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1135 (11th Cir.1990). The Supreme Court has recognized an exception to this principle in certain cases where injunctive relief is sought. *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). A claim for injunctive relief may become moot if:

> (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.
>
> *Id.,* at 631, 99 S.Ct. at 1383 (internal quotations and citations omitted).

**\*1202** Appellee JSI urges us to decide mootness for civil money penalties under the standard set forth in *Davis* for injunctive relief. JSI advances these points: (1) that the proceedings are moot because its cessation of business means that the violations cannot recur and the effects of the violations have been eradicated; and (2) that JSI can have no liability under OSHA because it is no longer an "employer" within the meaning of the Act.

[3] [4] We know—to say the least—that, in general, claims

Reich v. Occupational Safety and Health Review Com'n, 102 F.3d 1200 (1997)

17 O.S.H. Cas. (BNA) 1858, 1995-1997 O.S.H.D. (CCH) P 31,216...

for money do not become moot as a result of the defendants' acts following the occurrence giving rise to the claims.[2] Courts have traditionally treated monetary relief claims differently than injunctive relief claims for the purpose of mootness challenges. *See, e.g. Tyson,* 897 F.2d at 1134; *Powell,* 395 U.S. at 496 n. 8, 89 S.Ct. at 1951 n. 8; *Castaneda v. Dura–Vent Corp.,* 648 F.2d 612, 615 (9th Cir.1981). We reject the appellee's suggestion that we use the mootness analysis for injunctive relief to decide whether a money penalty claim is moot. Unlike injunctive relief which addresses only ongoing or future violations, civil penalties address past violations; liability attaches at the time the violation occurs. *See, e.g., Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696 (4th Cir.1989) (liability for civil penalties "is fixed by the happening of an event ... that occurred in the past.").

We are guided by our decision in *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128 (11th Cir.1990). In *Tyson,* a private plaintiff brought an action for civil penalties under the Clean Water Act, 33 U.S.C. § 1365, against the defendant corporation for violations of permit limitations on the discharge of pollutants. After the complaint was filed, but before trial, the defendant began complying with the limitation requirements. The district court dismissed the case as moot because the defendant was no longer in violation of the Act. We reversed, holding that "the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed." *Id.* at 1134. *Accord Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.,* 993 F.2d 1017, 1021 (2d Cir.1993); *Natural Resources Defense Council v. Texaco Refining & Marketing, Inc.,* 2 F.3d 493, 503 (3d Cir.1993); *Gwaltney,* 890 F.2d at 696–97.

[5] JSI argues that the facts of this case are distinguishable from a case such as *Tyson* where the employer has come into compliance with the statute but remains in business. In those post-complaint compliance cases, JSI asserts, there is a risk that the wrong will be repeated; but the risk does not exist where the employer has ceased all operations.

JSI's argument does not fit the reasoning in *Tyson.* In *Tyson,* we did not base our decision on a determination that the defendant corporation continued to operate and, therefore, presented a risk of future violations. Although injunctive relief was mooted because "the allegedly wrongful behavior could not reasonably be expected to recur," we held in *Tyson* that the claim for civil penalties was *not* moot. *Id.* at 1134.

JSI also argues, and the Commission agreed, that JSI is no longer an "employer" for purposes of OSHA. *See* 29 U.S.C. § 652(5) (defining "employer" as person engaged in business who has employees). This argument fails because, for purposes of civil money penalties, a tribunal looks to the employer's status at the time of the violation, not at the time of trial. *See, e.g. Gwaltney,* 890 F.2d at 696–97 (characterizing past violations as "the only possible basis for assessing a penalty"). Accepting the Commission's view of mootness would mean the existence of a "case or controversy" is dependent on an employer's post-violation acts as well as the date a tribunal sets for a hearing in the proceedings. This innovative view seems to inject unneeded confusion into traditional mootness principles. We agree with the Secretary's view of the pertinent statute, **\*1203** 29 U.S.C. § 666: JSI was an "employer" when the OSHA violations occurred as well as when JSI received citations, and it remains one for the proceedings to assess the penalties arising from the citations.

Although we do not rely much on OSHA-related policy considerations in deciding this case, we think our decision is consistent with the policies that OSHA was enacted to advance. We expect that to adopt JSI's proposed rule for mootness would frustrate the purpose of OSHA. OSHA was enacted to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions...." 29 U.S.C. § 651(b). Because of the large number of workplaces which OSHA must regulate, relying solely on workplace inspections is an impractical means of enforcement. We accept that OSHA must rely on the threat of money penalties to compel compliance by employers. *See Atlas Roofing Co. v. OSHRC,* 518 F.2d 990, 1001 (5th Cir.1975) *aff'd,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (OSHA penalties act as "pocket-book deterrence").

To let the cessation of business by an employer render a civil penalty proceeding moot might greatly diminish the effectiveness of money penalties as a deterrent. Employers in violation of OSHA could become complacent in the knowledge that future civil penalties could be avoided by ceasing operations on the eve of the Commission hearing. Violators would be encouraged "to delay litigation as long as possible, knowing that they will thereby escape liability even for post-complaint violations, so long as violations have ceased at the time the suit comes to trial." *Tyson,* 897 F.2d at 1137. We worry about creating an economic incentive to avoid a penalty by going out of business and, perhaps, then reincorporating under a different name.

**Reich v. Occupational Safety and Health Review Com'n, 102 F.3d 1200 (1997)**

17 O.S.H. Cas. (BNA) 1858, 1995-1997 O.S.H.D. (CCH) P 31,216...

More important, employers who were going out of business for ordinary commercial reasons would have little incentive to comply with safety regulations to the end if monetary penalties could be evaded once the business quit altogether. As long as a business operates, it should feel itself to be effectively under the applicable laws and regulations—even on the last day. And, the continuing potential of penalties—more so than injunctive relief—makes these feelings real.[3]

Because the Commission's dismissal for mootness was not in accordance with the law, we vacate the Commission's order and remand for further proceedings.[4]

VACATED and REMANDED.

### All Citations

102 F.3d 1200, 17 O.S.H. Cas. (BNA) 1858, 1995-1997 O.S.H.D. (CCH) P 31,216, 10 Fla. L. Weekly Fed. C 643

Footnotes

[*]  Honorable Ann Aldrich, Senior U.S. District Judge for the Northern District of Ohio, sitting by designation.

[1]  We decide the case before us and the issues it raises. By the way, we do not independently decide today that Article III mootness principles necessarily control administrative agency tribunals. *See generally Climax Molybdenum Co. v. Secretary of Labor, MSHA,* 703 F.2d 447, 451 (10th Cir.1983) ("[A]n agency possesses substantial discretion in determining whether the resolution of an issue before it is precluded by mootness. However, in exercising this discretion, an agency receives guidance from the policies that underlie the 'case or controversy' requirement of Article III."); *Tennessee Gas Pipeline Co. v. Federal Power Commission,* 606 F.2d 1373, 1380 (D.C.Cir.1979) ("The limitations imposed by Article III on what matters federal courts may hear affect administrative agencies only indirectly.").

[2]  At oral argument, we asked counsel for JSI whether he was aware of a decision which had considered a money claim to have become moot as a result of the defendant's own acts. He responded, "I do not know of any such cases which hold that, your Honor. We searched, and we could not find any."

[3]  We understand that criminal penalties can be sought for some violations. We doubt that those kinds of penalties will or should face most employers who violate OSHA. So, we do not believe the existence of possible criminal penalties has much impact on the mootness question presented here.

[4]  We do not rule out today that JSI's having ceased to do business might be important to the amount of penalties; the appropriate amount is for the Commission to set.

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by** Navo South Development Partners, Ltd. v. Denton County Elec. Co-op., Inc., E.D.Tex., October 23, 2009

236 F.3d 240
United States Court of Appeals,
Fifth Circuit.

SIMI INVESTMENT COMPANY, INC.,
Plaintiff–Appellee,
v.
HARRIS COUNTY, TEXAS, Defendant–Appellant.

No. 99–20686. | Dec. 21, 2000.

Property owner sued county in state court for damages and injunctive relief under state and federal constitutions, alleging that county unlawfully prevented it from gaining access to city street adjacent to property. After county removed action, parties cross-moved for partial summary judgment. The United States District Court for the Southern District of Texas, Lynn N. Hughes, J., 13 F.Supp.2d 603, ruled in owner's favor. County appealed. The Court of Appeals, King, Chief Judge, held that: (1) substantive due process claim was not subsumed by unripe takings claim; (2) county waived res judicata defense; (3) county violated owner's substantive due process rights in claiming ownership to nonexistent park to deny owner access to city street; and (4) owner could not recover attorney fees for work performed prior to assertion of § 1983 claim.

Affirmed in part, vacated in part, and remanded.

West Headnotes (31)

**[1]** **Federal Civil Procedure**
⚬─Proceedings

District court may enter summary judgment after providing notice and instructing the parties to submit all relevant evidence.

Cases that cite this headnote

**[2]** **Federal Courts**

⚬─Jurisdiction

Court of Appeals exercises plenary review of a district court's subject matter jurisdiction.

Cases that cite this headnote

**[3]** **Constitutional Law**
⚬─Streets, Highways, and Sidewalks

Property owner's § 1983 substantive due process claim, alleging that county had unlawfully prevented owner from gaining access to adjacent city street, was not subsumed by owner's unripe Fifth Amendment takings claim. U.S.C.A. Const.Amends. 5, 14; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[4]** **Federal Courts**
⚬─State or federal matters in general

State law claims, standing alone, do not provide federal jurisdiction.

3 Cases that cite this headnote

**[5]** **Declaratory Judgment**
⚬─Jurisdiction of Federal Courts

Declaratory Judgment Act claims, without another basis for jurisdiction, cannot support district court's jurisdiction. 28 U.S.C.A. § 2201.

4 Cases that cite this headnote

**[6]** **Constitutional Law**
⚬─Ripeness; prematurity

**Tab E-13**

Final decision required for substantive due process claim to be ripe for review was satisfied where county's decision to claim ownership of purported park, offered as justification for denying property owner access to city street, had been final for more than 40 years. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[7]** **Constitutional Law**
🔑Substantive Due Process in General
**Federal Courts**
🔑Due process

When a state interferes with property interests, a substantive due process claim may survive a takings analysis and, therefore, provide jurisdiction for a federal court. U.S.C.A. Const.Amends. 5, 14.

18 Cases that cite this headnote

**[8]** **Constitutional Law**
🔑Streets, Highways, and Sidewalks

Claim that county unlawfully prevented property owner from gaining access to adjacent city street, in violation of substantive due process, was governed by deferential rational basis test. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[9]** **Federal Courts**
🔑Governments and Political Subdivisions

Whether rational relationship exists between government action challenged on substantive due process grounds and legitimate governmental interest is a question of law reviewed de novo. U.S.C.A. Const.Amend. 14.

17 Cases that cite this headnote

**[10]** **Constitutional Law**
🔑Rights and interests protected; fundamental rights

Substantive due process analysis is appropriate only in cases in which government arbitrarily abuses its power to deprive individuals of constitutionally protected rights. U.S.C.A. Const.Amend. 14.

23 Cases that cite this headnote

**[11]** **Constitutional Law**
🔑Property Rights and Interests

To prevail on a substantive due process claim, plaintiff must first establish that it held a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies. U.S.C.A. Const.Amend. 14.

31 Cases that cite this headnote

**[12]** **Constitutional Law**
🔑Source of right or interest

State law governed issue of whether property owner had property right protected by due process under Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[13]** **Constitutional Law**
🔑Real property in general
**Constitutional Law**
🔑Streets, Highways, and Sidewalks
**Highways**

👉Right of access

County's alleged interference with property owner's access to abutting street right-of-way violated Texas law, and thus implicated property interest protected by due process under Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

**[14]**    **Easements**
👉Extent of Right
**Easements**
👉Damages

Under Texas law, abutting property owner possesses an easement of access which is a property right not limited to a right of access to the system of public roads, and diminishment in the value of property resulting from a loss of access constitutes damage.

1 Cases that cite this headnote

**[15]**    **Nuisance**
👉What Constitutes Nuisance in General

Property owner alleged private, continuing nuisance under Texas law when it alleged that county had unlawfully denied property owners access to adjacent city street, thereby unreasonably interfering with property owners' rights. Restatement (Second) of Torts § 821D.

Cases that cite this headnote

**[16]**    **Nuisance**
👉Time to sue, limitations, and laches

Under Texas law, limitations is not a defense to an action to abate a continuing nuisance.

Cases that cite this headnote

**[17]**    **Nuisance**
👉Nature and extent of injury or danger

Under Texas law, "continuing nuisance" is a condition of such character that it may continue indefinitely.

1 Cases that cite this headnote

**[18]**    **Nuisance**
👉Nature and elements of private nuisance in general

Under Texas law, "private nuisance" is a nontrespassory invasion of another's interest in the private use and enjoyment of land. Restatement (Second) of Torts § 821D.

1 Cases that cite this headnote

**[19]**    **Constitutional Law**
👉Reasonableness, rationality, and relationship to object

Under rational relationship test governing substantive due process claim, question is whether a rational relationship exists between the challenged policy and a conceivable legitimate objective; if the question is at least debatable, there is no substantive due process violation. U.S.C.A. Const.Amend. 14.

26 Cases that cite this headnote

**[20]**    **Federal Civil Procedure**
👉Res judicata and pendency of another action

County waived issue of res judicata effect of

prior state-court decision resolving earlier dispute involving same strip of land as that underlying property owner's substantive due process claim when county failed to raise issue until six months after district court's ruling on motion for partial summary judgment and three years after filing of initial complaint. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

[21]     **Federal Civil Procedure**
         Res judicata and pendency of another action

Res judicata is an affirmative defense which is considered waived if not specifically pleaded in the answer or in an amended answer. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

4 Cases that cite this headnote

[22]     **Federal Civil Procedure**
         Time for amendment

District courts have discretion to allow late amendments to answers when no prejudice would result to the other party, and the ends of justice so require.

Cases that cite this headnote

[23]     **Federal Courts**
         Pleading

Court of Appeals reviews for abuse of discretion district court's decision to grant or deny late amendment to answer.

Cases that cite this headnote

[24]     **Federal Civil Procedure**
         Res judicata and pendency of another action

Denying res judicata defense was not abuse of discretion where defendant did not assert defense until three years after original suit was filed and more than six months after liability issues were resolved in interlocutory judgment.

Cases that cite this headnote

[25]     **Constitutional Law**
         Streets, Highways, and Sidewalks
         **Highways**
         Right of access

County acted arbitrarily and without legitimate governmental purpose, in violation of property owner's substantive due process rights, when it claimed ownership of nonexistent five-foot by 3000-foot park solely to deny private property owner lawful access to abutting city street, to which owner was entitled under state law, particularly when interference appeared to be designed to benefit other private interests and continued 20 years after county ceded control over street to city. U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

[26]     **Federal Courts**
         Costs and attorney fees

Court of Appeals reviews district court's award of attorney fees for abuse of discretion, and its factual findings relating to the award of fees for clear error.

1 Cases that cite this headnote

[27]     **Civil Rights**
         Results of litigation;  prevailing parties

Property owner that prevailed on § 1983 claim

asserting substantive due process violation by county was entitled to award of attorney fees. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §§ 1983, 1988.

3 Cases that cite this headnote

[28]     **Civil Rights**
⚷Services or activities for which fees may be awarded

Property owner that prevailed on § 1983 claim against county could not recover attorney fees for work performed before owner's state-court case was removed to federal court and complaint was amended to add § 1983 claim, given absence of showing that state suit was part of enforcement of § 1983 claim. 42 U.S.C.A. §§ 1983, 1988.

2 Cases that cite this headnote

[29]     **Civil Rights**
⚷Services or activities for which fees may be awarded

When a state proceeding is a necessary preliminary action to the enforcement of a federal claim, associated attorney fees may be available under federal civil rights statute in some circumstances, subject to the discretion of the district court. 42 U.S.C.A. § 1988.

1 Cases that cite this headnote

[30]     **Federal Courts**
⚷Costs and attorney fees

Court of Appeals reviews awards of expert fees under an abuse of discretion standard.

1 Cases that cite this headnote

[31]     **Federal Civil Procedure**
⚷Witness fees

Courts may award expert fees in excess of the statutory limitations when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*242** H. Dixon Montague (argued), Alan B. Daughtry, Kathleen A. Gallagher, Vinson & Elkins, Houston, TX, for Plaintiff–Appellee.

Bruce S. Powers (argued), Houston, TX, for Defendant–Appellant.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, Chief Judge, and REYNALDO G. GARZA and PARKER, Circuit Judges.

**Opinion**

KING, Chief Judge:

Defendant–Appellant Harris County, Texas appeals the district court's judgment against the County, arguing that the district court erred in holding that the County had unconstitutionally interfered with the property rights of Plaintiff–Appellee Simi Investment Company, Inc. The district court found that the County had unlawfully prevented Simi from gaining access to the city street adjacent to its property in contravention of Texas law. Specifically, the district court held that the County had abused its governmental power **\*243** and violated Simi's substantive due process rights by inventing and claiming ownership of a nonexistent five-foot by 3000–foot county park, which blocked Simi's lawful access to the street. For the following reasons, we AFFIRM the judgment of the district court, including the grant of attorneys' fees; however, we VACATE and REMAND to determine the amount of those attorneys' fees in a manner consistent

with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This dispute centers around the real property (the "Simi Property") owned by Simi Investment Company, Inc. ("Simi") which is located in downtown Houston in close proximity to the Houston Astrodome stadium.[1] More specifically, the Simi Property is situated adjacent to Fannin Street at the intersection of Interstate Loop 610 ("Loop 610") and Fannin Street. Simi sought from the City of Houston ("City") access to Fannin Street from the Simi Property, but was denied access by the City because Harris County (the "County") claimed an interest in an intervening five-foot sliver of land that runs alongside this property, separating it from Fannin Street.

This land dispute finds its origin in the early 1960s when the construction of the Astrodome led to increased development in the area surrounding what is now the Simi Property. Two of the major investors in the area were Roy Hofheinz and R.E. Smith. Hofheinz was a former Harris County judge and had been the chair of the County's governing board, the County Commissioners Court. Hofheinz was also President of the Houston Sports Association (the "HSA"), which leased the Astrodome from the County. Hofheinz–Smith owned property north of the Simi Property site, which was also located along the eastern side of Fannin Street. As a result, Hofheinz–Smith and the HSA had control of much of the property surrounding the Astrodome.

In conjunction with building the Astrodome, the County acquired rights-of-way for streets leading to the stadium. In 1961, the County Commissioners Court requested the consent of the City to acquire one of those rights-of-way by extending the length of Fannin Street to Loop 610. The City Council approved the location and alignment of the proposed street, and the land was purchased from the Trustees of the Hermann Hospital Estate and conveyed to the County for this purpose. The Hermann Hospital Estate right-of-way consisted of a 20.67 acre tract of land that was approximately 220 feet wide and 4100 feet in length, running north-south alongside the Astrodome site. This north-south right-of-way was bounded on the west by the Astrodome and surrounding grounds, and on the east by several privately owned properties (including the Hofheinz–Smith property and what is now the Simi Property).

The deed granting the land to the County provided that the property was being purchased with the intention of extending Fannin Street "with such extension to run in a North–South direction along the Eastern side of the Property described above, **\*244** with the remaining Western portion of said Property to be used for street purposes or included in a park and stadium site lying along the West side of said Property." Pursuant to this deed, the County Commissioners Court issued an order on December 11, 1961, stating that "Harris County is to move back the existing fences to the new right of way line."[2] Subsequently, Fannin Street was constructed as described in the deed on the eastern side of the conveyed property, and fences were erected directly abutting the Simi Property.

The original maps accompanying the County's acquisition of the right-of-way and describing the location and alignment of Fannin Street could not be found, and, thus are not a part of the record. The first site-specific document in the record is dated October 16, 1961, and was created when engineers for the County prepared a plat of the area depicting the land to be conveyed to the County for the right-of-way. The plat showed the granted land directly abutting the Simi property line. This plat, however, was not a survey and did not include the exact location of Fannin Street within the right-of-way.

At some time after 1961, this plat was altered to include the placement of Fannin Street and also, most relevant for this case, a strip of land set off from the eastern side of Fannin Street lying in between the street and the adjoining private properties. This five-foot by 3000–foot strip of land[3] is the county "park" now at issue.

As drawn in the revised plat, the Fannin Street right-of-way runs north-south, directly abutting the Hofheinz–Smith property. However, once past the southern boundary of the Hofheinz–Smith property line, the right-of-way is shown to make a ninety-degree turn west for five feet, and then it continues south to the 610 Loop. The result is the creation of a five-foot strip of land that separates all of the property south of the Hofheinz–Smith property from Fannin Street, but leaves the Hofheinz–Smith property directly abutting the Fannin Street right-of-way. No description or reason is apparent for this offset, nor why the offset begins just south of the Hofheinz–Smith property.[4] This plat also includes the words "location questionable" drawn to indicate the uncertain location of Fannin Street. There is no revised date on the altered plat. The County contends that this plat depicts the correct location of all relevant boundaries, with Fannin Street running north-south within the original right-of-way and a thin county park on the east side also running parallel to Fannin Street.

From this uncertain beginning, the County's "park" has withstood several legal and administrative challenges to its existence and control. First, in 1964, Texaco, Inc. requested access to Fannin Street from property it owned on the corner of Fannin and the 610 Loop. This request was submitted to the County Commissioner and was then forwarded to the County Engineer. For an unknown reason, the County Engineer sought approval from Hofheinz, as President of the HSA. Hofheinz stated that the HSA was unalterably opposed to the access because the strip of land east of Fannin was included in the original HSA lease of land for the Astrodome site and, therefore, was under HSA's control. This assertion was factually erroneous because HSA was never granted **\*245** control of the land. However, Hofheinz's objection led the County to deny Texaco access to Fannin Street.

Similarly, in 1969, property owners sought a mandatory injunction against the County, requesting that the fence abutting their properties be removed to grant access to Fannin Street. A take-nothing judgment was affirmed by a Texas court of appeals, which denied the property owners access across the County's land. *See Lovett v. County of Harris,* 462 S.W.2d 405, 408 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e). The court found that the erection of the fence was not an unconstitutional taking under Texas law because the intervening strip of land separating the property owners from Fannin Street had not been dedicated for street purposes. *See id.*[5]

Most recently, in 1984, Sterling B. McCall, Jr., the owner of McCall Toyota, requested that he be allowed to keep a driveway that had been built on his property which provided the property with ingress and egress onto Fannin Street. This request was denied by the County Commissioners Court, and McCall was required to fence in the driveway to block access to Fannin Street.

The area designated as a park has also been subject to encumbrances that over its history have helped define its status and ownership. In 1974, Entex, a gas company, constructed a gas line running north-south along the east side of Fannin Street. This gas line was buried inside the land now claimed as a park. The district court found that "[n]o Commissioner's Court Order or other document can be found to show the County authorized an easement in the 'park' to Entex." In 1978, the City of Houston approved a plan and constructed an eight-inch water line that crossed the park. Again, the district court found no Commissioners Court order authorizing the easement across the park for the water line. Finally, in 1993, the Metropolitan Transit Authority of Harris County ("METRO") approved construction of a sidewalk on the park property, running alongside the Simi Property. No approval was sought from the County for an easement.

Control of Fannin Street, itself, was ceded from the County to the City of Houston in 1974. In that year, the County removed Fannin Street from its road logs.

From 1981 to 1984, Simi began acquiring property along Fannin Street.[6] In 1994, Simi submitted to the City a request for driveway access from its property to Fannin Street. Richard Scott, the Technical Director/City Engineer of the Department of Public Works and Engineering for the City, responded that the City "would be in a position to process [the] application, and likely approve it," but for the fact that the County has claimed an interest in the strip of land. Simi then applied to the County for access. This request was denied based on the assertion that the County owned parkland located between Fannin Street and the Simi Property.

Simi sued the County in state court. Simi sought damages and injunctive relief pursuant to Article 1, Section 17 of the Texas Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. In addition, Simi sought a declaration that its land directly abutted the right-of-way of Fannin Street. The County removed the suit to federal court. Simi filed a motion to remand, stating that its federal takings claim was not ripe. The district court did not rule on this motion for remand. In federal court, Simi added a 42 U.S.C. § 1983[7] substantive **\*246** due process claim, alleging that the County's denial of access to an adjoining right-of-way arbitrarily and capriciously denied Simi a property interest established under Texas law.

**[1]** The district court held two conferences during which the parties were required to submit all relevant documents and exhibits and to stipulate to the agreed facts. Both parties then moved for partial summary judgment based on this established record.[8]

On August 26, 1998, the district court issued an Interlocutory Judgment and an Opinion on Judgment solely on the issue of the existence of the park. The district court reserved deciding the issue of damages or attorneys' fees. The court found in its Interlocutory Judgment that: (1) "Harris County had never established a park"; (2) "Harris County had no interest in an intervening 5–foot by 3,000–foot strip east of Fannin Street and west of [the Simi Property] making illegal its interference with the owners' relation to the City of Houston and Fannin Street"; (3) "Harris County had ceded to the [C]ity of Houston all of its right, title, and interest in the eastern-most 100 feet of land conveyed to it by the Hermann Estate"; and (4) "[t]he City of Houston's

Fannin Street right of way abuts directly and fully the west boundary of [the Simi Property]."

After the Interlocutory Judgment, two hearings were held on damages and attorneys' fees. In addition, Simi introduced supplemental evidence into the record involving the County's reasons for denying property owners access to Fannin Street. The district court issued a Final Judgment on April 21, 1999, incorporating the Interlocutory Judgment and adding that the County was liable for $823,540 in damages, $367,000 in attorneys' fees, and $116,994.32 in expenses. On May 13, 1999, the district court issued Supplemental Findings that: (1) the County arbitrarily interfered with Simi's property rights; (2) the interference had no relation to a legitimate governmental interest; (3) the interference was an abuse of governmental power; (4) the County persisted in defending its claim to the park in bad faith and used the litigation to vex and oppress Simi; and (5) the County deliberately violated Simi's rights under the United States Constitution.[9]

The County timely appeals.

## II. STANDARD OF REVIEW

We review a grant of summary judgment[10] de novo, applying the same criteria **\*247** used by the district court in the first instance. *See Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994); *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994).* Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. SUBJECT MATTER JURISDICTION

[2] We exercise plenary review of a district court's subject matter jurisdiction. *See Rutherford v. Harris County, Tex.,* 197 F.3d 173, 189–90 (5th Cir.1999); *Taylor–Callahan–Coleman Counties v. Dole,* 948 F.2d 953, 956 (5th Cir.1991).

[3] As a threshold matter, the County argues that the district court lacked federal subject matter jurisdiction to decide the case. We find that the district court had subject matter jurisdiction by reason of Simi's § 1983 substantive due process claim.

In its Opinion on Judgment, the district court provided three grounds for its jurisdiction. First, the court found that "[t]he facts pleaded state claims under the Texas Constitution to which no accommodative delay is due.... Whatever the eventual fate of Simi's claim for compensation, Simi is entitled to use this court's authority to correct the county's continuing non-possessory interference with its land." *See Simi,* 13 F.Supp.2d 603, 605 (S.D.Tex.1998) (citations omitted). Second, the district court found that Simi had stated claims against the County under the Fourteenth Amendment, the Civil Rights Act of 1866, and 42 U.S.C. § 1983. *See id.* As these claims are ripe without exhaustion of state remedies, the court found proper jurisdiction. Finally, the district court held that Simi is entitled to seek declaratory relief under both Texas and federal law. *See id.*

[4] [5] The County correctly argues that the state law claims, standing alone, do not provide federal jurisdiction. Further, we agree that Declaratory Judgment Act claims, without another basis for jurisdiction, cannot support the district court's jurisdiction. *See Lawson v. Callahan,* 111 F.3d 403, 405 (5th Cir.1997) ("[I]t is well settled that [the Declaratory Judgment Act] does not confer subject matter jurisdiction on a federal court where none otherwise exists."). The County thus contends that the only potential federal claim available to Simi is a "takings" claim under the Fifth and Fourteenth Amendments, and that Simi has conceded that such a claim is not ripe for review.[11] While we agree that the takings claim is not ripe for review, this argument does not dispose of Simi's suit because the § 1983 substantive due process claim was properly before the district court.

In order to unpack the jurisdictional basis for the district court's holding, we revisit our recent decision in *John Corp. v. City of Houston,* 214 F.3d 573, 582 (5th Cir.2000), in which we held that substantive due process claims alleging deprivations of property are not necessarily subsumed under the Takings Clause. As this is precisely the issue raised by the County, **\*248** we find *John Corp.* to be dispositive as to the question of jurisdiction.

*John Corp.* recognized that "[i]ndividuals may look to several constitutional provisions for protection against state action that results in a deprivation of their property." *Id.* at 577. One of those provisions is the substantive due process component of the Fourteenth Amendment which guarantees that individuals shall not be deprived of their

property without due process of law. *See* U.S. CONST. amend. XIV, § 1; *see also John Corp.,* 214 F.3d at 577 ("Substantive due process, by barring certain government actions regardless of the fairness of the procedures used to implement them, [ ] serves to prevent governmental power from being used for purposes of oppression." (alterations in original) (citations and internal quotation marks omitted)). Another provision is the Takings Clause of the Fifth Amendment. *See* U.S. CONST. amend. V; *see also John Corp.,* 214 F.3d at 577; *Samaad v. City of Dallas,* 940 F.2d 925, 933 (5th Cir.1991) ("The Takings Clause of the Fifth Amendment directs that 'private property [shall not] be taken for public use, without just compensation.' The Supreme Court has held that the clause applies to the states through the Fourteenth Amendment." (citations omitted)). In the instant case, once Simi had its case removed to federal court, it explicitly pled a due process claim, recognizing that it did not have a takings claim.[12]

[6] [7] Nevertheless, the County argues that we must decide this case under the Takings Clause because "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims'." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Again, *John Corp.* controls our analysis. We take no issue with the principle inherent in the Supreme Court's *Albright/Graham* analysis; however, in the instant case, we find a takings analysis does not exhaust Simi's constitutional claims. *John Corp.* found that under *Albright/Graham,* a more explicit provision does not necessarily preempt due process protections, and that substantive due process claims can survive a related takings argument:

> This does not mean, however, that the applicability of the more explicit provision pre-empts due process protections. *See* [*County of Sacramento v.*] *Lewis,* 523 U.S. 833, 842–44, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); [*United States v.*] *James Daniel Good Real Property,* 510 U.S. 43, 49, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another."). Moreover, it is clear that a particular action may implicate more than one constitutional protection. *See Soldal [v. Cook County, Ill.],* 506 U.S. 56, 70, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such

multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn."). Thus, simply because an explicit provision applies does not mean that that provision makes inapplicable **\*249** all substantive due process protections. *See Albright,* 510 U.S. at 288, 114 S.Ct. 807 (Souter, J., concurring) (suggesting that due process is reserved for "otherwise homeless substantial claims").

*John Corp.,* 214 F.3d at 582.[13] Our limited holding in *John Corp.* is similarly limited here; we find only that when a state interferes with property interests, a substantive due process claim *may* survive a takings analysis and, therefore, provide jurisdiction for a federal court.

As alleged, there exists illegitimate governmental conduct that has deprived Simi of its property rights for the benefit of private interests. Because Simi submitted sufficient evidence to support its § 1983 substantive due process claim based on an allegedly arbitrary and unlawful attempt to interfere with private property rights, we reject the County's argument that the district court did not have federal subject matter jurisdiction.

## IV. SUBSTANTIVE DUE PROCESS

[8] [9] The determination that the district court had jurisdiction to decide the federal question of substantive due process, however, does not resolve the merits of Simi's claim. Our review of the County's actions must be measured against the deferential "rational basis" test that governs substantive due process. *See FM Prop. Operating Co. v. City of Austin,* 93 F.3d 167, 174 (5th Cir.1996) ("[G]overnment action comports with substantive due process if the action is rationally related to a legitimate governmental interest."). "Whether this 'rational relation' in fact exists is a question of law that we review de novo." *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1044 (5th Cir.1998).

"A violation of substantive due process, for example, occurs only when the government deprives someone of liberty or property; or, to use the current jargon, only when the government works a deprivation of a constitutionally protected interest." *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988) (internal quotation marks and citations omitted); *see also DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 601 (3d Cir.1995) ("[I]n the context of land use regulation, that is, in situations

where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrary or capricious.").

[10] Substantive due process analysis is appropriate only in cases in which government arbitrarily abuses its power to deprive individuals of constitutionally protected rights. Therefore, recognizing that reliance on substantive due process must be taken with the "utmost care," *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), we emphasize the particularly odd factual situation in this case, and the length and degree of governmental abuse and, thus, limit our holding to the type of blatant governmental interference with property rights that is now before us.

### A. The Constitutional Right at Issue

[11] [12] To prevail on a substantive due process claim, Simi must first establish that it held a constitutionally protected property right to which the Fourteenth **\*250** Amendment's due process protection applies. *See Spuler v. Pickar,* 958 F.2d 103, 106 (5th Cir.1992) (citing *Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *see also Hidden Oaks,* 138 F.3d at 1046 ("In order to assert a violation of this amendment, one must at least demonstrate the deprivation of a protected property interest established through some independent source such as state law." (internal quotation marks and citations omitted)). The nature of the property interest therefore must be determined by Texas law. *See Spuler,* 958 F.2d at 106; *see also Hidden Oaks,* 138 F.3d at 1046 ("Under this analysis, the hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except for cause." (internal quotation marks and citations omitted)).

[13] [14] [15] [16] [17] [18] Under Texas law, this first issue is resolved in Simi's favor. "It is the settled rule in this state that an abutting property owner possesses an easement of access which is a property right; that this easement is not limited to a right of access to the system of public roads; and that diminishment in the value of property resulting from a loss of access constitutes damage." *State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996) (internal quotation marks omitted) (quoting *DuPuy v. City of Waco,* 396 S.W.2d 103, 108 (Tex.1965)); *see also City of Beaumont v. Marks,* 443 S.W.2d 253, 255 (Tex.1969) ("It is well settled that abutting property owners ... have certain property rights in existing streets and highways in

addition to their right in common with the general public to use them. Generally, the most important of these private rights is the access to and from the highway or street."); *State v. Meyer,* 403 S.W.2d 366, 370 (Tex.1966); *Lethu Inc. v. City of Houston,* 23 S.W.3d 482, 485 (Tex.App.—Houston [1st Dist.] 2000, no pet.); *State v. Northborough Ctr., Inc.,* 987 S.W.2d 187, 190 (Tex.App.—Houston [14th Dist.] 1999, pet. denied). As the district court found, "Simi's western boundary is the same as the Hermann–Fannin–County–City eastern boundary; they abut by definition." Therefore, if Simi is correct in its assertion that no park exists or has ever existed, its property unquestionably abuts the Fannin Street right-of-way, and the County's interference with this access is a violation of Texas law.[14]

### B. The Substantive Due Process Violation

[19] Satisfied that the County's blockage of access implicates a constitutionally **\*251** protected property right, we must ask next whether this denial is rationally related to a legitimate governmental interest. *See FM Prop.,* 93 F.3d at 174. "The question is only whether a rational relationship exists between the [policy] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Id.* (alteration in original) (citations omitted). Even under this low threshold, we are unpersuaded that a rational basis exists to justify the County's interference with Simi's property rights.

In brief, it is apparent from the record that the County cannot demonstrate that a five-foot park ever existed in between Fannin Street and the Simi Property. Further, we can ascertain no rational reason for the County to deny abutting owners access to the street when the City of Houston now has complete jurisdiction over Fannin Street. Most troubling, however, the record reflects what the district court found to be an illegitimate plan to benefit the private interests of Hofheinz–Smith whose properties were financially benefitted by the denial of access to the other properties abutting Fannin Street. As will be discussed in detail below, the evidence demonstrates that the County acted arbitrarily in inventing a park and, thus, acted without a rational basis in depriving Simi of a constitutionally protected interest.

The dispositive question in this case is whether or not there ever was a park. The district court found that the County had never established a park. We agree.

First, the County has failed to provide any official

documentation of the existence of a park. None of the five surveys included in the record shows any sign of a county park. The 1978 survey prepared by R.A. Peyton & Associates for the City of Houston shows an eight-inch water main crossing Fannin Street without reference to an intervening county park. The 1988 survey prepared for the Holly Hall Home for the Retired, located north of the Simi Property does not show a park. The 1991 survey prepared by the South Texas Surveying Associates Inc. shows Simi's property directly abutting Fannin Street. The 1993 survey prepared by PGAL Engineering for METRO in order to install a sidewalk on the strip makes no mention of a county park. Finally, in 1996, Karen Rose Engineering & Surveying completed a survey that shows the east line of the Fannin Street right-of-way and the Simi property line to be the same. All of the above surveys were signed and sealed by registered professional surveyors.

These surveys also support Simi's claim that the Fannin Street right-of-way has always abutted the eastern properties, including the Simi Property. The district court found that the Hermann Hospital Estate deed determined the proper boundaries of the right-of-way. The deed provided that the Fannin right-of-way would run along the east side of the Astrodome property with "the remaining western portion of said Property to be used for street purposes or included in a park and stadium site lying along the West side of said Property." Under this deed, no parkland was reserved on the east of Fannin Street, and the right-of-way apparently was intended to extend to Simi's property line. No County Commissioners order changed this initial understanding of the right-of-way.[15] In fact, this understanding was confirmed when the County moved back the fences to the existing property line abutting what is now Simi's property.

In contrast, the sole descriptive evidence presented by the County was the altered version of the 1961 unsigned and unofficial plat. The altered version of the plat is of **\*252** limited persuasive authority because it provides no information about the purpose or date of the alteration, and includes the language "location questionable" to denote the uncertain placement of Fannin Street. Without some justification for why a five-foot setoff was created just south of the Hofheinz–Smith land, conveniently blocking all of the other property owners, we are compelled to find that this plat cannot carry the burden of establishing the County's park.

[20] [21] [22] [23] [24] The County also relies on *Lovett v. County of Harris,* a Texas Court of Civil Appeals case that decided an earlier dispute about this strip of land. *See* 462 S.W.2d 405 (Tex.Civ.App.—Houston [1st Dist.]

1970, writ ref'd n.r.e.). As a procedural matter, we find that the County has waived this issue for purposes of res judicata as it inexplicably failed to raise this argument until six months after the district court's Interlocutory Judgment and three years after the initial complaint.[16] However, as the case provides a discussion about the disputed land, we address its reasoning.

*Lovett* involved a suit by landowners whose property overlapped some of the current Simi Property. These landowners sought a mandatory injunction against the County to remove a six-foot chain-link fence, which ran along the property line and separated the Fannin Street right-of-way and their properties. *See id.* at 406. The court denied the request for an injunction finding that: (1) Fannin Street did not abut the landowners' property; (2) a 16.6 foot strip of land intervened between Fannin Street and the landowners' property; (3) neither the deed nor the City of Houston had dedicated the 16.6 feet of land as being used for street purposes; and (4) there was no taking of land under Article I, Section 17 of the Texas Constitution. *See id.* at 406–07.

This holding, while seemingly supportive of the County's claim, fails to carry the argument. First, we note that the *Lovett* court affirmed the lower court's decision which, as the *Lovett* court noted, did not include any findings of fact or conclusions of law.[17] Second and more important for our purposes, no showing was made that any county park existed, or even that the County argued that a park existed on the land. All that *Lovett* proves is that, as of 1970, the County held ownership to the eastern part of Fannin Street, a conclusion with which all parties agree. Third, the *Lovett* decision supports the contention that the Fannin Street right-of-way (if not **\*253** the street) extended to the boundary of the Simi Property. As this is where the disputed fence was placed, it is apparent the county land abuts the Simi Property. Finally, the state law takings holding is irrelevant to our analysis involving the existence of a substantive due process violation.

Even accepting the factual findings of the *Lovett* court, the issue left open is what happened to the 16.6 foot strip once the County yielded jurisdiction over Fannin Street to the City of Houston in 1974. It is undisputed that Fannin Street was ceded to the City, but there is no record that in doing so, the County retained an interest in a remaining five-foot strip of land. Once the City of Houston took responsibility for the street and the accompanying traffic and maintenance responsibilities, we are hard pressed to find a reason for the County's retention of five feet out of the original 16.6 feet of land.

Furthermore, the County's claim that a park has always

existed is belied by the fact that the park has not been treated as such by the County. City gas lines, water lines, and a sidewalk were all constructed on the park without receiving proper authorization or an easement from the County. As the district court found in its "Chronology":

> The County and Simi Investment agree that the County cannot sell or otherwise encumber its park land unless the encumbrance is approved by Commissioners Court Order with public notice under a state statute. The County and Simi Investment agree that no Commissioners Court Order can be found authorizing Entex, Houston, or METRO to construct facilities on the property and further, that there is no evidence that the County complied with the statutory notice requirements to convey an interest in this property to Entex, the City, or METRO.

*Simi,* 13 F.Supp.2d at 611–12. Further, owners of other properties along Fannin Street have developed their land in a manner that demonstrates that no park exists. For example, the owners of the Holly Hall tract north of the Simi Property along Fannin Street developed their property with a twenty-five foot setback from the street, pursuant to local ordinance. This twenty-five foot setback would not have been necessary if a five-foot park intervened between the street and the property.

From the foregoing, we agree with the district court that "Harris County has no interest in an intervening 5–foot by 3,000–foot strip east of Fannin Street and west of Knight's Main Street Addition [the Simi Property] and Holly Hall property, making illegal its interference with the owners' relation to the City of Houston and Fannin Street.... [and] Harris County has ceded to the city of Houston all of its right, title, and interest in the eastern-most 100 feet of land conveyed to it by the Hermann Estate." *Simi,* 13 F.Supp.2d at 612.

Measured against the rational basis test, a nonexistent park used by County officials to interfere with private property interests is clearly arbitrary, capricious, and violative of due process. "While the 'rational basis' standard is the least demanding test used by the courts to uphold [governmental] action, it is not 'toothless.' " *Berger v. City of Mayfield Heights,* 154 F.3d 621, 625 (6th Cir.1998) (quoting *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)). More

damaging to the County's argument, the only basis in the record to explain the County's interference with access appears to be that—as the district court recognized—this impediment would benefit the privately held Hofheinz–Smith properties and the HSA.

The record clearly suggests that creation of a park worked to enhance the value of the Hofheinz–Smith properties.[18] As the district court found, "interestingly, **\*254** that ridiculously narrow park limits the access of only those property owners who would compete with the Hofheinz–Smith interests." *Simi,* 13 F.Supp.2d at 607. Proof of this influence began in 1964 when the County denied Texaco the right of access to Fannin Street on the basis of Hofheinz's objection. Furthermore, we note that the original request to gain access to the street was denied not because of the County's own claim to the land or an assertion of a park, but because of Hofheinz's erroneous assertion that HSA owned the strip of land.

That the County acted to benefit solely private interests does not necessarily demonstrate a substantive due process violation. For substantive due process purposes, "the true purpose of the [policy], (i.e., the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis." *FM Prop.,* 93 F.3d at 174. However, the County failed to put forth any alternative rational basis for the continued interference with private property rights.[19] Certainly in 1994, twenty years after the County had ceded control over Fannin Street to the City of Houston, there was no rational basis for blocking access to the street. Once jurisdiction shifted to the City, whatever interests in maintaining traffic control or other governmental responsibilities that could be hypothesized to justify interference with access to Fannin Street disappear. Without a park and without a rational basis for impeding access, the County's arguments fail to survive even a rational basis review.

[25] We, therefore, affirm the district court's findings that the County acted arbitrarily and without a legitimate governmental purpose. We hold that the invention of a park solely to deny private property holders lawful access to an abutting street is an abuse of governmental power, which on this peculiar factual foundation rises to the level of a substantive due process violation. Having successfully pled a deprivation of a constitutional right under § 1983, Simi is entitled to the relief granted by the district court.

### V. ATTORNEYS' FEES

[26] [27] It is undisputed that attorneys' fees are provided under 42 U.S.C. § 1988 **\*255** for litigants who successfully bring § 1983 claims. *See* 42 U.S.C. § 1988 ("[T]he court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."). "We review a district court's award of attorneys' fees for abuse of discretion, and its factual findings relating to the award of attorneys' fees for clear error." *Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337, 348 (5th Cir.1999). Having found that Simi has proven a successful § 1983 claim predicated on substantive due process, we agree that Simi is entitled to receive attorneys' fees.[20]

[28] However, we find that the district court abused its discretion in awarding attorneys' fees based on legal work not provided in furtherance of Simi's § 1983 claim. While the record does not permit us to determine precisely what factors were controlling in the court's determination of the fee, our reading of the record leads us to be concerned that Simi's state court legal fees which preceded its amended § 1983 suit[21] were included in the calculation.

[29] This court has held that attorneys' fees resulting from state court litigation that does not seek to enforce federal constitutional rights, but which does precede a successful § 1983 suit, are not attorneys' fees contemplated by § 1988. *See Brantley v. Surles,* 804 F.2d 321, 325 (5th Cir.1986). This conclusion necessarily follows from the purpose of § 1988, which is to enforce § 1983 or other federal civil rights statutes. Of course, where a state proceeding is a necessary preliminary action to the enforcement of a federal claim, these attorneys' fees may be available in some circumstances, subject to the discretion of the district court. *See Redd v. Lambert,* 674 F.2d 1032, 1037 (5th Cir.1982); *see also Barrow v. Falck,* 977 F.2d 1100, 1104 (7th Cir.1992) ("Section 1988 permits a court to shift to defendant only those legal fees incurred in proceedings to enforce a few listed federal statutes. When proceedings in state courts or agencies are part of the enforcement of § 1983, then time reasonably devoted to them is compensable." (citing *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 71, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980))).

Simi brought its initial suit in state court and did not allege a § 1983 violation. Without a demonstration that this state suit was part of the enforcement of the § 1983 claim, legal fees relating to that litigation cannot be recovered under § 1988. Following *Brantley,* we find that the state suit was not a part of the enforcement of § 1983, and therefore, attorneys' fees relating to the state action are not recoverable. *See Brantley,* 804 F.2d at 325.

We are also concerned that the district court may have based its award on a record that includes billing reports of Simi's counsel dating back to 1990, well before the state and federal lawsuits were initiated. These records, and the district judge's assertion at the hearing on attorneys' fees that counsel had worked on the case for six years, compels us to find that the district court may have awarded an incorrect amount of attorneys' fees. Further, the district court apparently calculated the attorneys' fees with interest based on a time frame that may have included the state court proceedings. Because we find that the district court abused its discretion in considering attorneys' fees not related to the § 1983 action, we vacate the original award and remand it for reconsideration.

**\*256** [30] [31] Having prevailed on appeal, Simi is entitled to legal fees for the appeal. On remand, we also ask the district court to decide on a reasonable fee.[22]

### VI. CONCLUSION

For the above stated reasons, we AFFIRM the judgment of the district court in all respects, except for the award of attorneys' fees, which we VACATE and REMAND for further consideration consistent with this opinion.

### All Citations

236 F.3d 240

Footnotes

1       We are guided through the curious history and development of this particular strip of land by the stipulated record of exhibits which was submitted by the parties and was adopted by the district court as the entire record. On August 12, 1996, the district court entered a Conference Memorandum which stated that the case would be resolved by analyzing the documentary evidence submitted. On September 23, 1996, the district court entered a second Conference Memorandum recording that the parties had stipulated to exhibits 1 through 25 and that the exhibits and other documents submitted would constitute the whole record. On August 26, 1998, the district court allowed Simi to supplement the record with documents not previously turned over by the County. In addition, we rely on the

"Chronology" included as an addendum to the district court opinion. *See Simi Investment Co. Inc. v. Harris County, Tex.,* 13 F.Supp.2d 603, 609–13 (S.D.Tex.1998) (addendum to opinion).

The district court found that "[a]fter exhaustive search by the County and Simi, no later order of the Commissioners Court was found that modified in any way the alignment of the Fannin Street right of way described in the Hermann deed and the commissioners order of December 11, 1961." Presumably, the original location of the fence denotes the proper right-of-way line.

From our review of the record, the 3000–foot measure is an apparent approximation that was adopted by the district court and has been accepted by both parties.

The result of the offset is that the Hofheinz–Smith properties are granted full access to Fannin Street, but all properties south of the Hofheinz–Smith land are denied access.

The reasoning of the *Lovett* decision will be discussed in detail *infra.*

Simi owns Lots 1, 2, 3, and 4 in Block 68; Lots 1, 2, 3, 4, 5, and 6 in Block 69; Lots 1, 5, and 6 in Block 70 in Knight's Main Street Addition.

42 U.S.C. § 1983 reads in relevant part:Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
42 U.S.C. § 1983 (1994).

The County raises a preliminary challenge to the entry of summary judgment based on this stipulated record. We find no merit in this challenge as it is well established that a district court may enter summary judgment after providing notice and instructing the parties to submit all relevant evidence. *See Celotex v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."). In conference, the district court asked the parties to submit all relevant documents and exhibits. It was from this evidentiary basis that the district court decided to grant the request for partial summary judgment. We find no error in these actions.

The County challenges these Supplemental Findings as not supported by the evidence. We disagree. From the extensive exhibits and documentary evidence submitted by both parties, the district court could well establish a basis for liability. In short, without proof that a county park ever existed, the County's justification for interfering with Simi's access to Fannin Street fails, and becomes an arbitrary and capricious act. We, therefore, find no error in a damages award based on that liability, and find no error in the Supplemental Findings based on the district court's review of the evidence.

The County appeals the Final Judgment issued on April 21, 1999. While not designated as such, we interpret this Final Judgment as a final decision on summary judgment resolving all issues in favor of Simi. Simi had initially moved for partial summary judgment requesting a declaration that the County was interfering with its property. The County cross-moved for summary judgment on this issue. The district court's Interlocutory Judgment resolved the partial summary judgment motion in Simi's favor. In its Final Judgment, the district court incorporated the Interlocutory Judgment into its order and resolved all outstanding issues.

As stated, Simi opposed removal to federal court on the grounds that a ripe federal takings question was not presented for adjudication. *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 199, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

Simi's precise claim is that the County arbitrarily interfered with its property rights, not that the County sought to acquire or regulate the use of the property. Simi argues that in the forty-year history of this strip of land, the County never tried to "take" the Simi Property in a constitutionally significant sense, but rather abused its power to frustrate Simi's rightful use of that land. Similarly, the County did not seek to condemn Simi's right of access to the property in an inverse condemnation action. The County has simply wrongfully interfered with Simi's right of access for no legitimate public purpose.

13    The recognition that the Takings Clause does not subsume all substantive due process claims does not end the ripeness inquiry. There also must be a final decision from which to appeal. As we stated in *John Corp.,* "a careful analysis must be undertaken" to determine if there has been a final decision, the lack of which would render the claim not ripe. *Id.* at 584 ("If the Court considered the claim to be a due process, rather than a takings claim, the absence of a final decision still made that claim unripe."). As the County's decision to claim ownership of the park has been final for over forty years, and was in 1994 the justification for denying Simi access to Fannin Street, we are persuaded that a final decision has been made.

14    The County's interference with Simi's property right of access to the abutting street also provides reason for rejecting another of the County's procedural arguments—namely that the statute of limitations bars Simi's claim. Under Texas law, "limitations is not a defense to an action to abate a continuing nuisance." *Stein v. Highland Park Indep. Sch. Dist.,* 540 S.W.2d 551, 554 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.); *City of Dallas v. Early,* 281 S.W. 883 (Tex.Civ.App.—Dallas 1926, writ dism'd). We agree with the district court that Simi has alleged a continuing nuisance, asking for abatement and damages of its denial of access to an abutting street. "A continuing nuisance is a condition of such character that it may continue indefinitely." *Jamail v. Stoneledge Condo. Owners Ass'n,* 970 S.W.2d 673, 676 (Tex.App.—Austin 1998, no pet.) (citing 66 C.J.S. NUISANCE § 4 (1950)). "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 821D). In the instant case, the denial of access unreasonably interferes with the rights of property owners. It is therefore a private, continuing nuisance under Texas law, which precludes the statute of limitations defense asserted by the County.

The district court did recognize, however, that "limitations may bar the recovery of damages that accrued more than two years before suit". *Simi,* 13 F.Supp.2d at 606; *see also Stein,* 540 S.W.2d at 554 ("[A]ppellant [would not] be barred from recovery of damages for injuries suffered during the two years immediately prior to filing of her suit."). From our review of the record, it appears that the district court limited its determination of damages to damage occurring within this time period. In the October 29, 1999, hearing on damages, the district court made reference to a four-year time-frame for damages. As the original suit was filed in 1996, the 1999 determination of a four-year time period fits well within the statutory time limit for recovering damages.

15    As the district court recognized, "A county can act only through an official 'commissioners court order' to alter a thoroughfare." *Simi,* 13 F.Supp.2d at 607 (citing TEX. TRANSP. CODE ANN. § 251.051(b)(2) (1996), which states in relevant part: "A unanimous vote of the commissioners court is required ... to alter a public road, except to shorten it end to end."). The County has not provided any subsequent Commissioners Court order suggesting that the Fannin Street right-of-way was ever altered.

16    Nevertheless, the County contends that res judicata bars Simi's claim because this prior state court judgment supports the County's ownership of the strip of land. Again, we need not reach the merits of this claim, because the County failed to raise this issue as an affirmative defense.

"Res judicata is an affirmative defense which is considered waived if not specifically pleaded in the answer or in an amended answer permitted under FED.R.CIV.P. 15(a)." *Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1199 (5th Cir.1995); *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 172 (5th Cir.1985) ("[R]es judicata, and hence collateral estoppel, is an affirmative defense which if not pled is considered waived."). District courts, of course, have discretion to allow late amendments "when no prejudice would result to the other party, and the ends of justice so require." *See Mozingo,* 752 F.2d at 172. Our review is under an abuse of discretion standard. *See Morgan Guar. Trust Co. v. Blum,* 649 F.2d 342, 345–46 (5th Cir. Unit B July 1981).

In the instant case, the County did not raise the defense until three years after the original suit was filed and more than six months after the district court resolved the liability issues in its Interlocutory Judgment. We find that the district court did not abuse its discretion in denying the County's res judicata defense.

17    The *Lovett* court stated:

The appellants, as movants in the trial court, had the burden of proof. No findings of fact or conclusions of law were requested or made, so we cannot say that the trial judge necessarily held with respect to all of these matters as the points of error assert that he did. His decision may well have been based, in part, on the appellants' failure to sustain their burden of proof as to some of their allegations.

*Lovett,* 462 S.W.2d at 407.

18    Two letters included in the record from County officials support the understanding that the County had interfered with the private property owners to benefit Hofheinz–Smith and the HSA. A March 14, 1985 letter from Richard Doss, County Engineer for the County, to El Franco Lee, Commissioner, stated in relevant part,

[T]he lots ... were denied access to Fannin Street to prevent the establishment of businesses that could conceivably compete with the stadium operation. Surely, before any permission were granted the Houston Sports Association should be consulted.

Similarly, an August 20, 1991 letter from Ricardo Rivero, Technical Assistant, to County Engineer Terry A. Anderson reiterated this understanding, "[T]he lots and streets in Knights Main Street Addition [the Simi Property] were denied access to Fannin Street to prevent the establishment of businesses which conceivably would compete with the operation of the Dome stadium." While we recognize that these letters are not binding on the County, they are probative, supporting the district court's Supplemental Finding that "[t]he [County's] interference had no relation to a legitimate governmental responsibility of the county whether characterized as public health, safety, or general welfare."

We note that a second letter from Richard Doss to El Franco Lee on November 14, 1985, provides a mixed private/public reason for the denial of access, and comes the closest to proving a legitimate reason for the denial of access. In that letter, Doss discusses the fence that abuts the Simi Property: "The fence was erected to minimize interruption to traffic on Fannin en route to the stadium and to prevent business competition with the stadium." While the latter purpose is clearly illegitimate (benefitting purely private interests), the former could offer the requisite "rational" justification for impeding access. The flaw, however, is that this letter only addresses the *fence* abutting the Simi Property, and makes no mention of an intervening county park. As all parties have conceded that the County once owned the eastern property up to the Simi property line, this letter does little to demonstrate that a park existed and, in fact, seems to support Simi's theory that the right-of-way has always abutted its property. The question we cannot answer is what legitimate interest the County had in maintaining that fence more than a decade after it had ceded control of the Fannin Street right-of-way to the City of Houston.

It is apparent from the record that, in considering the award, the district court explained its reasons for the award and complied with the requirements of *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (1974). Our sole concern is the timetable used to judge the attorneys' fees.

As stated, Simi's § 1983 claim was first raised in its November 18, 1996, first amended complaint.

We find no merit in the County's argument that the district court exceeded its authority in awarding expert witness fees. We review awards of expert fees under an abuse of discretion standard. *See Holmes v. Cessna Aircraft Co.,* 11 F.3d 63, 64 (5th Cir.1994). The district court found in its Supplemental Findings that "the county persisted in defending its wrongful interference claim in bad faith; long after title questions had been clearly answered from the county's own records, it used this litigation to vex and oppress Simi." Under *Alyeska Pipeline Service Co. v. Wilderness Society,* courts may award expert fees in excess of the statutory limitations when "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see also United States ex rel Wallace v. Flintco Inc.,* 143 F.3d 955, 972 n. 14 (5th Cir.1998). The district court found that the County acted vexatiously and oppressively, and from the record, we cannot conclude that such a finding was an abuse of discretion. We therefore affirm the award of expert fees.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**959 F.2d 1283
United States Court of Appeals,
Fifth Circuit.**

SOCIETY OF SEPARATIONISTS, INC.,
Plaintiffs–Appellants,
v.
Guy HERMAN, Judge of the Travis County Court
at Law, et al., Defendants–Appellees.

No. 90–8660. | April 17, 1992.

Prospective juror who had been imprisoned for contempt when she refused to swear or affirm to tell the truth brought civil rights action against judge and others. The United States District Court for the Western District of Texas, Walter S. Smith, Jr., J., dismissed action. Prospective juror appealed. The Court of Appeals, 939 F.2d 1207, affirmed in part and remanded in part. Rehearing en banc was ordered, 946 F.2d 1573, and Patrick E. Higginbotham, Circuit Judge, held that prospective juror lacked standing to seek prospective relief.

Affirmed.

Wiener, Circuit Judge, filed a concurring and dissenting opinion.

Goldberg, Circuit Judge, filed a dissenting opinion.

West Headnotes (5)

[1]     **Federal Civil Procedure**
        In general;  injury or interest
        **Federal Civil Procedure**
        Causation;  redressability

        At the least, standing insists that complaint of injury be real and immediate rather than conjectural, that injury be traceable to defendant's allegedly unlawful conduct, and that relief from injury be likely to flow from favorable ruling. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        41 Cases that cite this headnote

[2]     **Injunction**
        Clear, likely, threatened, anticipated, or intended injury

        To obtain equitable relief for past wrongs, plaintiff must demonstrate either continuing harm or real and immediate threat of repeated injury in the future. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        48 Cases that cite this headnote

[3]     **Civil Rights**
        Injury and Causation

        Prospective juror who had been imprisoned for contempt because she refused on religious grounds either to swear or to affirm to answer voir dire questions truthfully lacked standing to obtain prospective relief; prospective juror suffered no continuing harm as a result of judge's actions nor could she show real and immediate threat that she would again appear before same judge as prospective juror and that same judge would again exclude her from jury service and jail her for contempt. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        20 Cases that cite this headnote

[4]     **Courts**
        Injunction by United States Court Against Proceedings in State Court

        Principles of comity and federalism, in addition to Article III's jurisdictional bar, mandate that Court of Appeals intervene in management of state courts only in the extraordinary case. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        1 Cases that cite this headnote

**Tab E-14**

[5]    **Civil Rights**
⚷ Third Party Rights; Decedents

National atheist organization dedicated to separation of church and state lacked standing to seek prospective relief which would dictate how state judges should handle prospective juror's refusal to swear or affirm to tell the truth in the future; organization failed to show that its members would otherwise have standing to sue in their own right since other members were not aggrieved by particular judge's exclusion of one member from venire, it appeared likely that organization's claim would require participation of individual members, and there was neither certifiable class of similarly situated persons nor real and immediate threat to such a class. U.S.C.A. Const. Art. 3, § 2, cl. 1.

15 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1283** John W. Vinson, Austin, Tex., for plaintiffs-appellants.

**\*1284** Ken Oden, Travis County Atty., James W. Collins, Director, Civ. Div., Austin, Tex., for defendants-appellees.

Javier P. Guajardo, Asst. Atty. Gen., Renea Hicks, Sp. Asst. Atty. Gen., Dan Morales, Atty. Gen., Austin, Tex., for intervenor State of Tex.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges.

**Opinion**

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Robin Murray–O'Hair and the Society of Separationists alleged that a state judge excluded O'Hair from a venire and held her in contempt because she refused on religious grounds either to swear or to affirm to answer voir dire questions truthfully. They sought damages as well as declaratory and injunctive relief for violating their rights under the Free Exercise Clause of the First Amendment. The district court granted defendants' motion for summary judgment, and a divided panel of this court agreed that immunity barred an award of damages. The panel granted a declaratory judgment, however, which dictated how state judges should handle a prospective juror's refusal to swear or affirm in the future. We granted rehearing en banc and, without reaching the underlying merits, conclude that plaintiffs lack standing to seek a prospective remedy.

**I.**

O'Hair is an atheist and a member of the Society of Separationists, a national atheist organization dedicated to the separation of church and state. In December of 1987, she was summoned and appeared for jury duty in Travis County, Texas. A deputy court clerk told the prospective jurors to rise and take the oath which Texas requires before voir dire questioning. O'Hair objected to taking an oath, explaining that she was an atheist and could not participate in such religious exercises. Judge Guy Herman called her to the bench and told her that in lieu of an oath, she could affirm that she would answer the voir dire questions truthfully. She stated that she also considered an affirmation religious and therefore could not affirm. Judge Herman told her to be seated while the other jurors were sworn in. He then directed her to his regular courtroom for a full hearing.

At this hearing, O'Hair was accompanied by her attorney. The judge said that he respected O'Hair's constitutional right to freedom of religion and therefore would "offer an affirmation without any recognition or any statement, any reference to God or anything of that nature." O'Hair again refused, repeating her belief that an affirmation was just as religious as an oath. The judge then explained that O'Hair could be held in civil contempt if she refused and that he was not asking her to take an oath and swear to God as to her qualifications for jury service. He was only asking her to affirm that she would give true answers to whatever questions were propounded to her. O'Hair replied that an affirmation was in her understanding a religious statement. No specific form of affirmation was tendered by Judge Herman. The judge did not ask O'Hair what form of assurance of truthfulness would meet her

objections, and O'Hair offered none. When she continued to refuse to affirm, Judge Herman found her in civil contempt. She was jailed and released on bond approximately six hours later. O'Hair filed a petition in Travis County district court for a writ of habeas corpus, which was rendered moot when Judge Herman commuted her contempt sentence to the six hours served.

O'Hair and the Society of Separationists then sued Judge Herman, Travis County Judge Bill Aleshire, Travis County, the "Travis County court system," and the clerk, sheriff, and court bailiffs of Travis County in federal district court. They asked the court, *inter alia,* to "declare the juror oath practice as engaged in by defendants (a judicial coercion of a religious exercise) **\*1285** to be unconstitutional under the First Amendment" and to "grant injunctive relief, both temporary and permanent, against the continuation of such unconstitutional jury oath practices by judges and other public officials." They also sought $2 million in actual damages and $3 million in punitive damages.[1]

The district court granted defendants' motion for summary judgment. A divided panel of this court affirmed in part, reasoning that all of the defendants other than Judge Herman were either immune, were nonexistent entities, or were otherwise improperly named. They found Judge Herman immune from suit for damages, but recognized that judicial immunity did not bar prospective equitable relief. They concluded that the judge erred in debating the correctness of O'Hair's religious beliefs rather than asking her what sort of pledge she could make to commit herself to tell the truth. Although they found injunctive relief unnecessary, they issued a declaratory judgment requiring judges to ask prospective jurors who object to the oath or affirmation requirement what form of serious public commitment would accord with their constitutionally protected beliefs.

## II.

[1] Article III of the Constitution confines the federal courts to deciding actual cases and controversies. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The rule that litigants must have standing to invoke the power of the federal courts is perhaps the most important doctrine stemming from the case or controversy requirement. *Id.* Standing defies precise definition, but at the least insists that the complained of injury be real and immediate rather than conjectural, that the injury be traceable to the defendant's allegedly unlawful conduct, and that relief from the injury must be likely to follow from a favorable ruling. *Id.*

[2] In *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court made clear that plaintiffs may lack standing to seek prospective relief even though they have standing to sue for damages. Lyons was a Los Angeles area resident who was subjected to a chokehold by city police officers when he was stopped for a traffic violation. He obtained a preliminary injunction which prohibited the police department from using the chokehold unless death or serious bodily injury were threatened. The Court reversed. It observed that " 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Lyons,* 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. Lyons lacked standing to obtain an injunction because it was entirely speculative that police officers would stop him again and choke him without provocation. Similar reasoning has been applied to suits for declaratory judgments. *Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

[3] O'Hair lacks standing to obtain prospective relief for the same reason that Lyons did. She suffers no continuing harm as a result of Judge Herman's actions. Nor can she show a real and immediate threat that she will again appear before Judge Herman as a prospective juror and that Judge Herman will again exclude her from jury service and jail her for contempt. There are over half a million residents in Travis county and twenty trial judges. The chance that O'Hair will be selected again for jury service and that Judge Herman will be assigned again to oversee her selection as a juror is slim. Judge Herman's regular duties do not include such matters. Even if O'Hair were likely to **\*1286** appear before Judge Herman in the future, there is little indication that they would interact in the same fashion. It is clear that the judge was not acting pursuant to any state or local rule or statute, or even some personal policy, when he failed to ask O'Hair if there were alternative ways in which she would be willing to commit herself to tell the truth.[2] Nor is there any reason to believe that O'Hair was acting on religious scruples in failing to propose such an alternative. Whatever the abstract merit of O'Hair's complaint, it springs from a lack of communication between judge and prospective juror that is inherently contextual and episodic.

This court and others have often held that plaintiffs lack standing to seek prospective relief against judges because the likelihood of future encounters is speculative. In *Adams v. McIlhany,* 764 F.2d 294, 299 (5th Cir.1985), a Texas judge held a woman in contempt and jailed her because she had impugned his integrity in a letter. We found the judge immune from suit for damages and held that no case or controversy existed with respect to declaratory or injunctive relief. We explained that it was most unlikely that the plaintiff would again come into conflict with the judge in similar circumstances, and with the same results. In *Schepp v. Fremont County,* 900 F.2d 1448, 1452–53 (10th Cir.1990), the Tenth Circuit confronted a § 1983 suit against a state judge who revoked plaintiff's probation. The court held that the judge was immune from suit for damages and that there was no actual controversy warranting the issuance of declaratory relief. The probability that plaintiff would ever again be subject to probation revocation proceedings before this judge was extremely remote. Similar cases are legion. *See e.g., Penthouse Int'l, Ltd. v. Meese,* 939 F.2d 1011, 1019–20 (D.C.Cir.1991); *Johnson v. Moore,* 948 F.2d 517, 521–22 (9th Cir.1991); *Foster v. Basham,* 932 F.2d 732 (8th Cir.1991); *Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045, 1048–49 (9th Cir.1980); *see also Brown v. Edwards,* 721 F.2d 1442, 1446–47 (5th Cir.1984).

[4] We must not shrink from our duty to decide a controversy, but that duty includes faithful obedience to the limits of our mandate. It is beyond our mandate to issue prospective relief every time a state actor arguably infringes a constitutional right. As the Supreme Court said in *Lyons,* "[i]n exercising their equitable powers federal courts must recognize 'the special delicacy of the adjustment to be preserved between federal power and State administration of its own law.' " 103 S.Ct. at 1670. Principles of comity and federalism, in addition to Article III's jurisdictional bar, mandate that we intervene in the management of state courts only in the extraordinary case. *Id.; Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 1979, 80 L.Ed.2d 565 (1984).

The Court has been reluctant to superintend state judges in the past. In *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), nineteen black residents of Cairo, Illinois requested an injunction against a state judge and magistrate who they alleged had intentionally discriminated against them in setting bond and sentencing. The Court held that the complaint failed to allege a case or controversy. It refused to assume that plaintiffs would violate the law, be charged, tried, and subjected to discrimination by defendants. It emphasized that the requested injunction "would constitute a form of

monitoring of the operation of state court functions that is antipathetic to established principles of comity." 414 U.S. at 501, 94 S.Ct. at 679.

Even if we were inclined to fan cold embers for the heat of a present case or controversy, we would be loath to award **\*1287** declaratory relief on the facts of this case. The Court has observed on more than one occasion that "[t]he Declaratory Judgment Act was an authorization, not a command." *Public Affairs Associates, Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962); *Eccles v. Peoples Bank,* 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948). "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles,* 333 U.S. at 431, 68 S.Ct. at 644. There is nothing to indicate, and we decline to presume, that Judge Herman will fail to take cognizance of applicable constitutional principles in future proceedings. *Cf. Hamill v. Wright,* 870 F.2d 1032, 1035–36 (5th Cir.1989).

There is, of course, a practical effect of the panel's decision. Issuing a declaratory judgment would support an award of attorney's fees against Judge Herman under § 1988. This is an "end run" around a defendant's immunity. It is appropriate that we recognize that reality in determining whether declaratory relief is warranted. *See Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985); *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 2677, 96 L.Ed.2d 654 (1987). We should be hesitant to inhibit state judges from exercising the discretion that comes with their job by imposing costs solely to protect against a hypothetical risk of future harm. The practical concerns, combined with concerns of equity, comity, and federalism, tip the balance decisively in favor of restraint.

In finding that O'Hair lacks standing to obtain prospective relief, we need not embrace or disturb our decision in *O'Hair v. White,* 675 F.2d 680 (5th Cir.1982) (en banc). There we found that Madalyn Murray O'Hair had standing to assert that § 4 of the Texas Constitution excluded her from jury service because of her lack of religious belief. A state law that on its face arguably excluded atheists from serving on juries clearly presented an ongoing threat to Madalyn O'Hair's right not to be excluded from jury service on religious grounds. Likewise courts have held that members of racial minorities have standing to obtain prospective relief from jury selection systems that are consistently administered so as to exclude them from jury service. *See, e.g., Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) (blacks had standing to obtain

injunction when statistics clearly indicated that blacks were being systematically excluded in jury selection process); *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 622 F.2d 807 (5th Cir.1980) (Mexican–Americans had standing to obtain prospective relief when jury commissioners systematically excluded them from grand jury service over a ten year period).

This case is of an entirely different stripe. O'Hair challenges no Texas law or policy. The state of Texas was not even named as a defendant. O'Hair makes no showing that Judge Herman or other judges in Travis County or elsewhere in Texas deliberately apply the oath or affirmation requirement so as to exclude atheists. Instead, she objects to the specific events which led to her incarceration by a single judge whom she is unlikely to encounter again and whose administration of the oath or affirmation requirement is likely to vary in different circumstances.

The Supreme Court recently alluded to a similar situation in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991). In holding that a defendant has standing to object to race-based exclusions of jurors through peremptory challenges, the Court noted the barriers to such suits by an excluded juror. It explained that "[u]nlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in *Carter,* it would be difficult for an individual juror to show a likelihood that discrimination at the voir dire stage will recur." *Id.,* 111 S.Ct. at 1373 (citing *Lyons* ). Absent evidence of some systematic practice, an excluded juror generally lacks standing to seek prospective relief, since the juror's repeated contacts are with the system itself and not any individual players within it.

[5] **\*1288** The presence of the Society of Separationists in this suit does not alter our conclusion. "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The Society fails the first and the third requirements of the *Hunt* test.

First, it has failed to show that its members would otherwise have standing to sue in their own right. Other Society members are not aggrieved by Judge Herman's exclusion of O'Hair from a venire. The fact that they may

share O'Hair's views of the oath or affirmation requirement is an insufficient predicate for the conclusion that they themselves are facing injury. *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). We cannot exercise jurisdiction merely because O'Hair and the Society purport to represent "all individuals eligible for jury service who have deep-seated convictions against mouthing any religious dogma as a condition to jury service." *See Plaintiff's Complaint* at 1. In *Golden v. Zwickler, supra,* the Court rejected the argument that Zwickler had a right to "a general adjudication of unconstitutionality in his own interest as well as that of others who would with like anonymity practice free speech in a political environment." 394 U.S. at 110, 89 S.Ct. at 960. Constitutional questions must be presented in the context of specific live grievances. *Id.* There is no live grievance here.

Second, it appears likely that the Society's claim would require the participation of individual members. It is often difficult for religious organizations to assert free exercise claims on behalf of their members because the religious beliefs and practices of the membership differ. *See Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 2690, 65 L.Ed.2d 784 (1980).[3] Nothing in this record supports the notion that Society members share O'Hair's views regarding the religious nature of an affirmance. Speculation that this is so would be perverse indeed in a free exercise case. This is a fact intensive case—an episodic exchange between a single venire person and a state trial judge.

This case differs from those in which the Court has found that the presence of a class generates a continuing controversy even though the claim of the named plaintiff has become moot. *See e.g., County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Here, there is neither a certifiable class of similarly situated individuals nor a real and immediate threat to such a class. Even if there were, they would have to demonstrate that a case or controversy existed at the time the complaint was filed. *Riverside,* 111 S.Ct. at 1667. O'Hair and the Society filed their complaint two years after O'Hair's encounter with Judge Herman. Any controversy had long since subsided.

Neither O'Hair nor the Society has standing to obtain declaratory relief against Judge Herman. We do not sit to review the actions of state judges in microscopic detail when there is no continuing harm and no real threat of repeated injury. Article III "forecloses the conversion of

courts of the United States into judicial versions of college debating forums." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). The panel held that the claim for **\*1289** money damages was barred by judicial immunity. We agree.

Affirmed.

WIENER, Circuit Judge, concurring in part and dissenting in part:

Judge Goldberg's dissent eloquently and forcefully raises a number of serious problems with the doctrine of standing as currently articulated, and, perhaps more significantly, offers the Supreme Court a principled way to limit the *Lyons* doctrine so that justice can be done in cases like O'Hair's. Nonetheless, given that the majority, with one minor exception, accurately states and applies the standing doctrine *now* sanctioned by that Court, I find myself unable to join Judge Goldberg's well-crafted dissent. I therefore concur in the majority's holding that O'Hair does not have standing to procure declaratory relief against Judge Herman under *Lyons* and its extensive progeny because she cannot show a real and immediate threat that Judge Herman will again exclude her from jury service and jail her for refusing to "affirm." I also concur in the majority's holding that the Society lacks standing to seek prospective relief for its members as it cannot meet the *first* prong of the test for associational standing set forth in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

My disagreement with the majority, and thus my reason for writing separately, stems from the sweeping language, unsupported speculation, and possibly incorrect analysis, that the majority employs in concluding that the Society fails the *third* prong of the *Hunt* test. The majority seems to offer two reasons why the Society fails this prong. One is that the Society's members may differ as to the religious nature of an affirmance. If by this statement the majority means to say that the Society lacks standing because its members *may* have *conflicting interests* on the outcome of the litigation, then it needlessly decides an issue not previously addressed by this court, and, in so doing, adopts a rule that has been rejected by most circuits that have decided that issue. See *National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1231–34 (D.C.Cir.1987) (conflicting interests among members will not defeat union's standing to urge the interests of some members in

litigation); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia,* 945 F.2d 1260, 1264–66 (3rd Cir.1991); and *Gillis v. U.S. Dept of Health and Human Services,* 759 F.2d 565, 572–73 (6th Cir.1985). But see *Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir.1979). Indeed, in *National Maritime Union,* the Circuit Court for the District of Columbia went so far as to assert that the Supreme Court itself, in *UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), determined that conflicting member interests will not preclude associational standing. 824 F.2d at 1232–33.

The majority's second reason for finding that participation of the individual members of the Society is necessary appears to be that a free exercise claim, by its very nature, requires particularized information from *all* members. For this proposition the majority cites *Harris v. McRae,* 448 U.S. 297, 320–21, 100 S.Ct. 2671, 2689–90, 65 L.Ed.2d 784 (1980), in which Justice Stewart, writing for the Court, determined that the Women's Division of the Board of Global Ministries of the United Methodist Church had no standing under the third *Hunt* prong to challenge the Hyde Amendment on behalf of its members because a free exercise claim "ordinarily requires individual participation." But this court has never interpreted *McRae* as precluding *all* free exercise claims brought by associations on behalf of their members. See, e.g., *Church of Scientology v. Cazares,* 638 F.2d 1272, 1276–80 (5th Cir.1981) (distinguishing *McRae* and finding church to have standing under the third *Hunt* prong to bring a free exercise claim on behalf of its members). The critical aspect of *McRae,* moreover, was that the Women's Division *conceded* a diversity of views within its membership as to the permissibility, necessity, and advisability of abortion. In this case, by contrast, the majority *presumes* **\*1290** a diversity of views, stating that nothing in the record supports the notion that Society members share O'Hair's views regarding the religious nature of an affirmance. Does not the fact that the Society is a co-petitioner in this suit indicate that at least a substantial number of its members hold the same view of an affirmation as does O'Hair?

Furthermore, numerous cases raising issues other than free exercise make clear that the third *Hunt* prong does not mean that an association lacks standing if the participation of *any* member is necessary. See, e.g., *Hospital Council of Western Pennsylvania v. Pittsburgh,* 949 F.2d 83, 89 (3rd Cir.1991) ("[A]ssociation may assert a claim that requires participation of *some* members."). The third *Hunt* prong merely paraphrases the more elaborate discussion of individual participation in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

(1975). In *Warth,* the Court explained that "so long as the nature of the claim and of the relief sought does not make the individual participation of *each* injured party *indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke this court's jurisdiction." 422 U.S. at 511, 95 S.Ct. at 2212 (emphasis added). In this case, however, it is not immediately apparent why the individual participation of *all* Society members would be required for this free exercise claim.

What really disturbs me, no less than it disturbs Judge Goldberg, is that neither O'Hair nor the Society has any way to pursue redress of the First Amendment violations perpetrated by the state trial judge in this case. My disturbance is not, I fear, shared by many of my colleagues, in most of whom I sense a degree of relief that the issue of standing pretermits the need to address Appellees' free exercise claims.

O'Hair, and likely her famous grandmother as well, must have thought that Santa Claus, the Easter bunny, and the tooth fairy had combined their efforts to deliver the jury summons that launched this case on its odyssey. I have the impression that many of my colleagues are thankful to the Supreme Court (if not to that same mythical trio) for providing the insurmountable obstacle of standing that interdicts this court's obligation to deal with the discomfiting First Amendment claims of these perennial Atheist gadflies. In that regard, however, we would all do well to heed the sagacious words of Justice Holmes:

> If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.

*United States v. Schwimmer,* 279 U.S. 644, 653, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929). The practical effect of lack of standing, pursuant to *Lyons,* is the denial of a remedy for the type of unconstitutional abuse visited by Judge Herman directly on O'Hair, and indirectly on the Society, as long as occurrences of that nature are anecdotal and do not rise to the frequency or consistency required to confer standing.

True, Judge Herman started down the path of propriety in his handling of O'Hair's free exercise objection to participating in an act of affirmation. In fact, the judge reached the penultimate stepping stone on that path before he deviated from the proper to the impermissible. If,

instead of engaging in constitutionally repugnant debate with O'Hair about the validity of *her* religious beliefs vis-a-vis an affirmation, Judge Herman had calmly but firmly insisted that O'Hair propose a truth-ensuring statement that she felt she could make without violating the tenets of Atheism as she in good faith professes them, the judge would have maintained an unassailable position, doing all that the courts and the Constitution require. That is clear from the panel majority opinion and the dissenting opinion, both penned by Judge Goldberg.

Fortunately, the substance of Judge Goldberg's opinions subsists, shining as a lamp to brighten the constitutional path for the eyes of all trial judges, both state and federal, within the boundaries of this circuit **\*1291** whenever one of those jurists happens to encounter a prospective juror or witness who has either religious or anti-religious concerns about oaths or affirmations. Albeit today's majority opinion keeps Judge Goldberg's opinions from constituting precedent, their lesson is "out there" for all judges of good will to heed.

For the foregoing reasons I specially concur in part and dissent in part.

GOLDBERG, Circuit Judge, dissenting:

This has become a case of the tail wagging the dog.

I cannot join the majority opinion because it wags the tail while emaciating the body of the panel opinion. For the reasons expressed in the panel opinion, 939 F.2d 1207 (5th Cir.1991), I adhere to the view that Judge Herman trespassed upon O'Hair's constitutional right to freedom of religion when he excluded her from jury service and jailed her for refusing to "affirm" without first proposing that she make a non-religious, conscious-binding declaration of a commitment to tell the truth. And because there is not only a likelihood of recurrence, but a *statistical certainty* that O'Hair and members of the Society of Separationists will again be summoned for jury duty before Judge Herman, I find no jurisdictional impediment to their bringing this lawsuit to challenge Judge Herman's practice.

### I.

The undercurrent of the standing requirement is the notion

that courts should only adjudicate those cases in which the plaintiffs have a " 'personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The plaintiffs in this "case" have a personal stake in the outcome and the constitutional issues presented are razor sharp: the plaintiffs are atheists who object to the mingling of religion in governmental activities. They brought this lawsuit based upon the practice employed by Judge Herman of the Travis County Court—*on more than one occasion*[1] —requiring that prospective jurors make an "affirmation." Whatever one might think of the constitutionality of Judge Herman's practice, *compare Society of Separationists,* 939 F.2d at 1215–17 (majority opinion) *with id.* at 1220–24 (Garwood, J., dissenting), no one should doubt that this litigation presents a case and controversy within the meaning of Article III of the Constitution.

### A.

The majority's conclusion that the plaintiffs lack standing rests entirely on its application of the Supreme Court's decision in *Lyons* to the facts of this case. Simply put, *Lyons* restates the proposition, articulated by the Court in *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974), and *Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 604–05, 46 L.Ed.2d 561 (1976), that past exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief "[a]bsent a sufficient likelihood that he will again be wronged in a similar way...." *Lyons,* 103 S.Ct. at 1670. The majority reasons that, like the plaintiff in *Lyons,* O'Hair cannot show a real and immediate threat that she will again be harmed in a similar way. *See* maj. op. at 1285.

*Lyons* involved a challenge to a chokehold maneuver employed by Los Angeles police officers. The Supreme Court found no standing to obtain prospective relief because the plaintiff, although injured by the chokehold in the past, could not establish a threat of a similar injury in the future. Pivotal to this conclusion was the fact that the plaintiff could not distinguish himself from any other citizen as being a future victim of the unconstitutional act. The past harm suffered by the plaintiff in that case had no bearing on the likelihood that he would again be harmed by the defendant. **\*1292** In other words, the plaintiff in

*Lyons* was no more likely than the next guy to be injured again.

O'Hair and members of the Society of Separationists do not stand in the shoes of the next guy. Indeed, they are susceptible to injury precisely because they are not like the average Joe: they are not willing to conform to the popular view that an affirmation is not a religious exercise. Thus, they are *the* plaintiffs to bring this action for prospective relief. True, all citizens can expect to be summoned to serve their duty as jurors. But only these plaintiffs, by virtue of their distinctive views about religious activities, are threatened by Judge Herman's practice. They are uniquely vulnerable to future injury. This is not a case in which "the asserted injury is a generalized grievance shared in substantially equal measure by all or most citizens." *O'Hair v. White,* 675 F.2d 680, 687 (5th Cir.1982) (en banc). Such an injury will not suffice to confer standing upon a plaintiff. *Id.* (citing *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 2931–32, 41 L.Ed.2d 706 (1974)). Rather, this is a case in which the threatened injury will be suffered by a limited, identifiable group of citizens—atheists and others whose religious beliefs (or lack of beliefs) cause them to be offended by the demand for an affirmation. *See, e.g., Ferguson v. C.I.R.,* 921 F.2d 588 (5th Cir.1991) (prospective oath-taker refused to "affirm" because she understood two passages from the Bible to prohibit affirmations).

Although no single plaintiff can predict with certainty when exactly he will be summoned to serve, we can rest assured that these plaintiffs will be summoned in due time, particularly under the random jury selection system. This fact assumes special significance because in *Lyons* the Court found no standing for the following reason:

> [I]t is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly or serious bodily injury.

*Lyons,* 103 S.Ct. at 1668. In essence, the plaintiff in *Lyons* was seeking redress based upon a "chain of speculative contingencies: that he would be arrested and provoke the officer to use the chokehold in an unconstitutional manner." *Nelsen v. King County,* 895 F.2d 1248, 1252 (9th Cir.1990) (explaining *Lyons* ).

Unlike *Lyons,* the threat of future of injury in this case does not depend on a "chain of speculative contingencies," but rather on certain probabilities beyond the plaintiffs' control. We are dealing here with jury *duty,* an obligation of citizenship. The plaintiffs can reasonably anticipate similar encounters with Judge Herman in the future when they are summoned to serve as jurors in Travis County. The record reflects that Judge Herman continues to serve on the County Court, and accordingly, there is a quantifiable, mathematical certainty that he will again preside over jury impanelment and encounter O'Hair or some other member the Society of Separationists among the prospective jurors.[2] For some, the fact that the probability is quantifiable, and not "contingency riddled," would independently establish that the likelihood of recurrence is sufficient for standing purposes. "Our analysis cannot be reduced to considering probability merely in terms of quantitative percentages." *Nelsen,* 895 F.2d at 1250. Perhaps **\*1293** we should also "describe 'probability' [of future injury] qualitatively, as requiring a very significant possibility," *id.* (quoting *Sample v. Johnson,* 771 F.2d 1335, 1343 (9th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986)), or, as the Supreme Court phrased it in a post-*Lyons* decision, as requiring a "credible threat" of future injury. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983). Under this qualitative analysis, the plaintiffs have standing because there is a "significant possibility" and "credible threat" that they will be summoned for jury service.

The fact that Judge Herman alone is accountable for the threat of future injury does not take the legs out from under the plaintiffs' position. Although Judge Herman was not "acting pursuant to any state or local rule or statute" when he demanded an affirmation from O'Hair, *see* maj. op. at 1286, there is evidence in the record that he continues to engage in a similar practice: While impaneling a jury following the incident with O'Hair, Judge Herman demanded an "affirmation" from another atheist who was summoned for jury duty and excluded him from service without first proposing that he make a non-religious, conscience-binding declaration as an alternative to an affirmation. *See supra* note 2. Thus, the record reflects the genesis of a pattern[3] or "personal policy"[4] of exclusion by Judge Herman based on the juror's religious beliefs, which cannot be dismissed as merely "contextual" or "episodic." *See* maj. op. at 1286. We need not wait until Judge Herman excludes or incarcerates others before we can evaluate the constitutionality of Judge Herman's practice and award the appropriate declaratory relief.

## B.

The majority's reliance on *Lyons* and its progeny is misguided for yet another reason. Unlike this case, the plaintiffs' assertion of standing in those cases cited by the majority was predicated upon the contingency that the plaintiff would commit a crime that would set in motion a chain of events culminating in the defendant's unconstitutional act. There was absolutely *no* measure of certainty that the plaintiffs in those cases would suffer the future injury and the likelihood that they would turn in large part on events *within their own control.*

Our court found no standing in *Adams v. McIlhany,* 764 F.2d 294, 299 (5th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986), because the recurrence depended upon the plaintiff's son *committing a crime,* being rearrested, charged, and sentenced before the defendant judge in order for the judge to hold the plaintiff in contempt for writing a derogatory letter about the judge. We also found no standing in *Brown v. Edwards,* 721 F.2d 1442, 1446–47 (5th Cir.1984), because the plaintiff did not allege or prove that he was "in any way likely, or more likely than any other Mississippian, to be again subjected to arrest or charging by any Mississippi constable." Most recently, this circuit found no standing in *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir.1992), because "[i]t would require conjecture or hypothesis to find that Johnson [would] again act in such a way as to be arrested on a misdemeanor charge" and thus subject himself to the unconstitutional act of the defendant-judge.

The Tenth Circuit found no standing in *Schepp v. Fremont County,* 900 F.2d 1448, 1452–53 (10th Cir.1990), for essentially the same reason: The probability of recurrence was too remote where it depended on the plaintiff *violating probation* so as to be subjected to probation-revocation proceedings. The Eighth and Ninth Circuits found no standing in cases brought by inmates **\*1294** challenging conditions of confinement in correctional institutions from which they had been transferred because there was no showing that the plaintiffs were likely to return to the institutions. *Foster v. Basham,* 932 F.2d 732, 734 (8th Cir.1991); *Johnson v. Moore,* 948 F.2d 517, 519 (9th Cir.1991).

In *Nelsen,* another Ninth Circuit case, the court found no standing, recognizing that cases like *Lyons* and *O'Shea* turned on the fact that the plaintiff had to *commit an unlawful act* in order to expose himself to repeated injury. *Nelsen,* 895 F.2d at 1252. In *Nelsen* the plaintiffs challenged the constitutionality of the conditions in a drug

rehabilitation center where they had been confined. Over a dissent, the panel majority concluded that standing was lacking because the plaintiffs "failed to demonstrate any ... systematic pattern or policy that would suggest that their return to the [drug rehabilitation] [c]enter [was] inevitable." *Id.* at 1254.[5]

Even the Supreme Court case underpinning the *Lyons* decision, *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), turned on a "chain of speculative contingencies, particularly a chain that include[d] the violation of an unchallenged law." *Nelsen,* 895 F.2d at 1252. The Supreme Court found no standing because the plaintiffs would have had to *violate the law,* be charged and tried before the defendants, in order to be subjected to the unconstitutional conduct. *O'Shea,* 414 U.S. at 496, 94 S.Ct. at 676; *see also Ashcroft v. Mattis,* 431 U.S. 171, 172 & n. 2, 97 S.Ct. 1739, 1740 & n. 2, 52 L.Ed.2d 219 (1977) (holding that the plaintiff, whose first son was killed by police while attempting to escape arrest, had no standing to obtain a declaratory judgment on the constitutionality of the state statute authorizing the use of deadly force in apprehending a fleeing felon where complaint merely alleged that plaintiff's other son might be arrested and attempt to flee).

While these cases, relied upon by the majority, distill a principle of black letter law for standing—that prospective relief is only available if there is a sufficient likelihood of recurrence—they do not govern this case. Unlike *Lyons, O'Shea, Ashcroft, Adams, Brown, Johnson* (5th Cir.), *Schepp, Foster, Johnson* (9th Cir.), and *Nelsen,*[6] the plaintiffs in this case "do not have to induce a police encounter before the possibility of injury can occur. The [plaintiffs] are subject to constitutional injury based on *completely innocent behavior....*" *LaDuke v. Nelson,* 762 F.2d 1318, 1326 (9th Cir.1985) (emphasis added) (holding that the plaintiffs had standing to obtain injunction against the INS for its policy of conducting random searches and seizures of residents of migrant farm dwellings), *amended,* 796 F.2d 309 (9th Cir.1986).[7] Rather, the more apposite precedents, are the ones downplayed by the majority: *O'Hair v. White,* 675 F.2d 680 (5th Cir.1982) (en banc) and *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Comm'r,* 622 F.2d 807 (5th Cir.1980), *cert. denied,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981).

In *O'Hair v. White* this court concluded that the plaintiffs, Madalyn Murray–O'Hair **\*1295** and the Society of Separationists, had standing to challenge a Texas law that infringed upon their right not to be excluded from jury service on religious grounds. The constitutional challenge was virtually identical to the one pressed here. The

plaintiffs alleged that law required that they acknowledge the existence of a supreme being. Over two dissenting opinions, a majority of the en banc court found that the plaintiffs had standing to bring the lawsuit even though the plaintiffs arguably could not demonstrate a high probability that they would be summoned for, and excluded from, jury duty. The majority wrote:

> O'Hair's final asserted basis for standing is that section 4 [of the Texas Constitution] caused her to be excluded from jury duty because she refused to swear to her belief in a supreme being.... O'Hair is ... aggrieved by being excluded from jury duty because of her lack of religious belief.... She clearly has standing to challenge that system.

675 F.2d at 691. *Contra id.* at 702 (Tjoflat, J., concurring in part and dissenting in part) ("I would hold that O'Hair lacks standing to assert [her] claim [that she is excluded from jury service based on her religious beliefs] because she alleges not that she has been excluded from jury service but only that she *would be* "); *id.* at 703 (Reavley, J., dissenting) (embracing Judge Tjoflat's dissent).

In *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners* this court held that Mexican–Americans had standing to obtain prospective relief from systematic exclusion from grand jury service. Concluding that "*O'Shea* [did] not control the disposition of these cases," we explained that:

> Under these allegations, the threat of future injury is palpable. Unlike the contingency riddled complaint in *O'Shea,* the complainants here claim an injury that turns on a single contingency that the jury commissioners will act exactly as they have for the past ten years ... Unlike *O'Shea* ... [plaintiffs'] injury here depends solely upon the action of the [defendants].

622 F.2d at 820–21; *see also Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970) ("Surely there is no jurisdictional or procedural bar to an attack upon systematic jury discrimination by way of a civil suit such as the one brought here.").

Both *O'Hair v. White* and *Ciudadanos* compel a

conclusion that the plaintiffs in this case have standing.[8] O'Hair and members of the Society of Separationists are just as threatened by exclusion from jury service as the plaintiffs in those cases. The majority's effort to distinguish those cases as involving either a "state law that on its face arguably excluded atheists from serving on juries" or "jury selection systems that [were] consistently administered so as to exclude [minorities] from jury service" is unpersuasive. *See* maj. op. at 1287. Standing to obtain equitable relief in *any* case depends on the threat of future injury—in this case, as in *O'Hair v. White,* the threat that the plaintiffs will be excluded from jury service because of their views on religion. In *O'Hair v. White* and *Ciudadanos* this court was necessarily satisfied that this threat of future was sufficient to establish the plaintiffs' standing to seek prospective relief. Surely the threat of future injury to any one plaintiff in *O'Hair v. White* and *Ciudadanos* was no more "credible," "distinct," "palpable," "real," or "immediate" than the threat of future injury plaguing the plaintiffs in this case. O'Hair and other members of the Society of Separationists have standing to obtain equitable relief.[9]

**\*1296 II.**

From this conclusion, it follows that the Society of Separationists itself has the requisite "associational standing" to bring this lawsuit. *See* maj. op. at 1288 (applying the three prong test articulated in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). I need not comment at length to make this point. I have explained why I believe that O'Hair and other members of the association have demonstrated a sufficient threat of future injury to establish that they have standing in their own right to challenge Judge Herman's practice.[10] That satisfies the first prong of the *Hunt* test. The majority does not dispute that the "interests [that the Society of Separationists] seeks to protect are germane to the organization's purpose." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. So much for the second prong.

As for the third prong, the majority suggests that "the Society's claim would require the participation of individual members ... [because] Society members' views [may] differ as to the religious nature of an affirmance." Maj. op. at 1288. Even if that bit of speculation were accurate—that members of the Society take differing positions on affirmations—associational standing does not require harmony of member interests. *See Contractors Ass'n v. Philadelphia,* 945 F.2d 1260, 1266 (3d Cir.1991) (finding litigation not contrary to interests of a majority of

members); *National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1231–34 (D.C.Cir.1987); *Gillis v. U.S. Dept. of Health & Human Servs.,* 759 F.2d 565, 572–73 (6th Cir.1985). *Contra Associated Gen. Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir.1979) (rejecting associational standing when factual or potential conflicts exist among members). *See generally UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 2532–33, 91 L.Ed.2d 228 (1986) (declining to "reject the principles of associational standing," notwithstanding argument that associations "will not always be able to represent adequately the interests of their injured members.").

It is also quite plain that in this challenge to Judge Herman's practice of demanding an affirmation as a condition of jury service, the individual plaintiffs are not "indispensable to proper resolution of the cause...." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2212, 45 L.Ed.2d 343 (1975). The plaintiffs merely seek a declaration that Judge Herman may not exclude or incarcerate a prospective juror for refusing to affirm until he has proposed that the prospective juror make a nonreligious, conscience-binding declaration of a commitment to tell the truth. "[T]he claim asserted and the relief requested affect the membership as a whole" and therefore, "the claim does not require individualized participation." *Church of Scientology v. Cazares,* 638 F.2d 1272, 1276–80 (5th Cir.1981) (association had standing to bring free exercise challenge on behalf of its members).

**\*1297** At least twice since *Hunt,* this court has held that the Society had standing to raise constitutional claims on behalf of its members. *See O'Hair v. White,* 675 F.2d at 691–92 (holding that the Society satisfied the requirements of *Hunt* and thus had standing to litigate alleged violations of its members voting rights); *Murray v. City of Austin,* 947 F.2d 147, 152 (5th Cir.1991) ("because Murray has standing, the Society, of which he is a member, also has standing" to litigate the constitutionality of the inclusion of a religious symbol in a city insignia). As in those two cases, I would find that the three-prong *Hunt* test poses no obstacle to the Society's associational standing in this case.

**III.**

This is a case about the First Amendment, the cornerstone of all other rights and freedoms which we, as citizens of this great Nation, have come to enjoy, and perhaps even take for granted. It is very disturbing to think that we

would contort the doctrine of standing and employ it as an evasive device for dodging sensitive constitutional questions, especially when First Amendment rights are at stake. *Accord* maj. op. at 1286 ("We must not shrink from our duty to decide a controversy...."). Not surprisingly, courts have consistently applied the standing doctrine liberally, not grudgingly, in the context of First Amendment litigation.[11]

Standing is not a static concept. Rather, it is an evolutionary doctrine that continues to mature. Although the doctrine appropriately restricts the flood of noxious litigation, we must insure that it does not narrow the avenue for raising concrete constitutional claims. I cannot believe that the Framers would say that a federal court lacks jurisdiction to hear a case brought by a citizen who has been jailed for her refusal to participate in a religious exercise in connection with the performance of a civic duty when that citizen can expect to be summoned again. This court has historically opened its ears and hearts to the wailing cries of those deprived of treasured rights. I would hold that these plaintiffs have standing to raise their claims, and in so doing, preserve the reputation of this court as an open, not a closed, circuit.

I respectfully, but fervently, dissent.

**All Citations**

959 F.2d 1283, 60 USLW 2710

Footnotes

1    Appended to the complaint was the affidavit of one other atheist who had been excused from jury service by Judge Herman because he refused to affirm. This individual was not held in contempt or jailed, however.

2    The Texas laws requiring oaths or affirmations have been narrowed by the Texas courts to mean that such oaths are to be administered in the manner most binding on the individual conscience. *Madeley v. Kern,* 488 F.2d 865 (5th Cir.1974); *Craig v. State,* 480 S.W.2d 680 (Tex.Cr.App.1972). See also Tex. Const. Art. 1 § 5; *Vaughn v. State,* 146 Tex.Crim. 586, 177 S.W.2d 59 (1944). These authorities establish what is really undisputed between the parties, namely that, apart from recognition that it is being made subject to the pains and penalties of perjury, Texas law does not require any particular form of words for an oath or affirmation.

3    The Society does not raise a free exercise claim in its own behalf. When a religious organization itself suffers an actual or threatened injury as a result of defendant's actions, it may have standing in its own right. *See Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

1    *See infra* note 2.

2    The majority's assertion that "Judge Herman's regular duties do not include such matters" as impaneling juries, maj. op. at 1285, finds no support in the record. Indeed, there is evidence in the record that not long after he excluded Ms. O'Hair from jury service, Judge Herman was again called upon to impanel a jury. Among the prospective jurors, he encountered an individual who interposed a similar objection to the affirmation process. As with O'Hair, Judge Herman excluded that individual from jury service on that basis. *See* maj. op. at 1285 n. 1.
     Of course, if there is any question about whether Judge Herman continues to impanel juries, a remand would be appropriate to allow the district court to make factual findings, rather than speculating on appeal as to the likelihood that these plaintiffs will appear before Judge Herman in the future.

3    *Cf. Ikuno v. Yip,* 912 F.2d 306, 309 (9th Cir.1990) ("two acts is an accepted minimum" for establishing a "pattern" under the RICO statute) (citing *H.J., Inc. v. Northwestern Bell tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1990)).

4    *Contra* maj. op. at 1286 ("It is clear that the judge was not acting pursuant to any ... personal policy, when he failed to ask O'Hair if there were alternative ways in which she would be willing to commit herself to tell the truth.").

5    The dissenting judge believed that standing did exist because plaintiffs had tendered unrebutted evidence proving that was a 35% to 75% probability that the plaintiffs themselves would return to the facility. The dissent concluded that "appellants have established there is credible threat they will again suffer the harm they have alleged." *Id.* at 1255 (Pregerson, J., dissenting).

6    *Foster* and *Johnson* (9th Cir.) are different because they involved inmates transferred to different penal institutions,

thus mooting out any claim for prospective relief. It appears that there was *no* threat that they would be transferred back to the original facility. Perhaps if the plaintiffs committed an offense some time later, they might serve time in that institution. Such speculation, of course, cannot establish a "credible threat" of future injury.

7    Moreover, this case is different because, as one legal scholar has observed, "*Lyons* must be understood in large part as a decision of substantive law. In particular, the case seems to represent a further extension and reification of the Court's general, sweeping respect and deference for men in uniform that has overridden a wide range of substantive law claims." Laurence H. Tribe, *American Constitutional Law* 122 (2d ed. 1988).

8    *Lyons* represented an application, not an extension, of *O'Shea. Lyons,* 103 S.Ct. at 1667 ("No extension of *O'Shea* ... is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought."). Thus, *Ciudadanos* and *O'Hair v. White,* both of which found that the plaintiffs had standing, were not undercut by the Supreme Court's subsequent decision in *Lyons.*

9    The majority's citation (maj. op. at 1287) to *Powers v. Ohio,* 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991), is misplaced. The *Powers* Court merely observed that a juror could not "easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges." Such would be the case because the use of a peremptory strike depends so much on the subject matter of the underlying prosecution. The threat of future injury would be particularly remote and turn on a "chain of speculative contingencies."

10   Because the Society represents the interests of similarly situated plaintiffs, it would be fitting, in my view, to aggregate the probabilities of future injury to determine whether the Society has standing to bring suit on behalf of its members. *Contrast ASARCO Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) ( "[T]he doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of *different kinds of plaintiffs,* each of whom may have claims that are remote or speculative taken by themselves."). By this I mean that under the first prong of *Hunt*—which asks whether the association's "members would otherwise have standing to sue in their own right," 432 U.S. at 343, 97 S.Ct. at 2441—the likelihood of future injury should be measured by the probability that *any one* member of the associational plaintiff would be injured, rather than the probability that *a particular* member of the associational plaintiff might be injured. I believe that aggregating the probabilities is appropriate in a case like this one, which does *not* involve a generalized grievance and implicates both *Lyons* and *Hunt,* because it more accurately reflects the reality, immediacy, and palpability of the threatened injury to the associational plaintiff and its membership.

11   *Cf. Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3220 n. 5, 87 L.Ed.2d 267 (1985) (citing "the numerous cases in which [the Supreme Court has] adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools"); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Establishment Clause challenge to federal aid-to-education program based upon federal taxpayer standing); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (local taxpayer standing to raise Establishment Clause challenge to school district expenditures); *Murray v. City of Austin,* 947 F.2d 147, 152 (5th Cir.1991) (concluding that the Society of Separationists and its member had standing to raise Establishment Clause challenge to inclusion of religious symbol in city insignia); *see generally* Tribe, *supra* note 3, at 116 ("The Court has been particularly generous in entertaining challenges under the establishment clause of the first amendment to state or local aid to church-related schools.").

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works.                    13

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

KeyCite Yellow Flag - Negative Treatment
**Called into Doubt by** Lexmark Intern., Inc. v. Static Control Components, Inc., U.S., March 25, 2014

**118 S.Ct. 1003**
**Supreme Court of the United States**

STEEL COMPANY, aka Chicago Steel and Pickling Company, petitioner,
v.
CITIZENS FOR A BETTER ENVIRONMENT.

No. 96–643. | Argued Oct. 6, 1997. | Decided March 4, 1998.

Environmental group brought action against steel manufacturer under Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA) for failure to make required reporting. Upon receiving group's statutory notice of intent to sue, manufacturer filed overdue forms, and manufacturer subsequently moved for dismissal. The United States District Court for the Northern District of Illinois, George M. Marovich, J., dismissed. Group appealed. The Seventh Circuit Court of Appeals, 90 F.3d 1237, reversed and remanded. Certiorari was granted. The Supreme Court, Justice Scalia, held that: (1) EPCRA section providing that district court has "jurisdiction in actions brought under" subsection authorizing certain civil actions does not render elements of cause of action under referenced subsection jurisdictional; (2) court may not decide cause of action before resolving whether court has Article III jurisdiction; and (3) environmental group failed to satisfy redressability requirement for standing.

Vacated and remanded with instructions to direct that complaint be dismissed.

Justice O'Connor filed concurring opinion, in which Justice Kennedy joined.

Justice Breyer filed opinion concurring in part and concurring in judgment.

Justice Stevens filed opinion concurring in judgment, in which Justices Souter and Ginsburg joined in part.

West Headnotes (27)

[1] **Environmental Law**
⚷Jurisdiction in general

Section of Emergency Planning and Community Right–To–Know Act (EPCRA) providing that district court has "jurisdiction in actions brought under" subsection authorizing certain civil actions does not render elements of cause of action under referenced subsection jurisdictional, but merely specifies court's powers to enforce violated requirement and to impose civil penalties; reference to actions "brought under" that subsection means suits contending that subsection contains a certain requirement. Emergency Planning and Community Right–To–Know Act of 1986, § 326(a, c), 42 U.S.C.A. § 11046(a, c).

65 Cases that cite this headnote

[2] **Federal Courts**
⚷Subject-matter jurisdiction in general

Absence of valid, as opposed to arguable, cause of action does not implicate "subject-matter jurisdiction," *i.e.,* courts' statutory or constitutional power to adjudicate case. U.S.C.A. Const. Art. 3, § 2, cl. 1.

543 Cases that cite this headnote

[3] **Federal Courts**
⚷Waiver, estoppel, and consent
**Federal Courts**
⚷Substantiality of federal question
**Federal Courts**
⚷Pleadings and Motions

Jurisdiction is not defeated by possibility that averments might fail to state cause of action on which petitioners could actually recover; rather, district court has jurisdiction if right of petitioners to recover under their complaint will be sustained if Constitution and laws of United States are given one construction and will be defeated if they are given another, unless claim

**Tab E-15**

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

clearly appears to be immaterial and made solely for purpose of obtaining jurisdiction or claim is wholly insubstantial and frivolous. U.S.C.A. Const. Art. 3, § 2, cl. 1.

224 Cases that cite this headnote

[4]  **Federal Courts**
🔑 Cases "Arising Under" Federal Law; Federal-Question Jurisdiction
**Federal Courts**
🔑 Substantiality of federal question

Dismissal for lack of subject-matter jurisdiction because of inadequacy of federal claim is proper only when claim is so insubstantial, implausible, foreclosed by prior decisions of Supreme Court, or otherwise completely devoid of merit as not to involve federal controversy. U.S.C.A. Const. Art. 3, § 2, cl. 1.

831 Cases that cite this headnote

[5]  **Constitutional Law**
🔑 Nature and scope in general
**Federal Courts**
🔑 Necessity of Objection; Power and Duty of Court

Federal court may not, via doctrine of "hypothetical jurisdiction," decide cause of action before resolving whether court has Article III jurisdiction; doing so would carry courts beyond bounds of authorized judicial action and thus offend fundamental principles of separation of powers, and would produce nothing more than hypothetical judgment, which would come to same thing as advisory opinion, disapproved by Supreme Court from the beginning; abrogating *SEC v. American Capital Investments, Inc.,* 98 F.3d 1133; *Smith v. Avino,* 91 F.3d 105; *Clow v. Dept. of Housing and Urban Development,* 948 F.2d 614; *Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327; *United States v. Parcel of Land,* 928 F.2d 1; *Browning–Ferris Industries v. Muszynski,* 899 F.2d 151. U.S.C.A. Const. Art.

3, § 2, cl. 1.

222 Cases that cite this headnote

[6]  **Courts**
🔑 Acts and proceedings without jurisdiction

Without jurisdiction, court cannot proceed at all in any cause; jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to court is that of announcing the fact and dismissing cause. U.S.C.A. Const. Art. 3, § 2, cl. 1.

613 Cases that cite this headnote

[7]  **Federal Courts**
🔑 Jurisdiction, powers, and authority in general

On every writ of error or appeal, first and fundamental question is that of jurisdiction, first, of Supreme Court, and then of court from which record comes; this question Supreme Court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to relation of parties to it. U.S.C.A. Const. Art. 3, § 2, cl. 1.

171 Cases that cite this headnote

[8]  **Federal Courts**
🔑 Necessity of Objection; Power and Duty of Court

Requirement that jurisdiction be established as threshold matter springs from nature and limits of judicial power of United States, and is inflexible and without exception. U.S.C.A. Const. Art. 3, § 2, cl. 1.

694 Cases that cite this headnote

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

[9]    **Constitutional Law**
&#128273;Nature and scope in general

Statutory and, especially, constitutional elements of jurisdiction are essential ingredient of separation and equilibration of powers, restraining courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. U.S.C.A. Const. Art. 3, § 2, cl. 1.

29 Cases that cite this headnote

[10]    **Federal Courts**
&#128273;Jurisdiction, Powers, and Authority in General

For federal court to pronounce upon meaning or constitutionality of state or federal law when it has no jurisdiction to do so is, by very definition, for court to act ultra vires. U.S.C.A. Const. Art. 3, § 2, cl. 1.

75 Cases that cite this headnote

[11]    **Federal Courts**
&#128273;Criminal Justice

While every criminal investigation conducted by Executive is "case," and every policy issue resolved by congressional legislation involves "controversy," these are not the sort of cases and controversies that Article III, § 2 refers to, since Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. U.S.C.A. Const. Art. 3, § 2, cl. 1.

81 Cases that cite this headnote

[12]    **Federal Civil Procedure**

&#128273;In general;  injury or interest

Standing to sue is part of common understanding of what it takes to make justiciable case. U.S.C.A. Const. Art. 3, § 2, cl. 1.

88 Cases that cite this headnote

[13]    **Constitutional Law**
&#128273;Nature and scope in general

Federal courts must stay within their constitutionally prescribed sphere of action, whether or not exceeding that sphere will harm one of the other two branches of government. U.S.C.A. Const. Art. 3, § 2, cl. 1.

1 Cases that cite this headnote

[14]    **Federal Civil Procedure**
&#128273;In general;  injury or interest

Supreme Court's standing jurisprudence, though it may sometimes have impact on presidential powers, derives from Article III, not Article II. U.S.C.A. Const. Art. 2, § 3; U.S.C.A. Const. Art. 3, § 2, cl. 1.

29 Cases that cite this headnote

[15]    **Federal Civil Procedure**
&#128273;In general;  injury or interest
**Federal Civil Procedure**
&#128273;Causation;  redressability

Irreducible constitutional minimum of standing contains three requirements: first and foremost, there must be alleged, and ultimately proven, an "injury in fact"—a harm suffered by plaintiff that is concrete and actual or imminent, not conjectural or hypothetical; second, there must be "causation"—a fairly traceable connection between plaintiff's injury and complained-of

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

conduct of defendant; third, there must be "redressability"—a likelihood that requested relief will redress alleged injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

560 Cases that cite this headnote

[16] **Federal Courts**
&#128273;Injury, harm, causation, and redress

Triad of injury in fact, causation, and redressability comprises core of Article III's case-or-controversy requirement, and party invoking federal jurisdiction bears burden of establishing its existence. U.S.C.A. Const. Art. 3, § 2, cl. 1.

382 Cases that cite this headnote

[17] **Federal Civil Procedure**
&#128273;Causation; redressability

Redressability, like other prongs of standing inquiry, does not depend on defendant's status as a governmental entity. U.S.C.A. Const. Art. 3, § 2, cl. 1.

12 Cases that cite this headnote

[18] **Declaratory Judgment**
&#128273;Subjects of relief in general

None of relief sought by environmental group alleging violations of Emergency Planning and Community Right–To–Know Act (EPCRA) by steel manufacturer would reimburse group for losses caused manufacturer's late reporting, or eliminate any effects of that late reporting upon group, and thus, group failed to satisfy redressability requirement for standing; complaint asked for declaratory judgment that manufacturer violated EPCRA, authorization to periodically inspect manufacturer's facility and records, order requiring manufacturer to provide

group copies of compliance reports, order requiring manufacturer to pay civil penalties to United States Treasury, award of costs of litigation, and any such further relief as court deemed appropriate. Emergency Planning Community Right–To–Know Act of 1986, §§ 312, 313, 326(a, c, f), 42 U.S.C.A. §§ 11022, 11023, 11046(a, c, f).

22 Cases that cite this headnote

[19] **Federal Courts**
&#128273;Scope and Extent of Review

On appeal from motion to dismiss on pleadings, Supreme Court had to presume that general allegations in complaint encompassed specific facts necessary to support those allegations. Fed.Rules Civ.Proc.Rule 12(b), 28 U.S.C.A.

30 Cases that cite this headnote

[20] **Federal Civil Procedure**
&#128273;Causation; redressability

Although suitor may derive great comfort and joy from fact that United States Treasury is not cheated, that wrongdoer gets his just deserts, or that nation's laws are faithfully enforced, that psychic satisfaction is not acceptable Article III remedy, for purposes of redressability requirement for standing, as it does not redress cognizable Article III injury; essence of redressability requirement is that relief that does not remedy injury suffered cannot bootstrap plaintiff into federal court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

310 Cases that cite this headnote

[21] **Federal Civil Procedure**
&#128273;Causation; redressability

Plaintiff cannot achieve standing to litigate

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

substantive issue by bringing suit for cost of bringing suit; litigation must give plaintiff some other benefit besides reimbursement of costs that are byproduct of litigation itself. U.S.C.A. Const. Art. 3, § 2, cl. 1.

107 Cases that cite this headnote

[22]    **Federal Courts**
⚷Rights and interests at stake;  adverseness

Interest in attorney's fees is insufficient to create Article III case or controversy where none exists on merits of underlying claim. U.S.C.A. Const. Art. 3, § 2, cl. 1.

132 Cases that cite this headnote

[23]    **Environmental Law**
⚷Persons Entitled to Sue or Seek Review;  Standing

Section of Emergency Planning and Community Right–To–Know Act (EPCRA) providing for recovery of costs covers only "costs of litigation," which cannot alone support standing. Emergency Planning Community Right–To–Know Act of 1986, § 326(f), 42 U.S.C.A. § 11046(f).

17 Cases that cite this headnote

[24]    **Environmental Law**
⚷Cognizable interests and injuries, in general

Deterring future violations of Emergency Planning and Community Right–To–Know Act (EPCRA) can be "remedial," for purposes of redressability requirement for Article III standing, when threatened injury is one of gravamens of complaint. U.S.C.A. Const. Art. 3, § 2, cl. 1; Emergency Planning Community Right–To–Know Act of 1986, § 326(a)(1), 42

U.S.C.A. § 11046(a)(1).

121 Cases that cite this headnote

[25]    **Injunction**
⚷Persons entitled to apply;  standing

Generalized interest in deterrence supporting claim for injunctive relief is insufficient to satisfy redressibility requirement for Article III standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

50 Cases that cite this headnote

[26]    **Federal Civil Procedure**
⚷In general;  injury or interest

Presumption of future injury when defendant has voluntarily ceased its illegal activity in response to litigation is not substitute for allegation of present or threatened injury upon which initial standing must be based. U.S.C.A. Const. Art. 3, § 2, cl. 1.

11 Cases that cite this headnote

[27]    **Federal Courts**
⚷Injunctions
**Injunction**
⚷Persons entitled to apply;  standing

Past exposure to illegal conduct does not in itself show present case or controversy regarding injunctive relief, as required for standing, if unaccompanied by any continuing, present adverse effects. U.S.C.A. Const. Art. 3, § 2, cl. 1.

50 Cases that cite this headnote

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

**\*\*1006 \*83** *Syllabus*\*

Alleging that petitioner manufacturer had violated the Emergency Planning and **\*\*1007** Community Right–To–Know Act of 1986 (EPCRA) by failing to file timely toxic- and hazardous-chemical storage and emission reports for past years, respondent environmental protection organization filed this private enforcement action for declaratory and injunctive relief under EPCRA's citizen-suit provision, 42 U.S.C. § 11046(a)(1). The District Court held that, because petitioner had brought its filings up to date by the time the complaint was filed, the court lacked jurisdiction to entertain a suit for a present violation; and that, because EPCRA does not allow suit for a purely historical violation, respondent's allegation of untimely filing was not a claim upon which relief could be granted. The Seventh Circuit reversed, concluding that EPCRA authorizes citizen suits for purely past violations.

*Held:* Because none of the relief sought would likely remedy respondent's alleged injury in fact, respondent lacks standing to maintain this suit, and this Court and the lower courts lack jurisdiction to entertain it. Pp. 1009–1021.

(a) The merits issue in this case—whether § 11046(a) permits citizen suits for purely past violations—is not also "jurisdictional," and so does not occupy the same status as standing to sue as a question that must be resolved first. It is firmly established that a district court's subject-matter jurisdiction is not defeated by the absence of a valid (as opposed to arguable) cause of action, see, *e.g., Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939. Subject-matter jurisdiction exists if the right to recover will be sustained under one reading of the Constitution and laws and defeated under another, *id.,* at 685, 66 S.Ct., at 777–778, unless the claim clearly appears to be immaterial, wholly insubstantial and frivolous, or otherwise so devoid of merit as not to involve a federal controversy, see, *e.g., Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 776–777, 39 L.Ed.2d 73. Here, respondent wins under one construction of EPCRA and loses under another, and its claim is not frivolous or immaterial. It is unreasonable to read § 11046(c)—which provides that "[t]he district court shall have jurisdiction in actions brought under subsection (a) ... to enforce [an EPCRA] requirement ... and to impose any civil penalty provided for violation of that requirement"—as making all the elements of the § 11046(a) cause of action **\*84** jurisdictional, rather than as merely specifying the remedial *powers* of the court. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306, as well as cases deciding a

statutory standing question before a constitutional standing question, distinguished. In no case has this Court called the existence of a cause of action "jurisdictional," and decided that question before resolving a dispute concerning the existence of an Article III case or controversy. Such a principle would turn every statutory question in an EPCRA citizen suit into a question of jurisdiction that this Court would have to consider—indeed, raise *sua sponte*—even if not raised below. Pp. 1009–1012.

(b) This Court declines to endorse the "doctrine of hypothetical jurisdiction," under which several Courts of Appeals have found it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. That doctrine carries the courts beyond the bounds of authorized judicial action and thus offends fundamental separation-of-powers principles. In a long and venerable line of cases, this Court has held that, without proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit. See, *e.g., Capron v. Van Noorden,* 2 Cranch 126, 2 L.Ed. 229; *Arizonans for Official English v. Arizona,* 520 U.S. 43, 73, 117 S.Ct. 1055, 1071-1072, 137 L.Ed.2d 170. *Bell v. Hood, supra; National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 465, n. 13, 94 S.Ct. 690, 696, n. 13, 38 L.Ed.2d 646; *Norton v. Mathews,* 427 U.S. 524, 531, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672; *Secretary of Navy v. Avrech,* 418 U.S. 676, 678, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033 (*per curiam*); *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537; *Philbrook* **\*\*1008** *v. Glodgett,* 421 U.S. 707, 721, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525; and *Chandler v. Judicial Council of Tenth Circuit,* 398 U.S. 74, 86–88, 90 S.Ct. 1648, 1654–1656, 26 L.Ed.2d 100, distinguished. For a court to pronounce upon a law's meaning or constitutionality when it has no jurisdiction to do so is, by very definition, an ultra vires act. Pp. 1012–1016.

(c) Respondent lacks standing to sue. Standing is the "irreducible constitutional minimum" necessary to make a justiciable "case" or "controversy" under Article III, § 2. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351. It contains three requirements: injury in fact to the plaintiff, causation of that injury by the defendant's complained-of conduct, and a likelihood that the requested relief will redress that injury. *E.g., ibid.* Even assuming, as respondent asserts, that petitioner's failure to report EPCRA information in a timely manner, and the lingering effects of that failure,

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

constitute a concrete injury in fact to respondent and its members that satisfies Article III, cf. *id., at 578, 112 S.Ct., at 2145–2146,* the complaint nevertheless fails the redressability test: None of the specific items of relief sought—a declaratory judgment that petitioner violated EPCRA; **\*85** injunctive relief authorizing respondent to make periodic inspections of petitioner's facility and records and requiring petitioner to give respondent copies of its compliance reports; and orders requiring petitioner to pay EPCRA civil penalties to the Treasury and to reimburse respondent's litigation expenses—and no conceivable relief under the complaint's final, general request, would serve to reimburse respondent for losses caused by petitioner's late reporting, or to eliminate any effects of that late reporting upon respondent. Pp. 1016–1020.

90 F.3d 1237, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and in which BREYER, J., joined as to Parts I and IV. O'CONNOR, J., filed a concurring opinion, in which KENNEDY, J., joined, *post,* p. 1020. BREYER, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 1020. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER, J., joined as to Parts I, III, and IV, and GINSBURG, J., joined as to Part III, *post,* p. 1021. GINSBURG, J., filed an opinion concurring in the judgment, *post,* p. 1032.

**Attorneys and Law Firms**

Sanford M. Stein, Chicago, IL, for Petitioner.

David A. Strauss, Chicago, IL, for Respondent.

Irving L. Gornstein, Washington, DC, for U.S. as amicus curiae, by special leave of Court.

**Opinion**

**\*86** Justice SCALIA delivered the opinion of the Court.

This is a private enforcement action under the citizen–suit provision of the Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA), 100 Stat. 1755, 42 U.S.C. § 11046(a)(1). The case presents the merits question, answered in the affirmative by the United States Court of Appeals for the Seventh Circuit, whether EPCRA authorizes suits for purely past violations. It also presents the jurisdictional question whether respondent,

plaintiff below, has standing to bring this action.

**I**

Respondent, an association of individuals interested in environmental protection, sued petitioner, a small manufacturing company in Chicago, for past violations of EPCRA. EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening release. Central to its operation are reporting requirements compelling users of specified toxic and hazardous chemicals to file annual **\*87** "emergency and hazardous chemical inventory forms" and "toxic chemical **\*\*1009** release forms," which contain, *inter alia,* the name and location of the facility, the name and quantity of the chemical on hand, and, in the case of toxic chemicals, the waste-disposal method employed and the annual quantity released into each environmental medium. 42 U.S.C. §§ 11022 and 11023. The hazardous-chemical inventory forms for any given calendar year are due the following March 1st, and the toxic-chemical release forms the following July 1st. §§ 11022(a)(2) and 11023(a).

Enforcement of EPCRA can take place on many fronts. The Environmental Protection Agency (EPA) has the most powerful enforcement arsenal: it may seek criminal, civil, or administrative penalties. § 11045. State and local governments can also seek civil penalties, as well as injunctive relief. §§ 11046(a)(2) and (c). For purposes of this case, however, the crucial enforcement mechanism is the citizen-suit provision, § 11046(a)(1), which likewise authorizes civil penalties and injunctive relief, see § 11046(c). This provides that "any person may commence a civil action on his own behalf against ... [a]n owner or operator of a facility for failure," among other things, to "[c]omplete and submit an inventory form under section 11022(a) of this title ... [and] section 11023(a) of this title." § 11046(a)(1). As a prerequisite to bringing such a suit, the plaintiff must, 60 days prior to filing his complaint, give notice to the Administrator of the EPA, the State in which the alleged violation occurs, and the alleged violator. § 11046(d). The citizen suit may not go forward if the Administrator "has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty." § 11046(e).

In 1995 respondent sent a notice to petitioner, the Administrator, and the relevant Illinois authorities,

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

alleging—accurately, as it turns out—that petitioner had failed since 1988, the first year of EPCRA's filing deadlines, to complete and **\*88** to submit the requisite hazardous-chemical inventory and toxic-chemical release forms under §§ 11022 and 11023. Upon receiving the notice, petitioner filed all of the overdue forms with the relevant agencies. The EPA chose not to bring an action against petitioner, and when the 60–day waiting period expired, respondent filed suit in Federal District Court. Petitioner promptly filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6), contending that, because its filings were up to date when the complaint was filed, the court had no jurisdiction to entertain a suit for a present violation; and that, because EPCRA does not allow suit for a purely historical violation, respondent's allegation of untimeliness in filing was not a claim upon which relief could be granted.

The District Court agreed with petitioner on both points. App. to Pet. for Cert. A24–A26. The Court of Appeals reversed, concluding that citizens may seek penalties against EPCRA violators who file after the statutory deadline and after receiving notice. 90 F.3d 1237 (C.A.7 1996). We granted certiorari, 519 U.S. 1147, 117 S.Ct. 1079, 137 L.Ed.2d 214 (1997).

## II

[1] We granted certiorari in this case to resolve a conflict between the interpretation of EPCRA adopted by the Seventh Circuit and the interpretation previously adopted by the Sixth Circuit in *Atlantic States Legal Foundation, Inc. v. United Musical Instruments, U.S.A., Inc.,* 61 F.3d 473 (1995)—a case relied on by the District Court, and acknowledged by the Seventh Circuit to be "factually indistinguishable," 90 F.3d, at 1241–1242. Petitioner, however, both in its petition for certiorari and in its briefs on the merits, has raised the issue of respondent's standing to maintain the suit, and hence this Court's jurisdiction to entertain it. Though there is some dispute on this point, see Part III, *infra,* this would normally be considered a threshold question that must be resolved in respondent's favor before proceeding to the **\*89** merits. Justice STEVENS' opinion concurring in the judgment, however, claims that the question whether § 11046(a) permits this cause of action is *also* "jurisdictional," and so has equivalent claim to being resolved first. Whether that is so has significant implications for this case and for many others, **\*\*1010** and so the point warrants extended discussion.

[2] [3] [4] It is firmly established in our cases that the

absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case. See generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350, p. 196, n. 8 and cases cited (2d ed.1990). As we stated in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), "[j]urisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Rather, the district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another," *id.,* at 685, 66 S.Ct., at 777, unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.,* at 682–683, 66 S.Ct., at 776; see also *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 285, 113 S.Ct. 753, 767–768, 122 L.Ed.2d 34 (1993); *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 411–412, 57 L.Ed. 716 (1913). Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); see also *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). Here, respondent wins under one construction of EPCRA and loses under another, and Justice STEVENS does not argue that respondent's claim is frivolous or immaterial— **\*90** in fact, acknowledges that the language of the citizen-suit provision is ambiguous. *Post,* at 1031.

Justice STEVENS relies on our treatment of a similar issue as jurisdictional in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). *Post,* at 1022. The statute at issue in that case, however, after creating the cause of action, went on to say that "[t]he district courts shall have jurisdiction, *without regard to the amount in controversy or the citizenship of the parties,*" to provide various forms of relief. 33 U.S.C. § 1365(a) (emphasis added). The italicized phrase strongly suggested (perhaps misleadingly) that the provision was addressing genuine subject-matter jurisdiction. The corresponding provision in the present case, however, reads as follows:

> "The district court shall have jurisdiction in actions brought under subsection (a) of this section against an owner or operator of a facility to enforce the

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U.S.C. § 11046(c).

It is unreasonable to read this as making all the elements of the cause of action under subsection (a) jurisdictional, rather than as merely specifying the remedial *powers* of the court, viz., to enforce the violated requirement and to impose civil penalties. "Jurisdiction," it has been observed, "is a word of many, too many, meanings," *United States v. Vanness,* 85 F.3d 661, 663, n. 2 (C.A.D.C.1996), and it is commonplace for the term to be used as it evidently was here. See, *e.g.,* 7 U.S.C. § 13a–1(d) ("In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose ... a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation"); 15 U.S.C. § 2622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief, including injunctive relief and compensatory and exemplary damages"); 42 U.S.C. § 7622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief **\*91** including, but not limited to, injunctive relief, compensatory, and exemplary damages").

It is also the case that the *Gwaltney* opinion does not display the slightest awareness that anything *turned upon* whether the existence **\*\*1011** of a cause of action for past violations was technically jurisdictional—as indeed nothing of substance did. The District Court had statutory jurisdiction over the suit in any event, since continuing violations were also alleged. See 484 U.S., at 64, 108 S.Ct., at 385. It is true, as Justice STEVENS points out, that the issue of Article III standing which is addressed at the end of the opinion should technically have been addressed at the outset if the statutory question was not jurisdictional. But that also did not really matter, since Article III standing was in any event found. The short of the matter is that the jurisdictional character of the elements of the cause of action in *Gwaltney* made no substantive difference (nor even any procedural difference that the Court seemed aware of), had been assumed by the parties, and was assumed without discussion by the Court. We have often said that drive-by jurisdictional rulings of this sort (if *Gwaltney* can even be called a ruling on the point rather than a dictum) have no precedential effect. See *Lewis v. Casey,* 518 U.S. 343, 352, n. 2, 116 S.Ct. 2174, 2180, n. 2, 135 L.Ed.2d 606 (1996); *Federal Election Comm'n v. NRA Political Victory Fund,* 513 U.S. 88, 97, 115 S.Ct. 537, 542–543, 130 L.Ed.2d 439 (1994); *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S.

33, 38, 73 S.Ct. 67, 69–70, 97 L.Ed. 54 (1952). But even if it is authoritative on the point as to the distinctive statute there at issue, it is fanciful to think that *Gwaltney* revised our established jurisprudence that the failure of a cause of action does not automatically produce a failure of jurisdiction, or adopted the expansive principle that a statute saying "the district court shall have jurisdiction to remedy violations [in specified ways]" **\*92** renders the existence of a violation necessary for subject-matter jurisdiction.

Justice STEVENS' concurrence devotes a large portion of its discussion to cases in which a statutory standing question was decided before a question of constitutional standing. See *post,* at 1022–1024. They also are irrelevant here, because it is not a statutory *standing* question that Justice STEVENS would have us decide first. He wishes to resolve, not whether EPCRA authorizes this plaintiff to sue (it assuredly does), but whether the scope of the EPCRA right of action includes past violations. Such a question, we have held, goes to the merits and not to statutory standing. See *Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 365, 114 S.Ct. 855, 862, 127 L.Ed.2d 183 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional"); *Romero v. International Terminal Operating Co., supra,* at 359, 79 S.Ct., at 473; *Montana—Dakota Util. Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951).

Though it is replete with extensive case discussions, case citations, rationalizations, and syllogoids, see *post,* at 1025, n. 12, and n. 2 *infra*, Justice STEVENS' opinion conspicuously lacks one central feature: a single case in which this Court has done what he proposes, to wit, call the existence of a cause of action "jurisdictional," and decide that question before resolving a dispute concerning the existence of an Article III case or controversy. Of course, even if there were not solid precedent contradicting Justice STEVENS' position, the consequences are alone enough to condemn it. It would turn every statutory question in an EPCRA citizen suit into a question of jurisdiction. Under Justice STEVENS' analysis, § 11046(c)'s grant of "jurisdiction in actions brought *under* [§ 11046(a) ]" withholds jurisdiction over claims involving purely past violations if past violations are not in fact *covered* by § 11046(a). By parity of reasoning, if there is a dispute as to whether the omission of a particular item constituted a failure to "complete" the form; or as to **\*93** whether a particular manner of delivery complied in time with the requirement to "submit" the form; and if the court agreed with the defendant on the point; the action would not be "brought under [§ 11046(a) ]," and would be dismissed for lack of jurisdiction rather

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

than decided on the merits. Moreover, those statutory arguments, since they are "jurisdictional," would have to be considered by this Court even though not raised earlier in the litigation—indeed, this Court would have to raise them *sua sponte.* See **1012 *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 278–279, 97 S.Ct. 568, 571–572, 50 L.Ed.2d 471 (1977); *Great Southern Fire Proof Hotel Co. v. Jones,* 177 U.S. 449, 453, 20 S.Ct. 690, 691–692, 44 L.Ed. 842 (1900).* Congress of course did not create such a strange scheme. In referring to actions "brought under" § 11046(a), § 11046(c) means suits *contending* that § 11046(a) contains a certain requirement. If Justice STEVENS is correct that all cause-of-action questions may be regarded as jurisdictional questions, and thus capable of being decided where there is no genuine case or controversy, it is hard to see what is left of that limitation in Article III.

### III

[5] In addition to its attempt to convert the merits issue in this case into a jurisdictional one, Justice STEVENS' concurrence proceeds, *post,* at 1023–1027, to argue the bolder point that jurisdiction need not be addressed first anyway. Even if the statutory question is not "fram[ed] ... in terms of 'jurisdiction,' " but is simply "characterize[d] ... as whether respondent's complaint states a 'cause of action,' " "it is also clear that we have the power to decide the statutory question first." *Post,* at 1024. This is essentially the position embraced by several Courts of Appeals, which find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. See, *e.g., SEC v. American* *94 *Capital Investments, Inc.,* 98 F.3d 1133, 1139–1142 (C.A.9 1996), cert. denied, *sub nom. Shelton v. Barnes,* 520 U.S. 1185, 117 S.Ct. 1468, 137 L.Ed.2d 681 (1997); *Smith v. Avino,* 91 F.3d 105, 108 (C.A.11 1996); *Clow v. U.S. Department of Housing and Urban Development,* 948 F.2d 614, 616, n. 2 (C.A.9 1991); *Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327, 333 (C.A.D.C.1991); *United States v. Parcel of Land,* 928 F.2d 1, 4 (C.A.1 1991); *Browning–Ferris Industries v. Muszynski,* 899 F.2d 151, 154–159 (C.A.2 1990). The Ninth Circuit has denominated this practice—which it characterizes as "assuming" jurisdiction for the purpose of deciding the merits—the "doctrine of hypothetical jurisdiction." See, *e.g., United States v. Troescher,* 99 F.3d 933, 934, n. 1 (1996).[1]

[6] [7] [8] We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co. v. Jones, supra,* at 453, 20 S.Ct., at 691–692. The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of *95 the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884).

This Court's insistence that proper jurisdiction appear begins at least as early as 1804, when we set aside a judgment for the defendant at the instance of the losing plaintiff *who had himself* failed to allege the basis for federal jurisdiction. *Capron v. Van Noorden,* 2 Cranch 126, 2 L.Ed. 229 (1804). Just last Term, we restated this principle in the clearest fashion, unanimously setting aside the Ninth Circuit's merits decision in a case that had lost the elements of a justiciable controversy:

> **1013 " '[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it. *Mitchell v. Maurer,* 293 U.S. 237, 244 [55 S.Ct. 162, 165, 79 L.Ed. 338] (1934). See *Juidice v. Vail,* 430 U.S. 327, 331–332 [97 S.Ct. 1211, 1215–1216, 51 L.Ed.2d 376] (1977) (standing). 'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.' *United States v. Corrick,* 298 U.S. 435, 440 [56 S.Ct. 829, 831, 80 L.Ed. 1263] (1936) (footnotes omitted).' " *Arizonans for Official English v. Arizona,* 520 U.S. 43, 73, 117 S.Ct. 1055, 1071-1072, 137 L.Ed.2d 170 (1997), quoting from *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986)

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

(brackets in original).

Justice STEVENS' arguments contradicting all this jurisprudence—and asserting that a court *may* decide the cause of action before resolving Article III jurisdiction—are readily refuted. First, his concurrence seeks to convert *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), into a case in which the cause-of-action question was decided before an Article III standing **\*96** question. *Post,* at 1024, n. 8. "*Bell,*" Justice STEVENS asserts, "held that we have jurisdiction to decide [whether the plaintiff has stated a cause of action] *even when it is unclear whether the plaintiff's injuries can be redressed.*" *Post,* at 1024. The italicized phrase (the italics are his own) invites the reader to believe that Article III redressability was at issue. Not only is this not true, but the whole *point* of *Bell* was that it is not true. In *Bell,* which was decided before *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the District Court had dismissed the case on *jurisdictional* grounds because it believed that (what we would now call) a *Bivens* action would not lie. This Court held that the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal. Thus, the uncertainty about "whether the plaintiff's injuries can be redressed" to which Justice STEVENS refers is simply the uncertainty about whether a cause of action existed—which is precisely what *Bell* holds *not* to be an Article III "redressability" question. It would have been a different matter if the relief *requested* by the plaintiffs in *Bell* (money damages) would not have remedied their injury in fact; but it of course would. Justice STEVENS used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability, having written for the Court that the former argument is "not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of ... federal rights," which issue is " 'not of the jurisdictional sort which the Court raises on its own motion.' " *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 398, 99 S.Ct. 1171, 1175–1176, 59 L.Ed.2d 401 (1979) (STEVENS, J.), (quoting *Mt. Healthy Bd. of Ed. v. Doyle,* 429 U.S., at 279, 97 S.Ct., at 572).

Justice STEVENS also relies on *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). *Post,* at 1024–1025. But in that case, we did not determine whether a cause of action existed before determining **\*97** that the plaintiff had Article III standing; there was no question of injury in fact or effectiveness of the requested remedy. Rather, *National Railroad Passenger Corp.* determined whether a statutory cause of

action existed before determining whether (if so) the plaintiff came within the "zone of interests" for which the cause of action was available. 414 U.S., at 465, n. 13, 94 S.Ct., at 696, n. 13. The latter question is an issue of *statutory* standing. It has nothing to do with whether there is case or controversy under Article III.[2]

**\*\*1014 \*98** Much more extensive defenses of the practice of deciding the cause of action before resolving Article III jurisdiction have been offered by the Courts of Appeals. They rely principally upon two cases of ours, *Norton v. Mathews,* 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), and *Secretary of Navy v. Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) *(per curiam).* Both are readily explained, we think, by their extraordinary procedural postures. In *Norton,* the case came to us on direct appeal from a three-judge District Court, and the jurisdictional question was whether the action was properly brought in that forum rather than in an ordinary district court. We declined to decide that jurisdictional question, because the merits question was decided *in a companion case, Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), with the consequence that the jurisdictional question could have no effect on the outcome: If the three-judge court had been properly convened, we would have affirmed, and if not, we would have vacated and remanded for a fresh decree from which an appeal could be taken to the Court of Appeals, the outcome of which was foreordained by *Lucas. Norton v. Mathews, supra,* at 531, 96 S.Ct., at 2775. Thus, *Norton* did not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed. Moreover, the Court seems to have regarded the merits judgment that it entered on the basis of *Lucas* as equivalent to a jurisdictional dismissal for failure to present a substantial federal question. The Court said: "This disposition *[Lucas]* renders the merits in the present case a decided issue and thus one no longer substantial in the jurisdictional sense." 427 U.S., at 530–531, 96 S.Ct., at 2774–2775. We think it clear that this peculiar case, involving a merits issue dispositively resolved in a companion case, was not meant to overrule, *sub silentio,* two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the merits. See *Clow,* 948 F.2d, at 627 (O'Scannlain, J., dissenting).

*Avrech* also involved an instance in which an intervening Supreme Court decision definitively answered the merits **\*99** question. The jurisdictional question in the case had been raised by the Court *sua sponte* after oral argument, and supplemental briefing had been ordered. *Secretary of Navy v. Avrech, supra,* at 677, 94 S.Ct., at 3039–3040. Before the Court came to a decision, however, the merits

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

issue in the case had been conclusively resolved in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), a case argued the same day as *Avrech.* The Court was unwilling to decide the jurisdictional question without oral argument, 418 U.S., at 677, 94 S.Ct., at 3039–3040, but acknowledged (with some understatement) that **\*\*1015** "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is ... foreordained," *id.,* at 678, 94 S.Ct., at 3040. Accordingly, the Court disposed of the case on the basis of the intervening decision in *Parker,* in a minimalist two-page *per curiam* opinion. The first thing to be observed about *Avrech* is that the supposed jurisdictional issue was technically not that. The issue was whether a court–martial judgment could be attacked collaterally by a suit for backpay. Although *Avrech,* like the earlier case of *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), characterized this question as jurisdictional, we later held squarely that it was not. See *Schlesinger v. Councilman,* 420 U.S. 738, 753, 95 S.Ct. 1300, 1310–1311, 43 L.Ed.2d 591 (1975). In any event, the peculiar circumstances of *Avrech* hardly permit it to be cited for the precedent–shattering general proposition that an "easy" merits question may be decided *on the assumption* of jurisdiction. To the contrary, the fact that the Court ordered briefing on the jurisdictional question *sua sponte* demonstrates its adherence to traditional and constitutionally dictated requirements. See *Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d, at 344–345, and n. 10 (Thomas, J., concurring in part and concurring in denial of petition for review).

Other cases sometimes cited by the lower courts to support "hypothetical jurisdiction" are similarly distinguishable. *United States v. Augenblick,* as we have discussed, did not involve a jurisdictional issue. In *Philbrook v. Glodgett,* 421 U.S. 707, 721, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525 (1975), the jurisdictional question was whether, **\*100** in a suit under 28 U.S.C. § 1343(3) against the Commissioner of the Vermont Department of Social Welfare for deprivation of federal rights under color of state law by denying payments under a federally funded welfare program, the plaintiff could join a similar claim against the Secretary of Health, Education, and Welfare. The merits issue of statutory construction involved in the claim against the Secretary was precisely the same as that involved in the claim against the Commissioner, and the Secretary (while challenging jurisdiction) assured the Court that he would comply with any judgment entered against the Commissioner. The Court's disposition of the case was to dismiss the Secretary's appeal under what was then this Court's Rule 40(g), for failure to brief the jurisdictional question

adequately. Normally, the Court acknowledged, its obligation to inquire into the jurisdiction of the District Court might prevent this disposition. But here, the Court concluded, "the substantive issue decided by the District Court would have been decided by that court even if it had concluded that the Secretary was not properly a party," and "the only practical difference that resulted ... was that its injunction was directed against him as well as against [the Commissioner]," which the Secretary "has [not] properly contended to be wrongful before this Court." 421 U.S., at 721–722, 95 S.Ct., at 1902–1903. And finally, in *Chandler v. Judicial Council of Tenth Circuit,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), we reserved the question whether we had jurisdiction to issue a writ of prohibition or mandamus because the petitioner had not exhausted all available avenues before seeking relief under the All Writs Act, 28 U.S.C. § 1651, and because there was no record to review. 398 U.S., at 86–88, 90 S.Ct., at 1654–1656. The exhaustion question *itself* was at least arguably jurisdictional, and was clearly treated as such. *Id.,* at 86, 90 S.Ct., at 1654–1655.[3]

**\*\*1016** [9] [10] **\*101** While some of the above cases must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question, none of them even approaches approval of a doctrine of "hypothetical jurisdiction" that enables a court to resolve contested questions of law when its jurisdiction is in doubt. Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning. *Muskrat v. United States,* 219 U.S. 346, 362, 31 S.Ct. 250, 256, 55 L.Ed. 246 (1911); *Hayburn's Case,* 2 Dall. 409 (1792). Much more than legal niceties are at stake here. The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. See *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947–2948, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706(1974). For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction **\*102** to do so is, by very definition, for a court to act ultra vires.

**IV**

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

[11] [12] [13] [14] Having reached the end of what seems like a long front walk, we finally arrive at the threshold jurisdictional question: whether respondent, the plaintiff below, has standing to sue. Article III, § 2, of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies." We have always taken this to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process. *Muskrat v. United States, supra,* at 356–357, 31 S.Ct., at 253–254. Such a meaning is fairly implied by the text, since otherwise the purported restriction upon the judicial power would scarcely be a restriction at all. Every criminal investigation conducted by the Executive is a "case," and every policy issue resolved by congressional legislation involves a "controversy." These are not, however, the sort of cases and controversies that Article III, § 2, refers to, since "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing to sue is part of the common understanding of what it takes to make a justiciable case. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990).[4]

[15] [16] [17] The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife,* **\*103** *supra,* at 560, 112 S.Ct., at 2136. First and foremost, there must be alleged (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore v. Arkansas, supra,* at 149, 155, 110 S.Ct., at 1723 (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's **\*\*1017** injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.,* at 45–46, 96 S.Ct., at 1927–1928; see also *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975). This triad of injury in fact, causation, and redressability[5] constitutes the core of Article III's case-or-controversy **\*104** requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–608, 107 L.Ed.2d 603 (1990).

[18] [19] We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements. This case is on appeal from a Rule 12(b) motion to dismiss on the pleadings, so we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). The complaint contains claims "on behalf of both [respondent] itself and its members."[6] App. 4. It describes respondent as an organization that seeks, uses, and acquires data reported under EPCRA. It says that respondent "reports to its members and the public about storage and releases of toxic chemicals into the environment, advocates changes in environmental regulations and statutes, prepares reports for its members and the public, seeks the reduction of toxic chemicals and further seeks to promote the effective enforcement of environmental laws." *Id.,* at 5. The complaint asserts that respondent's "right to know about [toxic-chemical] releases and its interests in protecting and improving the environment and the health of its members have been, are being, and will be adversely affected by [petitioner's] actions in failing to provide timely and required information under EPCRA." *Ibid.* The complaint also alleges that respondent's members, who live in or frequent the area near petitioner's facility, use the EPCRA-reported information "to learn about **\*105** toxic chemical releases, the use of hazardous substances in their communities, to plan emergency preparedness in the event of accidents, and to attempt to reduce the toxic chemicals in areas in which they live, work and visit." *Ibid.* The members' "safety, health, recreational, economic, aesthetic and environmental interests" **\*\*1018** in the information, it is claimed, "have been, are being, and will be adversely affected by [petitioner's] actions in failing to file timely and required reports under EPCRA." *Ibid.*

As appears from the above, respondent asserts petitioner's failure to provide EPCRA information in a timely fashion, and the lingering effects of that failure, as the injury in fact to itself and its members. We have not had occasion to decide whether being deprived of information that is supposed to be disclosed under EPCRA—or at least being deprived of it when one has a particular plan for its use—is a concrete injury in fact that satisfies Article III. Cf. *Lujan v. Defenders of Wildlife,* 504 U.S., at 578, 112 S.Ct., at 2145–2146. And we need not reach that question in the present case because, assuming injury in fact, the complaint fails the third test of standing, redressability.

The complaint asks for (1) a declaratory judgment that petitioner violated EPCRA; (2) authorization to inspect periodically petitioner's facility and records (with costs borne by petitioner); (3) an order requiring petitioner to

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

provide respondent copies of all compliance reports submitted to the EPA; (4) an order requiring petitioner to pay civil penalties of $25,000 per day for each violation of §§ 11022 and 11023; (5) an award of all respondent's "costs, in connection with the investigation and prosecution of this matter, including reasonable attorney and expert witness fees, as authorized by Section 326(f) of [EPCRA]"; and (6) any such further relief as the court deems appropriate. App. 11. None of the specific items of relief sought, and none that we can envision as "appropriate" under the general request, would serve to reimburse respondent for losses caused by the late reporting, **\*106** or to eliminate any effects of that late reporting upon respondent.[7]

The first item, the request for a declaratory judgment that petitioner violated EPCRA, can be disposed of summarily. There being no controversy over whether petitioner failed to file reports, or over whether such a failure constitutes a violation, the declaratory judgment is not only worthless to respondent, it is seemingly worthless to all the world. See *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 479, 110 S.Ct. 1249, 1254, 108 L.Ed.2d 400 (1990).

[20] Item (4), the civil penalties authorized by the statute, see § 11045(c), might be viewed as a sort of compensation or redress to respondent if they were payable to respondent. But they are not. These penalties–the only damages authorized by EPCRA—are payable to the United States Treasury. In requesting them, therefore, respondent seeks not remediation of its own injury—reimbursement for the costs it incurred as a result of the late filing—but vindication of the rule of law—the "undifferentiated public interest" in faithful execution of EPCRA. *Lujan v. Defenders of Wildlife, supra,* at 577, 112 S.Ct., at 2145; see also *Fairchild v. Hughes,* 258 U.S. 126, 129–130, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922). This does not suffice. Justice STEVENS thinks it is enough that respondent will be gratified by seeing petitioner punished for its infractions and that the **\*107** punishment will deter the risk of future harm. *Post,* at 1028-1029. If that were so, our holdings in *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), and *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), are inexplicable. Obviously, such a principle would make the redressability requirement **\*\*1019** vanish. By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced,

that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury. See, *e.g., Allen v. Wright,* 468 U.S. 737, 754–755, 104 S.Ct. 3315, 3326–3327, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 482–483, 102 S.Ct. 752, 763–765, 70 L.Ed.2d 700 (1982). Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.

[21] [22] [23] Item (5), the "investigation and prosecution" costs "as authorized by Section 326(f)," would assuredly benefit respondent as opposed to the citizenry at large. Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself. An "interest in attorney's fees is ... insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Continental Bank Corp., supra,* at 480, 110 S.Ct., at 1255 (citing *Diamond v. Charles,* 476 U.S. 54, 70–71, 106 S.Ct. 1697, 1707–1708, 90 L.Ed.2d 48 (1986)). Respondent asserts that the "investigation costs" it seeks were incurred prior to the litigation, in digging up the emissions and storage information that petitioner should have filed, and that respondent needed for its own purposes. See Brief for Respondent 37–38. The recovery of such expenses unrelated **\*108** to litigation would assuredly support Article III standing, but the problem is that § 326(f), which is the entitlement to monetary relief that the complaint invokes, covers only the "costs of litigation."[8] § 11046(f). Respondent finds itself, in other words, impaled upon the horns of a dilemma: For the expenses to be reimbursable under the statute, they must be costs of litigation; but reimbursement of the costs of litigation cannot alone support standing.[9]

[24] [25] The remaining relief respondent seeks (item (2), giving respondent authority to inspect petitioner's facility and records, and item (3), compelling petitioner to provide respondent copies of EPA compliance reports) is injunctive in nature. It cannot conceivably remedy any past wrong but is aimed at deterring petitioner from violating EPCRA in the future. See Brief for Respondent 36. The latter objective can of course be "remedial" for Article III purposes, when threatened injury is one of the gravamens of the complaint. If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm. But there is no such allegation here—and on the facts of the case, there seems no basis

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

for it. Nothing supports the requested injunctive relief except respondent's generalized interest in deterrence, **\*109** which is insufficient for purposes of Article III. See *Los Angeles v. Lyons,* 461 U.S., at 111, 103 S.Ct., at 1670.

[26] [27] The United States, as *amicus curiae,* argues that the injunctive relief does constitute remediation because "there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation," even if that **\*\*1020** occurs before a complaint is filed. Brief for United States as *Amicus Curiae* 27–28, and n. 11. This makes a sword out of a shield. The "presumption" the Government refers to has been applied to refute the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity. See, *e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based. See *Los Angeles v. Lyons, supra,* at 109, 103 S.Ct., at 1669. To accept the Government's view would be to overrule our clear precedent requiring that the allegations of future injury be particular and concrete. *O'Shea v. Littleton,* 414 U.S. 488, 496–497, 94 S.Ct. 669, 676–677, 38 L.Ed.2d 674 (1974). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.,* at 495–496, 94 S.Ct., at 676; see also *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991) ("[T]he mootness exception for disputes capable of repetition yet evading review ... will not revive a dispute which became moot before the action commenced"). Because respondent alleges only past infractions of EPCRA, and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.

\* \* \*

Having found that none of the relief sought by respondent would likely remedy its alleged injury in fact, we must conclude that respondent lacks standing to maintain this suit, **\*110** and that we and the lower courts lack jurisdiction to entertain it. However desirable prompt resolution of the merits EPCRA question may be, it is not as important as observing the constitutional limits set upon courts in our system of separated powers. EPCRA will have to await another day.

The judgment is vacated, and the case is remanded with instructions to direct that the complaint be dismissed.

It is so ordered.

Justice O'CONNOR, with whom Justice KENNEDY joins, concurring.

I join the Court's opinion. I agree that our precedent supports the Court's holding that respondent lacks Article III standing because its injuries cannot be redressed by a judgment that would, in effect, require only the payment of penalties to the United States Treasury. As the Court notes, *ante,* at 1019, had respondent alleged a continuing or imminent violation of the Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA), 42 U.S.C. § 11046, the requested injunctive relief may well have redressed the asserted injury.

I also agree with the Court's statement that federal courts should be certain of their jurisdiction before reaching the merits of a case. As the Court acknowledges, however, several of our decisions "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." *Ante,* at 1016. The opinion of the Court adequately describes why the assumption of jurisdiction was defensible in those cases, see *ante,* at 1014–1015, and why it is not in this case, see *ante,* at 1011. I write separately to note that, in my view, the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in "reserv[ing] difficult questions of ... jurisdiction when the case alternatively **\*111** could be resolved on the merits in favor of the same party," *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976).

Justice BREYER, concurring in part and concurring in the judgment.

I agree with the Court that the respondent in this case lacks Article III standing. I further agree that federal courts often, and typically should, decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better **\*\*1021** to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business. But my qualifying words "often" and "typically" are important. The Constitution, in my view, does not require us to replace those words with the word

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

"always." The Constitution does not impose a rigid judicial "order of operations," when doing so would cause serious practical problems.

This Court has previously made clear that courts may "reserv[e] difficult questions of ... jurisdiction when the case alternatively could be resolved on the merits in favor of the same party." *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976). That rule makes theoretical sense, for the difficulty of the jurisdictional question makes reasonable the court's jurisdictional assumption. And that rule makes enormous practical sense. Whom does it help to have appellate judges spend their time and energy puzzling over the correct answer to an intractable jurisdictional matter, when (assuming an easy answer on the substantive merits) the same party would win or lose regardless? More importantly, to insist upon a rigid "order of operations" in today's world of federal-court caseloads that have grown enormously over a generation means unnecessary delay and consequent added cost. See L. Mecham, Judicial Business of the United States Courts: 1996 Report of the Director 16, 18, 23; Report of the Proceedings of the Judicial Conference of the United States **\*112** 106, 115, 143 (1971) (indicating that between 1971 and 1996, annual appellate court caseloads increased from 132 to 311 cases filed per judgeship, and district court caseloads increased from 341 to 490 cases filed per judgeship). It means a more cumbersome system. It thereby increases, to at least a small degree, the risk of the "justice delayed" that means "justice denied."

For this reason, I would not make the ordinary sequence an absolute requirement. Nor, even though the case before us is ordinary, not exceptional, would I simply reserve judgment about the matter. *Ante* at 1020 (O'CONNOR, J., concurring). I therefore join only Parts I and IV of the Court's opinion.

Justice STEVENS, with whom Justice SOUTER joins as to Parts I, III, and IV, and with whom Justice GINSBURG joins as to Part III, concurring in the judgment.

This case presents two questions: (1) whether the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11001 *et seq.,* confers federal jurisdiction over citizen suits for wholly past violations; and (2) if so, whether respondent has standing under Article III of the Constitution. The Court has elected to decide the constitutional question first and, in doing so, has created new constitutional law. Because it is always prudent to avoid passing unnecessarily on an undecided constitutional question, see *Ashwander v. TVA,*

297 U.S. 288, 345–348, 56 S.Ct. 466, 482–484, 80 L.Ed. 688 (1936) (BRANDEIS, J., concurring), the Court should answer the statutory question first. Moreover, because EPCRA, properly construed, does not confer jurisdiction over citizen suits for wholly past violations, the Court should leave the constitutional question for another day.

I

The statutory issue in this case can be viewed in one of two ways: whether EPCRA confers "jurisdiction" over citizen suits for wholly past violations, or whether the statute **\*113** creates such a "cause of action." Under either analysis, the Court has the power to answer the statutory question first.

EPCRA frames the question in terms of "jurisdiction." Section 326(c) states:

"The district court shall have jurisdiction in actions brought under [§ 326(a) ] against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U.S.C. § 11046(c).

Thus, if § 326(a) authorizes citizen suits for wholly past violations, the district court has jurisdiction over these actions; if it does not, the court lacks jurisdiction.

Given the text of the statute, it is not surprising that the parties and the District Court framed the question in jurisdictional **\*\*1022** terms. Respondent's complaint alleged that the District Court had "subject matter jurisdiction under Section 326(a) of EPCRA, 42 U.S.C. § 11046(a)." App. 3. The merits questions that were raised by respondent's complaint were whether Steel Company violated EPCRA and, if so, what relief should be granted. The District Court, however, made no ruling on the merits when it granted Steel Company's motion to dismiss. It held that dismissal was required because respondent had merely alleged "a failure to timely file the required reports, a violation of the Act for which there is no jurisdiction for a citizen suit." App. to Pet. for Cert. A26.[1] Steel Company has also framed the **\*114** question as a jurisdictional one in its briefs before this Court.[2]

The threshold issue concerning the meaning of § 326 is virtually identical to the question that we decided in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). In that case, we considered whether § 505(a)

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

of the Clean Water Act allows suits for wholly past violations.[3] We unanimously characterized that question as a matter of "jurisdiction":

> "In this case, we must decide whether § 505(a) of the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), confers federal jurisdiction over citizen suits for wholly past violations." *Id.,* at 52, 108 S.Ct., at 378–379.
> See also *Block v. Community Nutrition Institute,* 467 U.S. 340, 353, n. 4, 104 S.Ct. 2450, 2457, n. 4, 81 L.Ed.2d 270 (1984) (citing *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 456, 465, n. 13, 94 S.Ct. 690, 692, 696, n. 13, 38 L.Ed.2d 646 (1974).) If we resolve the comparable statutory issue in the same way in this case, federal courts will have no jurisdiction to address the merits in future similar cases. Thus, this is not a case in which the choice between resolving the statutory question or the standing question first is a choice between a merits issue and a jurisdictional **\*115** issue; rather, it is a choice between two jurisdictional issues.

We have routinely held that when presented with two jurisdictional questions, the Court may choose which one to answer first. In *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), for example, we were presented with a choice between a statutory jurisdictional question and a question of Article III standing. In that case, the United States, as respondent, argued that petitioner lacked standing under the Administrative Procedure Act and under the Constitution.[4] Rather than taking up the constitutional issue, the Court stated:

> **\*\*1023** "Where ... Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, *the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff*." *Id.,* at 732, 92 S.Ct., at 1364–1365 (emphasis added).
> The Court concluded that petitioner lacked standing under the statute, *id.,* at 732–741, 92 S.Ct., at 1364–1369, and, therefore, did not need to **\*116** decide whether petitioner had suffered a sufficient injury under Article III.

Similarly, in *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the Court was faced with a choice between a statutory jurisdictional issue and a question of Article III standing. The Court of Appeals had held that the respondents had standing under both the statute and the Constitution. 698

F.2d 1239, 1244–1252 (C.A.D.C.1983). On writ of certiorari to this Court, the United States, as petitioner, argued both issues: that the respondents did not come within the "zone of interests" of the statute, and that they did not have standing under Article III of the Constitution.[5] A unanimous Court bypassed the constitutional standing question in order to decide the statutory question. It therefore construed the statute, and concluded that respondents could not bring suit under the statute. The only mention of the constitutional question came in a footnote at the end of the opinion: "Since congressional preclusion of judicial review is in effect jurisdictional, we need not address the standing issue decided by the Court of Appeals in this case." *Block,* 467 U.S., at 353, n. 4, 104 S.Ct., at 2457, n. 4 (citing *National Railroad Passenger Corp.,* 414 U.S., at 456, 465, and n. 13, 94 S.Ct., at 692, 696, and n. 13).

Finally, in *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), we were also faced with a choice between a statutory and constitutional jurisdictional question. *Id.,* at 93, 99 S.Ct., at 1605 ("This case presents both statutory and constitutional questions concerning standing to sue under Title VIII"). The statutory question was whether respondents had standing to sue under § 812 of the Fair Housing Act. The Court, **\*117** reluctant to address the constitutional question, opted to decide the statutory question first so as to avoid the constitutional question if possible:

> "The issue [of the meaning of § 812] is a critical one, for if the District Court correctly understood and applied § 812 [in denying respondents standing under the statute], we do not reach the question whether the minimum requirements of Art. III have been satisfied. If the Court of Appeals is correct [in holding that respondents have statutory standing], however, then the constitutional question is squarely presented." *Id.,* at 101, 99 S.Ct., at 1608.

See also *Bennett v. Spear,* 520 U.S. 154, 164, 117 S.Ct. 1154, 1162, 137 L.Ed.2d 281 (1997) (footnote omitted) (opinion of SCALIA, J.) (stating that "[t]he first question in the present case is whether the [Endangered Species Act's] citizen-suit provision ... negates the zone-of-interests test," and turning to the constitutional standing question only after determining that standing existed under the statute); *United Food and Commercial Workers v. Brown Group, Inc.,* 517 U.S. 544, 548–550, 116 S.Ct. 1529, 1532–1533, 134 L.Ed.2d 758 (1996) (analyzing the statutory question before turning to the constitutional **\*\*1024** standing question); *Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327, 341 (C.A.D.C.1991) (THOMAS, J., concurring in part and concurring in denial of petition for review) (courts exceed

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

the scope of their power "only if the ground passed over is jurisdictional and the ground rested upon is non-jurisdictional, for courts properly rest on one jurisdictional ground instead of another"). Thus, our precedents clearly support the proposition that, given a choice between two jurisdictional questions—one statutory and the other constitutional—the Court has the power to answer the statutory question first.

Rather than framing the question in terms of "jurisdiction," it is also possible to characterize the statutory issue in this case as whether respondent's complaint states a "cause **\*118** of action."[6] Framed this way, it is also clear that we have the power to decide the statutory question first. As our holding in *Bell v. Hood,* 327 U.S. 678, 681–685, 66 S.Ct. 773, 775–778, 90 L.Ed. 939 (1946), demonstrates, just as a court always has jurisdiction to determine its own jurisdiction, *United States v. Mine Workers,* 330 U.S. 258, 290, 67 S.Ct. 677, 694, 91 L.Ed. 884 (1947), a federal court also has jurisdiction to decide whether a plaintiff who alleges that she has been injured by a violation of federal law has stated a cause of action.[7] Indeed, *Bell* held that we have jurisdiction to decide this question *even when it is unclear whether the plaintiff's injuries can be redressed.*[8] Thus, *Bell* demonstrates that the Court **\*119** has the power to decide whether a cause of action exists even when it is unclear whether the plaintiff has standing.[9]

*National Railroad Passenger Corp.* also makes it clear that we have the power to **\*\*1025** decide this question before addressing other threshold issues. In that case, we were faced with the interrelated questions of "whether the Amtrak Act can be read to create a private right of action to enforce compliance with its provisions; whether a federal district court has jurisdiction under the terms of the Act to entertain such a suit [under 28 U.S.C. § 1337][10]; and whether respondent has [statutory] standing to bring such a suit." 414 U.S., at 455–456, 94 S.Ct., at 692. In choosing its method of analysis, the Court stated:

> **\*120** "[H]owever phrased, the *threshold question* clearly is whether the Amtrak Act or any other provision of law *creates a cause of action* whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it." *Id.,* at 456, 94 S.Ct., at 692 (emphasis added).[11]

After determining that there was no cause of action under the statute, the Court concluded: "Since we hold that no right of action exists, questions of standing and

jurisdiction become immaterial." *Id.,* at 465, n. 13, 94 S.Ct., at 696 n. 13.[12]

Thus, regardless of whether we characterize this issue in terms of "jurisdiction" or "causes of action," the Court clearly has the power to address the statutory question first. *Gwaltney* itself powerfully demonstrates this point. As noted, that case involved a statutory question virtually identical to the one presented here—whether the statute permitted citizens to sue for wholly past violations. While the Court framed the question as one of "jurisdiction," *supra,* at 1022, it could also be said that the case presented the question whether the plaintiffs had a "cause of action." Regardless of the label, the Court resolved the statutory question without pausing to consider whether the plaintiffs had standing **\*121** to sue for wholly past violations.[13] Of course, the fact that we did not discuss standing in *Gwaltney* does not establish that the plaintiffs had standing there. Nonetheless, it supports the proposition that—regardless of how the issue is characterized—the Court has the power to address the virtually identical statutory question in this case as well.

The Court disagrees, arguing that the standing question must be addressed first. Ironically, however, before "first" addressing standing, the Court takes a long excursion that entirely loses sight of the basic reason why standing is a matter of such importance to the proper functioning of the judicial process. The "gist of the question of standing" is whether plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for **\*\*1026** illumination of difficult constitutional questions."[14] The Court completely disregards this core purpose of standing in its discussion of "hypothetical jurisdiction." Not only is that portion of the Court's opinion pure dictum because it is entirely unnecessary to an explanation of the Court's decision; it is also not informed by any adversary submission by either party. Neither the topic of "hypothetical jurisdiction," nor any of the cases analyzed, distinguished, and criticized in Part III, was the subject of any comment in any of the briefs submitted by the parties or their *amici.* It therefore did not benefit from the "concrete adverseness" that the standing doctrine is meant to ensure. The discussion, in short, "comes **\*122** to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Ante,* at 1016; see also *Muskrat v. United States,* 219 U.S. 346, 362, 31 S.Ct. 250, 256, 55 L.Ed. 246 (1911) (stressing that Article III limits federal courts to "deciding cases or controversies arising between opposing parties").[15]

**\*123** The doctrine of "hypothetical jurisdiction" is

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

irrelevant because this case presents **\*\*1027** us with a choice between two threshold questions that are intricately interrelated—as there is only a standing problem if the statute confers jurisdiction over suits for wholly past violations. The Court's opinion reflects this fact, as its analysis of the standing issue is predicated on the hypothesis that § 326 may be read to confer jurisdiction over citizen suits for wholly past violations. If, as I think it should, the Court were to reject that hypothesis and construe § 326,[16] the standing discussion **\*124** would be entirely unnecessary. Thus, ironically, the Court is engaged in a version of the "hypothetical jurisdiction" that it has taken pains to condemn at some length.

## II

There is an important reason for addressing the statutory question first: to avoid unnecessarily passing on an undecided constitutional question. *New York Transit Authority v. Beazer,* 440 U.S. 568, 582–583, 99 S.Ct. 1355, 1364–1365, 59 L.Ed.2d 587 (1979); *Ashwander* v. *TVA,* 297 U.S. 288, 345–348, 56 S.Ct. 466, 482–484, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).[17] Whether correct or incorrect, the Court's constitutional holding represents a significant extension of prior case law.

The Court's conclusion that respondent does not have standing comes from a mechanistic application of the "redressability" aspect of our standing doctrine. "Redressability," of course, does not appear anywhere in the text of the Constitution. Instead, it is a judicial creation of the past 25 years, see *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 41–46, 96 S.Ct. 1917, 1924, 1925–1928, 48 L.Ed.2d 450 (1976); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617–618, 93 S.Ct. 1146, 1148–1149, 35 L.Ed.2d 536 (1973)—a judicial interpretation of the "Case" requirement of Article III, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–561, 112 S.Ct. 2130, 2135–2137, 119 L.Ed.2d 351 (1992).[18]

**\*125** In every previous case in which the Court has denied standing because of a lack of redressability, the plaintiff was challenging some governmental action or inaction. *Leeke v. Timmerman,* 454 U.S. 83, 85–87, 102 S.Ct. 69, 70–71, 70 L.Ed.2d 65 (1981) *(per curiam)* (suit against Director of the Department of Corrections and another prison official); *Simon,* 426 U.S., at 28, 96 S.Ct., at 1919–1920 (suit against the Secretary of the Treasury and the Commissioner of Internal Revenue); *Warth v. Seldin,* 422 U.S. 490, 493, 95 S.Ct. 2197, 2202, 45 L.Ed.2d 343 (1975) (suit against the town of Penfield and

members of Penfield's Zoning, Planning, and Town Boards); *Linda R.S.,* 410 U.S., at 615–616, 619, 93 S.Ct., at 1147–1148, 1149–1150 (suit against prosecutor); see also *Renne v. Geary,* 501 U.S. 312, 314, 111 S.Ct. 2331, 2335, 115 L.Ed.2d 288 (1991) (suit against the city and County of San Francisco, its board of supervisors, and other local officials).[19] **\*\*1028** None of these cases involved an attempt by one private party to impose a statutory sanction on another private party.[20]

In addition, in every other case in which this Court has held that there is no standing because of a lack of redressability, the injury to the plaintiff by the defendant was *indirect* (*e.g.,* dependent on the action of a third party). This is true in the two cases that the Court cites for the "redressability" prong, *ante,* at 1016; see also *Simon,* 426 U.S., at 40–46, 96 S.Ct., at 1925–1928 ("[T]he 'case or controversy' limitation of Art. III ... requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, **\*126** *and not injury that results from the independent action of some third party not before the court* " (emphasis added)); *Warth,* 422 U.S., at 504–508, 95 S.Ct., at 2207–2210 (stating that "the indirectness of the injury ... may make it substantially more difficult to meet the minimum requirement of Art. III," and holding that the injury at issue was too indirect to be redressable), as well as in every other case in which the Court denied standing because of a lack of redressability, *Leeke,* 454 U.S., at 86–87, 102 S.Ct., at 70–71 (injury indirect because it turned on the action of a prosecutor, a party not before the Court); *Linda R.S.,* 410 U.S., at 617–618, 93 S.Ct., at 1148–1149 (stating that "[t]he party who invokes [judicial] power must be able to show ... that he has sustained or is immediately in danger of sustaining some *direct* injury" (emphasis in original) (internal quotation marks omitted); injury indirect because it turned on the action of the father, a party not before the Court); see also 3 K. Davis & R. Pierce, Administrative Law Treatise 30 (3d ed.1994).[21] Thus, as far as I am aware, the Court has never held—until today—that a plaintiff who is *directly injured*[22] by a defendant lacks standing to sue because of a lack of redressability.[23]

**\*127** The Court acknowledges that respondent would have had standing if Congress had authorized some payment to respondent. *Ante,* at 1018 ("[T]he civil penalties authorized by the statute ... might be viewed as a sort of compensation or redress to respondent **\*\*1029** if they were payable to respondent"). Yet the Court fails to specify why payment to respondent—even if only a peppercorn—would redress respondent's injuries, while payment to the Treasury does not. Respondent clearly believes that the punishment of Steel Company, along

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

with future deterrence of Steel Company and others, redresses its injury, and there is no basis in our previous standing holdings to suggest otherwise.

When one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated. Thus, in some cases a tort is redressed by an award of punitive damages; even when such damages are payable to the sovereign, they provide a form of redress for the individual as well.

History supports the proposition that punishment or deterrence can redress an injury. In past centuries in England,[24] in the American Colonies, and in the United *128 States,[25] private persons regularly prosecuted criminal cases. The interest in punishing the defendant and deterring violations of law by the defendant and others was sufficient to support the "standing" of the private prosecutor even if the only remedy was the sentencing of the defendant to jail or to the gallows. Given this history, the Framers of Article III surely would have considered such proceedings to be "Cases" that would "redress" an injury even though the party bringing suit did not receive any monetary compensation.[26]

The Court's expanded interpretation of the redressability requirement has another consequence. Under EPCRA, *129 Congress gave enforcement power to state and local governments. 42 U.S.C. § 11046(a)(2). Under the Court's reasoning, however, state and local governments would not have standing to sue for past violations, as a payment to the Treasury would no more "redress" the injury of these governments than it would redress respondent's injury. This would be true *even if Congress explicitly granted state and local governments this power.* Such a conclusion is unprecedented.

It could be argued that the Court's decision is rooted in another separation-of-powers concern: that this citizen suit somehow interferes with the Executive's power to "take Care that the Laws be faithfully executed," Art. II, § 3. It is hard to see, however, how EPCRA's citizen-suit provision impinges on the power of the Executive. As an initial matter, this is not a case in which respondent merely possesses the " 'undifferentiated public interest' " in seeing EPCRA enforced. *Ante,* at 1018; see also **1030 *Lujan v. Defenders of Wildlife,* 504 U.S., at 577, 112 S.Ct., at 2145. Here, respondent—whose members live near Steel Company—has alleged a sufficiently particularized injury under our precedents. App. 5 (complaint alleges that respondent's members "reside, own property, engage in recreational activities, breathe

the air, and/or use areas near [Steel Company's] facility").

Moreover, under the Court's own reasoning, respondent would have had standing if Congress had authorized some payment to respondent. *Ante,* at 1018 ("[T]he civil penalties authorized by the statute ... might be viewed as a sort of compensation or redress to respondent if they were payable to respondent"). This conclusion is unexceptional given that respondent has a more particularized interest than a plaintiff in a *qui tam* suit, an action that is deeply rooted in our history. *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 541, n. 4, 63 S.Ct. 379, 383, n. 4, 87 L.Ed. 443 (1943) (" 'Statutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in *130 existence for hundreds of years in England, and in this country ever since the foundation of our Government' ") (quoting *Marvin v. Trout,* 199 U.S. 212, 225, 26 S.Ct. 31, 34–35, 50 L.Ed. 157 (1905)); *Adams v. Woods,* 2 Cranch 336, 341, 2 L.Ed. 297 (1805) (opinion of Marshall, C.J.) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt [*qui tam* ] as well as by information [by a public prosecutor]"); 3 W. Blackstone, Commentaries 160 (1768); Caminker, The Constitutionality of *Qui Tam* Actions, 99 Yale L.J. 341, 342, and n. 3 (1989) (describing *qui tam* actions authorized by First Congress); see also *Lujan v. Defenders of Wildlife,* 504 U.S., at 572–573, 112 S.Ct., at 2142–2143.

Yet it is unclear why the separation of powers question should turn on whether the plaintiff receives monetary compensation. In either instance, a private citizen is enforcing the law. If separation-of-powers does not preclude standing when Congress creates a legal right that authorizes compensation to the plaintiff, it is unclear why separation of powers should dictate a contrary result when Congress has created a legal right but has directed that payment be made to the Federal Treasury.

Indeed, in this case (assuming for present purposes that respondent correctly reads the statute) not only has Congress authorized standing, but the Executive Branch has also endorsed its interpretation of Article III. Brief for United States as *Amicus Curiae* 7–30. It is this Court's decision, not anything that Congress or the Executive has done, that encroaches on the domain of other branches of the Federal Government.[27]

*131 It is thus quite clear that the Court's holding today represents a significant new development in our constitutional jurisprudence. Moreover, it is equally clear that the Court has the power to answer the statutory question first. It is, therefore, not necessary to reject the

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

Court's resolution of the standing issue in order to conclude that it would be prudent to answer the question of statutory construction before announcing new constitutional doctrine.


## III

EPCRA's citizen-suit provision states, in relevant part:

> "[A]ny person may commence a civil action on his own behalf against ... [a]n owner or operator of a facility for failure to do **\*\*1031** any of the following: ... Complete and submit an inventory form under section 11022(a) of this title ... [or][c]omplete and submit a toxic chemical release form under section 11023(a) of this title." 42 U.S.C. §§ 11046(a)(1)(A)(iii)-(iv).

Unfortunately, this language is ambiguous. It could mean, as the Sixth Circuit has held, that a citizen only has the right to sue for a "failure ... to complete and submit" the required forms. Under this reading, once the owner or operator has filed the forms, the district court no longer has jurisdiction. *Atlantic States Legal Foundation v. United Musical,* 61 F.3d 473, 475 (1995). Alternatively, it could be, as the Seventh Circuit held, that the phrases "under section 11022(a)" and "under section 11023(a)" incorporate the requirements of those sections, including the requirement that the reports be filed by particular dates. 90 F.3d 1237, 1243 (1996).

**\*132** Although the language of the citizen-suit provision is ambiguous, other sections of EPCRA indicate that Congress did not intend to confer jurisdiction over citizen suits for wholly past violations. First, EPCRA requires the private litigant to give the alleged violator notice at least 60 days before bringing suit. 42 U.S.C. § 11046(d)(1).[28] In *Gwaltney,* we considered the import of a substantially identical notice requirement, and concluded that it indicated a congressional intent to allow suit only for ongoing and future violations:

> "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit. If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous. Indeed, respondents, in propounding their interpretation of the Act, can think of no reason for Congress to require such notice other than that 'it seemed right' to inform an alleged violator that it was about to be sued. Brief for Respondents 14."

484 U.S., at 60, 108 S.Ct., at 383.

Second, EPCRA places a ban on citizen suits once EPA has commenced an enforcement action. 42 U. S C. § 11046(e).[29] In *Gwaltney,* we considered a similar provision and concluded that it indicated a congressional intent to prohibit citizen suits for wholly past violations:

**\*133** "The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than supplant governmental action. ... Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit. This danger is best illustrated by an example. Suppose that the Administrator identified a violator of the Act and issued a compliance order .... Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive." 484 U.S., at 60–61, 108 S.Ct., at 383.

**\*\*1032** Finally, even if these two provisions did not resolve the issue, our settled policy of adopting acceptable constructions of statutory provisions in order to avoid the unnecessary adjudication of constitutional questions—here, the unresolved standing question—strongly supports a construction of the statute that does not authorize suits for wholly past violations. As we stated in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–1398, 99 L.Ed.2d 645 (1988): "This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. Schooner Charming Betsy,* 2 Cranch 64, 118 [2 L.Ed. 208] (1804), and has for so long been applied by this Court that it is beyond debate." See also **\*134** *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500–501, 99 S.Ct. 1313, 1318–1319, 59 L.Ed.2d 533 (1979); *Machinists v. Street,* 367 U.S. 740, 749–750, 81 S.Ct. 1784, 1789–1790, 6 L.Ed.2d 1141 (1961); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–297, 76 L.Ed. 598 (1932); *Lucas v. Alexander,* 279 U.S. 573, 577, 49 S.Ct. 426, 428, 73 L.Ed. 851 (1929); *Panama R. Co. v. Johnson,* 264 U.S. 375, 390, 44 S.Ct. 391, 395, 68 L.Ed. 748 (1924); *United States ex rel. Attorney General v. Delaware & Hudson*

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

*Co.,* 213 U.S. 366, 407–408, 29 S.Ct. 527, 535–536, 53 L.Ed. 836 (1909); *Parsons v. Bedford,* 3 Pet. 433, 448–449, 7 L.Ed. 732 (1830) (opinion of Story, J.).

## IV

For these reasons, I concur in the Court's judgment, but do not join its opinion.

Justice GINSBURG, concurring in the judgment.

Congress has authorized citizen suits to enforce the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11001 *et seq.* Does that authorization, as Congress designed it, permit citizen suits

for wholly past violations? For the reasons stated by Justice STEVENS in Part III of his opinion, I agree that the answer is "No." I would follow the path this Court marked in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 60–61, 108 S.Ct. 376, 382–383, 98 L.Ed.2d 306 (1987), and resist expounding or offering advice on the constitutionality of what Congress might have done, but did not do.

**All Citations**

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1   Our disposition makes it appropriate to address the approach taken by this substantial body of Court of Appeals precedent. The fact that Justice STEVENS' concurrence takes essentially the same approach makes his contention that this discussion is an "excursion," and "unnecessary to an explanation" of our decision, *post,* at 1025, 1026, particularly puzzling.

2   Justice STEVENS thinks it illogical that a merits question can be given priority over a statutory standing question (*National Railroad Passenger Corp.*) and a statutory standing question can be given priority over an Article III question (the cases discussed *post,* at 1022–1024), but a merits question cannot be given priority over an Article III question. See *post,* at 1025, n. 12. It seems to us no more illogical than many other "broken circles" that appear in life and the law: that Executive agreements may displace state law, for example, see *United States v. Belmont,* 301 U.S. 324, 330–331, 57 S.Ct. 758, 760–761, 81 L.Ed. 1134 (1937), and that unilateral Presidential action (renunciation) may displace Executive agreements, does not produce the "logical" conclusion that unilateral Presidential action may displace state law. The reasons for allowing merits questions to be decided before statutory standing questions do not support allowing merits questions to be decided before Article III questions. As *National Railroad Passenger Corp.* points out, the merits inquiry and the statutory standing inquiry often "overlap," 414 U.S., at 456, 94 S.Ct., at 692. The question whether *this* plaintiff has a cause of action under the statute, and the question whether *any* plaintiff has a cause of action under the statute are closely connected—indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two. The same cannot be said of the Article III requirement of remediable injury in fact, which (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon. Moreover, deciding whether any cause of action exists under a particular statute, rather than whether the particular plaintiff can sue, does not take the court into vast, uncharted realms of judicial opinion giving; whereas the proposition that the court can reach a merits question when there is no Article III jurisdiction opens the door to all sorts of "generalized grievances," *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974), that the Constitution leaves for resolution through the political process.

3   Justice STEVENS adds three cases to the list of those that might support "hypothetical jurisdiction." *Post,* at 1026, and n. 15. They are all inapposite. In *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), we declined to decide whether a federal court's pendent jurisdiction extended to state-law claims against a new party, because we agreed with the District Court's discretionary declination of pendent jurisdiction. *Id.,* at 715–716, 93 S.Ct., at 1798–1799. Thus, the case decided not a merits question before a jurisdictional question, but a discretionary jurisdictional question before a nondiscretionary jurisdictional question. Similarly in *Ellis v. Dyson,* 421 U.S. 426, 436, 95 S.Ct. 1691, 1696–1697, 44 L.Ed.2d 274 (1975), the "authoritative ground of decision" upon which the District Court

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

relied in lieu of determining whether there was a case or controversy was *Younger* abstention, which we have treated as jurisdictional. And finally, the issue pretermitted in *Neese v. Southern R. Co.,* 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (*per curiam*), was not Article III jurisdiction at all, but the substantive question whether the Seventh Amendment permits an appellate court to review the district court's denial of a Motion for New Trial on the ground that the verdict was excessive. We declined to consider that question because we agreed with the District Court's decision to deny the motion on the facts in the record. The more numerous the look-alike-but-inapposite cases Justice STEVENS cites, the more strikingly clear it becomes: His concurrence cannot identify a single opinion of ours deciding the merits before a disputed question of Article III jurisdiction.

4   Our opinion is not motivated, as Justice STEVENS suggests, by the more specific separation-of-powers concern that this citizen's suit "somehow interferes with the Executive's power to 'take Care that the Laws be faithfully executed,' Art. II, § 3," *post,* at 1029. The courts must stay within their constitutionally prescribed sphere of action, whether or not exceeding that sphere will harm one of the other two branches. This case calls for nothing more than a straightforward application of our standing jurisprudence, which, though it may sometimes have an impact on Presidential powers, derives from Article III and not Article II.

5   Contrary to Justice STEVENS' belief that redressability "is a judicial creation of the past 25 years," *post,* at 1027, the concept has been ingrained in our jurisprudence from the beginning. Although we have packaged the requirements of constitutional "case" or "controversy" somewhat differently in the past 25 years—an era rich in three-part tests—the point has always been the same: whether a plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U.S., at 508, 95 S.Ct., at 2210. For example, in *Marye v. Parsons,* 114 U.S. 325, 328–329, 5 S.Ct. 932, 933–934, 29 L.Ed. 205 (1885), we held that a bill in equity should have been dismissed because it was a clear case of "*damnum absque injuriâ.*" Although the complainant alleged a breach of contract by the State, the complainant "asks no relief as to that, for there is no remedy by suit to compel the State to pay its debts .... The bill as framed, therefore, calls for a declaration of an abstract character." Because courts do not "si[t] to determine questions of law *in thesi,*" we remanded with directions to dismiss the bill. *Id.,* at 328–330, 5 S.Ct., at 933–934.

   Also contrary to Justice STEVENS' unprecedented suggestion, *post,* at 1027, redressability—like the other prongs of the standing inquiry–does not depend on the defendant's status as a governmental entity. There is no conceivable reason why it should. If it is true, as Justice STEVENS claims, that all of the cases in which the Court has denied standing because of a lack of redressability happened to involve government action or inaction, that would be unsurprising. Suits that promise no concrete benefit to the plaintiff, and that are brought to have us "determine questions of law *in thesi,*" *Marye, supra,* at 330, 5 S.Ct., at 934, are most often inspired by the psychological smart of perceived official injustice, or by the government-policy preferences of political activists. But the principle of redressability has broader application than that.

6   EPCRA states that "any person may commence a civil action *on his own behalf* ...." 42 U.S.C. § 11046(a)(1) (emphasis added). "[P]erson" includes an association, see § 11049(7), so it is arguable that the statute permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members. Since it makes no difference to our disposition of the case, we assume without deciding that the interests of individual members may be the basis of suit.

7   Justice STEVENS claims that redressability was found lacking in our prior cases because the relief required action by a party not before the Court. *Post,* at 1028-1028. Even if that were so, it would not prove that redressability is lacking *only* when relief depends on the actions of a third party. But in any event, Justice STEVENS has overlooked decisions that destroy his premise. See *Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1666–1667, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 495–496, 94 S.Ct. 669, 675–676, 38 L.Ed.2d 674 (1974). He also seems to suggest that redressability always exists when the defendant has directly injured the plaintiff. If that were so, the redressability requirement would be entirely superfluous, since the causation requirement asks whether the injury is "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] resul[t] [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976).

8   Section 326(f) reads: "The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or the substantially prevailing party whenever the court determines such an award is appropriate." 42 U.S.C. § 11046(f).

9   Justice STEVENS contends, *post,* at 1027, n. 16, that this argument involves us in a construction of the statute, and thus belies our insistence that jurisdictional issues be resolved first. It involves us in a construction of the statute only to the extent of rejecting as frivolous the contention that costs incurred for respondent's own purposes, *not* in preparation for litigation (and hence sufficient to support Article III standing), are nonetheless "costs of litigation" under the statute. As we have described earlier, our cases make clear that frivolous claims are themselves a jurisdictional defect. See

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

*supra,* at 1010.

1   See also *Don't Waste Arizona, Inc. v. McLane Foods, Inc.,* 950 F.Supp. 972, 977–978 (D.Ariz.1997) ("[T]his Court has jurisdiction to hear this citizen suit brought pursuant to 42 U.S.C. § 11046(a) for a wholly past violation of the EPCRA"); *Delaware Valley Toxics Coalition v. Kurz–Hastings,* 813 F.Supp. 1132, 1141 (E.D.Pa.1993) ("This court concludes that 42 U.S.C. § 11046(a)(1) does provide the federal courts with jurisdiction for wholly past violations of the EPCRA"); *Atlantic States Legal Foundation v. Whiting Roll–Up Door Manufacturing Corp.,* 772 F.Supp. 745, 750 (W.D.N.Y.1991) ("The plain language of EPCRA's reporting, enforcement and civil penalty provisions, when logically viewed together, compel a conclusion that EPCRA confers federal jurisdiction over citizen lawsuits for past violations").

2   Brief for Petitioner 12 ("A statute conferring jurisdiction on the federal courts should ... be strictly construed, and any doubts resolved against jurisdiction. Here there are serious doubts that Congress intended citizens to sue for past EPCRA violations, and all citizen plaintiffs can highlight is a slight difference in language and attempt to stretch that difference into federal jurisdiction"); see also *id.,* at 26, 30.

3   Gwaltney contended that "because its last recorded violation occurred several weeks before respondents filed their complaint, the District Court lacked subject-matter jurisdiction over respondents' action." *Gwaltney,* 484 U.S., at 55, 108 S.Ct., at 380.

4   405 U.S., at 753–755, 92 S.Ct., at 1375–1376 (App. to opinion of Douglas, J., dissenting) (Extract from Oral Argument of the Solicitor General); Brief for Respondent in *Sierra Club v. Morton,* O.T.1970, No. 70–34, p. 18 ("The irreducible minimum requirement of standing reflects the constitutional limitation of judicial power to 'Cases' and 'Controversies'—'whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy" ... and whether the dispute touches upon the "legal relations of parties having adverse legal interests." ' *Flast v. Cohen,* 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)]"); see also Brief for County of Tulare as *Amicus Curiae* in *Sierra Club v. Morton,* O.T.1970, No. 70–34, pp. 13–14 ("This Court long ago held that to have standing ... a party must show he has sustained or is immediately in danger of sustaining some direct injury ... and not merely that he suffers in some indefinite way in common with people generally. This is an outgrowth of Article III of the Constitution which limits the jurisdiction of federal courts to cases and controversies. U.S. CONST. art III, § 2" (citation and internal quotation marks omitted)).

5   Brief for Petitioners in *Block v. Community Nutrition Institute,* O.T.1983, No. 83–458, pp. 32–50 (arguing that respondents failed to meet the injury-in-fact and redressability requirements of Article III); see also Brief for Respondents in *Block v. Community Nutrition Institute,* O.T.1983, No. 83–458, pp. 17–28; Reply Brief for Petitioners in *Block v. Community Nutrition Institute,* O.T.1983, No. 83–458, pp. 15–17.

6   As Justice Cardozo stated, " ' "cause of action" may mean one thing for one purpose and something different for another.' " *Davis v. Passman,* 442 U.S. 228, 237, 99 S.Ct. 2264, 2272, 60 L.Ed.2d 846 (1979) (quoting *United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 67–68, 53 S.Ct. 278, 280, 77 L.Ed. 619 (1933)). Under one meaning of the term, it is clear that citizens have a "cause of action" to sue under the statute. Under that meaning, "cause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Davis,* 442 U.S., at 240, and n. 18, 99 S.Ct., at 2274 and n. 18 (emphasis deleted); see also *id.,* at 239, 99 S.Ct., at 2274 ("The concept of a 'cause of action' is employed specifically to determine *who* may judicially enforce the statutory rights or obligations" (emphasis added)). Since EPCRA expressly gives citizens the right to sue, 42 U.S.C. § 11046(a)(1), there is no question that citizens are "member[s] of the class of litigants that may, as a matter of law, appropriately invoke the power of the court," *Davis,* 442 U.S., at 240, and n. 18, 99 S.Ct., at 2274 and n. 18.

7   "Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell,* 327 U.S., at 682, 66 S.Ct., at 776.

8   In *Bell,* a precursor to *Bivens v. Six Unknown Named Fed. Narcotics Agents,* 403 U.S.388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), petitioners brought suit in federal court "to recover damages in excess of $3,000 from ... agents of the Federal Bureau of Investigation" for allegedly violating their Fourth and Fifth Amendment rights. 327 U.S., at 679, 66 S.Ct., at 774. The question whether petitioners' injuries were redressable—"whether federal courts can grant money recovery for damages said to have been suffered as a result of federal officers violating the Fourth and Fifth Amendments"—was an open one, *id.,* at 684, 66 S.Ct., at 777 (which the Court did not decide until *Bivens,* 403 U.S., at 389, 91 S.Ct., at 2001). Nonetheless, even though it was unclear whether there was a remedy, the Court held that federal courts have jurisdiction to determine whether a cause of action exists. 327 U.S., at 685, 66 S.Ct., at 777–778.

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

9　The Court incorrectly states that I "used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability," *ante,* at 1013. The Court gives me too much credit. I have never understood any fundamental difference between arguing: (1) plaintiff's complaint does not allege a cause of action because the law does "not provide a remedy" for the plaintiff's injury; and (2) plaintiff's injury is "not redressable." In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 398, 99 S.Ct. 1171, 1175–1176, 59 L.Ed.2d 401 (1979), we stated that the absence of a remedy, *i.e.* the lack of redressability, was not the sort of jurisdictional issue that the Court raises on its own motion. That was the law when that case was decided, and it would still be the law today if the Court had not supplemented the standing analysis set forth in *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), with its current fascination with "redressability." What has changed is not the admittedly imperfect state of my understanding, but rather the state of the Court's standing doctrine.

10　Section 1337 states, in relevant part: "[D]istrict courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C. § 1337(a); see also *Potomac Passengers Assn. v. Chesapeake & Ohio R. Co.,* 475 F.2d 325, 339 (C.A.D.C.1973), rev'd on other grounds, *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

11　The Court distinguished this "threshold question" from respondent's claim "on the merits," *id.,* at 455, n. 3, 94 S.Ct., at 692, n. 3.

12　In insisting that the Article III standing question must be answered first, the Court finds itself in a logical dilemma. For if "A" (whether a cause of action exists) can be decided before "B" (whether there is statutory standing), *id.,* at 456, 465, n. 13, 94 S.Ct., at 692, 696, n. 13; and if "B" (whether there is statutory standing) can be decided before "C" (whether there is Article III standing), *e.g., Block v. Community Nutrition Institute,* 467 U.S. 340, 353, n. 4, 104 S.Ct. 2450, 2458, n. 4, 81 L.Ed.2d 270 (1984); then logic dictates that "A" (whether a cause of action exists) can be decided before "C" (whether there is Article III standing)—precisely the issue of this case.

13　In *Gwaltney,* in addition to answering the question whether the statute confers jurisdiction over citizen suits for wholly past violations, we considered whether the allegation of ongoing injury sufficed to support jurisdiction. The fact that we discussed "standing" in connection with that secondary issue, 484 U.S., at 65–66, 108 S.Ct., at 385–386, adds significance to the omission of even a passing reference to any standing issue in connection with the principal holding.

14　*Baker v. Carr,* 369 U.S., at 204, 82 S.Ct., at 703.

15　The Court boldly distinguishes away no fewer than five of our precedents. In each of these five cases, the Court avoided deciding a jurisdictional issue by assuming that jurisdiction existed for the purpose of that case. In *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976), for example, we stated:

> "It ... is evident that, whichever disposition we undertake, the effect is the same. It follows that there is no need to decide the theoretical question of jurisdiction in this case. In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party. See *Secretary of the Navy v. Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). The Court has done this even when the original reason for granting certiorari was to resolve the jurisdictional issue. See *United States v. Augenblick,* 393 U.S. 348, 349–352, 89 S.Ct. 528, 529–532, 21 L.Ed.2d 537 (1969) .... Making the assumption, then, without deciding, that our jurisdiction in this cause is established, we affirm the judgment in favor of the Secretary ...."

See also *Philbrook v. Glodgett,* 421 U.S. 707, 720–722, 95 S.Ct. 1893, 1901–1903, 44 L.Ed.2d 525 (1975) (opinion of REHNQUIST, J.) (declining to reach "subtle and complex" jurisdictional issue and assuming that jurisdiction existed); *Secretary of Navy v. Avrech,* 418 U.S. 676, 677–678, 94 S.Ct. 3039, 3039–3040, 41 L.Ed.2d 1033 (1974) *(per curiam)* ("[a]ssuming, *arguendo,* that the District Court had jurisdiction"; leaving "to a future case the resolution of the jurisdictional issue"); *Chandler v. Judicial Council of Tenth Circuit,* 398 U.S. 74, 89, 90 S.Ct. 1648, 1656, 26 L.Ed.2d 100 (1970) ("Whether the Council's action was administrative action not reviewable in this Court, or whether it is reviewable here, plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition"); *United States v. Augenblick,* 393 U.S. 348, 351–352, 89 S.Ct. 528, 531–532, 21 L.Ed.2d 537 (1969) (assuming, *arguendo,* that jurisdiction existed).

Moreover, in addition to the five cases that the Court distinguishes, there are other cases that support the notion that a court can assume jurisdiction. See, *e.g., Moor v. County of Alameda,* 411 U.S. 693, 715, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973) ("Whether there exists judicial power to hear the state law claims against the County is, in short, a subtle and complex question with far-reaching implications. But we do not consider it appropriate to resolve this

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

difficult issue in the present case, for we have concluded that even assuming, *arguendo,* the existence of power to hear the claim, the District Court [did not err]"); *Neese v. Southern R. Co.,* 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) *(per curiam)* ("We reverse the judgment of the Court of Appeals without reaching the constitutional challenge to that court's jurisdiction.... Even assuming such appellate power to exist ..., [the Court of Appeals erred]"); see also *Ellis v. Dyson,* 421 U.S. 426, 436, 95 S.Ct. 1691, 1697, 44 L.Ed.2d 274 (1975) (REHNQUIST, J., concurring) ("While it would have been more in keeping with conventional adjudication had [the District Court] first inquired as to the existence of a case or controversy, ... I cannot fault the District Court for disposing of the case on what it quite properly regarded at that time as an authoritative ground of decision. Indeed, this Court has on occasion followed essentially the same practice").

Because this case involves a choice between two threshold questions that are intricately interrelated, I do not take a position on the propriety of courts assuming jurisdiction. Nonetheless, I strongly disagree with the Court's decision to reach out and decide this question, especially in light of the fact that we have not had the benefit of briefing and argument. See *Philbrook,* 421 U.S., at 721, 95 S.Ct., at 1902 (opinion of REHNQUIST, J.) (declining to answer a "complex question of federal jurisdiction" because of "the absence of substantial aid from the briefs of either of the parties"); *Avrech,* 418 U.S., at 677, 94 S.Ct., at 3040 ("Without the benefit of further oral argument, we are unwilling to decide the difficult jurisdictional issue which the parties have briefed"); *ante,* at 1014 (noting that the *Avrech* Court "was unwilling to decide the jurisdictional question without oral argument" and emphasizing the importance of zealous advocacy to sharpen issues).

16 Indeed, the Court acknowledges—as it must—that the Court has the power to construe the statute, as it is impossible to resolve the standing issue without construing some provisions of EPCRA. Thus, in order to determine whether respondent's investigation and prosecution costs are sufficient to confer standing, the Court construes § 326(f) of EPCRA, which authorizes the district court to "award costs of litigation" to the prevailing party. *Ante,* at 1018–1019. Yet if § 326(f) were construed to cover the cost of the investigation that preceded the filing of respondent's complaint, even under the Court's reasoning respondent would have alleged a "redressable" injury and would have standing. See *ibid.*

17 There are two other reasons that counsel in favor of answering the statutory question first. First, it is the statutory question that has divided the courts of appeals and that we granted certiorari to resolve. See Pet. for Cert. i. Second, the meaning of the statute is a matter of general and national importance, whereas the Court's answer to the constitutional question depends largely on a construction of the allegations of this particular complaint, *ante,* at 1017 ("We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements").

18 In an attempt to demonstrate that redressability has always been a component of the standing doctrine, the Court cites our decision in *Marye v. Parsons,* 114 U.S. 325, 5 S.Ct. 932, 29 L.Ed. 205 (1885), a case in which neither the word "standing" nor the word "redressability" appears.

19 Although the Court discussed redressability, *Renne* did not in fact turn on that issue. While the Court stated that "[t]here is reason to doubt ... that the injury alleged ... can be redressed" by the relief sought, 501 U.S., at 319, 111 S.Ct., at 2337, it then went on to hold that the claims were nonjusticiable because "respondents have not demonstrated a live controversy ripe for resolution by the federal courts," *id.,* at 315, 320–324, 111 S.Ct., at 2338–2340.

20 This distinction is significant, as our standing doctrine is rooted in separation-of-powers concerns. *E.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573–578, 112 S.Ct. 2130, 2143–2148, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); see also *infra,* at 1029–1030.

21 "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action...." *Ex parte Lévitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937).

22 Assuming that EPCRA authorizes suits for wholly past violations, then Congress has created a legal right in having EPCRA reports filed on time. Although this is not a traditional injury:

"[W]e must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition .... Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before ...." *Lujan v. Defenders of Wildlife,* 504 U.S., at 580, 112 S.Ct., at 2146 (KENNEDY, J., concurring in part and concurring in judgment); see also *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373–374, 102 S.Ct. 1114, 1121–1122, 71 L.Ed.2d 214 (1982); *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975).

23 In another context, the Court has specified that there is a critical distinction between whether a defendant is directly or indirectly harmed. In *Lujan v. Defenders of Wildlife,* a case involving a challenge to Executive action, the Court stated:

"When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." 504 U.S., at 561–562, 112 S.Ct., at 2137 (emphasis in original).

24 "Several scholars have attempted to trace the historical origins of private prosecution in the United States. Without exception, these scholars have determined that the notion of private prosecutions originated in early common law England, where the legal system primarily relied upon the victim or the victim's relatives or friends to bring a criminal to justice. According to these historians, private prosecutions developed in England as a means of facilitating private vengeance." Bessler, The Public Interest and the Unconstitutionality of Private Prosecutors, 47 Ark.L.Rev. 511, 515 (1994) (footnotes omitted).

25 "American citizens continued to privately prosecute criminal cases in many locales during the nineteenth century. In Philadelphia, for example, all types of cases were privately prosecuted, with assault and battery prosecutions being the most common. However, domestic disputes short of assault also came before the court. Thus, 'parents of young women prosecuted men for seduction; husbands prosecuted their wives' paramours for adultery; wives prosecuted their husbands for desertion.' Although many state courts continued to sanction the practice of private prosecutions without significant scrutiny during the nineteenth century, a few state courts outlawed the practice." *Id.,* at 518-519 (footnotes omitted); A. Steinberg, The Transformation of Criminal Justice: Philadelphia, 1800–1880, p. 5 (1989) ("Private prosecution and the minor judiciary were firmly rooted in Philadelphia's colonial past. Both were examples of the creative American adaptation of the English common law. By the 17th century, private prosecution was a fundamental part of English common law"); see also F. Goodnow, Principles of the Administrative Law of the United States 412–413 (1905).

26 When such a party obtains a judgment that imposes sanctions on the wrongdoer, it is proper to presume that the wrongdoer will be less likely to repeat the injurious conduct that prompted the litigation. The lessening of the risk of future harm is a concrete benefit.

27 Ironically, although the Court insists that the standing question must be answered first, it relies on the merits when it answers the standing question. Proof that Steel Company repeatedly violated the law by failing to file EPCRA reports for eight years should suffice to establish the District Court's power to impose sanctions, or at least to decide what sanction, if any, is appropriate. Evidence that Steel Company was ignorant of the law and has taken steps to avoid future violations is highly relevant to the merits of the question whether any remedy is necessary, but surely does not deprive the District Court of the power to decide the remedy issue. Cf. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts").

28 "No action may be commenced under subsection (a)(1)(A) of this section prior to 60 days after the plaintiff has given notice of the alleged violation to the Administrator, the State in which the alleged violation occurs, and the alleged violator. Notice under this paragraph shall be given in such manner as the Administrator shall prescribe by regulation."

29 "No action may be commenced under subsection (a) of this section against an owner or operator of a facility if the Administrator has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty under this Act with respect to the violation of the requirement."

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

**Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)**

118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434...

398 Fed.Appx. 830
This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Andreas SURYANTO, Petitioner
v.
ATTORNEY GENERAL OF the UNITED STATES, Respondent.

Nos. 06–1424, 08–4342. | Submitted Under Third CircuitLAR 34.1(a) Oct. 19, 2010. | Filed: Oct. 22, 2010.

Synopsis
**Background:** Alien petitioned for review of orders of Board of Immigration Appeals (BIA) denying application for asylum, withholding of removal, and relief under Convention Against Torture and denying motion to reopen.

**Holding:** The Court of Appeals, Hardiman, Circuit Judge, held that the alien did not have a due process property or liberty interest in adjustment of his immigration status.

Petitions denied.

West Headnotes (1)

[1]     **Aliens, Immigration, and Citizenship**
         Adjustment of status
         **Constitutional Law**
         Admission and exclusion; deportation

         The alien did not have a due process property or liberty interest in adjustment of his immigration status, since the decision whether to adjust an alien's status was entrusted to the discretion of the Attorney General. U.S.C.A. Const.Amend.

5; Immigration and Nationality Act, § 245(a), 8 U.S.C.A. § 1255(a).

3 Cases that cite this headnote

**\*831** On Petition for Review from an Order of the Board of Immigration Appeals (Board No. A95–846–410), Immigration Judge: Donald Vincent Ferlise.

**Attorneys and Law Firms**

Bruce C. Wong, Esq., Duxford Law Group, San Francisco, CA, for Petitioner.

Annetta Foster Givhan, Esq., Office of United States Attorney, Philadelphia, PA, Thomas W. Hussey, Esq., Thankful T. Vanderstar, Esq., United States Department of Justice, Washington, DC, for Respondent.

Before: HARDIMAN, GREENAWAY, JR., and NYGAARD, Circuit Judges.

**OPINION OF THE COURT**

HARDIMAN, Circuit Judge.

**\*\*1** In these consolidated appeals, Andreas Suryanto petitions for review of two orders of the Board of Immigration Appeals (BIA). We will deny both petitions.

**I.**

Because we write for the parties, we state only the facts and procedural history necessary to our decision. Suryanto is an Indonesian Chinese Christian who was placed in removal proceedings after overstaying his visa. He conceded removability, but applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), arguing that he faced religious and ethnic persecution in Indonesia. After a hearing on the merits, the Immigration Judge (IJ) issued an oral decision denying Suryanto relief and granting his

**Tab E-16**

request for voluntary departure. The Board of Immigration Appeals (BIA) summarily affirmed the IJ's order. Following the BIA's decision, Suryanto incorrectly filed a petition for review in the Ninth Circuit, which transferred the case here. After his case was transferred, Suryanto married a United States citizen, and we held his appeal in abeyance pending adjudication of his I–130 application. Following approval of his I–130 application, Suryanto filed a motion with the BIA to reopen and remand his case. The BIA denied this petition, and Suryanto filed a second petition for review.

### A.

Suryanto argues that he is entitled to relief because he has suffered persecution in Indonesia as a result of his Chinese ethnicity and Christian faith, and because he fears future persecution if he is forced to return. At his removal hearing, Suryanto recounted incidents of harassment and violence to support his claim. While a student in primary school, children frequently demanded money from Suryanto, and on ten or more occasions he was physically assaulted, although sometimes the attack was limited to a slap or a push. Suryanto testified that he was targeted for these attacks because "they assume that every Chinese has money." Tr. 25.

Suryanto described two specific incidents of violence in greater detail. First, in 1990 he and a friend were beaten by seven or eight peers after rebuffing their demand for money. Second, about a year later, two older teenage boys accosted Suryanto and choked him until he "couldn't breathe." *Id.* at 30. Suryanto believed he was targeted both times because of his Chinese ethnicity.

Suryanto also related instances of violence and harassment directed toward his family. For example, Suryanto's father opened an electronics store in the late 1980s and gang members demanded protection money from him. Suryanto's father initially refused to pay, and the gang members beat him and his employees. Suryanto claimed that these incidents "only happen[ed] in the Chinese [stores]," and were thus likely motivated by ethnic animus. *Id.* at 41. In May 1998, during the widespread anti-government riots in **\*832** Indonesia, Suryanto's father's electronics store was burned down and his family was forced to hide in their home for a period of three days.

**\*\*2** In addition to this ethnically-motivated harassment, Suryanto described two religiously-motivated attacks that he experienced. On December 24, 2000, during a Christmas service at Suryanto's church in Jakarta, a bomb exploded in the parking lot. A few minutes later, after he had gone out to see what had happened, a second bomb exploded inside the church, causing several injuries, some of them serious. In January 2001, as Suryanto and other young members of the congregation were returning home from cleaning the church, they were again accosted. When Suryanto refused to turn over his money, he was beaten and warned: "don't even try to repair or rebuild that church." *Id.* at 53.

Soon after this incident, Suryanto left for Singapore at his mother's behest. After two months, however, he returned to Indonesia because Singapore was too "busy" and because it was "very difficult to find a job." *Id.* at 22. Five months later, in September 2001, Suryanto came to the United States.

In addition to his claims of past persecution, Suryanto testified that he fears future persecution because of ongoing hostility toward ethnic Chinese Christians in Indonesia.

### B.

Although Suryanto had "basically been a credible witness," the IJ found that Suryanto did not suffer past persecution. IJ Opinion 8. The IJ concluded that Suryanto's run-ins with children seeking money were a result of his "refus[al] to give individuals money. Not because he was Chinese." *Id.* at 9. The IJ also held that the bombing of Suryanto's church was not an "act of persecution," but rather "an isolated act of aggression and terrorism." *Id.* This finding was buttressed by the fact that "[t]here were no problems before or subsequent to that incident at that church." *Id.* The IJ also noted that the attack made on Suryanto during his return from cleaning the church did not constitute religious persecution because it did not impair his freedom of worship. Finally, the IJ concluded that Suryanto did not "truly ... fear for his life" in Indonesia, as evidenced by his prompt return from Singapore. *Id.* at 4. The IJ found that had Suryanto truly feared for his life, he would have remained in Singapore "notwithstanding the fact that ... life is very busy and hectic there, and notwithstanding the fact that he did not have a job at that time." *Id.* at 5.

Alternatively, the IJ held that Suryanto "could obviously avoid any future persecution by relocating to another section of his country...." *Id.* at 11. Suryanto conceded that he "has had no problems as an adult" in the province where his parents reside, and that his family is free to

practice religion there. *Id.*

### C.

Suryanto petitioned for review of the IJ's decision and the BIA affirmed without opinion. Because Suryanto improperly sought review of the BIA decision in the Court of Appeals for the Ninth Circuit, the case was transferred here on January 25, 2006.[1]

**\*833 \*\*3** On May 25, 2007, Suryanto married a United States citizen. He then moved the BIA to reopen his case, so we held his petition in abeyance pending further action by the BIA. After the BIA denied his motion, Suryanto filed a second petition for review, claiming a due process deprivation. We consolidated both petitions.

### II.

### A.

Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision. *Zhang v. Gonzales,* 405 F.3d 150, 155 (3d Cir.2005). We review the IJ's factual determinations under the substantial evidence standard, which requires us to defer to the IJ's findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We review the BIA's denial of the motion to reopen for an abuse of discretion. *Borges v. Gonzales,* 402 F.3d 398, 404 (3d Cir.2005).

### B.

An alien is eligible for asylum, pursuant to 8 U.S.C. § 1158(b)(1)(A), if he qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A), that is, if he "is unable or unwilling to return to" the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." The applicant bears the burden of showing that he qualifies as a refugee, *see Guo v. Ashcroft,* 386 F.3d 556, 561 (3d Cir.2004), and he "must establish that race, religion, nationality, membership in a particular social

group, or political opinion was or will be at least one central reason for [his] persecut[ion]." 8 U.S.C. § 1158(b)(1)(B)(i). "Persecution" is defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Lie v. Ashcroft,* 396 F.3d 530, 536 (3d Cir.2005) (quoting *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993)). A "well-founded fear of persecution" must be both genuinely held by the petitioner and objectively reasonable. *Id.* An alien may establish a presumption that a well-founded fear exists by demonstrating that he suffered persecution in the past. 8 C.F.R. § 208.13(b)(1).

After careful review of the record, we are unable to conclude that any reasonable factfinder would have been compelled to disagree with the IJ. In *Lie v. Ashcroft*—another case involving an ethnically Chinese Christian from Indonesia—we stated that "[s]imple robbery, in isolation, while unfortunate and troubling, does not seem to meet th[e] stringent standard" required to establish persecution under the statute. 396 F.3d at 536. The same conclusion applies here: although the robberies Suryanto suffered were terrible, a reasonable factfinder would not be compelled to conclude that they were severe enough to constitute persecution under the statute. Likewise, a reasonable factfinder would not be compelled to conclude that the bombing of Suryanto's church and the subsequent warning constituted persecution.

**\*\*4** Moreover, there is insufficient evidence to compel a reasonable factfinder to conclude that the robberies were motivated by Suryanto's race, as opposed to his perceived wealth. In *Lie,* the robbers referred to the petitioner as a "Chinese pig," but we agreed with the BIA that "a single ethnic slur was insufficient to establish that the thieves were motivated by Lie's or her husband's ethnicity." *Id.* at 535 (internal quotation marks omitted). Similarly, although Suryanto has offered some evidence supporting his contention that the harassment he suffered was a result of ethnic animus, the majority of his testimony **\*834** supports the IJ's conclusion that financial gain was the motivating force.

Furthermore, a reasonable factfinder could conclude (as the IJ did) that Suryanto does not subjectively hold a well-founded fear of persecution based on his voluntary return to Indonesia from Singapore.

For all the foregoing reasons, we will affirm the IJ's conclusion that Suryanto is not eligible for asylum, which also dooms his claim for withholding of removal. *See Kibinda v. Att'y Gen.,* 477 F.3d 113, 123 (3d Cir.2007).

## III.

Suryanto next claims the BIA's denial of his motion to reopen following his marriage deprived him of due process of law. We review this claim *de novo.*

We find no constitutional infirmity in the BIA's action. "[A] cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." *Mudric v. Att'y Gen.,* 469 F.3d 94, 98 (3d Cir.2006). Here, Suryanto seeks reopening to vindicate his supposed interest in adjusting his immigration status. Ordinarily, the Attorney General has discretion to adjust an alien's status.[2] *See* 8 U.S.C. § 1255(a); *Mudric,* 469 F.3d at 98–99. When the decision to grant or withhold a benefit is entrusted to the discretion of a government actor, one has no constitutional property interest in obtaining that relief. *Conn. Bd. of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). Accordingly, Suryanto does not have a sufficient property or liberty interest in the adjustment of his status to qualify for due

process protection. *Mudric,* 469 F.3d at 99 ("No constitutional injury occurred from the INS delays in this case because Mudric simply had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived...."). Suryanto's due process claim therefore must fail.

## IV.

For the foregoing reasons, we will deny both of Suryanto's petitions for review.

**All Citations**

398 Fed.Appx. 830, 2010 WL 4146155

Footnotes

1    The Government claims we lack jurisdiction, citing the requirement of 8 U.S.C. § 1252(b)(1) that a "petition for review [of an order of removal] must be filed not later than 30 days after the date of the final order." Suryanto did, however, file his petition within the requisite timeframe; he simply filed it in the wrong venue. *See id.* § 1252(b)(2). Because the venue requirement is nonjurisdictional, *Bonhometre v. Gonzales,* 414 F.3d 442, 446 n. 5 (3d Cir.2005), we reject the Government's argument in this regard.

2    In the instant case it appears that the Attorney General may have been statutorily required to deny adjustment because Suryanto failed to voluntarily depart within the timeline set by the IJ. *See* 8 U.S.C. § 1229a(b)(7) (an alien who fails to voluntarily depart is ineligible for relief under § 1255, governing adjustment of status, for 10 years). Because we find that Suryanto does not have a viable due process claim, however, there is no need for us to address this issue.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Robinson v. Lioi, 4th Cir.(Md.), July 30, 2013
125 S.Ct. 2796
**Supreme Court of the United States**

TOWN OF CASTLE ROCK, COLORADO,
Petitioner,
v.
Jessica GONZALES, individually and as next best
friend of her deceased minor children, Rebecca
Gonzales, Katheryn Gonzales, and Leslie Gonzales.

No. 04–278. | Argued March 21, 2005. | Decided
June 27, 2005.

**Synopsis**
**Background:** Wife brought civil rights action against
municipality and police officers based on officers' refusal
to enforce domestic abuse restraining order against
husband. The United States District Court for the District
of Colorado, Wiley Daniel, J., dismissed the action for
failure to state a claim. The Tenth Circuit Court of
Appeals, 307 F.3d 1258, reversed. Upon rehearing en
banc, the Tenth Circuit Court of Appeals, Seymour,
Circuit Judge, 366 F.3d 1093, reversed the District
Court's decision and remanded.

**Holdings:** Following grant of certiorari, the United States
Supreme Court, Justice Scalia held that:

[1] Supreme Court would not defer to the Tenth Circuit
Court of Appeals' determination that Colorado law gave
wife a right to have police enforce restraining order;

[2] Colorado law did not create personal entitlement to
police enforcement of restraining orders; and

[3] wife did not have protected property interest in police
enforcement of restraining order.

Reversed.

Justice Souter filed concurring opinion, in which Justice
Breyer joined.

Justice Stevens filed dissenting opinion, in which Justice
Ginsburg joined.

West Headnotes (12)

**[1]** **Constitutional Law**
⚷Rights, Interests, Benefits, or Privileges
Involved in General

The procedural component of the Due Process
Clause does not protect everything that might be
described as a benefit. U.S.C.A. Const.Amend.
14.

31 Cases that cite this headnote

**[2]** **Constitutional Law**
⚷Benefits, rights and interests in

To have a protected property interest in a
benefit, for due process purposes, a person must
have more than an abstract need or desire and
more than a unilateral expectation of it.
U.S.C.A. Const.Amend. 14.

101 Cases that cite this headnote

**[3]** **Constitutional Law**
⚷Benefits, rights and interests in

To have a protected property interest in a
benefit, for due process purposes, a person must
have a legitimate claim of entitlement to it.
U.S.C.A. Const.Amend. 14.

168 Cases that cite this headnote

**[4]** **Constitutional Law**
⚷Source of right or interest

Property interests, in the due process context,
are created and their dimensions are defined by

**Tab E-17**

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

existing rules or understandings that stem from an independent source such as state law. U.S.C.A. Const.Amend. 14.

100 Cases that cite this headnote

**[5]** **Constitutional Law**
🗝Rights, Interests, Benefits, or Privileges Involved in General

A benefit is not a protected entitlement, for due process purposes, if government officials may grant or deny it in their discretion. U.S.C.A. Const.Amend. 14.

154 Cases that cite this headnote

**[6]** **Constitutional Law**
🗝Source of right or interest

Although the underlying substantive interest in property is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause. U.S.C.A. Const.Amend. 14.

157 Cases that cite this headnote

**[7]** **Federal Courts**
🗝Scope and Extent of Review

The Supreme Court would not defer to the Tenth Circuit Court of Appeals' determination that Colorado law gave wife a right to have police enforce a domestic abuse restraining order against her husband, for purpose of determining ultimate question of whether wife had protected property interest in police enforcement, in wife's civil rights action against police and municipality, arising from failure to enforce order; the Court of Appeals' opinion did not draw upon state-specific case law or expertise,

but instead relied upon language that appeared in many state restraining law statutes. U.S.C.A. Const.Amend. 14; West's C.R.S.A. § 18–6–803.5(3)(a, b).

35 Cases that cite this headnote

**[8]** **Constitutional Law**
🗝Orders for protection
**Municipal Corporations**
🗝Injuries by Mobs or Other Wrongdoers

Colorado law did not create a personal entitlement to police enforcement of domestic abuse restraining orders, for purpose of determining whether wife had protected property interest in police enforcement of restraining order against husband, in civil rights action against police and municipality, arising from failure to enforce it; although restraining order statute provided that police "shall use" every reasonable means to enforce a restraining order, tradition of police discretion coexisted with similar mandatory arrest provisions, enforcement was not always possible or practical, statute provided for alternative to immediate enforcement, which was the seeking of an arrest warrant, an entitlement to procedure only, and although statute provided for a protected person's direct power to initiate contempt proceedings against restrained person if order was violated, it did not expressly give protected person a right to request or demand an arrest. U.S.C.A. Const.Amend. 14; West's C.R.S.A. §§ 18–6–803.5(3)(a, b), 18–6–803.6(1).

118 Cases that cite this headnote

**[9]** **Constitutional Law**
🗝Rights, Interests, Benefits, or Privileges Involved in General

A person cannot safely be deemed "entitled" to something, for purpose of determining whether person has protected due process interest, when the identity of the alleged entitlement is vague.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

U.S.C.A. Const.Amend. 14.

10 Cases that cite this headnote

**[10]    Constitutional Law**
 Orders for protection
**Municipal Corporations**
 Injuries by Mobs or Other Wrongdoers

Wife did not have protected property interest in police enforcement of restraining order, issued pursuant to Colorado law, against her husband, and thus, she could not prevail in civil rights action against police and municipality for an alleged due process violation, arising from failure to enforce it; even assuming that Colorado law created an entitlement to police enforcement of the restraining order, it was an indirect benefit, rather than a direct benefit. U.S.C.A. Const.Amend. 14; West's C.R.S.A. § 18–6–803.5(3)(a, b).

63 Cases that cite this headnote

**[11]    Constitutional Law**
 Protections Provided and Deprivations Prohibited in General

An indirect and incidental result of the government's enforcement action does not amount to a deprivation of any interest in life, liberty, or property, for due process purposes. U.S.C.A. Const.Amend. 14.

24 Cases that cite this headnote

**[12]    Constitutional Law**
 Investigative activity in general

A state-law created benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its substantive manifestations.

U.S.C.A. Const.Amend. 14.

79 Cases that cite this headnote

**\*\*2798 \*748** *Syllabus*[*]

Respondent filed this suit under 42 U.S.C. § 1983 alleging that petitioner violated the Fourteenth Amendment's Due Process Clause when its police officers, acting pursuant to official policy or custom, failed to respond to her repeated reports over several hours that her estranged husband had taken their three children in violation of her restraining order against him. Ultimately, the husband murdered the children. The District Court granted the town's motion to dismiss, but an en banc majority of the Tenth Circuit reversed, finding that respondent had alleged a cognizable procedural due process claim because a Colorado statute established the state legislature's clear intent to require police to enforce restraining orders, and thus its intent that the order's recipient have an entitlement to its enforcement. The court therefore ruled, among other things, that respondent had a protected property interest in the enforcement of her restraining order.

*Held:* Respondent did not, for Due Process Clause purposes, have a property interest in police enforcement of the restraining order against her husband. Pp. 2802–2810.

(a) The Due Process Clause's procedural component does not protect everything **\*\*2799** that might be described as a government "benefit": "To have a property interest in a benefit, a person ... must ... have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. Such entitlements are created by existing rules or understandings stemming from an independent source such as state law. *E.g., ibid.* Pp. 2802–2803.

(b) A benefit is not a protected entitlement if officials have discretion to grant or deny it. See, *e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462–463, 109 S.Ct. 1904, 104 L.Ed.2d 506. It is inappropriate here to defer to the Tenth Circuit's determination that Colorado law gave respondent a right to police enforcement of the restraining order. This Court therefore proceeds to its own analysis. Pp. 2803–2804.

(c) Colorado law has not created a personal entitlement to enforcement of restraining orders. It does not appear that state law truly made such enforcement *mandatory.* A well-established tradition of police discretion **\*749** has

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

long coexisted with apparently mandatory arrest statutes. Cf. *Chicago v. Morales,* 527 U.S. 41, 47, n. 2, 62, n. 32, 119 S.Ct. 1849, 144 L.Ed.2d 67. Against that backdrop, a true mandate of police action would require some stronger indication than the Colorado statute's direction to "use every reasonable means to enforce a restraining order" or even to "arrest ... or ... seek a warrant." A Colorado officer would likely have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the violation's circumstances or competing duties counsel decisively against enforcement in a particular instance. The practical necessity for discretion is particularly apparent in a case such as this, where the suspected violator is not actually present and his whereabouts are unknown. In such circumstances, the statute does not appear to require officers to arrest but only to seek a warrant. That, however, would be an entitlement to nothing but procedure, which cannot be the basis for a property interest. Pp. 2804–2808.

(d) Even if the statute could be said to make enforcement "mandatory," that would not necessarily mean that respondent has an entitlement to enforcement. Her alleged interest stems not from common law or contract, but only from a State's *statutory* scheme. If she was given a statutory entitlement, the Court would expect to see some indication of that in the statute itself. Although the statute spoke of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. Most importantly, it spoke directly to the protected person's power to "initiate" contempt proceedings if the order was issued in a civil action, which contrasts tellingly with its conferral of a power merely to "request" initiation of criminal contempt proceedings—and even more dramatically with its complete silence about any power to "request" (much less demand) that an arrest be made. Pp. 2808–2809.

(e) Even were the Court to think otherwise about Colorado's creation of an entitlement, it is not clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for due process purposes. Such a right would have no ascertainable monetary value and would arise incidentally, not out of some new species of government benefit or service, but out of a function that government actors have always performed—arresting people when they have probable cause. A benefit's indirect nature was fatal to a due process claim in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 787, 100 S.Ct. 2467, 65 L.Ed.2d 506. Here, **\*\*2800** as there, "[t]he simple distinction between government action that directly affects a citizen's legal rights ... and action that is directed against a third party and affects the citizen only ...

incidentally, provides **\*750** a sufficient answer to" cases finding government-provided services to be entitlements. *Id.,* at 788, 100 S.Ct. 2467. Pp. 2809–2810.

366 F.3d 1093, reversed.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which BREYER, J., joined, *post,* p. 2811. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post,* p. 2813.

**Attorneys and Law Firms**

John P. Elwood, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Thomas S. Rice, Eric M. Ziporin, Counsel of Record, Senter, Goldfarb & Rice, L.L.C., Denver, Colorado, John C. Eastman, c/o Chapman University School of Law, Orange, CA, Erik S. Jaffe, Erik S. Jaffe, P.C., Washington, D.C., Counsel for Petitioners.

Brian J. Reichel, Counsel of Record, Law Office of Brian J. Reichel, Broomfield, CO, David T. Odom, Odom & Associates, P.C., Naperville, IL, Counsel for Respondent.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

We decide in this case whether an individual who has obtained a state-law restraining order has a constitutionally **\*751** protected property interest in having the police enforce the restraining order when they have probable cause to believe it has been violated.

**I**

The horrible facts of this case are contained in the complaint that respondent Jessica Gonzales filed in Federal District Court. (Because the case comes to us on appeal from a dismissal of the complaint, we assume its allegations are true. See *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).) Respondent alleges that petitioner, the town of Castle Rock, Colorado, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution when its police officers, acting pursuant to

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

official policy or custom, failed to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order.[1]

The restraining order had been issued by a state trial court several weeks earlier in conjunction with respondent's divorce proceedings. The original form order, issued on May 21, 1999, and served on respondent's husband on June 4, 1999, commanded him not to "molest or disturb the **2801 peace of [respondent] or of any child," and to remain at least 100 yards from the family home at all times. 366 F.3d 1093, 1143 (C.A.10 2004) (en banc) (appendix to dissenting opinion of O'Brien, J.). The bottom of the preprinted form noted that the reverse side contained "IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS." *Ibid.* (emphasis deleted). The preprinted *752 text on the back of the form included the following **"WARNING"**:

"**A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME** .... A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. **YOU MAY BE ARRESTED** WITHOUT NOTICE IF A LAW ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER." *Id.,* at 1144 (emphasis in original).

The preprinted text on the back of the form also included a **"NOTICE TO LAW ENFORCEMENT OFFICIALS,"** which read in part:

"YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER." *Ibid.* (same).

On June 4, 1999, the state trial court modified the terms of the restraining order and made it permanent. The modified order gave respondent's husband the right to spend time with his three daughters (ages 10, 9, and 7) on alternate weekends, for two weeks during the summer, and, " 'upon reasonable notice,' " for a midweek dinner visit " 'arranged by the parties' "; the modified order also allowed him to visit *753 the home to collect the children for such "parenting time." *Id.,* at 1097 (majority opinion).

According to the complaint, at about 5 or 5:30 p.m. on Tuesday, June 22, 1999, respondent's husband took the three daughters while they were playing outside the family home. No advance arrangements had been made for him to see the daughters that evening. When respondent noticed the children were missing, she suspected her husband had taken them. At about 7:30 p.m., she called the Castle Rock Police Department, which dispatched two officers. The complaint continues: "When [the officers] arrived ..., she showed them a copy of the TRO and requested that it be enforced and the three children be returned to her immediately. [The officers] stated that there was nothing they could do about the TRO and suggested that [respondent] call the Police Department again if the three children did not return home by 10:00 p.m." App. to Pet. for Cert. 126a.[2]

At approximately 8:30 p.m., respondent talked to her husband on his cellular telephone. He told her "he had the three children [at an] amusement park in Denver." *Ibid.* She called the police again and **2802 asked them to "have someone check for" her husband or his vehicle at the amusement park and "put out an [all points bulletin]" for her husband, but the officer with whom she spoke "refused to do so," again telling her to "wait until 10:00 p.m. and see if" her husband returned the girls. *Id.,* at 126a–127a.

At approximately 10:10 p.m., respondent called the police and said her children were still missing, but she was now told to wait until midnight. She called at midnight and told the dispatcher her children were still missing. She went to her husband's apartment and, finding nobody there, called the police at 12:10 a.m.; she was told to wait for an officer to arrive. When none came, she went to the police station at *754 12:50 a.m. and submitted an incident report. The officer who took the report "made no reasonable effort to enforce the TRO or locate the three children. Instead, he went to dinner." *Id.,* at 127a.

At approximately 3:20 a.m., respondent's husband arrived at the police station and opened fire with a semiautomatic handgun he had purchased earlier that evening. Police shot back, killing him. Inside the cab of his pickup truck, they found the bodies of all three daughters, whom he had already murdered. *Ibid.*

On the basis of the foregoing factual allegations, respondent brought an action under Rev. Stat. § 1979, 42 U.S.C. § 1983, claiming that the town violated the Due

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

Process Clause because its police department had "an official policy or custom of failing to respond properly to complaints of restraining order violations" and "tolerate[d] the non-enforcement of restraining orders by its police officers." App. to Pet. for Cert. 129a.[3] The complaint also alleged that the town's actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" respondent's civil rights. *Ibid.*

Before answering the complaint, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion, concluding that, whether construed as making a substantive due process or procedural due process claim, respondent's complaint failed to state a claim upon which relief could be granted.

A panel of the Court of Appeals affirmed the rejection of a substantive due process claim, but found that respondent had alleged a cognizable procedural due process claim. 307 F.3d 1258 (C.A.10 2002). On rehearing en banc, a divided **\*755** court reached the same disposition, concluding that respondent had a "protected property interest in the enforcement of the terms of her restraining order" and that the town had deprived her of due process because "the police never 'heard' nor seriously entertained her request to enforce and protect her interests in the restraining order." 366 F.3d, at 1101, 1117. We granted certiorari. 543 U.S. 955, 125 S.Ct. 417, 160 L.Ed.2d 316 (2004).

## II

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." Amdt. 14, § 1. In 42 U.S.C. § 1983, Congress has created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the **\*\*2803** Constitution and laws." Respondent claims the benefit of this provision on the ground that she had a property interest in police enforcement of the restraining order against her husband; and that the town deprived her of this property without due process by having a policy that tolerated nonenforcement of restraining orders.

As the Court of Appeals recognized, we left a similar question unanswered in *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), another case with "undeniably tragic" facts: Local child-protection officials had failed to

protect a young boy from beatings by his father that left him severely brain damaged. *Id.,* at 191–193, 109 S.Ct. 998. We held that the so-called "substantive" component of the Due Process Clause does not "requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.,* at 195, 109 S.Ct. 998. We noted, however, that the petitioner had not properly preserved the argument that—and we thus "decline[d] to consider" whether—state "child protection statutes gave [him] an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection." *Id.,* at 195, n. 2, 109 S.Ct. 998.

[1] [2] [3] [4] **\*756** The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit": "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Such entitlements are, " 'of course, ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (quoting *Roth, supra,* at 577, 92 S.Ct. 2701); see also *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

## A

[5] Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. See, *e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462–463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Court of Appeals in this case determined that Colorado law created an entitlement to enforcement of the restraining order because the "court-issued restraining order ... specifically dictated that its terms must be enforced" and a "state statute command[ed]" enforcement of the order when certain objective conditions were met (probable cause to believe that the order had been violated and that the object of the order had received notice of its existence). 366 F.3d, at 1101, n. 5; see also *id.,* at 1100, n. 4; *id.,* at 1104–1105, and n. 9. Respondent contends that we are obliged "to give deference to the Tenth Circuit's analysis of Colorado law on" whether she had an entitlement to enforcement of the restraining order. Tr. of Oral Arg. 52.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

**[6]** We will not, of course, defer to the Tenth Circuit on the ultimate issue: whether what Colorado law has given respondent constitutes a property interest for purposes of the Fourteenth Amendment. That determination, despite its **\*757** state-law underpinnings, is ultimately one of federal constitutional law. "Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* **\*\*2804** determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (quoting *Roth, supra,* at 577, 92 S.Ct. 2701; emphasis added); cf. *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 279, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). Resolution of the federal issue begins, however, with a determination of what it is that state law provides. In the context of the present case, the central state-law question is whether Colorado law gave respondent a right to police enforcement of the restraining order. It is on this point that respondent's call for deference to the Tenth Circuit is relevant.

**[7]** We have said that a "presumption of deference [is] given the views of a federal court as to the law of a State within its jurisdiction." *Phillips, supra,* at 167, 118 S.Ct. 1925. That presumption can be overcome, however, see *Leavitt v. Jane L.,* 518 U.S. 137, 145, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) *(per curiam),* and we think deference inappropriate here. The Tenth Circuit's opinion, which reversed the Colorado District Judge, did not draw upon a deep well of state-specific expertise, but consisted primarily of quoting language from the restraining order, the statutory text, and a state-legislative-hearing transcript. See 366 F.3d, at 1103–1109. These texts, moreover, say nothing distinctive to Colorado, but use mandatory language that (as we shall discuss) appears in many state and federal statutes. As for case law: The only state-law cases about restraining orders that the Court of Appeals relied upon were decisions of Federal District Courts in Ohio and Pennsylvania and state courts in New Jersey, Oregon, and Tennessee. *Id.,* at 1104–1105, n. 9, 1109.[4] Moreover, if we were simply to accept the **\*758** Court of Appeals' conclusion, we would necessarily have to decide conclusively a federal constitutional question (*i.e.,* whether such an entitlement constituted property under the Due Process Clause and, if so, whether petitioner's customs or policies provided too little process to protect it). We proceed, then, to our own analysis of whether Colorado law gave respondent a right to enforcement of the restraining order.[5]

**B**

**[8]** The critical language in the restraining order came not from any part of the order itself (which was signed by the state-court trial judge and directed to the restrained party, respondent's husband), but from the preprinted notice to law-enforcement personnel that appeared on **\*\*2805** the back of the order. See *supra,* at 2801. That notice effectively restated the statutory provision describing "peace officers' duties" related to the crime of violation of a restraining order. At the time of the conduct at issue in this case, that provision read as follows:

"(a) Whenever a restraining order is issued, the protected person shall be provided with a copy of such **\*759** order. *A peace officer shall use every reasonable means to enforce a restraining order.*

"(b) *A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person* when the peace officer has information amounting to probable cause that:

"(I) The restrained person has violated or attempted to violate any provision of a restraining order; and

"(II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.

"(c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. *A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.*" Colo.Rev.Stat. § 18–6–803.5(3) (Lexis 1999) (emphases added).

The Court of Appeals concluded that this statutory provision—especially taken in conjunction with a statement from its legislative history,[6] and with another statute restricting **\*760** criminal and civil liability for officers making arrests[7]—established the Colorado Legislature's clear intent "to alter the fact that the police were not enforcing domestic abuse restraining orders," and thus its intent "that the recipient of a domestic abuse restraining order have an entitlement to its enforcement." 366 F.3d, at 1108. Any other result, it said, "would render domestic abuse restraining orders utterly valueless." *Id.,* at 1109.

This last statement is sheer hyperbole. Whether or not

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

respondent had a right to enforce the restraining order, it rendered certain otherwise lawful conduct by her husband both criminal and in contempt of court. See §§ 18–6–803.5(2)(a), (7). The creation of grounds on which he could be arrested, criminally prosecuted, and held in contempt was hardly "valueless"—even if the prospect of those sanctions ultimately failed to prevent him from committing three murders and a suicide.

We do not believe that these provisions of Colorado law truly made enforcement of restraining orders *mandatory.* A well established tradition of police discretion has **2806 long coexisted with apparently mandatory arrest statutes.

> "In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police.... However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally.... [T]hey clearly do not mean that a police officer may not lawfully decline to ... make an arrest. As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is *761 further diminished." 1 ABA Standards for Criminal Justice 1–4.5, commentary, pp. 1–124 to 1–125 (2d ed.1980) (footnotes omitted).

The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands, is illustrated by *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), which involved an ordinance that said a police officer " 'shall order' " persons to disperse in certain circumstances, *id.,* at 47, n. 2, 119 S.Ct. 1849. This Court rejected out of hand the possibility that "the mandatory language of the ordinance ... afford[ed] the police *no* discretion." *Id.,* at 62, n. 32, 119 S.Ct. 1849. It is, the Court proclaimed, simply "common sense that *all* police officers must use some discretion in deciding when and where to enforce city ordinances." *Ibid.* (emphasis added).

Against that backdrop, a true mandate of police action would require some stronger indication from the Colorado Legislature than "shall use every reasonable means to enforce a restraining order" (or even "shall arrest ... or ... seek a warrant"), §§ 18–6–803.5(3)(a), (b). That language is not perceptibly more mandatory than the Colorado statute which has long told municipal chiefs of police that they "shall pursue and arrest any person fleeing from justice in any part of the state" and that they "shall apprehend any person in the act of committing any offense ... and, forthwith and without any warrant, bring such person before a ... competent authority for

examination and trial." Colo.Rev.Stat. § 31–4–112 (Lexis 2004). It is hard to imagine that a Colorado peace officer would not have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.[8] *762 The practical necessity for discretion is particularly apparent in a case such as this one, where the suspected violator is not actually present and his whereabouts are unknown. Cf. *Donaldson v. Seattle,* 65 Wash.App. 661, 671–672, 831 P.2d 1098, 1104 (1992) ("There is a vast difference between a mandatory duty to arrest [a violator who is on the scene] and a mandatory duty to conduct a follow up investigation [to locate an absent violator].... A mandatory duty to investigate ... would be completely open-ended as to priority, duration and intensity").

The dissent correctly points out that, in the specific context of domestic violence, mandatory-arrest statutes have been found **2807 in some States to be more mandatory than traditional mandatory-arrest statutes. *Post,* at 2816–2819 (opinion of STEVENS, J.). The Colorado statute mandating arrest for a domestic-violence offense is different from but related to the one at issue here, and it includes similar though not identical phrasing. See Colo.Rev.Stat. § 18–6–803.6(1) (Lexis 1999) ("When a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence ... has been committed, the officer shall, without undue delay, arrest the person suspected of its commission ... "). Even in the domestic-violence context, however, it is unclear how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested. As the dissent explains, *post,* at 2817, and n. 8, much of the impetus for mandatory-arrest statutes and policies derived from the idea that it is better for police officers to arrest the aggressor in a domestic-violence incident than to attempt to mediate the dispute or merely to ask the offender to leave the scene. Those other options are only available, of course, when the offender is present at the *763 scene. See Hanna, No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions, 109 Harv. L.Rev. 1849, 1860 (1996) ("[T]he clear trend in police practice is to arrest the batterer *at the scene* ... " (emphasis added)).

As one of the cases cited by the dissent, *post,* at 2818–2819, recognized, "there will be situations when no arrest is possible, *such as when the alleged abuser is not in the home.*" *Donaldson,* 65 Wash.App., at 674, 831 P.2d, at 1105 (emphasis added). That case held that Washington's mandatory-arrest statute required an arrest only in "cases where the offender is on the scene," and

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

that it "d[id] not create an on-going mandatory duty to conduct an investigation" to locate the offender. *Id., at 675, 831 P.2d, at 1105.* Colorado's restraining-order statute appears to contemplate a similar distinction, providing that when arrest is "impractical"—which was likely the case when the whereabouts of respondent's husband were unknown—the officers' statutory duty is to "seek a warrant" rather than "arrest." § 18–6–803.5(3)(b).

[9] Respondent does not specify the precise means of enforcement that the Colorado restraining-order statute assertedly mandated—whether her interest lay in having police arrest her husband, having them seek a warrant for his arrest, or having them "use every reasonable means, up to and including arrest, to enforce the order's terms," Brief for Respondent 29–30.[9] Such indeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed "entitled" to something when the identity of the alleged entitlement is vague. See *Roth,* 408 U.S., at 577, 92 S.Ct. 2701 (considering **\*764** whether "certain benefits" were "secure[d]" by rule or understandings); cf. *Natale v. Ridgefield,* 170 F.3d 258, 263 (C.A.2 1999) ("There is no reason ... to restrict the 'uncertainty' that will preclude existence of a federally protectable property interest to the uncertainty that inheres in [the] exercise of discretion"). The dissent, after suggesting various formulations **\*\*2808** of the entitlement in question,[10] ultimately contends that the obligations under the statute were quite precise: either make an arrest or (if that is impractical) seek an arrest warrant, *post,* at 2820. The problem with this is that the seeking of an arrest warrant would be an entitlement to nothing but procedure—which we have held inadequate even to support standing, see *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); much less can it be the basis for a property interest. See *post,* at 2811–2813 (SOUTER, J., concurring). After the warrant is sought, it remains within the discretion of a judge whether to grant it, and after it is granted, it remains within the discretion of the police whether and when to execute it.[11] Respondent would have been assured nothing but the seeking of a warrant. This is not the sort of "entitlement" out of which a property interest is created.

Even if the statute could be said to have made enforcement of restraining orders "mandatory" because of the domestic-violence context of the underlying statute, that would not **\*765** necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate. Making the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people. See, *e.g., Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (finding no constitutionally protected

liberty interest in prison regulations phrased in mandatory terms, in part because "[s]uch guidelines are not set forth solely to benefit the prisoner"). The serving of public rather than private ends is the normal course of the criminal law because criminal acts, "besides the injury [they do] to individuals, ... strike at the very being of society; which cannot possibly subsist, where actions of this sort are suffered to escape with impunity." 4 W. Blackstone, Commentaries on the Laws of England 5 (1769); see also *Huntington v. Attrill,* 146 U.S. 657, 668, 13 S.Ct. 224, 36 L.Ed. 1123 (1892). This principle underlies, for example, a Colorado district attorney's discretion to prosecute a domestic assault, even though the victim withdraws her charge. See *People v. Cunefare,* 102 P.3d 302, 311–312 (Colo.2004) (en banc) (Bender, J., concurring in part, dissenting in part, and dissenting in part to the judgment).

Respondent's alleged interest stems only from a State's *statutory* scheme—from a restraining order that was authorized by and tracked precisely the statute on which the Court of Appeals relied. She does not assert that she has any common-law or contractual entitlement to enforcement. If she was given a statutory entitlement, we would expect to see some indication of that in the statute itself. Although Colorado's statute spoke of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. It said that a "protected person shall be **\*\*2809** provided with a copy of [a restraining] order" when it is issued, § 18–6–803.5(3)(a); that a law enforcement agency "shall make all reasonable efforts to contact the protected party upon the arrest of the restrained person," § 18–6–803.5(3)(d); and that the agency "shall give [to the protected **\*766** person] a copy" of the report it submits to the court that issued the order, § 18–6–803.5(3)(e). Perhaps most importantly, the statute spoke directly to the protected person's power to "initiate contempt proceedings against the restrained person if the order [was] issued in a civil action or request the prosecuting attorney to initiate contempt proceedings if the order [was] issued in a criminal action." § 18–6–803.5(7). The protected person's express power to "initiate" civil contempt proceedings contrasts tellingly with the mere ability to "request" initiation of criminal contempt proceedings—and even more dramatically with the complete silence about any power to "request" (much less demand) that an arrest be made.

The creation of a personal entitlement to something as vague and novel as enforcement of restraining orders cannot "simply g[o] without saying." *Post,* at 2821, n. 16 (STEVENS, J., dissenting). We conclude that Colorado has not created such an entitlement.

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

## C

[10] Even if we were to think otherwise concerning the creation of an entitlement by Colorado, it is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for purposes of the Due Process Clause. Such a right would not, of course, resemble any traditional conception of property. Although that alone does not disqualify it from due process protection, as *Roth* and its progeny show, the right to have a restraining order enforced does not "have some ascertainable monetary value," as even our "*Roth*-type property-as-entitlement" cases have implicitly required. Merrill, The Landscape of Constitutional Property, 86 Va. L.Rev. 885, 964 (2000).[12] Perhaps most radically, the alleged property *767 interest here arises *incidentally,* not out of some new species of government benefit or service, but out of a function that government actors have always performed—to wit, arresting people who they have probable cause to believe have committed a criminal offense.[13]

**2810 [11] The indirect nature of a benefit was fatal to the due process claim of the nursing-home residents in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).* We held that, while the withdrawal of "direct benefits" (financial payments under Medicaid for certain medical services) triggered due process protections, *id.,* at 786–787, 100 S.Ct. 2467,* the same was not true for the "indirect benefit[s]" conferred on Medicaid patients when the Government enforced "minimum standards of care" for nursing-home facilities, *id.,* at 787, 100 S.Ct. 2467.* "[A]n indirect and incidental result of the Government's enforcement action ... does not amount to a deprivation of any interest in life, liberty, or property." *Ibid.* In this case, as in *O'Bannon,* "[t]he simple distinction between government action that directly affects a citizen's legal rights ... and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to" respondent's reliance on cases that found government-provided *768 services to be entitlements. *Id.,* at 788, 100 S.Ct. 2467.* The *O'Bannon* Court expressly noted, *ibid.,* that the distinction between direct and indirect benefits distinguished *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978),* one of the government-services cases on which the dissent relies, *post,* at 2822.

## III

We conclude, therefore, that respondent did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband. It is accordingly unnecessary to address the Court of Appeals' determination (366 F.3d, at 1110–1117) that the town's custom or policy prevented the police from giving her due process when they deprived her of that alleged interest. See *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 61, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).[14]

[12] In light of today's decision and that in *DeShaney,* the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations. This result reflects our continuing reluctance to treat the Fourteenth Amendment as " 'a font of tort law,' " *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (quoting *Paul v. Davis,* 424 U.S., at 701, 96 S.Ct. 1155),* but it does not mean States are powerless to provide victims with personally enforceable remedies. Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have *769 prevented, the people of Colorado are free to craft such a system under state law. Cf. *DeShaney,* 489 U.S., at 203, 109 S.Ct. 998.[15]

**2811 The judgment of the Court of Appeals is

*Reversed.*

Justice SOUTER, with whom Justice BREYER joins, concurring.

I agree with the Court that Jessica Gonzales has shown no violation of an interest protected by the Fourteenth Amendment's Due Process Clause, and I join the Court's opinion. The Court emphasizes the traditional public focus of law enforcement as reason to doubt that these particular legal requirements to provide police services, however unconditional their form, presuppose enforceable individual rights to a certain level of police protection. *Ante,* at 2808. The *770 Court also notes that the terms of the Colorado statute involved here recognize and preserve the traditional discretion afforded law enforcement

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

officers. *Ante,* at 2805–2808, and n. 8. Gonzales's claim of a property right thus runs up against police discretion in the face of an individual demand to enforce, and discretion to ignore an individual instruction not to enforce (because, say, of a domestic reconciliation); no one would argue that the beneficiary of a Colorado order like the one here would be authorized to control a court's contempt power or order the police to refrain from arresting. These considerations argue against inferring any guarantee of a level of protection or safety that could be understood as the object of a "legitimate claim of entitlement," *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in the nature of property arising under Colorado law.[*] Consequently, the classic predicate for federal due process protection of interests under state law is missing.

Gonzales implicitly recognizes this, when she makes the following argument:

> "Ms. Gonzales alleges that ... she was denied the process laid out in the statute. The police did not consider her request in a timely fashion, but instead repeatedly required her to call the station over several hours. The statute promised a process by which her restraining order would be given vitality through careful and prompt consideration of an enforcement request .... Denial of that process drained all of the value from her property interest in the restraining order." Brief for Respondent 10.

The argument is unconventional because the state-law benefit for which it claims federal procedural protection is itself a variety of procedural regulation, a set of rules to be followed by officers exercising the State's executive power: use **\*771** all reasonable means to enforce, arrest upon demonstrable probable cause, get a warrant, and so on, see *ante,* at 2800–2801.

When her argument is understood as unconventional in this sense, a further reason **\*\*2812** appears for rejecting its call to apply *Roth,* a reason that would apply even if the statutory mandates to the police were absolute, leaving the police with no discretion when the beneficiary of a protective order insists upon its enforcement. The Due Process Clause extends procedural protection to guard against unfair deprivation by state officials of substantive state-law property rights or entitlements; the federal process protects the property created by state law. But Gonzales claims a property interest in a state-mandated process in and of itself. This argument is at odds with the rule that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona,* 461 U.S. 238, 250, 103

S.Ct. 1741, 75 L.Ed.2d 813 (1983); see also *Doe v. District of Columbia,* 93 F.3d 861, 868 (C.A.D.C.1996) (per curiam); *Doe v. Milwaukee County,* 903 F.2d 499, 502–503 (C.A.7 1990). In putting to rest the notion that the scope of an otherwise discernible property interest could be limited by related state-law procedures, this Court observed that "[t]he categories of substance and procedure are distinct .... 'Property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Just as a State cannot diminish a property right, once conferred, by attaching less than generous procedure to its deprivation, *ibid.,* neither does a State create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee. This is not to say that state rules of executive procedure may not provide significant reasons to infer an articulable property right meant to be protected; but it is to say that we have not identified property **\*772** with procedure as such. State rules of executive procedure, however important, may be nothing more than rules of executive procedure.

Thus, in every instance of property recognized by this Court as calling for federal procedural protection, the property has been distinguishable from the procedural obligations imposed on state officials to protect it. Whether welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), attendance at public schools, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), utility services, *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), public employment, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), professional licenses, *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and so on, the property interest recognized in our cases has always existed apart from state procedural protection before the Court has recognized a constitutional claim to protection by federal process. To accede to Gonzales's argument would therefore work a sea change in the scope of federal due process, for she seeks federal process as a substitute simply for state process. (And she seeks damages under Rev. Stat. § 1979, 42 U.S.C. § 1983, for denial of process to which she claimed a federal right.) There is no articulable distinction between the object of Gonzales's asserted entitlement and the process she desires in order to protect her entitlement; both amount to certain steps to be taken by the police to protect her family and herself. Gonzales's claim would thus take us beyond *Roth* or any other recognized theory of Fourteenth Amendment due process, by collapsing the distinction between property protected and the process that protects it, and would federalize every mandatory state-law direction to

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

executive officers whose performance on the job can **\*\*2813** be vitally significant to individuals affected.

The procedural directions involved here are just that. They presuppose no enforceable substantive entitlement, and *Roth* does not raise them to federally enforceable status in the name of due process.

**\*773** Justice STEVENS, with whom Justice GINSBURG joins, dissenting.

The issue presented to us is much narrower than is suggested by the far-ranging arguments of the parties and their *amici.* Neither the tragic facts of the case, nor the importance of according proper deference to law enforcement professionals, should divert our attention from that issue. That issue is whether the restraining order entered by the Colorado trial court on June 4, 1999, created a "property" interest that is protected from arbitrary deprivation by the Due Process Clause of the Fourteenth Amendment.

It is perfectly clear, on the one hand, that neither the Federal Constitution itself, nor any federal statute, granted respondent or her children any individual entitlement to police protection. See *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Nor, I assume, does any Colorado statute create any such entitlement for the ordinary citizen. On the other hand, it is equally clear that federal law imposes no impediment to the creation of such an entitlement by Colorado law. Respondent certainly could have entered into a contract with a private security firm, obligating the firm to provide protection to respondent's family; respondent's interest in such a contract would unquestionably constitute "property" within the meaning of the Due Process Clause. If a Colorado statute enacted for her benefit, or a valid order entered by a Colorado judge, created the functional equivalent of such a private contract by granting respondent an entitlement to mandatory individual protection by the local police force, that state-created right would also qualify as "property" entitled to constitutional protection.

I do not understand the majority to rule out the foregoing propositions, although it does express doubts. See *ante,* at 2809 ("[I]t is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a **\*774** 'property' interest"). Moreover, the

majority does not contest, see *ante,* at 2810, that if respondent did have a cognizable property interest in this case, the deprivation of that interest violated due process. As the Court notes, respondent has alleged that she presented the police with a copy of the restraining order issued by the Colorado court and requested that it be enforced. *Ante,* at 2800, n. 1. In response, she contends, the officers effectively ignored her. If these allegations are true, a federal statute, Rev. Stat. § 1979, 42 U.S.C. § 1983, provides her with a remedy against the petitioner, even if Colorado law does not. See *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The central question in this case is therefore whether, as a matter of Colorado law, respondent had a right to police assistance comparable to the right she would have possessed to any other service the government or a private firm might have undertaken to provide. See *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ( "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support **\*\*2814** claims of entitlement to those benefits").

There was a time when our tradition of judicial restraint would have led this Court to defer to the judgment of more qualified tribunals in seeking the correct answer to that difficult question of Colorado law. Unfortunately, although the majority properly identifies the "central state-law question" in this case as "whether Colorado law gave respondent a right to police enforcement of the restraining order," *ante,* at 2804, it has chosen to ignore our settled practice by providing its *own* answer to that question. Before identifying the flaws in the Court's ruling on the merits, I shall briefly comment on our past practice.

### \*775 I

The majority's decision to plunge ahead with its own analysis of Colorado law imprudently departs from this Court's longstanding policy of paying "deference [to] the views of a federal court as to the law of a State within its jurisdiction." *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 167, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); see also *Bishop v. Wood,* 426 U.S. 341, 346, and n. 10, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (collecting cases). This policy is not only efficient, but it reflects "our

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 500–501, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Hillsborough v. Cromwell,* 326 U.S. 620, 629–630, 66 S.Ct. 445, 90 L.Ed. 358 (1946) (endorsing "great deference to the views of the judges of those courts 'who are familiar with the intricacies and trends of local law and practice' "). Accordingly, we have declined to show deference only in rare cases in which the court of appeals' resolution of state law was "clearly wrong" or otherwise seriously deficient. See *Brockett,* 472 U.S., at 500, n. 9, 105 S.Ct. 2794; accord, *Leavitt v. Jane L.,* 518 U.S. 137, 145, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) *(per curiam).*

Unfortunately, the Court does not even attempt to demonstrate that the six-judge en banc majority was "clearly wrong" in its interpretation of Colorado's domestic restraining order statute; nor could such a showing be made. For it is certainly *plausible* to construe "*shall* use every reasonable means to enforce a restraining order" and "*shall* arrest," Colo.Rev.Stat. §§ 18–6–803.5(3)(a)–(b) (Lexis 1999) (emphasis added), as conveying mandatory directives to the police, particularly when the same statute, at other times, tellingly employs different language that suggests police discretion, see § 18–6–803.5(6)(a) ( "A peace officer *is authorized to* use every reasonable means to protect ... "; "Such peace officer *may* transport ... " (emphasis added)).[1] Moreover, unlike **\*776** today's decision, the Court of Appeals was attentive to the legislative history of the statute, focusing on a statement by the statute's sponsor in the Colorado House, *ante,* at 2805, n. 6 (quoting statement), which it took to "emphasiz[e] the importance of the police's mandatory enforcement of domestic restraining orders." 366 F.3d 1093, 1107 (C.A.10 2004) (en banc). Far from overlooking the traditional presumption of police discretion, then, the Court of Appeals' diligent analysis of the statute's text, purpose, and history led it to conclude that **\*\*2815** the Colorado Legislature intended precisely to abrogate that presumption in the specific context of domestic restraining orders. That conclusion is eminently reasonable and, I believe, worthy of our deference.[2]

## II

Even if the Court had good reason to doubt the Court of Appeals' determination of state law, it would, in my judgment, be a far wiser course to certify the question to the **\*777** Colorado Supreme Court.[3] Powerful considerations support certification in this case. First,

principles of federalism and comity favor giving a State's high court the opportunity to answer important questions of state law, particularly when those questions implicate uniquely local matters such as law enforcement and might well require the weighing of policy considerations for their correct resolution.[4] See *Elkins v. Moreno,* 435 U.S. 647, 662, n. 16, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (*sua sponte* certifying a question of state law because it is "one in which state governments have the highest interest"); cf. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 77, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources, and hel[p] build a cooperative judicial federalism' " (brackets in original)).[5] **\*778** Second, by certifying **\*\*2816** a potentially dispositive state-law issue, the Court would adhere to its wise policy of avoiding the unnecessary adjudication of difficult questions of constitutional law. See *Elkins,* 435 U.S., at 661–662, 98 S.Ct. 1338 (citing constitutional avoidance as a factor supporting certification). Third, certification would promote both judicial economy and fairness to the parties. After all, the Colorado Supreme Court is the ultimate authority on the meaning of Colorado law, and if in later litigation it should disagree with this Court's provisional state-law holding, our efforts will have been wasted and respondent will have been deprived of the opportunity to have her claims heard under the authoritative view of Colorado law. The unique facts of this case only serve to emphasize the importance of employing a procedure that will provide the correct answer to the central question of state law. See *Brockett,* 472 U.S., at 510, 105 S.Ct. 2794 (O'CONNOR, J., concurring) ("Speculation by a federal court about the meaning of a state statute in the absence of a prior state court adjudication is particularly gratuitous when, as is the case here, the state courts stand willing to address questions of state law on certification from a federal court").[6]

## \*779 III

Three flaws in the Court's rather superficial analysis of the merits highlight the unwisdom of its decision to answer the state-law question *de novo.* First, the Court places undue weight on the various statutes throughout the country that seemingly mandate police enforcement but are generally understood to preserve police discretion. As a result, the Court gives short shrift to the unique case of "mandatory arrest" statutes in the domestic violence context; States passed a wave of these statutes in the 1980's and 1990's with the unmistakable goal of

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

eliminating police discretion in this area. Second, the Court's formalistic analysis fails to take seriously the fact that the Colorado statute at issue in this case was enacted for the benefit of the narrow class of persons who are beneficiaries of domestic restraining orders, and that the order at issue in this case was specifically intended to provide protection to respondent and her children. Finally, the Court is simply wrong to assert that a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances does not resemble any "traditional conception of property," *ante,* at 2809; in fact, a citizen's property interest in such a commitment is just as concrete and worthy of protection as her interest in any other important service the government or a private firm has undertaken to provide.

**\*\*2817** In 1994, the Colorado General Assembly passed omnibus legislation targeting domestic violence. The part of the legislation at issue in this case mandates enforcement of a domestic restraining order upon probable cause of a violation, § 18–6–803.5(3), while another part directs that police officers "shall, without undue delay, arrest" a suspect upon "probable cause to believe that a crime or offense of domestic violence **\*780** has been committed," § 18–6–803.6(1).[7] In adopting this legislation, the Colorado General Assembly joined a nationwide movement of States that took aim at the crisis of police underenforcement in the domestic violence sphere by implementing "mandatory arrest" statutes. The crisis of underenforcement had various causes, not least of which was the perception by police departments and police officers that domestic violence was a private, "family" matter and that arrest was to be used as a last resort. Sack, Battered Women and the State: The Struggle for the Future of Domestic Violence Policy, 2004 Wis. L.Rev. 1657, 1662–1663 (hereinafter Sack); *id.,* at 1663 ("Because these cases were considered noncriminal, police assigned domestic violence calls low priority and often did not respond to them for several hours or ignored them altogether"). In response to these realities, and emboldened by a well-known 1984 experiment by the Minneapolis police department,[8] "many states enacted mandatory **\*781** arrest statutes under which a police officer must arrest an abuser when the officer has probable cause to believe that a domestic assault has occurred or that a protection order has been violated." Developments in the Law: Legal Responses to Domestic Violence, 106 Harv. L.Rev. 1498, 1537 (1993). The purpose of these statutes was precisely to "counter police resistance to arrests in domestic violence cases by removing or restricting police officer discretion; mandatory arrest policies would increase police response and reduce batterer recidivism." Sack 1670.

Thus, when Colorado passed its statute in 1994, it joined the ranks of 15 States **\*\*2818** that mandated arrest for domestic violence offenses and 19 States that mandated arrest for domestic restraining order violations. See Developments in the Law, 106 Harv. L.Rev., at 1537, n. 68 (noting statutes in 1993); N. Miller, Institute for Law and Justice, A Law Enforcement and Prosecution Perspective 7, and n. 74, 8, and n. 90 (2003), http://www.ilj. org/dv/dvvawa2000.htm (as visited June 24, 2005, and available in Clerk of Court's case file) (listing Colorado among the many States that currently have mandatory arrest statutes).[9]

Given the specific purpose of these statutes, there can be no doubt that the Colorado Legislature used the term "shall" advisedly in its domestic restraining order statute. While **\*782** "shall" is probably best read to mean "may" in other Colorado statutes that seemingly mandate enforcement, cf. Colo.Rev.Stat. § 31–4–112 (Lexis 2004) (police "*shall suppress* all riots, disturbances, and breaches of the peace, *shall apprehend* all disorderly persons in the city ..." (emphases added)), it is clear that the elimination of police discretion was integral to Colorado and its fellow States' solution to the problem of underenforcement in domestic violence cases.[10] Since the text of Colorado's statute perfectly captures this legislative purpose, it is hard to imagine what the Court has in mind when it insists on "some stronger indication from the Colorado Legislature." *Ante,* at 2806.

While Colorado case law does not speak to the question, it is instructive that other state courts interpreting their analogous statutes have not only held that they eliminate the police's traditional discretion to refuse enforcement, but have **\*783** also recognized that they create rights enforceable against the police under state law. For example, in *Nearing v. Weaver,* 295 Or. 702, 670 P.2d 137 (1983) (en banc), the court held that although the common law of negligence did not support a suit against the police for failing to enforce a domestic restraining order, the statute's mandatory directive formed the basis for the suit because it was "a specific duty imposed by statute for the benefit of individuals previously **\*\*2819** identified by judicial order." *Id.,* at 707, 670 P.2d, at 140.[11] In *Matthews v. Pickett County,* 996 S.W.2d 162 (Tenn.1999) (on certification to the Sixth Circuit), the court confirmed that the statute mandated arrest for violations of domestic restraining orders, and it held that the "public duty" defense to a negligence action was unavailable to the defendant police officers because the restraining order had created a "special duty" to protect the plaintiff. *Id.,* at 165. See also *Campbell v. Campbell,* 294 N.J.Super. 18, 24, 682 A.2d 272, 274 (1996) (domestic restraining order statute "allows no discretion"

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

with regard to arrest; "[t]he duty imposed on the police officer is ministerial"); *Donaldson v. Seattle,* 65 Wash.App. 661, 670, 831 P.2d 1098, 1103 (1992) ( "Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so. In regard to domestic violence, the rule is the reverse. If the officer has the legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest"). To what extent the Colorado Supreme Court would agree with the views of these courts is, of course, an open question, but it does seem rather brazen for the majority to assume that the Colorado Supreme Court **\*784** would repudiate this consistent line of persuasive authority from other States.

Indeed, the Court fails to come to terms with the wave of domestic violence statutes that provides the crucial context for understanding Colorado's law. The Court concedes that, "in the specific context of domestic violence, mandatory-arrest statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes," *ante,* at 2806–2807, but that is a serious understatement. The difference is not a matter of degree, but of kind. Before this wave of statutes, the legal rule was one of discretion; as the Court shows, the "traditional," general mandatory arrest statutes have always been understood to be "mandatory" in name only, see *ante,* at 2805–2806. The innovation of the domestic violence statutes was to make police enforcement, not "more mandatory," but simply *mandatory.* If, as the Court says, the existence of a protected "entitlement" turns on whether "government officials may grant or deny it in their discretion," *ante,* at 2803, the new mandatory statutes undeniably create an entitlement to police enforcement of restraining orders.

Perhaps recognizing this point, the Court glosses over the dispositive question—whether the police enjoyed discretion to deny enforcement—and focuses on a different question—which "precise means of enforcement," *ante,* at 2807, were called for in this case. But that question is a red herring. The statute directs that, upon probable cause of a violation, "a peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person." Colo.Rev.Stat. § 18–6–803.5(3)(b) (Lexis 1999). Regardless of whether the enforcement called for in this case was arrest or the seeking of an arrest warrant (the answer to that question probably changed over the course of the night as the respondent gave the police more information about the husband's whereabouts), the crucial point is that, under the statute, the police were *required* to provide enforcement; *they lacked the discre* **\*\*2820** *tion to do nothing.* **\*785** [12] The Court suggests that the fact that "enforcement" may encompass different acts infects any

entitlement to enforcement with "indeterminacy." *Ante,* at 2807. But this objection is also unfounded. Our cases have never required the object of an entitlement to be some mechanistic, unitary thing. Suppose a State entitled every citizen whose income was under a certain level to receive health care at a state clinic. The provision of health care is not a unitary thing—doctors and administrators must decide what tests are called for and what procedures are required, and these decisions often involve difficult applications of judgment. But it could not credibly be said that a citizen lacks an entitlement to health care simply because the content of that entitlement is not the same in every given situation. Similarly, the enforcement of a restraining order is not some amorphous, indeterminate thing. Under the statute, if the police have probable cause that a violation has occurred, enforcement consists of either making an immediate arrest or seeking a warrant and then executing an arrest—traditional, well-defined tasks that law enforcement officers perform every day.[13]

**\*\*2821 \*786** The Court similarly errs in speculating that the Colorado Legislature may have mandated police enforcement of restraining orders for "various legitimate ends other than the conferral of a benefit on a specific class of people," *ante,* at 2808; see also *ibid.* (noting that the "serving of public rather than private ends is the normal course of the criminal law"). While the Court's concern would have some bite were we **\*787** faced with a broadly drawn statute directing, for example, that the police "*shall suppress* all riots," there is little doubt that the statute at issue in this case conferred a benefit "on a specific class of people"—namely, recipients of domestic restraining orders. Here, respondent applied for and was granted a restraining order from a Colorado trial judge, who found a risk of "irreparable injury" and found that "physical or emotional harm" would result if the husband were not excluded from the family home. 366 F.3d, at 1143 (appendix to dissent of O'Brien, J.). As noted earlier, the restraining order required that the husband not "molest or disturb" the peace of respondent and the daughters, and it ordered (with limited exceptions) that the husband stay at least 100 yards away from the family home. *Ibid.*[14] It also directed the police to "use every reasonable means to enforce this ... order," and to arrest or seek a warrant upon probable cause of a violation. *Id., at 1144.* Under the terms of the statute, when the order issued, respondent and her daughters became " 'protected person[s].' " § 18–6–803.5(1.5)(a) ( " 'Protected person' means the person or persons identified in the restraining order as the person or persons for whose benefit the restraining order was issued").[15] The statute criminalized the knowing violation of the restraining order, § 18–6–803.5(1), and, as already discussed, the statute (as

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

**\*788** well as the order itself) mandated police enforcement, §§ 18–6–803.5(3)(a)–(b).[16]

**\*\*2822** Because the statute's guarantee of police enforcement is triggered by, and operates only in reference to, a judge's granting of a restraining order in favor of an identified " 'protected person,' " there is simply no room to suggest that such a person has received merely an " 'incidental' " or " 'indirect' " benefit, see *ante,* at 2810. As one state court put it, domestic restraining order statutes "identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity." *Nearing,* 295 Or., at 712, 670 P.2d, at 143.[17] Not only does the Court's doubt about **\*789** whether Colorado's statute created an entitlement in a protected person fail to take seriously the purpose and nature of restraining orders, but it fails to account for the decisions by other state courts, see *supra,* at 2818–2819, that recognize that such statutes and restraining orders create individual rights to police action.

### IV

Given that Colorado law has quite clearly eliminated the police's discretion to deny enforcement, respondent is correct that she had much more than a "unilateral expectation" that the restraining order would be enforced; rather, she had a "legitimate claim of entitlement" to enforcement. *Roth,* 408 U.S., at 577, 92 S.Ct. 2701. Recognizing respondent's property interest in the enforcement of her restraining order is fully consistent with our precedent. This Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Id.,* at 571–572, 92 S.Ct. 2701. The "types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.' " *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); see also *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (" '[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings' "). Thus, our cases have found "property" interests in a number of state-conferred benefits and services, including welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011,

25 L.Ed.2d 287 (1970); disability benefits, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); public education, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); utility services, *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); government employment, *Cleveland Bd. of Ed. v.* **\*790** *Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), as well as in other entitlements that defy easy categorization, see, *e.g.,* **\*\*2823** *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (due process requires fair procedures before a driver's license may be revoked pending the adjudication of an accident claim); *Logan,* 455 U.S., at 431, 102 S.Ct. 1148 (due process prohibits the arbitrary denial of a person's interest in adjudicating a claim before a state commission).

Police enforcement of a restraining order is a government service that is no less concrete and no less valuable than other government services, such as education.[18] The relative novelty of recognizing this type of property interest is explained by the relative novelty of the domestic violence statutes creating a mandatory arrest duty; before this innovation, the unfettered discretion that characterized police enforcement defeated any citizen's "legitimate claim of entitlement" to this service. Novel or not, respondent's claim finds strong support in the principles that underlie our due process jurisprudence. In this case, Colorado law *guaranteed* the provision of a certain service, in certain defined circumstances, to a certain class of beneficiaries, and respondent reasonably relied on that guarantee. As we observed in *Roth,* "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." **\*791** 408 U.S., at 577, 92 S.Ct. 2701. Surely, if respondent had contracted with a private security firm to provide her and her daughters with protection from her husband, it would be apparent that she possessed a property interest in such a contract. Here, Colorado undertook a comparable obligation, and respondent—with restraining order in hand—justifiably relied on that undertaking. Respondent's claim of entitlement to this promised service is no less legitimate than the other claims our cases have upheld, and no less concrete than a hypothetical agreement with a private firm.[19] The **\*\*2824** fact that it is based on a statutory enactment and a judicial order entered for her special protection, rather than on a formal contract, does not provide a principled basis for refusing to consider it "property" worthy of constitutional protection.[20]

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

**\*792 V**

Because respondent had a property interest in the enforcement of the restraining order, state officials could not deprive her of that interest without observing fair procedures.[21] Her description of the police behavior in this case and the department's callous policy of failing to respond properly to reports of restraining order violations clearly alleges **\*793** a due process violation. At the very least, due process requires that the relevant state decisionmaker *listen* to the claimant and then *apply the relevant criteria* in reaching his decision.[22] The failure to observe these **\*\*2825** minimal procedural safeguards creates an unacceptable risk of arbitrary and "erroneous deprivation[s]," *Mathews,* 424 U.S., at 335, 96 S.Ct. 893. According to respondent's complaint—which we must construe liberally at this early stage in the litigation, see *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)—the process she was afforded by the police constituted nothing more than a " 'sham or a pretense.' " *Joint Anti—Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

Accordingly, I respectfully dissent.

**All Citations**

545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642, 05 Daily Journal D.A.R. 7653, 18 Fla. L. Weekly Fed. S 511

Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     Petitioner claims that respondent's complaint "did not allege ... that she ever notified the police of her contention that [her husband] was actually in violation of the restraining order." Brief for Petitioner 7, n. 2. The complaint does allege, however, that respondent "showed [the police] a copy of the [temporary restraining order (TRO) ] and requested that it be enforced." App. to Pet. for Cert. 126a. At this stage in the litigation, we may assume that this reasonably implied the order was being violated. See *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

2     It is unclear from the complaint, but immaterial to our decision, whether respondent showed the police only the original "TRO" or also the permanent, modified restraining order that had superseded it on June 4.

3     Three police officers were also named as defendants in the complaint, but the Court of Appeals concluded that they were entitled to qualified immunity, 366 F.3d 1093, 1118 (C.A.10 2004) (en banc). Respondent did not file a cross-petition challenging that aspect of the judgment.

4     Most of the Colorado-law cases cited by the Court of Appeals appeared in footnotes declaring them to be irrelevant because they involved only substantive due process (366 F.3d, at 1100–1101, nn. 4–5), only statutes without restraining orders (*id.,* at 1101, n. 5), or Colorado's Government Immunity Act, which the Court of Appeals concluded applies "only to ... state tort law claims" (*id.,* at 1108–1109, n. 12). Our analysis is likewise unaffected by the Immunity Act or by the way that Colorado has dealt with substantive due process or cases that do not involve restraining orders.

5     In something of an anyone-but-us approach, the dissent simultaneously (and thus unpersuasively) contends not only that this Court should certify a question to the Colorado Supreme Court, *post,* at 2815–2816 (opinion of STEVENS, J.), but also that it should defer to the Tenth Circuit (which itself did not certify any such question), *post,* at 2814–2815. No party in this case has requested certification, even as an alternative disposition. See Tr. of Oral Arg. 56 (petitioner's counsel "disfavor[ing]" certification); *id.,* at 25–26 (counsel for the United States arguing against certification). At oral argument, in fact, respondent's counsel declined Justice STEVENS' invitation to request it. *Id.,* at 53.

6     The Court of Appeals quoted one lawmaker's description of how the bill " 'would really attack the domestic violence problems' ":
      " '[T]he entire criminal justice system must act in a consistent manner, which does not now occur. The police must make probable cause arrests. The prosecutors must prosecute every case. Judges must apply appropriate sentences, and probation officers must monitor their probationers closely. And the offender needs to be sentenced to offender-specific therapy.
      " '[T]he entire system must send the same message ... [that] violence is criminal. And so we hope that House Bill 1253 starts us down this road.' " 366 F.3d, at 1107 (quoting Tr. of Colorado House Judiciary Hearings on House Bill

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

1253, Feb. 15, 1994; emphasis deleted).

7    Under Colo.Rev.Stat. § 18–6–803.5(5) (Lexis 1999), "[a] peace officer arresting a person for violating a restraining order or otherwise enforcing a restraining order" was not to be held civilly or criminally liable unless he acted "in bad faith and with malice" or violated "rules adopted by the Colorado supreme court."

8    Respondent in fact concedes that an officer may "properly" decide not to enforce a restraining order when the officer deems "a technical violation" too "immaterial" to justify arrest. Respondent explains this as a determination that there is no probable cause. Brief for Respondent 28. We think, however, that a determination of no probable cause to believe a violation has occurred is quite different from a determination that the violation is too insignificant to pursue.

9    Respondent characterizes her entitlement in various ways. See Brief for Respondent 12 (" 'entitlement' to receive protective services"); *id.,* at 13 ("interest in police enforcement action"); *id.,* at 14 ("specific government benefit" consisting of "the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband"); *id.,* at 32 ("[T]he restraining order here mandated the arrest of Mr. Gonzales under specified circumstances, or at a minimum required the use of reasonable means to enforce the order").

10   See *post,* at 2813 ("entitlement to police protection"); *ibid.* ("entitlement to mandatory individual protection by the local police force"); *ibid.* ("a right to police assistance"); *post,* at 2816 ("a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances"); *post,* at 2822 ("respondent's property interest in the enforcement of her restraining order"); *post,* at 2823 (the "service" of "protection from her husband"); *post,* at 2824 ("interest in the enforcement of the restraining order").

11   The dissent asserts that the police would lack discretion in the execution of this warrant, *post,* at 2820, n. 12, but cites no statute mandating immediate execution. The general Colorado statute governing arrest provides that police "may arrest" when they possess a warrant "commanding" arrest. Colo.Rev.Stat. § 16–3–102(1) (Lexis 1999).

12   The dissent suggests that the interest in having a restraining order enforced does have an ascertainable monetary value, because one may "contract with a private security firm ... to provide protection" for one's family. *Post,* at 2813, 2823, and n. 19. That is, of course, not as precise as the analogy between public and private schooling that the dissent invokes. *Post,* at 2823–2824, n. 19. Respondent probably could have hired a private firm to guard her house, to prevent her husband from coming onto the property, and perhaps even to search for her husband after she discovered that her children were missing. Her alleged entitlement here, however, does not consist in an abstract right to "protection," but (according to the dissent) in enforcement of her restraining order through the arrest of her husband, or the seeking of a warrant for his arrest, after she gave the police probable cause to believe the restraining order had been violated. A private person would not have the power to arrest under those circumstances because the crime would not have occurred in his presence. Colo.Rev.Stat. § 16–3–201 (Lexis 1999). And, needless to say, a private person would not have the power to obtain an arrest warrant.

13   In other contexts, we have explained that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

14   Because we simply do not address whether the process would have been adequate if respondent had had a property interest, the dissent is correct to note that we do not "contest" the point, *post,* at 2813. Of course we do not *accept* it either.

15   In Colorado, the general statutory immunity for government employees does not apply when "the act or omission causing ... injury was willful and wanton." Colo.Rev.Stat. § 24–10–118(2)(a) (Lexis 1999). Respondent's complaint does allege that the police officers' actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" her civil rights. App. to Pet. for Cert. 128a.
     The state cases cited by the dissent that afford a cause of action for police failure to enforce restraining orders, *post,* at 2818–2819, 2820–2821, n. 13, vindicate state common-law or statutory tort claims—not procedural due process claims under the Federal Constitution. See *Donaldson v. Seattle,* 65 Wash.App. 661, 831 P.2d 1098 (1992) (city could be liable under some circumstances for *per se* negligence in failing to meet statutory duty to arrest); *Matthews v. Pickett County,* 996 S.W.2d 162 (Tenn.1999) (county could be liable under Tennessee's Governmental Tort Liability Act where restraining order created a special duty); *Campbell v. Campbell,* 294 N.J.Super. 18, 682 A.2d 272 (1996) (rejecting four specific defenses under the New Jersey Tort Claims Act in negligence action against individual officers); *Sorichetti v. New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985) (city breached duty of care arising from special relationship between police and victim); *Nearing v. Weaver,* 295 Or. 702, 670 P.2d 137 (1983) (en banc) (statutory duty to individual plaintiffs arising independently of tort-law duty of care).

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

\*     Gonzales does not claim to have a protected liberty interest.

1     The Court of Appeals also looked to other provisions of the statute to inform its analysis. In particular, it reasoned that a provision that gave police officers qualified immunity in connection with their enforcement of restraining orders, see Colo.Rev.Stat. § 18–6–803.5(5) (Lexis 1999), supported the inference that the Colorado Legislature intended mandatory enforcement. See 366 F.3d 1093, 1108 (C.A.10 2004) (en banc).

2     The Court declines to show deference for the odd reason that, in its view, the Court of Appeals did not "draw upon a deep well of state-specific expertise," *ante,* at 2804, but rather examined the statute's text and legislative history and distinguished arguably relevant Colorado case law. See *ante,* at 2804, and n. 4. This rationale makes a mockery of our traditional practice, for it is precisely when there is no state law on point that the presumption that circuits have local expertise plays any useful role. When a circuit's resolution of a novel question of state law is grounded on a concededly complete review of all the pertinent state-law materials, that decision is entitled to deference. Additionally, it should be noted that this is not a case in which the Court of Appeals and the District Court disagreed on the relevant issue of state law; rather, those courts disagreed only over the extent to which a probable-cause determination requires the exercise of discretion. Compare 366 F.3d, at 1105–1110, with App. to Pet. for Cert. 122a (District Court opinion).

3     See Colo. Rule App. Proc. 21.1(a) (Colorado Supreme Court may answer questions of law certified to it by the Supreme Court of the United States or another federal court if those questions "may be determinative of the cause" and "as to which it appears to the certifying court there is no controlling precedent in the decisions of the [Colorado] Supreme Court").

4     See *Westminster v. Dogan Constr. Co.,* 930 P.2d 585, 590 (Colo.1997) (en banc) (in interpreting an ambiguous statute, the Colorado Supreme Court will consider legislative history and the "consequences of a particular construction"); *ibid.* (" 'Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results' "). Additionally, it is possible that the Colorado Supreme Court would have better access to (and greater facility with) relevant pieces of legislative history beyond those that we have before us. That court may also choose to give certain evidence of legislative intent greater weight than would be customary for this Court. See, *e.g.,* Brief for Peggy Kerns et al. as *Amici Curiae* (bill sponsor explaining the Colorado General Assembly's intent in passing the domestic restraining order statute).

5     Citing similar considerations, the Second Circuit certified questions of state law to the Connecticut Supreme Court when it was faced with a procedural due process claim involving a statute that arguably mandated the removal of children upon probable cause of child abuse. See *Sealed v. Sealed,* 332 F.3d 51 (C.A.2 2003). The Connecticut Supreme Court accepted certification and held that the provision was discretionary, not mandatory. See *Teresa T. v. Ragaglia,* 272 Conn. 734, 865 A.2d 428 (2005).

6     The Court is correct that I would take an "anyone-but-us approach," *ante,* at 2804, n. 5, to the question of *who* decides the issue of Colorado law in this case. Both options that I favor—deferring to the Circuit's interpretation or, barring that, certifying to the Colorado Supreme Court—recognize the comparative expertise of another tribunal on questions of state law. And both options offer their own efficiencies. By contrast, the Court's somewhat overconfident "only us" approach lacks any cogent justification. The fact that neither party requested certification certainly cannot be a sufficient reason for dismissing that option. As with abstention, the considerations that weigh in favor of certification—federal-state comity, constitutional avoidance, judicial efficiency, the desire to settle correctly a recurring issue of state law—transcend the interests of individual litigants, rendering it imprudent to cast them as gatekeepers to the procedure. See, *e.g., Elkins v. Moreno,* 435 U.S. 647, 662, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (certifying state-law issue absent a request from the parties); *Aldrich v. Aldrich,* 375 U.S. 249, 84 S.Ct. 305, 11 L.Ed.2d 304 (1963) *(per curiam)* (same); see also 17A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4248, p. 176 (2d ed. 1988) ("Ordinarily a court will order certification on its own motion").

7     See Fuller & Stansberry, 1994 Legislature Strengthens Domestic Violence Protective Orders, 23 Colo. Lawyer 2327 (1994) ("The 1994 Colorado legislative session produced several significant domestic abuse bills that strengthened both civil and criminal restraining order laws and procedures for victims of domestic violence"); *id.,* at 2329 ("Although many law enforcement jurisdictions already take a proactive approach to domestic violence, arrest and procedural policies vary greatly from one jurisdiction to another. H.B. 94–1253 mandates the arrest of domestic violence perpetrators and restraining order violaters. H.B. 94–1090 repeals the requirement that protected parties show a copy of their restraining order to enforcing officers. In the past, failure to provide a copy of the restraining order has led to hesitation from police to enforce the order for fear of an illegal arrest. The new statute also shields arresting officers from liability; this is expected to reduce concerns about enforcing the mandatory arrest requirements" (footnotes

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

omitted)).

8 See Sack 1669 ("The movement to strengthen arrest policies was bolstered in 1984 by the publication of the results of a study on mandatory arrest in domestic violence cases that had been conducted in Minneapolis. In this study, police handled randomly assigned domestic violence offenders by using one of three different responses: arresting the offender, mediating the dispute or requiring the offender to leave the house for eight hours. The study concluded that in comparison with the other two responses, arrest had a significantly greater impact on reducing domestic violence recidivism. The findings from the Minneapolis study were used by the U.S. Attorney General in a report issued in 1984 that recommended, among other things, arrest in domestic violence cases as the standard law enforcement response" (footnotes omitted)); see also Zorza, The Criminal Law of Misdemeanor Domestic Violence, 1970–1990, 83 J.Crim. L. & C. 46, 63–65 (1992) (tracing history of mandatory arrest laws and noting that the first such law was implemented by Oregon in 1977).

9 See also Brief for International Municipal Lawyers Association et al. as *Amici Curiae* 6 ("Colorado is not alone in mandating the arrest of persons who violate protective orders. Some 19 states require an arrest when a police officer has probable cause to believe that such orders have been violated" (collecting statutes)).

10 See Note, Mandatory Arrest: A Step Toward Eradicating Domestic Violence, But is It Enough? 1996 U. Ill. L.Rev. 533, 541–542, 544–546 (describing the problems that attend a discretionary arrest regime: "Even when probable cause is present, police officers still frequently try to calm the parties and act as mediators .... Three studies found the arrest rate to range between 3% and 10% when the decision to arrest is left to police discretion. Another study found that the police made arrests in only 13% of the cases where the victim had visible injuries .... Police officers often employ irrelevant criteria such as the 'reason' for the abuse or the severity of the victim's injuries in making their decision to arrest .... Some [officers] may feel strongly that police should not interfere in family arguments or lovers' quarrels. Such attitudes make police much more likely to investigate intent and provocation, and consider them as mitigating factors, in responding to domestic violence calls than in other types of cases" (footnotes omitted)); see also Walsh, The Mandatory Arrest Law: Police Reaction, 16 Pace L.Rev. 97, 98 (1995). Cf. Sack 1671–1672 ("Mandatory arrest policies have significantly increased the number of arrests of batterers for domestic violence crimes .... In New York City, from 1993, the time the mandatory arrest policy was instituted, to 1999, felony domestic violence arrests increased 33%, misdemeanor domestic violence arrests rose 114%, and arrests for violation of orders of protection were up 76%").

11 The Oregon Supreme Court noted that the "widespread refusal or failure of police officers to remove persons involved in episodes of domestic violence was presented to the legislature as the main reason for tightening the law so as to require enforcement of restraining orders by mandatory arrest and custody." *Nearing,* 295 Or., at 709, 670 P.2d, at 142.

12 Under the Court's reading of the statute, a police officer with probable cause is mandated to seek an arrest warrant if arrest is "impractical under the circumstances," but then enjoys unfettered discretion in deciding whether to *execute* that warrant. *Ante,* at 2807–2808. This is an unlikely reading given that the statute was motivated by a profound distrust of police discretion in the domestic violence context and motivated by a desire to improve the protection given to holders of domestic restraining orders. We do not have the benefit of an authoritative construction of Colorado law, but I would think that if an estranged husband harassed his wife in violation of a restraining order, and then absconded after she called the police, the statute would not only obligate the police to seek an arrest warrant, but also obligate them to execute it by making an arrest. In any event, under respondent's allegations, by the time the police were informed of the husband's whereabouts, an arrest was practical and, under the statute's terms, mandatory.

13 The Court wonders "how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested." *Ante,* at 2807. Again, questions as to the *scope* of the obligation to provide enforcement are far afield from the key issue—whether there exists an entitlement to enforcement. In any event, the Court's speculations are off base. First, this is not a case like *Donaldson v. Seattle,* 65 Wash.App. 661, 831 P.2d 1098 (1992), in which the restrained person violated the order and then left the scene. Here, not only did the husband violate the restraining order by coming within 100 yards of the family home, but he continued to violate the order while his abduction of the daughters persisted. This is because the restraining order prohibited him from "molest[ing] or disturb[ing] the peace" of the daughters. See 366 F.3d, at 1143 (appendix to dissent of O'Brien, J.). Because the "scene" of the violation was wherever the husband was currently holding the daughters, this case does not implicate the question of an officer's duties to arrest a person who has left the scene and is no longer in violation of the restraining order. Second, to the extent that arresting the husband was initially "impractical under the circumstances" because his whereabouts were unknown, the Colorado statute (unlike some other States' statutes) expressly addressed that situation—it *required* the police to seek an arrest warrant. Third, the Court is wrong to suggest that this case falls outside the core situation that these types of statutes were meant to address. One of the well-known cases that contributed to the passage of these statutes involved facts similar to this case. See *Sorichetti v. New York City,* 65 N.Y.2d 461, 467, 492 N.Y.S.2d 591, 482

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

N.E.2d 70, 74 (1985) (police officers at police station essentially ignored a mother's pleas for enforcement of a restraining order against an estranged husband who made threats about their 6–year–old daughter; hours later, as the mother persisted in her pleas, the daughter was found mutilated, her father having attacked her with a fork and a knife and attempted to saw off her leg); Note, 1996 U. Ill. L.Rev., at 539 (noting *Sorichetti* in the development of mandatory arrest statutes); see also Sack 1663 (citing the police's failure to respond to domestic violence calls as an impetus behind mandatory arrest statutes). It would be singularly odd to suppose that in passing its sweeping omnibus domestic violence legislation, the Colorado Legislature did not mean to require enforcement in the case of an abduction of children in violation of a restraining order.

14    The order also stated: "If you violate this order thinking that the other party or child named in this order has given you permission, you are wrong, and can be arrested and prosecuted. The terms of this order cannot be changed by agreement of the other party or the child(ren). Only the court can change this order." 366 F.3d, at 1144 (appendix to dissent of O'Brien, J.).

15    A concern for the " 'protected person' " pervades the statute. For example, the statute provides that a "peace officer may transport, or obtain transportation for, the alleged victim to shelter. Upon the request of the protected person, the peace officer may also transport the minor child of the protected person, who is not an emancipated minor, to the same shelter ...." § 18–6–803.5(6)(a).

16    I find it neither surprising nor telling, cf. *ante,* at 2809, that the statute requires the restraining order to contain, "in capital letters and bold print," a "notice" informing protected persons that they can demand or request, respectively, civil and criminal contempt proceedings. § 18–6–803.5(7). While the legislature may have thought that these legal remedies were not popularly understood, a person's right to "demand" or "request" police enforcement of a restraining order simply goes without saying given the nature of the order and its language. Indeed, for a holder of a restraining order who has read the order's emphatic language, it would likely come as quite a shock to learn that she has no right to demand enforcement in the event of a violation. To suggest that a protected person has no such right would posit a lacuna between a protected person's rights and an officer's duties—a result that would be hard to reconcile with the Colorado Legislature's dual goals of putting an end to police indifference and empowering potential victims of domestic abuse.

17    See also *Matthews v. Pickett County,* 996 S.W.2d 162, 165 (Tenn.1999) ("The order of protection in this case was not issued for the public's protection in general. The order of protection specifically identified Ms. Matthews and was issued solely for the purpose of protecting her. Cf. *Ezell [v. Cockrell,* 902 S.W.2d 394, 403 (Tenn.1995)] (statute prohibiting drunk driving does not specify an individual but undertakes to protect the public in general from intoxicated drivers)"); *Sorichetti,* 65 N.Y.2d, at 469, 492 N.Y.S.2d 591, 482 N.E.2d, at 75 ("The [protective] order evinces a preincident legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual").

18    The Court mistakenly relies on *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), in explaining why it is "by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause." *Ante,* at 2809. In *O'Bannon,* the question was essentially whether certain regulations provided nursing-home residents with an entitlement to continued residence in the home of their choice. 447 U.S., at 785, 100 S.Ct. 2467. The Court concluded that the regulations created no such entitlement, but there was no suggestion that Congress could not create one if it wanted to. In other words, *O'Bannon* did not address a situation in which the underlying law created an entitlement, but the Court nevertheless refused to treat that entitlement as a property interest within the meaning of the Due Process Clause.

19    As the analogy to a private security contract demonstrates, a person's interest in police enforcement has " 'some ascertainable monetary value,' " *ante,* at 2809. Cf. Merrill, The Landscape of Constitutional Property, 86 Va. L.Rev. 885, 964, n. 289 (2000) (remarking, with regard to the property interest recognized in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), that "any parent who has contemplated sending their children to private schools knows that public schooling has a monetary value"). And while the analogy to a private security contract need not be precise to be useful, I would point out that the Court is likely incorrect in stating that private security guards could not have arrested the husband under the circumstances, see *ante,* at 2809, n. 12. Because the husband's ongoing abduction of the daughters would constitute a knowing violation of the restraining order, see n. 13, *supra,* and therefore a crime under the statute, see § 18–6–803.5(1), a private person who was at the scene and aware of the circumstances of the abduction would have authority to arrest. See § 16–3–201 ("A person who is not a peace officer may arrest another person when any crime has been or is being committed by the arrested person in the presence of the person making the arrest"). Our cases, of course, have never recognized any requirement that a property interest possess " 'some ascertainable monetary value.' " Regardless, I would assume that respondent would have paid the police to arrest her husband if that had been possible; at the very least, the entitlement has a monetary value in that

**Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005)**

125 S.Ct. 2796, 162 L.Ed.2d 658, 73 USLW 4611, 05 Cal. Daily Op. Serv. 5642...

sense.

20    According to Justice SOUTER, respondent has asserted a property interest in merely a "state-mandated process," *ante,* at 2812 (concurring opinion), rather than in a state-mandated "substantive guarantee," *ibid.* This misunderstands respondent's claim. Putting aside the inartful passage of respondent's brief that Justice SOUTER relies upon, *ante,* at 2811, it is clear that respondent is in fact asserting a substantive interest in the "enforcement of the restraining order," Brief for Respondent 10. Enforcement of a restraining order is a tangible, substantive act. If an estranged husband violates a restraining order by abducting children, and the police succeed in enforcing the order, the person holding the restraining order has undeniably just received a substantive benefit. As in other procedural due process cases, respondent is arguing that the police officers failed to follow fair procedures in ascertaining whether the statutory criteria that trigger their obligation to provide enforcement—*i.e.,* an outstanding order plus probable cause that it is being violated—were satisfied in her case. Cf. *Carey v. Piphus,* 435 U.S. 247, 266–267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (discussing analytic difference between the denial of fair process and the denial of the substantive benefit itself). It is Justice SOUTER, not respondent, who makes the mistake of "collapsing the distinction between property protected and the process that protects it," *ante,* at 2812.

      Justice SOUTER also errs in suggesting that respondent cannot have a property interest in enforcement because she would not be authorized to instruct the police to refrain from enforcement in the event of a violation. *Ante,* at 2811. The right to insist on the provision of a service is separate from the right to refuse the service. For example, compulsory attendance laws deny minors the right to refuse to attend school. Nevertheless, we have recognized that minors have a property interest in public education and that school officials must therefore follow fair procedures when they seek to deprive minors of this valuable benefit through suspension. See *Goss,* 419 U.S. 565, 95 S.Ct. 729. In the end, Justice SOUTER overlooks the core purpose of procedural due process—ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.

21    See *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (" ' "While the legislature may elect not to confer a property interest, ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards" ' ").

22    See *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ("[W]hen a person has an opportunity to speak up in his own defense, and *when the State must listen to what he has to say,* substantively unfair and simply mistaken deprivations of property interests can be prevented" (emphasis added)); *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet [the] standard [of due process]"); *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("[T]he decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing"); cf. *ibid.* ("[O]f course, an impartial decision maker is essential").

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** St. Bernard General Hospital, Inc. v. Hospital
Service Ass'n of New Orleans, Inc., 5th Cir.(La.), April 7, 1975

**72 S.Ct. 690**
**Supreme Court of the United States**

UNITED STATES
v.
OREGON STATE MEDICAL SOC. et al.

No. 19. | Argued Jan. 4 and 7, 1952. | Decided April
28, 1952.

Action by the United States of America against Oregon
State Medical Society, and others, for injunction to
prevent and restrain violations of the Sherman Anti-Trust
Act, wherein government asserted conspiracy to restrain
and monopolize business of providing prepaid medical
care in Oregon and conspiracy to restrain competition
between doctor-sponsored prepaid medical plans. The
United States District Court of the State of Oregon,
McColloch, J., 95 F.Supp. 103, dismissed the complaint,
and the United States appealed directly to the Supreme
Court. The Supreme Court, Mr. Justice Jackson, held that
findings of district judge were not clearly erroneous.

Judgment affirmed.

Mr. Justice Black dissented.

West Headnotes (23)

[1]      **Federal Courts**
         Credibility and impeachment
         **Federal Courts**
         "Clearly erroneous" standard of review in
         general

         Rule that where action is tried by court without
         jury, findings of fact shall not be set aside unless
         clearly erroneous and due regard shall be given
         to opportunity of trial court to judge credibility
         of witnesses, is particularly appropriate to case
         in which complaining party creates vast record
         of cumulative evidence as to long-past
         transactions, motives and purposes, the effect of
         which depends largely on credibility of
         witnesses, notwithstanding that case is on direct

appeal to Supreme Court from district court.
Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

55 Cases that cite this headnote

[2]      **Antitrust and Trade Regulation**
         Admissibility

         In action by government to restrain medical
         societies and physicians' service corporation and
         officers thereof from violating Sherman
         Anti-Trust Act, wherein government asserted
         conspiracy to monopolize business of providing
         prepaid medical care in Oregon, district judge
         properly rejected pre-1941 events as establishing
         cause of action, notwithstanding that it is proper
         to trace currently questioned conduct backwards
         to illuminate connections and meanings.
         Sherman Anti-Trust Act, §§ 1, 2, as amended,
         15 U.S.C.A. §§ 1, 2.

         2 Cases that cite this headnote

[3]      **Injunction**
         Prospective, preventive, or future-oriented
         nature of remedy

         Sole function of action for injunction is to
         forestall future violations.

         29 Cases that cite this headnote

[4]      **Abatement and Revival**
         Identity of causes and issues
         **Criminal Law**
         Availability or pendency of, or recovery in,
         civil action

         Action for injunction is so unrelated to
         punishment or reparations for past violations
         that its pendency or decision does not prevent
         concurrent or later remedy for past violations by

Tab E-18

indictment or action for damages by those injured.

13 Cases that cite this headnote

---

[5]     **Injunction**
       Clear, likely, threatened, anticipated, or intended injury

Real threat of future violation or contemporary violation of nature likely to continue or recur is sufficient to make cause of action for relief by injunction, and once established, it adds nothing that calendar of years gone by might have been filled with transgressions.

47 Cases that cite this headnote

---

[6]     **Injunction**
       Mandatory injunctions; restoration of status quo

Notwithstanding that injunctive relief is mandatory in form, such relief is to undo existing conditions, because otherwise they are likely to continue.

10 Cases that cite this headnote

---

[7]     **Antitrust and Trade Regulation**
       Admissibility

In action to restrain violations of Sherman Anti-Trust Act wherein government asserted conspiracy to monopolize business of prepaid medical care in Oregon, examination of past violations would be justified only if it illuminates or explains present and predicts shape of things to come. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

3 Cases that cite this headnote

---

[8]     **Antitrust and Trade Regulation**
       Presumptions and burden of proof

When defendants, in action to restrain violation of anti-trust laws, are shown to have settled into continuing practice or entered into conspiracy violative of anti-trust laws, court will not assume that it has been abandoned without clear proof. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

11 Cases that cite this headnote

---

[9]     **Injunction**
       Voluntary cessation or undertaking of conduct

It is duty of courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit and there is probability of resumption.

116 Cases that cite this headnote

---

[10]    **Antitrust and Trade Regulation**
       Injunction

Where in 1936 private associations of doctors sold certificates under prepaid medical plan and were opposed by state and county medical societies which attempted to stamp out such contract practices until 1941 when societies reversed themselves and state society formed a physicians' service corporation to provide prepaid medical care on contract basis and carried out extensive operations which had every appearance of being permanent, and there was no threat or probability of resumption of abandoned warfare against prepaid medical service and contract practice, such conduct discontinued in 1941 did not warrant issuance of injunction in 1949, in government's 1948 suit to

restrain conspiracy to monopolize prepaid medical care in Oregon. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

36 Cases that cite this headnote

[11] **Federal Courts**

👉Review of federal district courts

In action by government to restrain medical societies and physicians' service corporation and officers thereof from violation of Sherman Anti-Trust Act, wherein government asserted conspiracy to monopolize business of providing prepaid medical care in Oregon, and wherein district court dismissed complaint on ground of lack of proof on charges therein, it was duty of Supreme Court to inquire whether any restraints had been proved of character likely to continue if not enjoined. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Expediting Act, § 2, as amended, 15 U.S.C.A. § 29.

Cases that cite this headnote

[12] **Antitrust and Trade Regulation**

👉Monopolization or attempt to monopolize

Action of one county medical society in Oregon in threatening to expel doctors engaged in prepaid medical care on contract basis activity would not necessarily indicate joint venture or conspiracy with other county medical societies and state medical society to expel doctors engaged in such practice. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. § 1, 2.

Cases that cite this headnote

[13] **Antitrust and Trade Regulation**

👉Monopolization or attempt to monopolize

Where state medical society house of delegates voted that private patient status policy

theretofore applied to private commercial hospital association contracts for prepaid medical care be extended to industrial and railroad type of contracts, but their report stated that receipt shall be furnished each patient at time of each visit as it was understood that the industrial and railroad plan companies concerned would probably establish a program of reimbursement to affected employees, report did not show threat to restrict practice of industrial and railroad companies of reimbursing employees for medical expenses, and any ambiguity could properly be resolved in favor of society. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

3 Cases that cite this headnote

[14] **Antitrust and Trade Regulation**

👉Monopolization or attempt to monopolize

**Federal Courts**

👉Review of federal district courts

In action by government to restrain medical societies and physicians' service corporation and officers thereof from violation of Sherman Anti-Trust Act, wherein government asserted conspiracy to monopolize business of providing prepaid medical care in Oregon, letters from doctors to private health associations refusing to accept checks directly from them had some evidentiary value but were not compelling, and weighed against other evidence, did not show that findings of trial court that government had not proved charges, were clearly erroneous. Fed.Rules Civ.Proc., rule 52(a), 28 U.S.C.A.; Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

9 Cases that cite this headnote

[15] **Federal Courts**

👉Review of federal district courts

Where, in action by government to restrain medical societies and physicians' service corporation and officers thereof from violation

of Sherman Anti-Trust Act, on ground of conspiracy to monopolize business of providing prepaid medical care in Oregon, it was not proved that doctors made concerted refusal to deal with private health associations, on appeal Supreme Court would not decide whether same would violate anti-trust laws. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

3 Cases that cite this headnote

[16] **Health**
🔑Regulation of Professional Conduct;  Boards and Officers

Ethical considerations exist in relationship between patient and physician which are quite different than usual considerations prevailing in ordinary commercial matters, and hence forms of competition usual in business world may be demoralizing to ethical standards of medical profession.

12 Cases that cite this headnote

[17] **Federal Courts**
🔑Affirmance

In action by government to restrain medical societies and physicians' service corporation and officers thereof from violation of Sherman Anti-Trust Act, wherein government asserted conspiracy to monopolize business of prepaid medical care in Oregon, evidence on issue of boycott or discrimination by medical society members against private health associations and doctors dealing therewith was such that Supreme Court could not say that district court's refusal to find conspiracy to restrain or monopolize business was clearly erroneous. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

4 Cases that cite this headnote

[18] **Antitrust and Trade Regulation**
🔑Medical services

Where physicians' service corporation, sponsored and controlled by state medical society to provide prepaid medical care on contract basis, and county medical societies with similar plans, agreed that state organization would withdraw and keep out of areas where county societies provided local plan, but plan did not supply or withhold medical service or facilities but was merely plan for prepayment of fees for services performed by local doctors, and there was no proof that duplicating sources of prepaid certificates would make them cheaper, more available or render improved service, agreement not to compete was not an unreasonable restraint of trade in violation of the Sherman Anti-Trust Act. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

3 Cases that cite this headnote

[19] **Federal Courts**
🔑Definite and firm conviction of mistake

A finding is "clearly erroneous" when, although there is evidence to support it, reviewing court on entire evidence is left with definite and firm conviction mistake has been committed. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

90 Cases that cite this headnote

[20] **Antitrust and Trade Regulation**
🔑Restraints and misconduct in general

In action by government to restrain medical societies and physicians' service corporation and officers thereof from violation of Sherman Anti-Trust Act, on ground of conspiracy to restrain competition between doctor-sponsored prepaid medical plans in that physicians' service

corporation would not furnish prepaid medical care in area serviced by local society plan, district court's findings that sale of medical services by doctor-sponsored organizations as conducted within State of Oregon, is not "trade" or "commerce" within Sherman Anti-Trust Law or commerce within constitutional grant of power to Congress to regulate commerce among several states, were not clearly erroneous. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.; Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; U.S.C.A.Const. art. 1, § 8, cl. 3.

18 Cases that cite this headnote

[21] **Antitrust and Trade Regulation**
Medical services

Where sale of medical services by doctor-sponsored organizations offering plans of prepaid medical care, as conducted within state of Oregon, was not trade or commerce within meaning of Sherman Anti-Trust Act or commerce within meaning of constitutional grant of power to Congress to regulate commerce among several states, alleged conspiracy to restrain competition between the several doctor-sponsored organizations would not fall within prohibitions of Sherman Anti-Trust Act against restraint of interstate commerce. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; U.S.C.A.Const. art. 1, § 8, cl. 3.

4 Cases that cite this headnote

[22] **Federal Civil Procedure**
Trial by Court

It is trial judge's duty function to appraise testimony of witnesses.

9 Cases that cite this headnote

[23] **Federal Courts**
Affirmance

Where, in action by government to restrain medical societies and physicians' service corporation and officers thereof from violation of Sherman Anti-Trust Act, on ground of conspiracy to monopolize business of providing prepaid medical care in Oregon and conspiracy to restrain competition between doctor-sponsored prepaid medical plans, district judge dismissed complaint on ground that government had proved none of the charges, affirmance on appeal would be without prejudice to future suit if practices and conduct of the societies, whether or not involved in present action, should threaten or constitute violation of anti-trust laws. Sherman Anti-Trust Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*693 \*327** Mr. Stanley M. Silverberg, Washington, D.C., for appellant.

Mr. Nicholas Jaurequy, Portland, Or., for appellees.

**Opinion**

**\*328** Mr. Justice JACKSON delivered the opinion of the Court.

This is a direct appeal by the United States[1] from dismissal by the District Court[2] of its complaint seeking an injunction to prevent and restrain violations of ss 1 and 2 of the Sherman Act. 26 Stat. 209, as amended, 15 U.S.C. ss 1, 2, 15 U.S.C.A. ss 1, 2.[3]

Appellees are the Oregon State Medical Society, eight county medical societies, Oregon Physicians Service (an Oregon corporation engaged in the sale of prepaid medical care), and eight doctors who are or have been at some time responsible officers in those organizations.

This controversy centers about two forms of 'contract practice' of medicine. In one, private corporations organized for profit sell what amounts to a policy of

insurance by which small periodic payments purchase the right to certain hospital facilities and medical attention. In the other, railroad and large industrial employers of labor contract with one or more doctors to treat their ailing or injured employees. Both forms of 'contract practice,' for rendering the promised medical and surgical service, depend upon doctors or panels of doctors who cooperate on a fee basis or who associate themselves with the plan on a full or part-time employment basis.

Objections of the organized medical profession to contract practice are both monetary and ethical. Such *329 practice diverts patients from independent practitioners to contract doctors. It tends to standardize fees. The ethical objection has been that intervention by employer or insurance company makes a tripartite matter of the doctor-patient relation. Since the contract doctor owes his employment and looks for his pay to the employer or the insurance company rather than to the patient, he serves two masters with conflicting interests. In many cases companies assumed liability for medical or surgical service only if they approved the treatment in advance. There was evidence of instances where promptly needed treatment was delayed while obtaining company approval, and where a lay insurance official disapproved treatment advised by a doctor.

In 1936, five private associations were selling prepaid medical certificates in Oregon, and doctors of that State, alarmed at the extent to which private practice was being invaded and superseded by contract practice, commenced a crusade to stamp it out. A tooth-and-claw struggle ensued between the organized medical profession, on the one hand, and the organizations employing contract doctors on the other. The **694 campaign was bitter on both sides. State and county medical societies adopted resolutions and policy statements condemning contract practice and physicians who engaged in it. They brought pressure on individual doctors to decline or abandon it. They threatened expulsion from medical societies, and one society did expel several doctors for refusal to terminate contract practices.

However, in 1941, seven years before this action was commenced, there was an abrupt about-face on the part of the organized medical profession in Oregon. It was apparently convinced that the public demanded and was entitled to purchase protection against unexpected costs of disease and accident, which are catastrophic to persons without reserves. The organized doctors completely reversed *330 their strategy, and, instead of trying to discourage prepaid medical service, decided to render it on a nonprofit basis themselves.

In that year, Oregon Physicians' Service, one of the

defendants in this action, was formed. It is a nonprofit Oregon corporation, furnishing prepaid medical, surgical, and hospital care on a contract basis. As charged in the complaint, 'It is sponsored and approved by the Oregon State Medical Society and is controlled and operated by members of that society. It sponsors, approves, and cooperates with component county societies and organizations controlled by the latter which offer prepaid medical plans.' 95 F.Supp. at page 121. After seven years of successful operation, the Government brought this suit against the doctors, their professional organizations and their prepaid medical care company, asserting two basic charges: first, that they conspired to restrain and monopolize the business of providing prepaid medical care in the State of Oregon, and, second, that they conspired to restrain competition between doctor-sponsored prepaid medical plans within the State of Oregon in that Oregon Physicians' Service would not furnish prepaid medical care in an area serviced by a local society plan.

The District Judge, after a long trial, dismissed the complaint on the ground that the Government had proved none of its charges by a preponderance of evidence. The direct appeal procedure does not give us the benefit of review by a Court of Appeals of findings of fact.

The appeal brings to us no important questions of law or unsettled problems of statutory construction. It is much like United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150. Its issues are solely ones of fact. The record is long, replete with conflicts in testimony, and includes quantities of documentary material taken from the appellees' files and letters written by doctors, employers, and employees. The Government and the appellees each put more than *331 two score of witnesses on the stand. At the close of the trial the judge stated that his work 'does not permit the preparation of a formal opinion in so complex a case. I will state my conclusions on the main issues and then will append some notes made at various stages throughout the trial. These may be of aid to counsel in the preparation of Findings of Fact and Conclusions of Law to be submitted as a basis for final judgment.' 95 F.Supp. at page 104. These notes indicated his disposition of the issues, but the Government predicates a suggestion of bias on irrelevant soliloquies on socialized medicine, socialized law, and the like, which they contained. Admitting that these do not add strength or persuasiveness to his opinion, they do not becloud his clear disposition of the main issues of the case, in all of which he ruled against the Government. Counsel for the doctors submitted detailed findings in accordance therewith. The Government did not submit requests to find, but by letter raised objections to various proposals of the appellees.

The trial judge found that appellees did not conspire to restrain or attempt to monopolize prepaid medical care in Oregon in the period 1936—1941, and that, even if such conspiracy during that time was proved, it was abandoned in 1941 with the formation of Oregon Physicians' Service marking **695 the entry of appellees into the prepaid medical care business. He ruled that what restraints were proved could be justified as reasonable to maintain proper standards of medical ethics. He found that supplying prepaid medical care within the State of Oregon by doctor-sponsored organizations does not constitute trade or commerce within the meaning of the Sherman Act, but he declined to rule on the question whether supplying prepaid medical care by the private associations is interstate commerce.

The Government asks us to overrule each of these findings as contrary to the evidence, and to find that the business *332 of providing prepaid medical care is interstate commerce. We are asked to review the facts and reverse and remand the case 'for entry of a decree granting appropriate relief.' We are asked in substance to try the case de novo on the record, make findings and determine the nature and form of relief. We have heretofore declined to give such scope to our review. United States v. Yellow Cab Co., supra.

[1] While Congress has provided direct appeal to this Court, it also has provided that where an action is tried by a court without a jury 'findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A. There is no case more appropriate for adherence to this rule than one in which the complaining party creates a vast record of cumulative evidence as to long-past transactions, motives, and purposes, the effect of which depends largely on credibility of witnesses.

[2] The trial court rejected a grouping by the Government of its evidentiary facts into four periods, 1930—1936, the year 1936, 1936—1941, and 1941 to trial. That proposal projected the inquiry over an eighteen-year period before the action was instituted. The court accepted only the period since the organization of Oregon Physicians' Service as significant and rejected the earlier years as 'ancient history' of a time 'when the Doctors were trying to find themselves. * * * It was a period of groping for the correct position to take to accord with changing times.' 95 F.Supp. at page 105. Of course, present events have roots in the past, and it is quite proper to trace currently questioned conduct backwards to illuminate its connections and meanings. But we think the trial judge was quite right in rejecting pre-1941 events as establishing the cause of action the Government was trying to *333 maintain, and adopt his division of the time involved into two periods, 1936—1941, and 1941 to trial.

[3] [4] [5] [6] [7] It will simplify consideration of such cases as this to keep in sight the target at which relief is aimed. The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured. All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur. This established, it adds nothing that the calendar of years gone by might have been filled with transgressions. Even where relief is mandatory in form, it is to undo existing conditions, because otherwise they are likely to continue. In a forward-looking action such as this, an examination of 'a great amount of archeology'[4] is justified only when it illuminates or explains the present and predicts the shape of things to come.

[8] [9] When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of anti-trust laws, courts will not assume that it **696 has been abandoned without clear proof. Local 167 of International Brotherhood of Teamsters, etc. v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 398, 78 L.Ed. 804. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption. Cf. United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 297, 64 L.Ed. 343.

*334 [10] But we find not the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant-appellees which took place in 1941. It occurred seven years before this suit was commenced and, so far as we are informed, before it was predictable. It did not consist merely of pretensions or promises but was an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent because wise and advantageous for the doctors. The record discloses no threat or probability of resumption of the abandoned warfare against prepaid medical service and the contract practice it entails. We agree with the trial court that conduct discontinued in 1941 does not warrant the issuance of an injunction in 1949. Industrial Ass'n of San Francisco v. United States, 268 U.S. 64, 84, 45 S.Ct. 403, 408, 69 L.Ed. 849.

[11] Appellees, in providing prepaid medical care, may

engage in activities which violate the antitrust laws. They are now competitors in the field and restraints, if any are to be expected, will be in their methods of promotion and operation of their own prepaid plan. Our duty is to inquire whether any restraints have been proved of a character likely to continue if not enjoined.

Striking the events prior to 1941 out of the Government's case, except for purposes of illustration or background information, little of substance is left. The case derived its coloration and support almost entirely from the abandoned practices. It would prolong this opinion beyond useful length, to review evidentiary details peculiar to this case. We mention what appear to be some highlights.

[12] Only the Multnomah County Medical Society resorted to expulsions of doctors because of contract-practice activities, and there have been no expulsions for such cause since 1941. There were hints in the testimony that Multnomah was reviving the expulsion threat a short **\*335** time before this action was commenced, but nothing came of it, and what that Society might do within the limits of its own membership does not necessarily indicate a joint venture or conspiracy with other appellees.

[13] Some emphasis is placed on a report of a meeting of the House of Delegates of the State Society at which it was voted that the 'private patient status' policy theretofore applied to private commercial hospital association contracts be extended to the industrial and railroad type of contracts. Any significance of this provision seems neutralized by another paragraph in the same report, which reads: 'A receipt should be furnished each patient at the time of each visit, as it is understood the (industrial and railroad plan) companies concerned will probably establish a program of reimbursement to the affected employees.' That does not strike us as a threat to restrict the practice of industrial and railroad companies of reimbursing employees for medical expenses and we can not say that any ambiguity was not properly resolved in appellees' favor by the trial court.

[14] The record contains a number of letters from doctors to private associations refusing to accept checks directly from them. Some base refusal on a policy of their local medical society, others are silent as to reasons. Some may be attributed to the writers' personal resistance to dealing directly with the private health associations, for it is clear that many doctors objected to filling out the company forms and supplying details required by the associations, and preferred to confine **\*\*697** themselves to direct dealing with the patient and leaving the patient to deal with the associations. Some writers may have mistaken or misunderstood the policy of local associations. Others

may have avoided disclosure of personal opposition by the handy and impersonal excuse of association 'policy.' The letters have some evidentiary value, but it is not compelling and, weighed against the other post-1941 evidence, **\*336** does not satisfy us that the trial court's findings are 'clearly erroneous.'

[15] [16] Since no concerted refusal to deal with private health associations has been proved, we need not decide whether it would violate the antitrust laws. We might observe in passing, however, that there are ethical considerations where the historic direct relationship between patient and physician is involved which are quite different than the usual considerations prevailing in ordinary commercial matters. This Court has recognized that forms of competition usual in the business world may be demoralizing to the ethical standards of a profession. Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086.

Appellees' evidence to disprove conspiracy is not conclusive, is necessarily largely negative, but is too persuasive for us to say it was clear error to accept it. In 1948, 1,210 of the 1,660 licensed physicians in Oregon were members of the Oregon State Medical Society, and between January 1, 1947, and June 30, 1948, 1,085 Oregon doctors billed and received payment directly from the Industrial Hospital Association, only one of the several private plans operating in the State. Surely there was no effective boycott, and ineffectiveness, in view of the power over its members which the Government attributes to the Society, strongly suggests the lack of an attempt to boycott these private associations. A parade of local medical society members from all parts of the State, apparently reputable, credible, and informed professional men, testified that their societies now have no policy of discrimination against private health associations, and that no attempts are made to prevent individual doctors from cooperating with them. Members of the governing councils of the State and Multnomah County Societies testified that since 1940 there have been no suggestions in their meetings of attempts to prevent individual doctors from serving private associations. The manager of Oregon **\*337** Physicians' Service testified that at none of the many meetings and conferences of local societies attended by him did he hear any proposal to prevent doctors from cooperation with private plans.

[17] If the testimony of these many responsible witnesses is given credit, no finding of conspiracy to restrain or monopolize this business could be sustained. Certainly we cannot say that the trial court's refusal to find such a conspiracy was clearly erroneous.

The other charge is that appellees conspired to restrain competition between the several doctor-sponsored organizations within the State of Oregon. The charge here, as we understand it from paragraph 33(i) of the complaint, 95 F.Supp. at page 124, is that Oregon Physicians' Service, the state-wide organization, and the county-medical-society-sponsored plans agreed not to compete with one another. Apparently if a county was provided with prepaid medical care by a local society, the state society would stay out, or if the county society wanted to inaugurate a local plan, the state society would withdraw from the area.

[18] This is not a situation where suppliers of commercial commodities divide territories and make reciprocal agreements to exploit only the allotted market, thereby depriving allocated communities of competition. This prepaid plan does not supply to, and its allocation does not withhold from, any community medical service or facilities of any description. No matter what organization issues the certificate, it will be performed, in the main, by the local doctors. The certificate serves **698 only to prepay their fees. The result, if the state association should enter into local competition with the county association, would be that the inhabitants could prepay medical services through either one of two medical society channels. There is not the least proof that duplicating sources of the prepaid certificates would make them cheaper, more available or *338 would result in an improved service or have any beneficial effect on anybody. Through these nonprofit organizations the doctors of each locality, in practical effect, offer their services and hospitalization on a prepaid basis instead of on the usual cash fee or credit basis. To hold it illegal because they do not offer their services simultaneously and in the same locality through both a state and a county organization would be to require them to compete with themselves in sale of certificates. Under the circumstances proved here, we cannot regard the agreement by these nonprofit organizations not to compete as an unreasonable restraint of trade in violation of the Sherman Act.

With regard to this charge, the court found, 'The sale of medical services, by Doctor Sponsored Organizations, as conducted within the State of Oregon, is not trade or commerce within the meaning of Section 1 of the Sherman Anti-Trust Law, nor is it commerce within the meaning of the constitutional grant of power to Congress 'To regulate Commerce * * * among the several States'.' 95 F.Supp. at page 118. If that finding in both aspects is not to be overturned as clearly erroneous, it, of course, disposes of this charge, for if there was no restraint of interstate commerce, the conduct charged does not fall within the prohibitions of the Sherman Act.

Almost everything pointed to in the record by the Government as evidence that interstate commerce is involved in this case relates to across-state-line activities of the private associations. It is not proven, however, to be adversely affected by any allocation of territories by doctor-sponsored plans. So far as any evidence brought to our attention discloses, the activities of the latter are wholly intrastate. The Government did show that Oregon Physicians Service made a number of payments to out-of-state doctors and hospitals, presumably for treatment of polycyholders who happened to remove or temporarily to *339 be away from Oregon when need for service arose. These were, however, few, sporadic and incidental. Cf. Industrial Ass'n of San Francisco v. United States, supra, 268 U.S. at page 84, 45 S.Ct. at page 408, 69 L.Ed. 849.

American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434, does not stand for the proposition that furnishing of prepaid medical care on a local plane is interstate commerce. That was a prosecution under s 3 of the Sherman Act of a conspiracy to restrain trade or commerce in the District of Columbia. Interstate commerce was not necessary to the operation of the statute there.

[19] [20] [21] We conclude that the Government has not clearly proved its charges. Certainly the Court's findings are not clearly erroneous. 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. The Government's contentions have been plausibly and earnestly argued but the record does not leave us with any 'definite and firm conviction that a mistake has been committed.'

[22] As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: 'Face to face with living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth. * * * How can we say the judge is wrong? We never saw the witnesses. * * * To the sophistication **699 and sagacity of the trial judge the law confides the duty of appraisal.' Boyd v. Boyd, 252 N.Y. 422, 429, 169 N.E. 632, 634.

[23] Affirmance is, of course, without prejudice to future suit if practices in conduct of the Oregon Physicians' Service or the county services, whether or not involved *340 in the present action, shall threaten or constitute

violation of the antitrust laws. Cf. United States v. Reading Co., 226 U.S. 324, 373, 33 S.Ct. 90, 104, 57 L.Ed. 243.

Judgment affirmed.

Mr. Justice BLACK is of opinion that the judgment below is clearly erroneous and should be reversed.

Mr. Justice CLARK took no part in the consideration or decision of this case.

**All Citations**

343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978

Footnotes

1    Pursuant to s 2 of the Expediting Act of 1903, 32 Stat. 823, as amended, 15 U.S.C. s 29, 15 U.S.C.A. s 29.

2    95 F.Supp. 103.

3    26 Stat. 209, 15 U.S.C. s 1, 15 U.S.C.A. s 1: 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal * * *.'
     15 U.S.C. s 2, 15 U.S.C.A. s 2: 'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *.'

4    Judge Augustus Hand, 'Trial Efficiency,' dealing with antitrust cases, Business Practices Under Federal Antitrust Laws, Symposium, New York State Bar Assn. (C.C.H., 1951) 31—32. See also Sec. VIII, Procedure in Antitrust and Other Protracted Cases, a Report adopted September 26, 1951, by the Judicial Conference of the United States.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Sec. 12.115. BASIS FOR CHARTER REVOCATION OR MODIFICATION OF GOVERNANCE.

(a) Except as provided by Subsection (c), the commissioner shall revoke the charter of an open-enrollment charter school or reconstitute the governing body of the charter holder if the commissioner determines that the charter holder:

(1) committed a material violation of the charter, including failure to satisfy accountability provisions prescribed by the charter;

(2) failed to satisfy generally accepted accounting standards of fiscal management;

(3) failed to protect the health, safety, or welfare of the students enrolled at the school;

(4) failed to comply with this subchapter or another applicable law or rule;

(5) failed to satisfy the performance framework standards adopted under Section 12.1181; or

(6) is imminently insolvent as determined by the commissioner in accordance with commissioner rule.

(b) The action the commissioner takes under Subsection (a) shall be based on the best interest of the open-enrollment charter school's students, the severity of the violation, any previous violation the school has committed, and the accreditation status of the school.

(c) The commissioner shall revoke the charter of an open-enrollment charter school if:

(1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding school years;

(2) the charter holder has been assigned a financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or

(3) the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.

(c-1) For purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be considered. For purposes of revocation under Subsection (c)(1), the initial three school years for which performance ratings under Subchapter C, Chapter 39, shall be considered are the 2009-2010, 2010-2011, and 2012-2013 school years. For purposes of revocation under Subsection (c)(2), the initial three school years for which financial accountability performance ratings under Subchapter D, Chapter 39, shall be considered are the

**Tab F**

2010-2011, 2011-2012, and 2012-2013 school years.  This subsection expires September 1, 2016.

(d)  In reconstituting the governing body of a charter holder under this section, the commissioner shall appoint members to the governing body.  In appointing members under this subsection the commissioner:

(1)  shall consider:

(A)  local input from community members and parents; and

(B)  appropriate credentials and expertise for membership, including financial expertise, whether the person lives in the geographic area the charter holder serves, and whether the person is an educator; and

(2)  may reappoint current members of the governing body.

(e)  If a governing body of a charter holder subject to reconstitution under this section governs enterprises other than the open-enrollment charter school, the commissioner may require the charter holder to  create a new, single-purpose organization that is exempt from taxation under Section 501(c)(3), Internal Revenue Code of 1986, to govern the open-enrollment charter school and may require the charter holder to surrender the charter to the commissioner for transfer to the organization created under this subsection.  The commissioner shall appoint the members of the governing body of an organization created under this subsection.

(f)  This section does not limit the authority of the attorney general to take any action authorized by law.

(g)  The commissioner shall adopt rules necessary to administer this section.

(h)  The commissioner shall adopt initial rules under Subsection (g) not later than September 1, 2014.  This subsection expires October 1, 2014.


Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.  Amended by Acts 2001, 77th Leg., ch. 1504, Sec. 12, eff. Sept. 1, 2001.

Amended by: Acts 2013, 83rd Leg., R.S., Ch. 1140 (S.B. 2), Sec. 25, eff. September 1, 2013.

Sec. 12.116.  PROCEDURE FOR REVOCATION OR MODIFICATION OF GOVERNANCE.  (a)  The commissioner shall adopt an informal procedure to be used for revoking the charter of an open-enrollment charter school or for reconstituting the governing body of the charter holder as authorized by Section 12.115.

(b)   Chapter 2001, Government Code, does not apply to a procedure that is related to a revocation or modification of governance under this subchapter.

(c)  A decision by the commissioner to revoke a charter is subject to review by the State Office of Administrative Hearings.  Notwithstanding Chapter 2001, Government Code:

(1)  the administrative law judge shall uphold a decision by the commissioner to revoke a charter unless the judge finds the decision is arbitrary and capricious or clearly erroneous; and

(2)  a decision of the administrative law judge under this subsection is final and may not be appealed.

(d)  If the commissioner revokes the charter of an open-enrollment charter school, the commissioner may:

(1)  manage the school until alternative arrangements are made for the school's students; and

(2)  assign operation of one or more campuses formerly operated by the charter holder who held the revoked charter to a different charter holder who consents to the assignment.

Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.  Amended by Acts 2001, 77th Leg., ch. 1504, Sec. 12, eff. Sept. 1, 2001.

Amended by: Acts 2013, 83rd Leg., R.S., Ch. 1140 (S.B. 2), Sec. 26, eff. September 1, 2013.

"[p]rocedural due process requires reasonable notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *See Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 930 (Tex.1995).

SUBCHAPTER C.  ACCREDITATION

Sec. 39.051.  ACCREDITATION STATUS.  Accreditation of a school district is determined in accordance with this subchapter.  The commissioner by rule shall determine in accordance with this subchapter the criteria for the following accreditation statuses:

(1)  accredited;

(2)  accredited-warned; and

(3)  accredited-probation.

Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.  Amended by Acts 1997, 75th Leg., ch. 767, Sec. 6, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 396, Sec. 2.20, eff. Sept. 1, 1999;  Acts 1999, 76th Leg., ch. 397, Sec. 7, eff. Sept. 1, 1999;  Acts 1999, 76th Leg., ch. 1422, Sec. 3, eff. Sept. 1, 1999;  Acts 2001, 77th Leg., ch. 8, Sec. 3, eff. April 11, 2001;  Acts 2001, 77th Leg., ch. 725, Sec. 4, 5, eff. June 13, 2001;  Acts 2001, 77th Leg., ch. 834, Sec. 10, eff. Sept. 1, 2001;  Acts 2001, 77th Leg., ch. 1420, Sec. 4.007, 4.008, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 201, Sec. 26, eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 433, Sec. 2, eff. June 20, 2003;  Acts 2003, 78th Leg., ch. 805, Sec. 1, eff. Sept. 1, 2003.

Amended by:

Acts 2006, 79th Leg., 3rd C.S., Ch. 5 (H.B. 1), Sec. 3.10, eff. May 31, 2006.

Acts 2006, 79th Leg., 3rd C.S., Ch. 5 (H.B. 1), Sec. 3.11, eff. May 31, 2006.

Acts 2007, 80th Leg., R.S., Ch. 1312 (S.B. 1031), Sec. 15, eff. September 1, 2007.

Acts 2007, 80th Leg., R.S., Ch. 1340 (S.B. 1871), Sec. 5, eff. June 15, 2007.

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Sec. 39.052.  DETERMINATION OF ACCREDITATION STATUS OR PERFORMANCE RATING.  (a)  Each year, the commissioner shall determine the accreditation status of each school district.

(b)  In determining the accreditation status of a school district, the commissioner:

# Tab G

(1)  shall evaluate and consider:

(A)  performance on student achievement indicators described by Section 39.053(c); and

(B)  performance under the financial accountability rating system developed under Subchapter D; and

(2)  may evaluate and consider:

(A)  the district's compliance with statutory requirements and requirements imposed by rule of the commissioner or State Board of Education under specific statutory authority that relate to:

(i)  reporting data through the Public Education Information Management System (PEIMS) or other reports required by state or federal law or court order;

(ii)  the high school graduation requirements under Section 28.025; or

(iii)  an item listed under Sections 7.056(e)(3)(C)-(I) that applies to the district;

(B)  the effectiveness of the district's programs for special populations; and

(C)  the effectiveness of the district's career and technology program.

(c)  Based on a school district's performance under Subsection (b), the commissioner shall:

(1)  assign each district an accreditation status; or

(2)  revoke the accreditation of the district and order closure of the district.

(d)  A school district's accreditation status may be raised or lowered based on the district's performance or may be lowered based on the performance of one or more campuses in the district that is below a standard required under this subchapter.

(e)  The commissioner shall notify a school district that receives an accreditation status of accredited-warned or accredited-probation or a campus that performs below a standard required under this subchapter that the performance of the district or campus is below a standard required under this subchapter.  The commissioner shall require the district to notify the parents of students enrolled in the district and property owners in the district of the district's accreditation status and the implications of that accreditation status.

(f)  A school district that is not accredited may not receive funds from the agency or hold itself out as operating a public school of this state.

(g)  This chapter may not be construed to invalidate a diploma awarded, course credit earned, or grade promotion granted by a school district before the commissioner revoked the district's accreditation.

Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.  Amended by Acts 1999, 76th Leg., ch. 396, Sec. 2.21, eff. Sept. 1, 1999;  Acts 1999, 76th Leg., ch. 1514, Sec. 1, eff. June 19, 1999;  Acts 2001, 77th Leg., ch. 1420, Sec. 4.009, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 1269, Sec. 2, eff. Sept. 1, 2003.

Amended by:

Acts 2006, 79th Leg., 3rd C.S., Ch. 5 (H.B. 1), Sec. 3.12, eff. May 31, 2006.

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Sec. 39.053.  PERFORMANCE INDICATORS: STUDENT ACHIEVEMENT.  (a)  The commissioner shall adopt a set of indicators of the quality of learning and student achievement.  The commissioner biennially shall review the indicators for the consideration of appropriate revisions.

(b)  Performance on the student achievement indicators adopted under this section shall be compared to state-established standards.  The indicators must be based on information that is disaggregated by race, ethnicity, and socioeconomic status.

(c)  Indicators of student achievement adopted under this section must include:

(1)  the results of assessment instruments required under Sections 39.023(a), (c), and (l), including the results of assessment instruments required for graduation retaken by a student, aggregated across grade levels by subject area, including:

(A)  for the performance standard determined by the commissioner under Section 39.0241(a):

(i)  the percentage of students who performed satisfactorily on the assessment instruments, aggregated across grade levels by subject area; and

                         (ii)  for students who did not perform
satisfactorily, the percentage of students who met the standard for annual
improvement, as determined by the agency under Section 39.034, on the
assessment instruments, aggregated across grade levels by subject area; and

                 (B)  for the college readiness performance standard as
determined under Section 39.0241:

                         (i)  the percentage of students who performed
satisfactorily on the assessment instruments, aggregated across grade levels
by subject area; and

                         (ii)  for students who did not perform
satisfactorily, the percentage of students who met the standard for annual
improvement, as determined by the agency under Section 39.034, on the
assessment instruments, aggregated across grade levels by subject area;

         (2)  dropout rates, including dropout rates and district
completion rates for grade levels 9 through 12, computed in accordance with
standards and definitions adopted by the National Center for Education
Statistics of the United States Department of Education;

         (3)  high school graduation rates, computed in accordance with
standards and definitions adopted in compliance with the No Child Left Behind
Act of 2001 (20 U.S.C. Section 6301 et seq.);

         (4)  the percentage of students who successfully completed the
curriculum requirements for the distinguished level of achievement under the
foundation high school program;

         (5)  the percentage of students who successfully completed the
curriculum requirements for an endorsement under Section 28.025(c-1); and

         (6)  at least three additional indicators of student achievement
to evaluate district and campus performance, which must include either:

                 (A)  the percentage of students who satisfy the Texas
Success Initiative (TSI) college readiness benchmarks prescribed by the Texas
Higher Education Coordinating Board under Section 51.3062(f) on an assessment
instrument in reading,  writing, or mathematics designated by the Texas
Higher Education Coordinating Board under Section 51.3062(c); or

                 (B)  the number of students who earn:

                         (i)  at least 12 hours of postsecondary credit
required for the foundation high school program under Section 28.025 or to
earn an endorsement under Section 28.025(c-1);

                         (ii)  at least 30 hours of postsecondary credit
required for the foundation high school program under Section 28.025 or to
earn an endorsement under Section 28.025(c-1);

                         (iii)  an associate's degree; or

(iv)  an industry certification.

(c-1)  An indicator adopted under Subsection (c) that would measure improvements in student achievement cannot negatively affect the commissioner's review of a school district or campus if that district or campus is already achieving at the highest level for that indicator.

(c-2)  The commissioner by rule shall determine a method by which a student's performance may be included in determining the performance rating of a school district or campus under Section 39.054 if, before the student graduates, the student:

(1)  satisfies the Texas Success Initiative (TSI) college readiness benchmarks prescribed by the Texas Higher Education Coordinating Board under Section 51.3062(f) on an assessment instrument designated by the Texas Higher Education Coordinating Board under Section 51.3062(c); or

(2)  performs satisfactorily on an assessment instrument under Section 39.023(c), notwithstanding Subsection (d).

(d)  For purposes of Subsection (c), the commissioner by rule shall determine the period within which a student must retake an assessment instrument for that assessment instrument to be considered in determining the performance rating of the district under Section 39.054.

(d-1)  In aggregating results of assessment instruments across grade levels by subject in accordance with Subsection (c)(1), the performance of a student enrolled below the high school level on an assessment instrument required under Section 39.023(c) is included with results relating to other students enrolled at the same grade level.

(e)  Performance on the student achievement indicators under Subsections (c)(1) and (2) shall be compared to state standards and required improvement.  The state standard shall be established by the commissioner. Required improvement is the progress necessary for the campus or district to meet state standards and, for the student achievement indicator under Subsection (c)(1), for its students to meet each of the performance standards as determined under Section 39.0241.

(f)  Annually, the commissioner shall define the state standard for the current school year for each student achievement indicator described by Subsection (c) and shall project the state standards for each indicator for the following two school years.  The commissioner shall periodically raise the state standards for the student achievement indicator described by Subsection (c)(1)(B)(i) for accreditation as necessary to reach the goals of achieving, by not later than the 2019-2020 school year:

(1)  student performance in this state, disaggregated by race, ethnicity, and socioeconomic status, that ranks nationally in the top 10 states in terms of college readiness; and

(2)  student performance, with no significant achievement gaps by race, ethnicity, and socioeconomic status.

(g)  In defining the required state standard for the indicator described by Subsection (c)(2), the commissioner may not consider as a dropout a student whose failure to attend school results from:

(1)  the student's expulsion under Section 37.007; and

(2)  as applicable:

(A)  adjudication as having engaged in delinquent conduct or conduct indicating a need for supervision, as defined by Section 51.03, Family Code; or

(B)  conviction of and sentencing for an offense under the Penal Code.

(g-1)  In computing dropout and completion rates under Subsection (c)(2), the commissioner shall exclude:

(1)  students who are ordered by a court to attend a high school equivalency certificate program but who have not yet earned a high school equivalency certificate;

(2)  students who were previously reported to the state as dropouts, including a student who is reported as a dropout, reenrolls, and drops out again, regardless of the number of times of reenrollment and dropping out;

(3)  students in attendance who are not in membership for purposes of average daily attendance;

(4)  students whose initial enrollment in a school in the United States in grades 7 through 12 was as unschooled refugees or asylees as defined by Section 39.027(a-1);

(5)  students who are in the district exclusively as a function of having been detained at a county detention facility but are otherwise not students of the district in which the facility is located; and

(6)  students who are incarcerated in state jails and federal penitentiaries as adults and as persons certified to stand trial as adults.

(h)  Each school district shall cooperate with the agency in determining whether a student is a dropout for purposes of accreditation and evaluating performance by school districts and campuses under this chapter.

(i)  The commissioner by rule shall adopt accountability measures to be used in assessing the progress of students who have failed to perform satisfactorily as determined by the commissioner under Section 39.0241(a) or under the college readiness standard as determined under Section 39.0241 in the preceding school year on an assessment instrument required under Section 39.023(a), (c), or (l).

Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.  Amended by Acts 1999, 76th Leg., ch. 510, Sec. 2, eff. Sept. 1, 1999;  Acts 1999, 76th Leg., ch. 1417, Sec. 2, eff. June 19, 1999;  Acts 2001, 77th Leg., ch. 725, Sec. 6, eff. June 13, 2001;  Acts 2001, 77th Leg., ch. 834, Sec. 11, eff. Sept. 1, 2001;  Acts 2001, 77th Leg., ch. 1420, Sec. 4.010, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 1055, Sec. 24, eff. June 20, 2003.

Amended by:

        Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

        Acts 2011, 82nd Leg., R.S., Ch. 307 (H.B. 2135), Sec. 5, eff. June 17, 2011.

        Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 42(a), eff. June 10, 2013.

        Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 43(a), eff. June 10, 2013.

        Sec. 39.054.  METHODS AND STANDARDS FOR EVALUATING PERFORMANCE.  (a) The commissioner shall adopt rules to evaluate school district and campus performance and assign each district a performance rating of A, B, C, D, or F. In adopting rules under this subsection, the commissioner shall determine the criteria for each designated letter performance rating. A district performance rating of A, B, or C reflects acceptable performance and a district performance rating of D or F reflects unacceptable performance. The commissioner shall also assign each campus a performance rating of exemplary, recognized, acceptable, or unacceptable. A campus performance rating of exemplary, recognized, or acceptable reflects acceptable performance, and a campus performance rating of unacceptable reflects unacceptable performance. A district may not receive a performance rating of A if the district includes any campus with a performance rating of unacceptable.  Not later than August 8 of each year, the performance rating of each district and campus shall be made publicly available as provided by rules adopted under this subsection. If a district or campus received a performance rating that reflected unacceptable performance for the preceding school year, the commissioner shall notify the district of a subsequent such designation on or before June 15.

        (b)  In evaluating performance, the commissioner shall evaluate against state standards and consider the performance of each campus in a school district and each open-enrollment charter school on the basis of the campus's or school's performance on the student achievement indicators adopted under Section 39.053, other than, to the greatest extent possible, the student achievement indicator adopted under Section 39.053(c)(1).

        (b-1)  Consideration of the effectiveness of district programs under Section 39.052(b)(2)(B) or (C):

(1)  must:

(A)  be based on data collected through the Public Education Information Management System (PEIMS) for purposes of accountability under this chapter; and

(B)  include the results of assessments required under Section 39.023; and

(2)  may be based on the results of a special accreditation investigation conducted under Section 39.057.

(c)  In evaluating school district and campus performance on the student achievement indicators adopted under Sections 39.053(c)(1) and (2), the commissioner shall define acceptable performance as meeting the state standard determined by the commissioner under Section 39.053(e) for the current school year based on:

(1)  student performance in the current school year; or

(2)  student performance as averaged over the current school year and the preceding two school years.

(d)  In evaluating performance under Subsection (c), the commissioner:

(1)  may assign an acceptable performance rating if the campus or district:

(A)  performs satisfactorily on 85 percent of the measures the commissioner determines appropriate with respect to the student achievement indicators adopted under Sections 39.053(c)(1) and (2); and

(B)  does not fail to perform satisfactorily on the same measure described by Paragraph (A) for two consecutive school years;

(2)  may grant an exception under this subsection to a district or campus only if the performance of the district or campus is within a certain percentage, as determined by the commissioner, of the minimum performance standard established by the commissioner for the measure of evaluation; or

(3)  may establish other performance criteria for a district or campus to obtain an exception under this subsection.

(d-1)  The commissioner may consider alternative performance criteria to Subsection (d)(1)(A) only in special circumstances, including campus or district performance on the same measure for student groups that are substantially similar in composition to all students on the same campus or district.

(e)  Each annual performance review under this section shall include an analysis of the student achievement indicators adopted under Section 39.053(c) to determine school district and campus performance in relation to:

(1)   standards established for each indicator; and

(2)   required improvement as defined under Section 39.053(e).

(f)   In the computation of dropout rates under Section 39.053(c)(2), a student who is released from a juvenile pre-adjudication secure detention facility or juvenile post-adjudication secure correctional facility and fails to enroll in school or a student who leaves a residential treatment center after receiving treatment for fewer than 85 days and fails to enroll in school may not be considered to have dropped out from the school district or campus serving the facility or center unless that district or campus is the one to which the student is regularly assigned.  The agency may not limit an appeal relating to dropout computations under this subsection.

Added by Acts 1995, 74th Leg., ch. 260, Sec. 1, eff. May 30, 1995.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 44(a), eff. June 10, 2013.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 45(a), eff. June 10, 2013.

Text of section as added by Acts 2013, 83rd Leg., R.S., Ch. 167 (S.B. 1538), Sec. 1

For text of section as added by Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 46(a), see other Sec. 39.0545.

Sec. 39.0545.  EVALUATING DROPOUT RECOVERY SCHOOLS.  (a)  For purposes of evaluating performance under Section 39.053(c), the commissioner shall designate as a dropout recovery school a school district or an open-enrollment charter school or a campus of a district or of an open-enrollment charter school:

(1)   that serves students in grades 9 through 12 and has an enrollment of which at least 50 percent of the students are 17 years of age or older as of September 1 of the school year as reported for the fall semester Public Education Information Management System (PEIMS) submission; and

(2)  that meets the eligibility requirements for and is registered under alternative education accountability procedures adopted by the commissioner.

(b)  Notwithstanding Section 39.053(c)(2), the commissioner shall use the alternative completion rate under this subsection to determine the student achievement indicator under Section 39.053(c)(2) for a dropout recovery school.  The alternative completion rate shall be the ratio of the total number of students who graduate, continue attending school into the next academic year, or receive a high school equivalency certificate to the total number of students in the longitudinal cohort of students.

(c)  Notwithstanding Section 39.053(c)(2), in determining the performance rating under Section 39.054 of a dropout recovery school, the commissioner shall include any student described by Section 39.053(g-1) who graduates or receives a high school equivalency certificate.

(d)  For a dropout recovery school, only the best result from the primary administration and any retake of an assessment instrument administered to a student in the school year evaluated under the accountability procedures adopted by the commissioner may be considered in determining the performance rating of the school under Section 39.054.


Added by Acts 2013, 83rd Leg., R.S., Ch. 167 (S.B. 1538), Sec. 1, eff. May 24, 2013.



Text of section as added by Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 46



For text of section as added by Acts 2013, 83rd Leg., R.S., Ch. 167 (S.B. 1538), Sec. 1, see other Sec. 39.0545.



Sec. 39.0545.  SCHOOL DISTRICT EVALUATION OF PERFORMANCE IN COMMUNITY AND STUDENT ENGAGEMENT; COMPLIANCE.  (a)  Each school district shall evaluate the district's performance and the performance of each campus in the district in community and student engagement and in compliance as provided by this section and assign the district and each campus a performance rating of exemplary, recognized, acceptable, or unacceptable for both overall performance and each individual evaluation factor listed under Subsection (b).  Not later than August 8 of each year, the district shall report each performance rating to the agency and make the performance ratings publicly available as provided by commissioner rule.

(b)  For purposes of assigning the performance ratings under Subsection (a), a school district must evaluate:

(1)  the following programs or specific categories of performance at each campus:

(A)  fine arts;

(B)  wellness and physical education;

(C)  community and parental involvement, such as:

(i)  opportunities for parents to assist students in preparing for assessments under Section 39.023;

(ii)  tutoring programs that support students taking assessments under Section 39.023; and

(iii)  opportunities for students to participate in community service projects;

(D)  the 21st Century Workforce Development program;

(E)  the second language acquisition program;

(F)  the digital learning environment;

(G)  dropout prevention strategies; and

(H)  educational programs for gifted and talented students; and

(2)  the record of the district and each campus regarding compliance with statutory reporting and policy requirements.

(c)  A school district shall use criteria developed by a local committee to evaluate:

(1)  the performance of the district's campus programs and categories of performance under Subsection (b)(1); and

(2)  the record of the district and each campus regarding compliance under Subsection (b)(2).

Added by Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 46(a), eff. June 10, 2013.

Sec. 39.055.  STUDENT ORDERED BY A JUVENILE COURT OR STUDENT IN RESIDENTIAL FACILITY NOT CONSIDERED FOR ACCOUNTABILITY PURPOSES. Notwithstanding any other provision of this code except to the extent

otherwise provided under Section 39.054(f), for purposes of determining the performance of a school district, campus, or open-enrollment charter school under this chapter, a student ordered by a juvenile court into a residential program or facility operated by or under contract with the Texas Juvenile Justice Department, a juvenile board, or any other governmental entity or any student who is receiving treatment in a residential facility is not considered to be a student of the school district in which the program or facility is physically located or of an open-enrollment charter school, as applicable.  The performance of such a student on an assessment instrument or other student achievement indicator adopted under Section 39.053 or reporting indicator adopted under Section 39.301 shall be determined, reported, and considered separately from the performance of students attending a school of the district in which the program or facility is physically located or an open-enrollment charter school, as applicable.


Added by Acts 2001, 77th Leg., ch. 834, Sec. 12, eff. Sept. 1, 2001.  Amended by Acts 2003, 78th Leg., ch. 201, Sec. 27, 61(1), eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 903, Sec. 1, 4, eff. Sept. 1, 2003.

Amended by:

        Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

        Acts 2013, 83rd Leg., R.S., Ch. 517 (S.B. 306), Sec. 1, eff. June 14, 2013.


        Sec. 39.056.  ON-SITE INVESTIGATIONS.  (a)  The commissioner may:

            (1)  direct the agency to conduct on-site investigations of a school district at any time to answer any questions concerning a program, including special education, required by federal law or for which the district receives federal funds; and

            (2)  as a result of the investigation, change the accreditation status of a district, change the accountability rating of a district or campus, or withdraw a distinction designation under Subchapter G.

        (b)  The commissioner shall determine the frequency of on-site investigations by the agency according to annual comprehensive analyses of student performance and equity in relation to the student achievement indicators adopted under Section 39.053.

        (c)  In making an on-site accreditation investigation, the investigators shall obtain information from administrators, teachers, and parents of students enrolled in the school district.  The investigation may not be closed until information is obtained from each of those sources.  The State Board of Education shall adopt rules for:

(1)  obtaining information from parents and using that information in the investigator's report; and

(2)  obtaining information from teachers in a manner that prevents a district or campus from screening the information.

(d)  The agency shall give written notice to the superintendent and the board of trustees of a school district of any impending investigation of the district's accreditation.

(e)  The investigators shall report orally and in writing to the board of trustees of the school district and, as appropriate, to campus administrators and shall make recommendations concerning any necessary improvements or sources of aid such as regional education service centers.

(f)  A district which takes action with regard to the recommendations provided by the investigators as prescribed by Subsection (e) shall make a reasonable effort to seek assistance from a third party in developing an action plan to improve district performance using improvement techniques that are goal oriented and research based.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 47, eff. June 10, 2013.

Sec. 39.057.  SPECIAL ACCREDITATION INVESTIGATIONS.

Text of subsection as amended by Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 48

(a)  The commissioner shall authorize special accreditation investigations to be conducted:

(1)  when excessive numbers of absences of students eligible to be tested on state assessment instruments are determined;

(2)  when excessive numbers of allowable exemptions from the required state assessment instruments are determined;

(3)  in response to complaints submitted to the agency with respect to alleged violations of civil rights or other requirements imposed on the state by federal law or court order;

(4)  in response to established compliance reviews of the district's financial accounting practices and state and federal program requirements;

(5)  when extraordinary numbers of student placements in disciplinary alternative education programs, other than placements under Sections 37.006 and 37.007, are determined;

(6)  in response to an allegation involving a conflict between members of the board of trustees or between the board and the district administration if it appears that the conflict involves a violation of a role or duty of the board members or the administration clearly defined by this code;

(7)  when excessive numbers of students in special education programs under Subchapter A, Chapter 29, are assessed through assessment instruments developed or adopted under Section 39.023(b);

(8)  in response to an allegation regarding or an analysis using a statistical method result indicating a possible violation of an assessment instrument security procedure established under Section 39.0301, including for the purpose of investigating or auditing a school district under that section;

(9)  when a significant pattern of decreased academic performance has developed as a result of the promotion in the preceding two school years of students who did not perform satisfactorily as determined by the commissioner under Section 39.0241(a) on assessment instruments administered under Section 39.023(a), (c), or (l);

(10)  when excessive numbers of students eligible to enroll fail to complete an Algebra II course or any other advanced course as determined by the commissioner;

(11)  when resource allocation practices as evaluated under Section 39.0821 indicate a potential for significant improvement in resource allocation;

(12)  when a disproportionate number of students of a particular demographic group is graduating with a particular endorsement under Section 28.025(c-1);

(13)  when an excessive number of students is graduating with a particular endorsement under Section 28.025(c-1); or

(14)  as the commissioner otherwise determines necessary.

Text of subsection as amended by Acts 2013, 83rd Leg., R.S., Ch. 509 (S.B. 123), Sec. 2

      (a)  The commissioner may authorize special accreditation investigations to be conducted:

          (1)  when excessive numbers of absences of students eligible to be tested on state assessment instruments are determined;

          (2)  when excessive numbers of allowable exemptions from the required state assessment instruments are determined;

          (3)  in response to complaints submitted to the agency with respect to alleged violations of civil rights or other requirements imposed on the state by federal law or court order;

          (4)  in response to established compliance reviews of the district's financial accounting practices and state and federal program requirements;

          (5)  when extraordinary numbers of student placements in disciplinary alternative education programs, other than placements under Sections 37.006 and 37.007, are determined;

          (6)  in response to an allegation involving a conflict between members of the board of trustees or between the board and the district administration if it appears that the conflict involves a violation of a role or duty of the board members or the administration clearly defined by this code;

          (7)  when excessive numbers of students in special education programs under Subchapter A, Chapter 29, are assessed through assessment instruments developed or adopted under Section 39.023(b);

          (8)  in response to an allegation regarding or an analysis using a statistical method result indicating a possible violation of an assessment instrument security procedure established under Section 39.0301, including for the purpose of investigating or auditing a school district under that section;

          (9)  when a significant pattern of decreased academic performance has developed as a result of the promotion in the preceding two school years of students who did not perform satisfactorily as determined by the commissioner under Section 39.0241(a) on assessment instruments administered under Section 39.023(a), (c), or (l);

          (10)  when excessive numbers of students graduate under the minimum high school program;

(11)   when excessive numbers of students eligible to enroll fail to complete an Algebra II course or any other course determined by the commissioner as distinguishing between students participating in the recommended high school program from students participating in the minimum high school program;

(12)   when resource allocation practices as evaluated under Section 39.0821 indicate a potential for significant improvement in resource allocation;

(13)   in response to a complaint submitted to the agency with respect to alleged inaccurate data that is reported through the Public Education Information Management System (PEIMS) or through other reports required by state or federal law or rule or court order and that is used by the agency to make a determination relating to public school accountability, including accreditation, under this chapter; or

(14)   as the commissioner otherwise determines necessary.

(b)   If the agency's findings in an investigation under Subsection (a)(6) indicate that the board of trustees has observed a lawfully adopted policy, the agency may not substitute its judgment for that of the board.

(c)   The commissioner may authorize special accreditation investigations to be conducted in response to repeated complaints submitted to the agency concerning imposition of excessive paperwork requirements on classroom teachers.

(d)   Based on the results of a special accreditation investigation, the commissioner may:

(1)   take appropriate action under Subchapter E;

(2)   lower the school district's accreditation status or a district's or campus's accountability rating; or

(3)   take action under both Subdivisions (1) and (2).

(e)   Regardless of whether the commissioner lowers the school district's accreditation status or a district's or campus's performance rating under Subsection (d), the commissioner may take action under Sections 39.102(a)(1) through (8) or Section 39.103 if the commissioner determines that the action is necessary to improve any area of a district's or campus's performance, including the district's financial accounting practices.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 48(a), eff. June 10, 2013.

Acts 2013, 83rd Leg., R.S., Ch. 509 (S.B. 123), Sec. 2, eff. June 14, 2013.


Sec. 39.058.  CONDUCT OF INVESTIGATIONS.  (a)  The agency shall adopt written procedures for conducting on-site investigations under this subchapter.  The agency shall make the procedures available to the complainant, the alleged violator, and the public.  Agency staff must be trained in the procedures and must follow the procedures in conducting the investigation.

(b)  After completing an investigation, the agency shall present preliminary findings to any person the agency finds has violated a law, rule, or policy.  Before issuing a report with its final findings, the agency must provide a person the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.


Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

SUBCHAPTER D.  FINANCIAL ACCOUNTABILITY


        Sec. 39.081.  DEFINITIONS.  In this subchapter:

            (1)  "Parent" includes a guardian or other person having lawful control of a student.

            (2)  "System" means a financial accountability rating system developed under this subchapter.


Amended by:

    Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.



        Sec. 39.082.  DEVELOPMENT AND IMPLEMENTATION.  (a)  The commissioner shall, in consultation with the comptroller, develop and implement separate financial accountability rating systems for school districts and open-enrollment charter schools in this state that:

            (1)  distinguish among school districts and distinguish among open-enrollment charter schools, as applicable, based on levels of financial performance;

            (2)  include procedures to:

                (A)  provide additional transparency to public education finance; and

                (B)  enable the commissioner and school district and open-enrollment charter school administrators to provide meaningful financial oversight and improvement; and

            (3)  include processes for anticipating the future financial solvency of each school district and open-enrollment charter school, including analysis of district and school revenues and expenditures for preceding school years.

        (b)  The system must include uniform indicators adopted by commissioner rule by which to measure the financial management performance and future financial solvency of a district or open-enrollment charter school.  In adopting indicators under this subsection, the commissioner shall assign a point value to each indicator to be used in a scoring matrix developed by the commissioner.  Any reference to a teacher in an indicator adopted by the commissioner under this subsection means a classroom teacher.

# Tab H

(c) The system may not include an indicator under Subsection (b) or any other performance measure that:

(1) requires a school district to spend at least 65 percent or any other specified percentage of district operating funds for instructional purposes; or

(2) lowers the financial management performance rating of a school district for failure to spend at least 65 percent or any other specified percentage of district operating funds for instructional purposes.

(d) The commissioner shall evaluate indicators adopted under Subsection (b) at least once every three years.

(e) Under the financial accountability rating system developed under this section, each school district or open-enrollment charter school, as applicable, shall be assigned a financial accountability rating. In adopting rules under this section, the commissioner, in consultation with the comptroller, shall determine the criteria for each designated performance rating.

(f) A district or open-enrollment charter school shall receive the lowest rating under the system if the district or school fails to achieve a satisfactory rating on:

(1) an indicator adopted under Subsection (b) relating to financial management or solvency that the commissioner determines to be critical; or

(2) a category of indicators that suggest trends leading to financial distress as determined by the commissioner.

(g) Before assigning a final rating under the system, the commissioner shall assign each district or open-enrollment charter school a preliminary rating. A district or school may submit additional information to the commissioner relating to any indicator on which performance was considered unsatisfactory. The commissioner shall consider any additional information submitted by a district or school before assigning a final rating. If the commissioner determines that the additional information negates the concern raised by the indicator on which performance was considered unsatisfactory, the commissioner may not penalize the district or school on the basis of the indicator.

(h) The commissioner shall adopt rules for the implementation of this section.

(h-1) The commissioner shall adopt initial rules necessary to implement the changes to this section made by the 83rd Legislature, Regular Session, 2013, not later than March 1, 2015. This subsection expires April 1, 2015.

(i) Not later than August 8 of each year, the financial accountability rating of each school district and open-enrollment charter school under the financial accountability rating system developed under this

section shall be made publicly available as provided by rules adopted under this section.


Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 49(a), eff. June 10, 2013.



Sec. 39.0821.  COMPTROLLER REVIEW OF RESOURCE ALLOCATION PRACTICES. (a)  The comptroller shall identify school districts and campuses that use resource allocation practices that contribute to high academic achievement and cost-effective operations.  In identifying districts and campuses under this section, the comptroller shall:

(1)  evaluate existing academic accountability and financial data by integrating the data;

(2)  rank the results of the evaluation under Subdivision (1) to identify the relative performance of districts and campuses; and

(3)  identify potential areas for district and campus improvement.

(b)  In reviewing resources allocation practices of districts and campuses under this section, the comptroller shall ensure resources are being used for the instruction of students by evaluating:

(1)  the operating cost for each student;

(2)  the operating cost for each program; and

(3)  the staffing cost for each student.


Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Sec. 39.0823.  PROJECTED DEFICIT.  (a)  If the commissioner, based on the indicators adopted under Section 39.082 or other relevant information, projects a deficit for a school district or open-enrollment charter school general fund within the following three school years, the agency shall provide the district or school interim financial reports, including projected revenues and expenditures, to evaluate the current budget status of the district or school.

(b)  Repealed by Acts 2013, 83rd Leg., R.S., Ch. 211, Sec. 78(b)(5), eff. September 1, 2014.

(c)  Repealed by Acts 2013, 83rd Leg., R.S., Ch. 211, Sec. 78(b)(5), eff. September 1, 2014.

(d)  The agency may require a district or open-enrollment charter school to submit additional information needed to produce a financial report under Subsection (a).  If a district or school fails to provide information requested under this subsection or if the commissioner determines that the information submitted by a district or school is unreliable, the commissioner may order the district or school to acquire professional services as provided by Section 39.109.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 50(a), eff. June 10, 2013.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 78(b)(5), eff. September 1, 2014.

Sec. 39.0824.  CORRECTIVE ACTION PLAN.  (a)  A school district or open-enrollment charter school assigned the lowest rating under Section 39.082 shall submit to the commissioner a corrective action plan to address the financial weaknesses of the district or school.  A corrective action plan must identify the specific areas of financial weaknesses, such as financial weaknesses in transportation, curriculum, or teacher development, and include strategies for improvement.

(b)  The commissioner may impose appropriate sanctions under Subchapter E against a district or school failing to submit or implement a corrective action plan required under Subsection (a).

Added by Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 51(a), eff. June 10, 2013.

Sec. 39.083.  REPORTING.  (a)  The commissioner shall develop, as part of the system, a reporting procedure under which:

(1)  each school district is required to prepare and distribute an annual financial management report; and

(2)  the public is provided an opportunity to comment on the report at a hearing.

(b)  The annual financial management report must include:

(1)  a description of the district's financial management performance based on a comparison, provided by the agency, of the district's performance on the indicators adopted under Section 39.082(b) to:

(A)  state-established standards; and

(B)  the district's previous performance on the indicators; and

(2)  any descriptive information required by the commissioner.

(c)  The report may include:

(1)  information concerning the district's:

(A)  financial allocations;

(B)  tax collections;

(C)  financial strength;

(D)  operating cost management;

(E)  personnel management;

(F)  debt management;

(G)  facility acquisition and construction management;

(H)  cash management;

(I)  budgetary planning;

(J)  overall business management;

(K)  compliance with rules; and

(L)  data quality; and

(2)  any other information the board of trustees determines to be necessary or useful.

(d)  The board of trustees of each school district shall hold a public hearing on the report.  The board shall give notice of the hearing to owners of real property in the district and to parents of district students.  In addition to other notice required by law, notice of the hearing must be provided:

(1)  to a newspaper of general circulation in the district; and

(2)  through electronic mail to media serving the district.

(e)  After the hearing, the report shall be disseminated in the district in the manner prescribed by the commissioner.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 211 (H.B. 5), Sec. 52(a), eff. June 10, 2013.

Sec. 39.084.  POSTING OF ADOPTED BUDGET.  (a)  On final approval of the budget by the board of trustees, the school district shall post on the district's Internet website a copy of the budget adopted by the board of trustees.  The district's Internet website must prominently display the electronic link to the adopted budget.

(b)  The district shall maintain the adopted budget on the district's Internet website until the third anniversary of the date the budget was adopted.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Sec. 39.085.  RULES.  The commissioner shall adopt rules as necessary for the implementation and administration of this subchapter.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 895 (H.B. 3), Sec. 59, eff. June 19, 2009.

Sec. 39.086.  SOFTWARE STANDARDS.  (a)  The Department of Information Resources, in cooperation with the commissioner, shall adopt performance and interoperability standards for software used by school districts for financial accounting or attendance reporting.

(b)  Standards adopted under this section must ensure that the software will enable a school district to share and report information in a timely manner for purposes of financial management, operational decision-making, and transparency of district operations to the public.

(c)  The Department of Information Resources:

(1)  shall include compliance with standards adopted under this section as a requirement in any solicitation for software anticipated to be used for a purpose described by Subsection (a);

(2)  shall require a vendor awarded a contract in response to a solicitation described by Subdivision (1) to certify that the software complies with the standards adopted under this section; and

(3)  may negotiate state contract pricing for software that complies with the standards adopted under this section.

Added by Acts 2009, 81st Leg., R.S., Ch. 393 (H.B. 1705), Sec. 2.06, eff. September 1, 2009.

Transferred and redesignated from Education Code, Section 39.205 by Acts 2011, 82nd Leg., R.S., Ch. 91 (S.B. 1303), Sec. 27.001(6), eff. September 1, 2011.

<u><<Back</u>   # Historical Rule for the Texas Administrative Code

TITLE 19            EDUCATION
PART 2             TEXAS EDUCATION AGENCY
CHAPTER 97         PLANNING AND ACCOUNTABILITY
SUBCHAPTER AA      ACCOUNTABILITY AND PERFORMANCE MONITORING
RULE §97.1001      Accountability Rating System

(a) The rating standards established by the commissioner of education under Texas Education Code (TEC), §§39.052(a) and (b)(1)(A); 39.053, 39.054, 39.201, and 39.203(a) and (c)(1), as those sections existed before amendment by House Bill 5, 83rd Texas Legislature, Regular Session, 2013; §39.055, as that section existed before amendment by Senate Bill 306, 83rd Texas Legislature, Regular Session, 2013; §39.116; and §29.081(e), shall be used to evaluate the performance of districts, campuses, and charter schools. The indicators, standards, and procedures used to determine ratings will be annually published in official Texas Education Agency publications. These publications will be widely disseminated and cover the following procedures:

(1) indicators, standards, and procedures used to determine district ratings;

(2) indicators, standards, and procedures used to determine campus ratings;

(3) indicators, standards, and procedures used to determine Distinction Designations; and

(4) procedures for submitting a rating appeal.

(b) The procedures by which districts, campuses, and charter schools are rated and acknowledged for 2013 are based upon specific criteria and calculations, which are described in excerpted sections of the *2013 Accountability Manual* provided in this subsection.

Attached Graphic

(c) Ratings may be revised as a result of investigative activities by the commissioner as authorized under TEC, §39.056 and §39.057.

(d) The specific criteria and calculations used in the accountability manual are established annually by the commissioner of education and communicated to all school districts and charter schools.

(e) The specific criteria and calculations used in the annual accountability manual adopted for school years prior to 2013-2014 remain in effect for all purposes, including accountability, data standards, and audits, with respect to those school years.

**Source Note:** The provisions of this §97.1001 adopted to be effective June 13, 2000, 25 TexReg 5625; amended to be effective October 3, 2005, 30 TexReg 6265; amended to be effective July 30, 2006, 31 TexReg 5800; amended to be effective July 26, 2007, 32 TexReg 4549; amended to be effective July 31, 2008, 33 TexReg 5923; amended to be effective July 22, 2009, 34 TexReg 4734; amended to be effective July 26, 2010, 35 TexReg 6522; amended to be effective July 28, 2011, 36 TexReg 4657; amended to be effective August 7, 2013, 38 TexReg 4891

# Texas Administrative Code

| | |
|---|---|
| TITLE 19 | EDUCATION |
| PART 2 | TEXAS EDUCATION AGENCY |
| CHAPTER 109 | BUDGETING, ACCOUNTING, AND AUDITING |
| SUBCHAPTER AA | COMMISSIONER'S RULES CONCERNING FINANCIAL ACCOUNTABILITY |
| DIVISION 1 | FINANCIAL ACCOUNTABILITY RATING SYSTEM |
| RULE §109.1002 | Financial Accountability Ratings |

Historical                                                                 Texas Register

(a) In accordance with Texas Education Code (TEC), Chapter 39, Subchapter D, each school district and open-enrollment charter school must be assigned a financial accountability rating by the Texas Education Agency (TEA). The specific procedures for determining financial accountability ratings will be established annually by the commissioner of education and communicated to all school districts and open-enrollment charter schools.

(b) For fiscal years 2002-2003, 2003-2004, 2004-2005, and 2005-2006, each financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "School FIRST - Rating Worksheet," effective May 2003.

Attached Graphic

(c) For fiscal years 2006-2007 and 2007-2008, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "School FIRST - Rating Worksheet Effective August 2006." On this form, Indicator 13 entitled, "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 65%?" was phased in over a three-year period, as follows.

Attached Graphic

  (1) For fiscal year 2006-2007, the indicator was "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 55%?"

  (2) For fiscal year 2007-2008, the indicator was "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 60%?"

  (3) For fiscal year 2008-2009 and beyond, the indicator was repealed.

(d) For fiscal years 2008-2009 and 2009-2010, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "School FIRST - Rating Worksheet Dated March 2010."

Attached Graphic

**Tab J**

(e) For fiscal years 2008-2009 and 2009-2010, the financial accountability rating of an open-enrollment charter school is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "Charter School - School FIRST - Rating Worksheet Dated March 2010."

Attached Graphic

(f) Beginning with fiscal year 2010-2011, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "School FIRST - Rating Worksheet Dated October 2011."

Attached Graphic

(g) Beginning with fiscal year 2010-2011, the financial accountability rating of an open-enrollment charter school is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner of education in the financial accountability rating form provided in this subsection entitled "School FIRST for Charter Schools - Rating Worksheet Dated October 2011."

Attached Graphic

(h) A financial accountability rating by a voluntary association is a local option of the district or open-enrollment charter school, but it does not substitute for a financial accountability rating by the TEA.

(i) The TEA will issue a preliminary financial accountability rating to a school district or open-enrollment charter school within 150 days of its complete financial data being made available to the TEA staff. The financial accountability rating for a particular year will always be based on complete and audited financial data from the previous fiscal year given the availability of the data. For example, the final 2010 School FIRST rating issued in August 2010 is based on complete and audited financial data for the 2008-2009 fiscal year and is the financial accountability rating for the 2009-2010 school year for the purposes of §97.1055 of this title (relating to Accreditation Status).

(1) The issuance of the preliminary or final rating will not be delayed if a district or open-enrollment charter school fails to meet the statutory deadline for submitting the annual financial and compliance report. Instead, a rating of Suspended-Data Quality under §109.1003(a)(5) of this title (relating to Types of Financial Accountability Ratings) will be issued.

(2) A district or open-enrollment charter school may submit a written appeal requesting that the TEA review a preliminary rating if the preliminary rating was based on a data error solely attributable to the TEA's review of the data for any of the indicators.

(A) The TEA office responsible for financial audits must receive the appeal no later than 30 days after the TEA's release of the preliminary rating, and the appeal must include substantial evidence that supports the district's or open-enrollment charter school's position.

(i) Only appeals that would result in a change of the preliminary rating will be considered.

(ii) The TEA staff will review information submitted by the district or open-enrollment charter

school to validate the statements made to the extent possible. The TEA will examine all relevant data.

    (iii) The TEA staff will prepare a recommendation and forward it to an external panel for review. This review panel will provide independent oversight to the appeals process.

    (iv) The external review panel will examine the appeal, supporting documentation, staff research, and the staff recommendation. The review panel will determine its recommendation.

    (v) The external review panel's recommendation will be forwarded to the commissioner.

    (vi) The commissioner will make a final decision in accordance with the timeline specified in subparagraph (E) of this paragraph.

    (B) Appeals received 31 days or more after the TEA issues a preliminary rating will not be considered.

    (C) Errors by a district or open-enrollment charter school in recording data or submitting data through the TEA data collection and reporting system do not constitute a valid basis for appealing a preliminary rating.

    (D) A district that is the fiscal agent for a shared services arrangement (SSA) and has the staff of the SSA on its payroll may appeal the two indicators related to student-to-teacher and student-to-staff ratios if it fails these indicators due to the number of staff that are SSA staff. The district must provide the TEA with the number of staff that are employees of the district and the number of staff that are part of the SSA. This adjustment should not be a factor for an open-enrollment charter school that is a fiscal agent since the SSA reporting requirements are different than a school district.

    (E) If the TEA receives an appeal of a preliminary rating, a final rating will be issued to the school district or open-enrollment charter school no later than 45 days after the appeal has been received by the TEA.

    (F) If the TEA does not receive an appeal of a preliminary rating, the preliminary rating automatically becomes a final rating on the 31st day after issuance of the preliminary rating.

    (G) A final rating issued by the TEA pursuant to this section may not be appealed under the TEC, §7.057, or any other law or rule.

---

**Source Note:** The provisions of this §109.1002 adopted to be effective October 20, 2002, 27 TexReg 9572; amended to be effective May 7, 2003, 28 TexReg 3720; amended to be effective August 13, 2006, 31 TexReg 6215; amended to be effective July 2, 2007, 32 TexReg 3988; amended to be effective May 31, 2010, 35 TexReg 4398; amended to be effective February 3, 2011, 36 TexReg 414; amended to be effective October 18, 2011, 36 TexReg 6941



**Texas Administrative Code**

TITLE 19          EDUCATION
PART 2            TEXAS EDUCATION AGENCY
CHAPTER 109       BUDGETING, ACCOUNTING, AND AUDITING
SUBCHAPTER AA     COMMISSIONER'S RULES CONCERNING FINANCIAL
                  ACCOUNTABILITY
DIVISION 1        FINANCIAL ACCOUNTABILITY RATING SYSTEM
RULE §109.1002    Financial Accountability Ratings
Repealed Date:    **08/06/2015**

Historical                                              Texas Register

(a) In accordance with the Texas Education Code (TEC), Chapter 39, Subchapter D, each school district and open-enrollment charter school must be assigned a financial accountability rating by the Texas Education Agency (TEA). The specific procedures for determining financial accountability ratings will be established annually by the commissioner of education and communicated to all school districts and open-enrollment charter schools.

(b) For fiscal years 2002-2003, 2003-2004, 2004-2005, and 2005-2006, each financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "School FIRST - Rating Worksheet," effective May 2003.

Attached Graphic

(c) For fiscal years 2006-2007 and 2007-2008, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "School FIRST - Rating Worksheet Effective August 2006." On this form, Indicator 13, "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 65%?, " was phased in over a three-year period, as follows.

Attached Graphic

  (1) For fiscal year 2006-2007, the indicator was "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 55%?"

  (2) For fiscal year 2007-2008, the indicator was "Was The Percent Of Operating Expenditures Expended For Instruction More Than or Equal to 60%?"

  (3) For fiscal year 2008-2009 and beyond, the indicator was repealed.

(d) For fiscal years 2008-2009 and 2009-2010, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "School FIRST - Rating Worksheet Dated March 2010."

Attached Graphic

**Tab K**

(e) For fiscal years 2008-2009 and 2009-2010, the financial accountability rating of an open-enrollment charter school is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "Charter School - School FIRST - Rating Worksheet Dated March 2010."

Attached Graphic

(f) Beginning with fiscal year 2010-2011, the financial accountability rating of a school district is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "School FIRST - Rating Worksheet Dated October 2013."

Attached Graphic

(1) A school district that received a 2012 School Financial Integrity Rating System of Texas (FIRST) rating of substandard achievement, related to its 2010-2011 fiscal year financial data, based on the financial accountability rating form that was provided as a figure in this subsection as it existed October 18, 2011, may request that the TEA recalculate its 2012 School FIRST rating based on the financial accountability rating form that is currently provided as a figure in this subsection. The deadline for submitting a request is December 15, 2013, and the TEA will disregard any request received after that date.

(2) On receiving a request, the TEA will recalculate the school district's 2012 School FIRST rating and provide the district written notice of its recalculated rating. The TEA will consider the recalculated rating as the school district's final 2012 School FIRST rating, and a school district may not appeal a recalculated rating issued under this paragraph. This paragraph and paragraph (1) of this subsection expire March 1, 2014.

(g) Beginning with fiscal year 2010-2011, the financial accountability rating of an open-enrollment charter school is based on its overall performance on certain financial measurements, ratios, and other indicators established by the commissioner in the financial accountability rating form provided in this subsection, entitled "School FIRST for Charter Schools - Rating Worksheet Dated October 2013."

Attached Graphic

(1) An open-enrollment charter school that received a 2012 School FIRST for Charter Schools rating of substandard achievement, related to its 2010-2011 fiscal year financial data, based on the financial accountability rating form that was provided as a figure in this subsection as it existed October 18, 2011, may request that the TEA recalculate its 2012 School FIRST rating based on the financial accountability rating form that is currently provided as a figure in this subsection. The deadline for submitting a request is December 15, 2013, and the TEA will disregard any request received after that date.

(2) On receiving a request, the TEA will recalculate the charter school's 2012 School FIRST rating and provide the charter school written notice of its recalculated rating. The TEA will consider the recalculated rating as the charter school's final 2012 School FIRST rating, and a charter school may not appeal a recalculated rating issued under this paragraph. This paragraph and paragraph (1) of this subsection expire March 1, 2014.

(h) A financial accountability rating by a voluntary association is a local option of the district or open-

enrollment charter school, but it does not substitute for a financial accountability rating by the TEA.

(i) The TEA will issue a preliminary financial accountability rating to a school district or open-enrollment charter school within 150 days of its complete financial data being made available to TEA staff. The financial accountability rating for a particular year will always be based on complete and audited financial data from the previous fiscal year given the availability of the data. For example, the final 2010 School FIRST rating issued in August 2010 is based on complete and audited financial data for the 2008-2009 fiscal year and is the financial accountability rating for the 2009-2010 school year for the purposes of §97.1055 of this title (relating to Accreditation Status).

(1) The issuance of the preliminary or final rating will not be delayed if a district or open-enrollment charter school fails to meet the statutory deadline for submitting the annual financial and compliance report. Instead, a rating of Suspended-Data Quality under §109.1003(a)(5) of this title (relating to Types of Financial Accountability Ratings) will be issued.

(2) A district or open-enrollment charter school may submit a written appeal requesting that the TEA review a preliminary rating if the preliminary rating was based on a data error solely attributable to the TEA's review of the data for any of the indicators.

(A) The TEA office responsible for financial accountability must receive the appeal no later than 30 days after the TEA's release of the preliminary rating, and the appeal must include substantial evidence that supports the district's or open-enrollment charter school's position.

(i) Only appeals that would result in a change of the preliminary rating will be considered.

(ii) TEA staff will review information submitted by the district or open-enrollment charter school to validate the statements made to the extent possible. The TEA will examine all relevant data.

(iii) TEA staff will prepare a recommendation and forward it to an external panel for review. This review panel will provide independent oversight to the appeals process.

(iv) The external review panel will examine the appeal, supporting documentation, staff research, and the staff recommendation. The review panel will determine its recommendation.

(v) The external review panel's recommendation will be forwarded to the commissioner.

(vi) The commissioner will make a final decision in accordance with the timeline specified in subparagraph (E) of this paragraph.

(B) Appeals received 31 days or more after the TEA issues a preliminary rating will not be considered.

(C) Errors by a district or open-enrollment charter school in recording data or submitting data through the TEA data collection and reporting system do not constitute a valid basis for appealing a preliminary rating.

(D) A district that is the fiscal agent for a shared services arrangement (SSA) and has the staff of the SSA on its payroll may appeal the two indicators related to student-to-teacher and student-to-staff ratios if it fails these indicators because of the number of staff that are SSA staff. The district must provide the TEA with the number of staff that are employees of the district and the number of staff that are part

of the SSA. This adjustment should not be a factor for an open-enrollment charter school that is a fiscal agent since the SSA reporting requirements are different from those for a school district.

(E) If the TEA receives an appeal of a preliminary rating, the TEA will issue a final rating to the school district or open-enrollment charter school no later than 45 days after receiving the appeal.

(F) If the TEA does not receive an appeal of a preliminary rating, the preliminary rating automatically becomes a final rating on the 31st day after issuance of the preliminary rating.

(G) A final rating issued by the TEA pursuant to this section may not be appealed under the TEC, §7.057, or any other law or rule.

**Source Note:** The provisions of this §109.1002 adopted to be effective October 20, 2002, 27 TexReg 9572; amended to be effective May 7, 2003, 28 TexReg 3720; amended to be effective August 13, 2006, 31 TexReg 6215; amended to be effective July 2, 2007, 32 TexReg 3988; amended to be effective May 31, 2010, 35 TexReg 4398; amended to be effective February 3, 2011, 36 TexReg 414; amended to be effective October 18, 2011, 36 TexReg 6941; amended to be effective October 3, 2013, 38 TexReg 6589

Next Page    Previous Page

Re-Query TAC Database    Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS